**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)
Joseph A. Kanefield (No. 15838)
Brunn W. Roysden III (No. 28698)
Drew C. Ensign (No. 25463)
Anthony R. Napolitano (No. 34586)
Robert Makar (No. 33579)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Joe.Kanefield@azag.gov
Beau.Roysden@azag.gov
Anthony.Napolitano@azag.gov
Drew.Ensign@azag.gov
Robert.Makar@azag.gov
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| STATE OF ARIZONA and MARK BRNOVICH, in his official capacity as Attorney General of Arizona,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, in his official capacity as Secretary of Homeland Security; TROY MILLER, in his official capacity as Acting Commissioner of United States Customs and Border Protection; TAE JOHNSON, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; and TRACY RENAUD, in her official capacity as Acting Director of U.S. Citizenship and Immigration Services,<br><br>Defendants. | No._____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1. This is a suit to enforce bedrock requirements of immigration and administrative law, as well as binding commitments made by the U.S. Department of Homeland Security ("DHS") to Arizona's law enforcement community, through its Attorney General.

2. On January 20, 2021, DHS's Acting Secretary announced a policy that flouts entire swaths of immigration law for 100 days. Exhibit A. Specifically, Defendants intend to halt nearly all deportations during that time, including all or nearly all deportations of unauthorized aliens not lawfully present in Arizona. As long as those unauthorized aliens have not committed crimes related to terrorism and espionage, they are not subject to deportation under this policy.[1] And because DHS detention capacity is limited, on information and belief, a necessary consequence of DHS's policy is that individuals will be released into Arizona communities. On information and belief, DHS has already admitted that some aliens were released in the very first days of the 100-day moratorium.

3. Arizona, as a border state, will be directly impacted by Defendants' decision to flout their legal obligations. Arizona's law enforcement community is particularly concerned that aliens who have been charged or convicted of crimes will be released as a result of DHS's 100-day moratorium. Moreover, Arizona's law enforcement community is particularly concerned that releasing individuals during the

---

[1] While the DHS has created a limited exception for aliens for whom "removal is required by law," that requires an "individualized determination" by the Acting Director of ICE following consultation with the General Counsel, which is unlikely to encompass more than a very small group of people. Also, while the memorandum also provides an exception (at 4 n.2) for "voluntary waiver," which it states "encompasses noncitizens who stipulate to removal as part of a criminal disposition," that would not apply to aliens who refuse to stipulate to removal. The fact that DHS has not included serious violent crimes within the express exceptions to its policies indicates that DHS has not excluded unauthorized aliens that have committed such crimes from its 100-day moratorium.

COVID-19 pandemic will further stress hospitals and social services at the local and county level.

4.      Federal law on this issue is clear: "[W]hen an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days."  8 U.S.C. § 1231(a) (emphasis added).  But, in Defendants' view, "shall" does not really mean "shall" or "must," but instead merely "may."  In other words, despite a clear mandate of federal statutory law, Defendants believe that there are literally no constraints whatsoever on their authority, and they may release individuals, including those charged with or convicted of crimes, even when immigration courts have already ordered their removal from the United States.

5.      A federal court in Texas has already considered similar claims brought by the State of Texas.  *See Texas v. United States*, Case No. 6:21-cv-00003 (S.D. Tex., filed January 22, 2021).  That court concluded that Defendants likely violated applicable legal requirements and entered a 14-day nationwide temporary restraining order on January 26, 2021. Dkt. No. 21, __ F. Supp. 3d. ___, 2021 WL 247877 (S.D. Tex. Jan. 26, 2021), attached as Exhibit B.  This suit raises many of the same claims asserted by Texas, including those that the Southern District of Texas concluded are likely meritorious. *Id.* at *3-*5.

6.      This challenged policy is called the "Immediate 100-Day Pause on Removals" by DHS, which was promulgated by the "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities" memorandum issued January 20, 2021 by Acting Secretary Pekoske (the "Memorandum"), attached as Exhibit A.

7.      Although the moratorium is purportedly for 100 days, no apparent limiting factor is explained: if this action is permitted to stand, DHS could re-assert this suspension power for a longer period or even indefinitely, thus allowing the current

Administration to unilaterally amend the immigration laws as applied to the vast majority of the removable or inadmissible aliens in this country without the required congressional act. The Constitution and controlling statutes prevent such a seismic change to this country's immigration laws by mere memorandum.

**PARTIES**

8. Plaintiff State of Arizona is a sovereign state of the United States of America represented by Arizona Attorney General Mark Brnovich. The Attorney General is the chief legal officer of the State of Arizona, and has the authority to represent the State in federal court.

9. Mark Brnovich is the Attorney General of Arizona. He directs and controls the Arizona Attorney General's Office and Arizona Department of Law, which are parties to the "Agreement Between the Department of Homeland Security and the Arizona Attorney General's Office and the Arizona Department of Law" effective January 8, 2021 (the "Agreement"), attached as Exhibit C.

10. Defendant United States Department of Homeland Security is a federal agency.

11. Defendant the United States of America is sued under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346.

12. Defendant Alejandro Mayorkas is the Secretary of Homeland Security and therefore the "head" of DHS with "direction, authority, and control over it." 6 U.S.C. § 112(a)(2). Defendant Mayorkas is sued in his official capacity.

13. Defendant Troy Miller serves as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection. Defendant Miller is sued in his official capacity.

14. Defendant Tae Johnson serves as Deputy Director and Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement. Defendant Johnson is sued in his official capacity.

15. Defendant Tracy Renaud serves as the Senior Official Performing the Duties of the Director for U.S. Citizenship and Immigration Services. Defendant Renaud is sued in her official capacity.

**JURISDICTION AND VENUE**

16. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361, as well as 5 U.S.C. §§ 702-703.

17. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

18. Venue is proper within this federal district pursuant to 28 U.S.C. § 1391(e) because (1) Plaintiffs reside in Arizona and no real property is involved and (2) a "substantial part of the events and omissions giving rise to the claim occurred" in this District—*i.e.*, the non-deportation of aliens and consequent release into Arizona communities.

**FACTUAL AND LEGAL BACKGROUND**

**The Impact of Immigration on Arizona and DHS's Agreement**

**With Arizona Law Enforcement Agencies**

19. As a border state, Arizona is acutely affected by modifications in federal policy regarding immigration. Arizona is required to expend its scarce resources when DHS fails to carry out its statutory duty to deport aliens as provided by law. This includes resources expended by Arizona's law enforcement community.

20. In light of this state of affairs, the Arizona Attorney General's Office and Arizona Department of Law, agencies of the State of Arizona, through Attorney General Mark Brnovich, entered into the Agreement with DHS. Ex. C.

21. DHS recognized in the Agreement that Plaintiffs are "directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact [Plaintiff]'s law enforcement needs and budgets ... [and] other important health, safety, and pecuniary interests of the State of Arizona." Ex. C at 1.

22. DHS specifically recognized that "a decrease or pause on ... removals of removable or inadmissible aliens" "result[s] in direct and concrete injuries to [Plaintiff]." Ex. C at 2.

23. Plaintiff committed to "provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, national security, and other law enforcement missions in exchange for DHS's commitment to consult [Plaintiff] and consider its views before taking any action ... that could: ... pause or decrease the number of returns or removals of removal or inadmissible aliens from the country." Ex. C at 2.

24. Specifically, DHS is to "[p]rovide [Plaintiff] with 180 days' written notice ... of the proposed action and an opportunity to consult and comment on the proposed action, before taking any such action." Ex. C at 4.

25. In the event of doubt, the Agreement commits DHS to "err on the side of consulting with" Plaintiff. Ex. C at 4.

26. The Agreement specifically entitles its parties to injunctive relief "if the parties fail to comply with any of the obligations ... imposed" by the Agreement. Ex. C at 5.

27. On January 20, 2021, Acting Secretary Pekoske issued the Memorandum, purporting to institute an "Immediate 100-Day Pause on Removals." Ex. A at 3.

28. The Memorandum establishes a "Comprehensive Review of Enforcement Policies and Priorities" to be conducted within 100 days from the date of the Memorandum. Ex. A at 2.

29. During, and "pending the completion of the review set forth," Acting Secretary Pekoske "direct[s] an immediate pause on removals of any noncitizen with a final order of removal ... for 100 days to go into effect as soon as practical and no later than January 22, 2021." Ex. A at 3.

30. "The pause on removals applies to any noncitizen present in the United States when this directive takes effect with a final order of removal except one who: ... has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or" was not "physically present" or voluntarily waived "any rights to remain," or "[f]or whom the Acting Director of ICE ... makes an individualized determination that removal is required by law." Ex. A at 3-4.

**DHS's Refusal to Even Consult with Arizona Law Enforcement Notwithstanding its Agreement**

31. Defendant DHS did not consult with Plaintiffs prior to the Memorandum, nor did it provide 180 days written notice of the policies embodied in the Memorandum.

32. Plaintiff Mark Brnovich wrote Acting Secretary Pekoske on January 26, 2021, requesting that DHS comply with the Agreement before instituting the policy change described in the Memorandum. Exhibit D.

33. After the Arizona Attorney General's Office received no response, the Chief Deputy Attorney General sent a follow-up email on February 1, 2021, on behalf of Attorney General Brnovich, reiterating the request to at least participate in the consultative process agreed to by the parties before DHS change immigration enforcement in Arizona. Exhibit E.

34. On February 2, 2021, the Attorney General's Office received a response signed by Acting Secretary Pekoske completely refusing to engage in any consultative process, provide any further reasoning as to why DHS adopted the 100-day pause, and instead instructing the Arizona Attorney General to "direct any further correspondence concerning the [Agreement] to the Department of Justice." Exhibit F.

## CLAIMS FOR RELIEF

## COUNT I

### Failure To Provide Notice And Consult Per The Agreement

35. The allegations in the preceding paragraphs are reincorporated herein.

36. The Memorandum was promulgated without providing notice to or consulting with Plaintiffs, as required by the Agreement. Ex. C at 3-4.

37. Thus, the Memorandum is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedures Act ("APA"). 5 U.S.C. § 706(2)(A).

38. Thus, the Memorandum was issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

39. Due to the Memorandum, Plaintiffs "will be irreparably damaged and will not have an adequate remedy at law" and are thus also "entitled to injunctive relief." Ex. C at 5.

## COUNT II

### Violation Of 8 U.S.C. § 1231

40. The allegations in the preceding paragraphs are reincorporated herein.

41. The Memorandum pauses the operation of the vast majority of extant removal orders for 100 days.

42. Federal statute requires "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A).

43. Each removal order affected by, and not individually exempted from, the "pause" is incapable of being fulfilled within the required statutory period.

44. 8 U.S.C. § 1231 does not empower Defendants to alter the 90-day deadline, and compliance with the deadline may only be excused based on malfeasance by the alien. *See* 8 U.S.C. § 1231(a)(1)(C).

45. The Memorandum therefore violates the APA, as it is both "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

## COUNT III

### Failure To Follow Notice And Comment

46. The allegations in the preceding paragraphs are reincorporated herein.

47. The Memorandum is a rule obligated to follow notice-and-comment rulemaking under the APA. 5 U.S.C. § 553.

48. The Memorandum is not an interpretive rule, a general statement of policy, nor is it a rule of agency organization, procedure, or practice otherwise exempt from notice-and-comment rulemaking.

49. Thus, the Memorandum must be "held unlawful and set aside" as it was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT IV

### Arbitrary and Capricious Agency Action

50. The allegations in the preceding paragraphs are reincorporated herein.

51. APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

52. The Memorandum represents a sharp departure from DHS's previous policy. Because Defendants have not provided a reasoned justification for their sudden change in policy, the issuance of the Memorandum is arbitrary and capricious.

53. There is no indication that Defendants considered the costs of adopting the Memorandum, including the threats to public safety. This failure renders the resulting agency action arbitrary and capricious.

54. There is also no indication that Defendants considered alternative approaches that would allow at least some additional removals to continue beyond the extremely limited exceptions in the Memorandum. This would include aliens charged or convicted of crimes. The Supreme Court recently held that a DHS immigration action was arbitrary and capricious where it was issued "'without any consideration whatsoever' of a [more limited] policy." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)). The same result should obtain here.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment:

A. Declaring that the Memorandum was issued in violation of the Agreement;

B. Declaring that the Memorandum was issued in violation of 8 U.S.C. § 1231;

C. Declaring that the Memorandum was issued without observance of procedure required by law;

D. Postponing the effective date of the Memorandum pursuant to 5 § U.S.C. 705.

E. Vacating the Memorandum and enjoining Defendants from applying it;

F.   Awarding Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

G.   Granting any and all other such relief as the Court finds appropriate.

RESPECTFULLY SUBMITTED this _3rd_ day of February, 2021

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By /s/ *Brunn W. Roysden III*
    Joseph A. Kanefield (No. 15838)
    Brunn W. Roysden III (No. 28698)
    Drew C. Ensign (No. 25463)
    Anthony R. Napolitano (No. 34586)
    Robert J. Makar (No. 33579)
      *Assistant Attorneys General*

*Attorneys for Plaintiffs*