# Exhibit A



*Secretary*
**U.S. Department of Homeland Security**
**Washington, DC 20528**

January 20, 2021

MEMORANDUM FOR:    Troy Miller
                        Senior Official Performing the Duties of the Commissioner
                        U.S. Customs and Border Protection

                        Tae Johnson
                        Acting Director
                        U.S. Immigration and Customs Enforcement

                        Tracey Renaud
                        Senior Official Performing the Duties of the Director
                        U.S. Citizenship and Immigration Services

CC:                      Karen Olick
                        Chief of Staff

FROM:                 David Pekoske
                        Acting Secretary

SUBJECT:            **Review of and Interim Revision to Civil Immigration**
                        **Enforcement and Removal Policies and Priorities**

---

       This memorandum directs Department of Homeland Security components to conduct a review of policies and practices concerning immigration enforcement. It also sets interim policies during the course of that review, including a 100-day pause on certain removals to enable focusing the Department's resources where they are most needed. The United States faces significant operational challenges at the southwest border as it is confronting the most serious global public health crisis in a century. In light of those unique circumstances, the Department must surge resources to the border in order to ensure safe, legal and orderly processing, to rebuild fair and effective asylum procedures that respect human rights and due process, to adopt appropriate public health guidelines and protocols, and to prioritize responding to threats to national security, public safety, and border security.

       This memorandum should be considered Department-wide guidance, applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS).

### A. Comprehensive Review of Enforcement Policies and Priorities

The Chief of Staff shall coordinate a Department-wide review of policies and practices concerning immigration enforcement.  Pursuant to the review, each component shall develop recommendations to address aspects of immigration enforcement, including policies for prioritizing the use of enforcement personnel, detention space, and removal assets; policies governing the exercise of prosecutorial discretion; policies governing detention; and policies regarding interaction with state and local law enforcement.  These recommendations shall ensure that the Department carries out our duties to enforce the law and serve the Department's mission in line with our values.  The Chief of Staff shall provide recommendations for the issuance of revised policies at any point during this review and no later than 100 days from the date of this memo.

The memoranda in the attached appendix are hereby rescinded and superseded.

### B. Interim Civil Enforcement Guidelines

Due to limited resources, DHS cannot respond to all immigration violations or remove all persons unlawfully in the United States.  Rather, DHS must implement civil immigration enforcement based on sensible priorities and changing circumstances.  DHS's civil immigration enforcement priorities are protecting national security, border security, and public safety.  The review directed in section A will enable the development, issuance, and implementation of detailed revised enforcement priorities.  In the interim and pending completion of that review, the Department's priorities shall be:

1. **National security.**  Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.
2. **Border security.**  Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.
3. **Public safety.**  Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a) (43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

These priorities shall apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action or parole.  In

addition, all enforcement and detention decisions shall be guided by DHS's ability to conduct operations and maintain custody consistent with applicable COVID-19 protocols.

While resources should be allocated to the priorities enumerated above, nothing in this memorandum prohibits the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities herein. In order to ensure appropriate allocation of resources and exercise of prosecutorial discretion, the Acting Director of ICE shall issue operational guidance on the implementation of these priorities. This guidance shall contain a protocol for the Acting Secretary to conduct a periodic review of enforcement actions to ensure consistency with the priorities set forth in this memorandum. This guidance shall also include a process for the Director of ICE to review and approve of any civil immigration enforcement actions against individuals outside of federal, state or local prisons or jails.

These interim enforcement priorities shall go into effect on February 1, 2021 and remain in effect until superseded by revised priorities developed in connection with the review directed in section A.

### C. Immediate 100-Day Pause on Removals

In light of the unique circumstances described above, DHS's limited resources must be prioritized to: (1) provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at the southwest border fairly and efficiently; and (2) comply with COVID-19 protocols to protect the health and safety of DHS personnel and those members of the public with whom DHS personnel interact. In addition, we must ensure that our removal resources are directed to the Department's highest enforcement priorities. Accordingly, and pending the completion of the review set forth in section A, I am directing an immediate pause on removals of any noncitizen[1] with a final order of removal (except as noted below) for 100 days to go into effect as soon as practical and no later than January 22, 2021.

The pause on removals applies to any noncitizen present in the United States when this directive takes effect with a final order of removal except one who:

1. According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or
2. Was not physically present in the United States before November 1, 2020; or
3. Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver

---

[1] "Noncitizen" as used in this memorandum does not include noncitizen nationals of the United States.

and has been given a meaningful opportunity to access counsel prior to signing the waiver;[2] or

4. For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law.

No later than February 1, 2021, the Acting Director of ICE shall issue written instructions with additional operational guidance on the further implementation of this removal pause. The guidance shall include a process for individualized review and consideration of the appropriate disposition for individuals who have been ordered removed for 90 days or more, to the extent necessary to implement this pause.  The process shall provide for assessments of alternatives to removal including, but not limited to, staying or reopening cases, alternative forms of detention, custodial detention, whether to grant temporary deferred action, or other appropriate action.

### D.    No Private Right Statement

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[2] A voluntary waiver encompasses noncitizens who stipulate to removal as part of a criminal disposition.

# APPENDIX

Department of Homeland Security, *Enforcement of the Immigration Laws to Serve the National Interest,* Memorandum of February 20, 2017.

U.S. Immigration and Customs Enforcement, *Implementing the President's Border Security and Interior Immigration Enforcement Policies*, Memorandum of February 20, 2017.

U.S. Immigration and Customs Enforcement, *Guidance to OPLA Attorneys Regarding the Implementation of the President's Executive Orders and the Secretary's Directives on Immigration Enforcement*, Memorandum of August 15, 2017.

US Citizenship and Immigration Services, *Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens,* Policy Memorandum of June 28, 2018.  (US Citizenship and Immigration Services should revert to the preexisting guidance in Policy Memorandum 602-0050, US Citizenship and Immigration Services, *Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens*, Policy Memorandum of Nov. 7, 2011.)

US Citizenship and Immigration Services, *Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) When Processing a Case Involving Information Submitted by a Deferred Action for Childhood Arrivals (DACA) Requestor in Connection with a DACA Request or a DACA-Related Benefit Request (Past or Pending) or Pursuing Termination of DACA,* Policy Memorandum of June 28, 2018.

U.S. Customs and Border Protection, *Executive Orders 13767 and 13768 and the Secretary's Implementation Directions of February 17, 2017*, Memorandum of February 21, 2017.

# Exhibit B

2021 WL 247877
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Victoria Division.

State of TEXAS, Plaintiff,

v.

The UNITED STATES of America; David Pekoske,
Acting Secretary of the United States Department
of Homeland Security, in his official capacity;
United States Department of Homeland Security;
Troy Miller, Senior Official Performing the
Duties of the Commissioner of U.S. Customs and
Border Protection, in his official capacity; U.S.
Customs and Border Protection; Tae Johnson,
Acting Director of U.S. Immigration and Customs
Enforcement, in his official capacity; U.S.
Immigration and Customs Enforcement; Tracy
Renaud, Senior Official Performing the Duties of the
Director of the U.S. Citizenship And Immigration
Services, in her official capacity; and U.S.
Citizenship and Immigration Services, Defendants.

Civil Action No. 6:21-cv-00003
|
Signed 01/26/2021

**Synopsis**
**Background:** State of Texas brought action challenging
legality of Department of Homeland Security's (DHS)
announcement that it would place 100-day pause on removals.
State moved for temporary restraining order (TRO).

**Holdings:** The District Court, Drew B. Tipton, J., held that:

[1] state suffered sufficiently concrete injury to establish
standing to bring action;

[2] state was likely to succeed on merits of its claim that 100-
day pause violated Immigration and Nationality Act (INA);

[3] state was likely to succeed on merits of its claim that 100-
day pause was arbitrary and capricious;

[4] state demonstrated substantial threat of irreparable injury;

[5] balance of equities and public interest favored issuance of
TRO; and

[6] issuance of nationwide TRO was warranted.

Motion granted.

**Procedural Posture(s):** Motion for Temporary Restraining
Order (TRO).

West Headnotes (14)

[1]     **Injunction** 🔑

Injunctive relief is extraordinary remedy that
may be awarded only upon clear showing that
plaintiff is entitled to such relief.

[2]     **Injunction** 🔑

Preliminary injunction may issue only where (1)
there is substantial likelihood that movant will
prevail on merits; (2) there is substantial threat
that irreparable harm will result if injunction
is not granted; (3) threatened injury outweighs
threatened harm to defendant; and (4) granting
of preliminary injunction will not disserve public
interest.

[3]     **Injunction** 🔑

Temporary restraining order (TRO) is meant only
to preserve status quo for very brief time, so as
to avoid irreparable injury pending hearing on
issuance of preliminary injunction.

[4]     **Injunction** 🔑

In ruling on motion for temporary restraining
order (TRO), if currently existing status quo
itself is causing party irreparable injury, it is
necessary to alter situation so as to prevent injury,
by, inter alia, returning to last uncontested status
quo between parties.

[5]     **Injunction** 🔑

State of Texas suffered sufficiently concrete injury to establish standing to bring action to enjoin federal government's 100-day pause on removals by alleging that it faced "millions of dollars of losses" in spending on public services to illegal aliens.

**[6]  Injunction** 🔑

State of Texas was likely to succeed on merits of its claim that Department of Homeland Security's (DHS) announcement that it would place 100-day pause on removals violated Immigration and Nationality Act's (INA) requirement that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days," for purposes of determining Texas's entitlement to temporary restraining order (TRO), despite INA's jurisdictional bar against claims arising from government's decision or action to execute removal orders brought "by or on behalf of any alien"; statute's 90-day removal rule was mandatory, and Texas did not bring action on "behalf of any alien." 🚩 5 U.S.C.A. § 701(a)(1); Immigration and Nationality Act §§ 241, 242, 🚩 8 U.S.C.A. §§ 1231(a)(1)(A), 🚩 1252(g).

**[7]  Administrative Law and Procedure** 🔑

Agency's actions are "final" and subject to review under Administrative Procedure Act (APA) where (1) action marks consummation of agency's decision-making process and (2) action is one by which rights or obligations have been determined. 5 U.S.C.A. § 704.

**[8]  Injunction** 🔑

State of Texas was likely to succeed on merits of its claim that Department of Homeland Security's (DHS) announcement that it would place 100-day pause on removals was arbitrary and capricious, in violation of Administrative Procedure Act (APA), for purposes of determining Texas's entitlement to temporary restraining order (TRO), despite

DHS's claim that pause was necessary to provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at southwest border fairly and efficiently and to comply with COVID-19 protocols; memorandum announcing pause failed to consider potential policies more limited in scope and time or to provide any concrete, reasonable justification for pause. 🚩 5 U.S.C.A. § 706(2)(A).

**[9]  Administrative Law and Procedure** 🔑

Federal administrative agencies are required to engage in reasoned decision-making. 🚩 5 U.S.C.A. § 706(2)(A).

**[10]  Administrative Law and Procedure** 🔑

Not only must agency's decreed result be within scope of its lawful authority, but process by which it reaches that result must be logical and rational. 🚩 5 U.S.C.A. § 706(2)(A).

**[11]  Injunction** 🔑

To establish substantial threat of irreparable injury required for temporary restraining order (TRO), movant's injury need not have already been inflicted or be certain to occur; strong threat of irreparable injury before trial on merits is adequate.

**[12]  Injunction** 🔑

State of Texas demonstrated substantial threat of irreparable injury, as factor for temporary restraining order (TRO) in its action challenging legality of Department of Homeland Security's (DHS) announcement that it would place 100-day pause on removals; state paid millions of dollars annually to provide social services and uncompensated healthcare expenses and other state-provided benefits to removable noncitizens that it could not recover by suing federal government.

**[13]    Injunction** 🔑

Balance of equities and public interest favored issuance of temporary restraining order (TRO) in action by state of Texas challenging legality of Department of Homeland Security's (DHS) announcement that it would place 100-day pause on removals; DHS was free to conduct measured and considered assessment of immigration policies regardless of existence of 100-day pause, and any inefficiency suffered by federal immigration authorities caused by immediate injunction was outweighed by losses that state would face.

**[14]    Injunction** 🔑

Issuance of nationwide temporary restraining order (TRO) was warranted in state of Texas's action challenging legality of Department of Homeland Security's (DHS) announcement that it would place 100-day pause on removals; 100-day pause plainly affected national immigration policy, partial implementation of TRO would inevitably detract from Congress's integrated scheme of regulation, and geographically limited TRO would not effectively protect Texas's interests because of free flow of movement among states.

**Attorneys and Law Firms**

Patrick K. Sweeten, William Thomas Thompson, Office of the Attorney General, Austin, TX, for Plaintiff.

Adam David Kirschner, Pro Hac Vice, USDOJ, Civil Division, Washington, DC, Brian C. Rosen-Shaud, Daniel David Hu, Office of the US Attorneys Office, Houston, TX, for Defendants United States of America, United States Department of Homeland Security, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services.

Adam David Kirschner, Pro Hac Vice, USDOJ, Civil Division, Washington, DC, Brian C. Rosen-Shaud, for Defendants David Pekoske, Troy Miller, Tracy Renaud.

Adam David Kirschner, Pro Hac Vice, USDOJ, Civil Division, Brian C. Rosen-Shaud, Pro Hac Vice, US Department of Justice, Washington, DC, for Defendant Tae Johnson.

## ORDER GRANTING PLAINTIFF'S EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Drew B. Tipton, UNITED STATES DISTRICT JUDGE

**\*1** The State of Texas requests a Temporary Restraining Order ("TRO") to enjoin Defendants from executing a 100-day pause on the removal of aliens already subject to a final Order of Removal. [1] The 100-day pause was set into motion through a recent Memorandum of the Department of Homeland Security on January 20, 2021 (the "January 20 Memorandum"). (Dkt. No. 2-2). In relevant part, the January 20 Memorandum directs "an immediate pause on removals of any noncitizen with a final order of removal ... for 100 days." [2] (Dkt. No. 2-2 at 4–5). After reviewing Texas's Emergency Application, the arguments of Texas's and Defendants' counsel on January 22, 2021, the Defendants' Response filed on January 24, 2021, the brief of Amicus, the record, and the applicable law, the Court finds that Texas has satisfied the requirements for a TRO. Accordingly, Texas's Emergency Application for a TRO is **GRANTED**. In so doing, the Court makes clear that this Order is not based on the "Agreement Between Department of Homeland Security and the State of Texas" attached as Exhibit "A" to Plaintiff's Complaint. The issues implicated by that Agreement are of such gravity and constitutional import that they require further development of the record and briefing prior to addressing the merits. Rather, the Court finds that a TRO maintaining the status quo as it existed prior to the implementation of the January 20 Memorandum's 100-day pause is appropriate under the Administrative Procedures Act (the "APA"). Accordingly, and pursuant to Rule 65 of the Federal Rules of Civil Procedure, Defendants are enjoined from executing the 100-day pause on removals for 14 days for the reasons and in the manner described below.

## I. LEGAL STANDARD FOR A TEMPORARY RESTRAINING ORDER

**[1]** **[2]** The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). Injunctive relief is "an extraordinary remedy" that may be awarded only upon "a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). "[S]uch extraordinary relief will issue only where (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest." *Clark*, 812 F.2d at 993. "The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Id.* But "none of the four prerequisites has a fixed quantitative value." *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* (citing *Siff v. State Democratic Exec. Comm.*, 500 F.2d 1307 (5th Cir. 1974)).

## II. APPLICATION

**\*2** In its Emergency Application, Texas argues it will likely succeed on the merits of its challenges to the January 20 Memorandum, there is a significant risk it would suffer imminent and irreparable harm if a TRO is not granted, and a TRO would not harm Defendants or the public. (Dkt. No. 2 at 7–19). The Court agrees.

**[3]** **[4]** Before addressing those elements, the Court pauses to note a temporary restraining order is meant only to "preserve, for a very brief time, the status quo, so as to avoid irreparable injury pending a hearing on the issuance of a preliminary injunction." *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 829 (5th Cir. 1976). Importantly, "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, ... by, [inter alia,] returning to the *last uncontested status quo* between the parties." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (emphasis, ellipsis, and alteration added) (citation

omitted); *see also United States v. FDIC*, 881 F.2d 207, 210 (5th Cir. 1989) ("[T]he district court has the equitable power to return the parties to their last uncontested status."). The Court finds that the "last uncontested status quo" here is the status of Defendants' removal policy prior to issuance of the January 20 Memorandum's 100-day pause on removals.

*See Callaway*, 489 F.2d at 576.

### A. SUBSTANTIAL LIKELIHOOD THAT TEXAS WILL PREVAIL ON THE MERITS

A TRO is appropriate only where the plaintiff shows that there is a substantial likelihood it will prevail on the merits. *Clark*, 812 F.2d at 993. Indeed, the Fifth Circuit has cautioned that "it is inequitable to temporarily enjoin a party from undertaking activity which he has a clear right to pursue." *Seatrain*, 518 F.2d at 180.

Texas has asserted six claims against Defendants in its Complaint. (Dkt. No. 1 at ¶¶ 38–72). At this early stage, the Court finds Texas has a substantial likelihood of success on *at least* two: (Count II) Texas's claim that the January 20 Memorandum's 100-day pause should be set aside pursuant to Section 706 of the APA because it violates 8 U.S.C. § 1231(a)(1)(A),[3] and (Count IV) Texas's claim that Defendants arbitrarily and capriciously departed from its previous policy without sufficient explanation. To succeed on its Application for a TRO, Texas need only demonstrate a likelihood of success on "at least one" claim. *See Texas v. United States*, 86 F. Supp. 3d 591, 672 (S.D. Tex.), aff'd, 809 F.3d 134 (5th Cir. 2015), as revised (Nov. 25, 2015). The Court defers ruling on the remaining Counts, which should not be construed as an indication of the Court's view of their merits.

**[5]** Before addressing Counts II and IV, the Court must briefly address an issue concerning its jurisdiction under Article III. Defendants contend Texas cannot establish standing for these claims since Texas has asserted only "fiscal harm." (Dkt. No. 8 at 17–18). The Court disagrees. The panel in *Texas v. United States*, addressing similar claims, held that the plaintiff-states had pleaded a sufficiently concrete injury by demonstrating the harm to "the states' fisc," such as "millions of dollars of losses in Texas alone." 809 F.3d 134, 150–61, 162–63 (5th Cir. 2015), aff'd by an equally divided Court, —— U.S. ——, 136 S.Ct. 2271, 195 L.Ed.2d

638 (2016) (mem.). Thus, the Fifth Circuit distinguished its holding from its previous ruling in *Crane v. Johnson*, where the plaintiff-state had "waived" the harm-to-public-fisc theory the plaintiff-states advanced in *Texas*. 809 F.3d at 150 n.24. Here, Texas asserts and has provided evidence that the 100-day pause will result in millions of dollars of damage to its public fisc by causing it to increase its spending on public services to illegal aliens. (Dkt. No. 2 at 18; Dkt. Nos. 2-4, 2-5). The Court is therefore satisfied for now that Texas has established an injury-in-fact. The Court also finds, for now, that Texas's alleged injury is fairly traceable and redressable. *See Bennett v. Spear*, 520 U.S. 154, 167–71, 117 S.Ct. 1154, 1163–65, 137 L.Ed.2d 281 (1997).

### 1. Count II: Failure to Remove Illegal Aliens in Violation of 8 U.S.C. § 1231

**\*3** Texas claims that the 100-day pause violates 8 U.S.C. § 1231(a)(1)(A). (Dkt. No. 1 at ¶¶ 43–49). That section provides, "when an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A) (emphasis added). Texas contends that Defendants' alleged violation of § 1231(a)(1)(A) gives rise to a claim under the APA. (Dkt. No. 1 at ¶ 45). In relevant part, § 706 of the APA provides that "a reviewing court shall hold unlawful and set aside agency action ... found to be (A) ... not in accordance with law" and "(C) in excess of statutory ... authority." 5 U.S.C. § 706(2)(A), (C). Texas argues the 100-day pause on removals is not in accordance with law and in excess of the government's statutory authority under § 1231(a)(1)(A). (Dkt. No. 1 at ¶ 45). Further, Texas avers that Defendants' alleged violation of § 1231(a)(1)(A) causes Texas irreparable harm. (Dkt. No. 1 at ¶ 47).

Defendants respond that the 100-day pause does not violate § 1231(a)(1)(A) because that provision "does not mandate removal within the 90-day removal period." (Dkt. No. 8 at 15). Defendants also assert that Texas's claims are not subject to judicial review, that the January 20 Memorandum is not a "final agency action" as provided by 5 U.S.C. § 704, and Texas's claims are barred by 8 U.S.C. § 1231(h). (*Id.* at 13–16).

**[6]** The Court finds that, by ordering a 100-day pause on all removals of aliens already subject to a final order of removal, it appears that the January 20 Memorandum is clearly not in accordance with, or is in excess of, the authority accorded to the Attorney General pursuant to 8 U.S.C. § 1231(a)(1)(A). In other words, the Court disagrees with Defendants' argument that the 100-day pause does not violate § 1231(a)(1)(A). Defendants' argument rests upon an interpretation of § 1231(a)(1)(A) that contravenes the unambiguous text. Section 1231(a)(1)(A) provides that, "when an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A) (emphasis added). "[T]he word 'shall' usually connotes a requirement." *Me. Cmty. Health Options v. United States*, ––– U.S. ––––, 140 S.Ct. 1308, 1320, 206 L.Ed.2d 764 (2020) (internal quotation omitted). Here, "shall" means *must*. *Tran v. Mukasey*, 515 F.3d 478, 481–82 (5th Cir. 2008) ("[W]hen a final order of removal has been entered against an alien, the government *must* facilitate that alien's removal from the United States within ninety days, a period generally referred to as the removal period.") (emphasis added) (citing 8 U.S.C. § 1231(a)(1)(A)). This mandatory language of § 1231(a)(1)(A) is not neutered by the federal government's broad discretion in operating "the removal system" as a general matter, *see, e.g. Arizona v. United States*, 567 U.S. 387, 396–97, 132 S.Ct. 2492, 2499, 183 L.Ed.2d 351 (2012), the existence of statutes and caselaw outlining procedure in the event that practical circumstances prevent removal within 90 days, *see, e.g.* 8 U.S.C. § 1231(a)(1)(C); *Zadvydas v. Davis*, 533 U.S. 678, 701, 121 S.Ct. 2491, 2505, 150 L.Ed.2d 653 (2001), or regulations providing aliens an avenue to request a stay of deportation or removal, 8 C.F.R. § 241.6. Where Congress uses specific language within its immigration statutes to direct the Attorney General toward a specific result, courts are not free to assume based on a matrix of principles, statutes, and regulations that the Attorney General's authority is simply "a matter of discretion." *Zadvydas*, 533 U.S. at 688, 121 S.Ct. at 2497–98.

Defendants' arguments that judicial review of the January 20 Memorandum is improper also fail. To this end, Defendants

advance two arguments. First, Defendants contend that 5 U.S.C. § 701(a)(1), which bars judicial review where a "statute[ ] preclude[s] judicial review," applies here in light of 8 U.S.C § 1252(g). (Dkt. No. 8 at 13). The Court disagrees. In relevant part, § 1252(g) prevents courts from exercising jurisdiction over claims arising from the government's decision or action to execute removal orders brought "by or on behalf of any alien." 8 U.S.C § 1252(g). Texas is not an alien. Nor does Texas bring this action "on behalf of" any alien. Therefore, § 1252(g) does not apply to this Court's review. *See Texas*, 809 F.3d at 164. Second, Defendants contend that 5 U.S.C. § 701(a)(2), which precludes judicial review where "agency action is committed to agency discretion by law," applies here in light of Defendants' prosecutorial discretion in matters of immigration law generally and executing removal orders in particular. (Dkt. No. 8 at 13–14). Here again, the Court disagrees. As explained above, § 1231(a)(1)(A) clearly accords no discretion to the Attorney General to blatantly disregard the 90-day removal rule without finding that an enumerated exception applies. *See, e.g., Tran*, 515 F.3d at 481–82 (discussing narrow and explicitly defined exceptions to the mandatory 90-day removal rule in 8 U.S.C. § 1231(a)(6)); *Heckler v. Chaney*, 470 U.S. 821, 832–34, 105 S.Ct. 1649, 1656–57, 84 L.Ed.2d 714 (1985) (finding that the normal presumption that the Executive's nonenforcement of a statute is unreviewable is rebuttable where "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers"). *Cf.* Brief for the Petitioners at *26–28, *Reno v. Ma (Zadvydas v. Davis)*, 533 U.S. 678, 121 S.Ct. 2491 (No. 00-38) (2000 WL 1784982) (arguing *on behalf of the Attorney General* that the language of 8 U.S.C. § 1231(a)(2) is mandatory and that § 1231(a)(6)'s provision of discretionary authority is exceptional). Thus, Defendants do not have discretion to completely disregard § 1231(a)(1)(A) and their January 20 Memorandum appearing to do so is reviewable.

**\*4** **[7]** Defendants' argument that the January 20 Memorandum is not a "final agency action" subject to review under 5 U.S.C. § 704 also fails. In *Bennett v. Spear*, the Supreme Court explained that an agency's actions are

sufficiently "final" to satisfy § 704 where (1) the action marks the "consummation" of the agency's decision-making process and (2) the action is one by which "rights or obligations have been determined." 520 U.S. 154, 177–78, 117 S.Ct. 1154, 1168, 137 L.Ed.2d 281 (1997). Here, the January 20 Memorandum's order "directing an immediate pause on removals of any noncitizen with a final order of removal" is sufficiently final and immediate to denote the consummation of the agency's decision as it relates to a pause in removals. (Dkt. No. 2-2 at 4). As well, it seems clear that Defendants, through the January 20 Memorandum's 100-day pause, have disregarded their previous legal "obligations" and adjudication of the aliens' "rights" by inexplicably ordering a reassessment of *all* previous orders for removal and plainly ignoring the statutory mandate of § 1231(a)(1)(A) to remove aliens within 90 days. (Dkt. No. 2-2 at 4-5).

Finally, Defendants contend Texas is barred from suing by 8 U.S.C. § 1231(h). That section states that "nothing" in all of § 1231 "shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against" the government. 8 U.S.C. § 1231(h). Defendants' reliance on 8 U.S.C. § 1231(h) overstates the scope of that subsection's limitations. The Supreme Court in *Zadvydas* explained that, although § 1231(h) "forbids courts to construe that section 'to create any ... procedural right or benefit that is legally enforceable," it in no way "deprive[s] an alien of the right to rely on 28 U.S.C. § 2241 to challenge detention that is without statutory authority." 533 U.S. at 678–88, 121 S.Ct. at 2497. Similarly, here, § 1231(h) does not preclude Texas from challenging § 1231(a)(1)(A) under 5 U.S.C. § 706.

The Court therefore finds Texas has demonstrated a substantial likelihood of success on its claim that the January 20 Memorandum's 100-day pause on removals violates 8 U.S.C. § 1231(a)(1)(A).

### 2. Count IV: Arbitrary and Capricious

**[8]** Texas argues that the January 20 Memorandum is arbitrary and capricious because it was issued "without any consideration whatsoever of a [more limited] policy." (Dkt.

No. 2 at 12) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, ––– U.S. ––––, 140 S.Ct. 1891, 1912, 207 L.Ed.2d 353 (2020)). Defendants disagree, contending DHS "not only considered but enacted a specifically limited interim policy," the January 20 Memorandum's terms are "limited in both scope and time, and [they exempt] four classes of aliens from the pause on removal." (Dkt. No. 8 at 16). The Court agrees with Texas and finds Defendants' assertions unpersuasive.

**[9]** **[10]** The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374, 118 S.Ct. 818, 826, 139 L.Ed.2d 797 (1998) (internal quotation omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* Put differently, "agency action is lawful only if it rests 'on a consideration of the relevant factors.' " *Michigan v. EPA*, 576 U.S. 743, 750, 135 S.Ct. 2699, 2706, 192 L.Ed.2d 674 (2015) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)).

Here, the January 20 Memorandum not only fails to consider potential policies more limited in scope and time, but it also fails to provide any concrete, reasonable justification for a 100-day pause on deportations. The January 20 Memorandum states that the 100-day pause is required to assess immigration policies because of the "unique circumstances" present with respect to immigration, including "significant operational challenges at the southwest border as [the United States] is confronting the most serious global public health crisis in a century." (Dkt. No. 2-2 at 2). DHS specifically cites to its apparent (1) need for a comprehensive review of enforcement policies, (2) need for interim civil enforcement guidelines, and (3) "limited resources" that would necessitate a pause in executing removal orders. (*Id.* at 2–5). Additionally, the January 20 Memorandum states that the 100-day pause in deportations is necessary to "(1) provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at the southwest border fairly and efficiently; and (2) comply with COVID-19 protocols to protect the health and safety of DHS personnel and those members of the public with whom DHS personnel interact." (*Id.* at 3). The January 20 Memorandum also provides that DHS "must ensure that [the agency's] removal resources are directed to the Department's highest enforcement priorities." (*Id.*). DHS, however, never explains how the pause in removals helps accomplish these goals. It remains unknown why a 100-day pause is needed given the allegedly "unique circumstances" to which the January 20 Memorandum alludes. Indeed, despite such unique circumstances, DHS does not state or explain why 100 days *specifically* is needed to accomplish these goals. The silence of the January 20 Memorandum on these questions indicates that the terms provided for in the Memorandum were not a result of "reasoned decision-making." *Allentown Mack Sales*, 522 U.S. at 374, 118 S.Ct. at 826.

**\*5** The Court recognizes that the TRO process is expedited, and the record and briefing are abbreviated at this point. With an eye towards the preliminary injunction stage, Defendants will have an opportunity to supplement the record.[4]

Accordingly, the Court finds that Texas has established a substantial likelihood that it will prevail on the merits of at least these two claims.

## B. SUBSTANTIAL THREAT OF IRREPARABLE HARM

**[11]** In addition to showing a likelihood of success on the merits of a claim, Texas is required to demonstrate "a substantial threat of irreparable injury if the injunction is not issued." *Texas*, 809 F.3d at 150. To meet this requirement, Texas's injury "need not have already been inflicted or be certain to occur; a strong threat of irreparable injury before a trial on the merits is adequate." *Texas v. United States*, 328 F. Supp. 3d 662, 736 (S.D. Tex. 2018) (Hanen, J.).

**[12]** In this case, Texas has presented evidence it would suffer injuries for various reasons if an injunction is not entered. First, Texas demonstrates that it pays millions of dollars annually to provide social services and uncompensated healthcare expenses and other state-provided benefits to illegal aliens such as the Emergency Medicaid program, the Family Violence Program, and the Texas Children's Health Insurance Program. (Dkt. No. 2 at 16–17). Additionally, Texas has presented evidence that it would incur increased educational costs. (Dkt. No. 2 at 17). Texas

asserts that these expenses will grow because of the January 20 Memorandum. (Dkt. No. 2 at 16). The January 20 Memorandum expressly states that the Acting Director of ICE "shall provide for alternatives to removal" for those who have already been ordered to be removed, including but not limited to "whether to grant temporary deferred action." (Dkt. No. 2-2). In light of this mandatory reassessment for "alternatives to removal," Texas anticipates suffering financial harm from which it cannot recover by suing the federal government. *See Texas*, 328 F. Supp. 3d at 737 (citing *Texas v. United States*, 106 F.3d 661, 662 (5th Cir. 1997)).

Further, Texas argues that "the categorical refusal to remove aliens ordered removable will encourage additional illegal immigration into Texas," thereby exacerbating its public service costs. (Dkt. No. 2 at 17). During the January 22, 2021 hearing, Texas argued that the January 20 Memorandum's pause on removals increases its fiscal burden not only because of those aliens illegally present in Texas, but also because of those who may find their way to Texas from other states in the near future. Such injury is not, as a legal matter, purely speculative. The Fifth Circuit has expressly found that injuries to one state can flow from the fact that illegal aliens are "free to move among states." *Texas*, 809 F.3d at 188.

The Court finds that the foregoing establishes a substantial risk of imminent and irreparable harm to Texas. As a result, Texas has satisfied this element for a TRO as well.

## C. SUBSTANTIAL INJURY TO TEXAS OUTWEIGHS HARM TO DEFENDANTS AND WILL NOT UNDERMINE THE PUBLIC INTEREST

**\*6** Texas is next required to establish that that the threatened injury outweighs any harm that may result from the injunction to the non-movant and will not undermine the public interest. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

Texas argues that Defendants cannot be harmed by the TRO because "[t]hey have no legitimate interest in the implementation of an unlawful memorandum." (Dkt. No. 2 at 19). Defendants disagree and assert that there is a public interest in "measured and considered assessments of immigration policies by an incoming Administration." (Dkt. No. 8 at 13). Defendants further argue that "an injunction here

would disrupt the Administration's careful calibration of how to conduct a necessary review." (*Id.*).

**[13]** The Court finds Defendants' arguments unpersuasive. Defendants are free to conduct a "measured and considered assessment" of immigration policies regardless of the existence of the January 20 Memorandum's 100-day pause. Furthermore, the Fifth Circuit explained in *Texas* that "any inefficiency" suffered by federal immigration authorities caused by an immediate injunction is outweighed by the losses a plaintiff *State* would face. 809 F.3d at 187 (emphasis added).

Indeed, courts have recognized that the public interest is served by the execution of removal orders. *See Nken v. Holder*, 556 U.S. 418, 436, 129 S.Ct. 1749, 1762, 173 L.Ed.2d 550 (2009) ("There is *always* a public interest in prompt execution of removal orders." (emphasis added)); *see also Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) (collecting cases to support the proposition that "the public interest in enforcement of the immigration *laws* is significant" (emphasis added)). To this end, one of Texas's claims involves an allegation that the January 20 Memorandum's *100-day pause* contravenes § 1231(a)(1)(A)'s mandate that aliens subject to an order of removal be removed *within 90 days*. (Dkt. No. 2 at 10). The public's interest is not disserved by temporarily enjoining this policy.

In light of the foregoing, the Court finds that the threat of injury to Texas outweighs any potential harm to Defendants and the public interest is served and protected by the issuance of this TRO. The Court therefore finds that Texas has met its burden to satisfy these elements for a TRO.

\* \* \*

In summary, Texas has thus far satisfactorily demonstrated it is entitled to immediate and temporary relief from the January 20 Memorandum's 100-day pause on removals. The scope of this relief warrants additional attention.

## D. SCOPE OF RELIEF

Nationwide injunctions [5] of executive action are a topic of fierce and ongoing debate in both the courts and the legal academy. *Compare, e.g., DHS v. New York*, ––– U.S.

—, 140 S.Ct. 599, 599–601, 206 L.Ed.2d 115 (2020) (mem.) (Gorsuch, J., concurring) (articulating a common flaw in "injunctions of 'nationwide,' 'universal," or 'cosmic' scope"); *Trump v. Hawaii*, —— U.S. ——, 138 S.Ct. 2392, 2424–2429, 201 L.Ed.2d 775 (2018) (Thomas, J., concurring) (calling the practice of nationwide or "universal" injunctions "legally and historically dubious"); Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 461 (2017) (arguing "[n]ational injunctions interfere with good decisionmaking by the federal judiciary"); *with* East Bay Sanctuary Covenant v. Barr, 964 F.3d 832, 857 (9th Cir. 2020) (calling nationwide injunctions "uniquely appropriate in immigration cases"); Alan M. Trammell, *The Constitutionality of Nationwide Injunctions*, 91 U. COLO. L. REV. 977, 980–89 (2020) (arguing nationwide injunctions do not transgress Article III); Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. REV. 1065, 1080–1103 (2018) (arguing nationwide injunctions are appropriate as a constitutional *and* prudential matter); *see also* Alan M. Trammel, *Demystifying Nationwide Injunctions*, 98 TEX. L. REV. 67, 103–116 (2019) (proposing a "preclusion-based theory of nationwide injunctions"); Jonathan Remy Nash, *State Standing for Nationwide Injunctions Against the Federal Government*, 94 NOTRE DAME L. REV. 1985, 2012 (2019) (discussing at length the interplay between standing doctrine and nationwide injunctions where states seek relief against the federal government and concluding narrowly that "special solicitude should make nationwide injunctions potentially available in cases where plaintiff states can allege standing but other (nonstate) plaintiffs cannot").

**\*7** This Court is likewise concerned about the issuance of nationwide injunctions by a district court. Notwithstanding its concerns, as a district court, this Court is duty bound to faithfully apply the precedents of its Circuit. The Fifth Circuit has addressed the propriety of a nationwide injunction in the immigration context. In *Texas*, the Fifth Circuit held that "[i]t is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." 809 F.3d at 188. The "appropriate circumstances" warranting a nationwide injunction in *Texas* itself included a need for "uniformity" in immigration policies as prescribed by the Constitution, federal statutes, and Supreme Court precedent. *Id.* at 187–88 (citing U.S. CONST. art. I, § 8, cl. 4; Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384; *Arizona*, 567 U.S.

at 401, 132 S.Ct. at 2502). The Fifth Circuit in *Texas* also reasoned that "partial implementation" of the agency action being enjoined would detract from the "integrated scheme of regulation created by Congress." *Id.* at 188 (internal quotation omitted). And lastly, the panel found there was "a substantial likelihood that a geographically-limited injunction would be ineffective because [illegal aliens] would be free to move among states." *Id.*

**[14]** The Fifth Circuit's rationale in affirming a nationwide injunction in *Texas* applies with equal force here. The January 20 Memorandum's 100-day pause plainly affects national immigration policy, which demands "uniformity." *Id.* at 187–88; *see also East Bay Sanctuary Covenant*, 964 F.3d at 857 (citing *Texas*, 809 F.3d at 187–88). Because the January 20 Memorandum's 100-day pause impacts numerous statutes and agency regulations concerning removals and detention policies, its partial implementation would inevitably detract from Congress's "integrated scheme of regulation."[6] *Id.* at 188. Lastly, a geographically-limited injunction of the January 20 Memorandum's 100-day pause on removals would not effectively protect Texas's interests because of the free flow of movement among the states. In other words, many individuals who are subject to an order of removal in other states whose removal is delayed or ultimately deferred may migrate to Texas. As described above, Texas has persuasively demonstrated a substantial risk of irreparable harm in part because of the potential increased flow of illegal aliens from other states.

**\*8** Accordingly, the Court finds that, under the circumstances here, Defendants must be enjoined from executing the January 20 Memorandum's 100-day pause on the removal of aliens in *every* place Defendants would have jurisdiction to implement it.

That said, the Court notes that the scope of this injunction is something it is willing to revisit after the parties fully brief and argue the issue for purposes of the upcoming motion for preliminary injunction. Though the scope of this TRO is broad, it is not necessarily permanent.

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Texas's Emergency Application. (Dkt. No. 2). Therefore, it is hereby **ORDERED** that:

1. Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby ENJOINED and RESTRAINED from enforcing and implementing the policies described in the January 20 Memorandum in Section C entitled "Immediate 100-Day Pause on Removals." [7] (Dkt. No. 2-2 at 4–5).

2. This TRO is granted on a nationwide basis and prohibits enforcement and implementation of the policies described in the January 20 Memorandum in Section C entitled "Immediate 100-Day Pause on Removals" in every place Defendants have jurisdiction to enforce and implement the January 20 Memorandum.

3. No security bond is required under Federal Rule of Civil Procedure 65(c).

4. Finally, the Court ORDERS the parties to propose a briefing schedule no later than Thursday, January 28, 2021 at 12:00 p.m. with respect Texas's Request for Preliminary Injunction in its Complaint. The parties should also address whether expedited discovery is necessary and the contours and scheduling for same. The Court will promptly schedule a hearing on the Motion for Preliminary Injunction, if requested and necessary.

It is SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2021 WL 247877

## Footnotes

1       "[I]n the deportation context, a 'final order of removal' is a final order concluding that the alien is deportable or ordering deportation." *Nasrallah v. Barr*, ––– U.S. ––––, 140 S.Ct. 1683, 1690, 207 L.Ed.2d 111 (2020).

2       The January 20 Memorandum excludes from the 100-day pause any alien with a final removal order who:
        1. According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or
        2. Was not physically present in the United States before November 1, 2020; or
        3. Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver and has been given a meaningful opportunity to access counsel prior to signing the waiver; or
        4. For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law.
        (Dkt. No. 2-2 at 4–5 (footnote omitted)).

3       Section 1231 states: "Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A).

4       The Court notes, however, that "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

5       The term "nationwide injunction" is infamously wrought with imprecision. *See* Alan M. Trammel, *Demystifying Nationwide Injunctions*, 98 TEX. L. REV. 67, 72 n.23 (2019) (collecting sources and listing alternatives commonly used, such as "national injunction," "defendant-oriented injunction," and "universal injunction"). One scholar employs the term "nationwide injunctions," despite it being a "deeply imperfect term," because it appears to be the "most familiar." *Id.* at 72. With the same qualification and rationale, the Court does so here.

6       In addition, nationwide injunctions have been found to be appropriate when plaintiffs present claims alleging that defendant federal agencies have violated the APA. *See, e.g.,* *Nat'l Mining Ass'n v. U.S. Army Corps*

*of Eng'rs*, 145 F.3d 1399, 1407–08 (D.C. Cir. 1998) (invalidating an agency rule and affirming the nationwide injunction); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). Indeed, other district courts have noted that a geographically restricted injunction issued to remedy "likely unlawful agency actions" meant to be "appl[ied] universally" would, among other things, "invite[ ] arbitrary enforcement" on the part of the federal agency "and create[ ] more questions than it answers." *Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 271 (S.D.N.Y. 2020); *see also* *New York v. United States Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 352 (S.D.N.Y. 2019), *aff'd as modified*, 969 F.3d 42 (2d Cir. 2020). ("A geographically limited injunction that would result in inconsistent applications of [immigration policy in the context of public charge determinations] ... is inimical to [the] need for uniformity in immigration enforcement."). By contrast, a sister Circuit, presiding over a challenge to certain rules stemming from the implementation of the Affordable Care Act, vacated the scope of a nationwide injunction "when an injunction that applies only to the plaintiff states *would provide complete relief*" to the plaintiffs. *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (emphasis added). As explained in this section, the Court's injunction is consistent with *Azar*'s aim of providing "complete relief" to the plaintiff.

7    This Order does not in any way limit Defendants' efforts to carry out or adhere to the January 20 Memorandum's other sections, entitled "A. Comprehensive Review of Enforcement Policies and Priorities," (Dkt. No. 2-2 at 3), "B. Interim Civil Enforcement Guidelines," (*id.*), or "D. No Private Right Statement," (*id.* at 5). This injunction is effective for 14 days as prescribed by Rule 65 of the Federal Rules of Civil Procedure.

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit C

## AGREEMENT BETWEEN THE DEPARTMENT OF HOMELAND SECURITY AND THE ARIZONA ATTORNEY GENERAL'S OFFICE AND THE ARIZONA DEPARTMENT OF LAW

The parties to this Sanctuary for Americans First Enactment (SAFE) Agreement (Agreement) are on the one hand:

 (1) The Department of Homeland Security,
 (2) U.S. Customs and Border Protection (CBP),
 (3) U.S. Immigration and Customs Enforcement (ICE), and
 (4) U.S. Citizenship and Immigration Services (USCIS);[1]

and on the other hand:

 (5) the Arizona Attorney General's Office and the Arizona Department of Law (Agency).

## I. AUTHORITY

The authorities governing this Agreement include, but are not limited to:

 (1) Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended.
 (2) Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended.
 (3) Privacy Act, 5 U.S.C. Section 552a, as amended.
 (4) The Inter-Governmental Cooperation Act, 31 U.S.C. Section 6501, *et. seq.* as amended.
 (5) Homeland Security Act of 2002, 116 Stat. 2135, 6 U.S.C. Section 101, *et seq.* as amended.
 (6) Immigration and Nationality Act, 8 U.S.C. Section 1101, *et seq.* as amended.

## II. PURPOSE AND COMMITMENT

DHS recognizes that Agency, like other state agencies and municipalities, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact Agency's law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests of the State of Arizona. The harm to Agency is particularly acute where Agency's

---

[1] The Department of Homeland Security, CBP, ICE, and USCIS are collectively referred to in this Agreement as "DHS." The Department of Homeland Security, CBP, ICE, and USCIS enter into this Agreement individually and collectively, such that termination or removal of one or more of those parties (whether by law or contract) (including the Department of Homeland Security) does not terminate this Agreement as to any other parties.

budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes. Specifically, DHS recognizes that the following actions result in direct and concrete injuries to Agency, including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased economic competition with the State of Arizona's current residents for, among other things, employment, housing, goods and services:

(1)   a decrease of any immigration enforcement priorities;

(2)   a voluntary reduction in the number of DHS agents performing immigration enforcement functions;

(3)   a decrease or pause on returns or removals of removable or inadmissible aliens;

(4)   a decrease or pause on apprehensions or administrative arrests;

(5)   relaxation of the standards for granting relief from return or removal, such as asylum;

(6)   an increase in releases from detention;

(7)   a relaxation of the standards for granting release from detention;

(8)   changes to immigration benefits or eligibility, including work authorization, discretionary actions, or discretionary decisions; and

(9)   rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community.

At the same time, Agency recognizes that DHS relies on cooperation with Agency and information shared by Agency to carry out DHS's functions, including but not limited to combating financial crimes, internet crimes against children, and human trafficking, as well as immigration enforcement. Any decrease in a State's or municipality's cooperation or information sharing with DHS can result in a decrease in these law enforcement priorities.

To that end, this Agreement establishes a binding and enforceable commitment between DHS and Agency, in which Agency will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, national security, and other law enforcement missions in exchange for DHS's commitment to consult Agency and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

(1)   reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;

(2)   decrease the number of ICE agents performing immigration enforcement duties;

(3)   pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;

(4)   increase or decline to decrease the number of lawful, removable, or inadmissible aliens;

(5)   increase or decline to decrease the number of releases from detention;

(6)   relax the standards for granting relief from return or removal, such as asylum;

(7)     relax the standards for granting release from detention;

(8)     relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;

(9)     increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions for aliens; or

(10)    otherwise negatively impact Agency.

In case of doubt, DHS will err on the side of consulting with Agency.

## III.   RESPONSIBILITIES

### A.     DHS agrees to:

(1)     Utilize its immigration authorities, to the maximum extent possible, to prioritize the protection of the United States and its existing communities. This includes:

    a.     enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens;

    b.     enforcing the immigration laws of the United States to prioritize detention over release of inadmissible and removable aliens;

    c.     enforcing the immigration laws of the United States to apprehend and administratively arrest inadmissible and removable aliens;

    d.     eliminating incentives and so-called "pull factors" for illegal immigration;

    e.     limiting eligibility for asylum and other relief from detention, return, or removal to the statutory criteria; and

    f.     refusing asylum and other relief from detention, return, or removal for those aliens who pose a danger to the United States, whether due to prior criminal history, the security of the United States, health, or some other bar.

(2)     Consult with Agency before taking any action or making any decision that could reduce immigration enforcement, increase the number of illegal aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens. This includes policies, practices, or procedures which have as their purpose or effect:

    a.     reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement;

    b.     decreasing the number of ICE agents within Agency's territorial jurisdiction performing immigration enforcement duties;

    c.     pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country;

    d.     decreasing the number of or criteria for detention of removable or inadmissible aliens from the country;

    e.     decreasing or pausing apprehensions or administrative arrests;

      f.     increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States;

      g.    increasing, expanding, extending, or in any way changing the quantity or quality of immigration benefits or eligibility for these benefits or other discretionary actions for aliens; or

      h.    otherwise negatively impacting Agency.

(3)    Provide Agency with 180 days' written notice (in the manner provided for in Sections IV of this Agreement) of the proposed action and an opportunity to consult and comment on the proposed action, before taking any such action listed above.

(4)    Consider Agency's input and provide a detailed written explanation of the reasoning behind any decision to reject Agency's input before taking any action listed in Section III.A.2.

(5)    Err on the side of consulting with Agency in case of doubt as to whether DHS's action is implicated by this provision.

**B.**    **Agency agrees to:**

(1)    Provide the support, cooperation, assistance, and information that is reasonably necessary for DHS to perform its missions.

(2)    To the extent permitted by Agency's budget and resources in the good-faith determination of the Arizona Attorney General, continue participating in law enforcement task forces, including working with Homeland Security Investigations as part of the Financial Crimes Task Force, Internet Crimes Against Children (ICAC) Task Force, and any applicable anti-human trafficking task force(s), as well as any future task forces on these subjects. DHS and Agency understand and agree that the specifics of cooperation for any particular task force may be governed by a separate agreement regarding the particular task force.

(3)    Honor and assist DHS, to the extent consistent with applicable state and federal law and when covered under Agency's jurisdiction, with (1) ICE or CBP "detainer requests" or "requests to hold" issued to Agency and (2) DHS requests for records or information from Agency.

## IV.   NOTICES

All notices required hereunder shall be given by certified United States mail, postage prepaid return receipt requested, and addressed to the respective parties at their addresses set forth below,

or at such other address as any party shall hereafter inform the other party by written notice. All written notices so given shall be deemed effective upon receipt.

Department of Homeland Security
Secretary of Homeland Security
Washington, DC 20528

U.S. Customs and Border Protection
Office of the Commissioner
1300 Pennsylvania Ave. NW
Washington, D.C. 20229

U.S. Immigration and Customs Enforcement
Office of the Director
500 12th Street SW
Washington, D.C. 20536

U.S. Citizenship and Immigration Services
Office of the Director
5900 Capital Gateway Drive
Suitland, MD 20746

Arizona Attorney General's Office
Attn: Chief Deputy Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004

## V.    PENALTIES

Agency acknowledges the information it receives from DHS pursuant to this Agreement is governed by the Privacy Act, 5 U.S.C. section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this Agreement, or otherwise permitted by another agreement with DHS or applicable law, may be subject to civil or criminal penalties.

## VI.    INJUNCTIVE RELIEF

It is hereby agreed and acknowledged that it will be impossible to measure in money the damage that would be suffered if the parties fail to comply with any of the obligations herein imposed on them and that in the event of any such failure, an aggrieved party will be irreparably damaged and will not have an adequate remedy at law. Any such party shall, therefore, be entitled to injunctive relief (in addition to any other remedy to which it may be entitled in law or in equity), including specific performance, to enforce such obligations. If any action should be brought in

equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

## VII.   THIRD PARTY LIABILITY

Each party to this Agreement shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution or performance of this Agreement, whether civil or criminal, and retains responsibility for the payment of any corresponding liability.

Nothing in this Agreement is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any non-party to this Agreement against any party, its agencies, officers, or employees.

## VIII.   DISPUTE RESOLUTION

DHS and Agency will endeavor to the best of their ability to resolve their disputes informally and through consultation and communication. Disagreements on the interpretation of the provisions of this Agreement that cannot be resolved between the parties should be provided in writing to the heads of all parties for resolution. If settlement cannot be reached at this level, the disagreement may be adjudicated by invoking the judicial or alternative dispute resolution process.

## IX.   CONFLICTS

This Agreement constitutes the full agreement on this subject between DHS and Agency. Any inconsistency or conflict between or among the provisions of this Agreement will be resolved in the following order of precedence: (1) this Agreement and (2) other documents incorporated by reference in this Agreement.

## X.   SEVERABILITY

The Parties agree that if a binding determination is made that any term of this Agreement is unenforceable, such unenforceability shall not affect any other provision of this Agreement, and the remaining terms of this Agreement shall, unless prohibited by law, remain effective as if such unenforceable provision was never contained in this Agreement.

The parties additionally agree that if this Agreement is found to be unenforceable as to one or more of the parties comprising DHS, including the Department of Homeland Security, such unenforceability shall not affect the validity of this Agreement as to the remaining parties and this Agreement shall remain effective as if such party was never a party to this Agreement.

## XI.   ASSIGNMENT

Agency may not assign this Agreement, nor may it assign any of its rights or obligations under this Agreement. To the greatest extent possible, this Agreement shall inure to the benefit of, and be binding upon, any successors to DHS and Agency without restriction.

## XII.   WAIVER

No waiver by any party of any breach of any provision of this Agreement shall constitute a waiver of any other breach. Failure of any party to enforce at any time, or from time to time, any provision of this Agreement shall not be construed to be a waiver thereof.

## XIII.   EFFECTIVE DATE

This Agreement shall be effective immediately when both the DHS authorized officials and the Agency authorized official have signed this Agreement. This Agreement shall continue in effect unless modified or terminated in accordance with the provisions of this Agreement.

## XIV.   MODIFICATION

This Agreement is subject to periodic review by DHS, its authorized agents or designees, and, if necessary, periodic modification or renewal, consistent with this Agreement's terms, to assure compliance with current law, policy, and standard operating procedures. This Agreement constitutes the complete Agreement between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of all parties evidenced in writing and signed by all parties.

Any party may accomplish a unilateral administrative modification to change POC information. A written bilateral modification (*i.e.*, agreed to and signed by authorized officials of all parties) is required to change any other term of this Agreement.

## XV.   TERMINATION

Any party may terminate its involvement in this Agreement by submitting a request in writing to the other parties and providing 180 days' notice of intent to terminate its involvement in this Agreement. The termination will be effective 180 days after the written termination request was submitted or upon a date agreed upon by all parties, whichever is earlier. Termination by one party of its involvement in this Agreement shall not terminate the Agreement as to the remaining parties.

## XVI.   STATUS

The foregoing constitutes the full agreement on this subject between DHS and Agency.

Nothing in this Agreement may be construed to (1) negate any right of action for a State, local government, other person, or other entity affected by this Agreement; or (2) alter the laws of the United States.

## XVII.  KNOWING AND VOLUNTARY ACKNOWLEDGMENT

The parties enter into this Agreement voluntarily, without coercion or duress, and fully understand its terms. The parties acknowledge they had an opportunity to review and reflect on this Agreement and have discussed its provisions with their respective counsel, if any. The parties attest they understand the effect of each of the provisions in this Agreement and that it is binding on all parties.

## XVIII. COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

## XIX.  FORMALIZATION

The undersigned represent that they are authorized to execute this Agreement on behalf of CBP, ICE, USCIS, and Agency, respectively.

Furthermore, the undersigned execute this Agreement on behalf of CBP, ICE, USCIS, Agency, respectively.

[Signatures on the following pages]

**Signature for the Department of Homeland Security**

DEPARTMENT OF HOMELAND SECURITY

_____     1/8/2021
Kenneth T. Cuccinelli II                                    Date
Senior Official Performing the Duties of the Deputy Secretary
Signed individually and collectively[2]

---

[2] "Signed individually and collectively" as used here indicates that the agency is entering into this Agreement both (1) for itself, independently, and (2) along with the other entities that comprise DHS, collectively.  Should one agency, for whatever reason, cease to be a party to this Agreement, this Agreement shall still survive for all other parties and be read and interpreted as if the removed party had never been a party to this Agreement.

**Signature for the Arizona Attorney General's Office and the Arizona Department of Law**

THE ARIZONA ATTORNEY GENERAL'S OFFICE AND THE ARIZONA DEPARTMENT OF LAW

29 Dec 20

Mark Brnovich                    Date
Attorney General

Exhibit D



MARK BRNOVICH
ATTORNEY GENERAL

OFFICE OF THE ATTORNEY GENERAL
STATE OF ARIZONA

January 26, 2021

Mr. David Pekoske
Acting Secretary
U.S. Department of Homeland Security
Washington, D.C. 20528
ogc@hq.dhs.gov
ogcexecsec@hq.dhs.gov
david.palmer@hq.dhs.gov
stephen.mccleary@hq.dhs.gov
sharmistha.das@hq.dhs.gov
*VIA EMAIL AND CERTIFIED MAIL*

**Re:   Request for DHS to comply with its agreement with the Arizona Attorney
General's Office before instituting "pause on removals"**

Dear Mr. Pekoske:

     I am writing to request that you comply with the Sanctuary for Americans First
Enactment (SAFE) Agreement Between the U.S. Department of Homeland Security
("DHS") and the Arizona Attorney General's Office and Arizona Department of Law
(collectively, "AZAGO"), which the parties entered into on or about January 8, 2021 (the
"Agreement").  I am enclosing a copy of the Agreement for your reference.

     On January 20, 2021, you ordered a blanket halt on nearly all deportations of
removable or inadmissible aliens.[1]  Specifically, your memorandum directed DHS to
impose "an immediate pause on removals of any noncitizen with a final order of removal
[subject to limited exceptions] for 100 days to go into effect as soon as practical and no
later than January 22, 2021."[2]  This avoidance of DHS's obligation to enforce federal

---

[1] "Aliens" is used herein consistent with the statutory definition.  *See* 8 U.S.C. § 1101(a)(3).
[2] Memorandum from David Pekoske, Review of and Interim Revision to Civil Immigration Enforcement
and Removal Policies and Priorities (Jan. 20, 2021), at p. 3, *available at*
https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf (footnote
omitted) (last visited Jan. 26, 2021).

Letter to Acting Secretary Pekoske
January 26, 2021
Page 2

immigration law—particularly to discontinue processing the removal of persons who have been convicted of or charged with crimes—is unlawful and will seriously harm law enforcement efforts and public safety in Arizona.[3]   DHS itself has previously acknowledged that "a decrease or pause on returns or removals of removable or inadmissible aliens" "result[s] in direct and concrete injuries to [AZAGO], including increasing the rate of crime...." Agreement § II.

As the Chief Law Enforcement Officer for the State of Arizona, one of my duties is to ensure the protection of our State's residents.  The memorandum's directive to pause deportations could lead to overcrowding at ICE facilities, forcing the release of dangerous offenders into our State.  Additionally, it has come to our attention that people charged with or convicted of felonies have been released without coordination with the appropriate court or probation department.  I am sure you can see how this is a serious and valid concern.

DHS agreed to consult with AZAGO before reducing immigration enforcement, pausing removals, or declining to decrease the number of removable aliens residing in the United States. *See* Agreement §§ II, III.A.  DHS is also obligated to provide 180 days' written notice, consider AZAGO's input, and provide a detailed written explanation of the reasoning behind any decision to reject AZAGO's input before taking any such action. *See* Agreement § III.A.2–4.

Prior to issuing the memorandum, DHS did not contact AZAGO, much less comply with the notice and consultation requirements of our Agreement.  Moreover, should such a directive be left unchallenged by AZAGO, DHS could attempt to renew it indefinitely, thus allowing the current Administration to unilaterally amend the immigration laws as applied to the vast majority of the removable or inadmissible aliens in this country without the required congressional approval.

This letter serves as notice that AZAGO believes DHS has violated the Agreement; it is not a comprehensive list of the AZAGO's contentions regarding legal defects in the memorandum. *See* Agreement § VIII. AZAGO would like to resolve this dispute, and we ask you to immediately rescind the memorandum as it applies to "pausing" the removal of aliens charged or convicted of crimes in Arizona.  We further request that, consistent with the recent order entered by Judge Tipton, you provide

---

[3] While the memorandum provides (at 4) for an exception for aliens for whom "removal is required by law," that requires an "individualized determination" by the Acting Director of ICE following consultation with the General Counsel, which is unlikely to encompass more than a very small group of people.  Also, while the memorandum also provides an exception (at 4 n.2) for "voluntary waiver," which it states "encompasses noncitizens who stipulate to removal as part of a criminal disposition," that would not apply to aliens who refuse to stipulate to removal.

Letter to Acting Secretary Pekoske
January 26, 2021
Page 3

AZAGO with data of "the number of individuals in custody that were subject to an Order of Removal who have been released from custody in the United States since Friday January 22, 2021 and the locations from which they were released."[4]

AZAGO believes strongly that a collaborative effort with the federal government is necessary to ensure the safety of Arizonans. If the above concerns cannot be addressed in a timely manner, however, we will consider all legal options, including judicial resolution as contemplated by the Agreement. We look forward to your prompt response in a few days.   Please respond to Chief Deputy/Chief of Staff Joe Kanefield at: Joe.Kanefield @azag.gov or 602-542-8080.

Sincerely,

Mark Brnovich
Attorney General

Enclosure

Cc via Email and Certified Mail:

U.S. Customs and Border Protection
Office of the Commissioner
1300 Pennsylvania Ave. NW
Washington, D.C. 20536
Robert.E.Perez@cbp.dhs.gov
Robert.Perez@cbp.dhs.gov

U.S. Citizenship and Immigration Services
Office of the Director
5900 Capital Gateway Drive
Suitland, MD 20746
Tracy.L.Renaud@uscis.dhs.gov
Tracy.Renaud@uscis.dhs.gov

U.S. Immigration and Customs Enforcement
Office of the Director
500 12th Street SW
Washington, D.C. 20536
Tae.D.Johnson@ice.dhs.gov

---

[4] *See Texas v. United States*, Case No. 6:20-cv-00003, 1/25/2021 Minute Entry.

# Exhibit E

**From:** Kanefield, Joe <Joe.Kanefield@azag.gov>
**Sent:** Monday, February 1, 2021 4:37 PM
**To:** OGC <ogc@HQ.DHS.GOV>; OGC Exec Sec <OGCExecSec@HQ.DHS.GOV>; Palmer, David
<David.Palmer@hq.dhs.gov>; MCCLEARY, STEPHEN <stephen.mccleary@hq.dhs.gov>; DAS,
SHARMISTHA <sharmistha.das@hq.dhs.gov>
**Cc:** PEREZ, ROBERT E <ROBERT.E.PEREZ@cbp.dhs.gov>; PEREZ, ROBERT
<ROBERT.PEREZ@CBP.DHS.GOV>; Renaud, Tracy L <Tracy.L.Renaud@uscis.dhs.gov>;
'tracy.renaud@uscis.dhs.gov' <tracy.renaud@uscis.dhs.gov>; 'tae.d.johnson@ice.dhs.gov'
<tae.d.johnson@ice.dhs.gov>
**Subject:** DHS Arizona MOU Matter


Dear Mr. Pekoske,

I am writing on behalf of Arizona Attorney General Mark Brnovich.  General Brnovich has not received a
response from you regarding his January 26, 2021 letter.  We would appreciate a response by COB
tomorrow.   We are considering all legal options, including filing suit, but would prefer to hear back from
you first.

We note from the declaration recently filed by Robert Guadin in *Texas v. U.S.*, No. 6:21-cv-00003
(S.D.TX), that in the first three days following the "pause" memorandum, DHS released 27 aliens with
final removal orders in the Phoenix area.  This is the third highest in the country, behind only Atlanta
and San Antonio.  Please tell us in your response if any of those released in Phoenix have been convicted
of or charged with crimes, and what steps were made to coordinate with applicable courts and parole
departments in connection with those releases.

As Attorney General Brnovich said in his letter, we believe strongly that a collaborative effort with the
federal government is necessary to ensure the safety of Arizonans.  We look forward to your
response.  Take care,

Joe

Joseph Kanefield
Chief Deputy & Chief of Staff



Attorney General Mark Brnovich
Desk: 602-542-8080
Joe.Kanefield@azag.gov
http://www.azag.gov

Exhibit F

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

# Homeland
# Security

February 2, 2021

Mark Brnovich
Attorney General
State of Arizona
2005 N. Central Avenue
Phoenix, Arizona  85004

Dear Attorney General Brnovich:

I am writing in response to your letter to me of January 26, 2021 alleging that the
Department of Homeland Security (DHS) has violated a purported "Agreement" (Document)
with the State of Arizona.

The State of Texas has initiated a lawsuit against DHS seeking to enjoin, on the basis of a
substantially similar document, the Department's lawful exercise of its authority.  *Texas v.*
*United States*, No. 6:21-cv-00003, Complaint, ECF No. 1 (S.D. Tex. filed Jan. 22, 2021).  The
Document between DHS and Arizona is void, not binding, and unenforceable, for the same
reasons set forth in the Defendants' Memorandum of Points and Authorities in Opposition to
Plaintiffs' Application for a Temporary Restraining Order, ECF No. 8 (filed Jan. 24, 2021) in
*Texas v. United States*.

Notwithstanding that the Document is void, not binding, and unenforceable—and
preserving all rights, authorities, remedies, and defenses under the law—this letter also provides
notice, on behalf of DHS, U.S. Customs and Border Protection (CBP), U.S. Immigration and
Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS), that
DHS, CBP, ICE and USCIS rescinds, withdraws, and terminates the Document, effective
immediately.  DHS will continue to comply with applicable executive orders, statutes,
regulations, and court orders.

Please direct any further correspondence concerning the Document to the
Department of Justice.

Sincerely,

David P Pekoske

David Pekoske
Acting Secretary

**COPIES OF NOTICE TO**:

Brian M. Boynton
Acting Assistant Attorney General
Civil Division, U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Department of Homeland Security
c/o Joseph B. Maher, Acting General Counsel
Washington, D.C. 20528

U.S. Customs and Border Protection
c/o Troy Miller, Senior Official Performing the Duties of the Commissioner
Office of the Commissioner
1300 Pennsylvania Ave. NW
Washington, D.C. 20229

U.S. Immigration and Customs Enforcement
c/o Tae Johnson, Acting Director
Office of the Director
500 12th Street SW
Washington, D.C. 20536

U.S. Citizenship and Immigration Services
c/o Tracy Renaud, Senior Official Performing the Duties of the Director
Office of the Director
5900 Capital Gateway Drive
Suitland, Maryland 20746