| | |
|---|---|
| **MARK BRNOVICH**<br>**ATTORNEY GENERAL**<br>(Firm State Bar No. 14000) | **AUSTIN KNUDSEN**<br>**MONTANA ATTORNEY GENERAL** |
| Joseph A. Kanefield (No. 15838)<br>Brunn (Beau) W. Roysden III (No. 28698)<br>Drew C. Ensign (No. 25463)<br>Anthony R. Napolitano (No. 34586)<br>Robert Makar (No. 33579)<br>2005 N. Central Ave<br>Phoenix, AZ 85004-1592<br>Phone: (602) 542-8958<br>Joe.Kanefield@azag.gov<br>Beau.Roysden@azag.gov<br>Drew.Ensign@azag.gov<br>Anthony.Napolitano@azag.gov<br>Robert.Makar@azag.gov<br>*Attorneys for Plaintiffs State of Arizona and Mark Brnovich in his official capacity* | David M. Dewhirst*<br>   *Solicitor General*<br>215 N Sanders St.<br>Helena, MT 59601<br>Phone: (406) 444-4145<br>David.Dewhirst@mt.gov<br><br>**pro hac vice* forthcoming<br><br>*Attorneys for Plaintiff State of Montana* |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| State of Arizona; State of Montana; and Mark Brnovich, in his official capacity as Attorney General of Arizona,<br>      Plaintiffs,<br>v.<br>United States Department of Homeland Security; United States of America; Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security; Troy Miller, in his official capacity as Acting Commissioner of United States Customs and Border Protection; Tae Johnson, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; and Tracy Renaud, in her official capacity as Acting Director of U.S. Citizenship and Immigration Services,<br>      Defendants. | No. 2:21-cv-00186-SRB<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# INTRODUCTION

1. This is a suit to enforce bedrock requirements of immigration and administrative law, as well as binding commitments made by the U.S. Department of Homeland Security ("DHS") to Arizona and Montana.

2. On January 20, 2021, DHS's Acting Secretary announced a policy that flouts entire swaths of immigration law for 100 days. Exhibit A. Specifically, Defendants intend to halt nearly all deportations during that time, including all or nearly all deportations of unauthorized aliens not lawfully present in Arizona. As long as those unauthorized aliens have not committed crimes related to terrorism and espionage, they are not subject to deportation under this policy.[1] And because DHS detention capacity is limited, on information and belief, a necessary consequence of DHS's policy is that individuals will be released into Arizona communities. On information and belief, DHS has already admitted that some aliens were released in the very first days of the 100-day moratorium.

3. Arizona, as a border state, will be directly impacted by Defendants' decision to flout their legal obligations. Arizona's law enforcement community is particularly concerned that aliens who have been charged or convicted of crimes will be released as a result of DHS's 100-day moratorium. Moreover, Arizona's law enforcement community is particularly concerned that releasing individuals during the COVID-19 pandemic will further stress hospitals, jails, and other social services at the local and county level.

---

[1] While the DHS has created a limited exception for aliens for whom "removal is required by law," that requires an "individualized determination" by the Acting Director of ICE following consultation with the General Counsel, which is unlikely to encompass more than a very small group of people. Also, while the memorandum also provides an exception (at 4 n.2) for "voluntary waiver," which it states "encompasses noncitizens who stipulate to removal as part of a criminal disposition," that would not apply to aliens who refuse to stipulate to removal. The fact that DHS has not included serious violent crimes within the express exceptions to its policies indicates that DHS has not excluded unauthorized aliens that have committed such crimes from its 100-day moratorium.

4. Montana will be directly impacted by Defendants' decision to abdicate their legal obligations. Montana's law enforcement community is particularly concerned that DHS's 100-day moratorium will exacerbate the serious drug trafficking problems associated with illegal immigration that have afflicted communities across the state. Drug trafficking and the resulting drug-related crime and drug use threaten public safety and put a strain on Montana's limited law enforcement resources.

5. Federal law on this issue is clear: "[W]hen an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a) (emphasis added). But, in Defendants' view, "shall" does not really mean "shall" or "must," but instead merely "may." In other words, despite a clear mandate of federal statutory law, Defendants believe that there are literally no constraints whatsoever on their authority, and they may release individuals, including those charged with or convicted of crimes, even when immigration courts have already ordered their removal from the United States.

6. A federal court in Texas has already considered similar claims brought by the State of Texas. *See Texas v. United States*, Case No. 6:21-cv-00003 (S.D. Tex., filed January 22, 2021). That court concluded that Defendants likely violated applicable legal requirements and entered a 14-day nationwide temporary restraining order on January 26, 2021. Dkt. No. 21, __ F. Supp. 3d. ___, 2021 WL 247877 (S.D. Tex. Jan. 26, 2021), attached as Exhibit B. This suit raises many of the same claims asserted by Texas, including those that the Southern District of Texas concluded are likely meritorious in its initial order. *Id.* at *3-*5.

7. On February 23, 2021, the Texas court also issued a memorandum opinion and order granting Texas's motion for preliminary injunction. Dkt. No. 85, 2021 WL 723856 (S.D. Tex. Feb. 23, 2021), Exhibit K.

8. This challenged policy is called the "Immediate 100-Day Pause on Removals" by DHS, which was promulgated by the "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities" memorandum issued January 20, 2021 by Acting Secretary Pekoske (the "Memorandum"), attached as Exhibit A.

9. This action also challenges the "Interim Guidance," issued by the Acting Director of ICE on February 18, 2021, which purports to supersede the Memorandum to the extent the two conflict. *See* Exhibit G. This Interim Guidance was simply an attempt to quickly paper over the sparse administrative record without materially changing the Memorandum's substance, and it cannot cure the glaring legal defects in underlying the Memorandum.

10. Although the moratorium in the Memorandum is purportedly for 100 days, and in the Interim Guidance for 90 days, no apparent limiting factor is explained: if this action is permitted to stand, DHS could re-assert this suspension power for a longer period or even indefinitely, thus allowing the current Administration to unilaterally amend the immigration laws as applied to the vast majority of the removable or inadmissible aliens in this country without the required congressional act. The Constitution and controlling statutes prevent such a seismic change to this country's immigration laws by mere memorandum.

**PARTIES**

11. Plaintiff State of Arizona is a sovereign state of the United States of America represented by Arizona Attorney General Mark Brnovich. Arizona sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. The Attorney General is the chief legal officer of the State of Arizona, and has the authority to represent the State in federal court.

12. Mark Brnovich is the Attorney General of Arizona. He directs and controls the Arizona Attorney General's Office and Arizona Department of Law, which are parties to the "Agreement Between the Department of Homeland Security and the Arizona Attorney General's Office and the Arizona Department of Law" effective January 8, 2021 (the "Arizona Agreement"), attached as Exhibit C.

13. Plaintiff State of Montana is a sovereign state of the United States of America represented by Montana Attorney General Austin Knudsen. The Attorney General is the chief legal officer of the State of Montana, chief law enforcement officer, and director of the Montana Department of Justice, and has the authority to represent the State in federal court. Montana sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

14. The State of Montana is party to the "Agreement Between the Department of Homeland Security and the State of Montana" (the "Montana Agreement") effective on or about January 11, 2021, attached as Exhibit H.

15. Plaintiffs Arizona and Montana are required to spend state monies on Emergency Medicaid, including for unauthorized aliens. 42 C.F.R. § 440.255(c). Plaintiffs Arizona and Montana are also required to spend state monies on detention facilities. On information and belief, the immigration moratorium will require Plaintiff States to spend at least some money on healthcare, detention, and other services that would otherwise not have to be spent.

16. Defendant United States Department of Homeland Security is a federal agency.

17. Defendant the United States of America is sued under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346.

18. Defendant Alejandro Mayorkas is the Secretary of Homeland Security and therefore the "head" of DHS with "direction, authority, and control over it." 6 U.S.C. § 112(a)(2). Defendant Mayorkas is sued in his official capacity.

19. Defendant Troy Miller serves as Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection. Defendant Miller is sued in his official capacity.

20. Defendant Tae Johnson serves as Deputy Director and Senior Official Performing the Duties of Director of U.S. Immigration and Customs Enforcement. Defendant Johnson is sued in his official capacity.

21. Defendant Tracy Renaud serves as the Senior Official Performing the Duties of the Director for U.S. Citizenship and Immigration Services. Defendant Renaud is sued in her official capacity.

**JURISDICTION AND VENUE**

22. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361, as well as 5 U.S.C. §§ 702-703.

23. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201–2202.

24. Venue is proper within this federal district pursuant to 28 U.S.C. § 1391(e) because (1) Plaintiffs State of Arizona and Attorney General Mark Brnovich reside in Arizona and no real property is involved and (2) a "substantial part of the events and omissions giving rise to the claim occurred" in this District—*i.e.*, the non-deportation of aliens and consequent release into Arizona communities.

//
//
//
//

# FACTUAL AND LEGAL BACKGROUND

## The Impact of Immigration on Arizona and DHS's Agreement

## With Arizona Law Enforcement Agencies

25. As a border state, Arizona is acutely affected by modifications in federal policy regarding immigration. Arizona is required to expend its scarce resources when DHS fails to carry out its statutory duty to deport aliens as provided by law. This includes resources expended by Arizona's law enforcement community.

26. Based on DHS's own response to the preliminary injunction in *Texas v. United States*, there are over a million individuals with administratively final orders of removal in the United States.

27. Arizona bears substantial costs of incarcerating unauthorized aliens, which amounts to tens of millions of dollars each year, as reflected by Arizona's State Criminal Assistance Program (SCAAP) requests, the great majority of which are not reimbursed by the federal government.

28. Any delay or pause in the removal of aliens subject to final orders of removal from the United States increases the unreimbursed costs to Arizona of continuing to incarcerate unauthorized aliens who commit crimes due to multiple factors including recidivism.

29. The Memorandum orders DHS to pause removals, including removals of criminal aliens, by 100 days and therefore through recidivism and other factors, will increase the costs to Arizona jails and prisons.

30. By instituting the pause as an officially announced DHS policy, the Memorandum encourages a greater influx of unauthorized aliens into Arizona, further increasing law enforcement costs in Arizona, including costs related to coordinated activity between federal and state law enforcement agencies in the pursuit of suspected unauthorized aliens.

31. Federal law also requires that emergency medical services be provided to unlawfully present aliens. 42 C.F.R. § 440.255(c).

32. Arizona emergency medical providers deliver millions of dollars in medical services to unlawfully present aliens each year. These costs are not fully reimbursed by the federal government or the aliens themselves.

33. While these costs are impactful in typical years, the COVID-19 pandemic makes the potential for harm to Arizona through additional emergency healthcare costs to unauthorized aliens exceptionally high.

34. Any delay or pause in the removal of aliens subject to final orders of removal from the United States necessarily increases the number of unlawfully present aliens in Arizona who are subject to receiving such medical care at the expense of Arizona's healthcare institutions.

35. The Memorandum orders DHS to pause removals, and therefore will increase Arizona's costs of providing emergency medical care to these individuals who would otherwise be removed. Additionally, by instituting the pause as an officially announced DHS policy, the Memorandum encourages a greater influx of unauthorized aliens into Arizona, further increasing the population of unauthorized aliens for whom Arizona must bear the cost of emergency medical care.

36. In light of this state of affairs, the Arizona Attorney General's Office and Arizona Department of Law, agencies of the State of Arizona, through Attorney General Mark Brnovich, entered into the Arizona Agreement with DHS. Ex. C.

37. DHS recognized in the Arizona Agreement that Plaintiffs are "directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact [Plaintiff]'s law enforcement needs and budgets ... [and] other important health, safety, and pecuniary interests of the State of Arizona." Ex. C at 1.

38. DHS specifically recognized that "a decrease or pause on ... removals of removable or inadmissible aliens" "result[s] in direct and concrete injuries to [Plaintiff]." Ex. C at 2.

39. Plaintiff committed to "provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, national security, and other law enforcement missions in exchange for DHS's commitment to consult [Plaintiff] and consider its views before taking any action ... that could: ... pause or decrease the number of returns or removals of removal or inadmissible aliens from the country." Ex. C at 2.

40. Specifically, DHS is to "[p]rovide [Plaintiff] with 180 days' written notice ... of the proposed action and an opportunity to consult and comment on the proposed action, before taking any such action." Ex. C at 4.

41. In the event of doubt, the Arizona Agreement commits DHS to "err on the side of consulting with" Plaintiff. Ex. C at 4.

42. The Arizona Agreement specifically entitles its parties to injunctive relief "if the parties fail to comply with any of the obligations ... imposed" by the Arizona Agreement. Ex. C at 5.

43. On January 20, 2021, Acting Secretary Pekoske issued the Memorandum, purporting to institute an "Immediate 100-Day Pause on Removals." Ex. A at 3.

44. The Memorandum establishes a "Comprehensive Review of Enforcement Policies and Priorities" to be conducted within 100 days from the date of the Memorandum. Ex. A at 2.

45. During, and "pending the completion of the review set forth," Acting Secretary Pekoske "direct[s] an immediate pause on removals of any noncitizen with a final order of removal ... for 100 days to go into effect as soon as practical and no later than January 22, 2021." Ex. A at 3.

46. "The pause on removals applies to any noncitizen present in the United States when this directive takes effect with a final order of removal except one who: ... has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or" was not "physically present" or voluntarily waived "any rights to remain," or "[f]or whom the Acting Director of ICE ... makes an individualized determination that removal is required by law." Ex. A at 3-4.

**DHS's Refusal to Even Consult with Arizona Law Enforcement Notwithstanding its Agreement**

47. Defendant DHS did not consult with Plaintiffs prior to the Memorandum, nor did it provide 180 days written notice of the policies embodied in the Memorandum.

48. Plaintiff Mark Brnovich wrote Acting Secretary Pekoske on January 26, 2021, requesting that DHS comply with the Arizona Agreement before instituting the policy change described in the Memorandum. Exhibit D.

49. After the Arizona Attorney General's Office received no response, the Chief Deputy Attorney General sent a follow-up email on February 1, 2021, on behalf of Attorney General Brnovich, reiterating the request to at least participate in the consultative process agreed to by the parties before DHS change immigration enforcement in Arizona. Exhibit E.

50. On February 2, 2021, the Attorney General's Office received a response signed by Acting Secretary Pekoske completely refusing to engage in any consultative process, provide any further reasoning as to why DHS adopted the 100-day pause, and instead instructing the Arizona Attorney General to "direct any further correspondence concerning the [Arizona Agreement] to the Department of Justice." Exhibit F.

## The Impact of Unremoved Illegal Immigrants on Montana's Finances and Public Safety and DHS's Agreement with Montana

51. Plaintiff Montana is acutely affected by modifications in federal policy regarding immigration. Montana is required to stretch its scarce resources even further when DHS fails to carry out its statutory duty to deport aliens as required by law. This includes resources expended by Montana's law enforcement community to combat drug trafficking, drug-related crime, and drug use.

52. Montana has approximately 4,000-5,000 unauthorized aliens living in the state.[2]

53. In addition to the law-enforcement costs incurred by cooperating with DHS immigration enforcement, the State of Montana bears the costs of unauthorized aliens, including their US-born children, and is forced to expend resources on education, healthcare, public assistance, and general government services.

54. Because Montana has no state sales tax, many unauthorized aliens pay virtually no state taxes. Therefore, the costs of all the public services they consume are borne by lawfully present taxpayers.

55. Massive quantities of illegal drugs are transported into the United States across the southern border. These drugs end up in many states, including Montana.

56. Unauthorized aliens crossing the southern border and illegally present in the United States facilitate the trafficking of lethal drugs such as methamphetamine and heroin into Montana.

---

[2] The number of unauthorized aliens is notoriously difficult to calculate. Several studies, however, estimate the number of unauthorized aliens in Montana to be in this approximate range. *See, e.g.*, *Unauthorized Immigrant Population Profiles*, Migration Policy Institute, https://www.migrationpolicy.org/programs/us-immigration-policy-program-data-hub/unauthorized-immigrant-population-profiles#MT (4,000); *U.S. unauthorized immigrant population estimates by state*, Pew Research Center (2016), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (less than 5,000); *The Fiscal Burden of Illegal Immigration*, Federation for American Immigration Reform (2017), http://fairus.org/sites/default/files/2017-09/Fiscal-Burden-of-Illegal-Immigration-2017.pdf (less than 6,000).

57.     The influx of illicit drugs, as well as the gangs and cartels that traffic it across the southern border, have led to a sharp increase in drug use and drug-related crime in Montana.

58.     The drug trafficking, drug-related crime, and drug use associated with illegal immigration are a direct threat to public safety in Montana's residents and communities.

59.     To protect its citizens and help stem the tide of drug trafficking and drug-related crime, Montana entered into the Montana Agreement with DHS on or about January 11, 2021.  Exhibit H.  The terms of the Montana Agreement between Plaintiff Montana and DHS are identical to the terms of the Arizona Agreement between Plaintiff Arizona and DHS.  Exhibit C, Exhibit H.

60.     In the Montana Agreement, DHS recognized that Montana, "like other states and municipalities, is directly and concretely affected by changes to DHS rules and polices that have the effect of easing, relaxing, or limiting immigration enforcement." Exhibit H at 1.

61.     DHS further acknowledged that "[s]uch changes can negatively impact [Plaintiff Montana's] law enforcement … needs and budgets … as well as its other health, safety, and pecuniary interests." Exhibit H at 1.  Specifically, DHS agreed that "a decrease or pause on returns or removals of removable or inadmissible aliens" was one of several actions that would "result in direct and concrete injuries to [Plaintiff Montana], including increasing the rate of crime."  Exhibit H at 1-2.

62.     Plaintiff Montana agreed to "provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, national security, and other law enforcement missions in exchange for DHS's commitment to consult [Plaintiff Montana] and consider its views before taking any action ... that could:

... pause or decrease the number of returns or removals of removal or inadmissible aliens from the country." Exhibit H at 2.

63. Specifically, DHS is to "[p]rovide [Plaintiff Montana] with 180 days' written notice ... of the proposed action and an opportunity to consult and comment on the proposed action, before taking any such action." Exhibit H at 3.

64. In the event of doubt, the Montana Agreement commits DHS to "err on the side of consulting with" Plaintiff Montana. Exhibit H at 4.

65. The Montana Agreement specifically entitles its parties to injunctive relief "if the parties fail to comply with any of the obligations ... imposed" by the Agreement. Exhibit H at 4.

66. On January 20, 2021, Acting Secretary Pekoske issued the Memorandum, purporting to institute an "Immediate 100-Day Pause on Removals." Ex. A at 3.

67. During, and "pending the completion of the review set forth," Acting Secretary Pekoske "direct[s] an immediate pause on removals of any noncitizen with a final order of removal ... for 100 days to go into effect as soon as practical and no later than January 22, 2021." Ex. A at 3.

68. "The pause on removals applies to any noncitizen present in the United States when this directive takes effect with a final order of removal except one who: ... has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or" was not "physically present" or voluntarily waived "any rights to remain," or "[f]or whom the Acting Director of ICE ... makes an individualized determination that removal is required by law." Ex. A at 3-4.

**DHS's Failure to Consult with Montana Law Enforcement Pursuant to the Montana Agreement**

69. Defendant DHS did not consult with Plaintiffs prior to the Memorandum, nor did it provide 180 days written notice of the policies embodied in the Memorandum.

70. Plaintiff Montana's Governor and Attorney General wrote Acting Secretary Pekoske on February 1, 2021, requesting that DHS comply with the Montana Agreement before instituting the policy change described in the Memorandum. Exhibit I.

71. On February 2, 2021, the Montana Attorney General's Office received a response signed by Acting Secretary Pekoske completely refusing to engage in any consultative process, provide any further reasoning as to why DHS adopted the 100-day pause, and instead instructing the Montana Attorney General to "direct any further correspondence concerning the [Montana Agreement] to the Department of Justice." Exhibit J.

**DHS's Issuance of the Interim Guidance and Failure to Consult with Arizona or Montana Law Enforcement Pursuant to the Agreements**

72. On February 18, 2021 the Acting Director of ICE, issued "Interim Guidance," which purports to supersede the Memorandum to the extent the two conflict. *See* Exhibit G.

73. This Interim Guidance did not materially change the substance of the Memorandum as far as pausing removals of all but a few narrow categories of unauthorized aliens with final removal orders, and instead was simply an attempt to quickly paper over the sparse administrative record without materially changing the Memorandum's substance.

74. DHS did not provide prior notice or consult with the Arizona Attorney General, Arizona Attorney General's Office, or Arizona Department of Law prior to the Acting ICE Director issuing the Interim Guidance.

75. DHS did not provide prior notice or consult with the Montana Governor, Montana Attorney General, or Montana Attorney General's Office prior to the Acting ICE Director issuing the Interim Guidance.

14

# CLAIMS FOR RELIEF

## COUNT I

### Failure To Provide Notice And Consult Per The Agreements

76. The allegations in the preceding paragraphs are reincorporated herein.

77. The Memorandum was promulgated without providing notice to or consulting with Plaintiffs, as required by both the Arizona Agreement and the Montana Agreement. Exhibit C at 3-4, Exhibit H at 3-4.

78. The Interim Guidance likewise was promulgated without providing notice to or consulting with Plaintiffs, as required by both the Arizona Agreement and the Montana Agreement.

79. Thus, the Memorandum and Interim Guidance are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedures Act ("APA"). 5 U.S.C. § 706(2)(A).

80. Thus, the Memorandum and Interim Guidance were issued "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

81. Due to the Memorandum and Interim Guidance, Plaintiffs "will be irreparably damaged and will not have an adequate remedy at law" and are thus also "entitled to injunctive relief." Exhibit C at 5.

## COUNT II

### Violation Of 8 U.S.C. § 1231

82. The allegations in the preceding paragraphs are reincorporated herein.

83. The Memorandum and Interim Guidance pause the operation of the vast majority of extant removal orders for 100 days.

84. Federal statute requires "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A).

85. Each removal order affected by, and not individually exempted from, the "pause" is incapable of being fulfilled within the required statutory period.

86. 8 U.S.C. § 1231 does not empower Defendants to alter the 90-day deadline, and compliance with the deadline may only be excused based on malfeasance by the alien. *See* 8 U.S.C. § 1231(a)(1)(C).

87. The Memorandum and Interim Guidance therefore violate the APA, as they are both "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

## COUNT III

### Failure To Follow Notice And Comment

88. The allegations in the preceding paragraphs are reincorporated herein.

89. The Memorandum and Interim Guidance are rules obligated to follow notice-and-comment rulemaking under the APA. 5 U.S.C. § 553.

90. The Memorandum and Interim Guidance are not interpretive rules, general statements of policy, nor are they rules of agency organization, procedure, or practice otherwise exempt from notice-and-comment rulemaking.

91. Thus, the Memorandum and Interim Guidance must be "held unlawful and set aside" as they were promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## COUNT IV

### Arbitrary and Capricious Agency Action

92. The allegations in the preceding paragraphs are reincorporated herein.

93. APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

94. The Memorandum and Interim Guidance represent a sharp departure from DHS's previous policy. Because Defendants have not provided a reasoned justification for their sudden change in policy, the issuance of the Memorandum and Interim Guidance is arbitrary and capricious.

95. There is no indication that Defendants considered the costs of adopting the Memorandum and Interim Guidance, including the threats to public safety. This failure renders the resulting agency action arbitrary and capricious.

96. There is also no indication that Defendants considered alternative approaches that would allow at least some additional removals to continue beyond the extremely limited exceptions in the Memorandum and Interim Guidance. This would include aliens charged or convicted of crimes. The Supreme Court recently held that a DHS immigration action was arbitrary and capricious where it was issued "'without any consideration whatsoever' of a [more limited] policy." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1912 (2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983)). The same result should obtain here.

## COUNT V

### Pre-textual Agency Action

97. The allegations in the preceding paragraphs are reincorporated herein.

98. The Interim Guidance that the Acting Director of ICE issued on February 18, 2021 was simply an attempt to quickly paper over the sparse administrative record without changing the Removal Moratorium's substance.

99. The Interim Guidance cannot cure the glaring legal defects in underlying the Removal Moratorium, and therefore the Memorandum and Interim Guidance must be remanded to DHS. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (uncontested that decision resting on "pretextual basis" "warrant[s] a remand to the

agency").

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment:

    A.    Declaring that the Memorandum and Interim Guidance were issued in violation of the Arizona Agreement;

    B.    Declaring that the Memorandum and Interim Guidance were issued in violation of the Montana Agreement;

    C.    Declaring that the Memorandum and Interim Guidance were issued in violation of 8 U.S.C. § 1231;

    D.    Declaring that the Memorandum and Interim Guidance were issued without observance of procedure required by law;

    E.    Postponing the effective date of the Memorandum and Interim Guidance pursuant to 5 § U.S.C. 705.

    F.    Vacating the Memorandum and Interim Guidance and enjoining Defendants from applying it;

    G.    Declaring that the pretextual nature of the Interim Guidance warrants a remand to DHS.

    H.    Awarding Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

    I.    Granting any and all other such relief as the Court finds appropriate.

//
//
//
//
//
//

RESPECTFULLY SUBMITTED this __8th__ day of March, 2021.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By /s/ *Anthony R. Napolitano*
   Joseph A. Kanefield (No. 15838)
   Brunn W. Roysden III (No. 28698)
   Drew C. Ensign (No. 25463)
   Anthony R. Napolitano (No. 34586)
   Robert J. Makar (No. 33579)
    *Assistant Attorneys General*

*Attorneys for Plaintiffs Arizona and Arizona Attorney General Mark Brnovich*

**AUSTIN KNUDSEN**
**ATTORNEY GENERAL OF MONTANA**

/s/ *David M.S. Dewhirst (with permission)*
David M.S. Dewhirst*
 *Solicitor General*
**Pro hac vice application forthcoming*

*Attorneys for Plaintiff State of Montana*