# Exhibit A



*Secretary*
**U.S. Department of Homeland Security**
**Washington, DC 20528**

January 20, 2021

MEMORANDUM FOR:     Troy Miller
                    Senior Official Performing the Duties of the Commissioner
                    U.S. Customs and Border Protection

                    Tae Johnson
                    Acting Director
                    U.S. Immigration and Customs Enforcement

                    Tracey Renaud
                    Senior Official Performing the Duties of the Director
                    U.S. Citizenship and Immigration Services

CC:                 Karen Olick
                    Chief of Staff

FROM:               David Pekoske
                    Acting Secretary

SUBJECT:            **Review of and Interim Revision to Civil Immigration**
                    **Enforcement and Removal Policies and Priorities**

_____

     This memorandum directs Department of Homeland Security components to conduct a review of policies and practices concerning immigration enforcement.  It also sets interim policies during the course of that review, including a 100-day pause on certain removals to enable focusing the Department's resources where they are most needed.  The United States faces significant operational challenges at the southwest border as it is confronting the most serious global public health crisis in a century.  In light of those unique circumstances, the Department must surge resources to the border in order to ensure safe, legal and orderly processing, to rebuild fair and effective asylum procedures that respect human rights and due process, to adopt appropriate public health guidelines and protocols, and to prioritize responding to threats to national security, public safety, and border security.

     This memorandum should be considered Department-wide guidance, applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS).

## A.  Comprehensive Review of Enforcement Policies and Priorities

The Chief of Staff shall coordinate a Department-wide review of policies and practices concerning immigration enforcement.  Pursuant to the review, each component shall develop recommendations to address aspects of immigration enforcement, including policies for prioritizing the use of enforcement personnel, detention space, and removal assets; policies governing the exercise of prosecutorial discretion; policies governing detention; and policies regarding interaction with state and local law enforcement.  These recommendations shall ensure that the Department carries out our duties to enforce the law and serve the Department's mission in line with our values.  The Chief of Staff shall provide recommendations for the issuance of revised policies at any point during this review and no later than 100 days from the date of this memo.

The memoranda in the attached appendix are hereby rescinded and superseded.

## B.  Interim Civil Enforcement Guidelines

Due to limited resources, DHS cannot respond to all immigration violations or remove all persons unlawfully in the United States.  Rather, DHS must implement civil immigration enforcement based on sensible priorities and changing circumstances.  DHS's civil immigration enforcement priorities are protecting national security, border security, and public safety.  The review directed in section A will enable the development, issuance, and implementation of detailed revised enforcement priorities.  In the interim and pending completion of that review, the Department's priorities shall be:

1. **National security.**  Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.
2. **Border security.**  Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.
3. **Public safety.**  Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a) (43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

These priorities shall apply not only to the decision to issue, serve, file, or cancel a Notice to Appear, but also to a broad range of other discretionary enforcement decisions, including deciding: whom to stop, question, and arrest; whom to detain or release; whether to settle, dismiss, appeal, or join in a motion on a case; and whether to grant deferred action or parole.  In

addition, all enforcement and detention decisions shall be guided by DHS's ability to conduct operations and maintain custody consistent with applicable COVID-19 protocols.

While resources should be allocated to the priorities enumerated above, nothing in this memorandum prohibits the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities herein.  In order to ensure appropriate allocation of resources and exercise of prosecutorial discretion, the Acting Director of ICE shall issue operational guidance on the implementation of these priorities.  This guidance shall contain a protocol for the Acting Secretary to conduct a periodic review of enforcement actions to ensure consistency with the priorities set forth in this memorandum.  This guidance shall also include a process for the Director of ICE to review and approve of any civil immigration enforcement actions against individuals outside of federal, state or local prisons or jails.

These interim enforcement priorities shall go into effect on February 1, 2021 and remain in effect until superseded by revised priorities developed in connection with the review directed in section A.

**C.  Immediate 100-Day Pause on Removals**

In light of the unique circumstances described above, DHS's limited resources must be prioritized to: (1) provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at the southwest border fairly and efficiently; and (2) comply with COVID-19 protocols to protect the health and safety of DHS personnel and those members of the public with whom DHS personnel interact.  In addition, we must ensure that our removal resources are directed to the Department's highest enforcement priorities.  Accordingly, and pending the completion of the review set forth in section A, I am directing an immediate pause on removals of any noncitizen[1] with a final order of removal (except as noted below) for 100 days to go into effect as soon as practical and no later than January 22, 2021.

The pause on removals applies to any noncitizen present in the United States when this directive takes effect with a final order of removal except one who:

1. According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or
2. Was not physically present in the United States before November 1, 2020; or
3. Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver

---

[1] "Noncitizen" as used in this memorandum does not include noncitizen nationals of the United States.

3

and has been given a meaningful opportunity to access counsel prior to signing the waiver;[2] or

4. For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law.

No later than February 1, 2021, the Acting Director of ICE shall issue written instructions with additional operational guidance on the further implementation of this removal pause. The guidance shall include a process for individualized review and consideration of the appropriate disposition for individuals who have been ordered removed for 90 days or more, to the extent necessary to implement this pause.  The process shall provide for assessments of alternatives to removal including, but not limited to, staying or reopening cases, alternative forms of detention, custodial detention, whether to grant temporary deferred action, or other appropriate action.

### D.    No Private Right Statement

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

---

[2] A voluntary waiver encompasses noncitizens who stipulate to removal as part of a criminal disposition.

## APPENDIX

Department of Homeland Security, *Enforcement of the Immigration Laws to Serve the National Interest,* Memorandum of February 20, 2017.

U.S. Immigration and Customs Enforcement, *Implementing the President's Border Security and Interior Immigration Enforcement Policies*, Memorandum of February 20, 2017.

U.S. Immigration and Customs Enforcement, *Guidance to OPLA Attorneys Regarding the Implementation of the President's Executive Orders and the Secretary's Directives on Immigration Enforcement*, Memorandum of August 15, 2017.

US Citizenship and Immigration Services, *Updated Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens,* Policy Memorandum of June 28, 2018.  (US Citizenship and Immigration Services should revert to the preexisting guidance in Policy Memorandum 602-0050, US Citizenship and Immigration Services, *Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens*, Policy Memorandum of Nov. 7, 2011.)

US Citizenship and Immigration Services, *Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) When Processing a Case Involving Information Submitted by a Deferred Action for Childhood Arrivals (DACA) Requestor in Connection with a DACA Request or a DACA-Related Benefit Request (Past or Pending) or Pursuing Termination of DACA,* Policy Memorandum of June 28, 2018.

U.S. Customs and Border Protection, *Executive Orders 13767 and 13768 and the Secretary's Implementation Directions of February 17, 2017*, Memorandum of February 21, 2017.

# Exhibit B

2021 WL 247877
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Victoria Division.

State of TEXAS, Plaintiff,

v.

The UNITED STATES of America; David Pekoske,
Acting Secretary of the United States Department
of Homeland Security, in his official capacity;
United States Department of Homeland Security;
Troy Miller, Senior Official Performing the
Duties of the Commissioner of U.S. Customs and
Border Protection, in his official capacity; U.S.
Customs and Border Protection; Tae Johnson,
Acting Director of U.S. Immigration and Customs
Enforcement, in his official capacity; U.S.
Immigration and Customs Enforcement; Tracy
Renaud, Senior Official Performing the Duties of the
Director of the U.S. Citizenship And Immigration
Services, in her official capacity; and U.S.
Citizenship and Immigration Services, Defendants.

Civil Action No. 6:21-cv-00003
|
Signed 01/26/2021

**Synopsis**
**Background:** State of Texas brought action challenging
legality of Department of Homeland Security's (DHS)
announcement that it would place 100-day pause on removals.
State moved for temporary restraining order (TRO).

**Holdings:** The District Court, Drew B. Tipton, J., held that:

[1] state suffered sufficiently concrete injury to establish
standing to bring action;

[2] state was likely to succeed on merits of its claim that 100-
day pause violated Immigration and Nationality Act (INA);

[3] state was likely to succeed on merits of its claim that 100-
day pause was arbitrary and capricious;

[4] state demonstrated substantial threat of irreparable injury;

[5] balance of equities and public interest favored issuance of
TRO; and

[6] issuance of nationwide TRO was warranted.

Motion granted.

**Procedural Posture(s):** Motion for Temporary Restraining
Order (TRO).

West Headnotes (14)

**[1]    Injunction**  ⚷

Injunctive relief is extraordinary remedy that
may be awarded only upon clear showing that
plaintiff is entitled to such relief.

**[2]    Injunction**  ⚷

Preliminary injunction may issue only where (1)
there is substantial likelihood that movant will
prevail on merits; (2) there is substantial threat
that irreparable harm will result if injunction
is not granted; (3) threatened injury outweighs
threatened harm to defendant; and (4) granting
of preliminary injunction will not disserve public
interest.

**[3]    Injunction**  ⚷

Temporary restraining order (TRO) is meant only
to preserve status quo for very brief time, so as
to avoid irreparable injury pending hearing on
issuance of preliminary injunction.

**[4]    Injunction**  ⚷

In ruling on motion for temporary restraining
order (TRO), if currently existing status quo
itself is causing party irreparable injury, it is
necessary to alter situation so as to prevent injury,
by, inter alia, returning to last uncontested status
quo between parties.

**[5]    Injunction**  ⚷

State of Texas suffered sufficiently concrete injury to establish standing to bring action to enjoin federal government's 100-day pause on removals by alleging that it faced "millions of dollars of losses" in spending on public services to illegal aliens.

**[6]    Injunction** 🔑

State of Texas was likely to succeed on merits of its claim that Department of Homeland Security's (DHS) announcement that it would place 100-day pause on removals violated Immigration and Nationality Act's (INA) requirement that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days," for purposes of determining Texas's entitlement to temporary restraining order (TRO), despite INA's jurisdictional bar against claims arising from government's decision or action to execute removal orders brought "by or on behalf of any alien"; statute's 90-day removal rule was mandatory, and Texas did not bring action on "behalf of any alien." 🚩 5 U.S.C.A. § 701(a)(1); Immigration and Nationality Act §§ 241, 242, 🚩 8 U.S.C.A. §§ 1231(a)(1)(A), 🚩 1252(g).

**[7]    Administrative Law and Procedure** 🔑

Agency's actions are "final" and subject to review under Administrative Procedure Act (APA) where (1) action marks consummation of agency's decision-making process and (2) action is one by which rights or obligations have been determined. 5 U.S.C.A. § 704.

**[8]    Injunction** 🔑

State of Texas was likely to succeed on merits of its claim that Department of Homeland Security's (DHS) announcement that it would place 100-day pause on removals was arbitrary and capricious, in violation of Administrative Procedure Act (APA), for purposes of determining Texas's entitlement to temporary restraining order (TRO), despite

DHS's claim that pause was necessary to provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at southwest border fairly and efficiently and to comply with COVID-19 protocols; memorandum announcing pause failed to consider potential policies more limited in scope and time or to provide any concrete, reasonable justification for pause. 🚩 5 U.S.C.A. § 706(2)(A).

**[9]    Administrative Law and Procedure** 🔑

Federal administrative agencies are required to engage in reasoned decision-making. 🚩 5 U.S.C.A. § 706(2)(A).

**[10]    Administrative Law and Procedure** 🔑

Not only must agency's decreed result be within scope of its lawful authority, but process by which it reaches that result must be logical and rational. 🚩 5 U.S.C.A. § 706(2)(A).

**[11]    Injunction** 🔑

To establish substantial threat of irreparable injury required for temporary restraining order (TRO), movant's injury need not have already been inflicted or be certain to occur; strong threat of irreparable injury before trial on merits is adequate.

**[12]    Injunction** 🔑

State of Texas demonstrated substantial threat of irreparable injury, as factor for temporary restraining order (TRO) in its action challenging legality of Department of Homeland Security's (DHS) announcement that it would place 100-day pause on removals; state paid millions of dollars annually to provide social services and uncompensated healthcare expenses and other state-provided benefits to removable noncitizens that it could not recover by suing federal government.

**[13]**    **Injunction**  🗝️

Balance of equities and public interest favored issuance of temporary restraining order (TRO) in action by state of Texas challenging legality of Department of Homeland Security's (DHS) announcement that it would place 100-day pause on removals; DHS was free to conduct measured and considered assessment of immigration policies regardless of existence of 100-day pause, and any inefficiency suffered by federal immigration authorities caused by immediate injunction was outweighed by losses that state would face.

**[14]**    **Injunction**  🗝️

Issuance of nationwide temporary restraining order (TRO) was warranted in state of Texas's action challenging legality of Department of Homeland Security's (DHS) announcement that it would place 100-day pause on removals; 100-day pause plainly affected national immigration policy, partial implementation of TRO would inevitably detract from Congress's integrated scheme of regulation, and geographically limited TRO would not effectively protect Texas's interests because of free flow of movement among states.

**Attorneys and Law Firms**

Patrick K. Sweeten, William Thomas Thompson, Office of the Attorney General, Austin, TX, for Plaintiff.

Adam David Kirschner, Pro Hac Vice, USDOJ, Civil Division, Washington, DC, Brian C. Rosen-Shaud, Daniel David Hu, Office of the US Attorneys Office, Houston, TX, for Defendants United States of America, United States Department of Homeland Security, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, U.S. Citizenship and Immigration Services.

Adam David Kirschner, Pro Hac Vice, USDOJ, Civil Division, Washington, DC, Brian C. Rosen-Shaud, for Defendants David Pekoske, Troy Miller, Tracy Renaud.

Adam David Kirschner, Pro Hac Vice, USDOJ, Civil Division, Brian C. Rosen-Shaud, Pro Hac Vice, US Department of Justice, Washington, DC, for Defendant Tae Johnson.

## ORDER GRANTING PLAINTIFF'S EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Drew B. Tipton, UNITED STATES DISTRICT JUDGE

**\*1**   The State of Texas requests a Temporary Restraining Order ("TRO") to enjoin Defendants from executing a 100-day pause on the removal of aliens already subject to a final Order of Removal. [1] The 100-day pause was set into motion through a recent Memorandum of the Department of Homeland Security on January 20, 2021 (the "January 20 Memorandum"). (Dkt. No. 2-2). In relevant part, the January 20 Memorandum directs "an immediate pause on removals of any noncitizen with a final order of removal ... for 100 days." [2] (Dkt. No. 2-2 at 4–5). After reviewing Texas's Emergency Application, the arguments of Texas's and Defendants' counsel on January 22, 2021, the Defendants' Response filed on January 24, 2021, the brief of Amicus, the record, and the applicable law, the Court finds that Texas has satisfied the requirements for a TRO. Accordingly, Texas's Emergency Application for a TRO is **GRANTED**. In so doing, the Court makes clear that this Order is not based on the "Agreement Between Department of Homeland Security and the State of Texas" attached as Exhibit "A" to Plaintiff's Complaint. The issues implicated by that Agreement are of such gravity and constitutional import that they require further development of the record and briefing prior to addressing the merits. Rather, the Court finds that a TRO maintaining the status quo as it existed prior to the implementation of the January 20 Memorandum's 100-day pause is appropriate under the Administrative Procedures Act (the "APA"). Accordingly, and pursuant to Rule 65 of the Federal Rules of Civil Procedure, Defendants are enjoined from executing the 100-day pause on removals for 14 days for the reasons and in the manner described below.

## I. LEGAL STANDARD FOR A TEMPORARY RESTRAINING ORDER

**[1]** **[2]** The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). Injunctive relief is "an extraordinary remedy" that may be awarded only upon "a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). "[S]uch extraordinary relief would issue only where (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest." *Clark*, 812 F.2d at 993. "The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Id.* But "none of the four prerequisites has a fixed quantitative value." *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* (citing *Siff v. State Democratic Exec. Comm.*, 500 F.2d 1307 (5th Cir. 1974)).

## II. APPLICATION

**\*2** In its Emergency Application, Texas argues it will likely succeed on the merits of its challenges to the January 20 Memorandum, there is a significant risk it would suffer imminent and irreparable harm if a TRO is not granted, and a TRO would not harm Defendants or the public. (Dkt. No. 2 at 7–19). The Court agrees.

**[3]** **[4]** Before addressing those elements, the Court pauses to note a temporary restraining order is meant only to "preserve, for a very brief time, the status quo, so as to avoid irreparable injury pending a hearing on the issuance of a preliminary injunction." *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 829 (5th Cir. 1976). Importantly, "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, ... by, [*inter alia*,] returning to the *last uncontested status quo* between the parties." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (emphasis, ellipsis, and alteration added) (citation

omitted); *see also United States v. FDIC*, 881 F.2d 207, 210 (5th Cir. 1989) ("[T]he district court has the equitable power to return the parties to their last uncontested status."). The Court finds that the "last uncontested status quo" here is the status of Defendants' removal policy prior to issuance of the January 20 Memorandum's 100-day pause on removals. *See Callaway*, 489 F.2d at 576.

### A. SUBSTANTIAL LIKELIHOOD THAT TEXAS WILL PREVAIL ON THE MERITS

A TRO is appropriate only where the plaintiff shows that there is a substantial likelihood it will prevail on the merits. *Clark*, 812 F.2d at 993. Indeed, the Fifth Circuit has cautioned that "it is inequitable to temporarily enjoin a party from undertaking activity which he has a clear right to pursue." *Seatrain*, 518 F.2d at 180.

Texas has asserted six claims against Defendants in its Complaint. (Dkt. No. 1 at ¶¶ 38–72). At this early stage, the Court finds Texas has a substantial likelihood of success on *at least* two: (Count II) Texas's claim that the January 20 Memorandum's 100-day pause should be set aside pursuant to Section 706 of the APA because it violates 8 U.S.C. § 1231(a)(1)(A),[3] and (Count IV) Texas's claim that Defendants arbitrarily and capriciously departed from its previous policy without sufficient explanation. To succeed on its Application for a TRO, Texas need only demonstrate a likelihood of success on "at least one" claim. *See Texas v. United States*, 86 F. Supp. 3d 591, 672 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), as revised (Nov. 25, 2015). The Court defers ruling on the remaining Counts, which should not be construed as an indication of the Court's view of their merits.

**[5]** Before addressing Counts II and IV, the Court must briefly address an issue concerning its jurisdiction under Article III. Defendants contend Texas cannot establish standing for these claims since Texas has asserted only "fiscal harm." (Dkt. No. 8 at 17–18). The Court disagrees. The panel in *Texas v. United States*, addressing similar claims, held that the plaintiff-states had pleaded a sufficiently concrete injury by demonstrating the harm to "the states' fisc," such as "millions of dollars of losses in Texas alone." 809 F.3d 134, 150–61, 162–63 (5th Cir. 2015), *aff'd by an equally divided Court*, ––––U.S. ––––, 136 S.Ct. 2271, 195 L.Ed.2d

638 (2016) (mem.). Thus, the Fifth Circuit distinguished its holding from its previous ruling in *Crane v. Johnson*, where the plaintiff-state had "waived" the harm-to-public-fisc theory the plaintiff-states advanced in *Texas.* 809 F.3d at 150 n.24. Here, Texas asserts and has provided evidence that the 100-day pause will result in millions of dollars of damage to its public fisc by causing it to increase its spending on public services to illegal aliens. (Dkt. No. 2 at 18; Dkt. Nos. 2-4, 2-5). The Court is therefore satisfied for now that Texas has established an injury-in-fact. The Court also finds, for now, that Texas's alleged injury is fairly traceable and redressable. *See Bennett v. Spear*, 520 U.S. 154, 167–71, 117 S.Ct. 1154, 1163–65, 137 L.Ed.2d 281 (1997).

### 1. Count II: Failure to Remove Illegal Aliens in Violation of 8 U.S.C. § 1231

**\*3** Texas claims that the 100-day pause violates 8 U.S.C. § 1231(a)(1)(A). (Dkt. No. 1 at ¶¶ 43–49). That section provides, "when an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A) (emphasis added). Texas contends that Defendants' alleged violation of § 1231(a)(1)(A) gives rise to a claim under the APA. (Dkt. No. 1 at ¶ 45). In relevant part, § 706 of the APA provides that "a reviewing court shall hold unlawful and set aside agency action ... found to be (A) ... not in accordance with law" and "(C) in excess of statutory ... authority." 5 U.S.C. § 706(2)(A), (C). Texas argues the 100-day pause on removals is not in accordance with law and in excess of the government's statutory authority under § 1231(a)(1)(A). (Dkt. No. 1 at ¶ 45). Further, Texas avers that Defendants' alleged violation of § 1231(a)(1)(A) causes Texas irreparable harm. (Dkt. No. 1 at ¶ 47).

Defendants respond that the 100-day pause does not violate § 1231(a)(1)(A) because that provision "does not mandate removal within the 90-day removal period." (Dkt. No. 8 at 15). Defendants also assert that Texas's claims are not subject to judicial review, that the January 20 Memorandum is not a "final agency action" as provided by 5 U.S.C. § 704, and Texas's claims are barred by 8 U.S.C. § 1231(h). (*Id.* at 13–16).

**[6]** The Court finds that, by ordering a 100-day pause on all removals of aliens already subject to a final order of removal, it appears that the January 20 Memorandum is clearly not in accordance with, or is in excess of, the authority accorded to the Attorney General pursuant to 8 U.S.C. § 1231(a)(1)(A). In other words, the Court disagrees with Defendants' argument that the 100-day pause does not violate § 1231(a)(1)(A). Defendants' argument rests upon an interpretation of § 1231(a)(1)(A) that contravenes the unambiguous text. Section 1231(a)(1)(A) provides that, "when an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A) (emphasis added). "[T]he word 'shall' usually connotes a requirement." *Me. Cmty. Health Options v. United States*, ––– U.S. ––––, 140 S.Ct. 1308, 1320, 206 L.Ed.2d 764 (2020) (internal quotation omitted). Here, "shall" means *must. Tran v. Mukasey*, 515 F.3d 478, 481–82 (5th Cir. 2008) ("[W]hen a final order of removal has been entered against an alien, the government *must* facilitate that alien's removal from the United States within ninety days, a period generally referred to as the removal period.") (emphasis added) (citing 8 U.S.C. § 1231(a)(1)(A)). This mandatory language of § 1231(a)(1)(A) is not neutered by the federal government's broad discretion in operating "the removal system" as a general matter, *see, e.g. Arizona v. United States*, 567 U.S. 387, 396–97, 132 S.Ct. 2492, 2499, 183 L.Ed.2d 351 (2012), the existence of statutes and caselaw outlining procedure in the event that practical circumstances prevent removal within 90 days, *see, e.g.* 8 U.S.C. § 1231(a)(1)(C); *Zadvydas v. Davis*, 533 U.S. 678, 701, 121 S.Ct. 2491, 2505, 150 L.Ed.2d 653 (2001), or regulations providing aliens an avenue to request a stay of deportation or removal, 8 C.F.R. § 241.6. Where Congress uses specific language within its immigration statutes to direct the Attorney General toward a specific result, courts are not free to assume based on a matrix of principles, statutes, and regulations that the Attorney General's authority is simply "a matter of discretion." *Zadvydas*, 533 U.S. at 688, 121 S.Ct. at 2497–98.

Defendants' arguments that judicial review of the January 20 Memorandum is improper also fail. To this end, Defendants

advance two arguments. First, Defendants contend that 5 U.S.C. § 701(a)(1), which bars judicial review where a "statute[ ] preclude[s] judicial review," applies here in light of 8 U.S.C § 1252(g). (Dkt. No. 8 at 13). The Court disagrees. In relevant part, § 1252(g) prevents courts from exercising jurisdiction over claims arising from the government's decision or action to execute removal orders brought "by or on behalf of any alien." 8 U.S.C § 1252(g). Texas is not an alien. Nor does Texas bring this action "on behalf of" any alien. Therefore, § 1252(g) does not apply to this Court's review. *See Texas*, 809 F.3d at 164. Second, Defendants contend that 5 U.S.C. § 701(a)(2), which precludes judicial review where "agency action is committed to agency discretion by law," applies here in light of Defendants' prosecutorial discretion in matters of immigration law generally and executing removal orders in particular. (Dkt. No. 8 at 13–14). Here again, the Court disagrees. As explained above, § 1231(a)(1)(A) clearly accords no discretion to the Attorney General to blatantly disregard the 90-day removal rule without finding that an enumerated exception applies. *See, e.g., Tran*, 515 F.3d at 481–82 (discussing narrow and explicitly defined exceptions to the mandatory 90-day removal rule in 8 U.S.C.§ 1231(a) (6)); *Heckler v. Chaney*, 470 U.S. 821, 832–34, 105 S.Ct. 1649, 1656–57, 84 L.Ed.2d 714 (1985) (finding that the normal presumption that the Executive's nonenforcement of a statute is unreviewable is rebuttable where "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers"). *Cf.* Brief for the Petitioners at *26–28, *Reno v. Ma (Zadvydas v. Davis)*, 533 U.S. 678, 121 S.Ct. 2491 (No. 00-38) (2000 WL 1784982) (arguing *on behalf of the Attorney General* that the language of 8 U.S.C. § 1231(a)(2) is mandatory and that § 1231(a)(6)'s provision of discretionary authority is exceptional). Thus, Defendants do not have discretion to completely disregard § 1231(a)(1)(A) and their January 20 Memorandum appearing to do so is reviewable.

**\*4** **[7]** Defendants' argument that the January 20 Memorandum is not a "final agency action" subject to review under 5 U.S.C. § 704 also fails. In *Bennett v. Spear*, the Supreme Court explained that an agency's actions are

sufficiently "final" to satisfy § 704 where (1) the action marks the "consummation" of the agency's decision-making process and (2) the action is one by which "rights or obligations have been determined." 520 U.S. 154, 177–78, 117 S.Ct. 1154, 1168, 137 L.Ed.2d 281 (1997). Here, the January 20 Memorandum's order "directing an immediate pause on removals of any noncitizen with a final order of removal" is sufficiently final and immediate to denote the consummation of the agency's decision as it relates to a pause in removals. (Dkt. No. 2-2 at 4). As well, it seems clear that Defendants, through the January 20 Memorandum's 100-day pause, have disregarded their previous legal "obligations" and adjudication of the aliens' "rights" by inexplicably ordering a reassessment of *all* previous orders for removal and plainly ignoring the statutory mandate of § 1231(a)(1)(A) to remove aliens within 90 days. (Dkt. No. 2-2 at 4-5).

Finally, Defendants contend Texas is barred from suing by 8 U.S.C. § 1231(h). That section states that "nothing" in all of § 1231 "shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against" the government. 8 U.S.C. § 1231(h). Defendants' reliance on 8 U.S.C. § 1231(h) overstates the scope of that subsection's limitations. The Supreme Court in *Zadvydas* explained that, although § 1231(h) "forbids courts to construe that section 'to create any ... procedural right or benefit that is legally enforceable,'" it in no way "deprive[s] an alien of the right to rely on 28 U.S.C. § 2241 to challenge detention that is without statutory authority." 533 U.S. at 678–88, 121 S.Ct. at 2497. Similarly, here, § 1231(h) does not preclude Texas from challenging § 1231(a)(1)(A) under 5 U.S.C. § 706.

The Court therefore finds Texas has demonstrated a substantial likelihood of success on its claim that the January 20 Memorandum's 100-day pause on removals violates 8 U.S.C. § 1231(a)(1)(A).

## 2. Count IV: Arbitrary and Capricious

**[8]** Texas argues that the January 20 Memorandum is arbitrary and capricious because it was issued "without any consideration whatsoever of a [more limited] policy." (Dkt.

No. 2 at 12) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, ––– U.S. ––––, 140 S.Ct. 1891, 1912, 207 L.Ed.2d 353 (2020)). Defendants disagree, contending DHS "not only considered but enacted a specifically limited interim policy," the January 20 Memorandum's terms are "limited in both scope and time, and [they exempt] four classes of aliens from the pause on removal." (Dkt. No. 8 at 16). The Court agrees with Texas and finds Defendants' assertions unpersuasive.

[9]  [10]  The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374, 118 S.Ct. 818, 826, 139 L.Ed.2d 797 (1998) (internal quotation omitted). "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* Put differently, "agency action is lawful only if it rests 'on a consideration of the relevant factors.' " *Michigan v. EPA*, 576 U.S. 743, 750, 135 S.Ct. 2699, 2706, 192 L.Ed.2d 674 (2015) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)).

Here, the January 20 Memorandum not only fails to consider potential policies more limited in scope and time, but it also fails to provide any concrete, reasonable justification for a 100-day pause on deportations. The January 20 Memorandum states that the 100-day pause is required to assess immigration policies because of the "unique circumstances" present with respect to immigration, including "significant operational challenges at the southwest border as [the United States] is confronting the most serious global public health crisis in a century." (Dkt. No. 2-2 at 2). DHS specifically cites to its apparent (1) need for a comprehensive review of enforcement policies, (2) need for interim civil enforcement guidelines, and (3) "limited resources" that would necessitate a pause in executing removal orders. (*Id.* at 2–5). Additionally, the January 20 Memorandum states that the 100-day pause in deportations is necessary to "(1) provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at the southwest border fairly and efficiently; and (2) comply with COVID-19 protocols to protect the

health and safety of DHS personnel and those members of the public with whom DHS personnel interact." (*Id.* at 3). The January 20 Memorandum also provides that DHS "must ensure that [the agency's] removal resources are directed to the Department's highest enforcement priorities." (*Id.*). DHS, however, never explains how the pause in removals helps accomplish these goals. It remains unknown why a 100-day pause is needed given the allegedly "unique circumstances" to which the January 20 Memorandum alludes. Indeed, despite such unique circumstances, DHS did not state or explain why 100 days *specifically* is needed to accomplish these goals. The silence of the January 20 Memorandum on these questions indicates that the terms provided for in the Memorandum were not a result of "reasoned decision-making." *Allentown Mack Sales*, 522 U.S. at 374, 118 S.Ct. at 826.

**\*5**  The Court recognizes that the TRO process is expedited, and the record and briefing are abbreviated at this point. With an eye towards the preliminary injunction stage, Defendants will have an opportunity to supplement the record. [4]

Accordingly, the Court finds that Texas has established a substantial likelihood that it will prevail on the merits of at least these two claims.

## B. SUBSTANTIAL THREAT OF IRREPARABLE HARM

[11]  In addition to showing a likelihood of success on the merits of a claim, Texas is required to demonstrate "a substantial threat of irreparable injury if the injunction is not issued." *Texas*, 809 F.3d at 150. To meet this requirement, Texas's injury "need not have already been inflicted or be certain to occur; a strong threat of irreparable injury before a trial on the merits is adequate." *Texas v. United States*, 328 F. Supp. 3d 662, 736 (S.D. Tex. 2018) (Hanen, J.).

[12]  In this case, Texas has presented evidence it would suffer injuries for various reasons if an injunction is not entered. First, Texas demonstrates that it pays millions of dollars annually to provide social services and uncompensated healthcare expenses and other state-provided benefits to illegal aliens such as the Emergency Medicaid program, the Family Violence Program, and the Texas Children's Health Insurance Program. (Dkt. No. 2 at 16–17). Additionally, Texas has presented evidence that it would incur increased educational costs. (Dkt. No. 2 at 17). Texas

asserts that these expenses will grow because of the January 20 Memorandum. (Dkt. No. 2 at 16). The January 20 Memorandum expressly states that the Acting Director of ICE "shall provide for alternatives to removal" for those who have already been ordered to be removed, including but not limited to "whether to grant temporary deferred action." (Dkt. No. 2-2). In light of this mandatory reassessment for "alternatives to removal," Texas anticipates suffering financial harm from which it cannot recover by suing the federal government. *See Texas*, 328 F. Supp. 3d at 737 (citing *Texas v. United States*, 106 F.3d 661, 662 (5th Cir. 1997)).

Further, Texas argues that "the categorical refusal to remove aliens ordered removable will encourage additional illegal immigration into Texas," thereby exacerbating its public service costs. (Dkt. No. 2 at 17). During the January 22, 2021 hearing, Texas argued that the January 20 Memorandum's pause on removals increases its fiscal burden not only because of those aliens illegally present in Texas, but also because of those who may find their way to Texas from other states in the near future. Such injury is not, as a legal matter, purely speculative. The Fifth Circuit has expressly found that injuries to one state can flow from the fact that illegal aliens are "free to move among states." *Texas*, 809 F.3d at 188.

The Court finds that the foregoing establishes a substantial risk of imminent and irreparable harm to Texas. As a result, Texas has satisfied this element for a TRO as well.

### C. SUBSTANTIAL INJURY TO TEXAS OUTWEIGHS HARM TO DEFENDANTS AND WILL NOT UNDERMINE THE PUBLIC INTEREST

**\*6** Texas is next required to establish that that the threatened injury outweighs any harm that may result from the injunction to the non-movant and will not undermine the public interest. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

Texas argues that Defendants cannot be harmed by the TRO because "[t]hey have no legitimate interest in the implementation of an unlawful memorandum." (Dkt. No. 2 at 19). Defendants disagree and assert that there is a public interest in "measured and considered assessments of immigration policies by an incoming Administration." (Dkt. No. 8 at 13). Defendants further argue that "an injunction here

would disrupt the Administration's careful calibration of how to conduct a necessary review." (*Id.*).

**[13]** The Court finds Defendants' arguments unpersuasive. Defendants are free to conduct a "measured and considered assessment" of immigration policies regardless of the existence of the January 20 Memorandum's 100-day pause. Furthermore, the Fifth Circuit explained in *Texas* that "any inefficiency" suffered by federal immigration authorities caused by an immediate injunction is outweighed by the losses a plaintiff *State would face*. 809 F.3d at 187 (emphasis added).

Indeed, courts have recognized that the public interest is served by the execution of removal orders. *See Nken v. Holder*, 556 U.S. 418, 436, 129 S.Ct. 1749, 1762, 173 L.Ed.2d 550 (2009) ("There is *always* a public interest in prompt execution of removal orders." (emphasis added)); *see also Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) (collecting cases to support the proposition that "the public interest in enforcement of the immigration *laws* is significant" (emphasis added)). To this end, one of Texas's claims involves an allegation that the January 20 Memorandum's *100-day pause* contravenes § 1231(a)(1)(A)'s mandate that aliens subject to an order of removal be removed *within 90 days*. (Dkt. No. 2 at 10). The public's interest is not disserved by temporarily enjoining this policy.

In light of the foregoing, the Court finds that the threat of injury to Texas outweighs any potential harm to Defendants and the public interest is served and protected by the issuance of this TRO. The Court therefore finds that Texas has met its burden to satisfy these elements for a TRO.

\* \* \*

In summary, Texas has thus far satisfactorily demonstrated it is entitled to immediate and temporary relief from the January 20 Memorandum's 100-day pause on removals. The scope of this relief warrants additional attention.

### D. SCOPE OF RELIEF

Nationwide injunctions [5] of executive action are a topic of fierce and ongoing debate in both the courts and the legal academy. *Compare, e.g., DHS v. New York*, ——— U.S.

——, 140 S.Ct. 599, 599–601, 206 L.Ed.2d 115 (2020) (mem.) (Gorsuch, J., concurring) (articulating a common flaw in "injunctions of 'nationwide,' 'universal,' or 'cosmic' scope"); *Trump v. Hawaii*, —— U.S. ——, 138 S.Ct. 2392, 2424–2429, 201 L.Ed.2d 775 (2018) (Thomas, J., concurring) (calling the practice of nationwide or "universal" injunctions "legally and historically dubious"); Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 461 (2017) (arguing "[n]ational injunctions interfere with good decisionmaking by the federal judiciary"); *with* East Bay Sanctuary Covenant v. Barr, 964 F.3d 832, 857 (9th Cir. 2020) (calling nationwide injunctions "uniquely appropriate in immigration cases"); Alan M. Trammell, *The Constitutionality of Nationwide Injunctions*, 91 U. COLO. L. REV. 977, 980–89 (2020) (arguing nationwide injunctions do not transgress Article III); Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. REV. 1065, 1080–1103 (2018) (arguing nationwide injunctions are appropriate as a constitutional *and* prudential matter); *see also* Alan M. Trammel, *Demystifying Nationwide Injunctions*, 98 TEX. L. REV. 67, 103–116 (2019) (proposing a "preclusion-based theory of nationwide injunctions"); Jonathan Remy Nash, *State Standing for Nationwide Injunctions Against the Federal Government*, 94 NOTRE DAME L. REV. 1985, 2012 (2019) (discussing at length the interplay between standing doctrine and nationwide injunctions where states seek relief against the federal government and concluding narrowly that "special solicitude should make nationwide injunctions potentially available in cases where plaintiff states can allege standing but other (nonstate) plaintiffs cannot").

**\*7** This Court is likewise concerned about the issuance of nationwide injunctions by a district court. Notwithstanding its concerns, as a district court, this Court is duty bound to faithfully apply the precedents of its Circuit. The Fifth Circuit has addressed the propriety of a nationwide injunction in the immigration context. In *Texas*, the Fifth Circuit held that "[i]t is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." 809 F.3d at 188. The "appropriate circumstances" warranting a nationwide injunction in *Texas* itself included a need for "uniformity" in immigration policies as prescribed by the Constitution, federal statutes, and Supreme Court precedent. *Id.* at 187–88 (citing U.S. CONST. art. I, § 8, cl. 4; Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384; *Arizona*, 567 U.S.

at 401, 132 S.Ct. at 2502). The Fifth Circuit in *Texas* also reasoned that "partial implementation" of the agency action being enjoined would detract from the "integrated scheme of regulation created by Congress." *Id.* at 188 (internal quotation omitted). And lastly, the panel found there was "a substantial likelihood that a geographically-limited injunction would be ineffective because [illegal aliens] would be free to move among states." *Id.*

**[14]** The Fifth Circuit's rationale in affirming a nationwide injunction in *Texas* applies with equal force here. The January 20 Memorandum's 100-day pause plainly affects national immigration policy, which demands "uniformity." *Id.* at 187–88; *see also* East Bay Sanctuary Covenant, 964 F.3d at 857 (citing *Texas*, 809 F.3d at 187–88). Because the January 20 Memorandum's 100-day pause impacts numerous statutes and agency regulations concerning removals and detention policies, its partial implementation would inevitably detract from Congress's "integrated scheme of regulation."[6] *Id.* at 188. Lastly, a geographically limited injunction of the January 20 Memorandum's 100-day pause on removals would not effectively protect Texas's interests because of the free flow of movement among the states. In other words, many individuals who are subject to an order of removal in other states whose removal is delayed or ultimately deferred may migrate to Texas. As described above, Texas has persuasively demonstrated a substantial risk of irreparable harm in part because of the potential increased flow of illegal aliens from other states.

**\*8** Accordingly, the Court finds that, under the circumstances here, Defendants must be enjoined from executing the January 20 Memorandum's 100-day pause on the removal of aliens in *every* place Defendants would have jurisdiction to implement it.

That said, the Court notes that the scope of this injunction is something it is willing to revisit after the parties fully brief and argue the issue for purposes of the upcoming motion for preliminary injunction. Though the scope of this TRO is broad, it is not necessarily permanent.

### III. CONCLUSION
For the foregoing reasons, the Court **GRANTS** Texas's Emergency Application. (Dkt. No. 2). Therefore, it is hereby **ORDERED** that:

1. Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby ENJOINED and RESTRAINED from enforcing and implementing the policies described in the January 20 Memorandum in Section C entitled "Immediate 100-Day Pause on Removals."[7] (Dkt. No. 2-2 at 4–5).

2. This TRO is granted on a nationwide basis and prohibits enforcement and implementation of the policies described in the January 20 Memorandum in Section C entitled "Immediate 100-Day Pause on Removals" in every place Defendants have jurisdiction to enforce and implement the January 20 Memorandum.

3. No security bond is required under Federal Rule of Civil Procedure 65(c).

4. Finally, the Court ORDERS the parties to propose a briefing schedule no later than Thursday, January 28, 2021 at 12:00 p.m. with respect Texas's Request for Preliminary Injunction in its Complaint. The parties should also address whether expedited discovery is necessary and the contours and scheduling for same. The Court will promptly schedule a hearing on the Motion for Preliminary Injunction, if requested and necessary.

It is SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2021 WL 247877

## Footnotes

1    "[I]n the deportation context, a 'final order of removal' is a final order concluding that the alien is deportable or ordering deportation." Nasrallah v. Barr, ––– U.S. ––––, 140 S.Ct. 1683, 1690, 207 L.Ed.2d 111 (2020).

2    The January 20 Memorandum excludes from the 100-day pause any alien with a final removal order who:
     1. According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or
     2. Was not physically present in the United States before November 1, 2020; or
     3. Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver and has been given a meaningful opportunity to access counsel prior to signing the waiver; or
     4. For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law.
     (Dkt. No. 2-2 at 4–5 (footnote omitted)).

3    Section 1231 states: "Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A).

4    The Court notes, however, that "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

5    The term "nationwide injunction" is infamously wrought with imprecision. See Alan M. Trammel, Demystifying Nationwide Injunctions, 98 TEX. L. REV. 67, 72 n.23 (2019) (collecting sources and listing alternatives commonly used, such as "national injunction," "defendant-oriented injunction," and "universal injunction"). One scholar employs the term "nationwide injunctions," despite it being a "deeply imperfect term," because it appears to be the "most familiar." Id. at 72. With the same qualification and rationale, the Court does so here.

6    In addition, nationwide injunctions have been found to be appropriate when plaintiffs present claims alleging that defendant federal agencies have violated the APA. See, e.g., Nat'l Mining Ass'n v. U.S. Army Corps

*of Eng'rs*, 145 F.3d 1399, 1407–08 (D.C. Cir. 1998) (invalidating an agency rule and affirming the nationwide injunction); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."). Indeed, other district courts have noted that a geographically restricted injunction issued to remedy "likely unlawful agency actions" meant to be "appl[ied] universally" would, among other things, "invite[ ] arbitrary enforcement" on the part of the federal agency "and create[ ] more questions than it answers." *Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 271 (S.D.N.Y. 2020); *see also* *New York v. United States Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 352 (S.D.N.Y. 2019), *aff'd as modified*, 969 F.3d 42 (2d Cir. 2020). ("A geographically limited injunction that would result in inconsistent applications of [immigration policy in the context of public charge determinations] ... is inimical to [the] need for uniformity in immigration enforcement."). By contrast, a sister Circuit, presiding over a challenge to certain rules stemming from the implementation of the Affordable Care Act, vacated the scope of a nationwide injunction "when an injunction that applies only to the plaintiff states *would provide complete relief*" to the plaintiffs. *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (emphasis added). As explained in this section, the Court's injunction is consistent with *Azar*'s aim of providing "complete relief" to the plaintiff.

7       This Order does not in any way limit Defendants' efforts to carry out or adhere to the January 20 Memorandum's other sections, entitled "A. Comprehensive Review of Enforcement Policies and Priorities," (Dkt. No. 2-2 at 3), "B. Interim Civil Enforcement Guidelines," (*id.*), or "D. No Private Right Statement," (*id.* at 5). This injunction is effective for 14 days as prescribed by Rule 65 of the Federal Rules of Civil Procedure.

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit C

**AGREEMENT BETWEEN THE DEPARTMENT OF HOMELAND SECURITY AND
THE ARIZONA ATTORNEY GENERAL'S OFFICE AND THE ARIZONA
DEPARTMENT OF LAW**

The parties to this Sanctuary for Americans First Enactment (SAFE) Agreement (Agreement) are
on the one hand:

      (1)     The Department of Homeland Security,
      (2)     U.S. Customs and Border Protection (CBP),
      (3)     U.S. Immigration and Customs Enforcement (ICE), and
      (4)     U.S. Citizenship and Immigration Services (USCIS);[1]

  and on the other hand:

      (5)     the Arizona Attorney General's Office and the Arizona Department of Law
              (Agency).

## I.    AUTHORITY

The authorities governing this Agreement include, but are not limited to:

      (1)     Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended.
      (2)     Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended.
      (3)     Privacy Act, 5 U.S.C. Section 552a, as amended.
      (4)     The Inter-Governmental Cooperation Act, 31 U.S.C. Section 6501, *et. seq.* as amended.
      (5)     Homeland Security Act of 2002, 116 Stat. 2135, 6 U.S.C. Section 101, *et seq.* as amended.
      (6)     Immigration and Nationality Act, 8 U.S.C. Section 1101, *et seq.* as amended.

## II.    PURPOSE AND COMMITMENT

DHS recognizes that Agency, like other state agencies and municipalities, is directly and
concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing,
or limiting immigration enforcement. Such changes can negatively impact Agency's law
enforcement needs and budgets, as well as its other important health, safety, and pecuniary
interests of the State of Arizona. The harm to Agency is particularly acute where Agency's

---

[1] The Department of Homeland Security, CBP, ICE, and USCIS are collectively referred to in
this Agreement as "DHS." The Department of Homeland Security, CBP, ICE, and USCIS enter
into this Agreement individually and collectively, such that termination or removal of one or
more of those parties (whether by law or contract) (including the Department of Homeland
Security) does not terminate this Agreement as to any other parties.

budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes. Specifically, DHS recognizes that the following actions result in direct and concrete injuries to Agency, including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased economic competition with the State of Arizona's current residents for, among other things, employment, housing, goods and services:

    (1)    a decrease of any immigration enforcement priorities;

    (2)    a voluntary reduction in the number of DHS agents performing immigration enforcement functions;

    (3)    a decrease or pause on returns or removals of removable or inadmissible aliens;

    (4)    a decrease or pause on apprehensions or administrative arrests;

    (5)    relaxation of the standards for granting relief from return or removal, such as asylum;

    (6)    an increase in releases from detention;

    (7)    a relaxation of the standards for granting release from detention;

    (8)    changes to immigration benefits or eligibility, including work authorization, discretionary actions, or discretionary decisions; and

    (9)    rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community.

At the same time, Agency recognizes that DHS relies on cooperation with Agency and information shared by Agency to carry out DHS's functions, including but not limited to combating financial crimes, internet crimes against children, and human trafficking, as well as immigration enforcement. Any decrease in a State's or municipality's cooperation or information sharing with DHS can result in a decrease in these law enforcement priorities.

To that end, this Agreement establishes a binding and enforceable commitment between DHS and Agency, in which Agency will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, national security, and other law enforcement missions in exchange for DHS's commitment to consult Agency and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

    (1)    reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;

    (2)    decrease the number of ICE agents performing immigration enforcement duties;

    (3)    pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;

    (4)    increase or decline to decrease the number of lawful, removable, or inadmissible aliens;

    (5)    increase or decline to decrease the number of releases from detention;

    (6)    relax the standards for granting relief from return or removal, such as asylum;

(7)     relax the standards for granting release from detention;

(8)     relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;

(9)     increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions for aliens; or

(10)    otherwise negatively impact Agency.

In case of doubt, DHS will err on the side of consulting with Agency.

## III.   RESPONSIBILITIES

### A.   DHS agrees to:

(1)     Utilize its immigration authorities, to the maximum extent possible, to prioritize the protection of the United States and its existing communities. This includes:

    a.     enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens;

    b.     enforcing the immigration laws of the United States to prioritize detention over release of inadmissible and removable aliens;

    c.     enforcing the immigration laws of the United States to apprehend and administratively arrest inadmissible and removable aliens;

    d.     eliminating incentives and so-called "pull factors" for illegal immigration;

    e.     limiting eligibility for asylum and other relief from detention, return, or removal to the statutory criteria; and

    f.     refusing asylum and other relief from detention, return, or removal for those aliens who pose a danger to the United States, whether due to prior criminal history, the security of the United States, health, or some other bar.

(2)     Consult with Agency before taking any action or making any decision that could reduce immigration enforcement, increase the number of illegal aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens. This includes policies, practices, or procedures which have as their purpose or effect:

    a.     reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement;

    b.     decreasing the number of ICE agents within Agency's territorial jurisdiction performing immigration enforcement duties;

    c.     pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country;

    d.     decreasing the number of or criteria for detention of removable or inadmissible aliens from the country;

    e.     decreasing or pausing apprehensions or administrative arrests;

     f.     increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States;

     g.    increasing, expanding, extending, or in any way changing the quantity or quality of immigration benefits or eligibility for these benefits or other discretionary actions for aliens; or

     h.    otherwise negatively impacting Agency.

(3)    Provide Agency with 180 days' written notice (in the manner provided for in Sections IV of this Agreement) of the proposed action and an opportunity to consult and comment on the proposed action, before taking any such action listed above.

(4)    Consider Agency's input and provide a detailed written explanation of the reasoning behind any decision to reject Agency's input before taking any action listed in Section III.A.2.

(5)    Err on the side of consulting with Agency in case of doubt as to whether DHS's action is implicated by this provision.

**B.**    **Agency agrees to:**

(1)    Provide the support, cooperation, assistance, and information that is reasonably necessary for DHS to perform its missions.

(2)    To the extent permitted by Agency's budget and resources in the good-faith determination of the Arizona Attorney General, continue participating in law enforcement task forces, including working with Homeland Security Investigations as part of the Financial Crimes Task Force, Internet Crimes Against Children (ICAC) Task Force, and any applicable anti-human trafficking task force(s), as well as any future task forces on these subjects. DHS and Agency understand and agree that the specifics of cooperation for any particular task force may be governed by a separate agreement regarding the particular task force.

(3)    Honor and assist DHS, to the extent consistent with applicable state and federal law and when covered under Agency's jurisdiction, with (1) ICE or CBP "detainer requests" or "requests to hold" issued to Agency and (2) DHS requests for records or information from Agency.

## IV.   NOTICES

All notices required hereunder shall be given by certified United States mail, postage prepaid return receipt requested, and addressed to the respective parties at their addresses set forth below,

or at such other address as any party shall hereafter inform the other party by written notice. All written notices so given shall be deemed effective upon receipt.

> Department of Homeland Security
> Secretary of Homeland Security
> Washington, DC 20528
>
> U.S. Customs and Border Protection
> Office of the Commissioner
> 1300 Pennsylvania Ave. NW
> Washington, D.C. 20229
>
> U.S. Immigration and Customs Enforcement
> Office of the Director
> 500 12th Street SW
> Washington, D.C. 20536
>
> U.S. Citizenship and Immigration Services
> Office of the Director
> 5900 Capital Gateway Drive
> Suitland, MD 20746
>
> Arizona Attorney General's Office
> Attn: Chief Deputy Attorney General
> 2005 N. Central Avenue
> Phoenix, AZ 85004

## V.    PENALTIES

Agency acknowledges the information it receives from DHS pursuant to this Agreement is governed by the Privacy Act, 5 U.S.C. section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this Agreement, or otherwise permitted by another agreement with DHS or applicable law, may be subject to civil or criminal penalties.

## VI.    INJUNCTIVE RELIEF

It is hereby agreed and acknowledged that it will be impossible to measure in money the damage that would be suffered if the parties fail to comply with any of the obligations herein imposed on them and that in the event of any such failure, an aggrieved party will be irreparably damaged and will not have an adequate remedy at law. Any such party shall, therefore, be entitled to injunctive relief (in addition to any other remedy to which it may be entitled in law or in equity), including specific performance, to enforce such obligations. If any action should be brought in

equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

## VII. THIRD PARTY LIABILITY

Each party to this Agreement shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution or performance of this Agreement, whether civil or criminal, and retains responsibility for the payment of any corresponding liability.

Nothing in this Agreement is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any non-party to this Agreement against any party, its agencies, officers, or employees.

## VIII. DISPUTE RESOLUTION

DHS and Agency will endeavor to the best of their ability to resolve their disputes informally and through consultation and communication. Disagreements on the interpretation of the provisions of this Agreement that cannot be resolved between the parties should be provided in writing to the heads of all parties for resolution. If settlement cannot be reached at this level, the disagreement may be adjudicated by invoking the judicial or alternative dispute resolution process.

## IX. CONFLICTS

This Agreement constitutes the full agreement on this subject between DHS and Agency. Any inconsistency or conflict between or among the provisions of this Agreement will be resolved in the following order of precedence: (1) this Agreement and (2) other documents incorporated by reference in this Agreement.

## X. SEVERABILITY

The Parties agree that if a binding determination is made that any term of this Agreement is unenforceable, such unenforceability shall not affect any other provision of this Agreement, and the remaining terms of this Agreement shall, unless prohibited by law, remain effective as if such unenforceable provision was never contained in this Agreement.

The parties additionally agree that if this Agreement is found to be unenforceable as to one or more of the parties comprising DHS, including the Department of Homeland Security, such unenforceability shall not affect the validity of this Agreement as to the remaining parties and this Agreement shall remain effective as if such party was never a party to this Agreement.

## XI.   ASSIGNMENT

Agency may not assign this Agreement, nor may it assign any of its rights or obligations under this Agreement. To the greatest extent possible, this Agreement shall inure to the benefit of, and be binding upon, any successors to DHS and Agency without restriction.

## XII.   WAIVER

No waiver by any party of any breach of any provision of this Agreement shall constitute a waiver of any other breach. Failure of any party to enforce at any time, or from time to time, any provision of this Agreement shall not be construed to be a waiver thereof.

## XIII.   EFFECTIVE DATE

This Agreement shall be effective immediately when both the DHS authorized officials and the Agency authorized official have signed this Agreement. This Agreement shall continue in effect unless modified or terminated in accordance with the provisions of this Agreement.

## XIV.   MODIFICATION

This Agreement is subject to periodic review by DHS, its authorized agents or designees, and, if necessary, periodic modification or renewal, consistent with this Agreement's terms, to assure compliance with current law, policy, and standard operating procedures. This Agreement constitutes the complete Agreement between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of all parties evidenced in writing and signed by all parties.

Any party may accomplish a unilateral administrative modification to change POC information. A written bilateral modification (*i.e.*, agreed to and signed by authorized officials of all parties) is required to change any other term of this Agreement.

## XV.   TERMINATION

Any party may terminate its involvement in this Agreement by submitting a request in writing to the other parties and providing 180 days' notice of intent to terminate its involvement in this Agreement. The termination will be effective 180 days after the written termination request was submitted or upon a date agreed upon by all parties, whichever is earlier. Termination by one party of its involvement in this Agreement shall not terminate the Agreement as to the remaining parties.

## XVI.   STATUS

The foregoing constitutes the full agreement on this subject between DHS and Agency.

Nothing in this Agreement may be construed to (1) negate any right of action for a State, local government, other person, or other entity affected by this Agreement; or (2) alter the laws of the United States.

## XVII.  KNOWING AND VOLUNTARY ACKNOWLEDGMENT

The parties enter into this Agreement voluntarily, without coercion or duress, and fully understand its terms. The parties acknowledge they had an opportunity to review and reflect on this Agreement and have discussed its provisions with their respective counsel, if any. The parties attest they understand the effect of each of the provisions in this Agreement and that it is binding on all parties.

## XVIII. COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

## XIX.  FORMALIZATION

The undersigned represent that they are authorized to execute this Agreement on behalf of CBP, ICE, USCIS, and Agency, respectively.

Furthermore, the undersigned execute this Agreement on behalf of CBP, ICE, USCIS, Agency, respectively.

[Signatures on the following pages]

**Signature for the Department of Homeland Security**

DEPARTMENT OF HOMELAND SECURITY

_____    1/8/2021
Kenneth T. Cuccinelli II                              Date
Senior Official Performing the Duties of the Deputy Secretary
Signed individually and collectively[2]

---

[2] "Signed individually and collectively" as used here indicates that the agency is entering into this Agreement both (1) for itself, independently, and (2) along with the other entities that comprise DHS, collectively.  Should one agency, for whatever reason, cease to be a party to this Agreement, this Agreement shall still survive for all other parties and be read and interpreted as if the removed party had never been a party to this Agreement.

**Signature for the Arizona Attorney General's Office and the Arizona Department of Law**

THE ARIZONA ATTORNEY GENERAL'S OFFICE AND THE ARIZONA DEPARTMENT OF LAW

29Dec20

Mark Brnovich                    Date
Attorney General

Exhibit D



MARK BRNOVICH
ATTORNEY GENERAL

OFFICE OF THE ATTORNEY GENERAL
STATE OF ARIZONA

January 26, 2021

Mr. David Pekoske
Acting Secretary
U.S. Department of Homeland Security
Washington, D.C. 20528
ogc@hq.dhs.gov
ogcexecsec@hq.dhs.gov
david.palmer@hq.dhs.gov
stephen.mccleary@hq.dhs.gov
sharmistha.das@hq.dhs.gov
*VIA EMAIL AND CERTIFIED MAIL*

**Re:    Request for DHS to comply with its agreement with the Arizona Attorney
         General's Office before instituting "pause on removals"**

Dear Mr. Pekoske:

       I am writing to request that you comply with the Sanctuary for Americans First
Enactment (SAFE) Agreement Between the U.S. Department of Homeland Security
("DHS") and the Arizona Attorney General's Office and Arizona Department of Law
(collectively, "AZAGO"), which the parties entered into on or about January 8, 2021 (the
"Agreement").  I am enclosing a copy of the Agreement for your reference.

       On January 20, 2021, you ordered a blanket halt on nearly all deportations of
removable or inadmissible aliens.[1]  Specifically, your memorandum directed DHS to
impose "an immediate pause on removals of any noncitizen with a final order of removal
[subject to limited exceptions] for 100 days to go into effect as soon as practical and no
later than January 22, 2021."[2]  This avoidance of DHS's obligation to enforce federal

---

[1] "Aliens" is used herein consistent with the statutory definition. *See* 8 U.S.C. § 1101(a)(3).
[2] Memorandum from David Pekoske, Review of and Interim Revision to Civil Immigration Enforcement
and Removal Policies and Priorities (Jan. 20, 2021), at p. 3, *available at*
https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf (footnote
omitted) (last visited Jan. 26, 2021).

Letter to Acting Secretary Pekoske
January 26, 2021
Page 2

immigration law—<u>particularly to discontinue processing the removal of persons who
have been convicted of or charged with crimes</u>—is unlawful and will seriously harm law
enforcement efforts and public safety in Arizona.[3]   DHS itself has previously
acknowledged that "a decrease or pause on returns or removals of removable or
inadmissible aliens" "result[s] in direct and concrete injuries to [AZAGO], including
increasing the rate of crime…." Agreement § II.

As the Chief Law Enforcement Officer for the State of Arizona, one of my duties
is to ensure the protection of our State's residents.  The memorandum's directive to pause
deportations could lead to overcrowding at ICE facilities, forcing the release of
dangerous offenders into our State.  Additionally, it has come to our attention that people
charged with or convicted of felonies have been released without coordination with the
appropriate court or probation department.  I am sure you can see how this is a serious
and valid concern.

DHS agreed to consult with AZAGO <u>before</u> reducing immigration enforcement,
pausing removals, or declining to decrease the number of removable aliens residing in the
United States. *See* Agreement §§ II, III.A.  DHS is also obligated to provide 180 days'
written notice, consider AZAGO's input, and provide a detailed written explanation of
the reasoning behind any decision to reject AZAGO's input <u>before</u> taking any such
action. *See* Agreement § III.A.2–4.

Prior to issuing the memorandum, DHS did not contact AZAGO, much less
comply with the notice and consultation requirements of our Agreement.  Moreover,
should such a directive be left unchallenged by AZAGO, DHS could attempt to renew it
indefinitely, thus allowing the current Administration to unilaterally amend the
immigration laws as applied to the vast majority of the removable or inadmissible aliens
in this country without the required congressional approval.

This letter serves as notice that AZAGO believes DHS has violated the
Agreement; it is not a comprehensive list of the AZAGO's contentions regarding legal
defects in the memorandum. *See* Agreement § VIII. AZAGO would like to resolve this
dispute, and we ask you to immediately rescind the memorandum as it applies to
"pausing" the removal of aliens charged or convicted of crimes in Arizona.  We further
request that, consistent with the recent order entered by Judge Tipton, you provide

---

[3] While the memorandum provides (at 4) for an exception for aliens for whom "removal is required by
law," that requires an "individualized determination" by the Acting Director of ICE following
consultation with the General Counsel, which is unlikely to encompass more than a very small group of
people.  Also, while the memorandum also provides an exception (at 4 n.2) for "voluntary waiver," which
it states "encompasses noncitizens who stipulate to removal as part of a criminal disposition," that would
not apply to aliens who refuse to stipulate to removal.

Letter to Acting Secretary Pekoske
January 26, 2021
Page 3

AZAGO with data of "the number of individuals in custody that were subject to an Order of Removal who have been released from custody in the United States since Friday January 22, 2021 and the locations from which they were released."[4]

AZAGO believes strongly that a collaborative effort with the federal government is necessary to ensure the safety of Arizonans. If the above concerns cannot be addressed in a timely manner, however, we will consider all legal options, including judicial resolution as contemplated by the Agreement. We look forward to your prompt response in a few days.  Please respond to Chief Deputy/Chief of Staff Joe Kanefield at: Joe.Kanefield @azag.gov or 602-542-8080.

Sincerely,

Mark Brnovich
Attorney General

Enclosure

Cc via Email and Certified Mail:

U.S. Customs and Border Protection
Office of the Commissioner
1300 Pennsylvania Ave. NW
Washington, D.C. 20536
Robert.E.Perez@cbp.dhs.gov
Robert.Perez@cbp.dhs.gov

U.S. Citizenship and Immigration Services
Office of the Director
5900 Capital Gateway Drive
Suitland, MD 20746
Tracy.L.Renaud@uscis.dhs.gov
Tracy.Renaud@uscis.dhs.gov

U.S. Immigration and Customs Enforcement
Office of the Director
500 12th Street SW
Washington, D.C. 20536
Tae.D.Johnson@ice.dhs.gov

---

[4] *See Texas v. United States*, Case No. 6:20-cv-00003, 1/25/2021 Minute Entry.

Exhibit E

**From:** Kanefield, Joe <Joe.Kanefield@azag.gov>
**Sent:** Monday, February 1, 2021 4:37 PM
**To:** OGC <ogc@HQ.DHS.GOV>; OGC Exec Sec <OGCExecSec@HQ.DHS.GOV>; Palmer, David
<David.Palmer@hq.dhs.gov>; MCCLEARY, STEPHEN <stephen.mccleary@hq.dhs.gov>; DAS,
SHARMISTHA <sharmistha.das@hq.dhs.gov>
**Cc:** PEREZ, ROBERT E <ROBERT.E.PEREZ@cbp.dhs.gov>; PEREZ, ROBERT
<ROBERT.PEREZ@CBP.DHS.GOV>; Renaud, Tracy L <Tracy.L.Renaud@uscis.dhs.gov>;
'tracy.renaud@uscis.dhs.gov' <tracy.renaud@uscis.dhs.gov>; 'tae.d.johnson@ice.dhs.gov'
<tae.d.johnson@ice.dhs.gov>
**Subject:** DHS Arizona MOU Matter

Dear Mr. Pekoske,

I am writing on behalf of Arizona Attorney General Mark Brnovich.  General Brnovich has not received a
response from you regarding his January 26, 2021 letter.  We would appreciate a response by COB
tomorrow.   We are considering all legal options, including filing suit, but would prefer to hear back from
you first.

We note from the declaration recently filed by Robert Guadin in *Texas v. U.S.*, No. 6:21-cv-00003
(S.D.TX), that in the first three days following the "pause" memorandum, DHS released 27 aliens with
final removal orders in the Phoenix area.  This is the third highest in the country, behind only Atlanta
and San Antonio.  Please tell us in your response if any of those released in Phoenix have been convicted
of or charged with crimes, and what steps were made to coordinate with applicable courts and parole
departments in connection with those releases.

As Attorney General Brnovich said in his letter, we believe strongly that a collaborative effort with the
federal government is necessary to ensure the safety of Arizonans.  We look forward to your
response.  Take care,

Joe

Joseph Kanefield
Chief Deputy & Chief of Staff



Attorney General Mark Brnovich
Desk: 602-542-8080
Joe.Kanefield@azag.gov
http://www.azag.gov

Exhibit F



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

February 2, 2021

Mark Brnovich
Attorney General
State of Arizona
2005 N. Central Avenue
Phoenix, Arizona  85004

Dear Attorney General Brnovich:

I am writing in response to your letter to me of January 26, 2021 alleging that the Department of Homeland Security (DHS) has violated a purported "Agreement" (Document) with the State of Arizona.

The State of Texas has initiated a lawsuit against DHS seeking to enjoin, on the basis of a substantially similar document, the Department's lawful exercise of its authority.  *Texas v. United States*, No. 6:21-cv-00003, Complaint, ECF No. 1 (S.D. Tex. filed Jan. 22, 2021).  The Document between DHS and Arizona is void, not binding, and unenforceable, for the same reasons set forth in the Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Application for a Temporary Restraining Order, ECF No. 8 (filed Jan. 24, 2021) in *Texas v. United States*.

Notwithstanding that the Document is void, not binding, and unenforceable—and preserving all rights, authorities, remedies, and defenses under the law—this letter also provides notice, on behalf of DHS, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS), that DHS, CBP, ICE and USCIS rescinds, withdraws, and terminates the Document, effective immediately.  DHS will continue to comply with applicable executive orders, statutes, regulations, and court orders.

Please direct any further correspondence concerning the Document to the Department of Justice.

Sincerely,

David P. Pekoske
Acting Secretary

**<u>COPIES OF NOTICE TO</u>:**

Brian M. Boynton
Acting Assistant Attorney General
Civil Division, U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Department of Homeland Security
c/o Joseph B. Maher, Acting General Counsel
Washington, D.C. 20528

U.S. Customs and Border Protection
c/o Troy Miller, Senior Official Performing the Duties of the Commissioner
Office of the Commissioner
1300 Pennsylvania Ave. NW
Washington, D.C. 20229

U.S. Immigration and Customs Enforcement
c/o Tae Johnson, Acting Director
Office of the Director
500 12th Street SW
Washington, D.C. 20536

U.S. Citizenship and Immigration Services
c/o Tracy Renaud, Senior Official Performing the Duties of the Director
Office of the Director
5900 Capital Gateway Drive
Suitland, Maryland 20746

# Exhibit G

Policy Number: 11090.1
FEA Number: 306-112-002b

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

February 18, 2021

MEMORANDUM FOR:          All ICE Employees

FROM:                    Tae D. Johnson
                         Acting Director

SUBJECT:                 Interim Guidance: Civil Immigration Enforcement and
                         Removal Priorities

Purpose

This memorandum establishes interim guidance in support of the interim civil immigration
enforcement and removal priorities that Acting Secretary Pekoske issued on January 20, 2021.
Acting Secretary Pekoske issued the interim priorities in his memorandum titled, *Review of and
Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* (Interim
Memo).

This interim guidance is effective immediately. It applies to all U.S. Immigration and Customs
Enforcement (ICE) Directorates and Program Offices, and it covers enforcement actions, custody
decisions, the execution of final orders of removal, financial expenditures, and strategic
planning.

This interim guidance will remain in effect until Secretary Mayorkas issues new enforcement
guidelines. The Secretary has informed me that he will issue new guidelines only after
consultation with the leadership and workforce of ICE, U.S. Customs and Border Protection, and
other Department of Homeland Security (Department) agencies and offices. He anticipates
issuing these guidelines in less than 90 days.

I have requested approval of certain revisions to the Interim Memo until the Secretary issues new
enforcement guidelines. My requested revisions have been approved, and they are incorporated
into this guidance. To the extent this guidance conflicts with the Interim Memo, this guidance
controls. As you will read below, the revisions include, but are not limited to: (1) authorization to
apprehend presumed priority noncitizens[1] in at-large enforcement actions without advance
approval; (2) the inclusion of current qualifying members of criminal gangs and transnational
criminal organizations as presumed enforcement priorities; (3) authorization to apprehend

---

[1] For purposes of this memorandum, "noncitizen" means any person as defined in section 101(a)(3) of the
Immigration and Nationality Act (INA).

Interim Guidance: Civil Immigration Enforcement and Removal Priorities
Page 2 of 7

without prior approval other presumed priority noncitizens who are encountered during enforcement operations; (4) how to evaluate whether a noncitizen who is not a presumed priority nevertheless poses a public safety threat and should be apprehended; (5) the further delegation of approval authority; and (6) the importance of providing advance notice of at-large enforcement actions to state and local law enforcement.

Section C of the Interim Memo has been enjoined. This memorandum does not implement, nor take into account, Section C. This memorandum implements Section B (Interim Civil Enforcement Guidelines).

Background

On January 20, 2021, President Biden issued Executive Order (EO) 13993, Revision of Civil Immigration Enforcement Policies and Priorities, 86 Fed. Reg. 7051 (Jan. 25, 2021), which articulated the Administration's baseline values and priorities for the enforcement of the civil immigration laws.

On the same day, Acting Secretary Pekoske issued the Interim Memo. The Interim Memo did four things. First, it directed a comprehensive Department-wide review of civil immigration enforcement policies. Second, it established interim civil immigration enforcement priorities for the Department. Third, it instituted a 100-day pause on certain removals pending the review. Fourth, it rescinded several existing policy memoranda, including two ICE-related memoranda, as inconsistent with EO 13993.[2] The Interim Memo further directed that ICE issue interim guidance implementing the revised enforcement priorities and the removal pause.

On January 26, 2021, the U.S. District Court for the Southern District of Texas issued a temporary restraining order (TRO) enjoining the Department from enforcing and implementing the 100-day removal pause in Section C.

Like other national security and public safety agencies, ICE operates in an environment of limited resources. Due to these limited resources, ICE has always prioritized, and necessarily must prioritize, certain enforcement and removal actions over others.

In addition to resource constraints, several other factors render ICE's mission particularly complex. These factors include ongoing litigation in various fora; the health and safety of the ICE workforce and those in its custody, particularly during the current COVID-19 pandemic; the responsibility to ensure that eligible noncitizens are able to pursue relief from removal under the immigration laws; and the requirements of, and, relationships with, sovereign nations, whose laws and expectations can place additional constraints on ICE's ability to execute final orders of removal.

---

[2] Memorandum from Matthew T. Albence, Exec. Assoc. Dir., ICE, to All ERO Employees, *Implementing the President's Border Security and Interior Immigration Enforcement Policies* (Feb. 21, 2017); Memorandum from Tracy Short, Principal Legal Advisor, ICE, to All OPLA Attorneys, *Guidance to OPLA Attorneys Regarding Implementation of the President's Executive Orders and the Secretary's Directives on Immigration Enforcement* (Aug. 15, 2017).

Interim Guidance: Civil Immigration Enforcement and Removal Priorities
Page 3 of 7

Accordingly, in executing its critical national security, border security, and public safety mission, the Department must exercise its well-established prosecutorial discretion and prioritize its limited resources to most effectively achieve that mission.

Civil Immigration Enforcement and Removal Priorities

In support of the interim priorities, the guidance established in this memorandum shall be applied to all civil immigration enforcement and removal decisions made after the issuance of this memorandum. The civil immigration enforcement and removal decisions include, but are not limited to, the following:[3]

- Deciding whether to issue a detainer, or whether to assume custody of a noncitizen subject to a previously issued detainer;
- Deciding whether to issue, reissue, serve, file, or cancel a Notice to Appear;
- Deciding whether to focus resources only on administrative violations or conduct;
- Deciding whether to stop, question, or arrest a noncitizen for an administrative violation of the civil immigration laws;
- Deciding whether to detain or release from custody subject to conditions;
- Deciding whether to grant deferred action or parole; and
- Deciding when and under what circumstances to execute final orders of removal.

For ease of reference, the interim priorities identified in the Interim Memo, and as revised by this guidance, are set forth below along with further explanation.

As a preliminary matter, it is vitally important to note that the interim priorities do not require or prohibit the arrest, detention, or removal of any noncitizen. Rather, officers and agents are expected to exercise their discretion thoughtfully, consistent with ICE's important national security, border security, and public safety mission. Enforcement and removal actions that meet the criteria described below are presumed to be a justified allocation of ICE's limited resources. Actions not reflected in the criteria described below may also be justified, but they are subject to advance review as outlined further below.

In determining whether to pursue an action that falls outside the criteria described below, all relevant facts and circumstances regarding the noncitizen should be considered. For instance, officers and agents should consider: whether there are criminal convictions; the seriousness and recency of such convictions, and the sentences imposed; the law enforcement resources that have been spent; whether a threat can be addressed through other means, such as through recourse to criminal law enforcement authorities at the federal, state, or local level, or to public health and other civil authorities at the state or local level; and, other relevant factors (including, for example, the mitigating factors identified on page 5).

---

[3] As discussed above, the Department is enjoined from enforcing the Immediate 100-Day Pause on Removals in the Interim Memo. This following interim guidance should not be read to permit implementation of Section C of the Interim Memo.

Interim Guidance: Civil Immigration Enforcement and Removal Priorities
Page 4 of 7

*Criteria Defining Cases That Are Presumed to be Priorities*

**Priority Category 1: National Security**. A noncitizen is *presumed* to be a national security enforcement and removal priority if:

1) he or she has engaged in or is suspected of engaging in terrorism or terrorism-related activities;
2) he or she has engaged in or is suspected of engaging in espionage or espionage-related activities;[4] or
3) his or her apprehension, arrest, or custody is otherwise necessary to protect the national security of the United States.

In evaluating whether a noncitizen's "apprehension, arrest, or custody is otherwise necessary to protect" national security, officers and agents should determine whether a noncitizen poses a threat to United States sovereignty, territorial integrity, national interests, or institutions. General criminal activity does not amount to a national security threat (as distinguished from a public safety threat) and is discussed below.

**Priority Category 2: Border Security**. A noncitizen is *presumed* to be a border security enforcement and removal priority if:

1) he or she was apprehended at the border or a port of entry while attempting to unlawfully enter the United States on or after November 1, 2020[5]; or
2) he or she was not physically present in the United States before November 1, 2020.

To be clear, the border security priority includes any noncitizen who unlawfully entered the United States on or after November 1, 2020.

**Priority Category 3: Public Safety**. A noncitizen is *presumed* to be a public safety enforcement and removal priority if he or she poses a threat to public safety and:

1) he or she has been convicted of an aggravated felony as defined in section 101(a)(43) of the INA[6]; or

---

[4] For purposes of the national security enforcement priority, the terms "terrorism or terrorism-related activities" and "espionage or espionage-related activities" should be applied consistent with (1) the definitions of "terrorist activity" and "engage in terrorist activity" in section 212(a)(3)(B)(iii)-(iv) of the INA, and (2) the manner in which the term "espionage" is generally applied in the immigration laws.

[5] The statutory mandates in Section 235 of the INA (regarding asylum seekers) continue to apply to noncitizens.

[6] This criterion tracks Congress's prioritization of aggravated felonies for immigration enforcement actions. Whether an individual has been convicted of an aggravated felony is a complex question that may involve securing and analyzing a host of conviction documents, many of which may not be immediately available to officers and agents. Even when all conviction documents are available, whether a conviction is for an aggravated felony may be a novel question under applicable law. Accordingly, in deciding whether a noncitizen has been convicted of an

2)  he or she has been convicted of an offense for which an element was active participation in a criminal street gang, as defined in 18 U.S.C. § 521(a), or is not younger than 16 years of age and intentionally participated in an organized criminal gang or transnational criminal organization to further the illegal activity of the gang or transnational criminal organization.

In evaluating whether a noncitizen currently "pose[s] a threat to public safety," officers and agents are to consider the extensiveness, seriousness, and recency of the criminal activity. Officers and agents are to also consider mitigating factors, including, but not limited to, personal and family circumstances, health and medical factors, ties to the community, evidence of rehabilitation, and whether the individual has potential immigration relief available.

Officers are to base their conclusions about intentional participation in an organized criminal gang or transnational criminal organization on reliable evidence and consult with the Field Office Director (FOD) or Special Agent in Charge (SAC) in reaching this conclusion.

Particular attention is to be exercised in cases involving noncitizens who are elderly or are known to be suffering from serious physical or mental illness. Similarly, particular attention is to be exercised with respect to noncitizens who have pending petitions for review on direct appeal from an order of removal; have filed only one motion to reopen removal proceedings, and such a motion either remains pending or is on direct appeal via a petition for review; or have pending applications for immigration relief and are prima facie eligible for such relief. In such cases, execution of removal orders should have a compelling reason and are to have approval from the FOD.

A civil enforcement or removal action that does not meet the above criteria for presumed priority cases will require preapproval as described below.

Enforcement and Removal Actions: Approval, Coordination, and Data Collection

To ensure compliance with this guidance and consistency across geographic areas of responsibility, and to facilitate a dialogue between headquarters and field leadership about the effectiveness of the interim guidance, ICE will require that field offices collect data on the nature and type of enforcement and removal actions they perform. In addition, ICE will require field offices to coordinate their operations and obtain preapproval for enforcement and removal actions that do not meet the above criteria for presumed priority cases. The data and coordination will inform the development of the Secretary's new enforcement guidance.

*No Preapproval Required for Presumed Priority Cases*

Officers and agents need not obtain preapproval for enforcement or removal actions that meet the above criteria for presumed priority cases, beyond what existing policy requires and what a supervisor instructs.

---

aggravated felony for purposes of this memorandum, officers and agents must have a good-faith belief based on either a final administrative determination, available conviction records, or the advice of agency legal counsel.

Interim Guidance: Civil Immigration Enforcement and Removal Priorities
Page 6 of 7

*Preapproval for Other Priority Cases*

Any civil immigration enforcement or removal actions that do not meet the above criteria for presumed priority cases will require preapproval from the FOD or SAC. In deciding to undertake an enforcement action or removal, the agent or officer must consider, in consultation with his or her leadership, the nature and recency of the noncitizen's convictions, the type and length of sentences imposed, whether the enforcement action is otherwise an appropriate use of ICE's limited resources, and other relevant factors. In requesting this preapproval, the officer or agent must raise a written justification through the chain of command, explaining why the action otherwise constitutes a justified allocation of limited resources, and identify the date, time, and location the enforcement action or removal is expected to take place.

The approval to carry out an enforcement action against a particular noncitizen will not authorize enforcement actions against other noncitizens encountered during an operation if those noncitizens fall outside the presumption criteria identified above. An approval to take an enforcement action against any other noncitizen encountered who is not a presumed priority must be separately secured as described above.

In some cases, exigent circumstances and the demands of public safety will make it impracticable to obtain preapproval for an at-large enforcement action. While it is impossible to preconceive all such circumstances, they generally will be limited to situations where a noncitizen poses an imminent threat to life or an imminent substantial threat to property. If preapproval is impracticable, an officer or agent should conduct the enforcement action and then request approval as described above within 24 hours following the action.[7]

As always, it is important that ICE endeavor to remove noncitizens with final removal orders who have remained in post-order detention for more than 90 days. ICE will continue to review such noncitizens' cases on a regular basis, consistent with existing law and policy. ICE will endeavor to remove such noncitizens consistent with legal requirements and national, border security, and public safety priorities.

Periodically, ICE receives requests to exercise some form of individualized discretion in the interests of law and justice. ICE will create and maintain a system by which personnel can evaluate these individualized requests.

*Notice of At-Large Enforcement Actions*

The execution of an at-large enforcement action should be preceded by notification to the relevant state and local law enforcement agency or agencies. This notification will advance

---

[7] Where approval is sought following the enforcement action due to exigent circumstances, the request shall explain the exigency, where and when the enforcement activity took place, and whether the noncitizen is currently detained. Additionally, when the location of a proposed or completed enforcement action is a courthouse, as defined in ICE Directive 11072.1: Civil Immigration Enforcement Actions Inside Courthouses (Jan. 10, 2018, or as superseded), or a sensitive location, as defined in ICE Directive No. 10029.2, Enforcement Actions at or Focused on Sensitive Locations (Oct. 24, 2011, or as superseded), that should be explicitly highlighted in the request.

public safety and help ensure that planned immigration enforcement actions do not improperly interfere with state and local law enforcement investigations and actions.

*Weekly Reporting of All Enforcement and Removal Actions*

The Director will review all enforcement actions to ensure compliance with this guidance and consistency across geographic areas of responsibility and to facilitate a dialogue between headquarters and field leadership about the effectiveness of the interim priorities.

Each Friday, the Executive Associate Directors for Enforcement and Removal Operations and Homeland Security Investigations will compile and provide to the Office of the Director, the Office of the Deputy Director, and the Office of Policy and Planning (OPP), a written report: (1) identifying each enforcement action taken in the prior week, including the applicable priority criterion, if any; (2) providing a narrative justification of the action; and (3) identifying the date, time, and location of the action.

In addition, each Friday the Executive Associate Director for Enforcement and Removal Operations will provide to the Office of the Director, the Office of the Deputy Director, and OPP, a written report: (1) identifying each removal in the prior week, including the applicable priority criterion, if any; (2) providing a narrative justification of the removal; and (3) identifying the date, time, and location of the removal.

These reporting requirements will be assessed periodically during this interim period to ensure that they are both productive and manageable.

The weekly reports will be made available to the Office of the Secretary.

Questions

Questions regarding this interim guidance or the Interim Memo should be directed to OPP through the chain of command and Directorate or Program Office leadership. Answers to frequently asked policy questions will be published on OPP's inSight page on an ongoing basis. Please note, however, that case-specific questions should generally be addressed by Directorate or Program Office leadership.

No Private Right Statement

These guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

Exhibit H

# AGREEMENT BETWEEN THE DEPARTMENT OF HOMELAND SECURITY AND THE STATE OF MONTANA

The parties to this Sanctuary for Americans First Enactment (SAFE) Agreement (Agreement) are on the one hand:

> (1)    The Department of Homeland Security (DHS), by itself and on behalf of itself and all its Components;

and on the other hand:

> (2)    The State of Montana (Agency).

## I.    AUTHORITY

The authorities governing this Agreement include, but are not limited to:

> (1)    Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359, as amended.
> (2)    Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, as amended.
> (3)    Privacy Act, 5 U.S.C. Section 552a, as amended.
> (4)    The Inter-Governmental Cooperation Act, 31 U.S.C. Section 6501, *et. seq*. as amended.
> (5)    Homeland Security Act of 2002, 116 Stat. 2135, 6 U.S.C. Section 101, *et seq.* as amended.
> (6)    Immigration and Nationality Act, 8 U.S.C. Section 1101, *et seq.* as amended.

## II.    PURPOSE AND COMMITMENT

DHS recognizes that Agency, like other States and municipalities, is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact Agency's law enforcement, housing, medical, education, employment, commerce, and healthcare needs and budgets, as well as its other important health, safety, and pecuniary interests. The harm to Agency is particularly acute where Agency's budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes. Specifically, DHS recognizes that the following actions result in direct and concrete injuries to Agency, including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased economic competition with Agency's current residents for, among other things, employment, housing, goods and services:

> (1)    a decrease of any immigration enforcement priorities;
> (2)    a voluntary reduction in the number of DHS agents performing immigration enforcement functions;

(3)     a decrease or pause on returns or removals of removable or inadmissible aliens;

(4)     a decrease or pause on apprehensions or administrative arrests;

(5)     relaxation of the standards for granting relief from return or removal, such as asylum;

(6)     an increase in releases from detention;

(7)     a relaxation of the standards for granting release from detention;

(8)     changes to immigration benefits or eligibility, including work authorization, discretionary actions, or discretionary decisions; and

(9)     rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community.

At the same time, Agency recognizes that DHS relies on cooperation with Agency and information shared by Agency to carry out DHS's immigration enforcement functions. Any decrease in a State's or municipality's cooperation or information sharing with DHS can result in a decrease in immigration enforcement.

To that end, this Agreement establishes a binding and enforceable commitment between DHS and Agency, in which Agency will provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions in exchange for DHS's commitment to consult Agency and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

(1)     reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;

(2)     decrease the number of U.S. Immigration and Customs Enforcement (ICE) agents performing immigration enforcement duties;

(3)     pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;

(4)     increase or decline to decrease the number of lawful, removable, or inadmissible aliens;

(5)     increase or decline to decrease the number of releases from detention;

(6)     relax the standards for granting relief from return or removal, such as asylum;

(7)     relax the standards for granting release from detention;

(8)     relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;

(9)     increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions for aliens; or

(10)    otherwise negatively impact Agency.

In case of doubt, DHS will err on the side of consulting with Agency.

## III.   RESPONSIBILITIES

### A.   DHS agrees to:

(1)     Utilize its immigration authorities, to the maximum extent possible, to prioritize the protection of the United States and its existing communities. This includes:

      a.      enforcing the immigration laws of the United States to prohibit the entry into, and promote the return or removal from, the United States of inadmissible and removable aliens;

      b.      enforcing the immigration laws of the United States to prioritize detention over release of inadmissible and removable aliens;

      c.      enforcing the immigration laws of the United States to apprehend and administratively arrest inadmissible and removable aliens;

      d.      eliminating incentives and so-called "pull factors" for illegal immigration;

      e.      limiting eligibility for asylum and other relief from detention, return, or removal to the statutory criteria; and

      f.      refusing asylum and other relief from detention, return, or removal for those aliens who pose a danger to the United States, whether due to prior criminal history, the security of the United States, health, or some other bar.

(2)      Consult with Agency before taking any action or making any decision that could reduce immigration enforcement, increase the number of illegal aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens. This includes policies, practices, or procedures which have as their purpose or effect:

      a.      reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement;

      b.      decreasing the number of ICE agents within Agency's territorial jurisdiction performing immigration enforcement duties;

      c.      pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country;

      d.      decreasing the number of or criteria for detention of removable or inadmissible aliens from the country;

      e.      decreasing or pausing apprehensions or administrative arrests;

      f.      increasing or declining to decrease the number of lawful, removable, or inadmissible aliens residing in the United States;

      g.      increasing, expanding, extending, or in any way changing the quantity or quality of immigration benefits or eligibility for these benefits or other discretionary actions for aliens; or

      h.      otherwise negatively impacting Agency.

(3)      Provide Agency with 180 days' written notice (in the manner provided for in Sections IV of this Agreement) of the proposed action and an opportunity to consult and comment on the proposed action, before taking any such action listed above.

(4)      Consider Agency's input and provide a detailed written explanation of the reasoning behind any decision to reject Agency's input before taking any action listed in Section III.A.2.

Page 3 of 9

(5) Err on the side of consulting with Agency in case of doubt as to whether DHS's action is implicated by this provision.

**B.    Agency agrees to:**

(1) Provide the support, cooperation, assistance, and information that is reasonably necessary for DHS to perform its missions.

(2) Honor, to the extent consistent with law, (1) U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP) "detainer requests" or "requests to hold" issued to Agency and (2) DHS requests for records or information from Agency's Department of Motor Vehicles.

## IV.   NOTICES

All notices required hereunder shall be given by certified United States mail, postage prepaid return receipt requested, and addressed to the respective parties at their addresses set forth below, or at such other address as any party shall hereafter inform the other party by written notice. All written notices so given shall be deemed effective upon receipt.

Department of Homeland Security
Secretary of Homeland Security
Washington, DC 20528

State of Montana                                State of Montana
Governor                                        Attorney General
Helena, MT 59620                                Helena, MT 59601

## V.    PENALTIES

Agency acknowledges the information it receives from DHS is governed by the Privacy Act, 5 U.S.C. section 552a(i)(1), and that any person who obtains this information under false pretenses or uses it for any purpose other than as provided for in this Agreement may be subject to civil or criminal penalties.

## VI.   INJUNCTIVE RELIEF

It is hereby agreed and acknowledged that it will be impossible to measure in money the damage that would be suffered if the parties fail to comply with any of the obligations herein imposed on them and that in the event of any such failure, an aggrieved party will be irreparably damaged and will not have an adequate remedy at law. Any such party shall, therefore, be entitled to injunctive relief (in addition to any other remedy to which it may be entitled in law or in equity), including specific performance, to enforce such obligations. If any action should be brought in equity to

enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

## VII.   THIRD PARTY LIABILITY

Each party to this Agreement shall be solely responsible for its own defense against any claim or action by third parties arising out of or related to the execution or performance of this Agreement, whether civil or criminal, and retains responsibility for the payment of any corresponding liability.

Nothing in this Agreement is intended, or should be construed, to create any right or benefit, substantive or procedural, enforceable at law by any non-party to this Agreement against any party, its agencies, officers, or employees.

## VIII.   DISPUTE RESOLUTION

DHS and Agency will endeavor to the best of their ability to resolve their disputes informally and through consultation and communication. Disagreements on the interpretation of the provisions of this Agreement that cannot be resolved between the parties should be provided in writing to the heads of all parties for resolution. If settlement cannot be reached at this level, the disagreement may be adjudicated by invoking the judicial or alternative dispute resolution process.

## IX.   CONFLICTS

This Agreement constitutes the full agreement on this subject between DHS and Agency. Any inconsistency or conflict between or among the provisions of this Agreement, will be resolved in the following order of precedence: (1) this Agreement and (2) other documents incorporated by reference in this Agreement.

## X.   SEVERABILITY

The Parties agree that if a binding determination is made that any term of this Agreement is unenforceable, such unenforceability shall not affect any other provision of this Agreement, and the remaining terms of this Agreement shall, unless prohibited by law, remain effective as if such unenforceable provision was never contained in this Agreement.

The parties additionally agree that if this Agreement is found to be unenforceable as to one or more of the parties comprising DHS, including the Department of Homeland Security, such unenforceability shall not affect the validity of this Agreement as to the remaining parties and this Agreement shall remain effective as if such party was never a party to this Agreement.

## XI.   ASSIGNMENT

Agency may not assign this Agreement, nor may it assign any of its rights or obligations under this Agreement. To the greatest extent possible, this Agreement shall inure to the benefit of, and be binding upon, any successors to DHS and Agency without restriction.

## XII.   WAIVER

No waiver by any party of any breach of any provision of this Agreement shall constitute a waiver of any other breach. Failure of any party to enforce at any time, or from time to time, any provision of this Agreement shall not be construed to be a waiver thereof.

## XIII.   EFFECTIVE DATE

This Agreement shall be effective immediately when both the DHS authorized officials and the Agency authorized official have signed this Agreement. This Agreement shall continue in effect unless modified or terminated in accordance with the provisions of this Agreement.

## XIV.   MODIFICATION

This Agreement is subject to periodic review by DHS, its authorized agents or designees, and, if necessary, periodic modification or renewal, consistent with this Agreement's terms, to assure compliance with current law, policy, and standard operating procedures. This Agreement constitutes the complete Agreement between the parties for its stated purpose, and no modification or addition will be valid unless entered into by mutual consent of all parties evidenced in writing and signed by all parties.

Any party may accomplish a unilateral administrative modification to change POC information. A written bilateral modification (*i.e.*, agreed to and signed by authorized officials of all parties) is required to change any other term of this Agreement.

## XV.   TERMINATION

Any party may terminate its involvement in this Agreement by submitting a request in writing to the other parties and providing 180 days' notice of intent to terminate its involvement in this Agreement. The termination will be effective 180 days after the written termination request was submitted or upon a date agreed upon by all parties, whichever is earlier. Termination by one party of its involvement in this Agreement shall not terminate the Agreement as to the remaining parties.

## XVI.   STATUS

The foregoing constitutes the full agreement on this subject between DHS and Agency.

Nothing in this Agreement may be construed to (1) negate any right of action for a State, local government, other person, or other entity affected by this Agreement; or (2) alter the laws of the United States.

## XVII.  KNOWING AND VOLUNTARY ACKNOWLEDGMENT

The parties enter into this Agreement voluntarily, without coercion or duress, and fully understand its terms. The parties acknowledge they had an opportunity to review and reflect on this Agreement and have discussed its provisions with their respective counsel, if any. The parties attest they understand the effect of each of the provisions in this Agreement and that it is binding on all parties.

## XVIII. COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

## XIX.  FORMALIZATION

The undersigned represent that they are authorized to execute this Agreement by themselves and on behalf of themselves and all their Components.

Furthermore, the undersigned execute this Agreement on behalf of DHS and all its Components and Agency, respectively.

[Signatures on the following pages]

**Signature for the Department of Homeland Security**

DEPARTMENT OF HOMELAND SECURITY

_____ 1/11/2021
Kenneth T. Cuccinelli II                      Date
Senior Official Performing the Duties of the Deputy Secretary
Signed individually and collectively[1]

---

[1] "Signed individually and collectively" as used here indicates that the agency is entering into this Agreement both (1) for itself, independently, and (2) along with the other entities that comprise DHS, collectively.

**Signatures for the State of Montana**

OFFICE OF THE GOVERNOR OF MONTANA

_____          01/12/2021
Greg Gianforte                                    Date
Governor

OFFICE OF THE ATTORNEY GENERAL OF MONTANA

_____          1/11/2021
Austin Knudsen                                   Date
Attorney General

# Exhibit I



**Greg Gianforte**
**GOVERNOR**

**Austin Knudsen**
**ATTORNEY GENERAL**

February 1, 2021

Mr. David Pekoske
Acting Secretary
U.S. Department of Homeland Security
Washington, D.C. 20528
ogc@hq.dhs.gov
ogcexecsec@hq.dhs.gov
david.palmer@hq.dhs.gov
stephen.mccleary@hq.dhs.gov
sharmistha.das@hq.dhs.gov
*VIA EMAIL AND CERTIFIED MAIL*

Re:     **Notice Regarding DHS's violation of the Sanctuary for American First**
        **Enactment Agreement**

Dear Acting Secretary Pekoske:

We write to request that you comply with the Sanctuary for Americans First Enactment Agreement (SAFE Agreement)  between the Department of Homeland Security and the State of Montana, executed by the parties on or about January 11, 2021.  Enclosed for your reference is a copy of the Agreement.

On your first day as Acting Secretary, you issued a Department-wide memorandum that, among other things, ordered an "Immediate 100-day Pause" on removals of aliens illegally present in the country.[1]  Subject to several narrow exceptions, this "pause on removals applies to any noncitizen present in the United States … with a final order of removal."   January 20 Memorandum at 3.   You also ordered the Acting Director of Immigration and Customs Enforcement to develop an individualized process for aliens that have been ordered removed for more than ninety days that will "assess[] … alternatives to removal."  *Id.*

---

[1] Memorandum from David Pekoske, *Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities* ("January 20 Memorandum"), at 3 (Jan. 20, 2021), https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf.

*Letter to Acting Secretary Pekoske re: the SAFE Agreement*
February 1, 2021
Page 2

Not only is this brazen stand-down directive to your immigration enforcement agencies unlawful under 8 U.S.C. § 1231(a)(1)(A), but it will also surely impose the very strains upon Montana's "health, safety, and pecuniary interests" the Department acknowledged just weeks ago when it entered the SAFE Agreement.  SAFE Agreement § II. Suspending the removal process—especially for those aliens convicted of or charged with crimes—presents daunting challenges to Montana's law enforcement and public safety efforts.  For years, Montanans have suffered the awful effects of the infusion of illegal drugs illicitly transported into the country across the southern border.  To reverse the upswing in drug and violent crimes originating at the border, Montana requires diligent and engaged federal partners.  Your directive effectively eliminates that partnership,[2] and thereby causes "direct and concrete injuries" to Montana's public safety, public services, and residents.  SAFE Agreement § II.

Our foremost duty as Governor and Attorney General is to ensure the safety of all Montanans.  That is why we were pleased to enter the SAFE Agreement with the Department—it acknowledged the real-world impacts Montana faces when the federal government declines to fully "[u]tilize its immigration authorities … [and] prioritize the protection of the United States and its existing communities."  SAFE Agreement § III(A)(1).  Under the SAFE Agreement, the Department agreed to, inter alia, consult with Montana ***before*** "reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement."  *Id.* at § III(A)(2)(a). This "notice" to Montana requires 180 days' written notice of the Department's proposed action and an opportunity for Montana to consult and comment on the proposed action. *See id.* at § III(A)(3).  And if the Department chooses to "reject [Montana's] input before" relaxing immigration enforcement, the SAFE Agreement requires the Department to "provide a detailed written explanation  of [its] reasoning …."  *Id.* at § III(A)(3).

Montana was neither contacted nor consulted, as required by the SAFE Agreement, before the Department initiated the 100-day pause on removals.  And how could it have been?  The Acting Secretary issued the memorandum mere hours after assuming office. The Department's actions flagrantly violate its agreement with Montana.  And if left unchecked, the Department could attempt to extend its evaluative pause even longer— perhaps in perpetuity—effectively rewriting duly enacted immigration laws under the guise of prosecutorial and administrative discretion.   Separate and apart from these clear violations of the SAFE Agreement, the Department's discretion does not allow it to disregard unambiguous statutory mandates.  *See* 8 U.S.C. § 1231(a)(1)(A).

---

[2] The January 20 Memorandum provides that removal may proceed for certain aliens whose "removal is required by law."  January 20 Memorandum at 4.  But the Department will only exercise this option after the Acting ICE Director consults with the Department's General Counsel and makes an "individualized determination" that removal is required.  *Id.*  Respectfully, existing laws and regulations have already compelled the determination that removal is warranted and required.

*Letter to Acting Secretary Pekoske re: the SAFE Agreement*
February 1, 2021
Page 3

We made a deal.  Montana will honor its obligations,[3] but the Department must honor its obligations, too.[4]   While Montana may ultimately need to vindicate its rights under the SAFE Agreement before a court of law, *see* SAFE Agreement § VI, we are reaching out in good faith "to resolve [our] disputes informally, and through consultation and communication."  *See id.* at § VIII.  A necessary first step is your immediate rescission of Section C of the January 20 Memorandum.  This should present only a modest imposition on the Department, for a federal court has already temporarily enjoined the enforcement of Section C, and the prospect of more permanent injunctive relief is readily apparent.[5]

The safety and security of Montanans depend, in part, on a strong partnership with the federal government agencies responsible for immigration enforcement.  Under the SAFE Agreement, the Department has acknowledged that Montana suffers when those federal agencies stop doing their jobs.  Your pause order in the January 20 memorandum is precisely the type of action that requires prior consultation and communication.  *See* SAFE Agreement § II(A).  Yet with scant justification and no prior consultation, you issued an order that—under the SAFE Agreement—requires both.  We hope we can resolve these issues amicably through consultation and communication.  But if not, Montana will consider all available legal options, including the pursuit of injunctive relief expressly contemplated by the SAFE Agreement.  *See* SAFE Agreement § VI.  We will await a prompt response and look forward to a constructive consultation process.

Respectfully,

Greg Gianforte
Governor of Montana

Austin Knudsen
Attorney General of Montana

Enclosure

---

[3] Under the agreement, Montana has agreed to, among other things, "[p]rovide the support, cooperation, assistance, and information that is reasonably necessary for DHS to perform its missions." SAFE Agreement § III(B).  Such State cooperation is essential for DHS to effectively conduct its immigration enforcement duties.

[4] This notice focuses on the 100-day pause of removals, but Montana reserves the right to lodge other objections to other directives contained in the January 20 Memorandum, pursuant to the notice and consultation processes under § III(A) of the SAFE Agreement.

[5] *See* Order Granting Plaintiff's Emergency Application for a Temporary Restraining Order, *Texas v. Pekoske, et al.*, No. 6:21-cv-00003 (S.D. Tex. Jan. 26, 2021) (Tipton, J.), available at https://www.texasattorneygeneral.gov/sites/default/files/images/admin/2021/Press/TEXAS%20ORDE R_.pdf.  Importantly, Judge Tipton concluded that Texas is likely to succeed on the merits of at least two of its claims that the January 20 Memorandum violates the Administrative Procedure Act: first, that the 100-day pause violates 8 U.S.C. § 1231(a)(1)(A); and second, that the Department's departure from previous policy lacked sufficient explanation and is therefore arbitrary and capricious.

*Letter to Acting Secretary Pekoske re: the SAFE Agreement*
February 1, 2021
Page 4


<u>Copied via Email and Certified Mail</u>:

U.S. Customs and Border Protection
Office of the Commissioner
1300 Pennsylvania Ave. NW
Washington, D.C. 20536
Robert.E.Perez@cbp.dhs.gov
Robert.Perez@cbp.dhs.gov

U.S. Immigration and Customs Enforcement
Office of the Director
500 12th Street SW
Washington, D.C. 20536
Tae.D.Johnson@ice.dhs.gov

U.S. Citizenship and Immigration Services
Office of the Director
5900 Capital Gateway Drive
Suitland, MD 20746
Tracy.L.Renaud@uscis.dhs.gov
Tracy.Renaud@uscis.dhs.gov

Exhibit J



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

February 2, 2021

Glen Glanforte
Governor
State of Montana
Helena, MT  59620

Austin Knudsen
Attorney General
State of Montana
Helena, MT  59601

Dear Governor Glanforte and Attorney General Knudsen:

I am writing in response to your letter to me of February 1, 2021 alleging that the Department of Homeland Security (DHS) has violated a purported "Agreement" (Document) with the State of Montana.

The State of Texas has initiated a lawsuit against DHS seeking to enjoin, on the basis of a substantially similar document, the Department's lawful exercise of its authority.  *Texas v. United States*, No. 6:21-cv-00003, Complaint, ECF No. 1 (S.D. Tex. filed Jan. 22, 2021).  The Document that you reference in your letter is void, not binding, and unenforceable, for the same reasons set forth in the Defendants' Memorandum of Points and Authorities in Opposition to Plaintiffs' Application for a Temporary Restraining Order, ECF No. 8 (filed Jan. 24, 2021) in *Texas v. United States*.

Notwithstanding that the Document is void, not binding, and unenforceable—and preserving all rights, authorities, remedies, and defenses under the law—this letter also provides notice, on behalf of DHS, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS), that DHS, CBP, ICE and USCIS rescind, withdraw, and terminate the Document, effective immediately.  DHS will continue to comply with applicable executive orders, statutes, regulations, and court orders.

Please direct any further correspondence concerning the Document to the Department of Justice.

Sincerely,

David P. Pekoske

David Pekoske
Acting Secretary

**COPIES OF NOTICE TO**:

Brian M. Boynton
Acting Assistant Attorney General
Civil Division, U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Department of Homeland Security
c/o Joseph B. Maher, Acting General Counsel
Washington, D.C. 20528

U.S. Customs and Border Protection
c/o Troy Miller, Senior Official Performing the Duties of the Commissioner
Office of the Commissioner
1300 Pennsylvania Ave. NW
Washington, D.C. 20229

U.S. Immigration and Customs Enforcement
c/o Tae Johnson, Acting Director
Office of the Director
500 12th Street SW
Washington, D.C. 20536

U.S. Citizenship and Immigration Services
c/o Tracy Renaud, Senior Official Performing the Duties of the Director
Office of the Director
5900 Capital Gateway Drive
Suitland, Maryland 20746

Exhibit K

2021 WL 723856
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Victoria Division.

STATE OF TEXAS, Plaintiff,

v.

The UNITED STATES OF AMERICA; DAVID
PEKOSKE, Acting Secretary of The United States
Department of Homeland Security, in his official
capacity; UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; TROY MILLER, Senior
Official Performing the Duties of the Commissioner
of U.S. Customs and Border Protection, in his
official capacity; U.S. CUSTOMS AND BORDER
PROTECTION; TAE JOHNSON, Acting Director
of U.S. Immigration and Customs Enforcement,
in his official capacity; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; TRACY RENAUD,
Senior Official Performing the Duties of the Director
of the U.S. Citizenship And Immigration Services,
in her official capacity; and U.S. CITIZENSHIP
AND IMMIGRATION SERVICES, Defendants,
FIEL HOUSTON and REFUGEE AND
IMMIGRANT CENTER FOR EDUCATION
AND LEGAL SERVICES, Intervenors.

Civil Action No. 6:21-cv-00003
|
Signed February 23, 2021

DREW B. TIPTON, UNITED STATES DISTRICT JUDGE

## MEMORANDUM OPINION AND ORDER

**\*1** The State of Texas moves for a preliminary injunction to enjoin the United States (the "Government")[1] from executing a 100-day pause on the removal of aliens already subject to a final Order of Removal.[2] (Dkt. No. 62). The 100-day pause was set into motion through a recent Memorandum of the Department of Homeland Security on January 20, 2021 (the "January 20 Memorandum"). (Dkt. No. 2-2). The Government and the Intervenors[3] oppose Texas's Motion for a Preliminary Injunction ("Motion"). (Dkt. Nos. 82, 83). Having considered the pleadings on this issue, the record, and

the applicable law, the Court finds that Texas has satisfied the requirements for a preliminary injunction. Accordingly, Texas's Motion is **GRANTED**.[4]

## I. BACKGROUND

Just shy of a month old, this case has accumulated a significant procedural background and implicates the ever-complex immigration statutory scheme. Before addressing the merits, the Court first outlines those preliminary items. The factual statements made herein (except where the Court is discussing a factual dispute) should be considered as findings of fact regardless of any heading or lack thereof. Similarly, the legal conclusions, except where the Court discusses the various competing legal theories and positions, should be taken as conclusions of law regardless of any label or lack thereof.

### A. GENERAL BACKGROUND

Although Texas challenges an action of the current Executive Administration in the present case, this dispute has its genesis in the final days of the prior Administration. That is when the Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS") entered into a Memorandum of Understanding Between Texas and DHS concerning certain aspects of the nation's immigration laws (the "Agreement"). (Dkt. No. 63-2 at 2). The Agreement was finalized on January 8, 2021—just 12 twelve days before the transition from the Trump Administration to the Biden Administration. (*Id.* at 9–10). The Agreement purportedly established "a binding and enforceable commitment between DHS and Texas," in which Texas agreed to "provide information and assistance to help DHS perform its border security, legal immigration, immigration enforcement, and national security missions." (*Id.* at 3). In return, DHS agreed to:

**\*2** consult Texas and consider its views before taking any action, adopting or modifying a policy or procedure, or making any decision that could:

(1) reduce, redirect, reprioritize, relax, or in any way modify immigration enforcement;

(2) decrease the number of ICE agents performing immigration enforcement duties;

(3) pause or decrease the number of returns or removals of removable or inadmissible aliens from the country;

(4) increase or decline to decrease the number of lawful, removable, or inadmissible aliens;

(5) increase or decline to decrease the number of releases from detention;

(6) relax the standards for granting relief from return or removal, such as asylum;

(7) relax the standards for granting release from detention;

(8) relax the standards for, or otherwise decrease the number of, apprehensions or administrative arrests;

(9) increase, expand, extend, or in any other way change the quantity and quality of immigration benefits or eligibility for other discretionary actions for aliens; or

(10) otherwise negatively impact Texas. (*Id.*). "In case of doubt, DHS [agreed to] err on the side of consulting with Texas." (*Id.*). [5]

Twelve days later, on January 20, 2021, the current Administration took the reins of power from the prior Administration. On that same day, the current Administration performed two actions that are relevant to this case. The first is Executive Order 13,993, which sets forth two primary objectives pertaining to immigration law. (Dkt. No. 59-1 at 4–5). Section 1 of the Executive Order describes some of the remarkable contributions immigrants have made to the country and briefly communicates some of the Administration's immigration policy values and priorities. [6] (*Id.* at 4). In light of this, President Biden directed his Administration to "reset the policies and practices for enforcing civil immigration laws to align enforcement with these values and priorities." (*Id.*). The President also revoked Executive Order 13,768, [7] in which the previous Administration had set forth its immigration enforcement values and priorities. The President then directed certain department and agency heads to "review any agency actions developed pursuant to [Executive Order 13,768] and take action, including issuing revised guidance, as appropriate and consistent with applicable law, that advances the policy set forth in section 1 of this order." (*Id.*).

**\*3** The second relevant action taken by the current Administration on January 20, 2021 came in the form of a memorandum written by Acting DHS Secretary David Pekoske (the "January 20 Memorandum"). (Dkt. No. 63-1). In that memorandum, Pekoske announced changes to the enforcement of the nation's immigration laws. (*Id.*). The January 20 Memorandum began by acknowledging the current issues the federal government is presently encountering in enforcing immigration laws, noting that the United States "faces significant operational challenges at the southwest border as it is confronting the most serious global public health crisis in a century." (*Id.* at 2). The January 20 Memorandum went on to say that, "in light of those unique circumstances," DHS must substantially increase "resources to the border in order to ensure safe, legal and orderly processing, to rebuild fair and effective asylum procedures that respect human rights and due process, to adopt appropriate public health guidelines and protocols, and to prioritize responding to threats to national security, public safety, and border security." (*Id.*) The January 20 Memorandum called for a "Department-wide review of policies and practices concerning immigration enforcement" and simultaneously articulated "interim enforcement priorities [that] shall go into effect on February 1, 2021 and remain in effect until superseded by revised priorities developed in connection with the" Department-wide review. [8] (*Id.* at 3–4).

Most relevant here, the January 20 Memorandum ordered a temporary pause on removals of noncitizens. (*Id.* at 4–5). Specifically, the January 20 Memorandum directed "an immediate pause on removals of any noncitizen with a final order of removal...for 100 days." [9] (Dkt. No. 2-2 at 4–5). The January 20 Memorandum justified this pause by pointing to DHS's "limited resources," which it claimed "must be prioritized to...provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at the southwest border fairly and efficiently" and "comply with COVID-19 protocols to protect the health and safety of DHS personnel and those members of the public with whom DHS personnel interact." (*Id.* at 4). Further, the January 20 Memorandum stated, the pause is necessary for DHS to "ensure that [its] removal resources are directed to [its] highest enforcement priorities." (*Id.*).

**B. PROCEDURAL BACKGROUND**
Texas wasted little time seeking to enjoin the 100-day pause on removals. Texas filed this case just two days

after the Acting Secretary of DHS issued the January 20 Memorandum. (Dkt. No. 1). In its six-count Complaint, Texas alleges that the January 20 Memorandum is unlawful because it violates:

**\*4** 1) the Agreement between Texas and DHS;

2) the Administrative Procedure Act's ("APA") proscription of actions that are "not in accordance with law" and "in excess of...authority" by transgressing a statutory duty of DHS to remove individuals subject to a final order of removal pursuant to 8 U.S.C. § 1231(a)(1)(A);

3) the Constitution's requirement that the President "take Care that the Laws be faithfully executed"; [10]

4) the APA's proscription of agency actions that are arbitrary and capricious; [11]

5) the APA's requirement that agency rules be subject to notice and comment; [12] and

6) DHS's general responsibility to "[p]romote the [r]emoval of [i]llegal [a]liens." (*Id.*).

That same day, Texas pressed for a temporary restraining order ("TRO") to enjoin the 100-day pause on removals set forth in the January 20 Memorandum. (Dkt. No. 2). On January 26, 2020, the Court granted that request. (Dkt. No. 16). In doing so, the Court ordered, in relevant part:

1. Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby ENJOINED and RESTRAINED from enforcing and implementing the policies described in the January 20 Memorandum in Section C entitled "Immediate 100-Day Pause on Removals."

2. This TRO is granted on a nationwide basis and prohibits enforcement and implementation of the policies described in the January 20 Memorandum in Section C entitled "Immediate 100-Day Pause on Removals" in every place Defendants have jurisdiction to enforce and implement the January 20 Memorandum.

(*Id.* at 17). The Court subsequently extended the TRO from February 9, 2021 to February 23, 2021 after recognizing, among other things, the need "for a more fulsome record

that will assist the Court in adjudicating Texas's Motion for a Preliminary Injunction." (Dkt. No. 67 at 4, 5). That record has since been supplemented. (*See* Dkt. Nos. 59, 59-1, 63, 63-1–63-18, 78, 78-1–78-2, 82-1–82-5, 83-1, 84-1). The Court also granted intervention to two parties, FIEL Houston and the Refugee and Immigrant Center for Education and Legal Services (together, the "Intervenors"), who joined the Government as defendants (collectively, "the Defendants"). (Dkt. No. 65).

Texas now moves for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure to continue to enjoin the 100-day pause on removals on a nationwide basis. (Dkt. No. 62). The Defendants filed Responses in opposition to the Motion, (Dkt. Nos. 82, 83), to which Texas filed a Reply, (Dkt. No. 84). Several amicus briefs have also been filed in support of and in opposition to the Motion. (Dkt. Nos. 75, 77, 81). After full briefing on the issues at hand, Texas's Motion is now ripe for review.

## C. THE IMMIGRATION REMOVAL PROCESS

Before turning to the merits of the case, it is instructive to provide a brief outline of the complex immigration statutory scheme with respect to removals and corollary proceedings.

**\*5** The Immigration and Nationality Act ("INA"), along with its subsequent amendments, establishes the statutory framework for arresting, processing, and removing individuals who are unlawfully present in the United States. IMMIGRATION AND NATIONALITY ACT OF 1952, Pub.L. 82-414, 66 Stat. 163; *see* 8 U.S.C. § 1225 *et seq.*; (Dkt. No. 82 at 12); (Dkt. No. 83 at 14). The INA provides that individuals "in and admitted to the United States shall, upon the order of the Attorney General, be removed if" they are within one or more classes of "deportable aliens." 8 U.S.C. § 1227(a). As such, on a "warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). As explained next, the Attorney General's authority in removal matters has been further delegated by Congress to the Secretary of DHS.

### 1. DHS, ICE, ERO, & CBP

In response to the September 11, 2001 attacks on the nation, the Homeland Security Act of 2002 was enacted, creating DHS. HOMELAND SECURITY ACT OF 2002, Pub.L.

107-296, 116 Stat. 2135. [13] Section 102 of the Homeland Security Act, 6 U.S.C. § 112, and 8 U.S.C. § 1103, charges the Secretary of DHS with the administration and enforcement of immigration and naturalization laws. In turn, the Secretary has the authority to delegate any of the office's functions to any officer, employee, or organizational unit within the agency, except as otherwise provided by the Homeland Security Act. 6 U.S.C. § 112(b)(1).

ICE is an agency within DHS. [14] See *Fuentes-Pena v. Barr*, 917 F.3d 827, 828 (5th Cir. 2019) ("Accompanying the NTA was a notice from *ICE, an agency within DHS*,....." (emphasis added)). ICE has three "operational directorates," the most relevant of which to this case is Enforcement and Removal Operations ("ERO"). [15]

ICE states that ERO "upholds U.S. immigration law at, within, and beyond" the borders of the United States. *Id.* ERO "manages all aspects of the immigration enforcement process, including identification and arrest, domestic transportation, detention, bond management, and supervised release, including alternatives to detention." *Id.* ERO "removes aliens ordered removed from the U.S. to more than 170 countries around the world." *Id.*

## 2. Removal Proceedings

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. 104–208, 110 Stat. 3009–546, created a uniform procedure for deporting aliens or denying them entry into the United States. The removal process under section 240 of the Immigration and Nationality Act—also called "240 proceedings"—commences when DHS files a Notice to Appear ("NTA") against an alien or noncitizen—who are designated as "respondents"—in immigration court. (Dkt. No. 83 at 14); *Matter of S-O-G- & F-D-B-*, 27 I. & N. Dec. 462, 465 (2018); *see* 8 C.F.R. § 1003.14; Jennifer Williams, *The Potential Implications of the Supreme Court's Decision in Pereira v. Sessions on Prosecutions for Illegal Reentry Under 8 U.S.C. § 1326*, 67 DOJ J. Fed. L. & Prac. 141 (2019); *see also* (Dkt. Nos. 82 at 12, 82-1 at 5).

These immigration courts are within the purview of the Executive Office for Immigration Review ("EOIR"), an agency within the United States Department of Justice ("DOJ") that conducts removal proceedings and adjudicates appeals. 48 Fed. Reg. 8,038-02 (Feb. 25, 1983) (codified

at 8 C.F.R. pts. 1, 3, 100). [16] Immigration judges presiding over such courts are employees of the DOJ. *See* 8 U.S.C. § 1421(a) ("The sole authority to naturalize persons as citizens...is conferred upon the Attorney General."); *id.* § 1447 (a) ("If...an application for naturalization is denied, the applicant may request a hearing before an immigration officer."); *id.* § 1101(18) ("The term 'immigration officer' means any employee or class of employees...designated by the Attorney General...to perform the functions of an immigration officer...."); 8 C.F.R. § 1001.1(l) ("The term immigration judge means an attorney whom the Attorney General appoints as an administrative judge within the [EOIR]...."); (Dkt. No. 82 at 12). Immigration judges have been prescribed by statute to preside over "proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1); *see also* (Dkt. No. 83 at 14). Federal law also gives the Attorney General—and, by extension of DOJ's internal organizational structure, the immigration judges—discretion on whether such an individual may continue to be detained during the proceedings or released on bond or conditional parole. 8 U.S.C. § 1226(a).

**\*6** The respondents have certain rights in removal proceedings. For instance, they may request a change of venue. *See, e.g.,* *Chow v. I.N.S.*, 12 F.3d 34, 39 (5th Cir. 1993); *Maldonado-Perez v. I.N.S.*, 865 F.2d 328, 335 (D.C. Cir. 1989). The NTA served upon the respondents must also specify, "at a minimum, the time and place of the removal proceedings." *Pereira v. Sessions*, ___ U.S. ___, ___, 138 S.Ct. 2105, 2116, 201 L.Ed.2d 433 (2018). The NTA itself must be served in accordance with section 239 of the INA, which is housed at 8 U.S.C. § 1229a. The respondents are also entitled to due process, having the right to present evidence, cross-examine witnesses, and apply for relief from removal, if available. *Id.* § 1229a(b)(4).

After an NTA has been served, the next step is the Master Calendar Hearing ("MCH"). *See, e.g., Zhang v. Gonzales*, 432 F.3d 339, 346 (5th Cir. 2005); *see also* U.S. Dep't of Justice, Office of the Chief Immigration Judge, Immigration Court Practice Manual, § 4.15 (2018). The MCH is the respondent's "first appearance before an immigration judge" and is held for "pleadings, scheduling, and other similar matters." U.S. Dep't of Justice, Office of the Chief Immigration Judge, Immigration Court Practice Manual, § 4.15. It is possible to resolve some uncontested cases through the MCH, however,

cases that require an evidentiary hearing "typically also require one or more master calendar hearings in preparation for that individual hearing." *De Ren Zhang v. Barr*, 767 F. App'x 101, 103 (2d Cir. 2019) (citing Deborah E. Anker, Law of Asylum in the United States, App. A § A3:21 (2018)). At this stage, for instance, the respondent may be permitted to "voluntarily...depart the United States" at his or her "own expense...in lieu of being subject to" the removal process if the individual "is not deportable under section 1227(a)(2)(A)(iii) or section 1227(a)(4)(B) of this title." 8 U.S.C. § 1229c(a)(1); 8 C.F.R. § 1240.26(b)(1)(i)(A) (providing authority to the immigration judge to grant voluntary departure to an alien who, among other things, makes a request "prior to or at the master calendar hearing" to voluntarily depart the United States).

If the case is not resolved at the MCH stage, the removal proceedings progress to an "individual hearing" in which both the respondents and DHS argue the merits of the matter. *Zhang*, 432 F.3d at 346 n.5; *see also* U.S. Dep't of Justice, Office of the Chief Immigration Judge, Immigration Court Practice Manual, § 4.16. At the close of that hearing, the immigration judge "typically issues a decision on the merits of an alien's claims." *Zhang*, 432 F.3d at 346 n.5. The immigration court "may render an oral decision at the hearing's conclusion[ ] or...an oral or written decision on a later date." U.S. Dep't of Justice, Office of the Chief Immigration Judge, Immigration Court Practice Manual, § 4.16(g). If the immigration judge finds that the respondent is removable and does not grant relief from removal, the immigration court then issues an order of removal. *See* 8 U.S.C. § 1240.12; (Dkt. No. 82 at 13).

Both DHS and the respondents have the right to appeal the decision to the Board of Immigration Appeals ("BIA"), although a party may choose to waive that right. U.S. Dep't of Justice, Office of the Chief Immigration Judge, Immigration Court Practice Manual, § 4.16(h); *see also* 8 C.F.R. §§ 1003.1, 1003.3, 1003.38(a); (Dkt. No. 82 at 13). To appeal, a party must file a Notice of Appeal with the BIA no later than 30 calendar days after the immigration judge rendered an oral decision or mailed a written decision. *See* 8 C.F.R. § 1003.38. The immigration judge may also choose to certify the case to the BIA or to the Attorney General after issuing a decision and before the parties file for an appeal. *Id.* § 1003.7.

### 3. Final Orders of Removal

**\*7** 8 C.F.R. § 1241.1 prescribes six circumstances under which an immigration judge's order of removal becomes final:

**§ 1241.1 Final order of removal.**

An order of removal made by the immigration judge at the conclusion of proceedings under section 240 of the Act shall become final:

(a) Upon dismissal of an appeal by the [BIA];

(b) Upon waiver of appeal by the respondent;

(c) Upon expiration of the time allotted for an appeal if the respondent does not file an appeal within that time;

(d) If [the immigration judge] certifie[s] [the order of removal] to the Board or Attorney General, upon the date of the subsequent decision ordering removal;

(e) If an immigration judge orders an alien removed in the alien's absence, immediately upon entry of such order; or

(f) If an immigration judge issues an alternate order of removal in connection with a grant of voluntary departure, upon overstay of the voluntary departure period, or upon the failure to post a required voluntary departure bond within 5 business days. If the respondent has filed a timely appeal with the Board, the order shall become final upon an order of removal by the Board or the Attorney General, or upon overstay of the voluntary departure period granted or reinstated by the Board or the Attorney General."

*Id.* § 1241.1; *see also* 8 U.S.C. § 1101(a)(47)(B); 8 C.F.R. § 1003.39. An order also becomes final when the BIA "declines to accept a certified case for review." 8 C.F.R. § 1003.7.

Once an order of removal from a 240-proceeding is administratively "final," it may be judicially reviewed. *See* 8 U.S.C. § 1252(b)(9); (Dkt. No. 82 at 13). Federal circuit courts of appeal have exclusive jurisdiction to review a final order of removal affirmed by the BIA. 8 U.S.C. § 1252(a)(5). The respondent may petition the court of appeals and request a stay of the removal order pending the court of appeals' judicial review. *Id.* § 1252(b)(3)(B). But such orders may be reviewable only if (1) the respondents have exhausted all administrative remedies available, and

(2) another court has not decided the validity of the order, unless the reviewing court finds that the petition presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided for in that proceeding was inadequate or ineffective to test the order's validity. 8 U.S.C. § 1252(d).

In addition to seeking judicial remedies, once an individual's order of removal becomes administratively final, he or she may request an administrative stay, move to reopen their removal proceedings, and apply for deferred action or forbearance based on specific criteria. *See* 8 C.F.R. § 241.6; 8 U.S.C. § 1229a(c)(7)(A). Upon these actions by the individual subject to a final order of removal, DHS has statutory discretion to grant the respective administrative remedy. *See* 8 U.S.C. § 1229a; 8 C.F.R. § 241.6. Further, as the Government states, "Each removal effort," after a final order of removal requires consideration of a "highly individualized combination of resources" in coordination with other countries. (Dkt. No. 83 at 14–15).

A "voluntary departure" becomes "final" when "an immigration judge issues an alternate order of removal," if the individual "overstay[s]" their voluntary departure period, or upon the individual's "failure to post...bond within 5 business days." 8 C.F.R. § 1241.1(f). Although this may mean that voluntary departures by themselves are not administratively final, 8 C.F.R. § 1240.26 requires the immigration judge to enter an alternate order of removal "[u]pon granting a request made for voluntary departure either prior to the completion of proceedings [in the master calendar hearing] or at the conclusion of proceedings." Thus, the interplay of these regulations means that—at least with respect to 8 C.F.R. § 1241.1(f)—it may be assumed that *virtually all* voluntary orders of removal are accompanied by an alternate order of removal which becomes final if the individual overstays the voluntary departure period or upon failure to post a voluntary departure bond within five business days. *See id.* § 1241.1(f).

**\*8** With respect to expedited removals, 8 C.F.R. § 1241.1 and 8 U.S.C. § 1225 (the statute providing for expedited removal procedures) do not explicitly state that expedited removals are considered to be final orders of removal. [17] *See* 8 C.F.R. § 1241.1, 8 U.S.C. § 1225. However,

such removals are administratively "final" insofar as they are "not subject to [an] administrative appeal." [18] 8 U.S.C. § 1225(b)(1)(C). Unlike orders of removal pursuant to a 240 proceeding, expedited removal orders are not commonly subject to judicial review. *See* 8 U.S.C. § 1252(e); *Dep't of Homeland Sec. v. Thuraissigiam*, ___ U.S. ___, ___, 140 S.Ct. 1959, 1983, 207 L.Ed.2d 427 (2020) (holding that section 1252(e)(2), the statute that limits judicial review of expedited removal determinations through the writ of habeas corpus, does not violate the Suspension or the Due Process Clauses of the Constitution). Thus, because expedited removals cannot be judicially reviewed, in an important sense they are more "final" than 240-proceeding removal orders.

Lastly, Reinstatement of Removal Orders are administratively "final." [19] *See* *Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 295 (5th Cir. 2002) (Fifth Circuit noting that it could, in fact, review "the lawfulness of the reinstatement order" because a reinstatement of a previous order "is a final order" of DHS); 8 C.F.R. § 241.8(c) ("If the requirements of paragraph (a) of this section are met, the alien shall be removed *under the previous order* of exclusion, deportation, or removal in accordance with section 241(a) (5) of the Act." (emphasis added)). Note, section 1231(a) (5) provides that an individual may not challenge a prior removal order underlying the reinstatement of removal. 8 U.S.C. § 1231(a)(5). Indeed, the Fifth Circuit has held that it could review the validity of the removal order *underlying* a reinstatement of removal order only if the underlying order was challenged within 30 days of its issuance, there was a gross miscarriage of justice in the original proceedings, and the individual had exhausted all other administrative remedies. *See* *Luna-Garcia De Garcia v. Barr*, 921 F.3d 559, 565 (5th Cir. 2019).

## 4. Post Final Order of Removal Detention

ICE has detention authority over an individual with a final order of removal. *See* 8 U.S.C. § 1231(a)(1)(B)(i)–(ii). Section 1231(a)(1)(A) specifically provides that "when an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). A "special statute," however, "authorizes further detention if the Government

fails to remove the alien during those 90 days." *Zadvydas v. Davis*, 533 U.S. 678, 682, 121 S.Ct. 2491, 2495, 150 L.Ed.2d 653 (2001). That "special statute"— 8 U.S.C. § 1231(a)(6)—provides:

> "An alien ordered removed [1] who is inadmissible... [2] [or] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision...."

**\*9** *Id.* (quoting 8 U.S.C. § 1231(a)(6)) (alterations in original); *see also* (Dkt. No. 83 at 15–16) ("Indeed, § 1231 expressly contemplates—but generally does not require—detention and removal *after* the expiration of the removal period." (emphasis in original) (citations omitted)). In fact, section 1231(a)(1)(A)'s 90-day removal period is sometimes not satisfied due to the alien's lack of "good faith" in securing timely application for travel, 8 U.S.C. § 1231(a)(1)(C), or if the Attorney General determines "immediate removal" of "an alien" is otherwise "not practicable or proper," *id.* § 1231(c)(2)(A)(i), or "the alien is needed to testify," *id.* at (ii).

If the individual subject to the final order of removal is not in ICE custody, ICE will send a "Bag-and-Baggage" letter demanding the individual to report to an ICE facility to be deported. *Qian Gao v. Gonzales*, 481 F.3d 173, 175 (2d Cir. 2007). An individual who subsequently fails to report will be classified by ICE and the circuit courts as a "fugitive." *See, e.g., Giri v. Keisler*, 507 F.3d 833, 834–36 (5th Cir. 2007) (per curiam). Indeed, federal law provides that "the Attorney General shall detain the alien" and "[u]nder no circumstance during the removal period shall the Attorney General release an alien who has been found inadmissible under [certain] section[s] or deportable under [others]." 8 U.S.C. § 1231(a)(2). In practice, ICE states that ERO is responsible for coordinating the individual's departure from the United States.[20] ERO's removal operations are accomplished through "contract/ chartered flights and commercial airlines for escorted

and unescorted removals."[21] ERO also collaborates with ICE's other internal departments, the State Department, and "international partners to successfully execute removal operations."[22]

## II. JURISDICTION AND JUDICIAL REVIEW

With the procedural background and the relevant immigration statutory scheme explained, the Court now moves to the merits of the case. The Court first turns to the threshold issues of standing and judicial reviewability.

In many ways, this case is about the proper limits of governmental power. Through the Constitution, the People of this Nation granted separate and limited powers to each of three branches of federal government. To Congress, the People granted "legislative Powers." U.S. CONST. art. I, § 1. To the President, the People granted "[t]he executive Power." *Id.* art. II, § 1. And to federal courts, the People granted "[t]he judicial Power of the United States." *Id.* art. III, § 1. Interwoven into this constitutional fabric are the principles of federalism, which govern the relationship of the sovereign States and the federal government. This last point is of particular importance in this case because the States have ceded to the federal government the authority to regulate and enforce immigration and to establish a "uniform Rule of Naturalization."[23] *Id.* art. I, § 8, cl. 4. Far from being an arbitrary framework, the People separated these powers because they well understood, "where the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution are subverted." FEDERALIST NO. 47 (James Madison) (emphasis removed). The issues involved in this case require examining potential "subversions" coming from the federal courts and the Executive.

## A. STANDING

**\*10** As a federal court, this Court is obligated to first consider its own limitations. To prevent federal courts from usurping the respective powers of its fellow branches, the People through their Constitution limited exercise of the judicial power to certain "Cases" and "Controversies." U.S. CONST. art. III, § 2; *see* 4 PAPERS OF JOHN MARSHALL 95 (C. Cullen ed. 1984). Although the Constitution does not expressly define those terms, the "traditional understanding of a case or controversy" has given rise to several doctrines that are critical to maintaining the proper bounds of judicial

power,[24] one of which is "[s]tanding to sue." *Spokeo, Inc. v. Robins*, 578 U.S. ___, ___, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). Pursuant to the standing to sue doctrine, a federal court can exercise the judicial power only where a plaintiff has demonstrated that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)). That is—injury, traceability, and redressability. *Id.* These three elements constitute the "irreducible constitutional minimum" of standing, and any plaintiff seeking relief through a federal court's exercise of the judicial power must carry the burden of ensuring that each element is established. *Id.* (first quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136; and then citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990)); *see also Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017).

Relevant here, the Supreme Court has further explained that "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 518, 127 S.Ct. 1438, 1454, 167 L.Ed.2d 248 (2007). Rather, a State is afforded "special solicitude" in satisfying its burden to demonstrate the traceability and redressability elements of the traditional standing inquiry whenever its claims and injury meet certain criteria. *Id.* at 520, 127 S.Ct. at 1454– 55; *Texas v. United States*, 809 F.3d 134, 151–55 (5th Cir. 2015). Specifically, a State seeking special solicitude standing must allege that a defendant violated a congressionally accorded procedural right which affected the State's "quasi-sovereign" interests in, for instance, its physical territory or lawmaking function. *Massachusetts*, 549 U.S. at 520–21, 127 S.Ct. at 1454–55; *Texas*, 809 F.3d at 151–55.

In this case, Texas asserts that it has standing under the regular inquiry *and* because it is entitled to special solicitude in satisfying the traceability element. (Dkt. No. 62 at 16–17). The Defendants disagree on both points. In the main, the Defendants contend that Texas's alleged injuries are not traceable to the 100-day pause. (Dkt. No. 82 at 41–46); (Dkt. No. 83 at 18–21). After careful consideration of each of the three standing elements, the Court finds that Texas has carried

its burden to satisfy the regular inquiry and, regardless, it is entitled to special solicitude, which makes its standing to sue unassailable.

**1. Injury in Fact**

A plaintiff seeking to establish injury in fact must show that it suffered "an invasion of a legally protected interest" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S.Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136). To be sufficiently concrete, an injury must be " '*de facto*'; that is, it must actually exist" and not be merely "abstract." *Id.* (citations omitted). To be sufficiently particularized, an injury must "affect the plaintiff in a personal and individual way.' " *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1, 112 S.Ct. at 2136 n.1). To be sufficiently actual or imminent, the injured plaintiff must suffer "continuing, present adverse effects" or "show that he will soon expose *himself* to the injury" through "concrete plans" demonstrating his injury is "*certainly* impending." *Lujan*, 504 U.S. at 564 & n.2, 112 S.Ct. at 2138 n.2 (emphasis in original) (citations omitted).

**\*11** Texas asserts that the 100-day pause will injure the State's financial interests by requiring it to spend more than it had previously anticipated on State detention facilities and several public benefits and services.[25] (Dkt. No. 62 at 16–17). As the Defendants are apt to point out, however, this injury is premised upon the notion that the 100-day pause would result in a greater number of aliens moving freely in Texas and pulling on State financial resources than would otherwise occur. (Dkt. Nos. 82 at 45, 83 at 18–21). Leaving aside for the moment the issues of *how* the 100-day pause would result in a greater number of aliens moving freely in Texas and *how* that increase would lead to Texas's alleged financial injuries, *see* Traceability, *infra*, this section narrowly evaluates the evidence put forth by Texas to vindicate its claims of suffering cognizable injuries.

Texas's specific claim to financial injury is three-fold. The State alleges that the 100-day pause will result in unanticipated cost increases to its (i) detention facilities, (ii) provision of public education, and (iii) provision of various other public benefits and services. (Dkt. No. 62 at 16– 17). The Defendants do not challenge that these claimed injuries are particularized to Texas, and the Court finds that Texas has satisfied that injury prong. Based on the following, the Court finds that Texas's financial injuries implicate a legally

protected interest, but only the alleged injuries to its detention and education costs are sufficiently concrete and actual or imminent.

As a preliminary matter, the Court finds that Texas has demonstrated the invasion of a legally protected interest. Texas decries the deleterious effects on its public fisc caused by a sudden shift in federal immigration policy. (*Id.*). The Supreme Court and the Fifth Circuit have recognized injuries to a local or state government's financial interests based on the actions of the federal government. *See* *Clinton v. City of N.Y.*, 524 U.S. 417, 430–31, 118 S.Ct. 2091, 2099, 141 L.Ed.2d 393 (1998) (finding sufficient for standing purposes a local government's claim to suffering injury to its "borrowing power, financial strength, and fiscal planning");

*Texas*, 809 F.3d at 152–53 (finding sufficient for standing purposes several States' claims to suffering injury to their public fiscs); *see also* *Sch. Dist. of City of Pontiac v. Sec'y of the U.S. Dep't of Educ.*, 584 F.3d 253, 261–62 (6th Cir. 2009). Further, the Supreme Court and the Fifth Circuit have expressly acknowledged such financial injuries in the immigration context, where States have "an interest in mitigating the potentially harsh economic effects of *sudden shifts* in population." *Plyler v. Doe*, 457 U.S. 202, 228, 102 S.Ct. 2382, 2400, 72 L.Ed.2d 786 (1982) (emphasis added); *see id.* at n.23 (explaining that, because the Constitution deprives States of any "direct interest in controlling entry into this country,...unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service"); *Texas*, 809 F.3d at 152–54; *see also* *Arizona v. United States*, 567 U.S. 387, 397, 132 S.Ct. 2492, 2500, 183 L. Ed.2d 351 (2012) (acknowledging that States "bear[ ] many of the consequences of unlawful immigration"); *DHS v.* *Regents of the U. of Cal.*, ___ U.S. ___, ___, 140 S. Ct. 1891, 1913, 207 L. Ed. 2d 353 (2020) (finding a sudden shift in the government's immigration policy was arbitrary and capricious in part because the government "failed to address whether there was legitimate reliance" on the former immigration policy (internal quotation marks omitted)). Thus, the financial harm to States from "sudden shifts" in their population due to federal immigration policies are not nebulous, *Plyler*, 457 U.S. at 228, 102 S.Ct. at 2400, but rather, "serious and well recognized." *Massachusetts*, 549 U.S. at 521, 127 S.Ct. at 1455.

**\*12** Here, Texas seeks equitable protection squarely within this well-recognized shelter by establishing that a "federal shift" in immigration policy engendered by the 100-day pause would bring it "particularly acute" financial harm. (Dkt. No. 62 at 16). In other words, Texas points to its reliance interests on the federal government's immigration policies, noting the costly effect on its "budget [which] has been set months or years in advance" and which it "has no time to adjust." (*Id.*). Accordingly, Texas's alleged financial injuries to its detention facilities, public education program, and other public services are sufficient for purposes of Article III standing insofar as these injuries are concrete and actual or imminent. Only the former two categories hit that mark.

a. Detention Facilities Costs

Texas first highlights the unanticipated costs it would incur by having to detain aliens who have been convicted of a crime or have criminal charges currently pending against them [26] who would otherwise be removed but for the 100-day pause. (*Id.* at 17). Texas spends an average of $62.34 per day per inmate in its own detention facilities. (Dkt. No. 63-10 at 4). In 2018, Texas detained 8,951 criminal aliens for a total of 2,439,110 days, costing it $152,054,117. [27] (*Id.* at 3– 4). If the 100-day pause causes the number of criminal aliens present in Texas to rise above and beyond what Texas had anticipated and a portion of those criminal aliens recidivate, *see infra,* Texas anticipates its costs "will increase." (Dkt. No. 62 at 17; Dkt. No. 84 at 16).

The Court finds that Texas's claimed injury from unanticipated detention costs is sufficiently concrete and imminent. The harm is concrete or *de facto* because Texas incurs real financial costs in detaining criminal aliens. And the harm is imminent because Texas is currently operating a detention system that holds criminal aliens and has demonstrated plans to continue doing so in the future.

b. Public Education Costs

Next, Texas alleges the 100-day pause will lead to an unanticipated increase in expenditures on public education for "unaccompanied" (*i.e.* undocumented noncitizen) children. (Dkt. No. 62 at 16, 30–31). Texas, like all States, is all but required to provide free public education to unlawfully present noncitizens pursuant to the Equal Protection Clause. *See* *Plyler*, 457 U.S. at 230, 102 S.Ct. at 2401–02 (holding that denial of public education to any children "within its borders" must be justified by a "substantial state interest").

During the current year, Fiscal Year ("FY") 2021, Texas spends approximately $9,216 per regular student and $11,432 per student in its bilingual program. (Dkt. No. 63-12 at 3). Relying on data provided to it from the U.S. Health and Human Services Office of Refugee Resettlement for each of the years between 2014 and 2020, Texas claims it educated 2,336 unaccompanied children in the leanest year and 9,990 in the fullest, for a total cost-per-year ranging between $26.71 million and $112.1 million, respectively. (*Id.* at 3–4). The Chief School Finance Officer at the Texas Education Agency anticipates that, because State funding is based on projections made by each school district at the end of the previous biennium, "[a]ny additional [unaccompanied children] enrolled in Texas public schools would increase the State's cost...over what would otherwise have been spent." (*Id.* at 5).

The Court finds that Texas's claimed injury from unanticipated public education costs is sufficiently concrete and imminent. The harm is concrete or *de facto* because Texas incurs real financial costs in providing public education to unaccompanied children. And the harm is imminent because Texas is currently providing public education to unaccompanied children and demonstrates plans to continue doing so in the future.

c. Other Public Benefits and Services
**\*13** Lastly, Texas points to a host of other public benefits and services it provides to undocumented aliens, such as emergency medical services and a family violence program. (Dkt. No. 63-13). For some of these services, Texas provides exact numbers of its expenditures, and for others it provides only "estimates." (*Id.* at 4–5). The most recent year of reporting for any non-estimate costs for any of these services, however, is 2013. (*Id.*). And the Interim Director of the Texas Health and Human Services Commission's Center for Analytics and Decision Support testifies that she believes that Texas's total costs in providing these services will "continue to reflect trends to the extent that the number of undocumented immigrants residing in Texas increases or decreases each year." (*Id.* at 6).

Considering the age and uncertainty of this evidence, the Court finds it is insufficient to support a claim to an "imminent" injury that is "certainly impending" from Texas's provision of these other public services. *Lujan*, 504 U.S. at 564 & n.2, 112 S.Ct. at 2138 & n.2; *see also Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1232 (10th Cir. 2012)

(finding insufficient for standing purposes a study "conducted over 15 years ago"); *Crane v. Napolitano*, 920 F. Supp. 2d 724, 744–45 (N.D. Tex. 2013) (rejecting a "2006 Audit Report" in part because it provided only "estimates" based on "anecdotal evidence" and was written "six years prior" to the issuance of the challenged agency action).

**2. Traceability**
Having established two injuries in fact, Texas must next show a "fairly traceable" link between those injuries and the 100-day pause. As a general matter, the causation required for standing purposes can be established with "no more than *de facto* causality." *Dep't of Commerce v. New York*, 588 U.S. ___, ___, 139 S.Ct. 2551, 2566, 204 L.Ed.2d 978 (2019) (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)). In other words, the plaintiff need not demonstrate that the defendant's actions are "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169–170, 117 S.Ct. 1154, 1164, 137 L.Ed.2d 281 (1997); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734–35, 128 S.Ct. 2759, 2769, 171 L.Ed.2d 737 (2008).

Accordingly, the link Texas must establish here is twofold. First, Texas must demonstrate that the 100-day pause would lead to an increase in the number of aliens moving freely within Texas above and beyond what it could have reasonably anticipated. Second, Texas must show that some of those unremoved aliens would become detained or use public education in Texas. *Cf. Texas v. United States*, 328 F. Supp. 3d 662, 700 (S.D. Tex. 2018) (finding "both aspects" of a "causal chain" satisfied: that the federal program in question "increases the volume of individuals" to whom plaintiff-states must provide social services, and that the plaintiff-states must actually "bear the costs of providing" those services). Based on the following, Texas has satisfied both requirements.

a. The 100-Day Pause Leads to Unanticipated Increases in the Total Number of Aliens in Texas
Texas's argument that the 100-day pause would lead to unanticipated increases in the number of aliens in Texas is straightforward: the aliens the government normally removes would remain. (Dkt. No. 62 at 8–9, 16). To establish the number of aliens remaining, Texas has provided the Court with a commendable volume of statistics detailing removals. (Dkt. Nos. 63-1–63-18). This data is in some instances helpfully broad, such as a list of total removals by year from

1892 to 2019. (Dkt. No. 63-3). And in other instances it is helpfully specific, such as tables breaking down the number of removals *per* month, *by* city, and *according to* criminal status across the entire nation. (Dkt. No. 63-5). In light of the two financial injuries Texas has established—detention facility and public education costs—the *most* relevant data points are those concerning criminal aliens and unaccompanied children in recent years.

 **\*14**  During Fiscal Years 2017 through 2019, ICE removed a total of 241,000 criminal aliens from the interior of the United States. (Dkt. No. 63-4 at 23). By simple calculation,[28] this means, on average, 220 criminal aliens were removed by ICE per day from the interior of the United States during that period. (Dkt. No. 63-6 at 7). From Texas, specifically, in FY 2019,[29] ICE removed a total of 58,916 criminal aliens from Dallas, Houston and San Antonio.[30] (Dkt. No. 63-5 at 6–7). This means, on average, 161 aliens were removed from those Texas cities by ICE per day during that period. (*Id.*). Assuming that these numbers would hold approximately true for the present,[31] the Court finds that Texas could reasonably anticipate the 100-day pause on removals resulting in approximately 22,000 criminal aliens not being removed by ICE from the United States and 16,100 from those Texas cities.

During FYs 2017 through 2019, ICE removed 15,520 unaccompanied children from the interior of the United States. (Dkt. No. 63-4 at 21). This means on average 14 unaccompanied children per day were removed from the interior of the United States during that period. Texas did not present Texas-specific data for the removals of unaccompanied children. Assuming that the nationwide average would hold approximately true for the present, the Court finds Texas could reasonably anticipate the 100-day pause on removals resulting in approximately 1,400 unaccompanied children not being removed by ICE from the United States.

The Intervenors object to Texas's reliance on the data provided to calculate the number of alien removals by ICE that would likely occur but-for the 100-day pause. (Dkt. No. 82 at 11–12, 36). Namely, the Intervenors make much of the distinction between administratively final orders of removal pursuant to a formal "240 proceeding" and those done on a summary basis, such as "expedited" removals. (*See, e.g.*, Dkt. No. 82 at 11–14, 36). In short, the Intervenors and their expert contend that because expedited removals,

which comprised 82.7% of all removals from FY 2017 to FY 2019, are "rapid, summary procedures applied to recent arrivals *at the border*," (*id.* at 36) (emphasis added), "[g]oing forward, these removals will not *be impacted* by the 100-day pause on deportations because the policy does not apply to those 'not physically present in the United States before November 1, 2020.' " (Dkt. No. 82-1 at 19) (emphasis added) (citing January 20 Memorandum). But despite their careful wording, the Intervenors concede that expedited proceedings are "administratively final," (Dkt. No. 82-1 at 18 (citing 8 U.S.C. § 1225(b)(1)(B)(iii)(III), (C)), and stop well short of suggesting that expedited removal orders are not covered by the 100-day pause, (Dkt. No. 82 at 36; Dkt. No. 82-1 at 19). Therefore, the Intervenors' argument hinges on whether the data put forward by Texas regarding ICE removals is somehow undercut by the fact that expedited removals will continue for those "not physically present in the United States before November 1, 2020."

Importantly, there is more to the story that the Intervenors are not telling. Although expedited removals include those performed at or within 100 miles of the border, 69 Fed. Reg. 48877–01, 2004 WL 1776983, expedited removals *also* include those performed *anywhere in the United States* if an alien has entered *less than two years prior to apprehension*, Exec. Order No. 13,767, 82 Fed. Reg. 8,793 (Jan. 25, 2017); 84 Fed. Reg. 35,409 (July 23, 2019).[32] In other words, even though a significant proportion of all removals have historically been expedited, continuing only those expedited removals for aliens "not physically present in the United States before November 1, 2020" would inevitably cancel a substantial number of expedited removals ICE would have performed in the interior of the United States.

 **\*15**  Moreover, the ratio the Intervenors cite regarding the percentage of expedited removals as a percentage of all removals pertains to removals performed not only by ICE, but also by CBP— whose jurisdiction extends just 100 miles inland from the U.S. border. (Dkt. No. 82-1 at 19) (citing Office of Immigration Statistics, Immigration Enforcement Actions: 2019, at 10 (U.S. Department of Homeland Security)). *See* 8 C.F.R. § 287.1(b). ICE, on the other hand, performs hundreds of thousands of removals throughout the interior United States, (*see generally* Dkt. No. 63-5); *see also* (Dkt. No. 63-4 at 22–23), some of which are "expedited" under the two-year rule noted above, (Dkt. No. 63-5 at 7-8). Notably, all of the statistics regarding removals from FYs 2017 through 2019 listed above pertain to ICE's

"interior" removals. And the Texas-specific data regarding criminal alien removals includes only those cities which are greater than 100 miles from the border, which is why the Court excluded El Paso from its calculation mentioned above.

The Court further notes that the number of aliens who would otherwise be removed from the *entire* United States is very relevant to estimating the impact of the 100-day pause on Texas. The Fifth Circuit made clear in *Texas v. United States* that injury to a State can flow from the fact that aliens are "free to move among states." 809 F.3d at 188.

Regarding those who would be "free to move," the Intervenors argue that, among those criminal aliens who are currently detained by ICE but would not be removed under the 100-day pause, it is too speculative to simply guess how many would actually be "released" into the United States or Texas. (Dkt. No. 82 at 15). Accepting that proposition for the moment, *see infra,* the record demonstrates that the number of criminal aliens who might be released by ICE is irrelevant: only 5,962 aliens are currently being detained in ICE facilities nationwide in any event. (Dkt. No. 78-1 at 5). That relatively low figure is not expected to change anytime soon: ICE has "set a nationwide goal to reduce the capacity usage of all dedicated ICE facilities to under 70% to help mitigate the impact of COVID-19." (*Id.* at 4). Thus, even if *none* of those criminal aliens in ICE detention were released —which, as will be explained below is a virtual impossibility based on the operation of law—a significant portion of the estimated number of criminal aliens who would normally be removed from the United States and Texas are either already moving freely or being prepared for release from a state or local detention system. (*See, e.g.,* Dkt. No. 63-4 at 15, tbl. 2 (listing the number of "administrative arrests" where criminal aliens are removed upon being turned over by state or local authorities)). Beyond these points, the Defendants make no argument that the unaccompanied children who would otherwise be removed but-for the 100-day pause are not already moving freely in the United States and Texas. Indeed, they could not: practically *all* aliens normally detained in ICE facilities are adults. [33] (Dkt. No. 63-7 at 7).

Based on the foregoing, the Court finds Texas has established by a preponderance of the evidence that it could reasonably expect a 100-day pause to lead to a significant number of criminal aliens and unaccompanied children moving freely within and into Texas who would otherwise be removed.

**b. Some Unremoved Aliens Would Be Detained or Use Public Education in Texas**

**\*16**  Texas must next demonstrate that those unremoved aliens would affect its public fisc by being detained or using public education in Texas. Where, as here, the traceable link between the government's action and the plaintiff's injury depends in part on the future behavior of third parties, the Supreme Court has traditionally denied the plaintiff standing.

*See* *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 414, 133 S.Ct. 1138, 1150, 185 L.Ed.2d 264 (2013) ("This Court is reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." (citation omitted)). This reluctance is especially strong where, as here with Texas's asserted detention costs, the third party's behavior is alleged to be unlawful. *Lyons,* 461 U.S. at 105, 103 S.Ct. at 1666-67.

Under fairly consistent circumstances, however, the Supreme Court and the Fifth Circuit have recognized an exception to federal courts' general reluctance to embrace standing theories predicated on third-parties' future behavior. In *Dep't. of Commerce,* the Supreme Court found a traceable link between government action and noncitizens' future unlawful behavior where evidence established a likelihood that noncitizens have "historically" behaved in a certain manner. 588 U.S. at ___, 139 S.Ct. at 2566. In light of this evidence, the Supreme Court concluded that traceability was not "mere speculation," but rather, the product of a "predictable effect of the Government action on the decisions of third parties." *Id.* (citations omitted). In *Davis v. Fed. Election Comm'n,* the Supreme Court found a traceable link between government action and the future behavior of the plaintiff's political opponent because evidence demonstrated "most candidates" had behaved in a certain manner and there was "no indication" the opponent would do otherwise. 554 U.S. at 734–35, 128 S.Ct. at 2769. And in *Texas v. United States,* the Fifth Circuit—in the specific context of a federal immigration action causing financial injury to a State—found a traceable link between the Deferred Action for Parents of Americans program ("DAPA") and noncitizens' likelihood of obtaining driver's licenses where driving was a "practical necessity" for *all* residents of the state. 809 F.3d at 156.

From these cases, it seems clear that the rare situations in which an injury may be traced to government action—despite relying on future third-party behavior—are shepherded by a

limiting principle: The plaintiff must demonstrate individuals similarly situated to the third party have a propensity to engage in or a practical need for the relevant behavior. Texas easily satisfies that principle here for both its detention and public education costs.

Texas contends that it suffers financial injury from the 100-day pause based on its detention costs because a significant number of criminal aliens who otherwise would have been removed *would be detained again* in Texas. (Dkt. No. 62 at 17; Dkt. No. 84 at 16). In addition to the evidence listed above discussing the number of criminal aliens moving freely in Texas and the United States, Texas submits evidence that criminal aliens recently detained in one county jail have a 70% "recidivism" rate. (Dkt. No. 84 at 16 (citing Dkt. No. 63-11); *see also* Dkt. No. 63-14). The Intervenors' experts take odds with the manner in which that rate was calculated, (Dkt. No. 82-3 at 4), but regardless, those same experts direct the Court to a source that pegs the rate of recidivism for state offenders at 44% within the first year following release and 83% within the first nine years.[34] (*Id.* at n.5). No matter how one looks at it, a significant portion of criminal aliens and state offenders "historically" recidivate. *See* Dep't of Commerce, 588 U.S. at ___, 139 S.Ct. at 2566.

**\*17**  The Court therefore finds that Texas has established a traceable link between its detention costs and the 100-day pause. The 100-day pause will lead to a significant number of criminal aliens moving freely within and into Texas who otherwise would have been removed. Criminal aliens and state offenders have a demonstrable propensity to recidivate. Therefore, the 100-day pause will cause Texas unanticipated detention facility costs.

Underscoring the traceability of Texas's detention costs injury is the fact that the federal government itself provides financial aid to States to help ameliorate the strain criminal aliens put on state detention facilities. Through a program called State Criminal Alien Assistance Program ("SCAAP"), the federal government reimburses States for some of the costs associated with detaining criminal aliens. (Dkt. No. 63-10 at 3). For instance, from the $152,054,117 Texas spent in 2018 on detaining criminal aliens, the federal government through SCAAP reimbursed $14,657,739. (*Id.* at 4). Although this reimbursement makes up for less than 10% of Texas's actual costs, the existence of the SCAAP program demonstrates that the federal government already acknowledges that states like Texas will continue incurring financial harm from the ongoing presence of criminal aliens. In fact, and as will be

explained fully below, *see* Zone of Interests, *infra*, SCAAP is a direct manifestation of the purpose embedded in the removal provision at the core of this case: 8 U.S.C. § 1231(a)(1)(A). As discussed below, remarkably clear statutory history shows that section 1231(a)(1)(A)'s mandate that the Attorney General remove aliens in a short time period was plainly intended by Congress to aid *States* in their burden of detaining criminal aliens. SCAAP, which finds its statutory underpinnings in another part of the same removal statute, 8 U.S.C. § 1231(i), is unequivocal testimony to Congress's acknowledgment of States' costs of detaining criminal aliens.

Next, the record demonstrates that an increase in the number of unaccompanied children in Texas due to the 100-day pause would lead to an increase in its public education costs. Unlike the recidivism rates for criminal aliens, Texas fails to provide evidence demonstrating that unaccompanied children have a propensity to attend public school. Under Fifth Circuit precedent, however, Texas need not make that showing. Rather, just as the panel in *Texas* found a traceable link between DAPA and Texas's financial injury from the costs of driver's licenses based on the "practical necessity" for most Texans to be able to drive, 809 F.3d at 156, Texas can link its education cost harm to the 100-day pause by showing education is similarly necessary for children residing in America. Texas does so by arguing it is required to provide public education to undocumented aliens by *Plyler v. Doe*. (Dkt. No. 62 at 31). There, the Supreme Court reiterated its long-held opinion that education is in many ways "necessary," including for the acquisition of "the basic tools by which individuals might lead economically productive lives." *Plyler*, 457 U.S. at 221, 102 S.Ct. at 2397 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 221, 92 S.Ct. 1526, 1536, 32 L.Ed.2d 15 (1972)). Thus, it is clear that education for children in America is *at least* as much of a "practical necessity" as driving is for Texans. And because it is undisputed that mere residence in the State of Texas makes an unaccompanied child eligible for Texas's public education system, Texas has sufficiently traced a link between its claimed education costs injury and the 100-day pause.

**\*18**  In sum, Texas has amply demonstrated its detention and public education cost injuries are fairly traceable to the 100-day pause.

The Defendants nevertheless contend that the links between Texas's injuries and the 100-day pause are merely speculative.

Namely, the Defendants make much of the Fifth Circuit's decision in *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015), where a panel denied Mississippi standing in a challenge to a federal immigration policy action. (Dkt. No. 82 at 45); (Dkt. No. 83 at 18–19). Specifically, the panel in *Crane* addressed Mississippi's challenge to DHS's Deferred Action for Childhood Arrivals ("DACA") program, which temporarily postponed removal for a particular class of "low priority aliens"—children—entirely "on a case-by-case basis." 783 F.3d at 248. Mississippi alleged that DACA beneficiaries would "cost the state money in education, healthcare, law enforcement, and lost tax revenue," and pointed to a "2006 study" estimating the "burden of illegal immigration as a whole" at $25 million per year. *Id.* at 249. The panel found that Mississippi's fiscal injury was "purely speculative" because there was "no concrete evidence that Mississippi's costs had increased or will increase as a result of DACA." *Id.* at 252. Specifically, Mississippi had submitted "no evidence that any DACA eligible immigrants resided in the state" and "[no] evidence of costs it would incur if some DACA-approved immigrants came to the state." *Id.*

*Crane* is inapposite to this case because it concerned a very different type of federal deferral program and a very different evidentiary record. The DACA program at issue applied to only a certain class of "low priority aliens" whom Mississippi had made no showing even "resided in the state." *Id.* By contrast, Texas challenges a moratorium on nearly *all* individuals with final removal orders and has provided an abundance of statistics demonstrating the approximate number of criminal aliens it could reasonably expect the federal government to remove from the United States *and* Texas during the 100-day pause. *Cf. Crane*, 920 F. Supp. 2d at 745 (finding that Mississippi "offered only conclusory allegations that those illegal aliens who are permitted to remain would otherwise have been removed, or that there has been a decrease in the total number of removals as a result of [DACA]"). Also, the "2006 study" presented by Mississippi in *Crane* admitted on its face that it could not "accurately quantify the costs of illegal immigrants," made conclusions based on "estimates" or "anecdotal evidence," and conceded that "local and state law enforcement have no accurate picture of the costs associated with illegal immigrants." *Id.* at 744 (internal quotations and quotation omitted). Here, at least with regard to Texas's detention and public education costs, Texas provides precise and up-to-date statistics of its historic and ongoing costs for the provision of these services to

undocumented aliens—not outdated estimates or anecdotes. Thus, unlike Mississippi in *Crane*, Texas has satisfied its burden to demonstrate a concrete injury that is fairly traceable to the Government's sudden shift in immigration policy.

**\*19** Of note, the only evidence discussed in *Crane* that is analogous to Texas's evidence of injury from increased public education costs was "waived" by Mississippi. *Crane*, 783 F.3d at 252 n.34; (Dkt. No. 16 at 5). Apparently, after oral argument in front of the Fifth Circuit, Mississippi presented evidence of injury from the "cost of issuing driver's licenses to DACA's beneficiaries." *Id.* Although forfeited in *Crane*, this type of evidence would eventually be recognized as sufficient to support standing by the Fifth Circuit later that same year in a challenge to DAPA. *See Texas*, 809 F.3d at 150 n.24. As discussed above, the *Texas* panel found that DAPA "would enable beneficiaries to apply for driver's licenses," and that "there is little doubt that many would do so because driving is a practical necessity in most of the state." *Id.* at 155–56 (quotation omitted). Likewise, here, the record evidence demonstrates the 100-day pause would render unremoved, unaccompanied children eligible for public education and most would probably enroll in light of the "necessity" of education in America.

Finally, the Intervenors argue that Texas cannot demonstrate it would be harmed "during" the "brief window" of the 100-day pause. (Dkt. No. 82 at 43). In attempting to confine the period of time Texas could be harmed by the 100-day pause to those exact 100 days, it appears the Intervenors are asking this Court to assume that *all* the individuals not removed during the 100-day pause would be expeditiously removed on day 101—or soon thereafter. For one thing, the likelihood that the Government would suddenly remove those whom it had deliberately refrained from removing is at best speculative and, in reality, unlikely. The January 20 Memorandum itself directs the Acting Director of ICE to provide "operational guidance" describing a "process for individualized review...for individuals who have been ordered removed for 90 days or more" which assesses "alternatives to removal." (Dkt. No. 63-1 at 5). And even if this Court agreed with the Intervenor's assertion, the notion that ICE could instantly remove 100 days' worth of individuals it would have otherwise been removing on a daily basis is not credible. The Intervenors certainly provide no evidence demonstrating that ICE has *ever* removed in a single day the quantity of aliens Texas could reasonably anticipate it removing during the 100-day pause.

In sum, Texas has put forth clear evidence that the aliens not removed during the 100-day pause would have an impact on the State long after the 100th day. For starters, and as mentioned above, the number of aliens who would otherwise be removed during a 100-day pause far exceeds the number of aliens currently detained by ICE, and none (or at least few) are unaccompanied children. That means most are or will soon be moving freely. And although many aliens released from detention into the interior are "thoroughly vetted" to determine if they will comply with an "alternative to detention" program, 26.9% of family units and 12.3% of individuals abscond— meaning they fail to comply with the supervision requirements of the program. (Dkt. No. 63-4 at 12). To make matters worse, because the alternative to detention program was "not designed to facilitate [ICE's] mission of removing aliens with final orders," ICE "lacks sufficient resources ...to locate and arrest the significant number of participants who abscond." (*Id.*). ICE further anticipates that this problem "will only be exacerbated by enrolling greater numbers of participants." (*Id.*). Accordingly, the Court is persuaded that Texas's injury from the 100-day pause would persist long after it is lifted.

### 3. Redressability

The redressability element of the standing to sue doctrine requires a plaintiff to demonstrate "a substantial likelihood that the requested relief will remedy the alleged injury in fact." *El Paso Cty., Tex. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020). Texas easily satisfies this element. Texas is requesting that this Court hold unlawful, set aside, and enjoin the Government from implementing the 100-day pause. (Dkt. No. 62 at 33; *see also* Dkt. No. 1 at 15). Should this Court do so, it would require the Government to halt its plans to impose the virtually blanket pause on removals and actually exercise discretion on an *individualized case by case basis* as required by law. *See, e.g.*, 8 U.S.C. § 1231; *Reno v. American-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 484–85, 119 S.Ct. 936, 943–44, 142 L.Ed.2d 940 (1999); *Johns v. Dep't of Justice*, 653 F.2d 884, 890–892 (5th Cir. 1981). This individualized assessment would have already stopped pursuant to the January 20 Memorandum if not for this Court's TRO. The Defendants have made no argument against redressability and put forth no evidence suggesting that the exercise of the federal government's normal individualized discretion would result in the same number of aliens withheld from removal as if the 100-day pause were in effect. Because they can't. Moreover, Texas has

demonstrated that the federal government has removed aliens with remarkable constancy during each of the previous 14 years spanning four presidential administrations with widely varying immigration priorities; not a single year drops below 280,000 total removals. (Dkt. No. 63-3 at 2–3). The Court has been presented no evidence to suspect things would demonstrably change now. The Court therefore finds that preventing the Government from implementing the 100-day pause would remedy Texas's injury.

**\*20** Having found that any relief it would provide Texas here would redress its injury, the Court concludes that Texas has standing. The Court nevertheless proceeds to consider, in the alternative, whether and to what effect Texas is owed "special solicitude" in its standing inquiry.

### 4. Special Solicitude

Even if Texas could not carry its burden under the regular standing inquiry, the Court is persuaded that the State is entitled to special solicitude and thus can easily satisfy the standing elements. The Supreme Court in *Massachusetts v. EPA* held that a State is owed special solicitude wherever it asserts a congressionally bestowed procedural right and the government action at issue affects the State's "quasi-sovereign" interests. 549 U.S. at 519–20, 127 S.Ct. at 1454–55. The Fifth Circuit has recognized that the holding in *Massachusetts* applies to procedural claims under the APA and where federal immigration policies assert "direct, substantial pressure" on a State's "lawmaking authority." *Texas*, 809 F.3d at 152–55. Specifically, the Fifth Circuit in *Texas* granted the State special solicitude where it sought judicial review of an immigration policy memorandum which it purported was a final agency action, and also where the policy enacted by the immigration policy pressured the State to change its laws subsidizing driver's licenses for aliens. *Id.*

Here, Texas's claims and quasi-sovereign interests are nearly identical to those addressed by the Fifth Circuit in *Texas v. United States*. *Id.* Texas seeks judicial review of an immigration policy memorandum which it purports is a final agency action, and it asserts that the 100-day pause would cause it "particularly acute" harm in light of the fact that its budget "has been set months or years in advance." (Dkt. No. 62 at 16, 29). Accordingly, Texas has satisfied its burden to demonstrate it is entitled to special solicitude in the standing inquiry.

The Government argues that Texas should be denied special solicitude because it cannot show, as the State did in *Texas v. United States*, that it is being pressured to "change state law." (Dkt. No. 83 at 18) (citing 📄 *Texas*, 809 F.3d at 154– 55). Although the record demonstrates no express intention of any party to convince Texas to change its detention or education budgets, the pressure exerted on Texas to reconfigure its budget in those areas is just as "direct" and "substantial" as the pressure on the State in *Texas v. United States*. In both *Texas v. United States* and in this case, a sudden shift in immigration policy could cause immediate, unexpected, and acute harm to the State's budget. The potential for suffering such harm is direct and substantial. Moreover, Texas changes its budget through its lawmaking authority, and therefore any relief outside of this Court that Texas could find would come at the hand of its own legislature. The Government's argument therefore fails, and Texas is owed special solicitude in the standing inquiry.

In light of its special solicitude, any infirmity in Texas's demonstration that its injuries are fairly traceable to the 100-day pause or redressable by a favorable outcome in this Court is easily remedied. If Massachusetts, armed with special solicitude, can establish causation between the EPA's decision to not regulate greenhouse gas emissions from new motor vehicles and its interest in protecting its physical territory, 📄 549 U.S. at 523–24, 127 S.Ct. at 1456–57, so too can Texas establish causation between the 100-day pause and the costs it incurs from detaining and educating undocumented aliens. *See also* 📄 *Lujan*, 504 U.S. at 572 n.7, 112 S. Ct. at 2142 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.").

**\*21**  \* \* \*

Having concluded that Texas has standing to sue, the Court simply cannot refrain from exercising its jurisdiction over the controversy with the United States here. 📄 *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (noting that federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given"); 📄 *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 126, 134 S.Ct. 1377, 1386, 188 L.Ed.2d 392 (2014) (resolving doctrinal tension that had developed with a federal court's "virtually unflagging" obligation to

"hear and decide cases within its jurisdiction" (internal quotation omitted)). Accordingly, the Court finds it has jurisdiction to consider Texas's claims.

**B. JUDICIAL REVIEW**

Although the Court's jurisdiction is proper, it must further respect Congress's legislative power by carefully evaluating whether Texas's specific causes of action are reviewable. 📄 *Lexmark*, 572 U.S. at 128, 134 S.Ct. at 1387-88. Relevant here, the Court narrows its focus on Texas's claims under the APA. The APA imposes four requirements that must be satisfied before a federal court can review agency action. First, Texas must demonstrate that it is within the "zone of interests" to be protected by the statutes allegedly violated by the Defendants.[35] Second, no statute may preclude judicial review. Third, the 100-day pause must constitute a "final agency action." Finally, the 100-day pause must not be "committed to agency discretion by law." Based on the following, Texas has demonstrated each of these requirements are met.

**1. <u>Zone of Interests</u>**

Congress has placed limits on *who* can sue the Executive for violating the law and *how* they can do it. Starting with how: Congress, through the APA, has provided a cause of action for persons seeking redress against the federal government for violating *other* federal laws. *See* 📄 5 U.S.C. §§ 702, 📄 706. The trickier question is who: Congress has limited the availability of an APA cause of action to persons who allege an injury that is "arguably" within the "zone of interests" to be protected or regulated by the relevant statutes. 📄 *Collins v. Mnuchin*, 938 F.3d 553, 573–74 (5th Cir. 2019), *cert. granted,* 141 S.Ct. 193, 207 L.Ed.2d 1118 (2020); *see also* 📄 *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak* ("*Match-E*"), 567 U.S. 209, 224, 132 S.Ct. 2199, 2210, 183 L.Ed.2d 211 (2012) (quoting 📄 *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

**\*22**  In the APA context, the zone of interests test is not "especially demanding." 📄 *Collins*, 938 F.3d at 574 (quoting 📄 *Lexmark*, 572 U.S. at 130, 134 S.Ct. at 1389). Rather, the Supreme Court has "conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt

goes to the plaintiff." *Lexmark*, 572 U.S. at 130, 134 S.Ct. at 1389 (quoting *Matche-E*, 567 U.S. at 225, 132 S.Ct. at 2210). The zone of interests test " 'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." *Collins*, 938 F.3d at 574 (quoting *Lexmark*, 572 U.S. at 130, 134 S.Ct. at 1389).

Importantly, the relevant statute in whose zone of interests the plaintiff's injury must reside "is to be determined not by reference to the overall purpose of the Act in question," but rather, "by reference to the particular provision of law upon which the plaintiff relies." *Bennett*, 520 U.S. at 175–76, 117 S.Ct. at 1167. In other words, a court must review those "substantive provisions" of law that the plaintiff relies on for "the gravamen" of its complaint. *Id.*

Here, the Court considers just three of Texas's APA claims asserting that the Government violated federal law:

**Count II:** alleging that the Government's 100-day pause transgressed 8 U.S.C. § 1231(a)(1)(A) by deliberately "alter[ing]" and "suspend[ing]" its mandatory 90-day removal period without any "actions of the alien[s]" to which the pause applies, and therefore is "not in accordance with law" and "in excess of...authority" in violation of 5 U.S.C. § 706(2)(A) & (C), (Dkt. No. 1 at ¶¶ 43–49);

**Count IV:** alleging that the Government's 100-day pause "represents a sharp departure from DHS's previous policy" for "enforcing...immigration laws," and the Government "ignored" and "did not analyze" the harms and costs that "pausing removals will cause," and that the Government "failed to consider alternative approaches that would allow at least some additional removals to continue," thus rendering the 100-day pause "arbitrary and capricious" in violation of 5 U.S.C. § 706(2)(A), (*id.* at ¶¶ 58–64); and

**Count V:** [36] alleging that the Government was required but failed to use "notice-and-comment" procedures in issuing the 100-day pause because this new policy is a "substantive or legislative rule," and thus the Government violated 5 U.S.C. §§ 553 and 706, (*id.* at ¶¶ 65–67).

In short: Texas alleges a contrary to law claim in Count II, an arbitrary and capricious claim in Count IV, and a notice and comment claim in Count V. Before addressing the merits of these claims, the Court must first consider whether Texas's alleged injured interests fall within the relevant statutes' zone of interests. They do.

As a preliminary matter, the Parties dispute which provision of law constitutes the relevant statute for each claim. The Defendants contend—without explanation—that *all of* Texas's claims are relevant to 8 U.S.C. § 1231. (*See* Dkt. No. 83 at 30–32). Texas, on the other hand, asserts that its arbitrary and capricious and notice and comment claims "do not depend on Section 1231"— but, like the Defendants, offers no support. (Dkt. No. 84 at 22). This disagreement matters because, as discussed momentarily, the Defendants' entire argument against Texas's ability to satisfy the zone of interests test is that section 1231 itself precludes judicial review of *all* the APA claims. In so arguing, the Defendants elide the Fifth Circuit's historic treatment of APA claims in the immigration context, which considers "the INA" as a whole. *Texas*, 809 F.3d at 163. Based on the following, the Court agrees with Texas, but ultimately the distinction is irrelevant because section 1231 itself does not bar Texas's claims.

a. Counts IV & V: Zone of Interests

**\*23** Texas's arbitrary and capricious and notice and comment claims do not expressly mention section 1231. (Dkt. No. 1 at ¶¶ 58–67). And although the arbitrary and capricious claim focuses partly on "the harms that pausing removals will cause," the general subject of "removal," as the Defendants helpfully point out, implicates a suite of INA provisions. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1) (expedited removals); § 1226(a) (arrest and detainment during pending decision regarding removal); § 1229c (voluntary departure in lieu of removal); § 1252 (judicial review of orders of removal). (Dkt. Nos. 82 at 18–19); (83 at 22–23). Accordingly, the "gravamen" of Texas's claimed injuries *vis-à-vis* its arbitrary and capricious and notice and comment claims do not reside in section 1231. *See Bennet*, 520 U.S. at 175, 117 S.Ct. at 1167. Rather, for those claims, the zone of interests of *all* the INA is relevant. *See Texas*, 809 F.3d at 162–63.

Turning now to whether Texas's injuries fall within the zone of interests of the relevant statute, the Court first considers Texas's arbitrary and capricious and notice and comment claims. With regards to the former, and as just discussed, "[t]he interests the state[ ] seek[s] to protect fall within the zone of interests of the INA." *Id.* at 163. The injury Texas asserts is the same as that which satisfied its Article III standing: the concrete and imminent likelihood it will suddenly be required to spend more than reasonably anticipated on its detention facilities and public education, *see supra*. Texas asserts that this injury is exactly the type the INA's designers had in mind, arguing that *both* "Section 1231...and the INA more broadly...were enacted to protect Americans from the costs that illegal aliens impose." (Dkt. No. 84 at 21). The Court agrees, and, at least as it pertains to "the INA more broadly," so too does the Fifth Circuit. In *Texas v. United States*, the panel found that plaintiff-states' financial injury fit squarely within the INA's "concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.' " 809 F.3d at 163 (quoting 8 U.S.C. § 1601). Moreover, as it relates to Texas's detention facility costs, Congress explicitly demonstrated an intent to protect states' financial interests by empowering the Attorney General to "enter into contractual arrangement[s]" with States "which provide[ ] for compensation . . . with respect to the incarceration of the undocumented criminal alien." 8 U.S.C. § 1231(i)(1)(A). This is the statutory genesis of the SCAAP program discussed above. [37] Accordingly, it is beyond doubt that Texas's alleged injuries flowing from its arbitrary and capricious and notice and comment claims implicate an interest well within the zone protected by the INA.

b. Count II: Zone of Interests

As it relates to Texas's contrary to law claim—and even if its arbitrary and capricious and notice and comment claims were found to narrowly rely on section 1231—the Court finds that Texas's interests are protected by the relevant statute. In disagreeing, the Defendants make a pointed argument relying on a single provision of the relevant statute, 8 U.S.C. § 1231(h). This provision, the Defendants argue, precludes judicial review for Texas—or anyone else for that matter. (Dkt. No. 83 at 30–32) (citing § 1231(h)). The Court notes that the Government places this argument in the "zone of interests" section when it is better suited for discussion within

the Court's examination of "statutory bars to judicial review," *see infra*. (*See also* Dkt. No. 84 at 19– 20). Regardless, the Court is prepared to address the Defendants' section 1231(h) argument at this juncture because, as will be seen, the explanation facilitates a better understanding of how Texas rests squarely within the interests Congress intended to protect through section 1231.

**\*24**  The Defendants argue that Texas falls outside the "zone of interests" of section 1231 because subsection (h) precludes Texas from claiming a "right or benefit" derived from that statute. (Dkt. No. 83 at 30–32). Section 1231(h) provides:

> Nothing in this section [section 1231] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by *any party* against the United States or its agencies or officers or any other person.

8 U.S.C. § 1231(h) (emphasis added). While the Court notes the superficial appeal of relying on subsection (h) to preclude Texas from asserting its contrary-to-law claim, the Supreme Court has admonished that, when making a zone of interests finding, courts must "determine the meaning of the congressional provision" in question. *Lexmark,* 572 U.S. at 128, 134 S.Ct. at 1388. In so doing, it becomes clear that the above-referenced provision does not mean what the Defendants assert.

On the surface, the term "party" in this section appears to have two plausible meanings:

(1) it can mean any party *to the removal proceedings* detailed in that specific section, 8 U.S.C. § 1231, or (2) it can mean *any* party to *any* proceeding, including the removal proceedings but also any other subsequent proceeding unrelated to the removal of a specific individual. Texas suggests the former meaning is appropriate, urging that section 1231(h) cannot be read to "prevent *any* party [from] challenging an agency decision." (Dkt. No. 84 at 20)

(emphasis added). The Defendants argue for something more akin to the latter, suggesting that "party" denotes "aliens and sovereign entities alike." (Dkt. No. 83 at 32). Under the Defendants' reading, "no would-be plaintiff" could ever bring suit to enforce this section, either directly or indirectly, even if the federal government acts beyond the authority of the statute. (*Id.*). After scrupulous review, the Court "think[s] the statute is more complex than [the Defendants'] argument supposes." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson* (*Graham Cty.*), 545 U.S. 409, 415, 125 S.Ct. 2444, 2449, 162 L.Ed.2d 390 (2005). In other words, "party" in section 1231 undoubtedly means—and *only* means—any party to the removal proceedings referenced in section 1231.

The Court first takes notice of the basic rules for statutory construction. "The task of statutory interpretation begins and, if possible, ends with the language of the statute." *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013). "When the language is plain, [the court] 'must enforce the statute's plain meaning, unless absurd.' " *Id.* (quoting *In re Nowlin*, 576 F.3d 258, 261–62 (5th Cir. 2009)); *see also BedRoc Ltd. v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 1593, 158 L.Ed.2d 338 (2004) ("The preeminent canon of statutory interpretation requires [the court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.' " (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992))). "A statute is ambiguous if it is susceptible of more than one accepted meaning." *United Servs. Auto. Ass'n v. Perry*, 102 F.3d 144, 146 (5th Cir. 1996) (per curiam). Multiple accepted meanings do not exist merely because a statute's "authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope." *Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 497 (5th Cir. 2003). Thus, the Court must initially determine whether "all but one of the meanings" of the word *party* in section 1231(h) is "ordinarily eliminated by context." *Deal v. United States*, 508 U.S. 129, 132–33, 113 S.Ct. 1993, 1996–97, 124 L.Ed.2d 44 (1993).

**\*25** In order to conduct this analysis, the Court must use "the traditional means of statutory interpretation, which include the text itself, its history, and its purpose." *Bellum*

*v. PCE Constructors, Inc.*, 407 F.3d 734, 739 (5th Cir. 2005) (citation omitted). Only "when traditional methods of statutory construction fail to reveal a provision's meaning...we conclude that it is ambiguous." *United Servs. Auto. Ass'n*, 102 F.3d at 147.

Statutory Interpretation

Here, neither section 1231 nor the INA defines how the term "party" is to be used in section 1231(h). The Court must therefore "look first to the word's ordinary meaning." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407, 131 S.Ct. 1885, 1891, 179 L.Ed.2d 825 (2011). Importantly, "[s]tatutory language has meaning only in context." *Graham Cty.*, 545 U.S. at 415, 125 S.Ct. at 2449 (citing *Leocal v. Ashcroft*, 543 U.S. 1, 9, 125 S.Ct. 377, 382, 160 L.Ed.2d 271 (2004)). Accordingly, it is necessary to look at section 1231(h) and the term "party" in the broader context of the immigration statutes in general and the origin of this section in particular.

Historical Statutory Framework

The Court first considers the historical progression of the immigration statutes in question. In the past several decades, Congress has repeatedly revised the INA "with an eye to reducing both illegal immigration and the expenses related to the enforcement of the nation's immigration laws." *Loaiza v. I.N.S.*, No. 98-CV-1112 FB, 1998 WL 863126, at \*1 (E.D.N.Y. Dec. 8, 1998). Relevant to the instant inquiry, Congress passed INA-related legislation in 1986, 1994, and 1996. Because these congressional actions are highly relevant to the Court's historical analysis of the word "party" in section 1231(h), the Court details them here.

1986: Section 1252(i) of the IRCA

In 1986, Congress passed the Immigration Reform and Control Act ("IRCA"), which contained the following provision:

> In the case of an alien who is convicted of an offense which makes the alien subject to deportation, the Attorney General shall begin any deportation proceedings *as expeditiously as possible* after the date of conviction.

8 U.S.C. § 1252(i); Immigration and Nationality Act, as amended by the Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, 100 Stat. 3359 (1986) (emphasis added). The Fifth Circuit would later explain that section 1252(i) was enacted to further the purposes "of reducing prison overcrowding and cost to the government." *Giddings v. Chandler*, 979 F.2d 1104, 1109 (5th Cir. 1992); *see also Hernandez-Avalos v. I.N.S.*, 50 F.3d 842, 847 n.11 (10th Cir. 1995) ("§ 1252(i) was enacted in order to ease financial burdens on federal, state and local prisons resulting from lengthy detention of aliens awaiting deportation.").

The passage of this statute had unintended consequences. Incarcerated or criminally charged aliens began filing suit under this provision seeking to have an expedited deportation to avoid a prison sentence. *See, e.g., Campos v. I.N.S.*, 62 F.3d 311, 312 (9th Cir. 1995) (noting that the plaintiff/petitioner is "seeking an expedited deportation hearing pursuant to 8 U.S.C. § 1252(i)"). In the face of those claims, the Ninth Circuit held that criminal aliens could compel the initiation of removal or deportation proceedings. *See, e.g., Soler v. Scott*, 942 F.2d 597, 604–05 (9th Cir. 1991), *vacated as moot sub nom., Sivley v. Soler*, 506 U.S. 969, 113 S.Ct. 454, 121 L.Ed.2d 364 (1992). More specifically, the Ninth Circuit held that an individual could petition under the Mandamus Act to seek immediate deportation hearings under section 1252(i). *See, e.g., Garcia v. Taylor*, 40 F.3d 299, 301 (9th Cir. 1994). The Ninth Circuit noted that "delays and seemingly unnecessary, prolonged incarceration prompted our decisions in a line of cases finding standing...for incarcerated aliens to seek immediate deportation hearings." *Campos*, 62 F.3d at 313; *Silveyra v. Moschorack*, 989 F.2d 1012, 1014 n.1 (9th Cir. 1993); *Soler*, 942 F.2d at 605; *see also Garcia*, 40 F.3d at 301 (recognizing it is "settled" that "prisoner aliens who seek mandamus to force the INS to start deportation proceedings do have standing"). The Ninth Circuit had stated unequivocally that "8 U.S.C. § 1252(i) created a duty *to incarcerated aliens* because the plaintiff prisoner fell within the 'zone of interests' protected by the underlying statute." *Campos*, 62 F.3d at 312 (emphasis added) (citing *Silveyra*, 989 F.2d at 1014 n.1).

1994: Section 225 of INTCA

**\*26** Because "Congress disapproved of this practice and sought to eliminate it," Congress enacted the Immigration and Nationality Technical Corrections Act of 1994 ("INTCA"), Pub.L. No. 103–416, 108 Stat. 4305 (Oct. 25, 1994). *Ncube v. INS Dist. Directors & Agents*, No. 98 Civ. 0282, 1998 WL 842349, at \*11 (S.D.N.Y. Dec. 2, 1998) (citing *Campos*, 62 F.3d at 314). Section 225 of INTCA provides:

> No amendment made by this Act and nothing in § 242(i) of the Immigration and Nationality Act (8 U.S.C. § 1252(i)) shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any *party* against the United States or its agencies or officers or any other person.

INTCA § 225, 108 Stat. 4305 at 4324 (1994) (emphasis added). Note for now that this language is essentially identical to the language used in section 1231(h). [38]

The Ninth Circuit immediately recognized the import of Congress' action:

> Congress took the opportunity in section 225 of the INTCA to clarify for our benefit that section 1252(i) does not create an obligation on

the part of the government toward individual incarcerated aliens and that *such aliens lack standing to sue* for any relief under 🚩 section 1252 because they are outside the "zone of interests" of the statute.

🚩 *Campos, 62 F.3d at 314* (emphasis added). "By enacting section 225, Congress made clear that the sole purposes of 🚩 section 1252(i) are *economic*, not humanitarian." *Id.* (emphasis added). Similarly, as another court would acknowledge, "[t]ermination of judicial review of these types of claims would expedite removal of deportable aliens by allowing the Attorney General to concentrate on executing the removal order rather than having to defend her detention decisions in court." *Ncube, 1998 WL 842349, at \*7 n.4.*

The Ninth Circuit speculated as to why section 225 was passed in the first place: "The intended target of section 225 thus must have been our Ninth Circuit law allowing mandamus relief." 🚩 *Campos, 62 F.3d at 314.* And they were right. [39] The Congressional Record for section 225 makes this point clear:

Sec. 352. Construction of Expedited Deportation Requirements.

*In response to another recent ruling by the Court of Appeals for the Ninth Circuit,* this section makes clear that the provision in the INA that requires the Attorney General to begin deportation proceedings as expeditiously as possible cannot be construed to create a legally enforceable right or benefit.

104 Cong. Rec. 28441 (1994) (emphasis added).

Accordingly, it is clear that section 225 of the INTCA was designed to prohibit individual *aliens* from attempting to compel the Attorney General to deport them by relying on 🚩 section 1252(i)'s mandate to remove the alien "as expeditiously as possible."

1996: 🚩 Section 1231(h) emerges

**\*27** In 1996, Congress transferred the essence of 🚩 section 1252(i)'s removal mandate to a brand new 🚩 8 U.S.C. § 1231. Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No 104-208, Div. C, Title III, §§ 305(a)(3), 306(a)(1) 328(a)(1), Sept. 30, 1996, 110 Stat. 3009-598, 3009-607, 3009-630 (1996) (redesignating and amending 🚩 8 U.S.C. 1252(i) to 🚩 8 U.S.C. 1231); *see also* 🚩 *Channer v. Hall,* 112 F.3d 214, 215–16 (5th Cir. 1997) (acknowledging the transfer). In doing so, and in keeping with its long history of pairing the former 🚩 section 1252(i) removal mandate for the Attorney General with section 225 of the INTCA, Congress created a brand new 🚩 section 1231(h) whose language is virtually identical to section 225:

> Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any *party* against the United States or its agencies or officers or any other person.

🚩 8 U.S.C. § 1231(h) (1998) (emphasis added).

Congress also shifted over 🚩 section 1252(c), which provided "the Attorney General shall have a period of six months from the date of [a final order of deportation under administrative processes]...to effect the alien's departure." *See* 🚩 *Channer,* 112 F.3d at 216. Plainly, this language corresponds with 🚩 section 1231(a)(1)(A), which provides: "[W]hen an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period")." 🚩 8 U.S.C. § 1231(a)(1)(A).

In light of the foregoing, Congress's goals are crystal clear: If Congress is going to require the Attorney General to remove an individual alien for "economic" reasons related to detainment, 🚩 *Campos, 62 F.3d at 314,* it does not want that alien draining the government's resources by filing a lawsuit asserting a right to be removed. *See Ncube, 1998 WL 842349, at \*7 n.4.*

8 U.S.C. § 1231(h) applies only to aliens

With the foregoing in mind and using the traditional tools of statutory construction focusing on "text, context, structure, and history," *see State v. United States Envtl. Prot. Agency*, 983 F.3d 826, 836 (5th Cir. 2020), the Court finds that the term "party" as used in section 1231(h) is not ambiguous and means the alien involved in the immigration removal proceeding detailed in that specific section, 8 U.S.C. § 1231.⁴⁰ The Court finds that "party" does not mean the State of Texas in the current proceeding.

**\*28** In the alternative, to the extent that the term "party" remains ambiguous because it is "susceptible to more than one reasonable interpretation or more than one accepted meaning," *United States v. Kaluza*, 780 F.3d 647, 658–59 (5th Cir. 2015) (citing *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 519 (5th Cir. 2004)), the Court "turn[s] to the legislative history." *Schaeffler v. United States*, 889 F.3d 238, 242 (5th Cir. 2018); *see also Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568, 125 S.Ct. 2611, 2626, 162 L.Ed.2d 502 (2005) ("Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."); *Garrett v. Circuit City Stores, Inc.*, 449 F.3d 672, 679 (5th Cir. 2006) (similar).

The 1996 Conference Report for section 1231(h)⁴¹ specifically provides:

> Section 241(h) [section 1231(h)] provides that nothing in section 241 [section 1231] shall be construed to create any substantive or procedural right or benefit that is legally enforceable against the United States, its agencies or officers, or any other person. *This provision is intended, among other things, to prohibit the litigation of claims by aliens* who have been ordered removed

from the U.S. that they are removed at a particular time or to a particular place.

(H.R. REP. NO. 104-828H.R. REP. NO. 104-828, at 219) (Conf. Rep.) (1996) (emphasis added).

And there you have it. This provision, section 1231(h), is "intended" to prohibit the litigation of claims *by aliens*. *See Ncube*, 1998 WL 842349, at \*11 ("Several courts have interpreted language identical to that contained in § 1231(h) to preclude *an alien* from having standing to raise a claim for relief." (emphasis added)). Therefore, and again, the term "party" in section 1231(h) means "aliens who have been ordered removed from the U.S." and who are seeking to "be removed at a particular time or to a particular place" under section 1231.

Without considering the statutory history just described, the Defendants maintain that "party" in section 1231(h) includes Texas in this case by relying on *dicta* from a 1995 Tenth Circuit case. (Dkt. No. 83 at 31–32) (citing *Hernandez-Avalos*, 50 F.3d at 844). In *Hernandez-Avalos*, the Tenth Circuit was faced with petitions from "four aliens serving prison sentences" seeking "a writ of mandamus...compelling the [INS] to initiate deportation proceedings" under former section 1252(i). 50 F.3d at 843. The Tenth Circuit panel, citing section 225 of the INTCA, correctly held that section 225 deprived the aliens of a private right of action to compel their removal under the former section 1252(i). *Id.* at 844. Then the panel went further. In a quintessential example of the dangers inherent in engaging in *dicta*, the panel stated:

> **\*29** But we think it [section 225] does more than that [ (bar causes of action for aliens) ]. It imposes upon § 1252(i) a mandatory rule of construction compelling the conclusion that the statute creates no right or benefit enforceable by any party against the federal government or anyone else. The statute, in short, makes clear that Congress intended

that *no one* be able to bring suit to enforce § 1252(i), which means that no one can satisfy the zone of interests test, and therefore no would-be plaintiff has standing to bring suit, either directly under the statute or by way of the Mandamus Act.

*Id.* Thus, without any reference to the meaning of "party" from the historical interplay of section 1251(i) and section 225 of the INTCA, the Tenth Circuit foreclosed the opportunity of *anyone* to assert "interests" under section 1252(i). Respectfully, this Court declines to follow the Tenth Circuit in *Hernandez-Avalos* because it is *dicta*, has not been adopted by the Fifth Circuit, and is incorrect when the meaning of the word "party" is properly interpreted.

### Texas is within the zone of interests of 8 U.S.C. § 1231

In addition to demonstrating that Texas is not barred by section 1231(h), the foregoing analysis clearly shows that Texas's contrary-to-law claim falls squarely within the zone of interests Congress meant to protect when enacting section 1231. As demonstrated above, sections 1252(c) and (i) are prior corollary statutes to section 1231(a)(1)(A), *see Channer v. Hall*, 112 F.3d at 215-16, just as section 225 of the INTCA is to section 1231(h). These two provisions represent the removal requirement and the claim barring mechanism of the INA for aliens subject to a final order of removal. Their purposes are integrally linked, with the claim barring mechanism serving as the backstop for the removal requirement. To that end, the Fifth Circuit has described the former section 1252(i)'s bar on claims for aliens seeking expedited removal as being enacted to "reduc[e] prison overcrowding and cost to the government." *Giddings*, 979 F.2d at 1109. The Sixth Circuit has likewise noted that the former section 1252(i) was meant to help "local and State jails" that had become "jammed up" because "the burden of inaction [in removals] falls on the State

and local governments and not on the Federal system." *Prieto v. Gluch*, 913 F.2d 1159, 1165 (6th Cir. 1990) (quotation omitted). The Ninth Circuit stated that the former section 1252(i) demonstrated Congress's clear intent to protect "economic" interests. *Campos*, 62 F.3d at 314. And the Tenth Circuit has stated that the former section 1252(i) was enacted "in order to ease financial burdens on federal, state and local prisons resulting from lengthy detention of aliens awaiting deportation." *Hernandez-Avalos*, 50 F.3d at 847 n.11. Beyond this remarkably consistent interpretation of the purpose of section 1252(i), Congress appears to have continued building on its original purpose to financially protect State prisons even after the essence of section 225 of the INTCA was copied into section 1231(h) by expressly empowering the Attorney General to contract with States to offset the costs that States incur when detaining criminal aliens. *See* 8 U.S.C. § 1231(i). As discussed above in the standing section, *see supra*, the federal government was empowered through section 1231(i) to implement a program called SCAAP which provides direct financial aid to State prisons to offset the costs of detaining criminal aliens.

In light of the foregoing, it is beyond doubt that Congress had the financial interests of States like Texas in mind when it enacted the former section 1252(i), and the financial interests of States like Texas persisted to be important to Congress when section 1231 was created. The Court therefore finds that Texas is within the zone of interests to bring its APA claims here.

### 2. Statutory Bars to Judicial Review

**\*30** The Court next considers whether any "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The Government contends certain statutory provisions from the INA, namely 8 U.S.C. § 1252(a)(5) and (b)(9), bar judicial review of Texas's APA claims. The Government asserts that "Congress was explicit that only *noncitizens* could obtain judicial review of the type Texas seeks." (Dkt. No. 83 at 27 (emphasis in original).) Texas, unsurprisingly, states that those provisions are of no matter because they apply solely to judicial review of an order of removal, and Texas "is not asking this Court to review any order of removal." (Dkt. No. 84 at 14.) Turning

to each of these provisions, the Court finds the Governments' arguments unpersuasive.

First, 8 U.S.C. § 1252(a)(5) provides that federal courts of appeal have exclusive jurisdiction for any petition for review "filed...in accordance with" section 1252 itself. Section 1252 concerns "[j]udicial review of orders of removal." *See* 8 U.S.C. § 1252. Thus, an individual who has an order of removal affirmed by the BIA may appeal that decision to a federal circuit court. *See Martinez v. Napolitano*, 704 F.3d 620, 622 (9th Cir. 2012) ("The language of [ section 1252(a)(5)] is clear. The exclusive means to challenge *an order of removal* is the petition for review process." (emphasis added)); *see also* 8 U.S.C. § 1252(d) ("A court may review *a final order of removal* only if the alien has exhausted all administrative remedies available to the alien as of right, and another court has not decided the validity of the order, unless the new *petition* presents grounds that could not have been presented in the prior judicial proceeding or that the remedy provided in the prior proceeding was inadequate or ineffective to test the validity of that order." (emphasis added)). Texas is not challenging an order of removal or petitioning judicial review of one. Section 1252(a)(5) is therefore inapplicable to Texas's claims.

The same is true of 8 U.S.C. § 1252(b)(9). That provision provides, "Judicial review of all questions of law and fact...*arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter* shall be available only in judicial review of *a final order* under this section." 8 U.S.C. § 1252(b)(9) (emphasis added). This provision means that an individual subject to an order of removal must consolidate his claims in one proceeding, that is, when a federal court of appeals reviews the BIA's affirmation of the individual's order of removal. *See I.N.S. v. St. Cyr*, 533 U.S. 289, 313–14, 121 S.Ct. 2271, 2286–87, 150 L.Ed.2d 347 (2001). The Supreme Court, in the course of explaining that habeas petitions may be brought independently from an individual's petition of review of a final order of removal, stated that the purpose of 8 U.S.C. § 1252(b)(9) "is to consolidate 'judicial review' of immigration proceedings into one action in the court of appeals, but it applies only with respect to review of an order of removal under subsection (a)(1)." *Id.* (quotations omitted). In other words, the statute "simply provides for the consolidation of

issues to be brought in petitions for 'judicial review.' " *Id.* (quotations omitted); *see also AADC*, 525 U.S. at 499, 119 S.Ct. at 951 (Stevens, J., concurring) ("The meaning of 8 U.S.C. § 1252(b)(9)" is "perfectly clear." The statute "postpones judicial review of removal proceedings until the entry of a final order...."). Again, Texas is not challenging a final order of removal, nor is it challenging any aspect of removal proceedings an individual has undergone. Section 1252(b)(9) is therefore irrelevant to Texas's claims.

The Ninth Circuit said it best when it explained—in an opinion cited by both the Defendants and Texas—that, "while [ Sections 1252(a)(5) and 1252(b)(9)] limit *how* immigrants can challenge their removal proceedings, they are not jurisdiction-stripping statutes that, by their terms, foreclose *all* judicial review of agency actions. Instead, the provisions channel *judicial review over final orders of removal to the courts of appeals*." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) (emphasis added). As such, it is clear that these statutes focus on an individual's appeal of a final order of removal and any related challenges to the removal proceedings in which the removal was ordered. Texas was not ordered to be removed. It is not challenging a final order of removal. It is not asking for review of any prior removal proceedings. Therefore, neither section 1252(a)(5) nor 1252(b)(9) bars Texas's claims.

**\*31** The Government additionally claims that regardless of whether sections 1252(a)(5) and 1252(b)(9) apply, "judicial review would still be precluded" because "Congress has established a detailed scheme that carefully restricts judicial interference with Executive discretion in immigration enforcement." (Dkt. No. 83 at 29). Specifically, the Defendants note that Congress enacted numerous provisions protecting the Executive's discretion from judicial review— 8 U.S.C. §§ 1226(e), 1226a(b)(1), 1229c(f), 1231(h), and 1252(a)(2)(A), (a)(2)(B), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), and (g). (*Id.*). These provisions simply do not preclude this case.

The limiting provisions the Government cites are within statutory sections that deal with apprehension and detention of aliens ( § 1226), mandatory detention of suspected terrorists ( § 1226a), voluntary departure ( § 1229c),

detention and removal of aliens ordered removed ( § 1231), and, as discussed above, judicial review of orders of removal ( § 1252). The Government argues that these statutory provisions establish Congress's overall intent to preclude judicial review of *most if not all* of DHS's policy decisions with respect to immigration enforcement. Although these provisions are certainly limiting, the Government overstates Congress's intent. First, *all* of these limiting provisions concern limits to potential suits brought by aliens themselves. To suggest Congress in enacting those express limitations was also seeking to bar suits from States is a bridge too far. Thus, these limiting provisions themselves are of no moment to Texas's claims. Texas is not challenging DHS's decision or discretion to apprehend or detain an alien ( § 1226), detain suspected terrorists ( § 1226a), institute voluntary removals ( § 1229c), or order an alien's removal ( § 1252). It is challenging DHS's decision to blanket *pause* the removal of thousands of aliens under the APA. Thus, the detailed statutory scheme Congress has enacted does not bar Texas's claims. [42] To the contrary, the APA provides Texas avenues to challenge DHS's agency action.

### 3. Final Agency Action

**\*32** The Court next considers whether the 100-day pause on removals in the January 20 Memorandum constituted a final agency action. "Under the APA, an aggrieved party may file suit in a federal district court to obtain review of any final agency action for which there is no other adequate remedy in a court." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, ___ U.S. ___, ___, 138 S.Ct. 617, 626, 199 L.Ed.2d 501 (2018) (citing 5 U.S.C. § 704). Texas and the Government agree on the standard used to determine whether an agency action is "final." (Dkt. No. 62 at 15); (Dkt. No. 83 at 32). That standard requires two conditions to be satisfied. *See* *U.S. Army Corps of Eng'rs v. Hawkes Co.*, ___ U.S. ___, ___, 136 S.Ct. 1807, 1813, 195 L.Ed.2d 77 (2016). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citing *Bennett*, 520 U.S. at 177–78, 117 S.Ct. at 1168). The record reflects that Texas sufficiently demonstrates that the 100-day pause satisfies both conditions.

First, the 100-day pause is the consummation of DHS's decisionmaking process. Indeed, the January 20 Memorandum "direct[s] an *immediate* pause on removals of any noncitizen with a final order of removal...for 100 days to go into effect *as soon as practical* and *no later* than January 22, 2021." (Dkt. 63-1 at 4) (emphasis added) (footnote omitted). The immediacy of the implementation of the 100-day pause demonstrates DHS's decision with regard to the pause itself is final. The Government attempts to overcome this language by arguing that "the Secretary retains the discretion to change or abandon this nonenforcement policy at any time." (Dkt. No. 83 at 33). But "discretion" to reverse course, by itself, is insufficient to convert an action that is final to one that is nonfinal. *See* *Hawkes Co.*, 136 S.Ct. at 1814 ("The Corps may revise an approved [jurisdictional determination] within the five-year period based on 'new information.' That possibility, however, is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal." (citation omitted)); *Sackett v. E.P.A.*, 566 U.S. 120, 127, 132 S.Ct. 1367, 1372, 182 L.Ed.2d 367 (2012) ("The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal."). The Court therefore finds that the 100-day pause on removals satisfies the first condition.

Second, the 100-day pause determines certain rights and obligations, and legal consequences will undoubtedly flow therefrom. *See* *Hawkes Co.*, 136 S.Ct. at 1813. As an initial matter, the 100-day pause alters DHS's obligation under section 1231(a)(1)(A) to remove persons with final orders of removals. This statutory provision commands that those with final orders of removal be removed from the country within 90 days, "[e]xcept as otherwise provided in [that] section." 8 U.S.C. § 1231. The 100-day pause does more than just clarify how DHS will carry forth its statutory obligations; it calls for abandoning this duty almost entirely. *Compare* *id.* § 1231(a)(1)(A), *with* (Dkt. No. 63-1 at 4–5).

To be sure, the 100-day pause on removals also affects the rights of those with final orders of removal. Indeed, the January 20 Memorandum orders "assessments of alternatives to removal" for *all* previous final orders of removal without any individualized assessment that one of section 1231's exceptions to the 90-day removal mandate applies. (Dkt.

No. 63-1 at 5). DHS's abdication of its statutory duty under section 1231(a)(1)(A) has significant legal consequences for those with final orders of removal who are detained, as illustrated in *Zadvydas*. In *Zadvydas*, Justice Breyer provided chapter and verse on the detention and release process for those with final orders of removal. Notably, after an individual with a final order of removal is detained for 90 days, he may be released and placed under supervision. *Id.* at 683–84, 121 S.Ct. 2491 at 2495. And an individual who has been detained for six months may be entitled to release if "it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701, 121 S.Ct. 2491 at 2505. Here, because the 100-day pause would last for, well, 100 days, it is guaranteed that numerous detained individuals subject to a final order of removal would enter the six-month mark during its tenure. The Intervenors' own expert illustrates the addition required to understand this event: persons at or very near the 90-day mark at the start of the 100-day pause will finish it at or near the *190*-day mark. (Dkt. No. 82-2 at 4–5). The Intervenors seek to downplay this arithmetic, arguing that, even after six months, the Government maintains "discretion" to detain individuals. (Dkt. No. 82 at 44). Sure. But no one can deny that *Zadvydas* mandates a change in the manner in which that discretion is exercised. If such a change was significant enough for the Supreme Court to exercise jurisdiction in *Zadvydas*, it is sufficient to help establish that the 100-day pause constitutes a final agency action under the APA. The Court is therefore satisfied that the 100-day pause on removals satisfies the second condition and that it is, in fact, a final agency action under section 704.

## 4. Committed to Agency Discretion by Law

**\*33**  In 5 U.S.C. § 701, Congress set two limits on federal courts entertaining actions against federal agencies. The first, discussed above in section II.B.2, concerns whether any of Congress's "statutes preclude judicial review." *Id.* § 701(a)(1). The second concerns whether the "agency action is committed to agency discretion by law." *Id.* § 701(a)(2). Accordingly, the Court must now inquire whether the 100-day pause has been "committed" to the Government's discretion by law.

The APA embodies a "basic presumption of judicial review." *Lincoln v. Vigil*, 508 U.S. 182, 190, 113 S.Ct. 2024, 2030, 124 L.Ed.2d 101 (1993) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)). But this is "just" a presumption. *Id.* " '[R]eview is not to be had' in those rare circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.' " *Id.* at 191, 113 S.Ct. at 2031 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985)). Where there is no meaningful standard to apply, "the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Id.* (quoting *Heckler*, 470 U.S. at 830, 105 S.Ct. at 1655).

One category of administrative decisions that courts "traditionally have regarded as 'committed to agency discretion' " is relevant here. *Id.* (citation omitted). Namely, "an agency's decision not to institute enforcement proceedings." *Id.* (citing *Heckler*, 470 U.S. at 831, 105 S.Ct. at 1655–56). Non-enforcement decisions, however, are only "presumptively unreviewable." *Heckler*, 470 U.S. at 832–33, 105 S.Ct. at 1656. The Supreme Court has outlined one thin but clear road to overcoming that presumption and a second less traveled path. As for the first: "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* As for the second: it may be "justifiably...found that the agency has 'consciously and expressly adopted a *general* policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 833 n.4, 105 S.Ct. at 1656 n.4 (emphasis added) (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc) (per curiam)). Although the Supreme Court has not (yet) described this type of "abdication," it nevertheless instructed that any such inquiry should focus on "the statute conferring authority on the agency," which "might indicate that such decisions were not 'committed to agency discretion.' " *Id.*; *see also Texas*, 809 F.3d at 166–67.

In this case, Texas all but concedes the 100-day pause is a nonenforcement policy that is presumptively unreviewable by expressly seeking the exceptions laid out in *Heckler* and *Adams*. (Dkt. No. 62 at 13–15). Texas nevertheless asserts that the Government's action in implementing the 100-day pause warrants review because it is both proscribed by Congress's

guidelines *and* demonstrates a "general...abdication of its statutory responsibilities." (*Id.* at 13–14) (quoting *Heckler*, 470 at 833 n.4, 105 S.Ct. at 1656 n.4).

The Defendants' argue in response that they are shielded with general "prosecutorial" discretion, on the one hand, and broad discretion accorded to the Executive in areas of immigration policy, on the other. (Dkt. No. 82 at 19–22; Dkt. No. 83 at 22–27).

**\*34** The "substantive statute" through which Congress "provided guidelines for the agency to follow in exercising its enforcement powers" in this case is section 1231(a)(1)(A). *See* *Heckler*, 470 U.S. at 833, 105 S.Ct. 1656. The Government directs the Court to statutes conferring broad authority over the administration of "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to "issue such instructions; and perform such other acts as he deems necessary for carrying out his authority," 8 U.S.C. § 1103(a)(3). (Dkt. No. 83 at 25). But the INA "not only requires the agency to enforce the Act, but also sets forth specific enforcement procedures"—one of which Texas alleges the Government has "consciously and expressly" suspended. *Adams*, 480 F.2d at 1162; *see* 8 U.S.C. § 1103(a)(1) ("The Secretary of Homeland Security shall be charged with the administration and enforcement of...all other laws relating to the immigration and naturalization of aliens...."); (Dkt. No. 62 at 13). Therefore, the Court must consider whether the Government, in exercising its discretion, transgressed section 1231(a)(1)(A). *See* *Adams*, 480 F.2d at 1162 (interpreting the exact procedural statute allegedly discarded by the defendant).

Analyzing whether the 100-day pause is committed to agency action by law necessitates a resolution of the Parties' dispute over section 1231(a)(1)(A). That text reads:

> Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days (in

this section referred to as the "removal period").

8 U.S.C. § 1231(a)(1)(A) (emphasis added). The Parties disagree over whether the word "shall" means *must*. (*See* Dkt. No. 16 at 6). The Defendants argue that the word "shall" is precatory, that is, it expresses a strong wish but is ultimately discardable. (Dkt. No. 82 at 17–19; Dkt. No. 83 at 24). Texas disagrees. (Dkt. No. 62 at 17–19).

Once again, the Court must engage in statutory interpretation. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 53 (2012) ("*Every* application of a text to particular circumstances entails interpretation." (emphasis added)). As before in the Court's analysis of section 1231(h), the Parties' disagreement over the meaning of the word "shall" does not necessarily render that word "ambiguous." *Moore*, 317 F.3d at 497. Rather, the Court must determine whether "all but one of the meanings" of the word *shall* in section 1231(a)(1)(A) is "ordinarily eliminated by context." *Deal*, 508 U.S. at 132–33, 113 S.Ct. at 1996–97. In conducting this analysis, the Court applies "the traditional means of statutory interpretation, which include the text itself, its history, and its purpose." *Bellum*, 407 F.3d at 739 (citation omitted).

When considering the meaning of a given word in a statute, the Court must "look first to the word's ordinary meaning." *Schindler Elevator*, 563 U.S. at 407, 131 S.Ct. at 1891. "[T]he word 'shall' usually connotes a requirement." *Maine Cmty. Health Options v. United States*, 140 S.Ct. 1308, 1320, 206 L.Ed.2d 764 (2020); *see also* SCALIA & GARNER, *supra*, at 112 ("When drafters use *shall* and *may* correctly, the traditional rule holds—beautifully."). The Supreme Court has nonetheless cautioned that, "[a]s against the government, the word 'shall,' when used in statutes, is to be construed as 'may,' unless a contrary intention is manifest." *Railroad Co. v. Hecht*, 95 U.S. 168, 170, 24 L.Ed. 423 (1877).

This need for some manifestation of legislative intent to demonstrate that "shall" should be construed as *must* against the government has persisted in Supreme Court jurisprudence. For example, in *Town of Castle Rock,*

*Colorado v. Gonzales*, upon which the Defendants rely, (Dkt. No. 82 at 19); (Dkt. No. 83 at 25–26, 34), the respondent brought a section 1983 action claiming her Due Process rights were violated because a police department refused to enforce restraining orders despite language printed on the orders themselves stating that an "officer *shall* arrest" a restrained person where probable cause of a violation was evident. 545 U.S. 748, 754, 759, 125 S.Ct. 2796, 2802, 2805, 162 L.Ed.2d 658 (2005). Addressing respondent's contention that "shall" in the restraining order was mandatory, the Supreme Court found that, given the "well established tradition" and "deep-rooted nature" of police discretion, "the presence of seemingly mandatory legislative commands" could not automatically impose a "true mandate of police action." *Id.* at 760–61, 125 S.Ct. at 2805–06. What was needed, the Supreme Court explained, was "some stronger indication" from the legislature. *Id.* at 761, 125 S.Ct. at 2806. Because the restraining order's "shall" language was "not perceptibly more mandatory than" other State statutes using the word *shall* where the police force was traditionally afforded discretion, the restraining order was not obligatory. *Id.*; *see also* *Chicago v. Morales*, 527 U.S. 41, 61–62 n.32, 119 S.Ct. 1849, 1861 n.32, 144 L.Ed.2d 67 (1999) (noting that interpreting "shall" as mandatory in the context of police action "flies in the face of common sense that all police officers must use some discretion in deciding when and where to enforce city ordinances.").

**\*35** Building on the principle illustrated in *Hecht* and *Gonzales*, the Supreme Court demonstrated the type of "intent" or "indication" that would be sufficient to overcome the presumption against interpreting "shall" as mandatory against the government. In *Richbourg Motor Co. v. United States*, the Supreme Court expressly found reason to avoid the rule in *Hecht* where a statute provided that an officer "shall" take possession of a vehicle used in the act of transporting liquor. 281 U.S. 528, 533–34, 50 S.Ct. 385, 387–88, 74 L.Ed. 1016 (1930). After noting that the statute in question was "in form mandatory throughout," the Court explained that it "detail[ed]...successive steps to be taken, which, if followed, [led] unavoidably to forfeiture under that section.., *with the important consequence of protecting the interests of innocent third persons.*" *Id.* (emphasis added). These qualities of the relevant text, the Supreme Court explained, "suggests a definite purpose to make the protection effective" by imposing a mandatory duty. *Id.*

Five years later, the Supreme Court confirmed *Richbourg Motor Co.*'s development in *Escoe v. Zerbst*, 295 U.S. 490, 55 S.Ct. 818, 79 L.Ed 1566 (1935). There the Supreme Court recognized that the word "shall," although "the language of command," was "not controlling" as to whether a statute appearing to require a trial court to bring a probationer before it in order to revoke his probation. *Id.* at 492–93, 55 S.Ct. at 819–20 (citing *Richbourg Motor Co.*, 281 U.S. at 534, 50 S.Ct. 385). Any doubt the Court might have had regarding whether "shall" was mandatory, the Supreme Court explained, "is dispelled when we pass from the words alone to a view of ends and aims." *Id.* Because it was "[c]lear[ ] [that] the end and aim of an appearance before the court must be to enable an accused probationer to explain away the accusation," the presentment of the probationer was "necessary, or so the Congress must have thought, to protect the individual against malice or oppression." *Id.* at 493, 55 S.Ct. at 820. Thus, the Supreme Court in *Escoe* found the "shall" in the relevant statute was "mandatory in meaning as well as mandatory in form." *Id.* at 494, 55 S.Ct. at 820. To reiterate its rule, the Supreme Court stated: "Statutes are not [optional] when to put them in that category would result in serious impairment of the public or the private interests that they were intended to protect." *Id.*; *see also* *Ralpho v. Bell*, 186 U.S.App.D.C. 368, 388–89 & n.149, 569 F.2d 607, 627–28 & n.149 (1977) (applying *Escoe* to "prefer a construction" of mandatory language in a statute guiding governmental officials' discharge of duties "that bestows the benefits of the Act on those for whom it was chiefly intended").

From these cases, two tandem guiding principles emerge. From *Hecht* and *Gonzales*, it seems clear that the word "shall" cannot alone compel governmental action unless accompanied with "some stronger indication" from the legislature that the call to action was mandatory. *Hecht*, 95 U.S. at 170; *Gonzales*, 545 U.S. at 761, 125 S.Ct. at 2806. From *Richbourg Motor Co.* and *Escoe*, it seems clear the "indication" to conclude that "shall" means *must* as against the government is sufficient if the statute's manifest purpose is to protect the public or private interests of innocent third parties. *Richbourg Motor Co.*, 281 U.S. at 533–34, 50 S.Ct. at 387– 88; *Escoe*, 295 U.S. at 494, 55 S.Ct. at 820.

In this instance, the "shall" of section 1231(a)(1)(A) clears these hurdles. As explained fully in the Court's

discussion of whether section 1231(h) bars Texas's claims, *see supra* section II.B.1, the prior corollary immigration statutes to section 1231 in general and subsection 1231(a)(1)(A) in particular—8 U.S.C. § 1252(c) & (i)—clearly demonstrate a purpose to protect "public or private interests." As explained, those statutes were unequivocally meant to "reduc[e] prison overcrowding and cost to the government," *Giddings,* 979 F.2d at 1109 (citing 8 U.S.C. § 1252(i) (1986)); *see also Channer,* 112 F.3d at 216 (citing section 1252(c)), help "local and State jails" that had become "jammed up" because "the burden of inaction [in removals] falls on the State and local governments and not on the Federal system," *Prieto,* 913 F.2d at 1165 (citation omitted), protect "economic" interests, *Campos,* 62 F.3d at 314, and "ease financial burdens on federal, state and local prisons resulting from lengthy detention of aliens awaiting deportation." *Hernandez-Avalos,* 50 F.3d at 847. That statutory history and the consistent federal court recognition of those purposes lead inexorably to a single conclusion: the word "shall" in section 1231(a)(1)(A) means *must*—even as against the Government here.[43] *See Richbourg Motor Co.,* 281 U.S. at 534–35, 50 S.Ct. at 387–88; *Escoe,* 295 U.S. at 494, 55 S.Ct. at 820; (Dkt. No. 16 at 6).

**\*36** Moreover, Fifth Circuit—as well as sister Circuit—caselaw makes clear that "shall" means *must* in section 1231(a)(1)(A) and the prior corollary statutes. *See Giddings,* 979 F.2d at 1110 ("We read § 1252(i) as imposing *a duty* on the Attorney General to deport criminal aliens." (emphasis added)); *Tran v. Mukasey,* 515 F.3d 478, 481–82 (5th Cir. 2008) ("[W]hen a final order of removal has been entered against an alien, the government *must* facilitate that alien's removal from the United States within ninety days, a period generally referred to as the removal period." (emphasis added) (citing 8 U.S.C. § 1231(a)(1)(A))); *Hechavarria v. Sessions,* 891 F.3d 49, 55 (2d Cir. 2018), as amended (May 22, 2018) (holding that "[s]ection 1231 assumes that the immigrant's removal is both imminent and *certain*") (emphasis added); *Lema v. I.N.S.,* 341 F.3d 853, 855 (9th Cir. 2003) ("Ordinarily, the INS *must* remove an alien in its custody within ninety days from the issuance of a final removal order." (emphasis added)); *United States*

*v. Chinchilla,* ___ F.3d ___, ___, No. 19-10987, 2021 WL 501100, at \*4 (11th Cir. Feb. 11, 2021) ("Generally, an alien *must* be physically removed from the United States within ninety days of a final removal order." (emphasis added) (citing section 1231(a)(1)(A))).

Indeed, numerous federal courts have recognized that *other* parts of section 1231 itself uses "shall" as a mandatory command. *See, e.g., Rodney v. Mukasey,* 340 F. App'x 761, 764 n.3 (3d Cir. 2009) (per curiam) (interpreting "shall" in section 1231(a)(2) to mean the Attorney General "*must*" detain the alien for certain period (emphasis added)); *Shuaibu v. Gonzales,* 425 F.3d 1142, 1144 (8th Cir. 2005) (interpreting the "shall" in section 1231(b)(1)(C) to mean the Attorney General "must" attempt to remove the alien to certain countries); *Kim Ho Ma v. Ashcroft,* 257 F.3d 1095, 1115 (9th Cir. 2001) (interpreting "shall" in section 1231(a)(3) to mean all aliens ordered released "must" comply with supervision requirements). These interpretations of "shall" as mandatory in other parts of section 1231 are yet further indication that the "shall" in section 1231(a)(1)(A) bears the same meaning, for "a word or phrase is presumed to bear the same meaning throughout a text." SCALIA & GARNER, *supra* at 170; *see also Powerex Corp. v. Reliant Energy Servs., Inc.,* 551 U.S. 224, 232, 127 S.Ct. 2411, 2417, 168 L.Ed.2d 112 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Notwithstanding the text, context, statutory history, and precedent demonstrating that "shall" means *must* in section 1231(a)(1)(A), the Defendants raise two arguments in response. (Dkt. No. 82 at 17–25; Dkt. No. 83 at 33–35). First, the Defendants attempt to "interpret" the text and context. (Dkt. No. 82 at 21; Dkt. No. 83 at 34). Their interpretation is: at least one other "shall" in section 1231 is not mandatory, ergo, neither is the "shall" in section 1231(a)(1)(A). Namely, the Defendants point to section 1231(a)(2), which in relevant part provides: "During the removal period, the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has

been found inadmissible under [certain circumstances]." 8 U.S.C. § 1231(a)(2). The Defendants contend that reading "shall" as mandatory in the first sentence would make the second sentence superfluous. (Dkt. No. 82 at 21); (Dkt. No. 83 at 34). This argument is unavailing because the Defendants ignore the distinction between the two clauses. The first clause mandates the act of *detaining*. *See Rodney*, 340 F. App'x at 764. The second clause prohibits the *release* of certain individuals. By clear implication, the Attorney General may *in some circumstances* "release" those whom he has "detain[ed]." *See* § 1231(a)(2). These provisions are not at odds: section 1231 itself prescribes the conditions through which an alien—who is presumably detained at that moment—may pursue a "stay" and a "release." 8 U.S.C. § 1231(c)(2)(A) & (C). In fact, it could easily be said that the prohibition on releasing *certain* aliens demonstrates that Congress assumed *all* aliens would be detained—because they "shall" be. Thus, Defendants' "textual" argument fails.

**\*37** Second, Defendants lean heavily on a long line of cases espousing the uncontroversial proposition that the Executive wields tremendous discretion in the area of immigration law. (Dkt. No. 82 at 17–25) (discussing or citing, *e.g.*, *AADC*, 525 U.S. 471, 119 S.Ct. 936; *Nken v. Holder*, 556 U.S. 418, 439-40, 129 S.Ct. 1749, 1764, 173 L.Ed.2d 550 (2009) (Alito, J., dissenting); *Texas*, 809 F.3d 134) (Dkt. No. 83 at 22–23) (discussing or citing, *e.g.*, *Heckler*, 470 U.S. 821, 105 S.Ct. 1649; *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952); *Trump v. Hawaii*, ___, U.S. ___, ___, 138 S. Ct. 2392, 2418–19, 201 L.Ed.2d 775 (2018)). The Court agrees with every pronouncement of discretion in the immigration context accorded to the Executive Branch contained within those cases. Indeed, the federal government wields "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394, 132 S.Ct. at 2494. This power derives not only from Congress's power to establish a "uniform Rule of Naturalization," U.S. CONST. art. I, § 8, cl. 4, but also from its "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 394– 95, 132 S.Ct. at 2498 (citing *Toll v. Moreno*, 458 U.S. 1, 10, 102 S.Ct. 2977, 2982, 73 L.Ed.2d 563 (1982)).

But none of these principles are jeopardized by reviewing Texas's claim that the 100-day pause transgresses section 1231(a)(1)(A). Whatever "inherent authority" the Executive may have in the area of immigration, that authority—along with the executive Power—does not include the authority to "suspend" or "dispense with" *Congress's* exercise of legislative Powers in enacting immigration laws. *See United States v. Midwest Oil Co.*, 236 U.S. 459, 505, 35 S.Ct. 309, 325, 59 L.Ed. 673 (1915) (Day, J., dissenting) ("The Constitution does not confer upon him any power to enact laws or to *suspend* or repeal such as the Congress enacts." (emphasis added)); *Escoe*, 295 U.S. at 493, 55 S.Ct. at 819 ("[T]he power of the lawmakers to dispense with notice or a hearing as part of the procedure of probation does not mean that a like *dispensing* power, in opposition to the will of Congress, has been confided...."); *see also* MICHAEL STOKES PAULSEN, STEVEN G. CALABRESI, MICHAEL W. MCCONNELL, & SAMUEL L. BRAY, THE CONSTITUTION OF THE UNITED STATES 317 (Robert C. Clark et al. eds., 2d ed. 2013) (opining that the President's duty to " 'take care that the laws be faithfully executed...means that the president is not permitted to dispense with or *suspend* statutes the way King James II did before the Glorious Revolution of 1688" (emphasis added)); JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 316 (Quid Pro Brooks 2013) (1833) ("[T]he duty imposed upon [the President] to take care, that the laws be faithfully executed, follows out the strong injunctions of his oath of office, that he will 'preserve, protect, and defend the constitution.' The great object of the executive department is to accomplish this purpose; and without it, be the form of government whatever it may, it will be utterly worthless for offence, or defence; for the redress of grievances, or the protection of rights; for the happiness, or good order, or safety of the people."); Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power To Execute the Laws*, 104 YALE L.J. 541, 620 (1994) (noting that the "Committee of Detail [may have] added the requirement that the President 'take care' that the laws be 'faithfully' executed" out of a "desire to prevent the President from declaring that his executive power granted him the ability not only to enforce federal law, but also to *suspend* federal law or suspend the execution of it" (emphasis added)); Robert J. Delahunty & John C. Yoo, *Dream On: The Obama Administration's Nonenforcement of Immigration Laws, the DREAM Act, and the Take Care Clause*, 91 TEX. L. REV. 781, 797–98 & n.95, 804–09 (2013) (detailing how

the "suspending power" was abused by English Monarchs, such as James II, and how that history influenced Americans in limiting "[t]he executive Power"); Christopher N. May, *Presidential Defiance of Unconstitutional Laws: Reviving the Royal Prerogative*, 21 HASTINGS CONST. L.Q. 865, 873– 74 (1994) ("The duty to execute the laws faithfully means that the President may not-whether by revocation, *suspension*, dispensation, inaction, or otherwise-fail to honor and enforce statutes to which he or his predecessors have assented, or which may have been enacted over his objection." (footnotes omitted)). [44]

**\*38** Rather, the Executive—and thus, the Attorney General or the Secretary of DHS—must exercise any discretion accorded it by statute *in the manner which Congress has prescribed*. See *Vigil*, 508 U.S at 193, 113 S.Ct. at 2032 ("[A]n agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."); *Heckler*, 470 U.S. at 832–34, 105 S.Ct. at 1656– 57; *see also Regents*, ___ U.S. at ___, 140 S.Ct. at 1926 ("It is axiomatic that an administrative agency's power...is limited to the authority granted by Congress." (Thomas, J., dissenting) (alteration in original) (quoting *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988)) (Thomas, J., dissenting). In this case, for instance, the fact that "shall" means *must* in *section 1231(a)(1)(A)* does not in any way imply that the Attorney General has *no* discretion to ignore the 90-day removal period. Indeed, *section 1231* plainly dissolves the Attorney General of any requirement to remove aliens within the removal period *if* any of *section 1231*'s exceptions apply. *See § 1231(a)(1)(A)* ("Except as otherwise provided in this section,..."). By way of example, the removal period becomes optional "if the alien fails or refused to make timely application in good faith for travel" or "conspires or acts to prevent the alien's removal," *§ 1231(a)(1)(C)*, and the removal period *must* be ignored if the Attorney General determines that "an alien's life or freedom would be threatened" in the country to which they would have been removed, *§ 1231(b)(3)(A)*. But the fact that some parts of *section 1231* expressly prescribe the manner in which the Attorney General may exercise discretion to ignore the 90-day removal period does not imply total discretion

to pause or suspend a statutory mandate. [45] Rather, "these grants of authority must be read alongside the express limits contained within the statute." *Regents*, ___ U.S. at ___, 140 S.Ct. at 1925; *see also Texas*, 809 F.3d at 188 ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance. Agency announcements to the contrary are greeted with a measure of skepticism." (quotations, alteration, and ellipsis omitted)); *State ex rel. M'Cready v. Hunt*, 2 Hill (SC) 1, 171 (S.C. Ct. App. 1834) (per Johnson, J.) ("If one have authority, prescribes the mode in which a particular act is to be done, can the agent who executes it substitute any other? Does not the act of prescribing the mode, necessarily imply a prohibition to all other modes?").

In the end, through all their detailed explanation of the Executive's seemingly unending discretion, (Dkt. No. 82 at 17–27; Dkt. No. 83 at 13–15, 21–27, 29–35), the Defendants substantially undervalue the People's grant of "legislative Powers" to Congress. Here, the Government has changed "shall remove" to "may remove" when it unambiguously means *must* remove. Accordingly, the 100-day pause is not an action committed to agency discretion.

### III. DISCUSSION OF PRELIMINARY INJUNCTION

Having determined that this Court's jurisdiction is proper and nothing precludes judicial review under the APA, the Court now turns to the substance of Texas's motion for a preliminary injunction.

### A. LEGAL STANDARD

The Supreme Court has cautioned district courts that "a preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 585 U.S. ___, ___, 138 S.Ct. 1942, 1943, 201 L.Ed.2d 398 (2018) (quotation omitted). Indeed, the decision to grant a preliminary injunction is "to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Thus, "[i]n each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008) (quotation omitted). And in determining whether injunctive relief is proper,

"courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

**\*39** The standard for deciding whether to issue a preliminary injunction is the same standard used to issue a temporary restraining order. *See Clark v. Prichard,* 812 F.2d 991, 993 (5th Cir. 1987). That standard requires a movant to show (1) "a likelihood of success on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Benisek,* 585 U.S. at ___, 138 S.Ct. at 1944; *see also Opulent Life Church v. City of Holly Springs, Miss.,* 697 F.3d 279, 288 (5th Cir. 2012). "The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted." *Clark,* 812 F.2d at 993. However, "none of the four prerequisites has a fixed quantitative value." *State of Tex. v. Seatrain Int'l, S. A.,* 518 F.2d 175, 180 (5th Cir. 1975). "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* (citing *Siff v. State Democratic Exec. Comm.,* 500 F.2d 1307 (5th Cir. 1974)).

**B. APPLICATION**

**1. Substantial Likelihood of Success on the Merits**

a. Count II: Contrary to 1231(a)(1)(A)
Texas asserts that the 100-day pause is not in accordance with law and exceeds the Government's authority in contravention of 5 U.S.C. § 706(2)(A) & (C). (Dkt. No. 1 at ¶¶ 43–49; Dkt. No. 62 at 17–19). Specifically, Texas contends that the Government deliberately "alter[ed]" and "suspended" a statute passed by Congress requiring the Secretary of DHS to remove any alien with a final order of removal within 90 days absent an express exception. (Dkt. No. 1 at ¶¶ 43– 49 (citing 8 U.S.C. § 1231(a)(1)(A)). The Court agrees that Texas has a substantial likelihood of success on the merits of this claim.

As described above, the Court has determined that "shall" in section 1231(a)(1)(A) means *must.* Therefore, by asserting that the 100-day pause is not in accordance with law and exceeds the Government's authority, Texas has demonstrated a substantial likelihood of success on Count II.

b. Count IV: Arbitrary and Capricious
Texas argues that the January 20 Memorandum is arbitrary and capricious because the administrative record the Government provided does not show that the Government considered potential policies more limited in scope and time or any concrete, reasonable justification for a 100-day pause—the two findings the Court initially made against the Defendants at the TRO stage. (Dkt. No. 62 at 19). The Government disagrees, contending that DHS "engaged in reasoned decisionmaking." (Dkt. No. 83 at 35). The Intervenors likewise argue that the Government has, in fact, provided reasonable explanations to conclude that a 100-day pause on deportations is appropriate, and that Texas has a mere policy disagreement with the January 20 Memorandum stemming from a misunderstanding of the immigration removal system. (Dkt. No. 82 at 35–38). As discussed below, the Court finds that Texas has demonstrated a substantial likelihood of success of establishing that the Government's decision to implement the 100-day pause was arbitrary and capricious as alleged in Count IV.

Federal administrative agencies are required to engage in "reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. NLRB,* 522 U.S. 359, 374, 118 S.Ct. 818, 826, 139 L.Ed.2d 797 (1998) (internal quotation omitted). This necessarily means that "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* More specifically, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)).

**\*40** If an administrative agency does not engage in reasoned decisionmaking, a court, under the APA, "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In determining "whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' "

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867.

The arbitrary and capricious standard is "highly deferential." *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985). District courts must "accord the agency's decision a presumption of regularity" and "are prohibited from substituting [the courts'] judgment for that of the agency." *Id.* (citation omitted). "Nonetheless, while the arbitrary and capricious standard of review is highly deferential, it is by no means a rubber stamp." *Id.* "Because the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.' " *Id.* (quoting *State Farm*, 463 U.S. at 50, 103 S.Ct. at 2870). As such, "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). The administrative record, however, need only "indicate the determinative reason for the final action taken," *Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), and courts may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).

In the instant case, the January 20 Memorandum and the corresponding administrative record fail to indicate the appropriateness and rationality of DHS's "path" in implementing a 100-day pause on removals. In other words, the Court, even with additional briefing and the administrative record at its disposal, *still* cannot discern how DHS's stated concerns are logically connected with—let alone "determinative" of—the action taken, the 100-day pause.

The January 20 Memorandum states that DHS needed a 100-day pause on removals so that the agency may assess immigration policies stemming from "unique circumstances" present with respect to immigration, including "significant operational challenges at the southwest border as [the United States] is confronting the most serious global public health crisis in a century." (Dkt. No. 2-2 at 2). More specifically, DHS states in the January 20 Memorandum that the 100-day pause is necessary to "(1) provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at the southwest border fairly and efficiently; and (2) comply with COVID-19 protocols to protect the health and safety of DHS personnel and those members of the public with whom DHS personnel interact." (*Id.* at 4). Further, DHS provides that the pause is needed to "ensure that [the agency's] removal resources are directed to the Department's highest enforcement priorities." (*Id.*). The 100-day pause also apparently stems from President Biden's Executive Order stating that the new administration will "reset the policies and practices for enforcing civil immigration laws to align enforcement" with the "values and priorities" the new Executive deems important. (Dkt. No. 59-1 at 4).

**\*41** Be that as it may, neither the seven-page administrative record nor the language in the January 20 Memorandum itself demonstrates reasoned decisionmaking. To be clear, the administrative record in this case consists of the two-page Executive Order and the five-page January 20 Memorandum itself. The record also demonstrates that the Defendants are unsure who authored the January 20 Memorandum. (Dkt. No. 84 at 10). Additionally, the Executive Order and the January 20 Memorandum were both signed within hours of the Inauguration of President Biden. That did not leave much time for reflection and analysis.

The Court does not discount the Defendants' stated concerns as a general matter with respect to the southern border, COVID-19, and certain operational challenges inherent to immigration enforcement. Nor does the Court discount the new Executive's desire to reset immigration policies as it may see fit. But the Court *does* find a disconnect between the 100-day pause and these stated concerns. Why is a 100-day pause needed to alleviate the problems COVID-19 poses?[46] What basis in the record is there that anything will be different in 100 days on this front? Why does DHS need a 100-day pause on removals to "fairly and efficiently" process immigration and asylum applications at the southwest border?

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Why is pausing removals essential to redirecting immigration resources? And equally crucial, why and how does the pause connect to the new Executive's need to reset priorities? These questions—the answers to which may provide the "rational connection between the facts found and the choice made," *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866—remain unanswered in the bare administrative record before the Court.

Crucially, the January 20 Memorandum allows the continuation of removals for those individuals who arrive *after* November 1, 2020. (Dkt. No. 2-2 at 3). The Defendants do not explain how *those* removals do not interfere with the necessary "reset" DHS seeks through the 100-day pause. Notably, DHS has not even *attempted* to distinguish between those removals that will continue and those that will be paused and how each would affect the Executive's reset of its "priorities." Indeed, the Intervenors have informed the Court that even with the implementation of the 100-day pause, a "huge proportion of [expedited] removals" would still "continue unabated." (Dkt. No. 82 at 16). Assuming for the sake of argument this contention is correct, it leaves unanswered how the 100-day pause would actually aid DHS in its reset of priorities, redirection of resources, and management of COVID-19 challenges.

**\*42** Even the Government's attempt in its brief to provide rationality—the logical connection—between DHS's apparent concerns and the 100-day pause fall short. For instance, the Government states that the pause is necessary "for newly-appointed DHS leadership to evaluate how previous enforcement policies interplay with the new administration's priorities." (Dkt. No. 83 at 37). But a need to assess priorities does not necessarily mean a pause on government functions. The Defendants do not cite, and the Court cannot find, other instances in which *any* government agency paused its essential duties and tasks *for 100 days* to reassess its priorities.

The Government also argues that it need not consider Texas's expenses and costs when contemplating the pause because "there is no analogous situation of the agency being faced with the prospect of partially repealing a previous policy," and that "the cost to individual states is not a relevant concern" DHS was "required to consider." (Dkt. No. 62 at 20); (Dkt. No. 83 at 37–38). Assuming that there is no analogous situation, the Defendants still fail to rebut DHS's clear and obvious responsibility to consider the relevant factors which, by all intents and purposes, include consideration of an important aspect of the problem DHS is trying to solve—Texas's expenses and costs stemming from a 100-day pause on removals. *See Plyler,* 457 U.S. at 228 n.23, 102 S.Ct. at 2400, n.23; *Texas,* 809 F.3d at 152–54; *Arizona,* 567 U.S. at 397, 132 S.Ct. at 2500; *Regents,* ___ U.S. at ___, 140 S.Ct. at 1913; *see also State Farm,* 463 U.S. at 43, 103 S.Ct. at 2865–67. Caselaw does not require DHS to explain and compare "its chosen policy with every hypothetical," (Dkt No. 83 at 38), which is to say, why it chose to pause removals for 100 days as opposed to 50 days, or even 1,000 days. But the law *does* require DHS to explain why a 100-day pause is needed by showing how the policy is logically and reasonably connected to DHS's asserted reasons. This, DHS did not do. And without that rationale explained—or even at least apparent—in the record, the choice is arbitrary and capricious.

Equally important to this Court's findings is the lack of any relevant data and information in the administrative record on any of these stated concerns. As stated earlier, the agency "must examine the relevant data" in order to articulate its reasons for its decisions, thereby connecting the facts to the agency's choices. *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866. The seven-page administrative record does not provide *any* facts that could aid this Court in reasonably discerning what DHS's reasons were for instituting a 100-day pause aside from the general and conclusory concerns enumerated above. (*See* Dkt. No. 59-1 at 4–10). There is no indication that DHS went through the factors that Congress intended it to consider in its decisionmaking process, nor does the administrative record show what aspects of this issue were seriously considered. In essence, this failure boils down to one defect in the agency's decisionmaking process: a sparse adminstrative record. Given this defect, the Court has basically no material from which it may evaluate if DHS considered any facts, let alone whether the facts agency considered "run[ ] counter" to DHS's ultimate choice to implement the 100-day pause. *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2867.

With respect to the lack of depth in the administrative record, it is important to address the Government's contention that the January 20 Memorandum "standing alone, is sufficient," and a detailed administrative record is not needed to overcome Texas's challenge. (Dkt. No. 83 at 39). The Court agrees that agencies are required to provide only a brief statement to justify its choices and overcome an APA challenge.

See *Glob. Crossing Telecomm., Inc. v. Metrophones Telecomm., Inc.*, 550 U.S. 45, 63, 127 S.Ct. 1513, 1525, 167 L.Ed.2d 422 (2007) (upholding agency's practice and rationale where agency provided context and cross-referenced opinions). But this bare minimum requirement does not relinquish an agency from "*cogently* explain[ing] why it has exercised its discretion in a given manner." *State Farm*, 463 U.S.at 48, 103 S.Ct. at 2869 (emphasis added). Indeed, federal courts must examine the administrative record and the agency's statement itself to determine the context of the agency's decision, ultimately leading the Court to the agency's rationale. *See Metrophones Telecomm., Inc.*, 550 U.S. at 63, 127 S.Ct. at 1525. Given the content of the administrative record the Government has filed, the Court has no basis to conclude that the stated reasons for instituting the 100-day pause are fruits of reasoned decisionmaking. The January 20 Memorandum does, indeed, explain why DHS *believes* a 100-day pause is needed—for instance, that the 100-day pause is needed because of COVID-19 concerns and challenges—but it does not *cogently explain* the rationale behind that belief—as it is unknown what those COVID-19 concerns are in the context of immigration enforcement, what evidence bolsters those concerns, why a 100-day pause can alleviate such concerns, and whether there were alternative policies that were considered but were ultimately discarded in favor of the pause. In other words, the core failure of DHS lies not in the brevity of the January 20 Memorandum or the corresponding administrative record, but instead in its omission of a rational explanation grounded in the facts reviewed and the factors considered. This failure is fatal, as this defect essentially makes DHS's determination to institute a 100-day pause on deportations an arbitrary and capricious choice. [47]

### c. Count V: Notice & Comment

**\*43** Texas next claims that it is entitled to injunctive relief under the APA because the 100-day pause on removals "is a substantive or legislative rule that required notice and comment-rulemaking." (Dkt. No. 62 at 22). The Defendants set forth two primary arguments to counter Texas's claim. (Dkt. No 83 at 39–42); (Dkt. No. 82 at 39–41). First, the Defendants assert that the 100-day pause is exempt from notice and comment under 5 U.S.C. § 553(b)(3) (A) because it is not a "binding rule" and is instead "a general statement of policy regarding how DHS will exercise its enforcement discretion under the INA." (Dkt. No. 83 at 39–42). In the alternative, the Defendants argue that,

even if the Court finds that the 100-day pause is binding, the Government is nevertheless exempt from the notice and comment requirements because the 100-day pause is a "procedural rule" that "does not modify any substantive right or interest" and is, therefore, exempt from notice and comment requirements. (Dkt. No. 83 at 42); *see also* (Dkt. No. 82 at 39–41). The Court disagrees.

### Rulemaking under 5 U.S.C. § 553

No Party disputes that the 100-day pause is a rule of some kind and, therefore, that the rulemaking provisions of the APA apply. [48] (Dkt. Nos. 63, 82, 83). Nor does any Party contend that the 100-day pause underwent any notice and comment. (*Id.*). The question, then, is whether that 100-day pause is a rule that *should have* undergone notice and comment.

The APA requires rules to undergo notice and comment unless they are exempt. *See* 5 U.S.C. § 553(a), (b). [49] Section 553 sets forth two provisions that provide exemptions to the notice and comment requirements, one of which is relevant in this case. *Id.* § 553(b). That provision exempts "interpretative rules, *general statements of policy*, or *rules of* agency organization, *procedure*, or practice" from notice and comment. § 553(b)(A) (emphasis added). Thus, if an agency proposes a rule that is either a general statement of policy or a procedural rule, the agency is not required to conduct notice and comment on the proposed rule. *See id.*

Though there are exceptions to the notice and comment requirements, the Fifth Circuit has stated that such exceptions "must be narrowly construed." *Texas*, 809 F.3d at 171. Such a reading of these exceptions protects the vital interests notice and comment is intended to protect. *See U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) (" Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." (quotations omitted)). Indeed, notice and comment ensures those affected by a proposed rule have a voice in the rule-making process and assists the agency in crafting rules that better account for the costs and benefits of agency action. *See id.* at

1153. And states like Texas offer a unique perspective on illegal immigration issues that, if voiced through notice and comment, can assist an agency in rules addressing these issues. *See* *Arizona*, 567 U.S. at 397, 132 S.Ct. at 2500 ("The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States."); *see also* *Texas*, 809 F.3d at 163. Mindful of the importance of notice and comment, the Court now considers whether the 100-day pause is exempt from the notice and comment requirements as either a general statement of policy or a procedural rule.

### General Statement of Policy

**\*44** The Court first considers whether the 100-day pause is a general statement of policy. If it is, notice and comment is not required. *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995); *see also* § 553(b)(A). If, instead, the 100-day pause is a "substantive rule" then it is unlawful because a substantive rule may not be promulgated without notice and comment. *Shalala*, 56 F.3d at 595.

"In analyzing whether an agency pronouncement is a statement of policy or a substantive rule, the starting point is the agency's characterization of the rule." *Shalala*, 56 F.3d at 596 (quotation omitted). Relying on the agency's description alone, the Court would likely be convinced that the 100-day pause is in fact a general statement of policy. In addition to the Government's insistence in its Response that the 100-day pause on removals is merely a statement of policy, (Dkt. No. 83 at 39–42), the January 20 Memorandum itself contains language that would bolster such a conclusion. Indeed, the January 20 Memorandum explicitly declares that it "should be considered Department-wide *guidance*." (Dkt. No. 63-1 at 2) (emphasis added). What is more, the January Memorandum 20 unequivocally states that the "guidelines and priorities" contained therein "are not intended to, do not, and may not be relied upon to create any right or benefit, *substantive* or procedural, enforceable at law by any party...." (*Id.* at 5) (emphasis added).

But an agency's characterization of its rule is just that—its *own* characterization. Indeed, "[a]gencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar v. Allina Health*

*Servs.*, ___ U.S. ___, ___, 139 S.Ct. 1804, 1812, 204 L.Ed.2d 139 (2019). "On the contrary, courts have long looked to the contents of the agency's action, not the agency's self-serving label, when deciding whether statutory notice and comment demands apply." *Id.* Thus, the Fifth Circuit cautions courts to be "mindful but suspicious of the agency's own characterization." *Texas*, 809 F.3d at 171 (quotation omitted). That is to say, "[t]he label that the particular agency puts upon its given exercise of administrative power is not, for [the court's] purposes, conclusive; rather, it is what the agency does in fact." *Shalala*, 56 F.3d at 596 (quotations omitted).

In looking closely at the agency's actions, the Fifth Circuit instructs district courts to "evaluate two criteria to distinguish policy statements from substantive rules: whether the rule (1) impose[s] any rights and obligations and (2) genuinely leaves the agency and its decisionmakers free to exercise discretion." *Texas*, 809 F.3d at 171 (quotation omitted). The Fifth Circuit has acknowledged that "[t]here is some overlap in the analysis of those prongs because [i]f a statement denies the decisionmaker discretion in the area of its coverage...then the statement is binding, and creates rights or obligations." *Id.* (quotations omitted). Moreover, the D.C. Circuit Court has noted, these "criteria" are merely intended to guide a court in "fathom[ing] the interpretative/legislative distinction." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987). Or, as another Judge of this Court has stated, "[t]hese factors are not treated like different elements of a cause of action, both of which must be proved; but instead a matter of judgment is involved in distinguishing between rules however discretionary in form, that effectively circumscribe administrative choice." *Texas II*, 328 F. Supp. 3d at 730 (Hanen, J.) (citing *Am. Bus Ass'n v. United States*, 627 F.2d 525, 530 (D.C. Cir. 1980)).[50] The Court now weighs these criteria to determine whether the 100-day pause is a general statement of policy or a substantive rule requiring notice and comment.

### Whether the 100-Day Pause Affects Rights and Obligations

**\*45** The Court first considers whether the 100-day pause on removals affects rights and obligations. It does.

In its analysis of whether the 100-day pause is a final agency action, the Court described how the January 20 Memorandum affects rights and obligations in significant ways. Namely, the

January 20 Memorandum effectively commands that DHS stop performing its obligation under ⛤ section 1231(a)(1)(A) to remove persons with final orders of removals within 90 days. The January 20 Memorandum further affects the rights of those with final orders of removals by calling for a reassessment of *all* previous orders of removal—even those still within the 90-day removal period—and dramatically changes the constitutional calculus for whether those detained past 180 days can contest the legality of their continued confinement. *See* ⛤ *Zadvydas*, 533 U.S. at 683–84, 701, 121 S.Ct. at 2495, 2505.

To underscore these rights and obligations flowing from the 100-day pause, the Court notes that the briefs of the Intervenors show that those directly affected by the 100-day pause understand that the impact is legal in nature. For instance, the Intervenors state "[t]he injunction that Texas seeks will place noncitizens around the country *at risk of deportation*, even though many of them have paths to regularize their immigration status, claim humanitarian protection, or seek long-term grants of prosecutorial discretion in their favor." (Dkt. No. 28 at 6) (emphasis added). And further, "members and clients include vulnerable noncitizens *at risk of deportation and other serious adverse consequences if Texas is successful*." (*Id.*) (emphasis added). Thus, the Intervenors plainly admit that the 100-day pause unequivocally alleviates these individuals of any "risk of deportation." That is a legal consequence.

For these reasons, the Court concludes that the significant extent to which the 100-day pause impacts rights and obligations weighs against classifying it as a general statement of policy. [51]

Agency Discretion Under the 100-Day Pause

The Court next considers whether the 100-day pause genuinely leaves the agency and its decisionmakers free to exercise discretion. ⛤ *Texas*, 809 F.3d at 171. It does not.

**\*46** In evaluating an agency action for the discretion it affords to decisionmakers, the Fifth Circuit has noted:

> The key inquiry...is the extent to which the challenged policy leaves the

agency free to exercise its discretion to follow or not to follow that general policy *in an individual case*, or on the other hand, whether the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criteria. As long as the agency remains free to consider the *individual facts* in the various cases that arise, then the agency action in question has not established a binding norm.

⛤ *Shalala*, 56 F.3d at 596–97 (emphasis added) (citing *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir. 1983)). Thus, wherever an agency's decisionmakers are stripped of the ability to make "individualized" determinations for each case, it is doubtful that the policy in question is a "general statement." *See id.*

In this case, it is clear that the 100-day pause leaves little if any room for "individualized" determinations. The 100-day pause on removals applies to "*any* noncitizen present in the United States...with a final order of removal," unless that noncitizen falls under one of four categories. (Dkt. No. 63-1 at 4–5) (emphasis added). The only semblance of discretion in the 100-day pause on removals is contained in the fourth category, which applies to noncitizens "whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law." (*Id.* at 5). This, too, is insufficient. Indeed, under this provision a DHS decisionmaker may decide whether a noncitizen with a final order of removal is ultimately removed *only if* the Acting Director of ICE, *after* consulting DHS's General Counsel, determines that the law requires a noncitizen be removed. Moreover, Texas provided evidence that, even if the January 20 Memorandum *says* that it affords the Acting Director of ICE some discretion to make individualized determinations, such discretion will be virtually impossible for the Acting Director to exercise alone given the sheer number of deportations occurring annually. (Dkt. No. 63-6 at ¶ 27) ("Finally, with hundreds of thousands of deportations occurring each year in the United States, there are few cases that can reasonably be addressed through an 'individualized determination' by both the Acting Director of ICE and General Counsel of ICE."). Thus, in practice, "the exceptions provided in the [January 20] [M]emorandum do little to counteract the sweeping pause

on deportations of illegal immigrants with final orders of deportations." (*Id.*). And those implementing the 100-day pause "need only determine whether a given case is within the [100-day pause's] criteria." *Shalala*, 56 F.3d at 596–97. Accordingly, the Court finds that the 100-day pause confers almost no discretion on DHS and its decisionmakers. In light of the fact that the 100-day pause impacts rights and obligations, the Court rejects the Government's classification of the 100-day pause as a general statement of policy. [52]

### Procedural Rule

**\*47** Even if the 100-day policy is not a general statement of policy, it may be exempt from notice and comment if it is a "rule of agency organization, procedure, or practice." § 553(b)(3)(A); *see also Texas*, 809 F.3d at 176 ("A binding rule is not required to undergo notice and comment if it is one of agency organization, procedure, or practice." (quotation omitted)). The Defendants do not contend the pause is a rule of DHS organization or practice, but they do assert it is one of agency procedure. (Dkt. No. 83 at 39–40). For the reasons discussed below, the Court is unpersuaded.

The Fifth Circuit employs two tests to determine whether a rule is one of agency procedure. *See Texas*, 809 F.3d at 176–77; *see also Texas II*, 328 F. Supp. 3d at 728 ("[T]he Fifth Circuit applied two tests to determine whether DAPA and Expanded DACA were 'procedural.' "). Under both tests, the assertions of the Government and the Intervenors fail.

The first test the Fifth Circuit uses to determine whether a rule is procedural is the "substantial impact test." *See Texas*, 809 F.3d at 176. This test "is the primary means by which [the court] look[s] beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Id.* (citing *Kast Metals Corp.*, 744 F.2d at 1153). "An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply." *Id.* (quoting *Kast Metals Corp.*, 744 F.2d at 1153).

The 100-day pause easily satisfies the substantial impact test for several reasons. First, the 100-day pause significantly impacts those with final orders of removal, as discussed above. The substantive impact on those with final orders

of removal is made clear in the Intervenors' representations to the Court. (Dkt. No. 28 at 6) ("The injunction that Texas seeks will place noncitizens around the country at risk of deportation, even though many of them have paths to regularize their immigration status, claim humanitarian protection, or seek long-term grants of prosecutorial discretion in their favor. *Their interests* are acute and their perspectives are distinct from those of the parties.") (emphasis added).

The 100-day pause also impacts DHS's statutory obligation to remove those with final orders of removal under section 1231(a)(1)(A). The 100-day pause further has a significant impact on the States in which those with final orders of removal reside. In fact, this may be one of the few areas of agreement between the Amici States [53] and Texas. On the one hand, the Amici States, in no uncertain terms, attest to the significant benefits undocumented immigrants provide to the States and local communities in which they live. (*See* Dkt. No. 81 at 7–9). On the other hand, Texas offers arguments and evidence demonstrating the cost it bears having to provide certain services to those with final orders of removal who would have been removed but for the 100-day pause. Either for gain or for ill, the substantial impact is certain. For these reasons, the Court is not convinced that the 100-day pause is exempt from notice and comment as a procedural rule under the substantial impact test. *See Texas II*, 328 F. Supp. 3d at 728 ("[T]he individual Defendant-Intervenors, New Jersey, and the many states appearing through amicus curiae briefs have without exception urged this Court to consider the substantial positive impact these recipients have made. No matter which party's briefs and exhibits one reviews, each stresses the impact of the DACA program."). Therefore, under this test, the Court concludes the 100-day pause is not a procedural rule.

**\*48** The second test weighs two considerations. First, the Court considers the "effect on those interests ultimately at stake in the agency proceeding." *Texas*, 809 F.3d at 176 (quotation omitted). "Hence, agency rules that impose 'derivative,' 'incidental,' or 'mechanical' burdens upon regulated individuals are considered procedural, rather than substantive." *Id.* (quotation omitted). This consideration clearly weighs against characterizing the 100-day pause as a procedural rule, given that the Court has already determined that the pause effects certain rights and obligations and has a significant impact on those with final orders of removal and the states in which they reside.

Next, the Court assesses whether the 100-day pause affects the substantive standards by which DHS determines whether to stay deportations of those with final orders of removal. "[R]ules are generally considered procedural so long as they do not 'change the *substantive standards* by which the [agency] evaluates' applications which seek a benefit that the agency has the power to provide." *Id.* at 176–77 (quotation omitted) (emphasis in the original). Here, the January 20 Memorandum changes the substantive standards by which DHS determines whether persons with final orders of removal are removed. Indeed, the 100-day pause inverts section 1231(a)(1)(A)'s command that such persons be deported within 90 days by declaring that such persons *should not* be removed *unless* they meet certain exceptions. That is a change in the "substantive standards by which [DHS] evaluates" whether or not to remove a person with a final order of removal—plain and simple. *Id.* at 177 (DAPA "establishes the substantive standards by which the [agency] evaluates applications[ ] which seek a benefit that the agency [purportedly] has the power to provide." (emphasis and quotations omitted)). Therefore, this test, too, weighs against classifying the 100-day pause as a procedural rule.

### Texas Has Met Its Burden on Its Procedural APA Claim

In sum, the Court finds that the 100-day pause is a rule that is not exempt from the notice and comment requirements of section 553. The pause is not a general statement of policy because it has a binding effect insofar as it presently affects certain rights and obligations and does not leave sufficient discretion to DHS and its decisionmakers. Likewise, the Court declines to characterize the pause as a procedural rule because it has a significant impact on those with final orders of removal and the states in which these individuals reside and changes the substantive standards used to determine who is removed. Based on the arguments and evidence provided, the Court finds Texas has shown a likelihood of success on the merits of Count V, its procedural APA claim.

### 2. Irreparable Harm

Next, Texas must demonstrate "a substantial threat of irreparable injury if the injunction is not issued." *Texas,* 809 F.3d at 150. For its threat of injury to be sufficiently "substantial," Texas must show that it is "*likely* to suffer irreparable harm in the absence of preliminary relief." *Winter,* 555 U.S. at 20, 129 S.Ct. at 374 (emphasis added). For its injury to be sufficiently "irreparable," Texas need only show it "cannot be undone through monetary remedies." *Burgess v. FDIC,* 871 F.3d 297, 304 (5th Cir. 2017) (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. 1981). Texas has met its burden.

As discussed above in the section on Texas's standing to sue, Texas has presented evidence demonstrating the 100-day pause would cause financial harm to its budget for detention facilities and public education if the policy goes forward. The Court found that these injuries were sufficiently concrete, imminent, and traceable to the 100-day pause to support Texas's standing. The Court also concludes, for the reasons articulated above, that the threat of injury to Texas is "likely" as that term was used by the Supreme Court. *See Winter,* 555 U.S. at 20, 129 S.Ct. at 374. Furthermore, no Party has suggested that Texas could recover any of its likely financial injury here, and the Court cannot conceive of any path for Texas to pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm. *See Texas,* 809 F.3d at 186 (finding that the plaintiff-states' likelihood of "retracting...benefits" from the federal government "would be 'substantially difficult—if not impossible' "). Accordingly, Texas has demonstrated a substantial threat of irreparable injury.

### 3. The Balance of Equities and The Public's Interest

**\*49** Given that Texas has established the first two elements, it is now required to satisfy the final two: that the threatened injury outweighs any harm that may result from the injunction to the non-movant and that the threatened harm will not disserve the public interest. *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1051, 1056 (5th Cir. 1997).

Federal courts have considered the balance of equities and public interest factors together as they overlap considerably. *Texas,* 809 F.3d at 187; *Franciscan All., Inc. v. Burwell,* 227 F. Supp. 3d 660, 694 n.36 (N.D. Tex. 2016) (citing *Texas,* 809 F.3d at 187); *see also Nken,* 556 U.S. at 435, 129 S.Ct. at 1762 ("Once an applicant satisfies the first two factors [for a stay of an alien's removal pending judicial review], the traditional stay inquiry calls for assessing the

harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party."). In weighing equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24, 129 S.Ct. at 376. On the other hand, the public interest factor requires the court to consider what public interests might be injured and what public interests might be served by granting or denying a preliminary injunction. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997–98 (8th Cir. 2011) (citing *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002) abrogated on other grounds by *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011)).

Texas argues that the Defendants face no harm from the preliminary injunction, as "they have no legitimate interest in the implementation of an unlawful memorandum." (Dkt. No. 62 at 32). Texas further contends that even if the Defendants had a legitimate interest, "they face no substantial prejudice from a delayed implementation." (*Id.*). With respect to the public interest, Texas contends that the public interest strongly favors its request for a preliminary injunction because it enjoins the Defendants from violating the law. (*Id.*).

On the other hand, the Government contends that Texas's threatened injury is speculative and negligible because only 6,000 noncitizens subject to a final order of removal are currently detained nationwide, and only "some subset" will be released during the pause, with only a "smaller portion" ending up in Texas, and yet a "still smaller portion" would rely on Texas's social services. (Dkt. No. 83 at 48). The Government also supposes that a preliminary injunction would harm and severely burden the Executive's Article II authority and would impede DHS's desire to "focus on matters more urgent and pressing" such as "reinforcing the southwest border and ensuring safe operations during a pandemic." (*Id.* at 49). The Government argues that removal operations are "resource intensive even in ordinary times," and that "pausing these operations" will allow them to refocus their priorities. (*Id.* at 48–49). It further notes that the public interest is served by the *Executive's* enforcement of immigration law "on behalf of the public," which it claims DHS is doing through pausing removals for 100 days in order to refocus priorities. (*Id.* at 49).

**\*50** The Intervenors follow the Government's lead in arguing that Texas offers no evidence that the 100-day pause will impose any costs. (Dkt. No. 82 at 42). They further argue that "any further delay of the removal pause will severely impact individuals, families, and communities around the country," specifically those "facing deportation" and "their families and loved ones." (*Id.* at 47).

The Court is unpersuaded by the Defendants' contentions. First, Texas has "alleged a concrete threatened injury in the form of millions of dollars of losses," while the Government postulates harms with respect to Article II authority "that are less substantial" and "vague." *See Texas*, 809 F.3d at 186. As discussed earlier, the Court is unpersuaded by the Defendants' claims that Texas's threatened injury is "speculative" since the Court has found that Texas's injuries from costs relating to detention facilities and public education are sufficient and fairly traceable to the 100-day pause. Without a preliminary injunction, Texas will indeed be "threatened with substantial harm." *Burwell*, 227 F. Supp. 3d at 694.

The Government's additional contention that the injunction will prevent DHS from focusing on its priorities and duties is equally unpersuasive. As an initial matter, such concerns are "outweighed by the major financial losses" Texas will face. *Texas*, 809 F.3d at 187. And crucially, the injunction itself "does not enjoin or impair" DHS's ability to focus on southwest border reinforcement and the COVID-19 pandemic. *See id.* The preliminary injunction enjoins DHS not from refocusing its priorities, but from pausing removals in violation of a timeframe mandated by a federal statute. DHS's "resource intensive" duties and responsibilities do not grant license to suspend the law.

Moreover, the Court is unpersuaded by the Intervenors' contentions that any further delay on the pause would cause irreparable harm to individuals subject to final orders of removal. For one, such individuals *have* been ordered to be removed, and in some cases they have had the opportunity to go through the lengthy immigration removal process by which an order of removal was deemed to be appropriate. As explained earlier, individuals who may be in the country unlawfully sometimes have the opportunity to go through a "240-proceeding" with an immigration judge before an order of removal is issued, and they have the opportunity to appeal the decision to the BIA, and subsequently appeal that decision to a federal circuit court. More importantly, this preliminary

injunction does not bar the Executive from having discretion —as prescribed in the INA—over *individual* cases to, for example, rescind *in absentia* orders of removal and reopen cases, 8 U.S.C. § 1229a(b)(5)(C), (c)(7), stay removals, 8 U.S.C. § 1229a(c)(4), cancel removals, 8 U.S.C. § 1229b(a)–(b), authorize voluntary departure, 8 U.S.C. § 1229c, detain certain individuals for longer than 90 days, *see* 8 U.S.C. § 1231(a)(1)(C), (3)(A)–(D), determine the removability of certain individuals, 8 U.S.C. § 1252(2)(A)–(D), or allow individuals to apply for adjustment of status to permanent residency, 8 U.S.C. § 1255. Through these provisions, "Congress made a deliberate choice to delegate to the Executive Branch, and specifically to the Attorney General, the authority to allow deportable aliens to remain in this country *in certain specified circumstances.*" *INS v. Chadha*, 462 U.S. 919, 954, 103 S.Ct. 2764, 2786, 77 L.Ed.2d 317 (1983) (emphasis added). This preliminary injunction does not change that well-established law. What this preliminary injunction does is bar DHS from unlawfully enacting a blanket 100-day pause which is contrary to law.

**\*51** On that point, "the public is served when the law is followed," *Daniels Health Scis., L.L.C.*

*v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013), and the public will indeed be served if DHS is enjoined from suspending the law. *See League of Women Voters of United States*

*v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). The public interest is "always" served by the execution of removal orders. *Nken*, 556 U.S. at 436, 129 S.Ct. at 1762; *see also Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) (collecting cases to support the proposition that "the public interest in enforcement of the immigration *laws* is significant" (emphasis added)).
The Defendants contend that the "*Executive* administers immigration enforcement *on behalf of the public.*" (Dkt. No. 83 at 49) (emphasis in original). For the Defendants, this means that the public interest is served by the Executive's exercise of its Article II authority as *it* sees fit, including its determination of "whether particular removals are ultimately in the public interest, considering opportunity costs." (*Id.*).

That argument misses the mark because it falsely assumes that the Executive has absolute discretion in immigration enforcement and the execution of final orders of removal, including the discretion to issue a *blanket* pause on removal. As discussed more fully above, the Executive does not have such unending, unanswerable authority, especially where Congress has issued clear mandates limiting Executive discretion such as in section 1231(a)(1)(A) and the APA.

The Court also acknowledges that, as the Intervenors contend, the public is also served when "we do not deliver aliens into the hands of their persecutors." (Dkt. No. 82 at 47) (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 971 (9th Cir. 2011)). The Court finds that this interest is not harmed by this injunction. As explained earlier, DHS still retains discretion in determining how to handle removals in *individual* cases in accordance with the statutes of the INA. DHS and its officers could still choose, for instance, to stay or even cancel removals of certain individuals for humanitarian reasons, a concern the Intervenors bring. *See* 8 C.F.R. §§ 1240.65, 1240.66; (Dkt. No. 82 at 47). DHS is simply not permitted under the veil of "discretion" to flout a federal statute.

Given this, the Court concludes that the potential harms to Texas stemming from the 100-day pause outweigh any potential harms to the Defendants and public interest is served by the injunction. The Court thus finds that Texas has satisfied the final two elements for a preliminary injunction to be issued.

## C. SCOPE OF RELIEF

Since Texas has satisfied the four elements required for a preliminary injunction enjoining the January 20 Memorandum's 100-day pause, the Court now turns to the geographic scope of this injunction.

The Court begins by noting its deep skepticism of nationwide injunctions in general. Four weeks ago, the Court published a detailed and extensive explanation of its decision to issue a temporary restraining order enjoining the Defendants on a nationwide basis. (Dkt. No. 16 at 14). As the Court noted, nationwide injunctions of executive actions have been an area of fierce disagreement in the courts and in legal academia. (Dkt. No. 16 at 14–15) (comparing and discussing cases and articles that illuminate the debate on nationwide injunctions). Given this disagreement, this Court explicitly stated its concern about the issuance of nationwide injunctions by a district court. (*Id.* at 15). Nevertheless,

the Court applied Fifth Circuit precedent in determining that a nationwide scope was appropriate for a temporary restraining order. The Court found that "it is not beyond [its] power, in appropriate circumstances, to issue a nationwide injunction." (*Id.*) (quoting 📑 *Texas*, 809 F.3d at 188). One such "appropriate circumstance" warranting a nationwide injunction is the need for "uniformity" in immigration policies as prescribed by federal law. (*Id.*) (citing 📑 *Texas*, 809 F.3d at 187–88).

**\*52** Applying Fifth Circuit precedent, the Court found that the January 20 Memorandum affects national immigration policy, and in light of Fifth Circuit decisions on this subject, the remedy imposed must be of the uniform nature a nationwide injunction provides. (*Id.* at 16) (citing 📑 *Texas*, 809 F.3d at 187–88). The Court also found that Texas would not be effectively protected from the threatened injuries the 100-day pause would cause since Texas "has persuasively demonstrated a substantial risk of irreparable harm in part because of the potential increased flow of illegal aliens from other states." (*Id.* at 16–17). Given that reasoning, the Court concluded that a nationwide injunction was warranted under the circumstances, (*id.* at 17), but it encouraged the Parties to revisit this subject during the preliminary injunction phase.

Responding to the Court's invitation, the Government proffered new arguments to convince the Court to limit any relief it may afford Texas. *See* (Dkt. No. 83 at 50–52). These arguments, however, fail to carry the day.

First, the Government argues that this Court may not rely on caselaw noting a need for uniform enforcement of immigration law because "removal decisions are inherently discretionary and non-uniform." (*Id.* at 50–51). The Court finds that is not the case. *Individual* removal decisions, as explained in this Order, are indeed inherently discretionary and non-uniform since the Government has discretion in determining an individual's deportation status through a lengthy immigration removal process per the requirements of the INA and corresponding regulations. But this injunction does not enjoin *individual* removal decisions. As described above, it enjoins a *blanket* policy that is contrary to law. The Government makes much of its discretion in individual matters, even noting that "an alien in detention in California is potentially subject to discretionary relief by the Secretary regardless of whether Section C is enjoined." (*Id.* at 51). But nothing in this preliminary injunction changes that. The Government may still conduct an individualized assessment

and afford discretionary relief to that alien if circumstances and the law allow. Or it may not. What it cannot do is "pause" the removal process for nearly every individual with a final order of removal in contravention of the INA and the APA.

Next, the Government argues that Texas has not made a showing that there is a "substantial likelihood that a geographically-limited injunction would be ineffective" in this case. (*Id.*) (quoting 📑 *Texas*, 809 F.3d at 188). This too is unavailing. As discussed in the standing section of this Order, *supra* at section II.A., Texas has demonstrated that the number of aliens who would have been removed from the country but for the 100-day pause would impact its public fisc in part because aliens are "free to move" among the States. The Fifth Circuit has articulated and approved that rationale, and the Court is therefore bound by it. 📑 *Texas*, 809 F.3d at 188. Thus, the Government's argument that Texas has not made the requisite showing is without merit.

Lastly, the Government argues that Texas cannot rely on the APA for a nationwide injunction because "[c]ourts have previously declined to rely upon the APA to issue a nationwide injunction when it was not warranted." (Dkt. No. 83 at 52). As an initial matter, the foregoing analysis demonstrates that a nationwide injunction in this APA case is "warranted." But further, Texas is not exclusively or solely relying on the APA to request a nationwide injunction. Instead, it argues that a nationwide injunction is appropriate because the Court must consider legal precedent requiring "that immigration policy be uniform." (Dkt. No. 62 at 27–28). Texas further asks the Court to consider potential harms to Texas stemming from aliens having the right to freely move among the states. (*Id.*). The Government's argument therefore falls short.

**\*53** To be clear, the Court maintains its reluctance to issue an injunction of "nationwide" scope. But again, the Fifth Circuit's precedent in this area is applicable and controlling. *See* 📑 *Texas*, 809 F.3d at 187–88. Further, no new facts or developments and none of the Defendants' arguments convincingly distinguish the Fifth Circuit's holding. The Court therefore issues this preliminary injunction on a nationwide basis.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Texas's Motion for Preliminary Injunction. (Dkt. No. 62). Therefore, it is hereby **ORDERED** that:

1. Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby **ENJOINED** and **RESTRAINED** from enforcing and implementing the policies described in the January 20 Memorandum in Section C entitled "Immediate 100-Day Pause on Removals." (Dkt. No. 2-2 at 4–5).

2. This preliminary injunction is granted on a nationwide basis and prohibits enforcement and implementation of the policies described in the January 20 Memorandum in Section C entitled "Immediate 100-Day Pause on Removals" in every place Defendants have jurisdiction to enforce and implement the January 20 Memorandum.

3. This preliminary injunction shall remain in effect pending a final resolution of the merits of this case or until a further Order from this Court, the United States Court of

Appeals for the Fifth Circuit or the United States Supreme Court

This Order does not prohibit the Government from carrying out or adhering to the January 20 Memorandum's other sections, entitled "A. Comprehensive Review of Enforcement Policies and Priorities," "B. Interim Civil Enforcement Guidelines," or "D. No Private Right Statement."

No security bond is required under Federal Rule of Civil Procedure 65(c). It is SO ORDERED.

SIGNED this February 23, 2021.

**DREW B. TIPTON**

**UNITED STATES DISTRICT JUDGE**

**All Citations**

Slip Copy, 2021 WL 723856

## Footnotes

1    The use of the term Government throughout this Order is meant to include the United States, the agencies, and the individuals sued in their official capacity.

2    "[I]n the deportation context, a 'final order of removal' is a final order concluding that the alien is deportable or ordering deportation." *Nasrallah v. Barr*, ___ U.S. ___, ___, 140 S.Ct. 1683, 1690, 207 L.Ed.2d 111 (2020).

3    On February 6, 2021, the Court granted Intervenors' Emergency Motion to Intervene as defendants pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. (Dkt. No. 65 at 1–2).

4    In this Order, the Court is specifically not addressing Texas's likelihood of success on its claims that the January 20 Memorandum is unlawful because it violates: (1) the Agreement between Texas and the DHS; (2) the Constitution's requirement that the President "take Care that the Laws be faithfully executed"; and (3) DHS's general responsibility to "Promote the Removal of Illegal Aliens." (Dkt. No. 1 at 9, 11-13, 15). The Court stresses, however, that it is only withholding a ruling on these claims *for now*. In withholding a ruling on these claims, the Court is mindful that, to succeed on its Motion, Texas need only demonstrate a likelihood of success on "at least one" claim, *Texas v. United States*, 86 F. Supp. 3d 591, 672 (S.D. Tex. 2015), which it has. Moreover, given the significance of the substantial interests at stake in this case, the Court finds it to be in the interest of justice to rule after all Parties have had an opportunity to make a complete presentation on the merits of these claims. *See id. at 677.*

5    In a February 2, 2021 letter to the Attorney General of Texas, the Acting Secretary of DHS said of the Agreement:
Notwithstanding that the Document is void, not binding, and unenforceable— and preserving all rights, authorities, remedies, and defenses under the law—this letter also provides notice, on behalf of DHS, U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and U.S.

Citizenship and Immigration Services (USCIS), that DHS, CBP, ICE and USCIS rescinds, withdraws, and terminates the Document, effective immediately.

(Dkt. No. 63-16 at 1).

6 "The policy of my Administration is to protect national and border security, address the humanitarian challenges at the southern border, and ensure public health and safety. We must also adhere to due process of law as we safeguard the dignity and well-being of all families and communities." (Dkt. No. 59-1 at 4).

7 🚩 Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017).

8 While conducting the review, DHS's enforcement priorities are:

1. **National security.** Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the United States.

2. **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020.

3. **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a) (43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

(Dkt. No. 63-1 at 3). Yet, "[w]hile resources should be allocated to the priorities enumerated above, nothing in this memorandum prohibits the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities herein." (*Id.* at 4).

9 The January 20 Memorandum excluded from the 100-day pause any alien with a final removal order who:

1. According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or

2. Was not physically present in the United States before November 1, 2020; or

3. Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver and has been given a meaningful opportunity to access counsel prior to signing the waiver; or

4. For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law.

(Dkt. No. 2-2 at 4–5 (footnote omitted)).

10 U.S. CONST. art. II, § 3.

11 🚩 5 U.S.C. § 706(2)(A).

12 🚩 5 U.S.C. § 553.

13 *See* Department of Homeland Security, *Creation of the Department of Homeland Security*, https://www.dhs.gov/creation-department-homeland-security security (last published Sept. 24, 2015).

14 *See* U.S. Immigration and Customs Enforcement, *Celebrating the History of ICE 2003–2020*, https://www.ice.gov/features/history (last updated Jan. 26, 2021).

15 ICE also houses Homeland Security Investigations ("HSI") and the Office of the Principal Legal Advisor ("OPLA"). U.S. Immigration and Customs Enforcement, *Who We Are*, https://www.ice.gov/about-ice (last updated Feb. 11, 2021).

16 *See* The United States Department of Justice Executive Office for Immigration Review, *About the Office*, https://www.justice.gov/eoir/about-office (last updated Feb. 3, 2021).

17 DHS has authority to remove certain individuals applying for admission into the U.S. "without further hearing or review" unless the individual "indicates either an intention to apply for asylum...or a fear of persecution."

🚩 8 U.S.C. § 1225(b)(1)(A)(i).

18    The Defendants do not quibble with designating expedited removals as "final." (Dkt. No. 82-1 at 17–18 (citing 8 U.S.C. §§ 1225(b)(1)(B)(iii)(III), (C)).

19    Reinstatement of Removal Orders are orders of removal issued to an individual previously ordered removed who then reenters unlawfully. 8 U.S.C. § 1231(a)(5); (Dkt. No. 82 at 14). The Fifth Circuit has characterized a reinstatement order as "not literally an 'order of removal' because it merely reinstates a previously issued order of removal or deportation." *Ojeda-Terrazas v. Ashcroft*, 290 F.3d 292, 295 (5th Cir. 2002).

20    *See* U.S. Immigration and Customs Enforcement, Removal, https://www.ice.gov/remove/removal (last updated Jan. 7, 2021).

21    *Id.*

22    *Id.*

23    Yet, despite ceding this authority, States like Texas are not immune from the consequences of illegal immigration and the manner in which the federal government polices it. *See Arizona v. United States*, 567 U.S. 387, 397, 132 S. Ct. 2492, 2500, 183 L. Ed. 2d 351 (2012) (noting that "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States" and that certain states " bear[ ] many of the consequences of unlawful immigration."); *Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015) (same).

24    For instance, "no justiciable 'controversy' exists when parties seek adjudication of a political question, when they ask for an advisory opinion, or when the question sought to be adjudicated has been mooted by subsequent developments." *Massachusetts v. EPA*, 549 U.S. 497, 516, 127 S.Ct. 1438, 1452, 167 L.Ed.2d 248 (2007) (first citing *Luther v. Borden*, 7 How. 1, 12 L.Ed. 581 (1849); then citing *Hayburn's Case*, 2 Dall. 409, 1 L.Ed. 436 (1792), and *Clinton v. Jones*, 520 U.S. 681, 700, n.33, 117 S.Ct. 1636, 1647, n.33, 137 L.Ed.2d 945 (1997); and then citing *California v. San Pablo & Tulare R. Co.*, 149 U.S. 308, 13 S.Ct. 876, 37 L.Ed. 747 (1893)).

25    Texas also suggests a second type of injury: that the 100-day pause would subject its citizens to an increased risk of criminal harm. (*See* Dkt. No. 62 at 10-11) ("These convicted criminals...present a heightened risk to Texas and Texans.") and ("Should ICE no longer be able to remove those unlawfully present criminals, they would be released into Texas's communities, where they are likely to commit additional crimes."). Whether cognizable here or not, any standing argument based on the federal government's intrusion of Texas's sovereign right to protect its citizens from criminal harm implicates a unique standing doctrine known as *parens patriae. See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607, 102 S.Ct. 3260, 3269, 73 L.Ed.2d 995 (1982) (finding that a State may assert *parens patriae* standing based on its "interest in the health and well-being—both physical and economic— of its residents in general"). Aside from Texas's two comments, however, it has failed to expressly invoke the *parens patriae* doctrine based on the potential of criminal harm to its citizens. The Defendants, following Texas's lead, do not directly address issues surrounding the application of that doctrine to this case. *Cf. Texas*, 86 F. Supp. 3d at 625–28 (addressing well-developed arguments regarding plaintiff-states' alleged *parens patriae* standing based on economic harm to the states' citizens). The Court therefore finds that this *parens patriae* question is not before the Court. *See United States v. Thames*, 214 F.3d 608, 611 n.3 (5th Cir. 2000) (holding issues were waived for inadequate briefing).

26    The Court employs the term "criminal aliens" to refer to those unlawfully present noncitizens who have been convicted of a crime or have criminal charges currently pending against them.

27    As will be discussed *infra*, the federal government reimbursed Texas for a small fraction of its costs for detaining criminal aliens.

28    By the Court's calculation: 241,000 aliens ÷ 1095 days = 220 aliens/day.

29    Texas did not present city-specific removal data for FYs 2017 and 2018.

30    For reasons explained below, the Court excludes a fourth Texas city, El Paso, from this calculation. With El Paso included, ICE removed 76,109 criminal aliens from all of Texas. (Dkt. No. 63- 5 at 6–7).

31    The Defendants do not contend that the rates of removal of criminal aliens by ICE listed here are anomalous.

32    *See also* American Immigration Council, *A Primer on Expedited Removal*, at 2 (July 22, 2019), https:// www.americanimmigrationcouncil.org/sites/default/files/research/primer_on_expedited_removal.p df.

33    It is also noteworthy that Texas takes the lion's share of unaccompanied children sponsorships among states. An unrebutted data set referenced by Texas's Chief School Finance Officer from the U.S. Health and Human Services Office of Refugee Resettlement demonstrates that, for each of the previous seven years, Texas has released more unaccompanied children to sponsors than any other state—with the lone exception of California during FYs 2016 through 2018. (Dkt. No. 63-12 at 3); *see* U.S. Health and Human Services Office of Refugee Resettlement, *Unaccompanied Alien Children Released to Sponsors by State* (Sept. 27, 2019), https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-alien-children-released- sponsors-state.

34    NATIONAL INSTITUTE OF JUSTICE, https://nij.ojp.gov/topics/articles/measuring-recidivism#statistics.

35    The zone of interests test had long been categorized as a matter of "prudential standing" which bore upon a federal court's jurisdiction to review a case. *See* [flag] *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970)*. But the Supreme Court in *Lexmark* partially dissolved the entire category of prudential standing and refined the zone of interests test to inquire whether a particular plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue." [flag] *572 U.S. at 128, 134 S.Ct. at 1387*. This inquiry, the Supreme Court explained, "does not implicate subject- matter jurisdiction." *Id.* at n.4.

36    Texas appears to have misnumbered this claim in its opening Complaint by listing it as "Count IV" when it is actually the fifth Count raised. (Dkt. No. 1 at 14). The Court treats it as such going forward.

37    *See* Bureau of Justice Assistance, *State Criminal Alien Assistance Program (SCAAP)*, at "Legislation" (Mar. 4, 2012), https://bja.ojp.gov/program/state-criminal-alien-assistance-program- scaap/overview#legislation.

38    As stated earlier, [flag] section 1231(h) provides: "Nothing in this section shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."). [flag] *8 U.S.C. § 1231(h)*.

39    "Only the Ninth Circuit ha[d] permitted a petitioner to proceed...to 'enforce' the provisions of [flag] *§ 1252(i)*." [flag] *Medina v. United States, 785 F. Supp. 512, 514 (E.D. Pa. 1992)* (citing cases from several other circuits holding to the contrary).

40    It bears repeating: the Court finds the meaning of [flag] section 1231(h) is unambiguous. *See* [flag] *Deal, 508 U.S. at 132–33, 113 S.Ct. at 1996–97*. And therefore the Court need not determine whether the Government's interpretation of [flag] section 1231(h) in its brief before this Court is owed deference. *See* [flag] *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843–44 & n.9, 104 S.Ct. 2778, 2781–82 & n.9, 81 L.Ed.2d 694 (1984)* (noting "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress" and that "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent"). *But see* [flag] *Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212, 109 S.Ct. 468, 473– 74, 102 L.Ed.2d 493 (1988)* ("We have never applied the principle of [agency deference] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice."). Beyond this, the Court notes that the Government failed altogether to invoke any claim to *Chevron* deference in its construction of [flag] section 1231(h). Rather, the Government cites that case once, (Dkt. No. 83 at 36), for an unrelated proposition. *See* [flag] *Nuestar, Inc. v.*

*FCC*, 857 F.3d 886, 893–94 (D.C. Cir. 2017) (finding the government agency forfeited any claims to *Chevron* deference by "nominally referenc[ing]" that doctrine).

41    8 U.S.C. § 1231(h) was enacted as part of the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA), incorporated as a subsection of the Omnibus Appropriations Act of 1997, Pub. L. 104-208, Div. C, Title III, § 305(h), 110 Stat. 3009-606 (1996). Division C is the enactment of the Conference Report on H.R. 2202, The Illegal Immigration Reform and Immigration Act of 1996 (H.R. REP. NO. 104-828H.R. REP. NO. 104-828 (1996) (Conf. Rep.)). The House adopted Conference Report 104-828 to H.B. 2202, 104th Cong. (1996) as a floor action (142 Cong. Rec. 25868 (1996)) on September 28, 1996, four days after its printing. The Senate adopted the Conference Report (142 Cong. Rec. 26438 (1996) and 142 Cong. Rec. 26634-36) similarly on September 30, 1996. (Pub. L. 104-208, Div. C, Title III, § 305(h) corresponds to subsection 241(h) in bill).

42    The Government briefly discusses *United States v. Fausto*, 484 U.S. 439, 448, 108 S. Ct. 668, 674, 674, 98 L.Ed.2d 830 (1988) to explain that the presence of a "detailed mechanism for review of *some* claims by *some* parties, is " 'strong evidence that Congress intended to preclude [other plaintiffs] from obtaining judicial review.' " (Dkt. No. 83 at 30) (emphasis in original). In *Fausto*, the Supreme Court concluded that because a certain class of employees—classified as "nonpreference excepted service employees"—were not included in the provisions for administrative and judicial review of the Civil Service Reform Act of 1978, Congress did

not intend for them to have a statutory entitlement to judicial review.    *Fausto*, 484 U.S. at 448–49, 108 S.Ct. at 674. The Supreme Court noted that the relevant judicial review provision explicitly included "*preference* eligible excepted service employees" and specifically provided optional inclusion of "*certain* nonpreference excepted service employees with respect to certain protections of the chapter." *Id.* (emphasis in original). Thus, the exclusion of nonpreference excepted service employees was intentional and signaled Congress's desire to exclude from judicial review the claims from those employees. *Id. Fausto* is therefore irrelevant here. As discussed above, the INA's provisions limit judicial review of claims resulting from an *alien or noncitizen's* detention and subsequent order of removal. Indeed, the INA's "theme" has been described as an "aim[ ] to

protect the Executive's discretion from the courts" with respect to *individual* determinations. *See*    *AADC*, 525 U.S. at 486–87, 119 S.Ct. at 945 (listing statutes that aim to limit or bar review of claims arising from (1) the inspections of aliens arriving in the United States, (2) denials of discretionary relief, (3) final orders of removal against criminal aliens, and (4) asylum review determinations). But the statutes do not signal that the INA was enacted to limit a *State's* right to challenge agency action contrary to the INA itself and the APA. Thus, the Court cannot infer that Congress intended to bar Texas's claims through the INA's statutory scheme.

43    Thus,    section 1231(a)(1)(A), like    section 1231(h), is unambiguous. *See*    *Deal*, 508 U.S. at 132–33, 113 S.Ct. at 1996–97. And as with    section 1231(h), the Court need not determine whether the Government's interpretation of    section 1231(a)(1)(A) in its brief before this Court is owed deference. *See*    *Chevron*, 467 U.S. at 843–44 & n.9, 104 S.Ct. at 2781–82 & n.9. *But see*    *Bowen*, 488 U.S. at 212, 109 S.Ct. at 473–74. Here too the Government failed to invoke any claim to *Chevron* deference in its construction of    section 1231(a)(1)(A). *See*    *Nuestar, Inc.*, 857 F.3d at 893–94.

44    This proposition does not include circumstances in which the President is asked to enforce a law that is unconstitutional or, more specifically, a law that usurps Executive authority. *See* Calabresi & Prakash, *supra* at 621–22.

45    The Government attempts to expand upon the Attorney General's discretion to grant stays of removal under    section 1231(c)(2) and 8 C.F.R. § 241.6. (Dkt. No. 83 at 16). The statute provides that the Attorney General "may" stay the removal of "an alien" if one of two conditions is satisfied: "(i) immediate removal is not practicable or proper; or (ii) the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State."    8 U.S.C. § 1231(c)(2). A regulation expanding on section 1231,

8 C.F.R. § 241.6, accords government officials with "discretion" to grant a "request" for a stay of removal from "an alien" after considering certain factors, including those listed in section 1231(c). The Court is unpersuaded that Congress's prescription for the exercise of discretion in *one* area of removal is to serve as a delegation of the *whole* of Congress's authority to suspend or dispense with statutory mandates.

46    In an Order cited by the Intervenors, (Dkt. No. 82-1 at 19–20), the U.S. Department of Health and Human Services Centers for Disease Control and Prevention ("CDC") on October 13, 2020 authorized the CDC Director "to suspend the right to introduce persons into the United States" because of the COVID-19 pandemic. CDC, *Order Suspending Introduction of Certain Persons Where a Communicable Disease Exists*, (Mar. 20, 2020), available at https://bit.ly/3736Lue (updated Oct. 2020). Particularly, the Order "applies to persons traveling from Canada or Mexico (regardless of their country of origin) who would otherwise be introduced into a congregate setting in a land or coastal Port of Entry (POE) or Border Patrol station at or near the United States borders with Canada or Mexico, subject to the exceptions detailed below." *Id.* In light of this Order, the Intervenors' expert testifies that "a large number of summary expulsions have been effectuated by CBP under Title 42 of the U.S. Code since March 2020 in the name of addressing the COVID-19 pandemic." (Dkt. No 82-1 at 19–20). Given the Order and the expert's own testimony, the Court is left with the question *why* DHS has now apparently gone against the CDC Order and its own practices from only a few months prior to address similar COVID-19 concerns which the Order was supposed to answer. Thus, at least on its COVID-19 concerns, DHS seems to have "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867.

47    The Intervenors argue that if the Court finds DHS's explanation for the pause "unclear or incomplete," it should not halt the pause and instead remand the matter to DHS in order for the agency to provide a clearer rationale on its decision to implement the pause. (Dkt. No. 82 at 38). The Court acknowledges that caselaw generally indicates that the proper remedy for an arbitrary and capricious finding is to remand the matter back to the agency to afford the agency an opportunity to provide a reasoned explanation. *See Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000); *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966–67 (D.C. Cir. 1990). This, however, is of no matter here. The Court has found s*upra* that DHS's 100-day pause is contrary to law, that is, 8 U.S.C. 1231(a)(1)(A). Further, as this is a ruling on a preliminary injunction, this is not a final ruling on the merits in any case.

48    " '[R]ule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency...." 5 U.S.C. § 551(4).

49    Specifically, the APA requires that "[g]eneral notice of proposed rule making *shall* be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law." 5 U.S.C. § 553(b) (emphasis added). That notice *shall* contain "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* The APA also requires an agency to "give interested persons an opportunity to participate in the rule making." *Id.* § 553(c). Additionally, the APA requires that, subject to certain exceptions, the "publication or service of a substantive rule shall be made not less than 30 days before its effective date." *Id.* § 553(d).

50    The Fifth Circuit has relied on the D.C. Circuit in describing the criteria for determining whether a rule is a general statement of policy or a substantive rule requiring notice and comment. *See Shalala*, 56 F.3d at 595 n.15–16 (citing *Cmty. Nutrition Inst.*, 818 F.2d at 943, and *Am. Bus Ass'n*, 627 F.2d at 529).

51    The Fifth Circuit and the D.C. Circuit have emphasized that "unless a pronouncement acts prospectively, it is a binding norm. Thus...a statement of policy may not have a present effect...." *Shalala*, 56 F.3d at 595; *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C. Cir. 1987). The 100-day pause's pronouncement has a present effect. Indeed, the January 20 Memorandum calls for an "*immediate* pause on removals...." (Dkt. No. 63-1 at 4) (emphasis added). The Fifth Circuit cautions, however, that the "binding effect, *not the timing*,...is the essence of criterion one." *Shalala*, 56 F.3d at 595 (emphasis added). Thus, the "[m]ere pronouncements of what the agency intends, whether for the present or for the future, which do not have a binding effect, are properly classified as interpretative rules." *Cmty. Nutrition Inst.*, 818 F.2d at 946 n.4. This caveat is of no consequence here because the Court finds that 100-day pause has a binding effect due to its effect on the rights and obligations described.

52    Defendants point the Court to the Supreme Court's decision in *Vigil*, 508 U.S. 182, 113 S.Ct. 2024 to support their assertion that the 100-day pause on removals affords sufficient discretion for the Court to classify it as a general statement of policy. (Dkt. No. 83 at 41). That case does not control the disposition of the present case for two reasons. First, in *Vigil*, the relevant statutory criteria granted the Indian Health Service significant "discretionary authority" to allocate and reallocate resources. 508 U.S. at 198, 113 S.Ct. 2034–35. Here, in contrast, section 1231 commands that DHS "*shall* remove [an] alien [with a final order of removal] from the United States within a period of 90 days...." § 1231(a)(1)(A) (emphasis added). Second, the Service's challenged action in *Vigil* did not involve "modify[ing] eligibility standards" for the care the Service was providing. 508 U.S. at 198–99, 113 S.Ct. at 2035. In contrast, the January 20 Memorandum *does alter* the standards by which DHS determines whether a person with a final order of removal will be deported, as will be discussed in the Procedural Rule section, *infra*.

53    Joining the State of New York in its brief as amici are the Commonwealths of Massachusetts and Virginia, the District of Columbia, and the States of California, Connecticut, Delaware, Illinois, Maryland, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont, and Washington. (Dkt. No. 81 at 6).

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.