**MARK BRNOVICH**
**ARIZONA ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joseph A. Kanefield (No. 15838)
Brunn (Beau) W. Roysden III (No. 28698)
Drew C. Ensign (No. 25463)
Anthony R. Napolitano (No. 34586)
Robert Makar (No. 33579)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Joe.Kanefield@azag.gov
Beau.Roysden@azag.gov
Drew.Ensign@azag.gov
Anthony.Napolitano@azag.gov
Robert.Makar@azag.gov
*Attorneys for Plaintiffs State of Arizona
and Mark Brnovich in his official capacity*

**AUSTIN KNUDSEN**
**MONTANA ATTORNEY GENERAL**

David M. Dewhirst*
   *Solicitor General*
215 N Sanders St.
Helena, MT 59601
Phone: (406) 444-4145
David.Dewhirst@mt.gov

*pro hac vice* forthcoming

*Attorneys for Plaintiff State of Montana*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona; State of Montana; and Mark Brnovich, in his official capacity as Attorney General of Arizona, | No. 2:21-cv-00186-SRB |
| Plaintiffs, | **MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| United States Department of Homeland Security; United States of America; Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security; Troy Miller, in his official capacity as Acting Commissioner of United States Customs and Border Protection; Tae Johnson, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; and Tracy Renaud, in her official capacity as Acting Director of U.S. Citizenship and Immigration Services, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 4

LEGAL STANDARD ...................................................................................................... 6

ARGUMENT ................................................................................................................... 7

I.    Plaintiffs are Likely to Prevail on the Merits of Their Claims ............................... 7

    A.    DHS's Failure to Consider Alternatives Was Arbitrary and Capricious ...... 7

    B.    DHS Also Failed To Comply with Notice-And-Comment Requirements ................................................................................................. 9

        1.    The Removal Moratorium Is a "Rule" Under the APA, and DHS's Creation Of The Memorandum Was "Rulemaking" ............. 10

        2.    The Memorandum Does Not Fall Within The Subject-Matter Exclusion Or Good-Cause Exception ................................................. 10

    C.    The Removal Moratorium Is Contrary to 8 U.S.C. § 1231(a)(1)(A) .......... 13

    D.    DHS Did Not Follow the Agreements with Arizona and Montana, Resulting in Agency Action Contrary to Law ............................................. 14

II.    Plaintiffs will Suffer Irreparable Harm if an Injunction is not Granted ................ 14

    A.    DHS Has Admitted in the Agreements that Plaintiffs Face Irreparable Injury ......................................................................................................... 16

    B.    Plaintiffs Will Be Forced to Spend Money That Will Not Be Reimbursed For Healthcare and Law Enforcement Services for Unauthorized Aliens Present in the State .................................................. 16

        1.    A Pause In Removals Will Increase Incarceration Costs Because Some Unremoved Aliens Would Be Detained In Arizona ............... 17

        2.    The Memorandum Encourages Greater Unauthorized Traffic Leading To Greater Law Enforcement Expenditures And Investigations in Plaintiff States ......................................................... 18

        3.    Some Unremoved Aliens Would Use Emergency Medical Services In Arizona Without Federal Reimbursement ...................... 21

        4.    Courts Have Previously Found Similar Evidence Sufficient to Show Irreparable Injury ................................................................. 22

III.    A Preliminary Injunction Would Not Harm Defendants or the Public .............. 23

CONCLUSION .............................................................................................................. 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

States, including Arizona and Montana, necessarily must depend on the federal government to enforce the immigration laws and protect against the negative impacts of unlawful immigration on public safety, public health, and government finances.   The federal government, to the exclusion of the States, "has broad, undoubted power over the subject of immigration and the status of aliens."  *See Arizona v. United States*, 567 U.S. 387, 394-95 (2012).  Given the States' compelled reliance on the federal government in the immigration context, Congress unsurprisingly has enacted measures to ensure the executive branch actually takes steps to enforce federal immigration law.   One such requirement is the mandate that the Secretary of Homeland Security "shall remove" an alien within 90 days after a final order of removal.  *See* 8 U.S.C. § 1231(a)(1)(A).  And the strains that COVID-19 has put on States heighten the need for federal protection as required by law, so that healthcare systems and jails are not further burdened by failures in the immigration system at this perilous time.

But to Defendants, the unambiguous "shall" command in § 1231 actually means essentially "won't."  The Acting DHS Secretary effected a major policy change on the new administration's first day in office through a memorandum titled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities."  Exhibit A (the "Memorandum").[1]   Section C established an "immediate pause on removals of any noncitizen with a final order of removal (except as noted [in the Memorandum]) for 100 days to go into effect as soon as practical and no later than January 22, 2021."  *Id.* at 3 (the "Removal Moratorium").  Statutory violations are rarely so plain as reading "shall" to mean "shall not."

Equally plain are Defendants' patent violations of the Administrative Procedure Act ("APA").   As an initial matter, the Removal Moratorium is self-evidently a rule issued without notice and comment, and does not even attempt to invoke the good-cause exception (which must be asserted contemporaneously with the rule).  The Removal

---

[1] Exhibits A-K are filed in this matter at Dkt. 12-1.  Pursuant to LRCiv 7.1(d)(1), Dkt 12-1 Exhibits A-K are incorporated herein and will not be refiled.

Moratorium is thus invalid on that basis alone.

Even more striking, DHS's decision-making was so slipshod that it cannot state *who* actually made the decision at issue. Specifically, DHS has been forced to admit that it does not even know who "authored" the Memorandum prior to its issuance.[2] It is clear from administrative record, however, that the unknown decision-maker did not engage in *any* prior consultation with *anyone*—inside or outside the federal government—about the anticipated effects and costs of the Removal Moratorium, including the number of aliens with final removal orders who will be released from ICE custody and the detrimental impacts on public safety, health, and state and local finances from such releases. *See* Admin. Record at AR_000001-7, *Texas v. United States*, No. 6:21-cv-00003 (S.D. Tex. Feb. 3, 2021), ECF No. 59-1 (hereinafter Admin. Record). It is uncertain whether any federal court ever encountered this particular species of arbitrary-and-capricious decision-making in the modern era, where the parties cannot even identify *who* made the decision, let alone what that person's reasoning was.

Even if anyone were willing to acknowledge their authorship of the Removal Moratorium, it would remain substantively indefensible. The administrative record here is paper-thin: literally just seven pages in the Texas suit, consisting of just the Biden Executive Order and the Memorandum itself. This flimsy record is fatal since it is a "fundamental rule of administrative law … that a reviewing court … must judge the propriety of [agency] action solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Here, the administrative record has no genuine reasoning, and Defendants accordingly have no genuine defense.

Undoubtedly recognizing that the initial Removal Moratorium is legally untenable, Defendants have begun *post hoc* patching of the Order's most obvious deficiencies, but those efforts are both too little and too late. Specifically, on February

---

[2] It further has had to "acknowledge[] that the .pdf version of the [Memorandum] on the DHS website purports to identify Esther M. Olavarria as an 'author' of the document" but claims to "lack[] knowledge as to what role, if any, Ms. Olavarria had," other than vaguely stating she "provid[ed] substantive input." Ms. Olavarria appears to be a White House staffer, not anyone working at DHS.

18, 2021, the Acting Director of ICE then issued "Interim Guidance" that purported to supersede the Memorandum to the extent the two conflict. *See* Exhibit G at 1. But this Interim Guidance was simply an attempt to quickly paper over the sparse administrative record without changing the Removal Moratorium's substance. It further cannot cure the illegalities of the initial Removal Moratorium—which remains in place today—since it is clearly pretextual in nature. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573 (2019) (uncontested that decision resting on "pretextual basis" "warrant[s] a remand to the agency"). Whatever reasoning Defendants belatedly offer, it is obvious that the true *and sole* reason for the Removal Moratorium is simply "because the White House told us to do so." And it still is insufficient substantive reasoning if accepted at face value (to say nothing of the still uncured notice-and-comment violation).

This Court should preliminarily enjoin the Removal Moratorium (including as embodied in the Interim Guidance).[3] Plaintiffs are likely to prevail on their claims for four reasons. **First**, the Removal Moratorium is arbitrary and capricious under 5 U.S.C. § 706(2)(A), because DHS did not consider harms and alternatives to a nearly blanket pause on removals that would still allow it to effect its stated goal of comprehensively reviewing enforcement policies and priorities. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (*Regents*); *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 51 (1983) (*State Farm*).

**Second,** the Removal Moratorium squarely violates the APA's notice-and-comment requirement for rulemaking, *see* 5 U.S.C. §§ 553, 706: it plainly is a legislative rule and Defendants have not even tried to invoke the good-cause exception.

**Third**, the Removal Moratorium is contrary to law in violation of 5 U.S.C. § 706(2)(A), (C). Many aspects of our immigration system afford "broad discretion [to] immigration officials." *Arizona*, 567 U.S. at 396. But this case does not arise in one. Nor is the Removal Moratorium an exercise of discretion in any sense of that word; rather, it is a *prohibition* on immigration officials' exercising their discretion, and it

---

[3] Except as otherwise noted, "Removal Moratorium" herein refers both to that moratorium in the Memorandum and in the subsequent Interim Guidance.

establishes a policy to violate 8 U.S.C. § 1231(a)(1)(A)'s unequivocal mandate to process final orders of removal within 90 days. And while this "pause" purports to be for 100 days, there is no explanation provided why it could not be extended.

*Fourth*, even if the Removal Moratorium is not subject to notice-and-comment rulemaking, DHS agreed to "consult [Plaintiffs] and consider [their] views before taking any action ... that could: ... pause or decrease the number of returns or removals of removal or inadmissible aliens from the country."[4] The Agreements contain an express severability clause, Ex. C at 6 and Ex. H at 6, and at minimum DHS can be held to "[c]onsider[ing]" Plaintiffs input and "provid[ing] a detailed written explanation of the reasoning behind any decision to reject [that] input before taking any action." *Id.* at 4.

Plaintiffs are also able to establish the other factors warranting injunctive relief.

## FACTUAL BACKGROUND

On January 20, 2021, Acting Secretary Pekoske issued the Removal Moratorium "directing an immediate pause on removals of any noncitizen with a final order of removal (except as noted below) for 100 days." Ex. A at 3 (footnote omitted).

The Removal Moratorium includes only four narrow exceptions. "The pause on removals applies to any noncitizen present in the United States when [the Memorandum] takes effect with a final order of removal except one who:

1. According to a written finding by the Director of ICE, has engaged in or is suspected of terrorism or espionage, or otherwise poses a danger to the national security of the United States; or
2. Was not physically present in the United States before November 1, 2020; or
3. Has voluntarily agreed to waive any rights to remain in the United States, provided that he or she has been made fully aware of the consequences of waiver and has been given a meaningful opportunity to access counsel prior to signing the waiver; or
4. For whom the Acting Director of ICE, following consultation with the General Counsel, makes an individualized determination that removal is required by law."

*Id.* at 3-4 (footnote omitted). The Memorandum provided that the Removal Moratorium

---

[4] *See* Agreement Between DHS and the Arizona Attorney General's Office and the Arizona Department of Law (the "AZ Agreement"), Ex. C at 3-4; Agreement Between DHS and the State of Montana, CITE (the "MT Agreement"). The AZ Agreement and MT Agreement are collectively referred to as the "Agreements."

will "go into effect as soon as practical and no later than January 22, 2021." *Id.* at 3. When in effect, the Removal Moratorium prohibits immigration officials from carrying out any other removals even after the issuance of final removal orders.

DHS made no attempt to follow the APA's notice-and-comment procedures in issuing the Memorandum/Removal Moratorium. Indeed, the Acting Secretary (in whose name the memorandum was issued) did not solicit Plaintiffs' (or anyone else's) input regarding the effects of the Removal Moratorium or alternatives to that moratorium. *See* Admin. Record at AR_000001-7.[5] That seven-page record consists in its entirety of Executive Order 13993 and the Memorandum. Executive Order 13993 does not itself call for any sort of 100-day pause on processing removals pursuant to 8 U.S.C. § 1231. Instead, it provides "(a) Nothing in this order shall be construed to impair or otherwise affect (i) the authority granted by law to an executive department or agency, or the head thereof" and "[t]his order shall be implemented consistent with applicable law." *Id.* at AR_000001. As for the Memorandum, it does not consider any of the significant harms that Plaintiffs will likely face as a result of DHS largely suspending the removal of aliens with final removal orders. *See id.* at AR_000003-7. Nor did it provide a reasoned explanation for the sudden change in DHS policy or why 100 days, as opposed to 50, 200, or some other number of days, was necessary for DHS's stated goal of comprehensively reviewing enforcement policies and priorities. *See id.*

DHS previously entered into the AZ Agreement with the Arizona Attorney General's Office and Arizona Department of Law, which are agencies of Plaintiff State of Arizona under the direction and control of Plaintiff Arizona Attorney General Brnovich. *See* Exhibit C. DHS also previously entered into the MT Agreement with Governor Greg Gianforte and Montana Attorney General Austin Knudsen. Exhibit H.

---

[5] DHS had to admit that even looking outside of the administrative record, the Acting Secretary consulted only with his Chief of Staff, two Deputy Chiefs of Staff, the Assistant Secretary for Border Security and Immigration Policy, and two members of the Biden-Harris Transition's "DHS Agency Review Team." Exhibit 19 to Reply In Support of Preliminary Injunction at 4-5, *Texas v. United States*, No. 6:21-cv-00003 (S.D. Tex. Feb. 16, 2021), ECF No. 84-1. In other words, the Acting Secretary did not even directly consult with the Acting Director of ICE before imposing a Removal Moratorium that effectively prohibits ICE's exercise of discretion in carrying out removals.

DHS did not follow the procedures outlined in the Agreements before issuing the Memorandum. Among other things, DHS did not notify Plaintiffs that it was considering such changes, did not consult with Plaintiffs about such changes, and did not provide an explanation in writing rejecting Plaintiffs' input about such changes.[6]

On January 26, 2021, the U.S. District Court for the Southern District of Texas issued a nationwide TRO of the Memorandum's Removal Moratorium. *See* Ex. B (providing copy of Court's Order). DHS admitted that prior to the TRO, it released 27 aliens in the Phoenix area with final orders of removal in the few days that the Removal Moratorium was in effect. *See* Declaration of Robert Guadian at 5 ¶10, *Texas v. United States*, No. 6:21-cv-00003 (S.D. Tex. Feb. 8, 2021), ECF No. 40-1. The District Court extended its TRO through February 23, 2021, and subsequently issued a preliminary injunction on that date. *Texas v. United States*, No. 6:21-cv-00003, 2021 WL 723856 (S.D. Tex. Feb. 23, 2021), attached as Exhibit K. The Interim Guidance, which is not covered by the Texas Court's Order but is challenged here in the Amended Complaint and this Motion, does not purport to rescind the Memorandum and states that it applies separately from the Texas Court's injunction. Ex. G at 3 n.3.

## LEGAL STANDARD

Plaintiffs seek a preliminary injunction under Rule of Civil Procedure 65(a) for the purpose of "preserv[ing] the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). As the moving party, a plaintiff can obtain a preliminary injunction by showing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [its] favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).[7]

---

[6] DHS entered into similar agreements with Alabama, Indiana, Louisiana, South Carolina, West Virginia, and the Sheriff of Rockingham County in North Carolina. Exhibit 19 to Reply In Support of Preliminary Injunction at 4-5, Texas v. United States, No. 6:21-cv-00003 (S.D. Tex. Feb. 16, 2021), ECF No. 84-1.

[7] The APA also empowers a "reviewing court" to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

**I.    Plaintiffs are Likely to Prevail on the Merits of Their Claims**

Plaintiffs are likely to succeed on the merits of their challenges to the Removal Moratorium.  First, the Removal Moratorium is arbitrary and capricious because it was issued without a reasoned justification and indication that DHS considered alternative approaches representing a more limited policy or the costs of adopting it.  Second, DHS failed to follow notice-and-comment requirements under the APA in issuing the Removal Moratorium.  Third, making it official DHS policy not to remove aliens with final orders of removal violates the mandatory statutory command *to remove* such aliens within 90 days under 8 U.S.C. § 1231. Notably, the Southern District of Texas held these three claims have a substantial likelihood of success as to the Memorandum's Removal Moratorium.  *Texas,* 2021 WL 723856, at \*39-48.  Fourth, DHS issued the Removal Moratorium without notice or consultation, despite the AZ and MT Agreements.

**A.    DHS's Failure to Consider Alternatives Was Arbitrary and Capricious**

The Removal Moratorium violates the APA's prohibition on agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Courts require that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *State Farm*, 463 U.S. at 42.  The Removal Moratorium is arbitrary and capricious because DHS issued it without considering more limited, alternative policies and because DHS failed to weigh the costs of its adoption or provide other sufficient reasoned justification.

DHS's failure to consider more limited alternative policies in issuing the Removal Moratorium renders it arbitrary and capricious.   As the Supreme Court explained, "when an agency rescinds a prior policy[,] its reasoned analysis must consider the "alternative[s]" that are "within the ambit of the existing [policy]." *Regents*, 140 S.

pending conclusion of the review proceedings." 5 U.S.C. § 705. A stay of the Memorandum and Interim Guidance's effective date should issue "to the extent necessary to prevent irreparable injury" and "[o]n such conditions as may be required." *Id.*.

Ct. at 1913 (quoting *State Farm*, 463 U.S. at 51).  There, DHS issued a policy change by memorandum that "contain[ed] no discussion of" important alternative options and "[t]hat omission alone render[ed]" the "decision arbitrary and capricious."  *Id.*

Although it had just recently lost *Regents*, DHS remarkably failed to heed *Regents*' admonition.  The "Memorandum not only fails to consider potential policies more limited in scope and time, but it also fails to provide any concrete, reasonable justification for a 100-day pause on deportations."  *Texas*, 2021 WL 247877, at *4 (S.D. Tex. Jan. 26, 2021).  It creates a default *against* removal following a final removal order, despite federal immigration law requiring removal following such an order.  The Memorandum does not explain how adopting a broad no-removal policy with only a few narrow terrorism-based exceptions advances the stated interests that precipitated it, nor does it explain why other exceptions—that is, additional enforcement of duly enacted immigration laws—would harm those interests.  Because the Memorandum is wholly devoid of explanation as to why DHS has deemed enforcement categorically inappropriate, let alone why highly restricted enforcement is preferable to more limited restrictions on ICE officials' discretion, the Removal Moratorium is arbitrary and capricious under the Supreme Court's *Regents* and *State Farm* standard.

Additionally, the Removal Moratorium is arbitrary and capricious because it fails to consider important costs of a new policy and because it fails to, in general, provide other sufficient reasoned explanation for its adoption.  "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'"  *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015).  DHS ignored the harms its policy will cause.  The Memorandum and Interim Guidance do not mention those impacts at all.  Considering such policy concerns "was the agency's job, but the agency failed to do it."  *Regents*, 140 S. Ct. at 1914.

Because the Memorandum and Interim Guidance do not sufficiently justify itself, DHS acted arbitrarily and capriciously.  Any new explanations that may be provided to this Court by DHS's counsel are irrelevant.  "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was

based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

Similarly, the Interim Guidance is simply an attempt to quickly paper over the sparse administrative record without changing the Removal Moratorium's substance, and it does not—and cannot—cure the underlying procedural defects. *See Dep't of Commerce*, 139 S. Ct. at 2573 (uncontested that decision resting on "pretextual basis" "warrant[s] a remand to the agency"). The Supreme Court in *Department of Commerce* rejected an agency's rationale it deemed to be *post hoc* and contrived. *See id.* at 2573-76. As discussed, DHS's Removal Moratorium was arbitrary and capricious because it failed to consider more limited policies, consider important costs, and provide a reasoned explanation for its adoption. The only explanations for the Removal Moratorium provided by DHS in either document are opaque references to DHS's limited resources. *See* Ex. A at 3. Absent, however, is any evidence that DHS considered resource constraints when enacting the Moratorium. Moreover, at no point did DHS explain how halting all removals for 100 days accomplishes its stated goals under these allegedly unique circumstances. As the *Texas* Court found:

> [T]he law *does* require DHS to explain why a 100-day pause is needed by showing how the policy is logically and reasonably connected to DHS's asserted reasons. This, DHS did not do. And without that rationale explained—or even at least apparent—in the record, the choice is arbitrary and capricious.

2021 WL 723856 at *42.

Additionally, even if the Interim Guidance were to provide sufficient justification for the Removal Moratorium, it would create an impermissible mismatch between the evidence in the administrative record and the new rationale presented to the reviewing court. *See Dep't of Commerce*, 139 S. Ct. 2575-76. Thus, DHS is now precluded from offering an explanation, reasoned or otherwise, that justifies the incongruence between the Memorandum and the administrative record. *See id.* at 2575.

**B.    DHS Also Failed To Comply with Notice-And-Comment Requirements**

Plaintiffs are also likely to prevail because the APA required DHS to provide notice and an opportunity to comment before issuing the Removal Moratorium, which it

failed to do.  *See* 5 U.S.C. §§ 553, 706.  Nor does the Removal Moratorium fall within any of the exceptions to notice-and-comment rulemaking under the APA.

### 1.   The Removal Moratorium Is a "Rule" Under the APA, and DHS's Creation Of The Memorandum Was "Rulemaking"

The Removal Moratorium is a substantive rule that is required to undergo notice and comment under the APA.  The APA defines a "rule" as:

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency ….

5 U.S.C. §551(4).  A rule "includes 'nearly every statement an agency may make.'" *Milk Indus. Found. v. Glickman*, 949 F. Supp. 882, 893 (D.D.C. 1997) (quoting *Ctr. for Auto Safety v. NHTSA*, 710 F.2d 842, 846 (D.C. Cir. 1983)).  "The breadth of this definition cannot be gainsaid." *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980).

The Removal Moratorium, as embodied in both the Memorandum and Interim Guidance, is a statement directing a mandatory change in DHS operations with an immediate effective date.  Ex. A at 3; Ex. G at 1.  Its application is comprehensive to all cases that do not fall within the narrow exceptions it draws.  And it does not allow for deviation or variance except where ICE's Director makes a "written finding" that the individual "has engaged in or is suspected or terrorism or espionage" or otherwise makes "an individualized determination."  The Removal Moratorium is thus a rule.

Finally, because the Removal Moratorium is a "rule" under the APA, it necessarily follows that the DHS's process of creating the memorandum was a "rulemaking" under the APA.  *See* 5 U.S.C. §551(4) (defining "rule making" simply as an "agency process for formulating, amending, or repealing a rule").

### 2.   The Removal Moratorium Does Not Fall Within The Subject-Matter Exclusion Or Good-Cause Exception

While the APA provides exceptions where an agency statement does not require notice and comment, neither applies to the Removal Moratorium.   These are:

(1) "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" and (2) "when the agency for good cause finds … that notice and public procedure thereon are impracticable, unnecessary or contrary to the public interest." 5 U.S.C. § 553(b)(3)(A)-(B).

The APA distinguishes between legislative and interpretive rules. "Legislative rules, also known as substantive rules, are those which effect a change in existing law or policy, … or which impos[e] general, extra-statutory obligations pursuant to authority properly delegated by the legislature." *Reno-Sparks Indian Colony v. U.S. E.P.A.*, 336 F.3d 899, 909 (9th Cir. 2003) (internal quotation marks omitted). "Interpretive rules on the other hand, 'merely clarify or explain existing law or regulations.'" *Id.* (quoting *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1984). The Ninth Circuit "construe[s] narrowly the APA's interpretive rule exception." *Id.*

The Removal Moratorium not a mere interpretive rule because it changes DHS policy by immediately halting normal agency removal operations and formalizing nearly blanket non-compliance with the 90-day removal provisions of 8 U.S.C. § 1231. As an official announcement that DHS will cease complying with the statute directing one of its primary operations, the removal of aliens who have been ordered removed from the United States, the Removal Moratorium cannot be classified as "interpretive" of that statute. Rather it "effects a change in existing law or policy" and thus is a substantive rule that cannot escape the APA's notice and comment requirements. *Id.*; 5 U.S.C. § 553.

For similar reasons, the Removal Moratorium cannot be considered a general statement of policy. "[A] 'general statement of policy' is one that does not impose any rights and obligations." *Community Nutrition Institute v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987). General statements of policy "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012-13 (9th Cir. 1987). Far from "prospectively" advising the public, the Removal Moratorium affects rights of those who arrived pre-November 1, and it creates costs for states immediately upon becoming effective. Ex. A at 3.

The Removal Moratorium also is not a rule of agency organization, procedure, or practice.   Procedural rules "are those that are 'legitimate means of structuring [the agency's] enforcement authority.'" *Erringer v. Thompson,* 371 F.3d 625, 633 n. 15 (9th Cir.2004) (alteration in original) (quoting *Am. Hosp. Ass'n v. Bowen,* 834 F.2d 1037, 1055 (D.C.Cir.1987)).   "In general, a procedural rule does not itself 'alter the rights or interests of parties.'" *Elec. Privacy Info. Ctr. v. U.S. Dept. of Homeland Sec.,* 653 F.3d 1, 5 (D.C. Cir. 2011) (quotation marks and citation omitted). "Procedural rules ... are 'primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties.'" *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (quoting *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980)).   By contrast, "[s]ubstantive rules are ones which grant rights, impose obligations, or produce other significant effects on private interests." *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987).

At a minimum, the Removal Moratorium effectively grants this entire class of aliens-ordered-removed—persons who prior to the Memorandum had no right to remain, especially not after the statutory removal period—an illegal blanket extension on their removal order, which must otherwise have been executed within 90 days.  *See* 8 U.S.C. § 1231(a)(1)(A).  As the states in which these individuals remain are obliged to provide medical and social services to these individuals, the Removal Moratorium has the effect of granting rights and creating obligations regarding those services.  *See, e.g.*, 42 C.F.R. § 440.255; *Plyler v. Doe*, 457 U.S. 202 (1982) (states are constitutionally obligated to provide free education to unlawfully present aliens).  This is no mere internal efficiency measure but a substantive rule widely impacting private, state, and local interests.

Finally, DHS also cannot avail itself of the APA's good-cause exception.  To do so, DHS would have needed to have "incorporate[d] the [good cause] finding and a brief statement of reasons therefor in the rules issued."  5 U.S.C. §553(b)(3)(B).  They did not do so here, precluding any reliance on that exception.  *United States v. Picciotto*, 875 F.2d 345, 348 (D.C. Cir. 1989).

**C.      The Removal Moratorium Is Contrary to 8 U.S.C. § 1231(a)(1)(A)**

The Removal Moratorium also violates DHS's statutory obligations.  5 U.S.C. § 706(2)(A), (C).  Federal immigration law requires that "when an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days."  8 U.S.C. § 1231(a)(1)(A) (emphasis added).  That obligation has been transferred to the Secretary of Homeland Security.  *See Clark v. Martinez*, 543 U.S. 371, 375 n.1 (2005).  Now, "DHS has a statutory duty to effect removal within the 90-day period, if possible."  *Ulysse v. Dep't of Homeland Sec.*, 291 F. Supp. 2d 1318, 1325 (M.D. Fla.2003).  But "by ordering a 100-day pause on all removals of aliens already subject to a final order of removal, it appears that the Memorandum is clearly not in accordance with, or is in excess of, the authority accorded to the Attorney General pursuant to 8 U.S.C. § 1231(a)(1)(A)."  *Texas*, 2021 WL 247877, at *3.

Reading § 1231(a)(1)(A)'s "shall remove … within a period of 90 days" language to simultaneously allow DHS to issue a blanket pause exceeding that time period "contravenes the unambiguous text."  *Id.*  "'[T]he word 'shall' usually connotes a requirement' … Here, 'shall' means *must*."  *Id.* (quoting *Me. Cmty. Health Options v. United States*, ___ U.S. ___, 140 S.Ct. 1308, 1320 (2020) and *Tran v. Mukasey*, 515 F.3d 478, 481-82 (5th Cir. 2008) ("[W]hen a final order of removal has been entered against an alien, the government *must* facilitate that alien's removal from the United States within ninety days.")).  The Removal Moratorium contravenes the specific statutory mandate in § 1231(a)(1)(A) and goes far beyond the discretion afforded an agency tasked with carrying out such a clear and direct command.  *Id.* ("Where Congress uses specific language within its immigration statutes to direct the Attorney General toward a specific result, courts are not free to assume based on a matrix of principles, statutes, and regulations that the Attorney General's authority is simply 'a matter of discretion.'" (quoting *Zadvydas v.* Davis, 533 U.S. 678, 688 (2001))).

The Removal Moratorium is not designed to help DHS comply with its statutory obligations but rather to make compliance impossible.  By "pausing" removals for 100

days, DHS has ensured it cannot meet the 90-day removal deadline for numerous aliens already ordered removed or ordered removed within the first ten days of the Removal Moratorium's effective period.  This is a violation of 8 U.S.C. § 1231(a)(1)(A).

### D.     DHS Did Not Follow the Agreements with Arizona and Montana, Resulting in Agency Action Contrary to Law

The Agreements require DHS to notify and consult with the Arizona Attorney General and the State of Montana before "pausing or decreasing the number of returns or removals of removable or inadmissible aliens from the country."  Ex. C § III.A.2.c; Ex. H § III.A.2.c.  But DHS did not notify or consult with the Attorney General before "directing an immediate pause on removals" in the Removal Moratorium.  Ex. A at 3.  As a result, the Removal Moratorium is invalid, and Plaintiffs are entitled to injunctive relief.  *See* Ex. C § VI; Ex. H § VI.

The Memorandum provides no explanation for failing to follow the Agreements, nor any acknowledgement of it.  (As discussed below, that is an independent problem under the APA. *See infra* Part I.B.2.)  DHS's disregard of the Agreement in the Removal Moratorium is inconsistent with its earlier statement that the Agreement is "a binding and enforceable commitment between DHS and [Plaintiffs]." Ex. C § II; Ex. H § II.[8]

## II.     Plaintiffs will Suffer Irreparable Harm if an Injunction is not Granted

Plaintiffs are also likely to suffer irreparable harm in the absence of the requested preliminary injunction and demonstrate this in two ways:  First, DHS admitted that policies like the Removal Moratorium irreparably injure Plaintiffs.  Second, Plaintiffs are submitting declarations quantifying some of the unrecoverable financial costs of incarceration of unremoved alien criminals, the increased drug trade and related crime, law enforcement activity in cooperation with the U.S. Border Patrol, and providing emergency medical care to unauthorized aliens, which will be increased by the Removal

---

[8]  This defect also causes the Removal Moratorium to violate of 5 U.S.C.§706(2)(A), (D). For this reason, the APA requires the Court to "hold unlawful and set aside" the Removal Moratorium.  *Id.*§706(2).  In the alternative, the Court should enjoin the individual defendants from enforcing the Removal Moratorium because such enforcement would be *ultra vires* and beyond the authority the agency defendants could delegate.

Moratorium, irreparably harming Plaintiffs.[9]

To establish irreparable harm, Plaintiffs must show "a sufficient causal connection between the alleged irreparable harm and the activity to be enjoined," but "need not further show that the action sought to be enjoined is the exclusive cause of the injury." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (internal quotation marks omitted).  Irreparable harm exists where there is no adequate legal remedy to cure the harm.  *See Arizona Recovery Hous. Ass'n v. Arizona Dep't of Health Services*, 462 F. Supp. 3d 990, 997 (D. Ariz. 2020).  Further, "where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable" and "[i]ntangible injuries may also qualify as irreparable harm, because such injuries 'generally lack an adequate legal remedy.'"  *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) (quoting *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) and *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014)).  "The mere fact that the damages are susceptible to quantification … does not necessarily mean that a [PI] will not lie," so unrecoverable costs stemming from the impact of the Removal Moratorium are suitable to establish that Plaintiffs will face irreparable harm without injunctive relief.  *Ariz. Recovery Hous. Ass'n*, 462 F. Supp. 3d at 997.

Indeed, in *City & County of San Francisco v. United States Citizenship & Immigration Services*, 981 F.3d 742, the Ninth Circuit examined a DHS rule that it found "violates the standards of the APA in that it is both contrary to law and arbitrary and capricious."  981 F.3d at 762.  There, the plaintiffs faced the harm of likely having

---

[9]   For all of the reasons that Plaintiffs satisfy the more-demanding requirement of showing likely irreparable harm, they have Article III standing *a fortiorari*.  As States and their executives, Plaintiffs also have special solicitude standing arising from the Removal Moratorium's injury to their sovereign an quasi-sovereign interests, including "'the power to create and enforce a legal code.'"  *Texas v. U.S.*, 809 F.3d 134, 153 (5th Cir. 2015) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982)); *See also*, *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241-42 (10th Cir. 2008) (acknowledging "the 'special solicitude' the *Massachusetts* Court afforded to states" in determining "Wyoming has Article III standing" where the federal government's actions "interfere[] with Wyoming's ability to enforce its legal code.") (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)).

to bear "heavy financial costs" of supporting an increased number of immigrants "on state and local programs" as a consequence of the rule. *Id.* The circuit held "[t]here is no dispute that such economic harm is sufficient to constitute irreparable harm because of the unavailability of monetary damages." *Id.* (citing *Azar*, 911 F.3d at 581).

**A. DHS Admitted in the Agreements that Plaintiffs Face Irreparable Injury**

DHS has already acknowledged that policies like the Removal Moratorium cause Plaintiffs irreparable harm. Plaintiffs are "directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can impact [Plaintiff]'s law enforcement, housing, education, employment, commerce, and healthcare needs and budgets." Ex. C § II; Ex. H § II. Indeed, DHS has specifically admitted that "a decrease or pause on returns or removals of removable or inadmissible aliens" would "result in concrete injuries" to Plaintiffs. Ex. C § II; Ex. H § II. Plaintiffs face particular harm because the rushed implementation of the Removal Moratorium deprived Plaintiffs of the option of adjusting its policies in light of the federal shift. As DHS itself has acknowledged, "[t]he harm … is particularly acute" where Plaintiffs' "budget has been set months or years in advance and it has no time to adjust its budget to respond to DHS policy changes." Ex. C § II; Ex. H § II. And it admitted "an aggrieved party will be irreparably damaged and will not have an adequate remedy at law." Ex. C. § VI; Ex. H § VI.

**B. Plaintiffs Will Be Forced to Spend Money That Will Not Be Reimbursed For Healthcare and Law Enforcement Services for Unauthorized Aliens Present in the State**

The State of Arizona will be irreparably injured as a result of the Removal Moratorium's implementation because it will increase the State's unreimbursed costs related to the unauthorized alien population, including but not limited to incarceration and healthcare costs. The Removal Moratorium will directly increase the number of aliens with final orders of removal who remain in Arizona because they will not have been removed by DHS. Additionally, knowledge that DHS has issued a blanket moratorium on removals will encourage additional unauthorized immigration to

Arizona, and this increase in population will increase Arizona's incurred law enforcement and healthcare services costs related to them.   The U.S. Supreme Court recognizes that a state may assert injuries based on "the predictable effect of Government action on the decisions of third parties."  *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2565-66 (2019).  The majority of these costs are not reimbursed by the U.S. Government.   And as discussed above, these unrecoverable financial injuries constitute "irreparable harm" when analyzing the factors for a preliminary injunction.  *E.g.*, *E. Bay Sanctuary Covenant*, 950 F.3d at 1280; *supra* Part II.   These costs, therefore, sufficiently demonstrate Plaintiffs' irreparable harm.

### 1.  A Pause In Removals Will Increase Incarceration Costs Because Some Unremoved Aliens Would Be Detained In Arizona

Arizona also incurs millions of dollars each year on the expenses of incarcerating criminals who are unauthorized aliens.  DHS reports that in fiscal year 2019, it removed 33,665 aliens from the Phoenix Area of Responsibility alone who were either convicted criminals, pending criminal charges, or "Other Immigration Violator[s]," with convicted criminals making up the majority of these at 18,665 removals.  DHS, ERO FY2019 Local Statistics at 5-8, *Texas v. United States*, No. 6:21-cv-00003 (S.D. Tex. Feb. 3, 2021), ECF No. 63-5.  This makes Phoenix the Area of Responsibility with the second highest number of convicted criminal removals in the United States.  *Id.*  The average per capita cost of incarceration in Arizona's state prisons and county jails is roughly $70 per day—over $25,000 per inmate per year.  Declaration of Mark Lamb at ¶ 7, attached as Exhibit N; *See also, e.g.*, Arizona Dept. of Corrections, FY 2017 Operating Per Capita Cost Report at 8, available at https://tinyurl.com/djus39n4.

The Removal Moratorium is likely to increase the number of aliens subject to removal who must be incarcerated in Arizona due to the criminal recidivism of individuals who would have otherwise been removed but were instead released into the community.   Upon completion of criminal sentences, aliens subject to immigration detainers are typically transferred directly to ICE custody, but if ICE fails to accept

custody or releases them rather than pursuing removal, the criminal alien must be released.  The population of criminal aliens subject to immigration detainers has a high rate of recidivism, 70% in some jurisdictions, and therefore is likely to commit further crimes upon release.  Decl. of B. Waybourn at ¶ 8, *Texas v. U.S.*, No. 6:21-cv-00003 (S.D. Tex. Feb. 3, 2021), ECF No. 63-11.  When such unremoved individuals recidivate in Arizona, law-enforcement resources will be spent on their apprehension and at least some of them are likely to be incarcerated again.  This will directly result in increased costs to the state that would not have been incurred had the individuals been removed.

Additionally, it is not uncommon for criminal aliens subject to removal to be given reduced or suspended sentences in reliance on ICE taking the individual into custody and initiating removal proceedings against them.[10]

### 2. The Removal Moratorium Encourages Greater Unauthorized Traffic Leading To Greater Law Enforcement Expenditures And Investigations in Plaintiff States

In addition to incarceration of individuals already in the United States, the Removal Moratorium will increase Arizona's law enforcement expenses related to the flow and traffic of individuals across the border.  Cameras along Arizona's border show that roughly one in four individuals who attempt illegal border crossings are apprehended by the Border Patrol.  Declaration of Mark D. Napier at ¶ 4, attached as Exhibit L.  Hundreds of individuals attempting a border crossing ultimately perish in the Arizona desert each year.  Ex. L at ¶ 5 ("From January through September 2020 there were 181 sets of human remains recovered in the border region of Arizona's desert.").  The Removal Moratorium is likely to lead to an increase in attempted border crossings

---

[10] *See, e.g.*, *State v. Nunez-Diaz*, 444 P.3d 250, 252 ¶¶ 2, 4-5 (S.Ct. Ariz. 2019), *cert. denied* (Where defendant was charged with two class 4 felonies, the "State offered a plea deal that would reduce the charges … to a single count of possession of drug paraphernalia, a class 6 undesignated felony. … the trial court suspended sentencing … Nunez-Diaz was transferred to the custody of [ICE] … because of his plea, he could not bond out of custody and would be deported.").  This practice directly reduces the number of individuals that must be incarcerated in Arizona's correctional facilities.  But where removals are no longer being carried out, this option would no longer be available and criminal aliens who might have otherwise been turned over to federal custody would instead have to be incarcerated locally.  This increases Arizona's costs of incarcerating aliens subject to removal.

because it eliminates one of the disincentives to being caught.  Ex. L at ¶ 8.  With an increase in the number of individuals attempting a crossing, a corresponding increase in deaths is expected.  Ex. L at ¶ 8.  Each of these discoveries of remains requires the expense of law enforcement resources including (1) recovering the remains, (2) investigating the death, which must be treated as a potential homicide, and (3) engaging the Office of the Medical Examiner in the investigation.  Ex. L at ¶ 5.  Additionally, sheriff's offices often respond to calls by migrants "in serious distress lost in the remote areas" of the state and in need of assistance.  Ex. L at ¶ 6.  Such operations "often [lead] to significant expenditures of county … resources to affect rescue in the hope of preventing additional migrant deaths."  Ex. L at ¶ 6.  These direct costs will increase as the number of individuals who attempt to cross the border and find themselves in distress, or even succumb to the naturally perilous journey, also increases. Ex. L at ¶ 8.

But natural hazards are not the end.  Drug cartels or "transnational criminal organizations" engage in illicit profiteering via border traffic, and victimize migrants attempting to cross the border through areas these organizations "control."  Ex. L at ¶ 7-8.  Illegal drugs smuggled into the United States across the border with Mexico impact multiple states, including Montana.  Declaration of Bryan Lockerby at ¶ 8, attached as Ex. M.  The majority of methamphetamine and heroin in Montana comes from drug cartels in Mexico, and Montana law enforcement organizations have discovered a "Mexican drug cartel presence in the State."  Ex. M at ¶¶ 9-11.  "The influx of illicit drugs, as well as the gangs and cartels that traffic it across the southern border, have led to a sharp increase in drug use and drug-related crime in Montana."  Ex. M at ¶ 12.  The criminal activity related to these drugs coming from Mexico has led to a 48% rise in violent crimes across Montana and an 88% rise in violent crime in its largest city, Billings.  Ex. M at ¶¶ 13-16.  Increased drug activity and availability poses a health danger to Montana's citizens and impact the Montana State Crime Lab, which handles overdose deaths.  Ex. M at ¶¶ 17-18.  Montana and its citizens also suffer the costs of property crime related to this drug activity, and "also indirect and intangible costs for

19

communities such as reduction in property values, fear, pain and suffering, and reduction in quality of life." Ex. M at ¶ 19. The traffic of drugs into Montana is facilitated by some of the aliens who illegally cross into the United States from Mexico, and "pausing their removal for any amount of time … will likely increase the infusion of drugs into Montana, increase drug-related violent and property crimes, and harm the State's efforts to promote public safety and health." Ex. M at ¶ 20. "Additionally, the federal government's enforcement pause will encourage other aliens who transport and traffic illegal drugs to enter the country illegally and remain indefinitely, which will likely contribute to the increase in the drug-related public safety problems in Montana as described above." Ex. M at ¶ 20.

In addition to the effects of the illicit drug trade on Plaintiffs, the direct response to illegal immigration itself impacts the budgets of Arizona's local and state law enforcement agencies. Pinal County, Arizona, for instance contains "a large section of desert through which unauthorized aliens often attempt to travel," and the Pinal County Sheriff's Office has "recorded a surge in the number of pursuits of suspected unauthorized aliens … since the beginning of the year." Ex. N at ¶¶ 3-4. These pursuits are costly and consume a variety of resources including personnel, vehicle and aviation costs, and administrative and special investigation costs. Ex. N at ¶ 5. Personnel costs are among the easiest to track directly, and the Pinal County Sheriff's Office expended 377 man-hours on these pursuits of unauthorized aliens in January and February 2021 alone, which "represents a roughly 71% increase in costs" compared to "the same time period last year." Ex. N at ¶ 5-6. Change in the federal government's border enforcement and immigration policies impacts the behavior of those who may decide to illegally cross into the United States. Ex. N at 8. The pause or decrease in removals due to the Removal Moratorium will "incentivize individuals to illegally cross the border into Arizona," and is thus likely to "increase the number of unauthorized crossings and further exacerbate the current increase in law enforcement costs." Ex. N at ¶ 8. These costs are direct, irreparable harms.

### 3. Some Unremoved Aliens Would Use Emergency Medical Services In Arizona Without Federal Reimbursement

Federal law requires that, as a condition of participating in Medicaid, Arizona hospitals provide emergency services to individuals regardless of immigration status. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255.  This means that Arizona spends money to provide these services to unauthorized aliens and aliens subject to removal where they require emergency care.  Just one southern Arizona facility near the border, Yuma Regional Medical Center (YRMC), recorded $546,050 in unreimbursed costs of delivering care to aliens in ICE custody in a six-month period.  Declaration of Robert J. Trenschel, DO, MPH, FACHE at ¶ 7, attached as Exhibit O.  This figure covers 1,293 adults in ICE custody but does not include care provided to children, to undocumented migrants not in ICE custody, or the "substantial care expenses for the multiple mothers who delivered babies at YRMC while under ICE custody."  Ex. O at ¶ 5, 8.  So the actual figure for provision of medical services to all unauthorized aliens is likely higher.  However, the focus on adults in ICE custody is particularly relevant to this case.

First, the fact that the individual was in ICE custody helps to confirm that YRMC's statistics cover unauthorized aliens rather than leaving the hospital to estimate which patients were documented and which were not.  Second, the ICE custodial population represents unauthorized aliens who are already in the United States and who may be released into the community should the Removal Moratorium go into effect and efforts at their removal be paused or discontinued.  The YRMC data establishes that these individuals have a need for medical services, and that these services pose a significant cost.  There is no reason to believe that their need for medical help would suddenly disappear if they were released into the community; they would just have to reach the hospital on their own or through the additional provision of local EMS resources rather than being escorted by ICE.

The data also demonstrates that even if ICE maintained custody of all these individuals and merely prolonged their detention while pausing removals, Arizona would still suffer the unavoidable costs of providing medical services to them.  When

these individuals are removed per DHS's longstanding policy, they may receive medical care in the country to which they are removed.  But by pausing those removals, DHS is keeping individuals who would otherwise be removed in this country, instead, where local medical facilities such as YRMC must provide care at unreimbursed costs that for YRMC alone exceed a rate of $1,000,000 per year.  By pausing the removal of aliens subject to removal, the Removal Moratorium directly increases Arizona's costs of providing medical care to these individuals during their extended stay in the U.S.

### 4. Courts Have Previously Found Similar Evidence Sufficient to Show Irreparable Injury

In *Texas v. United States*, in issuing an injunction, the court found substantially similar evidence of unreimbursed state expenditures stemming from DHS's refusal to remove aliens with final orders of removal "demonstrate[s] a substantial threat of irreparable injury" to the State.  2021 WL 723856 at * 48, Ex. K at 39.

Courts in this circuit have also found the irreparable injury requirement to be satisfied in APA challenges to federal agency rulemaking where the state faces potential economic harm, even where that harm involves the reactions of third parties.  *E.g.*, *Washington v. DeVos*, 466 F.Supp.3d 1151, 1169-70 (E.D. Wash. 2020) (State's anticipated loss of tuition due to anticipated student disenrollment where federal grants became unavailable was "particularly persuasive" evidence of irreparable harm).  And such reasoning has been upheld by the Ninth Circuit in APA challenges multiple times. *E.g.*, *California v. Azar*, 911 F.3d at 581 ("it is reasonably probable that the states will suffer economic harm from the [interim final rules] … such harm is irreparable because the states will not be able to recover monetary damages connected to the IFRs.") and *E. Bay Sanctuary Covenant*, 950 F.3d at 1280 ("But where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases— economic harm can be considered irreparable.").  Thus Plaintiffs' evidence of economic loss due to the Removal Moratorium here establishes irreparable harm sufficient to justify the requested preliminary injunction.

Moreover, Defendants' unlawful denial of an opportunity to provide comments *before* the Removal Moratorium issued caused irreparable harm. *Northern Mariana Islands v. United States*, 686 F.Supp.2d 7, 17-19 (D.D.C. 2009). Such harm occurs when a party is "depriv[ed] of a procedural protection to which [they] are entitled" under the APA, including, in that case, the opportunity to shape the rules through notice and comment. *Id.* (citing *Sugar Cane Growers Cooperative of Florida v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002)). That harm is particularly acute as "[o]nce the program structured by the Rule has begun operation … DHS is far less likely to be receptive to comments." *Id.* And the Ninth Circuit has recognize that

### III. A Preliminary Injunction Would Not Harm Defendants or the Public

The third and fourth *Winter* factors, the balance of the equities and public interest factors, also weigh in favor of Plaintiffs, and are properly considered together here. "When the Government is a party … the balance of the equities and public interest factors merge." *Doe #1 v. Trump*, 984 F.3d 848, 861-62 (9th Cir. 2020) (cleaned up).

The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020). Here, as "often happens … this purpose is furthered by the status quo," which in this case is the normal operation of immigration enforcement activities prior to the Removal Moratorium's 100-day "pause" on removals. *Doe #1*, 957 F.3d at 1068. In *Doe #1*, plaintiffs challenged a presidential proclamation affecting immigration policy and obtained a preliminary injunction. In reviewing the federal government's request for a stay of the injunction, the Ninth Circuit held that "it was the Proclamation that altered the *status quo*," rejecting the federal government's argument that the status quo is the "Proclamation as implemented." *Id.* The same analysis controls here as the Removal Moratorium represents an anomaly in the normal course of DHS business both before its publication and after its implementation was enjoined by the Southern District of Texas within days of its initial effective date. *Texas*, 2021 WL 247877, at *8.

23

And maintaining this law-enforcement-as-usual status quo through a preliminary injunction poses no harm to DHS. They have no legitimate interest in the implementation of an unlawful memorandum. *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (recognizing that government officials "do[] not have an interest in the enforcement of an unconstitutional law"). And even if Defendants had a legitimate interest in the Removal Moratorium, they face no substantial prejudice from its delayed implementation. *See, e.g.*, *Doe #1*, 957 F.3d at 1068-69 ("lack of irreparable harm to the United States" due to delay in immigration policy implementation by "a *preliminary* injunction"). It is immaterial to this analysis that the policy change represented by the Removal Moratorium happens to be a "pause" in DHS carrying out its statutory duties rather than a policy change to taking some other unlawful action: It is the change itself that disrupts the status quo. "[I]t sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant." *Golden Gate Restaurant Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1116 (quoting *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n. 21 (D.C. Cir. 1984)). The Removal Moratorium's policy of dereliction of DHS's duty to act on final removal orders within the statutory timeframe is the brand of harmful inaction recognized in *Golden Gate*.

DHS has already acknowledged that any costs from delaying new policies is outweighed by the benefits of consultation and more reasoned decision making. *See* Ex. C § II; Ex. H § II. In contrast, as demonstrated—and expressly recognized by DHS— Plaintiffs will face irreparable harm should the Removal Moratorium be implemented during the pendency of this litigation. Where Plaintiffs face irreparable harm without an injunction while DHS faces none if the status quo is maintained, the public interest and balance of equities favor granting the Motion. *E.g.*, *Doe #1*, 957 F.3d at 1069.

## CONCLUSION

Plaintiffs respectfully request that the Court issue a preliminary injunction preventing Defendants from implementing the Removal Moratorium.

24

RESPECTFULLY SUBMITTED this 8th day of March, 2021.

**MARK BRNOVICH**
**ARIZONA ATTORNEY GENERAL**

By /s/ *Anthony R. Napolitano*
    Joseph A. Kanefield (No. 15838)
    Brunn W. Roysden III (No. 28698)
    Drew C. Ensign (No. 25463)
    Anthony R. Napolitano (No. 34586)
    Robert J. Makar (No. 33579)
     *Assistant Attorneys General*

*Attorneys for Plaintiffs Arizona and Arizona Attorney General Mark Brnovich*

**AUSTIN KNUDSEN**
**MONTANA ATTORNEY GENERAL**

*/s/ David M.S. Dewhirst (with permission)*
David M.S. Dewhirst*
 *Solicitor General*
*\*Pro hac vice application forthcoming*

*Attorneys for Plaintiff State of Montana*

Exhibit L

1

2

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

3

4

5

6

7

8

9

10

11

12

13

14

15

16

| | |
|---|---|
| State of Arizona; State of Montana; and Mark Brnovich, in his official capacity as Attorney General of Arizona,<br>         Plaintiffs,<br><br>        v.<br><br>United States Department of Homeland Security; United States of America; Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security; Troy Miller, in his official capacity as Acting Commissioner of United States Customs and Border Protection; Tae Johnson, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; and Tracy Renaud, in her official capacity as Acting Director of U.S Citizenship and Immigration Services,<br>        Defendants. | Case No: 2:21-cv-00186-SRB<br><br><br>**DECLARATION OF MARK D. NAPIER** |

17

18

19

20

21

22

23

24

25

26

27

28

I, Mark D. Napier, declare as follows:

     1.     I am competent to testify as to the matters contained herein and make this declaration based on my own personal and professional knowledge, law enforcement expertise, and the information available to me in my positions in public service.

     2.     I currently serve as the Chief of Staff for the Cochise County Sheriff's Office in Cochise County, Arizona.  I previously served as the Sheriff of Pima County, Arizona, from January 2017 to December 2020.  I began my enforcement career in 1981.

     3.     I am also the current Chair of the Executive Committee of the Arizona High Intensity Drug Trafficking Area (AZ HIDTA), a program established in 1990 to facilitate, support, and enhance collaborative drug control efforts among federal and local law enforcement agencies and community-based organizations with the goal of

1   significantly reducing the impact of illegal trafficking and use of drugs throughout

2   Arizona.

3      4. Cochise County operates a sophisticated camera system that views remote

4   areas of the border region across a large section of southern Arizona.  For the period from

5   July 2020 to January 2021, this system viewed 13,528 suspected undocumented persons

6   crossing the border.  Only 3,740 were known to be apprehended by Border Patrol.  This

7   represents a probable capture rate of only 27.6%.

8      5. From January through September 2020 there were 181 sets of human

9   remains recovered in the border region of Arizona's desert.  Each of these recoveries

10   results in the tremendous expenditure of law enforcement resources.  Generally, each

11   must be treated as a potential homicide, requiring the commitment of personnel and

12   financial resources to investigate and otherwise attempt to resolve the matter.

13   Additionally, each requires the expenditure of resources at the Office of the Medical

14   Examiner.  Moreover, many of the remains will never be identified.  This leaves some

15   family in some part of the world left to only wonder what befell a loved one.  As a person

16   who has dedicated his life to the service of others and is a staunch humanitarian, I am

17   troubled by the undeniable fact that these crossings are also potentially deadly to these

18   migrants.

19      6. Migrants abandoned by transnational criminal organizations trafficking in

20   humans on the north side of the border frequently call local law enforcement in distress.

21   The harsh environment and significant distances to be traveled lead to urgent requests for

22   assistance.  When I was Pima County Sheriff approximately 80% of the time my

23   department contacted Border Patrol it was due to a call for assistance by a migrant in

24   serious distress lost in the remote areas of the county.  These often led to significant

25   expenditures of county and Border Patrol resources to affect rescue in the hope of

26   preventing additional migrant deaths.

27      7. Undocumented migration will likely require the migrant(s) to engage

28   transnational criminal organizations who control the ingress points into the United States.

All indications are that this leads to financial, criminal, and even sexual victimization of migrants.  No matter how well-intended or seemingly compassionate the posture toward undocumented immigration on the north side of the border we cannot ameliorate the perils and victimization faced by migrants on the south side of the border.

8.     In my professional opinion, a pause or significant decrease in ICE removals will incentivize undocumented immigration.  This will most certainly encourage an increase in the number of migrants who attempt to illegally cross the border into Arizona.  We are seeing this presently with record numbers of crossers.  This will likely increase the number of those who perish in the desert, as they seek to enter undetected through less traditional means.  Further, it is reasonable to assume that this current posture may allow transnational criminal organizations to engage in increased profiteering from the trafficking of humans to the border and increase the victimization of migrants.  The recovery of human remains will continue to place additional strains on law enforcement and leave more families in Mexico and Central America grieving.  As a life-long public servant, humanitarian, father and grandfather it pains me to see that the current policies toward undocumented immigration will likely lead to increased, although perhaps unintended, humanitarian suffering and exploitation of those persons arguably only coming here for a better life.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that this declaration was issued on March 8, 2021, in Benson, Arizona.

_____
Mark D. Napier
Chief of Staff
Cochise County Sheriff's Office

# Exhibit M

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

STATE OF ARIZONA et al.,
Plaintiffs,
v.
UNITED STATES DEPARTMENT OF HOMELAND SECURITY et al.,
Defendants.

Case No.2:21-cv-00186-SRB

## DECLARATION OF BRYAN LOCKERBY

I, Bryan Lockerby, make this Declaration consistent with 28 U.S.C. § 1746 and under penalty of perjury and declare that all statements herein are true and accurate to the best of my knowledge.  I am of sound mind, capable of making this Declaration, and have personal knowledge and expertise of the matters stated herein.

1.      I currently serve as Administrator of the Division of Criminal Investigation (DCI) at the Montana Department of Justice.

2.      I have served in this position since January 20, 2013.  Prior to that, I served for over 31 years in law enforcement at the Great Falls Police Department, Montana.  My career included service as a patrol officer, general case detective, drug task force officer with the U.S. Drug Enforcement Administration, special response team member and commander, patrol sergeant, patrol lieutenant, captain of patrol, and captain of investigations. I have a combined law enforcement experience of 39 years.

3.      The DCI Administrator has a number of responsibilities, including oversight of the Narcotics Bureau, a statewide drug enforcement agency that initiates and conducts all types of dangerous-drug investigations throughout the state.  The Narcotics Bureau leads some local task forces provides investigative assistance at the request of city, county, state and federal law enforcement agencies within Montana and in neighboring states.  Narcotics Bureau agents also investigate organized criminal activity and assist other DCI bureaus in their investigations.

1

4.     The DCI Administrator oversees the state fusion center for law enforcement, referred to as the Montana Analysis and Technical Information Center (MATIC).   Fusion centers provide a mechanism for information and intelligence sharing between law enforcement agencies, to include all types of crime, narcotics smuggling, homeland security threats and terrorism.

5.     As DCI Administrator, I am a member of the Rocky Mountain High Intensity Drug Trafficking Area (RMHIDTA) Executive Board and have served in the role since my appointment.  I have served as Montana Chairman, Budget Chairman for both Montana and the Rocky Mountain region, and recently completed a term as Chairman of RMHIDTA in 2020.  I am currently a member of the RMHIDTA Intelligence Committee.

6.     I am Chairman of the Rocky Mountain Information Network (RMIN). RMIN serves Arizona, Colorado, Idaho, Montana, Nevada, New Mexico, Utah, and Wyoming, as well as parts of Canada.  RMIN facilitates information sharing within the law enforcement community and assists member agencies in combating multi-jurisdictional criminal activities and conspiracies that pose a threat to public safety.

7.     I am an Executive Board member of the Association of State Criminal Investigative Agencies (ASCIA), a professional association consisting of senior executives of the statewide criminal investigative agencies in the United States. ASCIA represents the concerns and issues of its members but also works with the major law enforcement associations on national issues of mutual concern.

8.     Massive quantities of illegal drugs are illicitly transported into the United States across the country's southern border.  These drugs end up in many states, including the State of Montana ("State").

9.     Nearly all the methamphetamine available in Montana originates in Mexico from drug cartels. The supply of methamphetamine in Montana has become so abundant and widely available that that prices have steadily dropped over the last few years.

10.     Moreover, law enforcement has encountered an actual Mexican drug cartel presence in the State.  Arrests made over the past few years have confirmed

that cartel members were smuggling methamphetamine into the State or managed distribution points out of major cities.

11.    The majority of heroin that is brought into Montana also originates in Mexico.

12.    The influx of illicit drugs, as well as the gangs and cartels that traffic it across the southern border, have led to a sharp increase in drug use and drug-related crime in Montana.  Drug trafficking and drug activity are a threat to public safety and negatively affect communities across the State.  There is a strong correlation between drug activity and violent crime.

13.    Violent crimes across the state of Montana have increased 48% from 2013 to 2019, according to the FBI.

14.    In the last several years, the State has continued to suffer a significant increase in drug related crimes especially related to methamphetamine.  These crimes significantly impact all communities in Montana—especially low-income areas—and disproportionately affect young people.

15.    Methamphetamine activity is especially dangerous.  It is the drug that most contributes to violent and property crime.  In my experience, when officers make an arrest or encounter a violent crime, quite often methamphetamine is either involved in the crime or has been ingested by the perpetrator.

16.    In the State's largest city, Billings, violent crime, frequently meth-driven, has increased by 88% percent from 2013 to 2019, according to the FBI.

17.    The methamphetamine originating in Mexico from the cartels is also more dangerous for users than the methamphetamine produced locally because the purity level is so high.

18.    The increased availability of heroin has resulted in an increase in overdose deaths in the State.  From 2015 to 2019, the number of heroin overdose death cases handled by the Montana State Crime Lab more than doubled.

19.    Increased drug activity results in a greater amount of property crimes as those suffering from drug addiction steal to support their addictions.  Property crimes also negatively affect public safety.  They have direct economic costs in the

3

form of property loss and/or damage, but also indirect and intangible costs for communities such as reduction in property values, fear, pain and suffering, and reduction of quality of life.

20.     Some aliens illegally crossing the southern border and illegally present in the country facilitate the trafficking of dangerous drugs like methamphetamine and heroin.  By pausing their removal for any amount of time, the federal government will likely increase the infusion of drugs into Montana, increase drug-related violent and property crimes, and harm the State's efforts to promote public safety and health. Additionally, the federal government's enforcement pause will encourage other aliens who transport and traffic illegal drugs to enter the country illegally and remain indefinitely, which will likely contribute to the increase the drug-related public safety problems in Montana as described above.


Bryan Lockerby
Administrator
Division of Criminal Investigation
Montana Department of Justice


        Subscribed this 5th day of March, 2021.


4

Exhibit N

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

State of Arizona; State of Montana; and
Mark Brnovich, in his official capacity
as Attorney General of Arizona,

      Plaintiffs,

      v.

United States Department of Homeland
Security; United States of America;
Alejandro Mayorkas, in his official
capacity as Secretary of Homeland
Security; Troy Miller, in his official
capacity as Acting Commissioner of
United States Customs and Border
Protection; Tae Johnson, in his official
capacity as Acting Director of United
States Immigration and Customs
Enforcement; and Tracy Renaud, in her
official capacity as Acting Director of
U.S. Citizenship and Immigration
Services,

      Defendants.

Case No: 2:21-cv-00186-SRB

**DECLARATION OF MARK LAMB**

I, Mark Lamb, declare as follows:

1.    I am competent to testify as to the matters contained herein and make this declaration based on my own personal and professional knowledge, law enforcement expertise, and the information available to me in my positions in public service.

2.    I currently serve as Sheriff of Pinal County, Arizona, and have been a law enforcement officer for over 14 years.

3.    Pinal County, Arizona, includes a large section of desert through which unauthorized aliens often attempt to travel. Pinal County Sheriff's Office

routinely works with the U.S. Border Patrol and other federal authorities in the pursuit and capture of such individuals.

4.      My office has recorded a surge in the number of pursuits of suspected unauthorized aliens it has been involved in since the beginning of the year compared to the same months in previous years.  We have been involved in 24 such pursuits in January and February 2021.  We only had 10 in 2019 and 14 in 2020.

5.      The 24 pursuits this year required an estimated 377 man-hours at an average personnel cost of $30 per hour, totaling a cost of $11,310 to my office, not including other expenses such as vehicle and aviation wear and tear, vehicle and aviation fuel costs, administrative costs, and investigative costs from specialty units.

6.      This represents a roughly 71% increase in costs over the estimated $6,597.50 in personnel costs experienced during the same time period last year.

7.      Additionally, where these pursuits result in arrests, the Pinal County Sheriff's Office incurs the cost of incarcerating the individual.  Our records indicate an average jail stay of 25-29 days at an average cost of $70 per day.  This represents an additional cost of $1,750 per booking on average.

8.      In my professional opinion, the increase in incidents, and therefore increase in costs, my office is experiencing is at least in part directly related to announced changes in federal border enforcement and alien removal policies.  A pause or significant decrease in ICE removals will serve to incentivize individuals to illegally cross the border into Arizona because, among other things, it removes one of the chief consequences that deters such actions.  This will, in turn, increase the number of unauthorized crossings and further exacerbate the current increase in law enforcement costs we are experiencing.

1

2
      I declare under penalty of perjury that the foregoing is true and correct to the best

3
of my knowledge, and that this declaration was issued on March 7th,  2021, in San Tan

4
Valley, Arizona.

5

6
                                Mark Lamb

7
                                Sheriff

8
                                Pinal County Sheriff's Office

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit O

1

2

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

3

4

5

State of Arizona; State of Montana; and
Mark Brnovich, in his official capacity
as Attorney General of Arizona,
     Plaintiffs,

Case No: 2:21-cv-00186-SRB

6

v.

7

8

9

10

11

12

13

14

15

16

United States Department of Homeland
Security; United States of America;
Alejandro Mayorkas, in his official
capacity as Secretary of Homeland
Security; Troy Miller, in his official
capacity as Acting Commissioner of
United States Customs and Border
Protection; Tae Johnson, in his official
capacity as Acting Director of United
States Immigration and Customs
Enforcement; and Tracy Renaud, in her
official capacity as Acting Director of U.S
Citizenship and Immigration Services,
    Defendants.

**DECLARATION OF ROBERT J.
TRENSCHEL, DO, MPH, FACHE**

17

I, Dr. Robert J. Trenschel, declare as follows:

18

19

20

    1.    I am competent to testify as to the matters contained herein and make this declaration based on my own personal and professional knowledge and the information available to me in the course of business.

21

22

    2.    I currently serve as the President and Chief Executive Officer of Yuma Regional Medical Center (YRMC).

23

24

    3.    YRMC is a 406-bed, not-for-profit hospital serving Yuma, Arizona, and the surrounding area.

25

26

27

    4.    YRMC regularly provides emergency medical services to undocumented migrants, including such migrants brought to YRMC under the custody of U.S. Immigrant and Customs Enforcement (ICE).

28

5.      From January through June 2019, YRMC records show that an estimated 1,293 adult patients were brought to YRMC while in ICE custody.  This number does not include children brought to YRMC by ICE or non-custodial visits by undocumented migrants who obtained care at YRMC.

6.      The estimated cost of care in that six-month period for the 1,293 individuals mentioned above was $810,433 according to our business records.

7.      YRMC has only received $264,383 in reimbursement for the care it provided, leaving a $546,050 unreimbursed gap for that six-month period alone.

8.      These cost estimates also do not include the substantial care expenses for the multiple mothers who delivered babies at YRMC while under ICE custody during that timeframe.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that this declaration was issued on March 5, 2021, in Yuma, Arizona.


Robert Trenschel (Mar 5, 2021 18:46 PST)
Robert J. Trenschel
President and Chief Executive Officer
Yuma Regional Medical Center

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| State of Arizona; State of Montana; and Mark Brnovich, in his official capacity as Attorney General of Arizona,<br><br>          Plaintiffs,<br><br>     v.<br><br>United States Department of Homeland Security; United States of America; Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security; Troy Miller, in his official capacity as Acting Commissioner of United States Customs and Border Protection; Tae Johnson, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; and Tracy Renaud, in her official capacity as Acting Director of U.S. Citizenship and Immigration Services,<br><br>          Defendants. | No.2:21-cv-00186-SRB<br><br>**[PROPOSED] ORDER** |

Upon consideration of Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 13), as well as all exhibits and the entire record in this case, the Court grants the motion. Therefore, IT IS HEREBY ORDERED pursuant to Rule 65(a) of the Rules of Civil Procedure and 5 U.S.C. §§ 553, 706 as follows:

1.     Defendants and all their respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby **ENJOINED** and **RESTRAINED** from enforcing and implementing the policies

described in the January 20, 2021 Memorandum in Section C entitled "Immediate 100-Day Pause on Removals" (Dkt. No. 12-1 at ECF Page Nos. 4–5) or described in the February 18, 2021 "Interim Guidance: Civil Immigration Enforcement and Removal Priorities" in the Sections entitled "Civil Immigration Enforcement and Removal Priorities" and "Enforcement and Removal Actions: Approval, Coordination, and Data Collection" (Dkt. No. 12-1 at ECF Page Nos. 42–46).

2.     This preliminary injunction is granted on a nationwide basis and prohibits enforcement and implementation of the policies described in Paragraph 1 of this Order in every place Defendants have jurisdiction to enforce and implement the January 20, 2021 Memorandum or February 18, 2021 Interim Guidance.

3.     This preliminary injunction shall remain in effect pending a final resolution of the merits of this case or until a further Order from this Court, the United States Court of Appeals for the Ninth Circuit, or the United States Supreme Court.

4.     This Order does not prohibit Defendants from carrying out or adhering to the January 20, 2021 Memorandum's other sections, entitled "A. Comprehensive Review of Enforcement Policies and Priorities," "B. Interim Civil Enforcement Guidelines," or "D. No Private Right Statement."