MICHAEL RYAN WILLIAMS, ESQ.
3636 North Central Avenue, Suite 560
Phoenix, Arizona 85012
State Bar No. 029703
m.ryan.williams@gmail.com
(602) 740-0321
*Lead Counsel for Movant Immigration Reform Law Institute*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| State of Arizona, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> United States Department of Homeland Security, *et al.*, <br><br> Defendants | Case No.: 2:21-cv-00186-SRB |

**MEMORANDUM OF LAW OF IMMIGRATION REFORM LAW INSTITUTE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

CHRISTOPHER J. HAJEC
MATT A. CRAPO
Immigration Law Reform Institute
25 Massachusetts Ave., NW, Ste. 335
Washington, DC  20001
Tel: 202-232-5590
Fax: 202-464-3590
Email: chajec@irli.org
Email: matt.crapo@pm.me

*On the Brief*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.     Plaintiffs Have Standing ............................................................................................... 2

II.    The Interim Guidance is Reviewable ........................................................................... 5

III.   The Interim Guidance is Contrary to Law ................................................................... 6

IV.   The Interim Guidance is Arbitrary and Capricious .................................................... 10

V.    The Adoption of the Interim Guidance Violates the APA's
Procedural Requirements ........................................................................................... 11

VI.   The Interim Guidance Violates the Take Care Clause .............................................. 12

CONCLUSION ..................................................................................................................... 14

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Arizona v. United States*,
   567 U.S. 387 (2012) .................................................................................................. 3

*Ass'n of Data Processing Serv. Org., Inc. v. Camp*,
   397 U.S. 150 (1970) .................................................................................................. 2

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971) .................................................................................................. 5

*Corley v. United States*,
   556 U.S. 303 (2009) .................................................................................................. 4

*Demore v. Kim*,
   538 U.S. 510 (2003) ................................................................................................ 10

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) .............................................................................................. 5

*DHS v. Regents of the U. of Cal.*,
   140 S. Ct. 1891 (2020) ................................................................................. 3, 10, 11

*Guardian Fed. Sav. & Loan Ass'n v. FSLIC*,
   589 F.2d 658 (D.C. Cir. 1978) ................................................................................ 11

*Hemp Indus. Ass'n v. DEA*,
   333 F.3d 1082 (9th Cir. 2003) ................................................................................. 11

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
   523 U.S. 26 (1998) .................................................................................................... 7

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) .................................................................................................. 5

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .............................................................................................. 3, 4

*Maine Cmty. Health Options v. United States*,
   140 S. Ct. 1308 (2020) .............................................................................................. 7

*Manhattan Gen. Equip. Co. v. Comm'r*,
   297 U.S. 129 (1936) .................................................................................................. 9

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) .................................................................................................. 4

*Michigan v. EPA*,
   576 U.S. 743 (2015) ................................................................................................ 10

*Mont. Shooting Sports Ass'n v. Holder*,
   727 F.3d 975 (9th Cir. 2013) .................................................................................... 3

*Plyler v. Doe*,
   457 U.S. 202 (1982) ............................................................................................. 3, 4

*Southern Cal. Edison Co. v. F.E.R.C.*,
   502 F.3d 176 (D.C. Cir. 2007) .................................................................................. 3

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) .................................................................................... 4

*Texas v. United States*,
   2021 U.S. Dist. LEXIS 33890, 2021 WL 723856 (S.D. Tex. 2021) ................. 1, *passim*

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   136 S.Ct. 1807 (2016) ............................................................................................... 6

*United States v. Picciotto*,
   875 F.2d 345 (D.C. Cir. 1989) ................................................................................ 12

*United States v. Texas*,
   136 S.Ct. 906 (2016) ............................................................................................... 12

*Warth v. Seldin*,
   422 U.S. 490 (1975) .................................................................................................. 3

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................................ 13

**CONSTITUTION AND STATUTES**

5 U.S.C. § 553 .................................................................................................................. 12

iii

5 U.S.C. § 553(a) ............................................................................................................. 11

5 U.S.C. § 553(b) ............................................................................................................. 11

5 U.S.C. § 553(b)(3)(A) ................................................................................................... 11

5 U.S.C. § 553(b)(3)(B) ............................................................................................ 11, 12

5 U.S.C. § 701(a)(1) ........................................................................................................... 5

5 U.S.C. § 701(a)(2) ........................................................................................................... 5

5 U.S.C. § 706(2)(A) ....................................................................................................... 10

5 U.S.C. § 706(2)(B) ......................................................................................................... 9

5 U.S.C. § 706(2)(C) ......................................................................................................... 9

8 U.S.C. § 1182(a)(2) ........................................................................................................ 8

8 U.S.C. § 1225(a)(1) .................................................................................................... 5, 8

8 U.S.C. § 1225(b)(1) ........................................................................................................ 8

8 U.S.C. § 1225(b)(2)(A) .................................................................................................. 8

8 U.S.C. § 1225(b)(2)(B) .................................................................................................. 8

8 U.S.C. § 1225(b)(2)(C) .................................................................................................. 8

8 U.S.C. § 1226(a)(2) ........................................................................................................ 8

8 U.S.C. § 1226(c) ..................................................................................................... 5, 7, 8

8 U.S.C. § 1226(c)(1)(D) .................................................................................................. 8

8 U.S.C. § 1227(a)(2) ........................................................................................................ 8

8 U.S.C. § 1229(d) ........................................................................................................ 5, 9

8 U.S.C. § 1229(d)(1) ........................................................................................................ 9

8 U.S.C. § 1229(d)(2) .................................................................................................... 9

8 U.S.C. § 1229a ............................................................................................................ 8

8 U.S.C. § 1231(a)(1)(A) ....................................................................................... 5, 6, 7

8 U.S.C. § 1231(h) ......................................................................................................... 9

U.S. Const. art. II, §3 ................................................................................................... 13

**MISCELLANEOUS**

Executive Order 13993, *Revision of Civil Immigration Enforcement Policies and Priorities*, 86 Fed. Reg. 7051 (Jan. 25, 2021) .................................................................. 1

# INTRODUCTION

On his first day in office, President Biden issued Executive Order 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021), which the Department of Homeland Security ("DHS") implemented in a memorandum entitled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities," dated January 20, 2021 (the "January 20 Memo"). *See* Exhibit ("Ex.") A.[1] In section A of the January 20 Memo, the acting Secretary ordered a Department-wide review of policies and practices concerning immigration enforcement. *Id.* at 2. In section B, the acting Secretary established interim enforcement priorities focused on National Security, Border Security, and Public Health.[2] *Id.* The January 20 Memo further stated that "nothing in this memorandum prohibits the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities herein." *Id.* at 3. In section C, the acting Secretary announced an immediate 100-day pause of all removals, subject to narrow exceptions. *Id.* at 3. On January 26, 2021, a district court in the Southern District of Texas entered a nationwide temporary restraining order against the 100-day stay of removals, and on February 23, the court converted the TRO into a preliminary injunction. *Texas v. United States*, 2021 U.S. Dist. LEXIS 33890, *9, *147-48, 2021 WL 723856 (S.D. Tex. 2021).

On February 18, 2021, the Acting Director of Immigration and Customs Enforcement ("ICE") issued an interim guidance memorandum in support of the January 20 Memo. Ex. G ("February 18 Memo"). This memorandum largely reiterated the

---

[1] Citations to exhibits herein refer to the exhibits attached to Plaintiffs' Amended Complaint or Motion for a Preliminary Injunction.

[2] The Department's enforcement priorities were limited to three classes of aliens:  1. aliens who are terrorists, who engage in espionage, or are otherwise a danger to national security; 2. aliens apprehended at the border while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020; and 3. incarcerated aliens who are released on or after the issuance of this memorandum, who have been convicted of an "aggravated felony," and are determined to pose a threat to public safety.

enforcement priorities set forth in the January 20 Memo.[3] Ex. G at 4-5. Although the February 18 Memo stressed that "the interim priorities do not require or prohibit the arrest, detention, or removal of any noncitizen," *id.* at 3, it requires any enforcement action targeted at non-priority individuals to be preapproved by a Field Office Director or Special Agent in Charge.[4] *Id.* at 6. Thus, prior to the issuance of the February 18 Memo, an immigration officer had the discretion to take enforcement actions against any individual who is present in the United States in violation of the immigration laws.[5] In order to take an enforcement action against a non-priority alien following the issuance of the February 18 Memo, however, an immigration officer must make a written justification for the enforcement action and receive preapproval from a Field Office Director or Special Agent in Charge. Ex. G at 6. In other words, under the interim guidance, an immigration officer must seek permission to enforce the law.

## ARGUMENT

### I.     Plaintiffs Have Standing

To establish standing, a plaintiff must show that: (1) the challenged action constitutes an "injury in fact," (2) the injury is "arguably within the zone of interests to be protected or regulated" by the relevant statutory or constitutional provision, and (3) nothing otherwise precludes judicial review. *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970). An "injury in fact" is (1) an actual or imminent

---

[3] The February 18 Memo added criminal gang members to the Public Safety priority category. Ex. G at 5.

[4] The memorandum defines enforcement and removal actions to include deciding whether: to issue a detainer; to issue, serve, file or cancel a Notice to Appear; to stop, question, or arrest a noncitizen for an immigration violation; to detain or release an alien from custody, to grant deferred action; or to execute a removal order. Ex. G at 3.

[5] Under a 2017 enforcement guidance memorandum, the removal of certain aliens (including all criminal aliens) were prioritized, but the memorandum also directed agency personnel to "faithfully execute the immigration laws of the United States against all removable aliens." Memorandum from then DHS Secretary John Kelly, Re: Enforcement of the Immigration Laws to Serve the National Interest, at 2 (available at: https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf) (last visited Mar. 22, 2021).

2

invasion of a constitutionally cognizable interest, (2) which is causally connected to the challenged conduct, and (3) which likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992). The standing analysis assumes the plaintiff's merits views. *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Southern Cal. Edison Co. v. F.E.R.C.*, 502 F.3d 176, 180 (D.C. Cir. 2007) ("in reviewing the standing question, the court… must therefore assume that on the merits the [plaintiffs] would be successful in [their] claims").

As Plaintiffs argue, the interim enforcement guidelines will cause an increase in the number of aliens in their states, including criminal aliens, which will result in an increase in criminal activity and economic injury, and require the states to expend additional resources. Plaintiffs' Motion for a Preliminary Injunction ("PI Motion"). at 16-22. Under Circuit precedent, those economic injuries suffice for an Article III case or controversy. *Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 979 (9th Cir. 2013) ("Economic injury caused by a proscriptive statute is sufficient for standing to challenge that statute.") (citation omitted).

In addition, the Supreme Court has acknowledged such financial injuries in the immigration context, where States have "an interest in mitigating the potentially harsh economic effects of sudden shifts in population." *Plyler v. Doe*, 457 U.S. 202, 228, (1982); *see id.* at n.23 (explaining that, because the Constitution deprives States of any "direct interest in controlling entry into this country, . . . unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service"); *see also Arizona v. United States*, 567 U.S. 387, 397 (2012) (acknowledging that States "bear[] many of the consequences of unlawful immigration"); *DHS v. Regents of the U. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (finding a sudden shift in the government's immigration policy was arbitrary and capricious in part because the government "failed to address whether there was legitimate reliance" on the former immigration policy) (internal quotation marks omitted). The financial harm to States from "sudden shifts" in their population due to immigration policies are "serious and well

recognized." *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007).[6] As the district court in *Texas* observed, the various States are "all but required to provide free public education to any unlawfully present noncitizens pursuant to the Equal Protection Clause." 2021 U.S. Dist. LEXIS 33890 at *33 (citing *Plyler*, 457 U.S. at 230).

Finally, insofar as Plaintiffs allege procedural violations, the bar for Article III standing is lowered. "The history of liberty has largely been the history of observance of procedural safeguards," *Corley v. United States*, 556 U.S. 303, 321 (2009) (internal quotation marks omitted), and "procedural rights are special," *Lujan*, 504 U.S. at 572 n.7 (internal quotation marks omitted). For procedural injuries, Article III's redressability and immediacy requirements apply to the present procedural violation (which may someday injure a concrete interest) rather than to a concrete future injury. *Lujan*, 504 U.S. at 571-72 & n.7. Plaintiffs' allegations of procedural-rights violations thus undercut the potential claim that it lacks a sufficiently immediate injury. Importantly, when it comes to redressability, Plaintiffs need not show that notice-and-comment rulemaking would result in a rule more to their liking: "If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA had to show that its comment would have altered the agency's rule, section 553 would be a dead letter." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002). Instead, vacatur would put the parties back in the position they should have been in all along, and thus provide enough redress, even if Defendants potentially could take the same action on remand, leaving Plaintiffs no better off in the end.

---

[6] "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts*, 549 U.S. at 518. Rather, a State is afforded "special solicitude" in satisfying its burden to demonstrate the traceability and redressability elements of the traditional standing inquiry whenever the federal government violates a congressionally accorded procedural right that affects the State's "quasi-sovereign" interests in its physical territory or lawmaking function. *Id.* at 520-21.

4

## II. The Interim Guidance is Reviewable

The APA creates a "basic presumption of judicial review." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019). "[A] very narrow exception" to that presumption exists, however, when an action is "committed to agency discretion by law." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410 (1971); 5 U.S.C. § 701(a)(2). This is not one of those "rare instances" because the statutes are not "drawn in such broad terms that . . . there is no law to apply." *Overton Park*, 401 U.S. at 410. The INA contains several provisions that mandate certain enforcement actions be taken. For instance, 8 U.S.C. § 1225(a)(1) requires initiation of removal proceedings against certain aliens present in the United States without being admitted, 8 U.S.C. § 1226(c) requires the detention of certain criminal aliens, 8 U.S.C. § 1229(d) requires immigration officers to initiate removal proceedings against certain criminal aliens, and 8 U.S.C. § 1231(a)(1)(A) requires the removal of aliens within 90 days of a final removal order. Thus, there is ample law to apply.

Further, no statute bars review of DHS's interim enforcement guidelines. *Cf.* 5 U.S.C. § 701(a)(1). Although the INA contains several provisions that preclude judicial review, none of those provisions precludes review of DHS's interim guidelines by this court. *See Texas*, 2021 U.S. Dist. LEXIS 33890 at *79-84 (discussing various jurisdiction-stripping provisions of the INA and finding none applicable to DHS's January 20 Memo). Although it is permissible for federal agencies to exercise discretion in marshalling their resources and prioritizing how those resources are expended, agencies may not, as DHS has done here, develop substantive enforcement guidelines that are contrary to congressional directives, arbitrary and capricious, and adopted without complying with the required notice-and-comment procedure. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities:  Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes.").

Finally, although both Memos describe the guidelines as "interim," they are final for purposes of APA review. The standard used to determine whether an agency action is final requires that two conditions to be satisfied. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S.Ct. 1807, 1813 (2016). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. Second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (citation omitted).

The immediacy of the implementation of the February 18 Memo demonstrates that DHS's decision is final and has been put into effect. Ex G at 1 ("This interim guidance is effective immediately."). In addition, the interim guidance determines certain rights and obligations, and legal consequences have already begun to flow therefrom. *See Hawkes Co.*, 136 S.Ct. at 1813. Immigration officers within the DHS are currently constrained from taking enforcement action against any individual who does not fall within a priority category without preapproval by a senior official. Ex. G at 6. Practically speaking, no enforcement actions will be taken against non-priority aliens. Inasmuch as the interim guidance is affecting whether enforcement actions are taken against certain aliens, the guidance is final for purposes of judicial review.

**III.     The Interim Guidance is Contrary to Law**

As the February 18 Memo makes clear, the interim guidance covers a broad range of enforcement actions, and DHS's refusal to take those enforcement actions with respect to aliens who do not fall within the narrowly-drawn priority categories runs afoul of several provisions of the INA.[7] First, as Plaintiffs argue, DHS's interim guidance violates the statutory command in 8 U.S.C. § 1231(a)(1)(A) requiring the removal of aliens within 90 days of a final removal order. PI Motion 13-14. Plaintiffs focus on how the "100-day

---

[7] The narrowness of the enforcement priorities set forth in the February 18 Memo is remarkable. The interim enforcement priorities include only terrorists, spies, national security threats, those not present in the United States prior to November 1, 2020, aggravated felons, and gang members.

6

pause" set forth in the January 20 Memo violates 8 U.S.C. § 1231(a)(1)(A), but the enforcement priority scheme set forth in the interim guidance also runs afoul of the statute. 8 U.S.C. § 1231(a)(1)(A) states: "[W]hen an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." By its terms, it applies to every alien who is issued a removal order, and 8 U.S.C. § 1231(a)(1)(A) commands the removal of all such aliens. *See Texas*, 2021 U.S. Dist. LEXIS 33890 at *92-106 (determining that "shall" in section 1231(a)(1)(A) means "must").[8] The interim guidance, in contrast, clearly states that any "enforcement or removal actions that do not meet the above criteria for presumed priority cases will require preapproval" from a senior official. Ex. G at 6. The interim guidance thus ignores the statutory command to remove all such aliens; even absent the blanket 100-day pause on deportations,[9] immigration officers are prohibited from taking any enforcement action against a non-priority alien without preapproval—and such preapproval, of course, will not always (and in fact will almost never) be either sought or given. Ex G at 3, 5-6. Because the interim guidance sets up this largely-impassible roadblock to the removal of aliens who do not fall within a priority category, it contradicts the congressional command to removal all aliens within 90 days.

Second, the interim guidance runs afoul of 8 U.S.C. § 1226(c) because the statute requires the detention of a broader class of aliens than the interim guidelines permit. Under the interim guidance, only criminal aliens who have been convicted of an aggravated felony or are involved in gang activity are deemed an enforcement priority. Ex. G at 4-5. Under the statute, however, detention is required for aliens who have

---

[8] Courts routinely interpret "shall" as creating a mandatory duty. *See*, *e.g.*, *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion.").

[9] As noted above, the "100-day pause" in deportations has been enjoined by the United States District Court for the Southern District of Texas. *Texas*, 2021 U.S. Dist. LEXIS 33890, *9, *147-48 (S.D. Tex. 2021).

committed many crimes other than aggravated felonies.[10] *See* 8 U.S.C. § 1226(c) (requiring the detention of aliens convicted of crimes described under sections 1182(a)(2) and 1227(a)(2)). Such crimes include crimes of moral turpitude, crimes involving controlled substances, human trafficking, money laundering, and certain firearms offenses. *See generally* 8 U.S.C. §§ 1182(a)(2), 1227(a)(2). Thus, 8 U.S.C. § 1226(c) requires the detention of a broad range of criminal aliens, whereas the interim guidance only permits—without hard-to-obtain preapproval—enforcement actions against aliens who have been convicted of an aggravated felony or have engaged in terrorist activities. An immigration officer dutifully complying with the interim guidance will be constrained from complying with the statutory obligation to detain certain criminal aliens who do not fall within the enforcement priorities.

Third, Congress has restricted DHS's discretion regarding certain enforcement actions in other areas of the INA. 8 U.S.C. § 1225(a)(1) provides: "An alien present in the United States who has not been admitted or who arrives in the United States … *shall* be deemed for purposes of this chapter an 'applicant for admission.'" (emphasis added). 8 U.S.C. § 1225(b)(2)(A), in turn, specifies that, subject to subparagraphs (B) and (C),[11] if the examining immigration officer determines that an "applicant for admission" is not clearly and beyond a doubt entitled to be admitted, the alien *shall* be detained for a proceeding under section 1229a of this title.[12] Thus, Congress has commanded immigration officers to initiate removal proceedings against any alien who is present in

---

[10] Aliens who have engaged in terrorist activities must be detained under both 8 U.S.C. § 1226(c)(1)(D) and the interim guidelines. *See* Ex. G at 4.

[11] Subparagraph (B) specifies that subparagraph (A) does not apply to crewmen, aliens subject to expedited removal under 8 U.S.C. § 1225(b)(1), or stowaways. Subparagraph (C) states: "In the case of an alien described in subparagraph (A) who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States, the Attorney General may return the alien to that territory pending a proceeding under section 1229a of this title.

[12] "[S]ection 1229a of this title" refers to removal proceedings before an immigration judge. *See* 8 U.S.C. § 1229a. So long as the alien is not removable as a criminal alien, DHS is permitted to release the alien from custody on bond or conditional parole pending a decision on whether the alien is to be removed. 8 U.S.C. § 1226(a)(2).

8

the United States without being admitted unless the alien can show that he or she is "clearly and beyond doubt entitled to be admitted." Again, an immigration officer dutifully complying with the interim guidance will be constrained from complying with the statutory obligation to initiate removal proceedings against a non-priority alien.

Finally, 8 U.S.C. § 1229(d) similarly requires immigration officers to initiate removal proceedings against certain criminal aliens. Section 1229(d)(1) states: "In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General *shall* begin any removal proceeding as expeditiously as possible after the date of the conviction." (emphasis added).[13] Again, the statutory obligation is much broader than the enforcement prohibitions set forth in the interim guidance. Insofar as a criminal alien is deportable but not an aggravated felon, an immigration officer is prevented from fulfilling the statutory obligation to initiate removal proceedings by the interim guidance.

In sum, at least four provisions of the INA mandate specific immigration enforcement actions that the interim guidance prohibits without preapproval. As Plaintiffs observe, the interim guidance makes it impossible for immigration officers to comply with their statutory obligations. PI Motion at 13. Because the interim enforcement guidelines run afoul of the INA, they should be enjoined. *See* 5 U.S.C. §706(2)(B)-(C); *Manhattan Gen. Equip. Co. v. Comm'r*, 297 U.S. 129, 134 (1936) (holding that a "regulation [that] … operates to create a rule out of harmony with the statute, is a mere nullity" because an agency's "power … to prescribe rules and regulations … is not the

---

[13] 8 U.S.C. § 1229(d)(2) states: "Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." Although 8 U.S.C. § 1229(d)(2) might appear to preclude judicial review of subsection (d), this language merely bars aliens from raising a claim to compel DHS to initiate removal proceedings at a particular time. *Cf. Texas*, 2021 U.S. Dist. LEXIS 33890 at *69-77 (holding that the term "party" in nearly identical section 1231(h) does not include states such as Texas, but instead is limited to "aliens who have been ordered removed from the U.S." and who are seeking to "be removed at a particular time or to a particular place" under section 1231).

9

power to make law" but rather "the power to adopt regulations to carry into effect the will of Congress as expressed by the statute").

## IV. The Interim Guidance is Arbitrary and Capricious

The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The interim enforcement guidance as set forth in the February 18 Memo is arbitrary and capricious because it not only fails to consider potential policies more limited in scope and time, but it also fails to provide any concrete, reasonable justification for such a drastic change in policy. According to the two Memos, DHS needed time to reevaluate immigration policies and procedures and implemented a drastic reduction in immigration enforcement pending the outcome of that review and evaluation.[14] Nowhere in either Memo did DHS explain why the Department-wide review of policies and practices could not occur while it proceeded with the then-current enforcement guidelines.

Congress mandated the detention of criminal aliens in an effort to protect the American people from recidivist crime committed by criminal aliens. *Demore v. Kim*, 538 U.S. 510, 518-19 (2003). But DHS failed to acknowledge that its interim enforcement guidelines would result in the release (or non-detention) of every criminal alien other than those who have been convicted of an aggravated felony or gang-related offenses. Failing to consider important costs of a new policy renders that policy arbitrary and capricious. "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015). Considering such policy concerns "was the agency's job, but the agency failed to do it." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1914.[15]

---

[14] The January 20 Memo also mentioned the need to maintain custody consistent with applicable COVID-19 protocols, but did not expound on how the change in guidance furthered that goal. Ex. A at 3.

[15] In *Regents of the Univ. of Cal.*, the Supreme Court held that a DHS immigration action was arbitrary and capricious because it was issued "without any consideration whatsoever of a [more limited] policy." 140 S. Ct. at 1912 (internal quotation omitted). The two Memos at

10

Similarly, DHS failed to explain its extreme departure from prior practice as required by the APA. *Regents*, 140 S. Ct. at 1913. Indeed, the agency did not consider or weigh the policy concerns that underlie the enforcement obligations under the INA, much less the policy concerns that underlie prior agency enforcement priorities. Further, DHS failed to address or acknowledge the foreseeable or almost certain consequences of adopting such narrowly-drawn enforcement priorities. The failure to enforce immigration laws (or the mere perception of it) is always followed by dramatic increases in the number of unlawful migrants at the southern border. The number of unlawful migrants flooding the southern border this year are a testament to this reality. Because of the agency's failure to consider such policy concerns, its adoption of the interim guidance is arbitrary and capricious.

## V. The Adoption of the Interim Guidance Violates the APA's Procedural Requirements

The APA requires rules to undergo notice and comment unless they are exempt. *See* 5 U.S.C. § 553(a), (b). While the APA provides exceptions, neither applies to the interim enforcement guidelines. The exceptions are: (1) "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" and (2) "when the agency for good cause finds … that notice and public procedure thereon are impracticable, unnecessary or contrary to the public interest." 5 U.S.C. § 553(b)(3)(A)-(B). An interpretative rule, as opposed to a legislative rule for which notice and comment rulemaking is required, "merely explain[s], but do[es] not add to, the substantive law that already exists in the form of a statute or legislative rule." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003). A legislative rule, in contrast, creates new law, rights, or duties. *Id.* Legislative rules also substantially curtail the agency's discretion going forward. *Guardian Fed. Sav. & Loan Ass'n v. FSLIC*, 589 F.2d 658, 666-67 (D.C. Cir.

---

issue in this case also fail this requirement. It creates a default rule against removal, despite federal immigration law requiring removal, and only permits enforcement actions that fit within the narrow priorities identified. Neither Memo explains why highly restricted enforcement is preferable to more limited restrictions.

11

1978) ("If it appears that a so-called policy statement is in purpose or likely effect one that narrowly limits administrative discretion, it will be taken for what it is -- a binding rule of substantive law.").

Here, there is little question that the interim enforcement guidance "effects a change in existing law or policy" and is thus a substantive rule that cannot escape the APA's notice and comment requirements. 5 U.S.C. § 553. The interim guidance itself demonstrates how the agency severely curtailed its own discretion in taking enforcement actions. Prior to the issuance of the interim guidance memoranda, immigration officers were free to execute the immigration laws of the United States against all removable aliens. But, after the issuance of the interim guidance, immigration officers must obtain preapproval from Field Office Directors or Special Agents in Charge prior to fulfilling enforcement actions mandated by the INA, for example, executing a removal order against a non-priority alien.

In addition, there is little question that rights and obligations are altered by the interim guidance. Aliens who were present in the United States prior to November 1, 2020, but have no criminal record will not be apprehended or removed by ICE agents. Indeed, most criminal aliens (those not convicted of an aggravated felony) who would have been a priority under prior guidance will no longer face enforcement actions. *See Texas*, 2021 U.S. Dist. LEXIS 33890 at \*125-26.

Finally, DHS also cannot avail itself of the APA's good-cause exception. To do so, DHS would have needed to have "incorporate[d] the [good cause] finding and a brief statement of reasons therefor in the rules issued." 5 U.S.C. § 553(b)(3)(B). It did not do so here, precluding any reliance on that exception. *United States v. Picciotto*, 875 F.2d 345, 348 (D.C. Cir. 1989).

**VI.    The Interim Guidance Violates the Take Care Clause**

In granting review in a related enforcement-policy case, the Supreme Court ordered "the parties … to brief and argue '[w]hether [the DHS policy] violates the Take Care Clause of the Constitution.'" *United States v. Texas*, 136 S.Ct. 906 (2016). If this

Court considers the Take Care Clause, it should rule against defendants either under the Clause itself or under the INA on constitutional-avoidance grounds.

The failure to "take Care that the Laws be faithfully executed," U.S. CONST. art. II, §3, is present here because, under separation-of-powers principles, it falls to Congress to make the laws, to the Executive to enforce the laws faithfully, and to the judiciary to interpret the laws. Under that division of authority, this Court clearly must reject the interim guidance:

> With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.
>
> Such institutions may be destined to pass away. But it is the duty of the Court to be last, not first, to give them up.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952). Justice Jackson put *Youngstown* within a "judicial tradition" beginning with Chief Justice Coke's admonishing his sovereign that "[the King] is under God and the Law." *Id.* at 655 n.27 (interior quotation marks omitted). Following Coke and Jackson, this Court must reject the interim guidance's overreach.

The restrictions on the enforcement actions immigration officers are authorized to take under the interim guidance do not simply apply to the removal of aliens. Rather, they apply to "decision[s] to issue, serve, file, or cancel a Notice to Appear" (the charging document in removal proceedings), as well as "to a broad range of other discretionary enforcement decisions, including" immigration stops and arrests, detentions and releases, and the termination of removal proceedings against facially removable aliens. Unless the court enjoins the interim guidance, it effectively means that there will be little or no immigration enforcement, or even removal proceedings, involving a broad swath of facially removable aliens for the foreseeable future. This programmatic refusal to enforce the law is incompatible with the Take Care Clause.

# **CONCLUSION**

This Court should grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted, this 23rd day of March, 2021.

| | |
|---|---|
| CHRISTOPHER J. HAJEC<br>MATT A. CRAPO<br>Immigration Law Reform Institute<br>25 Massachusetts Ave., NW, Ste. 335<br>Washington, DC  20001<br>Tel: 202-232-5590<br>Fax: 202-464-3590<br>Email: chajec@irli.org<br>Email: matt.crapo@pm.me | */s/ Michael Ryan Williams*<br>MICHAEL RYAN WILLIAMS, ESQ.<br>3636 North Central Avenue, Suite 560<br>Phoenix, Arizona 85012<br>State Bar No. 029703<br>m.ryan.williams@gmail.com<br>(602) 740-0321<br><br>*Lead Counsel for Amicus Curiae* |