Victoria Lopez  (Bar No. 330042)**
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
vlopez@acluaz.org
Telephone: (602) 650-1854
*Counsel for Amici Curiae ACLU, ACLU of Arizona, ACLU of Montana*

***admitted pursuant to Ariz. Sup. Ct. R. 38(f)*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> United States Department of Homeland Security, *et al.*, <br><br> *Defendants*. | Case No. 2:21-cv-00186-SRB |

### BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION, ACLU OF ARIZONA, AND ACLU OF MONTANA IN SUPPORT OF DEFENDANTS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

    A. Removal Orders ...................................................................................... 2

    B. The 100-Day Deportation Pause ........................................................... 3

ARGUMENT .................................................................................................... 4

    I. The Deportation Pause Is Not Contrary To Section 1231(a)(1) ........... 4

        A. Section 1231(a)(1)(A) does not override the discretion to
            stay removals ...................................................................... 4

        B. Any violation of § 1231(a)(1)(A) is insufficient to support
            the broad injunction Plaintiffs seek ................................... 8

    II. The States' Agreements Are Unenforceable and Invalid. ................... 9

    III. Plaintiffs' Arbitrary and Capricious Argument Lacks Merit. ......... 13

    IV. The Deportation Pause Is Exempt From Notice And Comment ..... 14

CONCLUSION ................................................................................................ 15

i

# TABLE OF AUTHORITIES

**Cases**

*Alabama Rural Fire Ins. Co. v. Naylor,*
530 F.2d 1221 (5th Cir. 1976) ................................................................. 10

*Am. Hosp. Ass'n v. Bowen,*
834 F.2d 1037 (D.C. Cir. 1987) ............................................................... 15

*Arizona Dream Act Coal. v. Brewer,*
855 F.3d 957 (9th Cir. 2017) ..................................................................... 5

*Arizona v. United States,*
567 U.S. 387 ............................................................................................. 11

*Asika v. Ashcroft,*
362 F.3d 264 (4th Cir. 2004) ..................................................................... 6

*Batterton v. Marshall,*
648 F.2d 694 (D.C. Cir. 1980) ................................................................. 14

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ................................................................................... 9

*Bresgal v. Brock,*
843 F.2d 1163 (9th Cir. 1987) ................................................................... 9

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ................................................................................... 9

*Chicago v. Morales,*
527 U.S. 41 (1999) ..................................................................................... 5

*City of Seabrook v. Costle,*
659 F.2d 1371 (5th Cir. Unit A 1981) ....................................................... 5

*Coleman v. Quaker Oats Co.,*
232 F.3d 1271 (9th Cir.2000) ..................................................................... 4

*Devitri v. Cronen,*
290 F. Supp. 3d 86 (D. Mass. 2017) .......................................................... 7

*E. Bay Sanctuary Covenant v. Biden,*
18-17274, 2020 WL 8970552 (9th Cir. Feb. 28, 2020) ............................. 9

*Freytag v. Comm'r,*
501 U.S. 868 (1991) ................................................................................. 12

*Gardner v. City of Dallas,*
81 F.2d 425 (5th Cir. 1936) ..................................................................... 11

*Grainger v. Ensley,*
2019 WL 1997485 (D. Or. Feb. 15, 2019) ................................................ 6

*Horne v. Flores*,
   557 U.S. 433 (2009) ................................................................. 12

*Ibrahim v. Acosta*,
   2018 WL 582520 (S.D. Fla. Jan. 26, 2018) ................................ 7

*In re Rains*,
   428 F.3d 893 (9th Cir. 2005) .................................................... 4

*Int'l Eng'g Co., Div. of A-T-O v. Richardson*,
   512 F.2d 573 (D.C. Cir. 1975) ................................................. 10

*Kessler v. FCC*,
   326 F.2d 673 (D.C. Cir. 1963) ................................................. 14

*Larson v. Domestic & Foreign Commerce Corp.*,
   337 U.S. 682 (1949). ................................................................. 9

*Maine Cmty. Health Options v. United States*,
   140 S. Ct. 1308 (2020) ............................................................. 8

*Make the Rd. New York v. Wolf*,
   962 F.3d 612 (D.C. Cir. 2020) ................................................. 13

*Matter of E-R-M- & L-R-M-*,
   25 I. & N. Dec. 520 (BIA 2011) ............................................... 6

*N. Am. Commercial Co. v. United States*,
   171 U.S. 110 (1898) ................................................................. 11

*New York v. United States*,
   505 U.S. 144 (1992) ................................................................. 12

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................. 5

*Nw. Env't Advoc. v. EPA*,
   340 F.3d 853 (9th Cir. 2003) .................................................... 12

*Perry Cap. LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ................................................. 10

*Printz v. United States*,
   521 U.S. 898 (1997) ................................................................. 12

*Reno v. American-Arab Anti-Discrimination Cmte.*,
   525 U.S. 471 (1999) ................................................................. 4

*Robbins v. U.S. Bureau of Land Mgmt.*,
   438 F.3d 1074 (10th Cir. 2006) ............................................... 10

*Stone v. Mississippi*,
   101 U.S. 814 (1879) ................................................................. 11

iii

*Texas v. United States*, No. 6:21-cv-00003,
    2021 WL 723856 (S.D. Tex. Feb. 23, 2021) .......................................................... 6, 13

*Town of Castle Rock v. Gonzales*,
    545 U.S. 748 (2005) ................................................................................................. 5

*Tran v. Mukasey*,
    515 F.3d 478 (5th Cir. 2008) ................................................................................... 8

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
    136 F.3d 641 (9th Cir. 1998) ................................................................................. 10

*U.S. Dep't of Lab. v. Kast Metals Corp.*,
    744 F.2d 1145 (5th Cir. 1984) ............................................................................... 15

*U.S. Tr. Co. of New York v. New Jersey*,
    431 U.S. 1 (1977) ............................................................................................. 10, 11

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) ............................................................................................... 11

**Statutes**

5 U.S.C. § 702(2) ........................................................................................................ 10

8 U.S.C. § 1225(b)(1) ................................................................................................. 13

8 U.S.C. § 1229a .......................................................................................................... 2

8 U.S.C. § 1231(a)(1) ............................................................................................ 3, 4, 8

8 U.S.C. § 1231(a)(1)(B) .............................................................................................. 8

8 U.S.C. § 1231(a)(1)(C) .............................................................................................. 8

8 U.S.C. § 1231(a)(5) ................................................................................................. 13

8 U.S.C. § 1252(a)(1) ................................................................................................... 2

**Regulations**

8 C.F.R. § 214.11(d)(1)(ii) ............................................................................................ 7

8 C.F.R. § 214.14(c)(1)(ii) ............................................................................................ 7

8 C.F.R. § 241.6(a) ....................................................................................................... 7

8 C.F.R. § 1241.6(a) ..................................................................................................... 7

**Other Authorities**

BEN HARRINGTON, CONG. RESEARCH SERV., R45158, AN OVERVIEW OF DISCRETIONARY
    REPRIEVES FROM REMOVAL: DEFERRED ACTION, DACA,
    TPS, AND OTHERS (Apr. 10, 2018) .......................................................................... 6, 7

Const. art. II, § 1, cl. 1.................................................................................... ......11

Exec. Order No. 12,711, Policy Implementation With Regard to Nationals of the
People's Republic of China, 55 Fed. Reg. 13,897 (Apr. 11, 1990) ............................... 7

ICE Form 246, Application for a Stay of Deportation or Removal (Nov. 2020),
https://bit.ly/3d3BR7j ..................................................................................... 7

Presidential Memorandum of January 19, 2021: Deferred Enforced Departure for Certain
Venezuelans, 86 Fed. Reg. 6,845 (Jan. 25, 2021) ........................................... 7

# INTRODUCTION

Weeks before an interim immigration policy—already blocked by another court—is set to expire, Arizona and Montana bring this lawsuit seeking to enjoin it.  Specifically, Plaintiffs challenge a 100-day pause of certain types of removals that prioritizes other removals and enforcement actions while the administration develops longer-term immigration policies.  In doing so, they seek to upend the federal government's discretion to temporarily stay certain removals and determine immigration enforcement priorities.  Plaintiffs' case relies on legal errors, misunderstandings of the policy at issue, and baseless speculation.  It should be rejected.

Amici ACLU, ACLU of Arizona, and ACLU of Montana submit this brief to address several reasons why Plaintiffs' arguments fail.  First, 8 U.S.C. § 1231(a)(1)(A) does not override the Executive's longstanding discretion to stay removals and, even if the Court finds otherwise, any injunction would apply to only a small subset of individuals.  Second, Plaintiffs cannot enforce the unlawful and invalid Agreement signed by an outgoing Department of Homeland Security ("DHS") official immediately before a change in administrations.  Third, when properly understood in the context of the entire immigration system, the pause is not arbitrary and capricious because it funnels DHS's limited resources to prioritize removals at the border.  And finally, interim policies such as this one that pause agency action while it sorts out long term priorities are procedural rules exempt from notice and comment.

# BACKGROUND

### A. Removal Orders

When an immigration judge determines that a person is removable and denies any relief from removal, the judge enters a removal order.  This order becomes administratively final once the person either loses their administrative appeal or declines to file one.  At this point, the order is a "final removal order."  But this term of art obscures the fact that a final order is often far from the end of the process.  *See* Declaration of Claudia Valenzuela, ECF No. 82-1 ("Valenzuela Decl.") ¶¶ 17–20, *Texas v. U.S.*, No. 6:21-cv-00003 (S.D. Tex. *filed* Feb. 12, 2021).  The noncitizen may seek judicial review of the final order with the appropriate federal Court of Appeals.  *Id*. ¶ 18; 8 U.S.C. § 1252(a)(1).  Final orders may also be reopened by the executive branch for such matters as lack of a hearing notice, new evidence of danger in the country where a person would be removed, or new eligibility for a form of immigration relief.  *Texas v. U.S.*, No. 6:21-cv-00003 (S.D. Tex. *filed* Feb. 10, 2021).  Thus, individuals with "final" orders arising from regular removal proceedings under § 240 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229a, often remain in the country for months or years, with real prospects of permanent immigration relief.  Valenzuela Decl. ¶ 19–20; Berg Decl. ¶ 12.

There are approximately 11 million individuals without regular immigration status in the United States—"undocumented" persons.  Valenzuela Decl. ¶ 9.  Of those, approximately 1.19 million have final removal orders.  Berg Decl. ¶ 8.  Through many administrations, there has been a substantial number of individuals with outstanding final

removal orders.  *Id.* ¶ 12 (only 17.73% of removal orders that became final since January 2019 have been executed); Valenzuela Decl. ¶¶ 17–20.  There are many reasons for this: some people are pursuing judicial review, others have been granted deferred action for various reasons, and others have simply not been a high priority.  Berg Decl. ¶ 8; Valenzuela Decl. ¶ 17.  By contrast, at any given time only a tiny proportion of overall removal orders have become final within the last 90 days—meaning a tiny proportion are within the removal period described in 8 U.S.C. § 1231(a)(1).  Declaration of David Hausman, ECF No. 82-2 ("Hausman Decl.") ¶ 18, *Texas v. U.S.*, No. 6:21-cv-00003 (S.D. Tex. *filed* Feb. 12, 2021).  The vast majority of people with removal orders are outside of the removal period.

## B.  The 100-Day Deportation Pause

On January 20, 2021, the Acting Secretary of Homeland Security issued a memorandum ("DHS Memorandum") setting interim policies while the agency undertakes a review of federal immigration enforcement policies and priorities.  As part of those interim policies, the DHS Memorandum directed a 100-day pause on the removal of certain noncitizens with final orders of removal so that "DHS's limited resources [can] be prioritized to: (1) provide sufficient staff and resources to enhance border security and conduct immigration and asylum processing at the southwest border fairly and efficiently; [] (2) comply with COVID-19 protocols to protect the health and safety of DHS personnel and those members of the public with whom DHS personnel interact;" and (3) "ensure that . . . removal resources are directed to the Department's highest enforcement priorities."  ECF No. 12-1, Ex. A at 3.  Among other exceptions, the

pause does not cover noncitizens who have entered the country after November 1, 2020.

On February 18, 2021, the Acting Director of ICE issued interim guidance ("Interim Guidance") implementing the enforcement priorities of the DHS Memorandum. The Interim Guidance "does not implement, nor take into account" the 100-day removal pause.  ECF No. 12-1, Ex. G at 2.[1]

## ARGUMENT

### I.     The Deportation Pause Is Not Contrary To Section 1231(a)(1).

#### A.  Section 1231(a)(1)(A) does not override the discretion to stay removals

Plaintiffs misconstrue 8 U.S.C. § 1231(a)(1)(A) to *require* removal of all noncitizens with final removal orders within 90 days.  PI Br. 13 (citing *Texas v. United States*, No. 6:21-cv-00003, 2021 WL 247877, at *3 (S.D. Tex. Jan. 26, 2021)).  But this position flatly contradicts Supreme Court precedent establishing that the Executive has the authority to prioritize removals and stay its own hand as it sees fit.  Nothing in § 1231(a)(1) overrides that discretion, as confirmed by the statutory context and past agency practice.

The Supreme Court has already recognized that under the very statute on which

---

[1] Plaintiffs purportedly seek to enjoin the 100-day pause and the Interim Guidance and seek to enjoin the pause "including as embodied by the Interim Guidance."  PI Br. 3, 6.  Yet, the Interim Guidance explicitly does not include any aspect of the deportation pause, *see* ECF No. 12-1, Ex. G at 2, 3 n.3, or contain a removal moratorium.  Thus, Plaintiffs' claims are limited solely to the 100-day pause in the DHS Memorandum, and Amici address only that policy.  Having not raised any argument as to why the Interim Guidance is illegal, Plaintiffs are foreclosed from raising any new such argument on reply because they failed to brief it in their initial filing.  *See In re Rains*, 428 F.3d 893, 902 (9th Cir. 2005) ("issues cannot be raised for the first time in a reply brief") (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1289 n. 4 (9th Cir.2000)).

4

Plaintiffs rely, the executive branch retains its longstanding discretion to stay removal.  In *Reno v. American-Arab Anti-Discrimination Cmte.*, 525 U.S. 471, 484 (1999) ("*AADC*"), the Court explained that "execut[ing] removal orders" is part of "the deportation process," and "[a]t each stage the Executive has discretion to abandon the endeavor." *Id.* at 483 (first alteration in original).  The Court thus made clear that executive branch authorities "may . . . decline to execute a final order of deportation." *Id.* at 484.  It further noted that the 1996 statute was enacted against the backdrop of the executive branch's prior "regular practice . . . of exercising that discretion for humanitarian reasons or simply for its own convenience." *Id.* at 483–84;  *see also Nken v. Holder*, 556 U.S. 418, 439–40 (2009) (Alito, J., dissenting) ("Once an order of removal has become final, it may be executed at any time"—but "the Executive Branch" may still "stay its own hand."); *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 967 (9th Cir. 2017) ("the federal statutory and regulatory scheme, as well as federal case law, vest the Executive with very broad discretion to determine enforcement priorities").

Contrary to Plaintiffs' contention, a single word in § 1231(a)(1)(A)—"shall"—does not disturb this longstanding discretion to execute removals.  PI Br. 13.  Law enforcement statutes providing that an agency "shall" engage in an enforcement action generally do *not* create mandatory, enforceable duties.  In *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760 (2005), the Supreme Court confronted a statute providing that a police officer "*shall arrest*" or "*seek a warrant"* in case of certain violations.  *Id*. at 754, 759.  Justice Scalia, writing for the Court, explained that "[t]he deep-rooted nature of law-enforcement discretion" means that officers continue to have discretion not to take

enforcement actions "even in the presence of seemingly mandatory commands." *Id.* at 761; *see also Chicago v. Morales*, 527 U.S. 41, 62 n.32 (1999); *City of Seabrook v. Costle*, 659 F.2d 1371, 1374 n.3 (5th Cir. Unit A 1981) ("the word 'shall'" imposes no mandate "when duties within the traditional realm of prosecutorial discretion are involved"); *Grainger v. Ensley*, 2019 WL 1997485, at *5 (D. Or. Feb. 15, 2019), *report and rec. adopted,* 2019 WL 1993530 (D. Or. May 6, 2019) (same).

The *Texas* court recognized that *Castle Rock* speaks to the statutory question at issue, but inexplicably refused to apply its holding. Instead, the court contrived a new doctrine that a "shall" in a law enforcement statute *is* indeed mandatory "if the statute's manifest purpose is to protect the public or private interests of innocent third parties." *Texas v. United States*, No. 6:21-cv-00003, 2021 WL 723856, at *35 (S.D. Tex. Feb. 23, 2021). But this would swallow the *Castle Rock* rule because presumably all law enforcement directives aim at protecting third parties from crime. No court has ever adopted this gloss on *Castle Rock*, where the directive was found not to be mandatory despite the statute's obvious purpose to "protect . . . [the] interests of innocent third parties"—domestic violence survivors—by promoting robust enforcement of restraining orders. *Id.*; *cf. id.* at 779 (Stevens, J., dissenting) (describing legislature's "unmistakable goal of eliminating police discretion in this area . . . for the benefit of the narrow class of persons who are beneficiaries of domestic restraining orders").

The *Castle Rock* presumption that "shall" is not mandatory has long been true in the removal context. "It is common for the term 'shall' to mean 'may' when it relates to decisions made by the Executive Branch" that pertain to "DHS's exercise of its

prosecutorial discretion." *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 522 (BIA

2011); *see also Asika v. Ashcroft*, 362 F.3d 264, 268 n.5 (4th Cir. 2004) (per curiam).

DHS and its predecessors have therefore exercised their discretion to stay removals for

decades.  *See generally* BEN HARRINGTON, CONG. RESEARCH SERV., R45158, AN

OVERVIEW OF DISCRETIONARY REPRIEVES FROM REMOVAL: DEFERRED ACTION, DACA,

TPS, AND OTHERS (Apr. 10, 2018) (providing overview of the historical and

contemporary practice of staying removal).  Contemporary DHS regulations and policies

make clear that the agency has the authority to "grant a stay of removal or deportation" to

"an alien under a final order" "for such time and under such conditions as [the agency]

may deem appropriate."  8 C.F.R. § 241.6(a); *see also id.* § 1241.6(a); ICE Form 246,

Application for a Stay of Deportation or Removal (Nov. 2020), https://bit.ly/3d3BR7j.

And the agency has developed special procedures to stay the removal of certain

categories of individuals on humanitarian and law enforcement grounds.  *See, e.g.*, 8

C.F.R. § 214.11(d)(1)(ii) (T-visa applicants); *id.* § 214.14(c)(1)(ii) (U-visa applicants).

This discretion encompasses categorical reprieves from removal, which are

regularly granted by every presidential administration.  *See, e.g.*, Presidential

Memorandum of January 19, 2021: Deferred Enforced Departure for Certain

Venezuelans, 86 Fed. Reg. 6,845 (Jan. 25, 2021) (directive by prior administration

staying removal of Venezuelans for 18 months); Exec. Order No. 12,711, Policy

Implementation With Regard to Nationals of the People's Republic of China, 55 Fed.

Reg. 13,897 (Apr. 11, 1990) (deferring removal of Chinese nationals as response to the

Tiananmen Square protests); *Devitri v. Cronen*, 290 F. Supp. 3d 86, 89 (D. Mass. 2017)

(approximately 100 Indonesian Christians with final removal orders granted annual stays of removal routinely for seven years); *Ibrahim v. Acosta*, 2018 WL 582520 at *1 (S.D. Fla. Jan. 26, 2018) (similar, for approximately 4,800 Somali nationals with final removal orders).

Plaintiffs do not mention this century of Supreme and Circuit Court precedent and consistent government practice.  Instead, they cite inapposite cases that did not consider *AADC*, *Castle Rock*, or the weight of historical practice.  *See* PI Br. 13 (citing *Ulysse v. Dep't of Homeland Sec.*, 291 F. Supp. 2d 1318, 1325 (M.D. Fla. 2003) (only addressing *when* the removal period began for purposes of detention authority); *Tran v. Mukasey*, 515 F.3d 478, 481 (5th Cir. 2008) (not interpreting discretionary power to stay removal or *Castle Rock*); and *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) (interpreting "shall" in a distinct context)).

### B. Any violation of § 1231(a)(1)(A) is insufficient to support the broad injunction Plaintiffs seek.

Even if the Court holds that § 1231(a)(1) overrides the government's discretion to stay removals, by the plain terms of the statute that duty could only apply during the "removal period"—generally the 90 days after an order becomes final.  *See* 8 U.S.C. § 1231(a)(1)(A), (B); *see also id.* § 1231(a)(1)(C) (limited exception).  Plaintiffs do not, and could not, offer any argument that the government is under a statutory obligation to remove individuals who are outside the removal period within a specific period of time. The vast majority of individuals with final orders of removal are well past the 90-day removal period.  *See* Hausman Decl. ¶ 18 (estimating that removal orders issued through

regular removal proceedings that are currently in the removal period represent just 0.84% of all outstanding removal orders).  As such, the broad injunctive relief Plaintiffs seek is unwarranted.  *See* PI Br. 3.

"[T]he scope of injunctive relief is dictated by the extent of the violation established." *E. Bay Sanctuary Covenant v. Biden*, 18-17274, 2020 WL 8970552, at *25 (9th Cir. Feb. 28, 2020) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  "[I]t must be narrowly tailored to remedy the specific harm shown."  *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987).  The Court cannot and should not enjoin the entire pause based on a legal claim that at most impacts a small subset of people to whom the pause applies.  Any injunction must instead be limited to the small subset of people who are still within the 90-day removal period.[2]

## II.    The States' Agreements Are Unenforceable and Invalid.

The States briefly invoke a "SAFE Agreement" they signed with an outgoing DHS official just days before the end of the prior administration.  PI Br. 14.  The Agreement purports to give the States a 6-month veto over *any* changes to the prior administration's immigration enforcement policies, a stunning and unprecedented attempt to sign away the incoming administration's constitutional and statutory power over immigration.  *See* ECF No. 12-1, Exs. C, H at § III.A.1, 2, 3.  The Court should reject this Agreement as emphatically as possible.  It is unenforceable, invalid, and unconstitutional.

---

[2] The *Texas* court did not address the limits of Plaintiffs' statutory theory, despite the fact that Intervenors fully briefed it.  *See Texas*, 2021 WL 723856, at *35–38; Intervenors' PI Opp., *Texas v. United States*, No. 6:21-cv-00003, 2021 WL 723856, ECF No. 82 at 16–18 (S.D. Tex. *filed* Feb. 12, 2021).

1.  There is no jurisdiction over this claim, because for over 70 years, it has been "settled that sovereign immunity bars a suit against the United States for specific performance of a contract." *Bowen v. Massachusetts*, 487 U.S. 879, 921 (1988) (Scalia, J., dissenting) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 704 (1949)). The APA incorporates this bar on the equitable enforcement of contracts, as the Ninth Circuit and every other Circuit to consider the issue has held. *See Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646–47 (9th Cir. 1998); *Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1228 (5th Cir. 1976) (same); *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006) (same and collecting further cases from the First, Second, Third, and D.C. Circuits). As the Ninth Circuit has explained, Congress waived sovereign immunity for contract claims seeking *damages*, but intentionally did not for contract claims seeking declaratory and injunctive relief; 5 U.S.C. § 702(2) therefore bars the States' contract claim. *Tucson Airport*, 136 F.3d at 646; *see Robbins*, 438 F.3d at 1083 (same).

The States cannot evade this rule by dressing their claim in the garb of the APA. *See* PI Br. 14. The APA does not allow a plaintiff to bring "a disguised contract action" where the contract provides "the source of the rights" the plaintiff seeks to enforce, and the plaintiff simply argues that the contract violation also amounts to an APA violation. *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017); *see Int'l Eng'g Co., Div. of A-T-O v. Richardson*, 512 F.2d 573, 576, 580 n.10 (D.C. Cir. 1975) (cutting through such "plumage").

2.  The Agreement is also substantively invalid because it impermissibly purports

to sign away an enormous swath of the federal government's immigration power.  The "reserved powers" doctrine imposes a common-sense rule: a government may not "enter into an agreement that limits its power to act in the future" where the agreement "surrenders an essential attribute of its sovereignty."  *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 23 & n.20 (1977).  As the Supreme Court explained in *Stone v. Mississippi*, "agencies can govern according to their discretion . . . while in power; but they cannot give away nor sell the discretion of those that are to come after them."  101 U.S. 814, 820 (1879).  Thus, the government "may not contract away an essential attribute of sovereignty."  *United States v. Winstar Corp.*, 518 U.S. 839, 888–89 (1996) (plurality opinion) (internal quotation marks omitted); *id.* at 922–23 (Scalia, J., concurring in the judgment) ("certain core governmental powers cannot be surrendered"); *N. Am. Commercial Co. v. United States*, 171 U.S. 110, 137 (1898) (same).

The Agreement here plainly violates that principle.  It purports to give the States a veto over "the National Government's constitutional power" to regulate immigration, implicating its "inherent power as sovereign to control and conduct relations with foreign nations."  *Arizona v. United States*, 567 U.S. 387, 394–95.  That kind of sovereign function lies at the core of the powers that may not be contracted away under the reserved powers doctrine.  *Cf. U.S. Trust Co.*, 431 U.S. at 24–25 (explaining that certain "purely financial" contracts fall outside the doctrine).  The "new administration" can ignore such a contract, because the agency "could not lawfully commit itself to the continued enforcement of [] existing [policies]."  *Gardner v. City of Dallas*, 81 F.2d 425, 426 (5th Cir. 1936).

3.  Most fundamentally, the Agreement threatens the basic principles of our constitutional system.  The Constitution provides that the "executive Power" is "vested" in the President.  Const. art. II, § 1, cl. 1.  But the Agreement would divest the President of that authority in significant ways.  If it were valid, then *every* agency could lock in *every* policy whenever power is set to change hands, preventing the next Executive from exercising its constitutional duties.  Simply by finding a contracting partner—a State, or an advocacy group, or even an individual—executive officials could hobble their successors indefinitely.  The Supreme Court has consistently rejected such attempts by the President or agencies to give away their own authority.  *See, e.g.*, *New York v. United States*, 505 U.S. 144, 181–82 (1992) ("the Executive Branch," cannot "narrow[]" its own "constitutional authority"); *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991) (similar); *Printz v. United States*, 521 U.S. 898, 922 (1997) (President cannot "transfer[] th[e] responsibility" to administer federal law).

Even more troubling, the Agreement's surrender of authority strikes at the heart of our Constitution's guarantee of democratic governance.  Mechanisms that "bind . . . officials to the policy preferences of their predecessors" prevent future administrations from "fulfill[ing] their duties as democratically-elected officials."  *Horne v. Flores*, 557 U.S. 433, 449 (2009) (quotation marks omitted) (warning against agreements that represent "collusion between advocacy groups and executive officials who *want* to bind the hands of future policymakers") (emphasis added) (citing *Nw. Env't Advoc. v. EPA*, 340 F.3d 853, 855 (9th Cir. 2003) (Kleinfeld, J., dissenting)).  And, conversely, the Agreement would deprive the People of their basic ability to bring about change by

voting for officials who promise to change policy.  The Agreement thus cannot be squared with the bedrock principle that "both state and federal officials" must "remain accountable to the people."  *New York*, 505 U.S. at 168.

### III.    Plaintiffs' Arbitrary and Capricious Argument Lacks Merit.

Plaintiffs' arbitrary and capricious arguments are predicated on a fundamental misunderstanding of the policy. Plaintiffs allege that the 100-day pause "creates a default *against* removal" and amounts to "a broad no-removal policy."  PI Br. 8.  But this is incorrect: the policy directs resources to border processing and in doing so, *prioritizes* the removals of recent arrivals over the removal of people who have been in the United States longer.

The majority of removals result from rapid, summary procedures applied to recent arrivals at the border—generally expedited removal and reinstatement of removal. Valenzuela Decl. ¶¶ 21, 26–27.  Expedited removal permits the entry of a removal order by a Customs and Border Protection ("CBP") officer, subject to a limited asylum screening conducted by a DHS asylum officer and reviewed by an Immigration Judge. *Id*. ¶¶ 22–23; 8 U.S.C. § 1225(b)(1).  Reinstatement of removal applies where an individual previously ordered removed reenters unlawfully, in which case DHS can reinstate and execute the prior removal order without a new hearing.  Valenzuela Decl. ¶ 25; 8 U.S.C. § 1231(a)(5).  The DHS Memorandum allows most of these streamlined deportations at the border to continue, because it allows removals of people who have arrived and continue to arrive since November 2020.  DHS Memorandum at 3.  These removals at the border represent the majority of *all* removals nationwide, *see* Valenzuela

1   Decl. ¶ 27, and by transferring resources to the border, the Memorandum *prioritizes* this

2   largest category of removals over others.[3]

3
      Thus, understood in the context of the *entire* immigration removal system,
4
5   Plaintiffs' claims that the agency failed to explain how the pause "accomplishes its stated

6   goals" and "ignored the harms its policy will cause" fall apart.  PI Br. 8–9.  DHS has

7   chosen to prioritize certain removals over others by freeing up resources from interior

8
9   removals and redirecting them to the agency's identified priorities of border processing,

10  border removals, and public health protection.  There was nothing arbitrary about that

11  decision.

12  **IV.    The Deportation Pause Is Exempt From Notice And Comment.**

13
      Plaintiffs additionally claim that the 100-day pause was subject to notice and
14
15  comment.  PI Br. 11–12.  Not so.  The pause is a procedural rule "primarily directed

16  toward improving the efficient and effective operations of an agency."  *Batterton v.*

17  *Marshall*, 648 F.2d 694, 702 n.34 (D.C. Cir. 1980).  It does not bar anyone's eventual

18
19  removal, but instead briefly prioritizes some removals over others while the agency sorts

20  out its long-term enforcement policies.

21      Courts have rejected similar notice-and-comment claims and "declined to upset

22  freezes on" agency activity "pending completion of" longer-term policymaking.  *Kessler*

23

24  [3] The *Texas* court resisted this uncontested evidence, emphasizing that DHS expanded
      expedited removal in 2019 to encompass people who have been in the country up to two
25  years, and concluding that as a result the pause would "inevitably cancel a substantial
      number of expedited removals ICE would have performed in the interior of the United
26  States."  *Texas*, 2021 WL 723856, at *14.  But that conclusion is simply wrong.  The
      expansion was entirely enjoined until late last year, *see Make the Rd. New York v. Wolf*,
27  962 F.3d 612 (D.C. Cir. 2020), and all available public information indicates that use of
      the expansion in the months since has been extremely limited—and may soon be
28  discontinued all together, *see* 86 Fed. Reg. 8267 (Feb. 2, 2021).

*v. FCC*, 326 F.2d 673, 680–82 (D.C. Cir. 1963) (collecting cases).  *Kessler* held that

notice and comment was not required for a policy temporarily pausing decisions on

broadcast permit applications so that the agency could promulgate new substantive

criteria for deciding applications.  *Id*.  The court agreed that "a temporary limited halt" in

regulatory action "was a necessary adjunct to any efficient and effective" policymaking

process.  *Id.* at 680–81.  The same is true here.

Nor does the pause "grant[] rights and creat[e] obligations."  PI Br. 12.  It does not

dictate that individuals subject to the pause will or will not be ultimately deported; it

simply postpones such a decision.  Notice and comment is not required for a policy like

this that simply "funnel[s] . . . agency [enforcement] resources" and does not decide the

ultimate "rights and obligations" of regulated parties.  *U.S. Dep't of Lab. v. Kast Metals

Corp.*, 744 F.2d 1145, 1155 (5th Cir. 1984); *see also Am. Hosp. Ass'n v. Bowen*, 834 F.2d

1037, 1050 (D.C. Cir. 1987) (agency "enforcement plan" to "concentrate" its "limited

resources on particular areas" is a "classic procedural rule[]").

## CONCLUSION

The Court should deny Plaintiffs' request for a preliminary injunction.

1    Dated: March 26, 2021                         Respectfully submitted,

2                                                  /s/ *Victoria Lopez*

3    Cody Wofsy*                                   Victoria Lopez**
     Spencer E. Amdur*                             ACLU FOUNDATION OF ARIZONA
4    AMERICAN CIVIL LIBERTIES UNION                3707 North 7th Street, Suite 235
5    39 Drumm Street                               Phoenix, AZ 85014
     San Francisco, CA 94111                       Telephone: (602) 650-1854
6    Telephone: (415) 343-1198                     vlopez@acluaz.org
     cwofsy@aclu.org
7    samdur@aclu.org                               Noor Zafar*
8                                                  Omar C. Jadwat*
     Alex Rate*                                    Michael K.T. Tan*
9    ACLU OF MONTANA                               Anand Balakrishnan*
10   FOUNDATION, INC.                              David Chen*
     P.O. Box 1968                                 AMERICAN CIVIL LIBERTIES UNION
11   Missoula, MT 59806                            FOUNDATION, IMMIGRANTS' RIGHTS
     Telephone: (406) 224-1447                     PROJECT
12   ratea@aclumontana.org                         125 Broad Street, 18th Floor
13                                                 New York, NY 10004
                                                   (212) 549-2600
14                                                 nzafar@aclu.org
15                                                 ojadwat@aclu.org
                                                   mtan@aclu.org
16                                                 abalakrishnan@aclu.org
                                                   dchen@aclu.org
17
18                                                 *pro hac vice forthcoming*

19                                                 **admitted pursuant to Ariz. Sup. Ct. R.
20                                                 38(f)*

21

22

23

24

25

26

27

28

16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2021 I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

*/s/Victoria Lopez*
Victoria Lopez