1   **MARK BRNOVICH**                          **AUSTIN KNUDSEN**
    **ATTORNEY GENERAL**                       **MONTANA ATTORNEY GENERAL**
2   (Firm State Bar No. 14000)

3
    Joseph A. Kanefield (No. 15838)            David M. Dewhirst*
4   Brunn (Beau) W. Roysden III (No. 28698)       *Solicitor General*
5   Drew C. Ensign (No. 25463)                 215 N Sanders St.
    Anthony R. Napolitano (No. 34586)          Helena, MT 59601
6   Robert Makar (No. 33579)                   Phone: (406) 444-4145
7   2005 N. Central Ave                        David.Dewhirst@mt.gov
    Phoenix, AZ 85004-1592
8   Phone: (602) 542-8958                      *pro hac vice granted*
9   Joe.Kanefield@azag.gov
    Beau.Roysden@azag.gov                      *Attorneys for Plaintiff State of Montana*
10  Drew.Ensign@azag.gov
11  Anthony.Napolitano@azag.gov
    Robert.Makar@azag.gov
12  *Attorneys for Plaintiffs State of Arizona*
13  *and Mark Brnovich in his official capacity*

14                  **UNITED STATES DISTRICT COURT**

15                        **DISTRICT OF ARIZONA**

16  State of Arizona; State of Montana; and     No. 2:21-cv-00186-SRB
    Mark Brnovich, in his official capacity as
17  Attorney General of Arizona,                **REPLY IN SUPPORT OF MOTION**
                                                **FOR PRELIMINARY INJUNCTION**
18              Plaintiffs,

19          v.                                  **(Oral Argument Set for April 8, 2021
                                                at 10:30 a.m.)**
20  United States Department of Homeland
    Security; United States of America;
21  Alejandro Mayorkas, in his official
    capacity as Secretary of Homeland
22  Security; Troy Miller, in his official
    capacity as Acting Commissioner of
23  United States Customs and Border
    Protection; Tae Johnson, in his official
24  capacity as Acting Director of United
    States Immigration and Customs
25  Enforcement; and Tracy Renaud, in her
    official capacity as Acting Director of U.S.
26  Citizenship and Immigration Services,
27
28              Defendants.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………..…...1

ARGUMENT……………………………………………………….……...2

I.      Plaintiffs Have Shown a Likelihood of Success on the Merits .............................. 2

     A. Defendants' Threshold APA Defenses Fail ........................................................ 2

          1.      This decision is not committed to agency discretion by law ........................ 2

          2.      Congress has not precluded judicial review of these types of decisions ...... 4

          3.      The States are not barred by the "zone of interests" test............................. 6

          4.      The Removal Moratorium Is Final Agency Action .................................... 7

     B. Defendants' Merits Defenses Also Fail ............................................................... 9

          1.      The Memorandum and Interim Guidance are Contrary to Law under 8
                   U.S.C. § 1231(a)(1) ........................................................................................ 9

          2.      The Memorandum and Interim Guidance Failed to Consider
                   Alternatives Under *State Farm* and *Regents* ............................................... 11

          3.      The Memorandum and Interim Guidance Failed to Comply with Notice
                   and Comment .................................................................................................. 13

          4.      The Memorandum and Interim Guidance failed to follow any part of
                   the MOUs, even the commitment by DHS to consult and provide a
                   written explanation for rejecting State's requests ...................................... 14

II.     Plaintiffs Have Standing And Have Established Irreparable Injury Warranting a
        Preliminary Injunction Here...................................................................................... 15

III.    The Balance of the Equities and Public Interest Factors Support Plaintiffs .......... 17

CONCLUSION……………………………………………………………..………17

i

**INTRODUCTION**

Plaintiffs' Motion for Preliminary Injunction can and should be resolved based on the flagrant procedural illegalities of the January 20 Memorandum—an issue that DHS has already lost in *Texas v. United States* and chose not to appeal. *See* Dkt. 12-1 at 66. The illegality of the Memorandum extends to the nearly identical Interim Guidance, which is necessarily built upon the Memorandum as its indispensable foundation.

The policy announced by the Acting DHS Secretary on January 20—but in truth "author[ed]" by an incoming White House staffer in an act of political ventriloquism— was to "pause" removals of all but a narrow subset of aliens with final removal orders (the "Removal Moratorium").[1]  In its haste to announce a policy appealing to certain aspects of its political base on Inauguration Day, the Biden administration engaged in fundamental—and quite possibly unprecedented—violations of the APA and immigration laws.  First, the Removal Moratorium is arbitrary and capricious because DHS failed to consider the harms and alternatives to its nearly blanket prohibition on removals of those with final removal orders. Indeed, there is no indication that DHS considered anything at all.  Second, the Removal Moratorium squarely violates the APA's notice-and-comment requirements.  Third, the Removal Moratorium establishes an official policy to violate 8 U.S.C. § 1231(a)(1)(A)'s unequivocal mandate to process final orders of removal within 90 days.  Fourth, the Removal Moratorium violates the MOUs between DHS and Plaintiffs.

Defendants' response attempts to sidestep these patent violations under the pretense that this case is limited to the Memorandum—which has already been enjoined. DOJ goes so far as to refer this Court to a different twenty-five page brief filed in Florida if "the Court believes this action does implicate the February 18 Guidance[.]" Response at 3 n.2. But this case is not so limited, and Plaintiffs have been clear that "This action also challenges the 'Interim Guidance.'" Dkt. 12 ¶ 9.

---

[1]  As noted in the Motion, "Removal Moratorium" herein refers both to that moratorium in the Memorandum and in the Subsequent Interim Guidance unless otherwise noted.  *See* Dkt. 17 at 3 n.3; *see also infra* pp. 8, 12 (discussing Interim Guidance).

In any event, that apparently incorporated-by-reference response is heavily focused on 8 U.S.C. § 1226—*not* 8 U.S.C. § 1231, which is the provision actually at issue here.  And putting that aside, the Florida brief in turn refers to yet another brief, which was filed in the *Texas* case for certain key issues—such as whether the removal pause violates § 1231.  Response to Preliminary Injunction, *Florida v. United States*, No. 21-cv-541, Dkt. 23 at 20 (M.D. Fla. Mar. 23, 2021).   All of this attempted incorporating other briefs by reference is procedurally improper, and this Court should reject Defendant's arguments as to the Interim Guidance on that basis alone.  *D'Agnese v. Novartis Pharm. Corp.*, 952 F. Supp. 2d 880, 885 (D. Ariz. 2013) (disregarding cross-references, noting "this attempt to incorporate various documents by reference that include arguments related and unrelated to the current issues before the Court circumvents … rules governing page limits.").

Those referenced briefs make plain that the Interim Guidance's restatement of the Removal Moratorium in slightly modified form is nothing more than an unsuccessful attempt to paper over the defects in the Removal Moratorium in the original Memorandum, which was enjoined in *Texas* and not appealed.  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573-76 (2019) (rejecting pre-textual agency action).  For the reasons set forth below, the Court should grant the Motion and should enjoin the Removal Moratorium in the Interim Guidance as well in the Memorandum.

## ARGUMENT

### I.   Plaintiffs Have Shown a Likelihood of Success on the Merits
#### A.   Defendants' Threshold APA Defenses Fail

Defendants raise the same threshold defenses they raised in *Texas v United States*.  They fail here for the same reasons that they were rejected by that court.

##### 1.  This decision is not committed to agency discretion by law

Defendants cannot overcome the APA's "strong presumption in favor of judicial review[.]"  *INS v. St. Cyr*, 533 U.S. 289, 298 (2001).  Because Section 1231(a)(1)(A) contains an express command to execute the final step in the removal process within 90

2

days, Congress has removed agency discretion from this particular provision of the INA. *See Heckler v. Chaney*, 470 U.S. 821, 832-33 (1985).  Even if the statute were to vest the agency with *some* discretion, the Removal Moratorium amounts to an abdication of DHS's statutory duty and, thus, still runs afoul of the APA.  *See id.* at 833 n.4.

Section 1231(a)(1)(A) is best understood as the culmination of Congress's statutory scheme for removal.  It is categorically not the type of general investigative, prosecutorial, or police task committed to agency discretion under *Chaney* or *Castle Rock*.  Although *other* INA provisions may contain enforcement flexibility, the unambiguous mandatory language of § 1231(a)(1)(A) does not.  *See Lema v. INS,* 341 F.3d 853, 855 (9th Cir. 2003) ("Ordinarily, the INS *must* remove an alien in its custody within ninety days from the issuance of a final removal order." (emphasis added)).

Congress enacted § 1231(a)—and its less-stringent predecessor § 1252(i)—to "reduc[e] prison overcrowding and cost to the government" and therefore impos[ed] a duty on the [government] to deport criminal aliens[.]"  *Giddings v. Chandler*, 979 F.2d 1104, 1109-10 (5th Cir. 1992) (citing 8 U.S.C. § 1252(i) (1986)); *Prieto v. Gluch*, 913 F.2d 1159, 1165 (6th Cir. 1990) ("the burden of inaction [in removals] falls on the State and local governments and not on the Federal system.") (quotations omitted).  For that reason, "Congress intended for inadmissible, excludable, or removable aliens to be deported within 90 days, if possible." *Ulysse v. Dep't of Homeland Sec.*, 291 F. Supp. 2d 1318, 1325 (M.D. Fla. 2003).  Congress in § 1231(a)(1)(A) has left virtually no room for agency discretion when it comes to the agency's timely removal of aliens; Defendants may not skirt that statutory duty by rearranging enforcement priorities.  *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("[A]n agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes[.]").

The statutory language and context § 1231(a) divest DHS of any possible discretion.  *See Dunlop v. Bachowski*, 421 U.S. 560 (1975) (mandatory "shall" language required Secretary of Labor to investigate complaint filed by union worker); *Chaney*, 470

U.S. at 833 (distinguishing *Dunlop* statute from FDA's general decision to forego enforcement proceeding).   A statutory event, such as the filing of a complaint or the entering of a final order of removal, combined with "shall" sets these situations apart more generalized enforcement decisions under *Chaney*.   As discussed in section I.B.1., *infra*, the use of "shall" in the statutory context shows this command to be mandatory.

Moreover, even general enforcement commands, are not completely immune from judicial review under *Chaney* when a plaintiff challenges an agency's enforcement *policy* rather than an individual enforcement decision.   *See Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994).   This is because "an agency's pronouncement of a broad policy against enforcement poses special risks that it 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities[.]'"   *Id.* at 677 (quoting *Chaney*, 470 U.S. at 833 n.4); *see also Abreu v. United States*, 796 F. Supp. 50, 54 (D.R.I. 1992) (INS "abrogates its statutory duty by delaying deportation hearings until the expiration of a prison term") (citing 8 U.S.C. § 1252(i) (1988)). DHS's wholesale exemption of nearly all final orders of removal is just such a policy.

Defendants cannot evade APA review by hiding behind generalized—and capacious—assertions of enforcement discretion.   Congress has spoken and the Moratorium directly conflicts with the unambiguous directives in § 1231(a)(1)(A).

## 2. Congress has not precluded judicial review here

None of the INA provisions cited by Defendants preclude judicial review because they pertain only to *individuals'* claims challenging removal.   Sections 1252(a)(5) and 1252(b)(9) are inapplicable because they merely limit how aliens can challenge their removal proceedings and channel judicial review to the courts of appeals.   *See J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016).   Section 1231(h)'s text shows that Congress enacted it to bar *aliens* from filing lawsuits under § 1231, not to protect unlawful agency action from APA challenge.   *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

The text of § 1252 makes clear that it applies to "[j]udicial review of orders of

removal." *See* 8 U.S.C. § 1252.  This applies to individual filing petitions challenging orders of removal, not Plaintiff states. *See Martinez v. Napolitano,* 704 F.3d 620, 622 (9th Cir. 2012); 8 U.S.C. § 1252(d).   The States are not challenging a judicial order of removal and therefore § 1252(a)(5) does not apply.

Section 1252(b)(9) is likewise inapplicable because it concerns individuals' challenges to final orders of removal.  *See* 8 U.S.C. § 1252(b)(9) ("Judicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 499 (1999) (Stevens, J., concurring) ("[T]he meaning of 8 U.S.C. §[] 1252(b)(9)" is "perfectly clear." The statute "postpones judicial review of removal proceedings until the entry of a final order ….").

Section 1231(h) also does not bar review.  The term "any party," as used in § 1231(h), unambiguously refers to aliens involved in removal proceedings.  As a result, "[s]ection 1231(h)'s bar is irrelevant" because the States do "not bring any claims under that section." *See Chhoeun v. Marin*, No. SACV 17-01898-CJC, 2018 U.S. Dist. LEXIS 132363, at *17 n.3 (C.D. Cal. Mar. 26, 2018).   This conclusion is confirmed by the statutory and legislative history of § 1231.

Section 1231(a)(1)(A) has two prior corollary statutes, 8 U.S.C. § 1252(i)[2] and 8 U.S.C. § 1252(c).[3]  *See Channer v. Hall*, 112 F.3d 214, 216 (5th Cir. 1997).  In enacting these earlier versions, Congress was concerned with prison overcrowding because "the burden of inaction [on removals] falls on the State and local governments[.]"  *See Prieto*, 913 F.2d at 1165 (citing 132 Cong. Rec. H9794 (daily ed. Oct. 9, 1986) (statement of Rep. MacKay)).[4]

---

[2] "In the case of an alien who is convicted of an offense which makes the alien subject to deportation, the Attorney General shall begin any deportation proceedings *as expeditiously as possible* after the date of conviction." 8 U.S.C. 1252(i) (1986).
[3] "[T]he Attorney General shall have a period of six months from the date of [a final order of deportation under administrative processes] . . . to effect the alien's departure." 8 U.S.C. 1252(c) (1994).
[4] *Accord Campos v. INS*, 62 F.3d 311, 314 (9th Cir. 1995); *Giddings*, 979 F.2d at 1109; *Hernandez-Avalos v. INS*, 50 F.3d 842, 847 (10th Cir. 1995); *Gonzalez v. United States*

The Ninth Circuit subsequently ruled that § 1252(i) also created a duty to incarcerated aliens, putting them within the zone of interest for mandamus actions. *See Campos*, 62 F.3d at 312. Congress disapproved of this interpretation and enacted § 225 of the Immigration and Nationality Technical Corrections Act of 1994 ("INTCA") to address the problem. Pub. L. No. 103–416, 108 Stat. 4305 ("nothing in … 8 U.S.C. § 1252(i)[] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person"). The Ninth Circuit acknowledged that § 225 was likely in direct response to its prior holding. *See Campos,* 62 F.3d at 314. It also noted that "[b]y enacting section 225, Congress made clear that the sole purposes of section 1252(i) are economic, not humanitarian." *Id.* The term "party" only applies to aliens involved in removal proceedings and does not bar Plaintiffs' APA claims.[5]

### 3.  The States are not barred by the "zone of interests" test

The zone of interest test is not especially demanding, and the States need only be "'arguably'" within what is protected or regulated by the statute. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). The States easily satisfy this "lenient" standard for an APA claim. *Sierra Club v. Trump*, 929 F.3d 670, 703 n.26 (9th Cir. 2019).

The interests the States seek to protect fall directly within the zone of interests of the INA. *See Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015) (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012) ("The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[] many of the consequences of unlawful immigration."). This "[r]eflect[s] a concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local

---

*INS*, 867 F.2d 1108, 1110 (8th Cir.1989) (§ 1252(i)).

[5]  In 1996, Congress transferred §§ 1252(i) and (c) to a new section, § 1231, with the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. No 104-208, 110 Stat. 3009 (1996). *See Channer*, 112 F.3d at 215–16 (discussing transfer). The language of § 1231(h) is nearly identical to § 1252(i).[5] Thus, § 1231(h) was meant to correct the Ninth Circuit's ruling and nothing else. The statutory text, context, and legislative history eliminate any doubt regarding Congress's intent in enacting § 1231(h).

governments at increasing rates[.]'" *Id.* (quoting 8 U.S.C. § 1601). "'Congress deemed some *unlawfully present* aliens ineligible for certain and local public benefits unless the state explicitly provides otherwise.' With limited exceptions, unlawfully present aliens are 'not eligible for any State or local public benefit.'" *Id.* (quoting 8 U.S.C. § 1621(a)).[6]

Defendants mistakenly rely on dicta from the Tenth Circuit's decision in *Hernandez-Avalos.* Dkt. 26 at 13-14. *Hernandez-Avalos*, importantly, did not involve an APA claim. 50 F.3d at 845 n.8. And the claim made by four aliens serving prison sentences seeking a writ of mandamus to initiate deportation proceedings. *Id.* at 843. *Hernandez-Avalos* was also decided prior to the Supreme Court's decision in *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), which loosened the zone of interest test. *See id.* at 283. The dicta in *Hernandez-Avalos* cannot overcome the definitive statutory history and plethora of caselaw showing that § 1231(h) applies only to aliens.

### 4. The Removal Moratorium Is Final Agency Action

The Removal Moratorium constitutes final agency action. DHS chose to institute a binding 100-day Moratorium for a statute containing a 90-day window for removal that directly affects rights and obligations and has immediate legal consequences. Defendants attempt to characterize this abdication of statutory duty as "a temporary shift in priorities" which "defer[s] enforcement for a brief period;" but the action deserving scrutiny is the pause itself, which took effect immediately and constituted the consummation of the agency's (*i.e.*, the White House's) decision-making process, such as it were. Dkt. 26 at 14. The possibility that DHS may supersede the Moratorium with another final agency action down the line does not insulate it from review. *See Sackett v. EPA*, 566 U.S. 120, 127 (2012).

The Removal Moratorium suspends DHS's statutory obligation to remove aliens within 90 days. *See Lema*, 341 F.3d at 855. It demands that DHS officials defy

---

[6] Although not required, Plaintiffs also satisfy the zone of interest test when applied specifically to § 1231. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 401 (1987). As discussed in Part I(A)(2), *supra*, § 1231(a)(1)(A) and its prior corollary statutes, 8 U.S.C. § 1252(i) and 8 U.S.C. § 1252(c), were intended to remove burdens on the State and local governments. *See, e.g., Campos*, 62 F.3d at 314; *Prieto*, 913 F.2d at 1165; *Giddings*, 979 F.2d at 1109.

§ 1231(a)(1)(A). *See NRDC v. EPA*, 643 F.3d 311, 320 (9th Cir. 2011). Section B of the Memorandum tellingly stated "nothing [herein] prohibits the *apprehension* or *detention* of individuals unlawfully in the United States who are not identified as priorities" but specifically did not mention *removals*. Dkt. 12-1, Ex. A at 3 (emphasis added).

The Interim Guidance later expanded that pronouncement to "the arrest, detention, *or removal* of any noncitizen" and set forth a process whereby ICE may allegedly institute removal actions against non-priority persons. *Id.*, Ex. G at 3, 6 (emphasis added). But this new scheme merely hides the same non-removal policy behind a slightly more creative veil of discretion.[7] Even if the Guidance confers some discretion, it reverses the statutory presumption in favor of removal and forces ICE to seek approval from high-level officials to carry out its most routine statutory functions. *See Lema,* 341 F.3d at 855.

There are also legal consequences flowing from these rights and obligations. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). DHS's abdication of its statutory duty has significant legal consequences for those with final orders of removal who are detained. *See Zadvydas*, 533 U.S. at 683-84; *id.* at 701 (discussing 8 U.S.C. § 1231(a)(6)). It also orders "assessments of alternatives to removal" for all previous final orders of removal. Dkt. 12-1, Ex. A at 4. As discussed in section II, *infra*, it also affects the obligations of the States. *See, e.g.*, *Campos*, 62 F.3d at 314; *Prieto*, 913 F.2d at 1165; 8 U.S.C. § 1231(i) (empowering the Attorney General to contract with States to offset the costs that States incur when detaining criminal aliens).

The Removal Moratorium affects rights and obligations for multiple parties. The legal consequences are such that it clearly constitutes final agency action regardless of post hoc efforts by DHS to appear otherwise.

---

[7] *See* Molly O'Toole, *Biden directs ICE to focus arrests and removals on security threats*, L.A. TIMES (Feb. 18, 2021) ("John Sandweg, acting ICE director and general counsel at the Homeland Security Department under President Obama, said … 'ICE follows its policies to a T … I don't share the groups' concerns that somehow they will … result in individuals who don't pose public safety being apprehended or deported.'").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.** **Defendants' Merits Defenses Also Fail**

Plaintiffs are likely to succeed on the merits of their claims because the Removal Moratorium is contrary to law under 8 U.S.C. § 1231(a)(1) and a violation of the APA and of the MOUs.  While Plaintiffs are likely to succeed on their multiple claims, "a party seeking a preliminary injunction need only demonstrate a likelihood of success on one claim for which injunctive relief would otherwise be appropriate." *Piper v. Gooding & Co. Inc.*, 334 F. Supp. 3d 1009, 1021 n. 7 (D. Ariz. 2018).

### 1. The Memorandum and Interim Guidance are Contrary to Law under 8 U.S.C. § 1231(a)(1)

The Removal Moratorium is contrary to law under 8 U.S.C. § 1231(a)(1) and an improper assertion of agency discretion.  The word "shall" in § 1231(a)(1)'s 90-day removal directive is mandatory language.  *See Lema*, 341 F.3d at 855 ("Ordinarily, the INS *must* remove an alien in its custody within ninety days from the issuance of a final removal order. *See* 8 U.S.C. § 1231(a)(1)(A)-(B).") (emphasis added).  Defendants' contrary assertions (at Dkt. 26 at 15-16) rely almost exclusively upon *Castle Rock*.  But that case involves interpretation of different statutory language (described as "vague" by the Supreme Court), a different basis for plaintiff's claims (Due Process Clause rights and § 1983), and different requested relief (monetary damages for a single incident of non-enforcement).  *Town of Castle Rock, Colorado v. Gonzales*, 545 U.S. 748, 754, 763 (2005).  And its holding was based on a different question of whether the plaintiff had a "protected property interest" in the benefit of police enforcement of the restraining order against her husband: "Even if the statute could be said to have made enforcement of restraining orders 'mandatory' … that would not necessarily mean that state law gave *respondent* an entitlement to *enforcement* of the mandate." *Id.* at 751, 764-65.

Unlike § 1231(a)(1), the language of the Colorado statute at issue in *Castle Rock* provides for discretion on its face, first stating a "peace officer shall use every reasonable means to enforce a restraining order" and "shall arrest, or, if an arrest would be impractical … seek a warrant for the arrest of a restrained person" when probable cause of a violation exists.  *Id.* at 759 (quoting Colo. Rev. Stat. § 18-6-803.5(3) (Lexis 1999)).

As the Court noted, this imprecision and potential for choice leaves unclear "the precise means of enforcement that the Colorado restraining-order statute assertedly mandated. … Such indeterminacy is not the hallmark of a duty that is mandatory." *Id.* at 763.  And one of the options, "seeking of an arrest warrant[,] would be an entitlement to nothing but procedure—which we have held inadequate even to support standing[.]" *Id.* at 764.

Contrast this with "Except as otherwise provided in this section … the Attorney General shall remove the alien from the United States within a period of 90 days[.]"  8 U.S.C. § 1231(a)(1)(A).  Here, the means of enforcement are clear: removal within 90 days.  Exceptions must be prescribed in the law.  The language of § 1231(a)(3) regarding supervision after the 90-day period does not make the 90-day removal period any less mandatory, especially where § 1231(a)(1) acknowledges that Congress may provide for exceptions to the 90-day timeframe, such as where the alien fails to obtain travel documents or "conspires or acts to prevent the alien's removal" as outlined by § 1231(a)(1)(C).[8]  Section 1231(a)(3)'s language merely shows that Congress recognized the need for regulations to cover those instances in which reality does not conform to the 90-day removal period, such as in those exceptions it expressly provided.  But that is not license for DHS to disregard the statute's mandatory language as applied wholesale to entire classes of aliens with final orders of removal.

To the contrary, as the Ninth Circuit recognized in *Lima*, "shall" means "must" in § 1231(a)(1)(A), and it is proper for this Court to hold that the same language continues in its recognized, mandatory meaning.  341 F.3d at 855.  DHS's authority is bound by the language of the U.S. Constitution and of relevant statutes enacted by Congress, and "does not include the authority to 'suspend' or 'dispense with' *Congress's* exercise of legislative Powers in enacting immigration laws."  *Texas v. U.S.*, 2021 WL 723856, at *37 (S.D. Tex. Feb 23, 2021).  Thus the 100-day Removal Moratorium is unlawful

---

[8]   Indeed, the Ninth Circuit also held that the "shall" in § 1231(a)(3) means "must," which supports a reading of the word to conform to the same meaning throughout the same statutory text.  *See*, *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1115 (9th Cir. 2001); *and Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning").

because it violates § 1231(a)(1)'s mandatory 90-day removal language on its face.

### 2. The Memorandum and Interim Guidance Failed to Consider Alternatives Under *State Farm* and *Regents*

The Removal Moratorium is also arbitrary and capricious because DHS failed to "supply a reasoned analysis for the change" and to consider policy alternatives. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 51 (1983); *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) ("*Regents*") ("when an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'") (quoting *State Farm*, 463 U.S. at 51). Indeed, as the Supreme Court reaffirmed this week, the "APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus*, No. 19-1231, slip op. at 7 (U.S. Apr. 1, 2021).

Defendants provide almost no reasoning or explanation for the Memorandum—a scant seven-page administrative record consisting of a broadly worded executive order and the Memorandum itself—and refused to provide *any* record or other evidence of analysis supporting the Interim Guidance. Admin. Record at AR_000001-7, *Texas v. United States*, No. 6:21-cv-00003 (S.D. Tex. Feb. 3, 2021), ECF No. 59-1; Dkt. 18 at 2-3; Dkt. 20. Defendants' position appears to be that all the evidence of the agency's "reasoned analysis" necessary to support either documents for the purposes of this Motion for Preliminary Injunction is contained in the text of the Memorandum itself. Dkt. 18 at 3 (claiming an administrative record for the Interim Guidance is not necessary because of its link to the Memorandum). Defendants offer nothing else to sustain it.

This is not remotely sufficient. "When an administrative agency sets policy, it must provide a reasoned explanation for its action. That is not a high bar, but it is an unwavering one." *Judulang v. Holder*, 565 U.S. 42, 45 (2011). But DHS's decision documents only announce *what* DHS is doing and make no attempt to explain *why*. In doing so, DHS failed to surmount the APA's not-high bar.

The absence of any genuine reasoning is particularly alarming in light of Defendants' admission that "DHS 'display[ed] awareness that it *is* changing position.'"

11

Dkt. 26 at 18 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Yet the Memorandum fails to provide any indication that the agency even considered the important costs of its new policy, despite such decision-making being "the agency's job[.]" *Regents*, 140 S.Ct. at 1914. DHS even fails to supply an explanation for the length of its 100-day pause in removals. Why not 50 or 180 days? DHS certainly never even hints why (though the metadata reveals it was because that it was length that the White House dictated to it). Defendants argue that it is somehow fatal to Plaintiffs' case that the States have not suggested their own policy alternatives, but (1) not only has *Regents* made clear that doing so is DHS's job—not Plaintiffs' and (2) Plaintiffs did actually name alternatives in their briefing by questioning why a 100-day pause was chosen over some other number, such as 50 or 200. Dkt. 26 at 18; Dkt. 17 at 5. DHS still failed to provide evidence of having weighed even these obvious alternatives.

The lack of evidence of any prior analysis or weighing of factors exposes the Removal Moratorium as resting on impermissible pretextual basis. To the extent that any actual analysis actually occurred here: (1) it was performed by the White House, not DHS, and (2) is entirely imperceptible—*i.e.*, completely absent from the administrative record produced to date and Defendants' own submissions to-date here.

Defendants note that the standard of review allows for proportionality regarding the evidence required on each side, and choosing a policy may involve "a complicated balancing" of factors within the agency's expertise. Dkt. 26 at 18. Maybe so. But there is no evidence that DHS did any such balancing. "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

Unlike the cases Defendants cite, Plaintiffs do not ask the Court to judge the policy wisdom of DHS's preferred policy against Plaintiffs'. Plaintiffs simply ask this Court to take note of the near-complete absence of actual reasoning by DHS and weigh that against that the APA demands under *State Farm* and its progeny, under which DHS's analysis is palpably wanting. *See,* Dkt. 26 at 18.

The administrative record provides no support for the Memorandum.  And Defendants' briefing admits that validity of the Removal Moratorium rests on the validity of the Memorandum alone.   Dkt. 26 at 17 n 8 ("Defendants do not rely on the Guidance to defend the policy the States challenge.").   Moreover, even if DHS were to attempt to provide more justification now, such rationale must be rejected as *post hoc* pretext since the evidence here shows that DHS irretrievably committed to the Moratorium at a time when it had done no analysis whatsoever to support that decision.  *Dep't of Commerce*, 139 S.Ct. at 2573-76.  It is thus arbitrary and capricious.

### 3.  The Memorandum and Interim Guidance Failed to Comply with Notice and Comment

The Memorandum and Interim Guidance both failed to comply with the APA's notice and comment requirements.  5 U.S.C. § 553.  Defendants acknowledge that the Removal Moratorium is a rule subject to the APA, but assert that it is exempt as either a "general statement of policy" or a "procedural rule."  Dkt. 26 at 18-19.  But "[a]gencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements."  *Azar v. Allina Health Servs.*, 139 S.Ct. 1804, 1812 (2019).  "[C]ourts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply."  *Id.*

The Removal Moratorium is neither a general statement of policy nor a procedural rule.  A general statement of policy must "not impose any rights and obligations" and may only "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Community Nutrition Institute v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987); and *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012-13 (9th Cir. 1987).   Similarly, "a procedural rule does not itself 'alter the rights or interests of parties.'"  *Elec. Privacy Info. Ctr. v. U.S. Dept. of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011) (quotations omitted).   But the Removal Moratorium does just that: it is of immediate effect, "commands that DHS stop performing its obligation under section 1231(a)(1)(A)," and "affects the rights of those with final orders of removals by calling for a reassessment of *all* previous orders of removal[.]"   Ex. A at 3; *Texas*, 2021 WL

13

723856, at *45.  Indeed that is the very point of the Moratorium: confer on those with final removal orders a new right to avoid removal.[9]

More generally, a rule is not procedural if it "encodes a substantive value judgment" thereby "putting a stamp of [agency] approval or disapproval on a given type of behavior." *Chamber of Commerce of the U.S. v. U.S. DOL*, 174 F.3d 206, 211 (D.C. Cir. 1999) (cleaned up).  The Moratorium plainly does that: it places DHS's "stamp of disapproval" on removals for 100 days in a manner no line officer could fail to perceive.

The Moratorium also affects the rights and obligations of states that suffer the costs of the Removal Moratorium, such as those leading to Plaintiffs' irreparable injury discussed in section II., *infra*.  And the Removal Moratorium is not an exercise of a discretionary power, as discussed in sections I.A.1. and I.B.1., *supra*.  Thus the rule cannot be a mere statement of policy or procedural rule.

### 4. The Memorandum and Interim Guidance failed to follow any part of the MOUs, even the commitment by DHS to consult and provide a written explanation for rejecting State's requests

DHS's failure to follow the MOUs supports these claims.  But for one footnote, Defendants' Response is generally preoccupied with a mischaracterizing of Plaintiffs' claims regarding the MOUs.  Dkt. 26 at 20 n 9 ("The States raise the agreements only in support of an APA claim").  Plaintiffs are not seeking specific performance of the MOUs. Dkt. 26 at 20-23.  Rather, Plaintiffs seek a declaration that the Removal Moratorium is void, and *inter alia*, the MOUs establish that DHS changed its removal policy, did not follow proper procedure in doing so—including a failure to comply with either the APA or the MOUs' requirements to provide notice and an explanation of that change—and recognized that such a change would cause Defendants irreparable harm.  Dkt. 12 at 15. DHS's non-compliance with the MOUs exposes its non-compliance with APA requirements.  Even if DHS could not bind itself to later specific performance claims via the MOUs, these documents support Plaintiffs' APA claims, highlighting policy change and DHS's failure to follow statutory procedures in adopting it.

---

[9] The States' obligations are also affected.  *See* section I.A.4., *supra*.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.   Plaintiffs Have Standing And Have Established Irreparable Injury Warranting a Preliminary Injunction Here

Defendants' position is that no State—not Arizona, Montana, Texas, or Florida— has standing to challenge DHS's sudden change in policy on carrying out the immigration laws and also that no State suffers irreparable injury from the predictable consequences of DHS's actions.[10]   But this extreme position has already lost in this Court on similar issues.  *See United States v. Arizona*, 2011 WL 13137062, at *1-2 (D. Ariz. Oct. 21, 2011) (finding Arizona had standing to bring counterclaims).  And the United States has already lost in *Texas v. United States* on this very issue in the context of the Memorandum.  *See* Dkt. 12-1 at 73-81, 104.  The same result should obtain here.

As a preliminary matter, the Court can easily reject DHS's argument (at 5) that the *Texas* preliminary injunction eliminates standing for the simple reason that this case also challenges the Interim Guidance, which was not at issue in Texas.

DHS also admitted in its MOUs that "a decrease or pause on returns or removals of removable or inadmissible aliens" would "result in concrete injuries" to Plaintiffs. Dkt. 17 at 16.  DHS further acknowledged that "an aggrieved party will be irreparably damaged and will not have an adequate remedy at law."  *Id.*  DHS responds by offering its merits argument about the validity of the MOUs.  Dkt. 26 at 7.  But "the question whether a plaintiff states a claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute[.]"   *Bond v. United States*, 564 U.S. 211, 219 (2011). Moreover, the harm alleged with respect to the MOU is a procedural harm—the harm from DHS's breach of its commitment to hear the States' concerns and provide a written explanation if it rejects those concerns.  Such procedural harm is irreparable for purpose of injunctive relief.   Dkt. 17 at 23 (collecting cases).   And contrary to Defendants' argument (at 7), this procedural injury is sufficiently tied to the other concrete harms that the State discussed in its Motion and supported with affidavit evidence—the financial

---

[10]   *See* Dkt. 26 at 4-7 (arguing that Arizona and Montana cannot establish standing or irreparable injury); *see also* Dkt. 12-1 at 73-81, 104 (reviewing and rejecting argument that Texas lacks standing and irreparable injury in *Texas v. United States*); Response to Preliminary Injunction, *Florida v. United States*, No. 21-cv-541, Dkt. 23 at 7 (M.D. Fla. Mar. 23, 2021) (arguing that Florida lacks standing and irreparable harm).

harms that Plaintiffs will suffer from a sudden and ill-conceived change in policy.

Indeed Plaintiffs identified three specific bases for standing and irreparable harm separate from the MOU:  incarceration costs, other increased law enforcement costs such as traffic, and healthcare costs for unauthorized aliens.  Dkt. 17 at 16-22.  The State also demonstrated that many of these costs are unrecoverable, and thus irreparable.  *Id.* Importantly, DHS never responded to the increase in unauthorized traffic leading to greater law enforcement expenditures (Motion at 18).  *See also*, Ex. M at ¶ 20 and Ex. P at 10 (Aliens illegally crossing the southern border and remaining present in the United States facilitate drug trafficking, and the increased costs of enforcing drug laws and combating drug-related crime have taxed Montana's already limited resources.).  DHS's failure to respond to this argument—which was supported by specific evidence— concedes irreparable injury.  *See United States v. Duro*, 2009 WL 10669404, at *11 n.8 (C.D. Cal. Apr. 1, 2009) ("Based on the Government's failure to respond to the merits of this argument, the Court finds that it has waived the right to oppose the Court's ruling on this issue."); *Doe v. Dickenson*, 615 F. Supp. 2d 1002, 1010 (D. Ariz. 2009) (same). Defendants also never address special solicitude standing.  Dkt. 17 at 15 n.9.  This is because they have no response to this.

Defendants' only response to the other unrecoverable financial harms (incarceration and medical expenses) is to argue that these events are contingent on the actions of third parties.  Dkt. 26 at 7. But the cases Plaintiffs cited in the Motion are on point and hold that when the actions of third parties are a predictable consequence of the defendant's actions, standing and irreparable injury are met.  Most significantly in *California v. Azar*, the Ninth Circuit held that a causal chain did not fail simply because it has multiple "links"; and a state meets its burden by demonstrating an event is "reasonably probable[.]"  911 F.3d 558, 571-72 (9th Cir. 2018).[11]  In the Motion, the State noted that in Texas the recidivism rate for unauthorized aliens was 70%.  Further

---

[11]  Defendant's attempts to distinguish this and other cases fail.  *See, e.g.*, *Washington v. DeVos*, 466 F.Supp.3d 1151, 1169-70 (E.D. Wash. 2020); *Dep't of Commerce v. New York*, 139 S. Ct. at 2565.

data shows that in the Pinal County Jail, individuals with ICE Detainers have a recidivism rate of approximately 53%.   Ex. Q (Lamb Supplemental Declaration.). Plaintiffs have thus shown a reasonable probability of suffering unrecoverable financial costs from the Removal Moratorium. The State's argument therefore is not that there is a "mere increase in population," Dkt. 26 at 6, but rather that DHS's new policy to limit removals even after final orders of removal have been issued will result in specific, unrecoverable costs to healthcare and law enforcement.[12]   In sum, Plaintiffs have met their burden of showing standing and irreparable injury to support a preliminary injunction.

## III.   The Balance of the Equities and Public Interest Factors Support Plaintiffs

Respondents argue (at 23) that any injunction would "restrain[] core article II authority."  But that contention is belied by their refusal to appeal the *Texas* injunction. Respondents are not acquiescing in an unconstitutional evisceration of their executive powers; they are simply abandoning defense of the indefensible.

Ultimately, the Moratorium is not an exercise of discretion by DHS. It is an outright prohibition imposed by White House political staffers eager to demonstrate progress on "day 1" and contemptuous of statutory mandates and APA procedural requirements. And the most relevant Constitutional concern here is not "core article II authority"—it is the executive's patent violation of Congress's exercise of its authority "[t]o establish an uniform Rule of Naturalization." U.S. CONST. art. I, § 8, cl 4..

## CONCLUSION

Plaintiffs respectfully request that the Court issue a preliminary injunction preventing Defendants from implementing the Removal Moratorium.

---

[12]   The Response's factual premise (at 5-6) that because the moratorium excludes those arriving after 11/1/20, it does not encourage additional unauthorized immigration.  That factual premise contravenes common sense and extensive news reports.   Moreover, Defendants do not provide any citation to the administrative record to support this bare assertion.  Instead this is mere attorney argument that cannot make up for the lack of any meaningful administrative record in this case.

1    RESPECTFULLY SUBMITTED this 2nd day of April, 2021.

2

3                                        **MARK BRNOVICH**
                                         **ATTORNEY GENERAL**
4

5                                        By /s/ Anthony R. Napolitano _____
                                             Joseph A. Kanefield (No. 15838)
6                                            Brunn W. Roysden III (No. 28698)
                                             Drew C. Ensign (No. 25463)
7                                            Anthony R. Napolitano (No. 34586)
                                             Robert J. Makar (No. 33579)
8                                              *Assistant Attorneys General*

9
                                         *Attorneys for Plaintiffs Arizona and Arizona*
10                                       *Attorney General Mark Brnovich*

11

12                                       **AUSTIN KNUDSEN**
                                         **ATTORNEY GENERAL OF MONTANA**
13
                                         */s/ David M.S. Dewhirst (with permission)*
14                                       David M.S. Dewhirst*
                                           *Solicitor General*
15                                       *Pro hac vice granted*

16                                       *Attorneys for Plaintiff State of Montana*

17

18                              CERTIFICATE OF SERVICE

19

20        I hereby certify that on April 2, 2021, I electronically transmitted the attached

21   document to the Clerk's office using CM/ECF System for filing.  Notice of this filing is

22   sent by email to all parties by operation of the Court's electronic filing system.

23                                */s/ Brunn W. Roysden III*

24

25

26

27

28

                                           18

EXHIBIT P

UNCLASSIFIED//FOR OFFICIAL USE ONLY

# MONTANA ANALYSIS & TECHNICAL INFORMATION CENTER



**MONTANA DEPARTMENT OF JUSTICE
DIVISION OF CRIMINAL INVESTIGATION**

# MONTANA NARCOTICS REPORT
# 11 MARCH 2021

This document contains For Official Use Only (FOUO) and information/images and may not be disseminated without prior approval from the Montana Analysis & Technical Information Center (MATIC).  Information contained in this document is subject to change.

# (U) TABLE OF CONTENTS

(U) SCOPE .............................................................................................................................- 3 -

(U) SOURCE SUMMARY AND KEY ASSUMPTIONS .............................................................- 3 -

(U) KEY JUDGMENTS ..........................................................................................................- 3 -

(U) ASSOCIATIONS BETWEEN DRUG, VIOLENT, AND PROPERTY CRIMES .......................- 4 -

(U) DRUG TRAFFICKING IN MONTANA ..............................................................................- 5 -

(U) TRANSNATIONAL CRIMINAL ORGANIZATIONS IN MONTANA .....................................- 7 -

(U) DRUG PURITY LEVELS IN MONTANA............................................................................- 9 -

(U) ASSOCIATED COSTS WITH DRUG ENFORCEMENT......................................................- 10 -

(U) OUTLOOK .....................................................................................................................- 11 -

(U) APPENDIX A: EXPRESSIONS OF LIKELIHOOD OR PROBABILITY ...............................- 12 -

(U) APPENDIX B: CONFIDENCE INTERVALS REGARDING ANALYTICAL JUDGMENTS .....- 12 -

(U) APPENDIX C: CHARTS AND TABLES.............................................................................- 12 -

(U) APPENDIX D: MBCC CRIME CATEGORIES AND UCR CODES .....................................- 14 -

(U) SOURCES......................................................................................................................- 15 -

UNCLASSIFIED//FOR OFFICIAL USE ONLY

# (U) SCOPE

(U//FOUO) This Montana Analysis & Technical Information Center (MATIC) report is intended for law enforcement agencies and public safety officials involved in combatting drug trafficking in Montana. This report provides general information on trends regarding drug, violent, and property crime in Montana, drug trafficking organization operations and the origin of the narcotics transported into the state, drug purity, and generalized financial costs associated with enforcing drug laws in Montana.

# (U) SOURCE SUMMARY AND KEY ASSUMPTIONS

(U//FOUO) The information presented in this report is based off reporting from the Montana Board of Crime Control (MBCC), the Montana Department of Justice-Division of Criminal Investigation (DCI) Narcotics Bureau, the Rocky Mountain High Intensity Drug Tracking Area (RMHIDTA), and the Drug Enforcement Administration (DEA).

(U//FOUO) The most recent data available on crime statistics from the MBCC is 2019, although 2020 statistics will likely be available in the coming weeks. DCI's information is year-to-date, yet it is generalized. The most recent data from MHP is as of 2020. The information used from RMHIDTA is from August 2020, but the majority of the information is circa 2019. The information used from the DEA is from 2021, but most of the information is circa 2019.

(U//FOUO) Methamphetamine (meth), heroin, fentanyl, opioids, and cocaine are the main focus of this report. Note that while these agencies presumably receive and keep up-to-date information on drug and crime trends, there is always a processing and analysis period before agencies can officially release finalized numbers on trends. The official drug and crime statistics presented in this report are one or more years behind, which undoubtedly poses information gaps, since part of the MATIC's analysis relies on the assumption that drug and crime statistics for 2020 and 2021 are likely on the same trajectory from previous years. The MATIC attempts to address these information gaps by incorporating general reporting from DCI Agents who have direct access and up-to-date, tactical knowledge of Montana's current drug trends. As such, the MATIC's judgments in this report rely heavily on DCI reporting.

# (U) KEY JUDGMENTS

- (U//FOUO) The MATIC assesses it is likely[a] that the overall increasing violent crime[b] rates strongly coincide with the overall narcotics violations rates. The MATIC makes this assessment with medium confidence[c] based on reporting from the MBCC, and RMHIDTA, and DCI. However, because the MATIC does not possess 2020 or 2021 crime statistics from MBCC and RMHIDTA, the MATIC cannot render a judgment higher than medium confidence.

---

[a] (U) Refer to Appendix A for expressions of likelihood or probability.
[b] (U) Refer to Appendix D for the types of crimes defined under crimes against persons and property.
[c] (U) Refer to Appendix B for confidence in sources supporting assessments and judgments.

- (U//FOUO) The MATIC assess it is nearly certain that the vast majority of meth, heroin, opioids, fentanyl, and cocaine trafficked in Montana is manufactured abroad and smuggled through the southwestern border—particularly in Arizona and California—before their eventual distribution and use throughout the state. Meth, heroin, opioids, and fentanyl are manufactured in Mexico by Mexican Transnational Criminal Organizations (TCOs) while cocaine is produced in South American countries—Bolivia, Colombia, and Peru—and subsequently smuggled through the southwestern border. The MATIC makes this assessment with high confidence based on substantial reporting and accounts from DEA, DCI, and RMHIDTA.

- (U//FOUO) The MATIC assess it is nearly certain that TCOs have an intermittent presence in Montana but pose a low threat to Montana communities. The MATIC further assesses it is nearly certain that TCOs rely heavily on regional and local DTOs to traffic narcotics within the state on their behalf. The MATIC makes this assessment with high confidence based on reporting from DCI, RMHIDTA, and DEA.

- (U//FOUO) The MATIC assesses it is nearly certain that the purity of meth in Montana is at least 95 percent and has recently increased to 96-99 percent purity in certain areas, while the purity of heroin and cocaine likely varies, as these two drugs are not always tested for purity. The MATIC makes this assessment with high confidence based on reporting from DCI and DEA.

- (U//FOUO) The financial costs of enforcing drug laws and combatting drug related crime have increased overall for the DCI Narcotics Bureau, although the exact amount has not been determined. Reasons for these cost increases include extra hours and resources required to conduct drug investigations which involve tracing drugs with out-of-state origins, a rise in the number of DTOs operating in Montana, a lack of grant funding matches, and increases in quantities purchased during drug investigations.

## (U) ASSOCIATIONS BETWEEN DRUG, VIOLENT, AND PROPERTY CRIMES

(U//FOUO) The MATIC assesses it is likely that the overall increasing violent crime rates strongly coincide with the overall narcotics violations rates. The MATIC makes this assessment with medium confidence based on reporting from the MBCC, and RMHIDTA, and DCI. However, because the MATIC does not possess 2020 or 2021 crime statistics from MBCC and RMHIDTA, the MATIC cannot render a judgment higher than medium confidence.

(U//FOUO) For the time period of 2015 through 2019, Montana's population steadily grew roughly 10,000 people per year, or about one percent.[d,1] During this period, the average rate of crimes against persons increased by 7.6 percent while the average rate of crimes against property decreased by 13.9 percent.[2] At the same time, narcotics violations in Montana have increased by an average rate of 10.1 percent,[3] a statistic which includes substantial increases in Montana drug seizures—particularly meth, pharmaceuticals, and fentanyl. These increases were accompanied by increases in overdoses from meth, heroin, opioids, pharmaceuticals, and fentanyl/synthetic narcotics.[4] Generally, the MATIC is aware that

---

[d] (U) Refer to Appendix C for all charts and tables.

drug crime typically involves crimes against persons and property (e.g. drug users committing assaults, robberies, or burglaries to finance drug purchases), but property crime rates do not seem to reflect that information in reporting between 2015-2019.

(U//FOUO) Because comprehensive data is not yet available for 2020 and year-to-date 2021, the MATIC surveyed DCI Narcotics Bureau Regions 1 through 4 to gain a better understanding of narcotics trends in Montana. General reporting from the DCI Regions is consistent with the above statistics except for property crime. Please note that not all respondents were able to report on all issues or caveats.



(U) MT DCI Narcotics Bureau Regions 1 through 4.
Source:dojmt.gov/enforcement/narcotics-bureau/

(U//FOUO) In DCI Region 1, DCI assessed the following:

- (U//FOUO) It is very common while conducting a dangerous drug investigation to receive information identifying that same suspects' involvement in crimes related to violence or property.[5]

(U//FOUO) In DCI Region 2, DCI assessed the following:

- (U//FOUO) Within the Region, there has been an increase in violent and property crimes. Meth remains the most significant drug threat, followed by heroin. Both drugs are a substantial concern for public health and continue to negatively impact local communities. Montana has seen a significant increase in heroin-related overdose deaths, some of which may be related to the recent trend of heroin being laced with fentanyl.[6]

- (U//FOUO) Counterfeit pills containing fentanyl is an emerging threat. (More on this in the following section.)[7]

(U//FOUO) In DCI Region 4, DCI assessed the following:

- (U//FOUO) Drug trafficking is a major factor in both property and violent crime incidents. Whenever drugs are readily available in eastern Montana, property crime and violence-related calls for service tend to increase for local law enforcement agencies. As drug availability decreases, so do property crimes and violence.[8]

# (U) DRUG TRAFFICKING IN MONTANA

(U//FOUO) The MATIC assess it is nearly certain that the vast majority of meth, heroin, opioids, fentanyl, and cocaine trafficked in Montana is manufactured abroad and smuggled through the southwestern border—particularly in Arizona and California—before their eventual distribution and use throughout the state. Meth, heroin, opioids and fentanyl are manufactured in Mexico by Mexican TCOs while cocaine is produced in South American countries—Bolivia, Colombia, and Peru—and subsequently smuggled through the southwestern border. The MATIC makes this assessment with high confidence based on substantial reporting and accounts from the DEA, DCI, and RMHIDTA.

(U//FOUO) According to the DEA, the vast majority of the meth, heroin, and opioids trafficked in Montana originates from Mexico.[9] It is then smuggled through the southwestern border—mainly Arizona and California—and then transported to Montana through various west coast and Rocky Mountain states.[10] The organizations primarily responsible for the production and smuggling of the meth, heroin, and opioids across the southwestern border (which eventually makes its way to Montana) is the Sinaloa Cartel and the Jalisco New Generation Cartel (CJNG).[11]

(U//FOUO) In DCI Region 1, during the course of several meth, heroin, and fentanyl investigations, DCI assessed the following:

- (U//FOUO) In the majority of cases involving meth, heroin, and fentanyl, the originating sources of supply are directly associated with cartels operating both within Mexico and the United States. The most prevalent organization operating in the DCI Region 1 appears to be the Sinaloa Cartel. Throughout these cases, several Mexican nationals have been identified as sources of supply.[12]

- (U//FOUO) Ongoing trends for drug sources of supply varies to some degree based on the drug type. Drugs such as meth, cocaine, heroin, fentanyl, and counterfeit pharmaceuticals, which require a clandestine laboratory for production have traditionally been exported out of Mexico. Although meth labs still operate in Montana, they are proportionally much smaller and can be as simple as a single self-contained reaction vessel, which produces one-time personal use amounts.[13]

(U//FOUO) In DCI Region 2, during the course of several meth, heroin, and fentanyl investigations, DCI assessed the following:

- (U//FOUO) The sources of these three drugs are associated with the Mexican cartels operating in Mexico and the United States. Mexican cartel associates travel within region, dropping off several pound quantities of meth, heroin, fentanyl, and recently pills identified as OxyContin pills, but laced with fentanyl from a pill press. The Mexican cartels deliver these drugs to citizens in Montana who then distribute the drugs in the bigger cities and branching out to the smaller communities and reservations.[14]

- (U//FOUO) A new trend is counterfeit pills containing fentanyl that are made to resemble prescription pills. Most of these pills are believed to be manufactured in Mexico and smuggled across the Mexican border and either transported by vehicle or disguised and sent by parcel services.[15]

(U//FOUO) In DCI Region 3, during the course of several meth, heroin, and fentanyl investigations, DCI assessed the following:

- (U//FOUO) The majority of drugs appear to being trafficked from California, Nevada, Utah, and Washington. The origin sometimes depends on the method of transportation.[16]

- (U//FOUO) The existence and use of clandestine laboratories for producing drugs in the region has significantly declined over the years. Region 3 only investigates a minimal number of clandestine labs. This is a direct result of Federal drug initiatives as well as drugs being manufactured in other countries on a large-scale and subsequently imported into the United

States (and Montana). This has directly affected Montana's prices, amounts, and the quality of the drugs. Overall, the prices of meth and heroin are cheaper, available in larger amounts, and contain higher purity levels.[17]

- (U//FOUO) The Covid-19 pandemic initially created drug shortages in the region which resulted in price increases. Drug supply levels have since returned to 2019 levels while prices remain elevated. Drug prices vary from town-to-town, depending on their location along, and any disruptions to, the supply chain.[18]

(U//FOUO) In DCI Region 4, during the course of several meth, heroin, and fentanyl investigations, DCI assessed the following:

- (U//FOUO) The sources of drugs vary. Montana residents are known to travel to other states to acquire large amounts of drugs for redistribution, yet drug traffickers from other states also seek to develop networks in the state where they can capitalize on the higher prices and larger profits Montana offers in the illegal drug trade.[19]

- (U//FOUO) Over the past two years in Miles City, dealers and users have been observed shifting to other cities such as Billings, Sidney, and Williston, North Dakota to purchase meth or heroin whenever a shortage occurs. But when drugs are readily available in Miles City, users will often acquire them through the commission of property crimes.[20]

- (U//FOUO) One specific case involved a Billings female escort in Las Vegas. The escort would engage in human trafficking while in Las Vegas to pay for multiple pounds of meth to later distribute in Miles City, Billings, and North Dakota. Another case involved a social media investigation where the suspect claimed to deliver for Colorado cartel gang members. A third case from 2021 involved a suspect living in Sidney, Montana who traded firearms and money for pound level quantities of meth in Colorado. Subsequent interviews with this suspect reported the distributor in Colorado was an active gang member.[21]

- (U//FOUO) Almost all large-scale dealers in Region 4 have a criminal history involving dangerous drugs, and approximately half were either on probation or released from probation within the last year of investigation. The main location for acquiring dangerous drugs for redistribution is Las Vegas, Nevada. Other states have included California, Oregon, Washington, North Dakota, and Colorado.[22]

# (U) TRANSNATIONAL CRIMINAL ORGANIZATIONS IN MONTANA

(U//FOUO) The MATIC assess it is nearly certain that TCOs have an intermittent presence in Montana but pose a low threat to Montana communities. The MATIC further assesses it is nearly certain that TCOs rely heavily on regional and local DTOs to traffic narcotics within the state on their behalf. The MATIC makes this assessment with high confidence based on reporting from RMHIDTA, DCI, and DEA.

(U) In their August 2020 report, RMHIDTA assessed that international DTOs (referred to as TCOs in this report) directly pose the lowest threat to communities throughout Montana. They assessed that these

organizations are complicit in smuggling the high volumes of illicit opioids and stimulants, primarily methamphetamine, into and throughout the state by exploiting the interstate highway system. However, the low number of international DTOs investigated in Montana indicates their threat within the state is lower than multi-state or local organizations. They further noted that Montana RMHIDTA task forces fluctuated year-to-year on the number of international DTOs they investigate, ranging from zero to two international DTOs every year within the last five years. This made it difficult to compare trends regarding international DTOs investigated in Montana.[23]

(U//FOUO) DCI reporting on TCOs in Montana is consistent with reporting from RMHIDTA. In DCI Region 1, DCI assessed the following:

- (U//FOUO) The most prevalent organization operating appears to be the Sinaloa Cartel. Throughout DCI's investigations, several Mexican nationals have been identified as the supply sources. These suspects have entered the United States through border crossings and maintained travel documents. Although they have direct relationships with cartel members within Mexico and the United States, their status within these organizations is difficult to determine. Some have acted as arbitrators between cartels and regional DTOs, where they set up drug transactions, recruit members, and manage the collection and transfer of currency out of Montana. These suspects rely heavily on assistance and support from the local DTOs.[24]

- (U//FOUO) Through various conspiracies involving cartel-directed networking, multiple large scale DTOs have established a presence Montana. The bulk of the distribution and currency transactions may be managed or directed by cartels but seem to be conducted by regional and local groups within the state.[25]

- (U//FOUO) Regarding pharmaceutical drugs, local individuals and some loosely linked groups supply the majority of legitimate pharmaceuticals which are obtained through various diversion methods.[26]

(U//FOUO) In DCI Region 2, DCI assessed the following:

- (U//FOUO) Mexican TCOs deliver narcotics to Montana residents who then distribute the drugs locally. However, delivery from cartel associates to Montana is not the only way these drugs arrive in the region. Local residents travel to Colorado, Utah, California, Nevada, and Washington to meet with the Mexican cartel associates to purchase the drugs for a cheaper price and then transport the drugs back to Montana by vehicle or through parcel services.[27]

(U//FOUO) In DCI Region 4, DCI assessed the following:

- (U//FOUO) Local residents commonly travel out of state to California, Colorado, Nevada, Oregon, and Washington to acquire bulk amounts of meth and heroin for redistribution in Montana. Some suppliers in other states are known or suspected gang members and part of organized crime in their respective areas.[28]

(U//FOUO) Due to Montana's rurality and location along the U.S.-Canadian border, possible links to drug smuggling and subsequent distribution from outside the United States is of concern. While Montana has experienced past incidents involving illegal aliens[29] and human smuggling,[30,31,32] the nexus between the

two is not typically witnessed nor dealt with by Montana law enforcement. However, the MATIC is aware of drug trafficking incidents involving Mexican nationals.

- (U) In October 2018, a Mexican national and resident of Washington was sentenced to 70 months in prison for meth trafficking and money laundering. The suspect was a DTO member who had been trafficking meth from Washington to a local Billings-area distributor in 2016.[33]

- (U) In April 2019, an individual from California was sentenced to 18 months in prison and two years of supervised release after Toole County Sheriff's Office deputies stopped the suspect for speeding and ultimately found a mustard-covered package of meth that was hidden in a cooler in October 2015. The suspect provided a Mexican voter registration card but had no valid driver's license, registration or insurance for the car.[34]

- (U) In May 2019, a Mexican citizen was sentenced to 57 months in prison and five years of supervised release for possession with intent to distribute meth. Law enforcement had seized 34 pounds of meth, worth an estimated $1.5 million, from a Billings hotel room.[35]

## (U) DRUG PURITY LEVELS IN MONTANA

(U//FOUO) Drug purity issues pertain mainly to meth, heroin, and cocaine. The MATIC assesses it is nearly certain that the purity of meth in Montana is at least 95 percent and has recently increased to 96-99 percent purity in certain areas, while the purity of heroin and cocaine likely varies, as these two drugs are not always tested for purity. The MATIC makes this assessment with high confidence based on reporting from DCI and DEA.

(U//FOUO) DCI Narcotics Bureau investigations at the state level require the drug evidence to be sent to the Montana State Crime Lab where the drug is identified and given a quantitative weight.  While federal prosecutions require drug evidence to be sent to the DEA lab.[36] The DEA lab, unlike the Montana State Crime Lab, conducts both a quantitative and qualitative test. As a result of this analysis, samples tested have consistently shown a high purity level which translates to potency.[37]

(U//FOUO) In DCI Region 1, DCI assessed the following:
- (U//FOUO) Meth samples have consistently tested at 95 percent or higher purity. This level of purity indicates the drugs are produced in large scale facilities most likely operating inside Mexico, it also points to the existence of direct supply routes to Montana where the drugs are not tampered with or diluted while in transport.[38]

- (U//FOUO) In the last three years, the purity and consistency of meth seized has remained relatively high. One aspect of drug investigations which has shown an increase is the larger amounts of dangerous drugs being distributed. In the past three years, transactional amounts have increased from multiple ounce investigations to pounds.[39]

(U//FOUO) In DCI Region 3, DCI assessed the following:

- (U//FOUO) The amounts of meth and heroin trafficked into Region 3 appear to be in larger quantities and have a high level of purity.[40]

(U//FOUO) In DCI Region 4, DCI assessed the following:

- (U//FOUO) Approximately five years ago, purity levels increased to all-time highs. Purity rates are typically between 96-99 percent and it is rare if the region sees purity lower than mid-to-high 90s. This does not account for cases where Montana dealers used cutting agents to increase their redistribution volume which has been found in three cases within the last year.[41]

(U) According to the DEA, heroin and cocaine purity is not always known, as they typically only test for the drugs and not their purity. Historically, DEA has seen heroin cut to below 50 percent purity, as with cocaine.[42] Retail level heroin distributors have mixed or "cut" heroin with adulterants such as caffeine, procaine, and lidocaine, which increased their profits but also decreased the purity of their product. Analysis by the DEA indicates that heroin mixed with other controlled substances, mostly fentanyl, is increasingly widespread at the retail level. Nationally, the domestic market for fentanyl overlaps with most of the major white powder heroin markets. However, in select areas, law enforcement and public health officials report fentanyl is either supplanting or has surpassed a significant portion of the pre-established heroin market. Adding fentanyl to heroin allows distributors to greatly increase their profits while maintaining product quality.[43]

# (U) ASSOCIATED COSTS WITH DRUG ENFORCEMENT

(U//FOUO) The financial costs of enforcing drug laws and combatting drug related crime have increased overall for the DCI Narcotics Bureau, although the exact amount has not been determined. Reasons for these cost increases include extra hours and resources required to conduct drug investigations which involve tracing drugs with out-of-state origins, a rise in the number of DTOs operating in Montana, a lack of grant funding matches, and increases in quantities purchased during drug investigations.

(U//FOUO) In DCI Region 1, DCI reported the following:

- (U//FOUO) Costs related to operations and personnel have increased over the last three years when accounting for the hours and resources needed to conduct narcotics investigations. DCI Agents often conduct high level investigations involving drugs with out-of-state origins, and the resources required to identify those origins taxes already limited resources. However, in doing so, DCI is able to divert large shipments of dangerous drugs away from Montana.[44]

- (U//FOUO) Costs related to operational purchases has for the most part decreased, which can be attributed to economic factors as well as a more direct relationships between local DTOs and supply sources. The cost of a pound per gram of meth is more profitable than an ounce per gram, so the more weight that a local DTO can directly purchase from a distribution source, the lower the overall cost burden.[45]

(U//FOUO) In DCI Region 3, DCI reported the following:

- (U//FOUO) Costs of operational purchases have dropped due to economic forces. At the same time, the presence of DTOs in the region continues to rise. As their presence increases, so do the number of hours and investigative resources required to identify the DTO members operating to determine their positions within their organizations.[46]

(U//FOUO) In DCI Region 4, DCI reported the following:

- (U//FOUO) The costs associated with drug enforcement has increased dramatically over time, to the point the local task force is spending approximately $40,000 more annually than what the Region receives in grants and matching funds from other law enforcement partners.[47]

- (U//FOUO) Operational drug purchases involve increasingly larger quantities each year, which has translated to consistently larger caseloads since 2018. Equipment and overhead costs have also increased.[48]

- (U//FOUO) DCI no longer has civil forfeiture options available at the state level, which has limited their capabilities in seizing and utilizing criminal assets such as vehicles, firearms, or currency directly tied to the distribution of dangerous drugs.[49]

# (U) OUTLOOK

(U//FOUO) Law enforcement agencies throughout the state will likely encounter increased drug trafficking incidents, overdoses, and related violent crimes. Any drug shortages brought on by the COVID-19 pandemic have since recovered while drug prices remain elevated, and these market conditions will likely motivate TCOs and local DTOs to expand their operations in the state, particularly with meth. In order to meet demand, TCOs will probably increase meth shipments to Montana due to their abilities to manufacture meth at lower costs, higher purities, and higher potencies. Because of this, the MATIC assesses that meth will very likely remain the most significant drug threat, followed by fentanyl, then heroin, pharmaceuticals, and cocaine. However, the emerging threat of fentanyl and counterfeit pills containing fentanyl is very likely a warning sign for what Montana communities and law enforcement agencies should expect in the coming years.

# (U) APPENDIX A: EXPRESSIONS OF LIKELIHOOD OR PROBABILITY

| Terms of Likelihood | Almost No Chance | Very Unlikely | Unlikely | Roughly Even Chance | Likely | Very Likely | Almost Certain(ly) |
|---|---|---|---|---|---|---|---|
| Terms of Probability | Remote | Highly Improbable | Improbable (Improbably) | Roughly Even Odds | Probable (Probably) | Highly Probable | Nearly Certain |
| | 1-5% | 5-20% | 20-45% | 45-55% | 55-80% | 80-95% | 95-99% |

# (U) APPENDIX B: CONFIDENCE INTERVALS REGARDING ANALYTICAL JUDGMENTS

(U) High confidence generally indicates judgments based on high-quality information and/or the nature of the issue makes it possible to render a solid judgment. Medium confidence generally means there are various ways to interpret the information, we have alternate views, or the information is credible and plausible but not corroborated sufficiently. Low confidence generally means the information is scant, questionable or very fragmented, making it difficult to make solid analytic inferences.

# (U) APPENDIX C: CHARTS AND TABLES



| 2015 | 2016 | 2017 | 2018 | 2019 | Average % Change | % Change 2015-2019 |
|---|---|---|---|---|---|---|
| - | 1.0% | 1.1% | 0.8% | 0.8% | 3.7% | 3.7% |

*(U) Source – Census.gov; Accessed on 04 March 2021*



| 2015 | 2016 | 2017 | 2018 | 2019 | Average % Change | % Change 2015-2019 |
|---|---|---|---|---|---|---|
| - | 5.1% | 3.3% | -1.7% | 0.9% | 7.6% | 7.6% |

*(U) Source – Montana Board of Crime Control; Accessed on 26 February 2021*



| 2015 | 2016 | 2017 | 2018 | 2019 | Average % Change | % Change 2015-2019 |
|------|------|------|------|------|------------------|--------------------|
| - | 4.1% | -4.8% | -2.6% | -10.6% | -13.9% | -13.7% |

*(U) Source – Montana Board of Crime Control; Accessed on 26 February 2021*



| 2015 | 2016 | 2017 | 2018 | 2019 | Average % Change | % Change 2015-2019 |
|------|------|------|------|------|------------------|--------------------|
| - | 7.3% | 6.0% | -14.8% | 11.6% | 10.1% | 8.2% |

*(U) Source – Montana Board of Crime Control; Accessed on 26 February 2021*

| (U) Montana Felony Drug Arrests, 2015-2019 | | | | | | |
|------|------|--------|-----------|--------|-----------------|----------|
| | Meth | Heroin | Marijuana | Cocaine | Pharmaceuticals | Fentanyl |
| 2015 | 413 | 26 | 47 | 7 | 85 | N/A |
| 2016 | 447 | 76 | 46 | 14 | 72 | N/A |
| 2017 | 469 | 96 | 30 | 14 | 75 | N/A |
| 2018 | 404 | 69 | 16 | 26 | 42 | N/A |
| 2019 | 372 | 53 | 20 | 11 | 17 | N/A |

*(U) Source – RMHIDTA, August 2020. Accessed on 05 March 2021.*

| (U) Montana Drug Seizures (lbs./DU), 2015-2019 | | | | | | |
|------|--------|--------|-----------|------------------|---------------------|---------------|
| | Meth | Heroin | Marijuana | Cocaine and Crack | Pharmaceuticals (DU) | Fentanyl (DU) |
| 2015 | 127.93 | 13.63 | 202.60 | 90.62 | 7,266.00 | * |
| 2016 | 97.55 | 4.20 | 1,471.08 | 149.45 | 5,551.00 | 75.00 |
| 2017 | 188.17 | 4.05 | 240.18 | 4.00 | 4,910.00 | 11.00 |
| 2018 | 187.22 | 9.22 | 230.86 | 7.35 | 6,095.00 | 496.00 |
| 2019 | 250.04 | 6.87 | 223.13 | 9.04 | 20,220.00 | 358.00 |

*(U) Source – RMHIDTA, August 2020. Accessed on 05 March 2021.*

UNCLASSIFIED//FOR OFFICIAL USE ONLY

| (U) Montana Drug Overdoses, 2015-2019 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Meth | Heroin | Marijuana | Cocaine | Opioids | Pharmaceuticals/Benzodiazepines | Fentanyl/Synthetic Narcotics |
| 2015 | 32 | 5 | 0 | 0 | 23 | 6 | 7 |
| 2016 | 21 | 5 | 0 | 1 | 11 | 4 | 10 |
| 2017 | 24 | 7 | 0 | 0 | 18 | 9 | 6 |
| 2018 | 30 | 20 | 0 | 2 | 21 | 9 | 12 |
| 2019 | 58 | 23 | 0 | 5 | 25 | 19 | 16 |

*(U) Source – RMHIDTA, August 2020. Accessed on 05 March 2021.*

# (U) APPENDIX D: MBCC CRIME CATEGORIES AND UCR CODES

(U) Crimes against persons and NIBRS codes
- (U) Aggravated Assault (13A)
- (U) Human Trafficking, Commercial Sex Acts (64A)
- (U) Intimidation (13C)
- (U) Kidnapping/Abduction (100)
- (U) Murder and Nonnegligent Homicide (09A)
- (U) Negligent Manslaughter (09B)
- (U) Sex Offense - Forcible (110)
- (U) Sex Offenses - Nonforcible (360)
- (U) Simple Assault (13B)

(U) Crimes against property definitions and Uniform Crime Reporting codes
- (U) All Other Larceny (23H)
- (U) Arson (200)
- (U) Bribery (510)
- (U) Burglary/Breaking & Entering (220)
- (U) Counterfeiting/Forgery (250)
- (U) Credit Card/Automatic Teller Fraud (26B)
- (U) Destruction/Damage/Vandalism of Property (290)
- (U) Embezzlement (270)
- (U) Extortion/Blackmail (210)
- (U) False Pretenses/Swindle/Confidence Game (26A)
- (U) Identity Theft (26F)
- (U) Impersonation (26C)
- (U) Motor Vehicle Theft (240)
- (U) Pocket-picking (23A)
- (U) Purse-snatching (23B)
- (U) Robbery (120)
- (U) Shoplifting (23C)
- (U) Stolen Property Offenses (280)
- (U) Theft From Building (23D)

- (U) Theft From Coin Operated Machine (23E)
- (U) Theft From Motor Vehicle (23F)
- (U) Theft of Motor Vehicle Parts/Accessories (23G)
- (U) Welfare Fraud (26D)
- (U) Wire Fraud (26E)

# //END//

## (U) Sources

---

[1] (U); U.S. Census Bureau; County Population Totals; co-est2019-annres-30.xlsx; https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html; accessed on 03 MAR 2021; DOI 01 JUL 2019; (U); Annual Estimates of the Resident Population for Counties: April 1, 2010 to July 1, 2019; Extracted information is U; Overall record classification is (U); Source is the U.S. authority on demographics data.

[2] (U); Montana Board of Crime Control. Montana Incident Based Reporting System; accessed on 26 FEB 2021; DOI 26 FEB 2021; (U); National Incident Based Reporting System (NIBRS) Reported Criminal Offenses By County 2015-2019; Extracted Information is U; Overall record classification is (U); Source is the clearinghouse for Montana crime statistics.

[3] (U); Montana Board of Crime Control. Montana Incident Based Reporting System; accessed on 26 FEB 2021; DOI 26 FEB 2021; (U); National Incident Based Reporting System (NIBRS) Reported Criminal Offenses By County 2015-2019; Extracted Information is U; Overall record classification is (U); Source is the clearinghouse for Montana crime statistics.

[4] (U); Rocky Mountain High Intensity Drug Trafficking Area; Statewide narcotics assessment; AUG 2020; (U); "Rocky Mountain HIDTA 2020 Montana State Assessment"; Extracted information U; Overall document classification is U//LES.

[5] (U//FOUO); Montana Department of Justice, Division of Criminal Investigation, Narcotics Bureau; Drug trends report; "Montana DCI Current Drug Trends"; Extracted information is U//FOUO; Overall document classification is U//FOUO.

[6] Ibid.

[7] Ibid.

[8] Ibid.

[9] (U//FOUO); U.S. Drug Enforcement Administration Drug Analyst; Email; 01 MAR 2021; DOI 01 MAR 2021; Nexus Between Illegal Aliens and Drug Crime in Montana; Extracted information is U//FOUO; Overall document classification is U//FOUO.

[10] Ibid.

[11] Ibid.

[12] (U//FOUO); Montana Department of Justice, Division of Criminal Investigation, Narcotics Bureau; Drug trends report; "Montana DCI Current Drug Trends"; Extracted information is U//FOUO; Overall document classification is U//FOUO.

[13] Ibid.

[14] Ibid.

[15] Ibid.

[16] Ibid.

[17] Ibid.

[18] Ibid.

[19] Ibid.

[20] Ibid.

[21] Ibid.

[22] Ibid.

[23] (U); Rocky Mountain High Intensity Drug Trafficking Area; Statewide narcotics assessment; AUG 2020; (U); "Rocky Mountain HIDTA 2020 Montana State Assessment"; Extracted information U; Overall document classification is U//LES.

[24] Ibid.

[25] Ibid.

[26] Ibid.

[27] Ibid.

[28] Ibid.

[29] (U); U.S. Department of Justice-U.S. Attorney's Office, District of Montana; "Mexican Man Sentenced to Federal Prison for Illegal Reentry"; 06 JUN 2018; https://www.justice.gov/usao-mt/pr/mexican-man-sentenced-federal-prison-illegal-reentry; accessed on 05 MAR 2021; (U).

[30] (U); U.S. Department of Justice-U.S. Attorney's Office, District of Montana; "Mexican citizen admits illegally transporting aliens from Canada into Montana"; 10 DEC 2019; https://www.justice.gov/usao-mt/pr/mexican-citizen-admits-illegally-transporting-aliens-canada-montana' accessed on 05 MAR 2021; (U).

[31] (U); U.S. Department of Justice-U.S. Attorney's Office, District of Montana; "Two Mexican citizens admit roles in transporting aliens from Canada into Montana"; 05 FEB 2020; https://www.justice.gov/usao-mt/pr/two-mexican-citizens-admit-roles-transporting-aliens-canada-montana; accessed on 05 MAR 2021; (U).

[32] (U); U.S. Department of Justice-U.S. Attorney's Office, District of Montana; "Five Mexican Citizens Charged After Arrest in Investigation into Suspected Alien Smuggling in Glacier County"; 21 NOV 2019; https://www.justice.gov/usao-mt/pr/five-mexican-citizens-charged-after-arrest-investigation-suspected-alien-smuggling; accessed on 05 MAR 2021; (U).

[33] (U); U.S. Department of Justice-U.S. Attorney's Office, District of Montana; "Mexican National Sentenced to Years in Federal Prison For Methamphetamine Trafficking and Money Laundering"; 24 OCT 2018; https://www.justice.gov/usao-mt/pr/mexican-national-sentenced-years-federal-prison-methamphetamine-trafficking-and-money; accessed on 05 MAR 2021; (U).

[34] (U); U.S. Department of Justice-U.S. Attorney's Office, District of Montana; "California woman convicted in meth case sentenced to 18 months in prison'; 19 APR 2019; https://www.justice.gov/usao-mt/pr/california-woman-convicted-meth-case-sentenced-18-months-prison; accessed on 05 MAR 2021; (U).

[35] (U); U.S. Department of Justice-U.S. Attorney's Office, District of Montana; "Mexican citizen sentenced in Billings drug case in which agents seized 34 pounds of meth"; 17 MAY 2019; https://www.justice.gov/usao-mt/pr/mexican-citizen-sentenced-billings-drug-case-which-agents-seized-34-pounds-meth; accessed on 05 MAR 2021; (U).

[36] (U//FOUO); Montana Department of Justice, Division of Criminal Investigation, Narcotics Bureau; Drug trends report; "Montana DCI Current Drug Trends"; Extracted information is U//FOUO; Overall document classification is U//FOUO.

[37] Ibid.

[38] Ibid.

[39] Ibid.

[40] Ibid.

[41] Ibid.

[42] Stacy

[43] (U); U.S. Drug Enforcement Administration; "2020 National Drug Threat Assessment"; 02 MAR 2021; pg. 9; (U);

[44] (U//FOUO); Montana Department of Justice, Division of Criminal Investigation, Narcotics Bureau; Drug trends report; "Montana DCI Current Drug Trends"; Extracted information is U//FOUO; Overall document classification is U//FOUO.

[45] Ibid.

[46] Ibid.

[47] Ibid.

[48] Ibid.

[49] Ibid.

EXHIBIT

**From:** Mark Lamb
**Sent:** Tuesday, March 30, 2021 8:09 PM
**To:** Kredit, Joshua
**Subject:** Re: FW: Supplemental Declaration for Lamb

1
2
3            **UNITED STATES DISTRICT COURT**
4                  **DISTRICT OF ARIZONA**
5
6    State of Arizona; State of Montana; and
7    Mark Brnovich, in his official capacity as    Case No: 2:21-cv-00186-SRB
8    Attorney General of Arizona,
9              Plaintiffs,
10        v.                                         **SUPPLEMENTAL   DECLARATION   OF**
11   United States Department of Homeland            **MARK LAMB**
12   Security; United States of America;
13   Alejandro Mayorkas, in his official
14   capacity as Secretary of Homeland
15   Security; Troy Miller, in his official
16   capacity as Acting Commissioner of
17   United States Customs and Border
18   Protection; Tae Johnson, in his official
19   capacity as Acting Director of United
20   States Immigration and Customs
21   Enforcement; and Tracy Renaud, in her
22   official capacity as Acting Director of U.S.
23   Citizenship and Immigration Services,
24              Defendants.
25
26
27
28

I, Mark Lamb, declare as follows:

　　1. I am competent to testify as to the matters contained herein and make this declaration based on my own personal and professional knowledge, law enforcement expertise, and the information available to me in my positions in public service.

　　2. I currently serve as Sheriff of Pinal County, Arizona, and have been a law enforcement officer for over 14 years.

　　3. On or about March 9, 2021, my staff conducted a review of records regarding inmates then in Pinal County's custody and found as follows:

　　4. Pinal County on average has around 35 inmates in custody who have ICE Detainers, costing the county an estimated $ 208,845 annually.  Currently, we have 31 such inmates in our jails out of a total population in custody of 592.

　　5. The 31 inmates in custody with ICE Detainers at the time of review have 41 violations of state law pending against them.  This includes. Assault, Disorderly Conduct, Crimes against Children, Domestic Violence, Assault with a Deadly Weapon, Possession of Drugs, Possession of Drugs with intent to Distribute, DUI, and Possession of Deadly Weapon.  This is fairly representative of the charges such populations have at any given time in custody in our jails.

　　6. An examination of the criminal history files of the inmates in custody with an ICE Detainer for 2019 shows that these individuals have a recidivism rate (indicated by prior jail time) of approximately 53% for that population.

　　I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that this declaration was issued on March [[day]], 2021, in [[city]], Arizona.



Mark Lamb
Sheriff