BRIAN M. BOYNTON
ACTING ASSISTANT ATTORNEY GENERAL

BRIGHAM J. BOWEN
ASSISTANT BRANCH DIRECTOR

Michael F. Knapp (CA Bar No. 314104)
Adam Kirschner (IL Bar No. 6286601)
Brian C. Rosen-Shaud (ME Bar No. 006018)
Kuntal Cholera (DC Bar No. 1031523)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW Room 12008
Washington, D.C. 20530
(202) 514-2071 (telephone)
(202) 616-8470 (facsimile)
Email: Michael.F.Knapp@usdoj.gov
        Adam.Kirschner@usdoj.gov
        Brian.C.Rosen-Shaud@usdoj.gov
        Kuntal.Cholera@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, et al., | No. 2:21-cv-00186-SRB |
| Plaintiffs, | |
| v. | **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** |
| United States Department of Homeland Security, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND .............................................................................................................. 1

ARGUMENT ................................................................................................................... 5

I.     Any Challenge to the Section C "Pause" on Removals Is Now Moot. .............................. 5

II.    The States Cannot Establish Standing. ................................................................. 7

III.   The States Cannot Clear Four Threshold Obstacles to Their APA Claims. .................. 10

       A.     The challenged action is "committed to agency discretion by law." ..................... 10

       B.     Congress has precluded judicial review of these types of decisions.. .................. 13

       C.     The States fall outside the zone of interests of the relevant statute. ................... 15

       D.     The challenged action is not final agency action. ............................................ 16

IV.    The Court Lacks Jurisdiction to Resolve Claims Predicated on the MOUs ................... 17

CONCLUSION ................................................................................................................ 17

# TABLE OF AUTHORITIES

**Cases**

*Aguilar v. ICE*,
   510 F.3d 1 (1st Cir. 2007) ........................................................................... 13

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013) ........................................................................................ 5

*Ariz. Dream Act Coal. v. Brewer*,
   855 F.3d 957 (9th Cir. 2017) ...................................................................... 11

*Arizona v. United States*,
   567 U.S. 387 (2012) ............................................................................. 2, 3, 11

*Arpaio v. Obama*,
   27 F. Supp. 3d 185 (D.D.C. 2014),
   *aff'd*, 797 F.3d 11 (D.C. Cir. 2015) ........................................................ 7, 8

*Ayuda, Inc. v. Reno*,
   7 F.3d 246 (D.C. Cir. 1993) ........................................................................ 14

*Bennett v. Spear*,
   520 U.S. 154 (1997) ..................................................................................... 16

*Bhd. of Ry. Carmen Div. v. Pena*,
   64 F.3d 702 (D.C. Cir. 1995) ...................................................................... 12

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ......................................................................... 13, 14, 15

*Burke v. Barnes*,
   479 U.S. 361 (1987) ....................................................................................... 5

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ..................................................................... 8, 9

*California v. United States*,
   104 F.3d 1086 (9th Cir. 1997) .................................................................... 10

*Campos v. INS*,
   62 F.3d 311 (9th Cir. 1995) ........................................................................ 16

*City of Oakland v. Lynch*,
   798 F.3d 1159 (9th Cir. 2015) .................................................................... 10

*Ctr. for Env't Sci. v. Cowin*,
   2016 WL 1267572 (E.D. Cal. Mar. 31, 2016) ............................................................ 6

*Department of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ............................................................................................ 8, 9

*E. Bay Sanctuary Covenant v. Trump*,
   950 F.3d 1241 (9th Cir. 2020) .................................................................................. 14

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................................................ 10, 12

*Hernandez-Avalos v. INS*,
   50 F.3d 842 (10th Cir. 1995) .................................................................................... 16

*J.E.C.M. ex rel. Saravia v. Lloyd*,
   352 F. Supp. 3d 559 (E.D. Va. 2018) ......................................................................... 7

*J.E.F.M. v. Lynch*,
   837 F.3d 1026 (9th Cir. 2016) ............................................................................. 13, 14

*Kingdomware Techs., Inc. v. United States*,
   136 S. Ct. 1969 (2016) ............................................................................................... 6

*Levine v. Vilsack*,
   587 F.3d 986 (9th Cir. 2009) ...................................................................................... 8

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) .................................................................................................. 15

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................ 7, 8, 9

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) .................................................................................................. 15

*Mendoza v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014) ................................................................................ 15

*Morales de Soto v. Lynch*,
   824 F.3d 822 (9th Cir. 2016) .................................................................................... 10

*Ncube v. I.N.S. Dist. Directors & Agents*,
   1998 WL 842349 (S.D.N.Y. Dec. 2, 1998) .............................................................. 16

*North Side Lumber Co. v. Block*,
   753 F.2d 1482 (9th Cir. 1985) .................................................................................. 17

*Protectmarriage.com-Yes on 8 v. Bowen,*
  752 F.3d 827 (9th Cir. 2014) .......................................................................... 6

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
  525 U.S. 471 (1999)......................................................................... 11, 13, 14

*S. Cal. All. of Publicly Owned Treatment Works v. EPA,*
  2015 WL 2358620 (E.D. Cal. May 15, 2015)................................................ 6

*Sanders v. United States,*
  252 F.3d 1329 (Fed. Cir. 2001) .................................................................... 17

*Shaltry v. United States,*
  87 F.3d 1322 (9th Cir. 1995) ........................................................................ 10

*Sierra Club v. Whitman,*
  268 F.3d 898 (9th Cir. 2001) ........................................................................ 12

*Sierra Forest Legacy v. Sherman,*
  646 F.3d 1161 (9th Cir. 2011) ........................................................................ 7

*Simon v. E. Kentucky Welfare Rights Org.,*
  426 U.S. 26 (1976) .......................................................................................... 9

*Spell v. Edwards,*
  962 F.3d 175 (5th Cir. 2020) .......................................................................... 6

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) .................................................................................... 9

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009)........................................................................................ 9

*Texas v. United States,*
  2021 WL 723856 (S.D. Tex. Feb. 23, 2021) ....................................... passim

*Thompson v. N. Am. Stainless, LP,*
  562 U.S. 170 (2011)...................................................................................... 15

*Town of Castle Rock v. Gonzales,*
  545 U.S. 748 (2005)................................................................................. 12, 13

*Town of Chester, N.Y. v. Laroe Ests., Inc.,*
  137 S. Ct. 1645 (2017) .................................................................................... 8

*Trump v. Int'l Refugee Assistance Project,*
  138 S. Ct. 353 (2017)...................................................................................... 5

*Tucson Airport Auth. v. Gen. Dynamics Corp.*,
    136 F.3d 641 (9th Cir. 1998) ....................................................... 17

*United States v. Arizona*,
    2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ........................... 8, 10, 12, 15

*United States v. Fausto*,
    484 U.S. 439 (1988) ...................................................................... 13, 14

*United States v. Johnson*,
    319 U.S. 302 (1943) ............................................................................. 9

*Wolfson v. Brammer*,
    616 F.3d 1045 (9th Cir. 2010) ........................................................... 6

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ...................................................................... 11, 14

**Statutes**

5 U.S.C. § 701(a)(1) ........................................................................... 13, 14

5 U.S.C. § 701(a)(2) ................................................................................. 5

5 U.S.C. § 702 ...................................................................................... 15

5 U.S.C. § 704 ...................................................................................... 16

5 U.S.C. § 706 ...................................................................................... 10

5 U.S.C. § 706(2) .................................................................................... 6

6 U.S.C. § 202(5) .................................................................................... 2

8 U.S.C. § 1101(a)(47)(B) ........................................................................ 2

8 U.S.C. § 1103(a)(3) ............................................................................... 1

8 U.S.C. § 1225(b)(1) ............................................................................... 2

8 U.S.C. § 1226(e) ................................................................................ 14

8 U.S.C. § 1229(a) .................................................................................. 2

8 U.S.C. § 1229a .................................................................................... 2

8 U.S.C. § 1229a(a) ................................................................................ 2

8 U.S.C. § 1231(a)(1) ............................................................................................ 2

8 U.S.C. § 1231(a)(1)(B)(ii) .................................................................................. 2

8 U.S.C. § 1231(a)(1)(A) ...................................................................................... 11

8 U.S.C. § 1231(a)(3) ........................................................................................... 11

8 U.S.C. § 1231(h) .......................................................................................... 14, 15

8 U.S.C. § 1252(a)(2)(A) ..................................................................................... 13

8 U.S.C. § 1252(a)(5) ............................................................................................. 2

8 U.S.C. § 1252(b)(9) ........................................................................................... 14

8 U.S.C. § 1252(i) ................................................................................................ 16

28 USC § 1491 ..................................................................................................... 17

**Legislative Materials**

H.R. Rep. 104-469, pt. 1, at 160 (1996) ............................................................. 12

**Regulations**

8 C.F.R. § 241.6 .................................................................................................... 2

8 C.F.R. § 1003.1(b) ............................................................................................. 2

8 C.F.R. § 1240.12 ................................................................................................ 2

8 C.F.R. § 1003.13 ................................................................................................ 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION

Congress has vested the Secretary of Homeland Security with broad statutory authority to establish "national immigration enforcement polices and priorities," 6 U.S.C. § 202(5), and to "issue such instructions" and "perform such other acts as he deems necessary for carrying out his authority." 8 U.S.C. § 1103(a)(3). Arizona and Montana challenge the manner in which the Executive has exercised its inherent and statutory discretion to set priorities for immigration enforcement. On January 20, 2021, the then–Acting Secretary of Homeland Security issued a Memorandum directing the Department to conduct a review of policies and practices concerning immigration enforcement and setting interim policies during the course of that review. The Acting Director of Immigration and Customs Enforcement (ICE) later issued interim guidance in support of the civil immigration enforcement and removal priorities.

The States seek to displace the Executive's enforcement discretion by effectively dictating which noncitizens must be removed, in what order, and when. Their efforts, invoking the Administrative Procedure Act (APA), must fail from the start because they lack standing. Their alleged injuries are wholly speculative and caused, if at all, by the independent acts of third parties. The States' claims also fail to clear four threshold obstacles to an APA action: (i) enforcement prioritization is committed to agency discretion by law; (ii) Congress has precluded judicial review of decisions related to removal orders; (iii) the States are outside of the zone of interests of the relevant statute; and (iv) the Memoranda are not final agency action. Last, this Court lacks jurisdiction to adjudicate claims related to purported "agreements" between DHS and the States, which "agreements" are void and unenforceable in any event. The Court should dismiss the States' Amended Complaint.

## BACKGROUND

### Statutory and Regulatory Background

The Immigration and Nationality Act ("INA") establishes the framework for arresting, detaining, and removing noncitizens who are illegally present in, or otherwise deportable from, the United States. "A principal feature of th[is] removal system is the broad discretion

exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).[1] Congress thus granted the Secretary of Homeland Security authority to "establish[] national immigration policies and priorities." 6 U.S.C. § 202(5).

Removability is determined by an immigration judge or immigration officer in an immigration proceeding. *See* 8 U.S.C. § 1229a; *see also, e.g.*, 8 U.S.C. § 1225(b)(1) (expedited removal proceedings). DHS exercises its discretion to initiate a removal proceeding by filing a Notice to Appear with the immigration court. *See, e.g.*, 8 U.S.C. § 1229(a); 8 C.F.R. §§ 1003.13, 1003.14. The immigration judge then determines whether the noncitizen is removable and, if so, whether to enter an order of removal or to grant relief or protection from removal. 8 U.S.C. § 1229a(a); 8 C.F.R. § 1240.12. The noncitizen may appeal the removal order to the Board of Immigration Appeals (BIA). 8 C.F.R. § 1003.1(b). If the BIA dismisses the appeal, the noncitizen may petition for review of the decision by a court of appeals, and may request a stay of removal pending judicial review of the order. 8 U.S.C. § 1252(a)(5).

Once a noncitizen has an administratively final order of removal, *see* 8 U.S.C. § 1101(a)(47)(B), not subject to a judicial stay, *see* 8 U.S.C. § 1231(a)(1)(B)(ii), DHS may exercise additional discretion on how to proceed. *See, e.g.*, 8 C.F.R. § 241.6 (discretion regarding administrative stays of removal). Section 1231 sets a "removal period" of 90 days that begins when the removal order becomes "administratively final" or when certain other criteria are satisfied. 8 U.S.C. § 1231(a)(1). But § 1231 also authorizes supervision after that 90-day period, "[i]f the alien does not leave or is not removed within the removal period." *Id.* § 1231(a)(3).

Each removal effort requires an individualized combination of resources. The process varies depending on the country of removal, and removals require considerable coordination and effort. DHS must ensure the noncitizen has appropriate paperwork required by the country of removal and must coordinate the logistics of removal. The process for executing removal orders has been further complicated by the ongoing COVID-19 pandemic.

<u>Factual and Procedural Background</u>

On January 20, 2021, the then–Acting Secretary of Homeland Security issued a

---

[1] Internal quotation marks and citations are omitted throughout, unless otherwise stated.

Memorandum that ordered a review of enforcement policies and set new priorities in the interim. *See* Am. Compl. (FAC) Ex. A, ECF. No. 12-1 (DHS Memo). The DHS Memo noted DHS's inherent resource limitations and the "significant operational challenges" it faces due to the COVID-19 pandemic, and, in light of these considerations, called upon DHS "components to conduct a review of policies and practices concerning immigration enforcement" and "set[] interim policies during the course of that review." *Id.* at 1. The DHS Memo has three substantive parts. In Section A, the Acting Secretary instructed DHS components to develop recommendations concerning, among other things, "policies for prioritizing the use of enforcement personnel, detention space, and removal assets" and "policies governing the exercise of prosecutorial discretion." *Id.* at 2.

The DHS Memo also adopted two interim measures in sections B and C. Because DHS has "limited resources" and "cannot respond to all immigration violations," Section B identified three broad "priority" groups of noncitizens that DHS components should focus on when rendering "a broad range" of "discretionary enforcement decisions." *Id.* The DHS Memo clarifies, however, that "nothing" therein "prohibits the apprehension or detention of" other noncitizens "who are *not* identified as priorities." *Id.* at 3 (emphasis added). It also calls on the Acting Director of U.S. Immigration and Customs Enforcement (ICE) to "issue operational guidance on the implementation" of this priority framework. *Id.*

Section C then set out a temporary, 100-day suspension of the execution of certain removal orders so that "DHS's limited resources" could be shifted to "provide sufficient staff and resources to enhance border security" and other operations at the southwest border and to "protect the health and safety of DHS personnel" and the public in light of the ongoing COVID-19 pandemic. *Id.* at 3-4. During this period, DHS would continue to execute final orders of removal for certain identified priorities, including national security risks and recent arrivals. The policy set out in Section C was enjoined shortly after its adoption, *see Texas v. United States*, 2021 WL 723856 (S.D. Tex. Feb. 23, 2021); the government did not appeal that preliminary injunction. This Court denied the States' motion for a second injunction against the same policy, *see* ECF No. 42, and the policy expired by its own terms on April 30, 2021.

1    On February 18, 2021, the Acting Director of ICE issued the operational guidance

2    contemplated by Section B, noting also that the Secretary had approved the incorporated

3    revisions to the interim priorities. *See* FAC Ex. G, ECF No. 12-1 at 40 (ICE Memo). The ICE

4    Memo confirms that "ICE operates in an environment of limited resources," and "necessarily

5    must prioritize" certain "enforcement and removal actions over others" in order to "most

6    effectively achieve [its] mission" of "national security, border security, and public safety." *Id.*

7    at 2-3. The ICE Memo catalogues the three presumed priority groups identified in the DHS

8    Memo, and notes that DHS revised the presumed priorities to include "qualifying members

9    of criminal gangs and transnational criminal organizations." *Id.* at 1, 4-5.

10   The ICE Memo reiterates that the policies do not "prohibit the arrest, detention, or

11   removal of any noncitizen," and that enforcement actions against non-presumed priority

12   persons may still be permissible and justified based on "all relevant facts and circumstances,"

13   including the nature of any prior criminal convictions. *Id.* at 3. To ensure that resources are

14   spent pursuing priority cases, though, the ICE Memo puts in place certain internal pre-

15   approval procedures ICE officials must follow when taking enforcement action in non-

16   presumed priority cases. *See id.* at 6. The ICE Memo also includes a general catch-all provision

17   allowing agents to submit "requests to exercise . . . individualized discretion" in certain cases,

18   if it is "in the interest[] of law and justice." *Id.*

19   Plaintiffs Arizona and Montana bring claims under the APA, contending that Section

20   C and the ICE Memo are "arbitrary, capricious, an abuse of discretion, or otherwise not in

21   accordance with law" or "without observance of procedures required by law." *See* FAC ¶¶ 79-

22   80, 87, 91, 93, 98-99, ECF No. 12. One of the States' APA claims relies on two purported

23   "agreements" between each state and DHS that a subordinate official in DHS signed in the

24   weeks prior to President Biden's inauguration. *See* FAC Ex. C, ECF No. 12-1 at 28; FAC Ex.

25   H, ECF No. 12-1 at 55. These so-called MOUs—which DHS has terminated, FAC Ex. F,

26   ECF No. 12-1—purport to permit a single state or locality to halt nationwide immigration

27   policy for 180 days by requiring DHS to "[c]onsult with" the States "before taking *any action*

28   or making *any decision* that could reduce immigration enforcement, increase the number of

illegal aliens in the United States, or increase immigration benefits or eligibility for benefits for removable or inadmissible aliens." FAC Ex. C, ECF No. 12-1 at 22-23.

## ARGUMENT

The States challenge two distinct policies—Section C's pause on removals, and the ICE Memo's implementation of Section B's interim enforcement priorities. The challenge to the Section C pause is plainly moot: that policy expired on April 30, 2021. The ICE Memo implements Section B of the January 20 Memorandum; it "does not implement or take into account" Section C of the January 20 Memorandum. ICE Memo at 2. Still, Plaintiffs challenge the ICE Memo's priorities on the same principal basis as they challenge Section C: that it is inconsistent with 8 U.S.C. § 1231(a)(1).

Plaintiffs' challenge is anomalous, for the ICE Memo shares no relevant similarities with the aspects of Section C that the States claim violate that statute. Regardless, the Court lacks jurisdiction to adjudicate the States' claims for five independent reasons: (1) the States lack standing; (2) the challenged actions are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2); (3) other "statutes preclude judicial review," *id.* § 701(a)(1); (4) the States are not within the zone of interests "within the meaning of a relevant statute," *id.* § 702; and (5) the challenged actions are not "final agency action," *id.* § 704. In addition, jurisdiction over any claim related to the purported agreements lies exclusively in the Court of Federal Claims.

## I.   Any Challenge to the Section C "Pause" on Removals Is Now Moot.

The States' challenge to the 100-day pause set out in Section C of the January 20 Memorandum is moot, and this Court therefore lacks jurisdiction to adjudicate those claims. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). That policy was inherently time-limited: by its terms, it expired 100 days after it began. On April 30, 2021, the policy expired, and Plaintiffs' related claims became moot.

No exception to mootness applies. The exception for voluntary cessation does not apply when a challenged policy is time-limited on its face and it has "expired by its own terms." *Trump v. Int'l Refugee Assistance Project*, 138 S. Ct. 353 (2017); *Burke v. Barnes*, 479 U.S. 361, 363 (1987) (challenge to validity of bill became moot when "that bill expired by its own terms");

*Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) (similar). Such is the case here—from the start, the policy set out in Section C was scheduled to expire 100 days after implementation. That period has now run and the policy is no longer in effect. Because it was "the planned termination of a temporary project that mooted this case," the "voluntary cessation doctrine does not apply." *Ctr. for Env't Sci. v. Cowin*, 2016 WL 1267572, at *2 (E.D. Cal. Mar. 31, 2016).

Nor does the exception for claims that are "capable of repetition yet evading review" apply. "That exception applies only in exceptional situations," where two conditions are met. *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016). Neither requirement is met here. First, the claims the States raise would not "*always* evade judicial review." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 836 (9th Cir. 2014). Thus, "even if a particular controversy evades review, there is no risk that future repetitions of the controversy will necessarily evade review as well." *Id.* at 837; *cf. Texas,* 2021 WL 723856 (reviewing Section C). To be sure, in this *specific* case the policy was limited to 100 days, but the States' claims do not turn on the duration of the policy and there is no reason that any future policy to which the States could raise similar claims would necessarily be of so limited a duration.

Second, the States "must establish a reasonable expectation that [they] will be subjected to the same action or injury again" before they can invoke the Court's exceptional jurisdiction over a non-live controversy. *Wolfson v. Brammer*, 616 F.3d 1045, 1054 (9th Cir. 2010). The States cannot meet that burden: there is no indication that DHS will reinstate a suspension on enforcing certain removal orders for noncitizens. Quite the contrary, DHS has expressly stated it has no intent to reinstate the policy. *See* https://go.usa.gov/xHwkr (DHS Statement).

Regardless, any new policy will necessarily raise *new and distinct* claims—not the same claims. The States bring their claims under the APA, but any future APA challenge will be to a new policy, not the old one. Under the APA, the Court reviews only final agency action, and its review is confined to "the whole record." 5 U.S.C. § 706(2). Any agency action in the future necessarily "would be the result of a new proceeding on a new record," and thus any challenge to the now-expired policy is moot. *S. Cal. All. of Publicly Owned Treatment Works v. EPA*, 2015 WL 2358620, at *2 (E.D. Cal. May 15, 2015). Where, as here, the speculated "renewed" action

would raise "an entirely new claim," but not "reawaken[]" old ones, the initial claim is moot. *J.E.C.M. ex rel. Saravia v. Lloyd*, 352 F. Supp. 3d 559, 577 & n.8 (E.D. Va. 2018).

## II.   The States Cannot Establish Standing.

The States' case fails at the outset because they cannot demonstrate any actual or imminent injury caused by the challenged policies. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To start, the States' current budgets were "set well in advance" and have not yet been "adjust[ed] . . . to account for the impact." Pls.' Disc. Resp. (Ex. 1) at 12. As to future spending, the States can only speculate what effect the challenged policies may have, because the budget process "requires a budget bill to be passed by the legislature and signed by the governor." *Id.* at 13. Put otherwise, the States cannot provide any evidence that they have spent, or will spend, even a single penny more than they otherwise planned to.

Regardless, no injury the States allege, even if it did occur, would be fairly traceable to challenged policies or redressable by an order of the Court. The States allege injuries in two categories. *First*, the States allege that the challenged policies—the 100-day pause and the ICE Memo—will lead to an increase in unauthorized immigration. The States allege that increased immigration will increase various harms from drug trafficking to Montana's citizens, *see* FAC ¶ 55–59; Pls.' Disc. Resp. at 8-9, and will increase Arizona's expenses related to noncitizen interdiction and recovery operations and emergency medical care, FAC ¶¶ 30, 35. *See also* PI Mot. at 19-20, ECF No. 17 (Montana's alleged injury); *id.* at 16-17 (Arizona's alleged injury). To start, Montana's asserted injury is *legally* insufficient to establish standing because a state cannot invoke an injury to its citizenry—a *parens patriae* argument—in a suit against the federal government. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011).

Moreover, neither States' injuries in this category, even assuming they occur, can be fairly traced to the memoranda. Both the 100-day pause and the ICE Memo expressly continue—and prioritize—removal operations for noncitizens arriving after November 1, 2020. DHS Memo at 3; ICE Memo at 4. The policies thus cannot be the cause of any additional immigration. *See Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (increased immigration not caused by policy that did not apply to "entrants arriving now or in the future").

*Second*, the States allege that a reduction in removals will mean a comparative increase in their States' noncitizen populations, and that the States will expend more resources related to noncitizens than they otherwise would. FAC ¶¶ 53-54 (Montana's "education, healthcare, public assistance, and general government services" costs); *id.* ¶¶ 28-29 (Arizona's incarceration costs); *id.* ¶¶ 31-35 (Arizona's medical costs); *see* Pls.' Disc. Resp. at 9-10. These injuries are not cognizable; a state "has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11. Such an injury is a generalized grievance; to accept it "would permit nearly all state officials to challenge a host of Federal laws simply because they disagree with how many—or how few—Federal resources are brought to bear on local interests." *Id.* The States' purported injuries here are similarly a generalized complaint that federal policy will have downstream effects on state spending.[2]

Regardless, any such costs are not fairly traceable to the challenged policies. When, as here, "the plaintiff is not himself the object of the government action or inaction he challenges," standing is "substantially more difficult to establish." *Lujan*, 504 U.S. at 562. The States principally rely on *California v. Azar*, 911 F.3d 558 (9th Cir. 2018) and *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019), as supporting standing in this context. PI Mot. at 22-23; PI Reply at 16, ECF No. 35. But each is readily distinguishable.

Those cases recognize that standing is not precluded when the third parties' actions are not "independent" of the challenged action. But to establish standing when the claimed injury turns on a third party's actions, a plaintiff must show that the challenged conduct has a "determinative or coercive effect upon the action of someone else." *See Levine v. Vilsack*, 587 F.3d 986, 992 (9th Cir. 2009). Thus, in *Department of Commerce*, the plaintiffs established standing

---

[2] This Court previously presumed Arizona's standing to challenge federal immigration policy *in toto. See United States v. Arizona*, 2011 WL 13137062, at *2 (D. Ariz. Oct. 21, 2011). But here the States challenge specific policies; any injury must be caused by those policies. *See, e.g., Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017).

based on "the predictable effect of Government action *on the decisions* of third parties." 139 S. Ct. at 2566 (emphasis added). The government's own information indicated that including a citizenship question would lead some individuals not to answer the census. *Id.* So too, in *Azar*, the plaintiff states demonstrated that private entities would respond to the challenged rule in a predictable way that would require the states to spend money. 911 F.3d at 572. The rule authorized private entities to limit insurance coverage for certain services, and the agency itself predicted that some entities would do so. *Id.*

The States' theories of standing here are of another kind entirely: their injuries, assuming they occur, would be the result of "unfettered choices made by independent actors," *Lujan*, 504 U.S. at 562. Take first the assertion that the States will incur more medical expenses caring for noncitizens. Such expenses, if they occur, would be the result of a series of events wholly unrelated to the challenged policies, including noncitizens needing medical care, noncitizens not paying for that care, healthcare providers requesting the States to pay, and the States in fact paying without federal reimbursement. *Cf. Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 43 (1976). Consider next the suggestion that, because of an increase in the number of noncitizens living in the States, there will be in an increase in the number of crimes committed by noncitizens. Any such acts would be the independent decision of the individuals committing them; the challenged policies do not encourage or cause any noncitizen to perform an illegal act. The States therefore cannot demonstrate standing.

The States also cannot rely on the purported agreements to establish standing for an APA claim. Even if those documents were valid and enforceable, which they are not, *see* Defs.' PI Opp'n at 20-23, injury is a jurisdictional requirement and must be established as a matter of fact; standing cannot be manufactured by agreement. *See United States v. Johnson*, 319 U.S. 302, 304-05 (1943); *cf. Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016). Nor can the States rely on the "procedural" nature of some of their claims to evade the requirement to show an injury caused by the challenged action. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). All that is "relaxed" is the need to show that the "substantive result" of the agency proceedings "would have been different had he received proper procedure." *Azar*, 911 F.3d at 571.

**III.    The States Cannot Clear Four Threshold Obstacles to Their APA Claims.**

The States bring their claims under the APA, 5 U.S.C. § 706, but "[t]o invoke these provisions," they "must first get past the threshold obstacle[s]" set out in the APA. *Shaltry v. United States*, 87 F.3d 1322 (9th Cir. 1995); *see City of Oakland v. Lynch*, 798 F.3d 1159, 1165 (9th Cir. 2015). As Defendants previously explained in reference to the States' challenge to Section C, the States cannot meet four, independent requirements to bring this action. Those same requirements bar the States' claims related to the ICE Memo.

*A.  The challenged action is "committed to agency discretion by law."*

"[T]he APA does not apply to permit judicial review or permit a reviewing court to compel agency action where 'agency action is committed to agency discretion by law.'" *United States v. Arizona*, 2011 WL 13137062, at *9 (D. Ariz. Oct. 21, 2011) (quoting 5 U.S.C. § 701(a)(2)). Setting enforcement priorities "involves a complicated balancing of a number of factors which are peculiarly within [the Executive's] expertise," including "whether agency resources are best spent on this violation or another" and "whether the particular enforcement action requested best fits the agency's overall policies." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Thus, as this Court recognized in an earlier action by Arizona challenging what Arizona thought inadequate enforcement of immigration laws, "enforcement decisions, including the decisions to prioritize agency resources and act on agency determined priorities, are committed to the discretion of" the Executive. *Arizona*, 2011 WL 13137062, at *9 n.6; *see California v. United States*, 104 F.3d 1086, 1094 (9th Cir. 1997); *see also Morales de Soto v. Lynch*, 824 F.3d 822, 827 (9th Cir. 2016).

This longstanding doctrine bars Arizona's substantive challenges here: Together, the DHS Memo and the ICE Memo reflect the Executive's prerogative to set enforcement priorities and to act on those priorities. In Section B of the DHS Memo, the Acting Secretary set out the agency's top priorities for enforcement: threats to national security, to border security, and to public safety. The ICE Memo instructs personnel how to proceed with enforcement actions to ensure that ICE is devoting its resources toward the most important cases, while authorizing enforcement actions on non-presumed priority cases with appropriate justification and pre-approval. The now-defunct Section C also set out enforcement priorities

1    with regard to removal, albeit with different exceptions. Such prioritization is well within the

2    Executive's discretion. *See Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 967 (9th Cir. 2017).

3         The discretion to set and follow priorities is especially important in immigration

4    enforcement. The Executive must consider a host of issues not present even in ordinary

5    enforcement decisions, such as the "dynamic nature of relations with other countries" and the

6    need for enforcement policies to be "consistent with this Nation's foreign policy with respect

7    to these and other realities." *Arizona*, 567 U.S. at 397. A "principal feature of the removal

8    system," therefore, "is the broad discretion exercised by immigration officials." *Id.* at 396.

9         The guidance ensures that DHS's limited resources are committed to DHS's priorities

10   in light of these many considerations. The States' attempt to brand the pause as an

11   "abdicat[ion]" of statutory duty, FAC ¶ 4, ignores the basic prerogative to structure

12   enforcement in light of scarce enforcement resources and for "humanitarian reasons or simply

13   for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-84

14   (1999) (*AADC*). And the ICE Memo does not prohibit any enforcement activity, but instead

15   focuses agency resources on the most pressing matters.

16        The States suggest that Congress limited the Secretary's discretion by providing that

17   "the [Secretary] shall remove" a noncitizen subject to a final order of removal "within a period

18   of 90 days." 8 U.S.C. § 1231(a)(1)(A); *see* PI Mot. 3-4, 13-14. That argument does not apply to

19   the ICE Memo, which does not prohibit the removal of any noncitizen, but rather prioritizes

20   some over others. But the argument is ill-founded in any event. As the Supreme Court

21   observed in *Zadvydas v. Davis*, it is doubtful that Congress "believed that all reasonably

22   foreseeable removals could be accomplished in that time." 533 U.S. 678, 701 (2001); *see also*

23   *Ariz. Dream Act Coal.*, 855 F.3d at 976-77. Congress accordingly included provisions for when

24   a noncitizen "is not removed within the removal period." 8 U.S.C. § 1231(a)(3).

25        Indeed, the States' argument ignores a basic and longstanding principle of law: the word

26   "shall," standing alone, does not displace the Executive's inherent and unreviewable authority

27   to exercise enforcement discretion. Congress displaces the presumption of unreviewability

28   only if it "limit[s] an agency's exercise of enforcement power . . . either by setting substantive

11

priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Chaney*, 470 U.S. at 833. But a provision that merely directs that the enforcement authority "shall" enforce a law offers no such limitations. Rather, the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory commands." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005)). In *Castle Rock*, a statute provided that law enforcement "shall arrest . . . or . . . seek a warrant" for the arrest of any violator of a restraining order, but the Supreme Court rejected the notion this imposed a mandatory duty because to be "a true mandate of police action would require some stronger indication" of legislative intent than the bare "shall." *Id.*

So too here. Nothing provides the "stronger indication" necessary to displace enforcement discretion. Quite the opposite: The statutory and practical context here clarify beyond doubt that Congress set 90 days only as a "target," and not as a mandate. H.R. Rep. 104-469, pt. 1, at 160 (1996); *see Bhd. of Ry. Carmen Div. v. Pena*, 64 F.3d 702, 704 (D.C. Cir. 1995) ("absent a clear indication that Congress intended otherwise, we will deem a statutory deadline to be directory" rather than "mandatory"). The most important context here is the statute's subject matter: Executive enforcement of immigration law. The Court should not lightly infer from a naked "shall" an intent to displace such a core Executive function. *See Chaney*, 470 U.S. at 832; *Castle Rock*, 545 U.S. at 761; *cf. Sierra Club v. Whitman*, 268 F.3d 898, 903-05 (9th Cir. 2001) (non-enforcement unreviewable under "shall" statute).

The States have leaned almost exclusively on a decision from the Southern District of Texas that reached a contrary conclusion. *See* PI Mot. at 13 (quoting *Texas*, 2021 WL 723856 at *3). Defendants believe that this non-binding decision is incorrect. The court in that case crafted an "exception" to this established doctrine that is not only absent from precedent but is in fact directly contradicted by *Castle Rock* itself. The *Texas* district court correctly recognized that precedent required "some stronger indication" than a naked "shall" for a statute to displace an executive's enforcement discretion. 2021 WL 723856, at *34. It erred, though, in concluding that such an indication existed when "the statute's manifest purpose is to protect the public or private interests of innocent third parties." *Id.* at *35. It is impossible to reconcile

this analysis with *Castle Rock*: the statute there concerned enforcement of *restraining orders* entered to benefit a "protected person." 545 U.S. at 758-59. It is difficult to conceive a statute whose purpose is more manifestly the protection of "innocent third parties." Yet the statute still preserved enforcement discretion. *Id.* at 761. Shorn of this misunderstanding of the doctrine described in *Castle Rock*, it is apparent that § 1231(a)(1) is similarly not mandatory.

     B. *Congress has precluded judicial review of these types of decisions.*

An action also cannot proceed under the APA when another statute precludes review. 5 U.S.C. § 701(a)(1). Whether a particular statute precludes review "is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). A detailed mechanism for review of some claims by some plaintiffs is "strong evidence that Congress intended to preclude [other plaintiffs] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

Congress was explicit that only *noncitizens* could obtain judicial review of the type the States seek. Section 1252(a)(5) provides that "[*n*]*otwithstanding any other provision of law*," "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal." And § 1252(b)(9) states that "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."

Section 1252(b)(9) thus channels judicial review of all "decisions and actions leading up to or consequent upon final orders of deportation" into one proceeding exclusively before a court of appeals. *AADC*, 525 U.S. at 483, 485. (A separate—and even more limited—scheme governs judicial review of expedited removal orders. *See* 8 U.S.C. § 1252(a)(2)(A); *id.* § 1252(e).) This provision circumscribes district court jurisdiction over "*any* issue—whether legal or factual—arising from *any* removal-related activity," which issues "can be reviewed *only* through the [statutorily defined] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029-31 (9th Cir. 2016); *see Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007) (similar). That includes "policies-and-practices

1     challenges," *J.E.F.M.*, 837 F.3d at 1035, arising from any "action taken or proceeding brought
2     to remove an alien," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final
3     order of removal or whether there even is a final order at all. *J.E.F.M.*, 837 F.3d at 1032.

4          The States' claims "arise[] from" "action[s] taken or proceeding[s] brought to remove"
5     noncitizens. 8 U.S.C. § 1252(b)(9). The States contend that DHS's decisions not to remove
6     every noncitizen with a final order of removal within 90 days violates § 1231, but § 1252
7     provides the sole mechanism for review of all "decisions and actions leading up to or
8     consequent upon final orders of deportation," *AADC*, 525 U.S. at 485, and for all "challenges
9     inextricably linked with actions taken to remove migrants from the country," *E. Bay Sanctuary*
10    *Covenant v. Trump*, 950 F.3d 1241, 1269 (9th Cir. 2020). Because only § 1252 provides judicial
11    review of these issues, and because the States cannot invoke that provision, their claims
12    necessarily fail. Moreover, Congress has expressly barred review of *any* claim, by *any* party,
13    invoking § 1231 against the government. 8 U.S.C. § 1231(h). That provision "limit[s] the
14    circumstances in which judicial review . . . is available," *Zadvydas*, 533 U.S. at 687.

15         These provisions *expressly* preclude review of the States' claims in district court. *See* 5
16    U.S.C. § 701(a)(1). But even in their absence, judicial review would still be precluded. *See Block*,
17    467 U.S. at 345 (judicial review precluded by statutory structure and other context). The
18    detailed scheme Congress has established contains numerous provisions "aimed at protecting
19    the Executive's discretion from the courts." *AADC*, 525 U.S. at 486-87. *See, e.g.*, 8 U.S.C.
20    §§ 1226(e); 1226a(b)(1); 1229c(f); 1231(h); 1252(a)(2)(A–C), (b)(4)(D), (b)(9), (d), (f–g).

21         The States may object that this statutory review scheme does not offer a means for a
22    *state* to challenge any decision related to removal. *Cf. Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C.
23    Cir. 1993) (holding that organizational plaintiff could not challenge INS policies "that bear on
24    an alien's right to legalization"). But that is precisely the point: the detailed mechanism for
25    review of *some* claims by *some* parties, is "strong evidence that Congress intended to preclude
26    [other plaintiffs] from obtaining judicial review." *Fausto*, 484 U.S. at 448. Thus, in *Fausto*, the
27    Supreme Court concluded that the "deliberate exclusion" of certain types of employees from
28    administrative and judicial review provisions related to federal employment prevented those

1   employees from seeking relief *at all. Id.* at 455. Similarly, in *Block*, Congress provided a specific

2   review scheme for "dairy handlers" but not for "consumers." 467 U.S. at 346-47. This did not

3   mean that milk consumers could resort to the APA to challenge the agency action; it meant

4   they could not challenge the action at all. *Id.* at 347. Just so here.

5           *C. The States fall outside the zone of interests of the relevant statute.*

6           Among the threshold obstacles that an APA plaintiff must clear is to show that it is

7   "aggrieved . . . within the meaning of a relevant statute." 5 U.S.C. § 702. The Supreme Court

8   has long "held that this language establishes a regime under which a plaintiff may not sue

9   unless he falls within the zone of interests sought to be protected by the statutory provision

10  whose violation forms the legal basis for his complaint." *Thompson v. N. Am. Stainless, LP*, 562

11  U.S. 170, 177 (2011); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,

12  567 U.S. 209, 224 (2012). If a plaintiff is not within the zone of interests, then all his APA

13  claims—including claims that the agency failed to follow required procedures—fail as a matter

14  of law. *See, e.g., Mendoza v. Perez*, 754 F.3d 1002, 1016 (D.C. Cir. 2014).

15          Congress could scarcely have been clearer in its intent to preclude the States' claims in

16  this case. The focus of the zone-of-interests inquiry is "whether [the plaintiff] falls within the

17  class of plaintiffs whom Congress has authorized to sue" under the applicable statute—a

18  question answered "using traditional tools of statutory interpretation." *Lexmark Int'l, Inc. v.*

19  *Static Control Components, Inc.*, 572 U.S. 118, 127-28 (2014). Section 1231, the "statute that [the

20  States] say[] was violated," *Patchak*, 567 U.S. at 224, expressly provides that "[n]othing in this

21  section shall be construed to create any substantive or procedural right or benefit that is legally

22  enforceable by *any party* against the United States or its agencies or officers or any other

23  person," 8 U.S.C. § 1231(h) (emphasis added). Congress was unmistakable that it wanted no

24  party to judicially enforce § 1231. *See Arizona*, 2011 WL 13137062, at *11 n.8 ("[I]t is not clear

25  that Arizona has any rights under 8 U.S.C. § 1231 that it can seek to vindicate.").[3]

26  

27  [3] The district court in *Texas* interpreted the term "any party" in § 1231(h) to mean only "any
    alien." 2021 WL 723856, at *24-27. That implausible interpretation would mean that everyone

28  *except* the actual people in removal proceedings could challenge removal policies,
    notwithstanding the statute's text and Congress's evident intent to shield Executive discretion.

1    The Tenth Circuit thus interpreted an almost identical statutory provision to bar a claim

2    seeking injunctive relief against the government. *Hernandez-Avalos v. INS*, 50 F.3d 842, 844

3    (10th Cir. 1995). The plaintiff had invoked a statute directing that "the Attorney General shall

4    begin any deportation proceedings as expeditiously as possible," 8 U.S.C. § 1252(i) (since

5    amended), but a separate provision stated, just like § 1231(h), that "nothing" in that section

6    "shall be construed to create any substantive or procedural right or benefit that is legally

7    enforceable by any party against" the government. *Hernandez-Avalos*, 50 F.3d at 844. The court

8    applied the "zone of interests" test applicable to APA actions and readily concluded that the

9    statute "means that no one can satisfy the zone of interests test," and that "no would-be

10   plaintiff" could bring suit, either directly or indirectly. *Id.*; *accord Campos v. INS*, 62 F.3d 311,

11   314 (9th Cir. 1995) (favorably citing legislative history stating that the same statutory language

12   "clarifies that . . . the requirement in current law of speedy deportation for criminal aliens

13   do[es] not create enforcement rights against the United States"); *Ncube v. I.N.S. Dist. Directors

14   & Agents*, 1998 WL 842349, at *12 (S.D.N.Y. Dec. 2, 1998).[4]

15          *D. The challenged action is not final agency action.*

16          The States' APA claims fail for still another reason: The APA allows challenges only to

17   "final agency action." 5 U.S.C. § 704. Agency action is "final" under the APA only if it both is

18   "the consummation of the agency's decisionmaking process" and also determines "rights or

19   obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The memoranda structure how DHS

20   will take distinct final agency actions; they are not themselves "final" under the APA.

21          Neither Section C of the DHS Memo nor the ICE Memo changes any person's legal

22   status, determines any legal benefits, or reverses any final order of removal. To the contrary:

23   noncitizens subject to a final order of removal have no more legal right to remain in the United

24   States after either memoranda than they did before. The memoranda simply shift agency

25   priorities. Such policies are not "final agency action" because the agency's discretionary

26   decision not to enforce a law against a private party in particular circumstances does not make

27   _____

     [4] It is no answer that the Supreme Court did not view § 1231(h) as an obstacle to *habeas*

28   review in *Zadvydas*. For one, the petitioners did not seek to enforce § 1231 "against" the
     United States. For another, there is no "zone of interests" inquiry in a habeas action.

16

that party's underlying conduct lawful. There is only final agency action in this context when a noncitizen's legal status is changed or when the agency completes a removal action; those actions must be challenged, if at all, in distinct proceedings after they occur.

**IV.    The Court Lacks Jurisdiction to Resolve Claims Predicated on the MOUs.**

Arizona also suggests that Section C and the ICE Memo are "without observance of procedure required by law," FAC ¶ 80 (quoting 5 U.S.C. § 706(2)(D)), and thus invalid under the APA, because they were not promulgated under the procedures set out in the purported "agreements" between DHS and the States. The Court lacks jurisdiction over these claims for all the reasons set out above. But the Court lacks jurisdiction over the MOU-related claims for yet another reason: the United States has not waived sovereign immunity for such claims.

APA claims are barred when they "seek relief expressly or impliedly forbid[den] by another statute." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998). The Tucker Act, 28 USC § 1491, and the Little Tucker Act, *id.* § 1346, provide the relief—the only relief—for claims based in contract: money damages. *See Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001) ("[D]amages are always the default remedy for breach of contract."). Those statutes therefore "impliedly forbid[] declaratory and injunctive relief and preclude[] a § 702 waiver of sovereign immunity." *Tucson Airport*, 136 F.3d at 646 (quoting *North Side Lumber Co. v. Block,* 753 F.2d 1482, 1485 (9th Cir. 1985)).

The States' MOU-related claims "do not exist independent of" the MOUs; the States are asking the Court to "decide what [their] contract rights are" and then to enforce those rights by setting aside actions that, they contend, violate their claimed right to consultation. *Id.* at 647. But any duty to consult the States, "if it exists, derives from the contract[s]." *Id.* Thus, to the extent the agreements are enforceable at all, Congress has limited the States' remedies to monetary damages and, for the amount the States claim is at issue, jurisdiction would be proper only in the Court of Federal Claims.

## CONCLUSION

For the reasons above, the Court should dismiss the States' Amended Complaint.

RESPECTFULLY SUBMITTED this 6th day of May, 2021.

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director
Federal Programs Branch

 /s/ *Michael F. Knapp*
MICHAEL F. KNAPP
CA Bar No. 314104
Trial Attorney
ADAM KIRSCHNER
IL Bar No. 6286601
Senior Trial Counsel
BRIAN C. ROSEN-SHAUD
ME Bar No. 006018
KUNTAL CHOLERA
DC Bar No. 1031523
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW Room 12008
Washington, D.C. 20530
(202) 514-2071 (telephone)
(202) 616-8470 (facsimile)
Email: Michael.F.Knapp@usdoj.gov
          Adam.Kirschner@usdoj.gov
          Brian.C.Rosen-Shaud@usdoj.gov
          Kuntal.Cholera@usdoj.gov

EREZ REUVENI
CA Bar No. 264124
Assistant Director
U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
202-307-4293 (telephone)
Email: Erez.R.Reuveni@usdoj.gov

*Counsel for Defendants*