**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joseph A. Kanefield (No. 15838)
Brunn (Beau) W. Roysden III (No. 28698)
Drew C. Ensign (No. 25463)
Anthony R. Napolitano (No. 34586)
Robert Makar (No. 33579)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Joe.Kanefield@azag.gov
Beau.Roysden@azag.gov
Drew.Ensign@azag.gov
Anthony.Napolitano@azag.gov
Robert.Makar@azag.gov
*Attorneys for Plaintiffs State of Arizona*
*and Mark Brnovich in his official capacity*

**AUSTIN KNUDSEN**
**MONTANA ATTORNEY GENERAL**

David M. Dewhirst*
  *Solicitor General*
215 N Sanders St.
Helena, MT 59601
Phone: (406) 444-4145
David.Dewhirst@mt.gov

*pro hac vice granted*

*Attorneys for Plaintiff State of Montana*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona; State of Montana; and Mark Brnovich, in his official capacity as Attorney General of Arizona,<br><br>          Plaintiffs,<br><br>          v.<br><br>United States Department of Homeland Security; United States of America; Alejandro Mayorkas, in his official capacity as Secretary of Homeland Security; Troy Miller, in his official capacity as Acting Commissioner of United States Customs and Border Protection; Tae Johnson, in his official capacity as Acting Director of United States Immigration and Customs Enforcement; and Tracy Renaud, in her official capacity as Acting Director of U.S. Citizenship and Immigration Services,<br><br>          Defendants. | No. 2:21-cv-00186-SRB<br><br>**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**(Hearing Set for May 27, 2021, at 10:00 a.m.)** |

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………….…...1

FACTUAL BACKGROUND………………………………………………..…..2

ARGUMENT……………………………………………………….…..5

I.      Plaintiffs Are Likely To Prevail on Their APA Claims Against The Interim Guidance as Applied to Removals ........................................................................ 5

    A.  The Interim Guidance Is Arbitrary and Capricious.................................................. 5

    B.  The Interim Guidance Is A Substantive Rule Issued In Violation Of The APA's Notice And Comment Requirements ..................................................... 11

    C.  The MOUs Bound DHS To Consult With Plaintiffs Prior To Issuing The Interim Guidance....................................................................................... 13

    D.  The Interim Guidance Violates 8 U.S.C. § 1231(a)(1) .......................................... 15

    E.  Defendants' Threshold APA Defenses Fail ......................................... 16

II.     Plaintiffs Will Suffer Irreparable Harm Under The Interim Guidance ................. 17

III.    The Balance Of Equities And Public Interest Favor An Injunction...................... 21

CONCLUSION…………………………………………………………..………22

i

## INTRODUCTION

Plaintiffs hereby renew their request for a preliminary injunction of the ICE February 18, 2021 Interim Guidance as it relates to removals.  Congress has spoken unequivocally on the issue, directing that the Secretary of Homeland Security "shall remove" an alien within 90 days of a final order of removal.  8 U.S.C. §1231(a)(1)(A). Congress enacted this statutory command to protect States from the costs of illegal immigration, and it does not carve out categories of aliens for whom removal is presumptively unwarranted.  But the Interim Guidance did just that: purporting to establish only three "priority" categories of aliens for whom various enforcement actions, including removal, can be carried out and implicitly precluding nearly all other enforcement actions by requiring "preapproval" from high-ranking ICE officials.

Plaintiffs are likely to succeed on their challenge to the Interim Guidance.  The Administrative Record reveals the Interim Guidance is arbitrary and capricious, and further that the sole proffered justification of "limited resources" is demonstrably pretextual.  Even during COVID, ICE was consistently carrying out about 6,000 removals per month.  But after the "priority" categories were applied to removals— initially through a midnight email that followed pressure from advocacy groups to the White House—removals have **plummeted almost 50%** to fewer than 3,000/month since February.  This is the lowest level of removals recorded, and will result in ICE only removing approximately 55,000 aliens in FY2021—a shockingly low number as ICE has never removed fewer than 100,000 aliens.  Nothing has changed about ICE's "limited resources" required this dramatic drop.  What is lacking is political will, not resources.

Moreover, the precipitous drop in removals clearly establishes that the Interim Guidance is a substantive rule subject to notice and comment (further bolstered by the MOUs entered into with Plaintiffs), and that the Interim Guidance is contrary to law. Any procedural bars to APA review fail.  Finally, Plaintiffs have established the other elements required for a preliminary injunction. The Court should grant preliminary relief.

1

## FACTUAL BACKGROUND

On 1/20/2021 DHS issued the Memorandum, which in Section B imposed Interim Civil Enforcement Guidelines and in Section C imposed a 100-day moratorium on removals outside of narrow categories.  Dkt. 12-1 Ex. A at 2-5.[1]  A stated rationale for suspending removals in Section C was prioritizing "limited resources" to conduct processing at the border and to comply with COVID-19 protocols.  *Id.* at 3.  The entire administrative record for the Memorandum is only 7 pages, and the Memorandum was "author[ed]" by an incoming White House staffer—something discovered only because DHS briefly posted a version with metadata.  Dkt. 17 at 4.  After the Memorandum was issued, senior ICE staff emailed on 1/21-22 about its effects, noting the "issue of *Zadvydas* and potential releases will be front and center."  AR_AZ_0000018.[2]  *Zadvydas v. Davis* requires release when "there is no significant likelihood of [an alien's] removal in the reasonably foreseeable future."  533 U.S. 678, 701 (2001).  A report attached to the ICE staff's email chain showed 14,195 individuals in ICE custody, and only 5,870 (41%) of those falling in the three Section B priority categories.  AR_AZ_0001574-75.

On 1/26, a federal court issued a TRO against Section C's removal moratorium, concluding it was unlawful.  Dkt. 12-1 Ex. B (reproducing *Texas v. United States*, No. 16-cv-3, 2021 WL 247877 (S.D. Tex. Jan. 26, 2021)).  That night, ICE notified its employees that "until further notice, in order to comply with the TRO, [ICE] employees should return to <u>normal removal operations as prior to the issuance of the</u> <u>Memorandum</u>.  AR_AZ_0004631 (emphasis added).

On 1/27, the acting head of ICE Enforcement and Removal Operations ("ERO") emailed data to inform "potential impacts of the interim guidance."  AR_AZ_004670.  There is no reference to removals in the email.  Instead, it estimates "book-ins," defined as "an individual entering [ICE] custody from a single event (arrest by CBP or ICE)," to

---

[1] Unless otherwise noted, Dkt. page citations are to the ECF (blue header) page number.
[2] The "AR_AZ" prefix refers to the Administrative Record produced by Defendants in this case, which is attached to this Motion as Exhibit R.

"be reduced by 50% of historical numbers and the vast majority of book-ins would come from CBP transfers." *Id.*; *see also* AR_AZ_00004673 (chart).

On Sunday 1/31, the Acting DHS Secretary issued guidance for compliance with the *Texas* TRO. AR_AZ_00004677-78. That guidance never suggests that Section B of the Memorandum governs removals. Instead it says, "[a]bsent further notice, ICE should continue to conduct removal operations without implementing, and without taking into consideration, the pause on removals set forth in Section C." *Id.*

On 2/1, groups wrote to the White House and the Acting DHS Secretary, stating:

> Just this morning, on the first day of Black History month, there was another deportation flight from San Antonio to Haiti…. In a continued attempt to thwart the new administration's priorities, we believe ICE has scheduled yet another deportation flight for this Wednesday to Angola, Cameroon, and the Democratic Republic of Congo. We believe some or all of the individuals scheduled to be deported on this flight fall outside of the interim enforcement guidelines which take effect today. … The administration must step in now to stop this injustice before it is too late.

AR_AZ_0004679-70 (emphasis added). On 2/4 at 11:32 p.m., Acting ICE Director Tae Johnson emailed senior staff regarding "ICE's Removal Priorities." AR_AZ_00004699. Despite being sent in the dead of night, it was "[e]ffective immediately." *Id.* It contained no discussion whatsoever of limited resources, but instead simply engrafted the enforcement priorities in Section B onto removals, even though it was well-understood Section B had not applied to removals. *Id.* It further made clear that the Section B priorities were no mere guidance, but instead imposed a near-absolute prohibition on removal: "Over the next few days until formal guidance is issued, removal flights will continue and should be prioritized so that only those who meet the [Section B] priorities will be removed." AR_AZ_00004699 (emphasis added). The email adds a boilerplate disclaimer that ICE is "not foreclosed" from taking other actions, including removal. *Id.*

On 2/7, the *Washington Post* published an article stating it had a copy of a "draft memo circulating the agency" and even quoted from that draft memo as referring to "limited resources." AR_AZ_00004701. The article also refers to the request for cancellation of the deportation flight to "majority Black countries … during Black

3

History Month" and states "[w]ithin hours, the acting director of ICE wrote to senior staff, stopping the deportations." AR_AZ_00004703.

On 2/9, the *Texas* court extended its TRO through 2/23/2021. AR_AZ_00004705. On 2/10, the Acting ICE Deputy Director notified ICE employees of the TRO's extension. AR_AZ_00004711. He stated that when the TRO first issued ICE "employees were advised to return to normal removal operations as prior to the issuance of the" Memorandum, and it was only later that they were instructed that "removals should be conducted according to the priorities set forth in Section B" of the Memorandum. *Id.*

On 2/18, the Acting ICE Director issued the Interim Guidance. AR_AZ_00000001. This guidance largely continued the policy, as had been ordered on 2/4, of applying the priorities in Section B of the Memorandum to removals. AR_AZ_00004699. The purported basis for this guidance was "limited resources." AR_AZ_00000001. On 2/23, the *Texas* court issued a preliminary injunction against Section C of the Memorandum, again finding it unlawful. *See* Dkt. 12-1 Ex. K at 66.

ICE publishes data and has provided discovery responses in this case showing that the Section B enforcement guidelines—expanded to removals on 2/4 and carried forward in the 2/18 Interim Guidance—have resulted in a dramatic overall decrease in ICE enforcement. This decrease is on top of the prior substantial coronavirus-related decreases. ICE's book-ins by preceding month through 4/24/21 are as follows.

| 10/20 | 11/20 | 12/20 | 01/21 | | 02/21 | 03/21 | 04/21 | | Total |
|---|---|---|---|---|---|---|---|---|---|
| 6,804 | 5,978 | 6,071 | 5,118 | | 1,985 | 2,343 | 2,156 | | 30,455 |

Comparing the 3 months before February and 3 three months since shows that ICE is only booking-in **41%** of the number of noncitizens per month that it had been.[3]

ICE also provided the number of Removals through 4/16/21:

| 10/20 | 11/20 | 12/20 | 01/21 | | 02/21 | 03/21 | 04/21 | | Total |
|---|---|---|---|---|---|---|---|---|---|
| 10,367 | 5,840 | 5,886 | 5,732 | | 3,180 | 3,687 | 1,448 | | 36,140 |

---

[3] *See* Ex S AZMT007826. The change was calculated by comparing the sum of book-ins for 11/20, 12/20, and 01/21 with the sum for 02/21, 03/21, and (30/24)*04/21.

Comparing the 3 months before February and 3 three months since shows that ICE is only removing **55%** of the number of noncitizens per month that it had been.[4]   The *Washington Post* reported that the number of removals carried out by ICE in April "fell to the lowest monthly level on record," 2,962 according to preliminary data, and this is "the first time the monthly figure has dipped below 3,000 … a 20 percent decline from March."  Ex. U (Nick Miroff, *Ice deportations fell in April to lowest monthly level on record, enforcement data shows*, Washington Post (May 5, 2021)).  It further reported that "ICE has recorded about 37,000 [removals] during the past seven months, putting the agency on pace for fewer than 55,000 deportations for the 2021 fiscal year.  It would be the first time that figure has fallen below 100,000."  *Id.*

Because ICE has approximately 6,000 ERO officers, they are now averaging 1 interior arrest per 2.5 months per officer, on pace for 4-5 arrests per year.  *See* Ex. V Nick Miroff Tweet.  "In private, ICE officials say their work is being essentially abolished through restrictions on their ability to make arrests and deportations."  Ex. U (article).

## ARGUMENT

### I.     Plaintiffs Are Likely To Prevail on Their APA Claims Against The Interim Guidance as Applied to Removals

#### A.     The Interim Guidance Is Arbitrary and Capricious

The Interim Guidance violates the APA because its adoption was "arbitrary [and] capricious."  5 U.S.C. § 706(2)(A).  ICE failed to (1) supply a reasoned analysis for the change in prior policy, (2) consider policy alternatives, and (3) consider important aspects of the problem.  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 51 (1983).  ICE's sole stated rationale of "limited resources," moreover, is demonstrably pretextual and therefore violates the APA for that additional reason.  *See Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2573 (2019) (decision resting on a "pretextual basis" "warrant[s] a remand" to agency).

---

[4] *See* Ex. T (Ds' discovery responses).  The change was calculated by comparing the sum of removals for 11/20, 12/20, and 01/21 with the sum for 2/21, 3/21, and (30/16)*4/21.

1

### 1. ICE Failed to Supply a Reasoned Analysis for its Policy Change Severely Limiting "Normal" Removal Operations

2

"[T]he touchstone of 'arbitrary and capricious' review under the APA is

3

'reasoned decision-making.'" *Altera Corp. & Subsidiaries v. Comm'r of Internal*

4

*Revenue,* 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *State Farm*, 463 U.S. at 52); *see*

5

*also FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021) (Arbitrary-and-

6

capricious standard requires "agency action be reasonable and reasonably explained").

7

What occurred here is not "reasoned decision-making" but rather its antithesis:

8

the Administrative Record reveals a politicized process that involved 1) a ghostwritten

9

Memorandum from the White House on the new administration's first day that was

10

adopted without question or independent reasoning by Defendants, and was swiftly

11

enjoined as unlawful (a holding that Defendants tellingly have not appealed); 2) an

12

abrupt shift in ICE policy—announced in the middle of the night and made effective

13

"immediately," almost transparently in response to crude pressure from advocacy groups

14

complaining that the mere occurrence of "another deportation flight" was "a continued

15

attempt to thwart the new administration's priorities"; 3) a manifest failure to consider

16

any data whatsoever about existing removals in comparison to ICE resources, let alone

17

to supply a rational connection between the facts found and the choice made; and

18

4) objective evidence that—as designed by the political higher-ups—the policy shift was

19

not about mere prioritization of particular removals, but instead an intentional slashing

20

of removals to a mere **55%** of the already reduced COVID-19 rate.

21

Federal law dictates that the Secretary of Homeland Security "shall remove" an

22

alien within 90 days after a final order of removal.  8 U.S.C. §1231(a)(1)(A). Congress

23

added this provision to protect States and localities from having to expend resources on

24

aliens that shall be removed.  Dkt. 35 at 5.  As is made clear in the Administrative

25

Record, prior to the issuance of the Memorandum on 1/20/2021, ICE was conducting

26

"normal removal operations," and ICE returned to those "normal removal operations"

27

after the *Texas* TRO on 1/26.  AR_AZ_0004631.pdf; *see also* AR_AZ_00004711 (2/10

28

email from Deputy Director acknowledging same).  These "normal removal operations"

were occurring during COVID-19 and had consistently resulted in approximately 6,000 removals per month for the past three months (down from 20,000/month pre-COVID and 7,000-10,000/month during the first months of COVID). *Supra* at p.4. Nothing in the Administrative Record indicates ICE's limited resources had changed in any way from November, December, and January to February, or that 6,000 removals per month was incompatible with ICE's existing limited resources in February and beyond.

Sustaining that level of removals, particularly given Congress's "shall remove" command, was thus not resource-precluded but instead politically undesired.  Under "normal removal operations," AR_AZ_0004631, ICE was able to continue removals at a level that certain outside advocacy groups felt was "thwart[ing] the new administration's priorities."  AR_AZ_0004679-70.  So they complained to the White House.  *Id.*[5]  And "[w]ithin hours, the acting director of ICE wrote to senior staff, stopping the deportations." AR_AZ_00004703.

Literally in the middle of the night on 2/4, the Acting ICE Director instituted a sudden shift in policy from "normal removal operations," AR_AZ_0004631, to stating "[e]ffective immediately and until formal guidance is issued, removals should be conducted according to" Section B of the Memorandum." AR_AZ_00004699.  As noted above (at 3), there was no pretense that "limited" resources had suddenly required this "immediate[]" change in policy.  Nor was there any doubt that Defendants were issuing only non-binding guidance rather than substantive commands: the email expressly stated that "only those who meet the [Section B] priorities will be removed."  *Id.* (emphasis added).  And that substantive command was carried forward with the Interim Guidance.

The remainder of the Administrative Record dispels any conceivable doubt, confirming that DHS never considered removal data, changes in resource constraints,

---

[5] Other comments by activist groups are also in the record.  On 2/1, groups sent a letter to ICE Officials in California demanding the release of people from ICE custody. AR_AZ_00004695.  On 2/5, groups also sent a renewed meeting request to establish a policy for detainees to escalate issues under the Memorandum.  AR_AZ_00004762; AR_AZ_00004764.  On 2/11, advocacy groups demanded a file review of current detainees pursuant to the Memorandum.  AR_AZ_00004712.

"priority" aliens not being removed, or the connection between these things when developing the Interim Guidance. *Altera Corp,* 926 F.3d at 1080 (agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting *State Farm*, 463 U.S. at 43). If such reasoned consideration existed, surely ICE would have included it in the record. It didn't.

It is undisputed that the seven-page administrative record underlying the now-enjoined removal moratorium in Section C of the Memorandum does not contain any consideration of data related to removals whatsoever. Dkt. 17 at 4 (citing *Texas* administrative record). Similarly, the Administrative Record underlying the Interim Guidance here is also completely devoid of any such data. The day after the 1/20 memorandum was issued, Senior ICE staff emailed about "the issue of *Zadvydas* and potential releases." AR_AZ_0000018. A report attached to that email chain showed 14,195 individuals in ICE custody, and only 5,870 (41%) of those falling in the three Section B priorities. AR_AZ_0001574-75. But there is no data or analysis whatsoever of how that relates to ICE's removal resources. The earliest mention of "interim guidance" occurred on 1/27 in an email from the acting director of ERO but likewise contains no discussion of removal resources. AR_AZ_00004670. Other than these two reports, there do not appear to be <u>any</u> other quantitative reports in the record. This, despite the fact that DHS was dramatically changing ICE's enforcement policies based on the purported basis of "limited resources." *See* AR_AZ_00004701 (article noting priorities were "major shift in enforcement" and part of attempt to "reorient ICE").

Simply put, the scant administrative record fairly mandates a conclusion that Plaintiffs are likely to prevail on their claim that ICE violated the APA by failing to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Altera Corp,* 926 F.3d at 1080 (quoting *State Farm*, 463 U.S. at 43).

### 2.  ICE Failed to Consider Policy Alternatives to the Interim Guidance

A *sine qua non* of any reasoned decision-making is meaningful consideration of alternatives.  *State Farm*, 463 U.S. at 50-51.  But Defendants here engaged in nothing of the sort: there was no meaningful weighing of alternatives, as instead simple (and unreasoned) surrender to prevailing political imperatives.  Obvious alternatives would include: (1) expanding the priorities to cover additional types of criminal convictions and criminal charges, (2) continuing removals at the "normal" 6,000/month rate, or (3) increasing removals to the prior 10,000-20,000/month as COVID subsides.[6]

DHS acted with undeniable knowledge the Interim Guidance would likely decrease ICE arrests by a whopping 50%.  *See* AR_AZ_00004670.  Yet the record confirms that DHS utterly failed to consider any less dramatic shifts.  That failure alone violates the APA.  *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) ("*Regents*") ("[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'") (quoting *State Farm*, 463 U.S. at 51).

### 3.  ICE Failed to Consider an Important Aspect of the Problem

As acknowledged in the MOUs and explained further in Part I.C *infra*, states are directly and concretely affected by changes in immigration enforcement, including suspension of removals.  *See* AR_AZ_00004660-4661.  The legislative history of §1231(a)(1)(A) shows that Congress specifically enacted this provision with an eye towards mitigating financial burdens on States and localities.  Dkt. 35 at 5.  But the administrative record demonstrates that DHS failed to consult with any State or consider *whatsoever* the impacts of the Interim Guidance upon the States or public safety, health, or finances.  *Cf. E. Bay Sanctuary Covenant v. Garland*, No. 19-16487, __ F.3d __, 2020 WL 9156716, at *17 (9th Cir. July 6, 2020) (agency's policy was arbitrary and

---

[6] On 2/12/21, Pfizer announced it was going to supply 300 million doses, showing a change justifying <u>increasing</u> removals.  *See*  <u>https://www.pfizer.com/news/press-release/press-release-detail/pfizer-and-biontech-supply-united-states-100-million</u>

capricious because its explanation failed to address the special vulnerability of unaccompanied minors). Considering such policy implications "was the agency's job, but the agency failed to do it." *Regents*, 140 S. Ct. at 1914.

This failure is exacerbated by the White House and DHS's transparent fixation on political considerations. While completely indifferent to burden on States, DHS was apparently willing to change ICE policy "[w]ithin hours," when pressured by certain outside groups that the mere occurrence of deportation flights represented an "attempt to thwart the new administration's priorities." AR_AZ_00004703. And the record reflects consideration of no fewer than four different letters from advocacy groups between 2/1 and 2/11. *See supra* at 7 & n.5. Yet DHS and ICE maintained on 2/2 that it was "void, binding, and unenforceable" for DHS to agree to even *consider* input from States and provide a written response. Dkt. 12-1 Ex. F at 37, Ex. J at 63. Arizona's 1/26 letter stated "[t]he [M]emorandum's directive to pause deportations could lead to overcrowding at ICE facilities, forcing the release of dangerous offenders into our State" and that "people charged with or convicted of felonies have been released without coordination with the appropriate court or probation department." Ex. D. at 32. Despite Arizona's repeated statements that it "believes strongly that a collaborative effort with the federal government is necessary to ensure the safety of Arizonans," Ex. D at 33, Ex. E at 35, and Montana's request to "resolve these issues amicably through consultation and communication," Ex. I at 60, DHS refused to even directly *receive* input from States, instead instructing them to "direct any further correspondence concerning the [MOU] to the Department of Justice." Ex. F at 37, Ex. J at 63; *see also* Parts I.B,C, *infra*.

### 4. DHS's Current Rationale for the Policy Change is Pretextual

The complete lack of evidence of any consideration of resource constraints also renders the Interim Guidance illegal under the APA because Defendants' "resource constrains" rationale is demonstrably pretextual. *Dep't of Commerce*, 139 S.Ct. 2575-76 (holding that mismatch between the record evidence and the rationale presented to the reviewing court violated the APA). As discussed above, DHS's actions do not rest on

10

any actual consideration of resource constraints.  To the extent that they rest on any apparent rationale at all—which is minimal—the rationale is simply political motivations untethered from tenable justifications.  And any new, *post hoc* explanations that may now be supplied to this Court by DHS's counsel come too late.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

The 2/7 *Washington Post* article—which Defendants tellingly chose to include the otherwise-sparse administrative record here—discusses the Interim Guidance and the Biden Administration's approach to enforcement, and notes the passing reference to "limited resources" in a draft memo, but discusses actual rationales such as the Biden Administration's desire to "assert[] more control over [ICE]" and "rein in and reform ICE." *See* Document #27, AR_AZ_00004701, 42702.

Those real rationales are also borne out by the subsequent objective data—only booking-in at 41% of the previous number and only removing at 55% of the previous number per month beginning in February 2021. *See* p.4 *supra*. Consistent with the sharp drop in removals, the small number of requests for "preapproval" under the process provided in the Interim Guidance shows that the Interim Guidance was not prioritization, with agents free to use remaining resources to carry out further removals, but rather a signal that removals outside of "priority" categories were disfavored. *See* Part I.B, *infra*.

DHS may not now offer a new explanation—reasoned or otherwise—other than "limited resources" that justifies the discrepancy between the Interim Guidance and the Administrative Record. *See Dep't of Commerce*, 139 S. Ct. at 2575.

**B.    The Interim Guidance Is A Substantive Rule Issued In Violation Of The APA's Notice And Comment Requirements**

The Interim Guidance promulgates a legislative rule that required notice-and-comment rulemaking prior to its issuance.  DHS does not contend it complied with those procedures, nor does the Interim Guidance assert a good cause finding for avoiding them. The Interim Guidance accordingly is invalid unless it is not a substantive rule and thus

11

qualifies for exception under 5 U.S.C. § 553(b)(A).  It does not.

This determination cannot be controlled by the "agency's self-serving *label*," and instead courts must examine "the *contents* of the agency's action."  *Azar v. Allina Health Services*, 139 S.Ct. 1804, 1812 (2019); *Hemp Indus. Ass'n v. Drug Enf't Admin*, 333 F.3d 1082, 1087 (9th Cir. 2003) ("the court need not accept the agency characterization at face value."), *E. Bay Sanctuary Covenant v. Trump*, 349 F.Supp. 3d 838, 860 (N.D. Cal. 2018), *aff'd sub nom. E. Bay Sanctuary Covenant v. Biden*, No. 18-17274, 2021 WL 1220082 (9th Cir. Mar. 24, 2021) (history cleaned up) ("An agency's legal conclusions regarding whether § 553 notice-and-comment procedures are required are not entitled to deference."). Here, analysis of the Interim Guidance and its effect demonstrates that it is a substantive rule

The Interim Guidance is neither a general statement of policy nor a procedural rule.  A general statement of policy must "not impose any rights and obligations" and may only "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Community Nutrition Institute v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987); and *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012-13 (9th Cir. 1987).  Similarly, "a procedural rule does not itself 'alter the rights or interests of parties.'"  *Elec. Privacy Info. Ctr. v. U.S. Dept. of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011).  More generally, a rule is not procedural if it "encodes a substantive value judgment" thereby "putting a stamp of [agency] approval or disapproval on a given type of behavior."  *Chamber of Commerce of the U.S. v. U.S. DOL*, 174 F.3d 206,211 (D.C. Cir. 1999) (cleaned up). The Interim Guidance plainly does that: it places DHS's "stamp of disapproval" on removals of aliens with final orders of removal who do not fit into its narrow priority categories, and through that has resulted in a significant drop in removals.

DHS statistics on demonstrate the tremendous impact the Interim Guidance has had, not just in its end result of reducing the number of removals by 45% so far, but also by encoding a substantive value judgment evident in the low number of requests for preapproval. *See supra* at 4, 11.  DHS documents roughly 200 removal action reports for

the Phoenix and Salt Lake City field offices from February 18 to April 16, 2021. *See generally*, AZ_00000001-678.[7]  While the majority of these were approved, the majority also appear to be for individuals already in priority categories, typically for either an aggravated felony conviction or having entered the United States after November 1, 2020. *See generally id.*  In other words, these individuals appear to have already fit one of the priority categories.  Dkt. 12-1 at 44, Ex. G.

This demonstrates that the value judgment encoded by the Interim Guidance—and its unmistakable presumption against removal operations—is so strong that preapproval *requests* are so low that they could not make up for even half of the precipitous drop in removal operations even if they were all approved.   Such extreme unwillingness to request preapproval demonstrates that not only that line officers have internalized the Interim Guidance's resounding stamp of disapproval against enforcement in non-priority cases, but also the reality of the Interim Guidance's impact on the rights and obligations of individuals who fit either side of the priority/nonpriority distinction.  Indeed, those in non-priority categories have effectively been granted a reprieve from removal while priority removals continue apace even though both groups having the same type of final removal orders.  The Interim Guidance thus bears the hallmark of a substantive rule by imposing substantive criteria with powerful and demonstrable effects.  As such, the APA's notice-and-comment requirements applied to its issuance but were not followed.

### C.    The MOUs Bound DHS To Consult With Plaintiffs Prior To Issuing The Interim Guidance

DHS's non-compliance with the MOUs exposes and underscores its non-compliance with APA requirements.  The MOUs establish that DHS changed its removal policy, did not follow proper procedure in doing so—including a failure to comply with either the APA or the MOUs' requirements to provide notice and an explanation of that change—and recognized that such a change would cause Defendants irreparable harm.

---

[7] Plaintiffs are conducting discovery on this issue, including in a forthcoming deposition, and will file relevant documents and testimony with the Court in conjunction with their May 14 brief.

AR_AZ_00004661.

The MOUs were a commitment to consult with Plaintiffs prior to any change in policy. And the MOUs were signed by duly authorized parties from the Plaintiffs—Attorneys General and/or Governors—and DHS—a Senior Official Performing the Duties of the Deputy Secretary ("SOPDDS").[8]

Plaintiffs do not seek specific performance but rather a negative injunction in line with the normal remedies for unlawful agency action. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (requiring an agency "to follow [its] own procedures . . . . even where the internal procedures are possibly more rigorous than otherwise would be required"); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 717 (8th Cir. 1979) ("Failure of the [agency] to make any real attempt to comply with its own policy of consultation . . . violates those general principles which govern administrative decisionmaking.").

DHS also could have used the ordinary notice-and-comment process to receive meaningful input from Plaintiffs. *See Alcaraz v. Block*, 746 F.2d 593, 611 (9th Cir. 1984) ("[notice and comment] framework creates a pre-publication dialogue which allows the

---

[8] Kenneth Cuccinelli was lawfully appointed to his role as SOPDDS under the Homeland Security Act of 2002 (HSA), which gives the Secretary of Homeland Security ("Secretary") the exclusive authority "to designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2). On April 9, 2019, then-Secretary of Homeland Security Kirstjen M. Nielsen legally changed the succession order for the Secretary by issuing a document designating the order of succession for any and all vacancies in the position of the Secretary, which provided that then-Commissioner McAleenan of U.S. Customs and Border Protection would be her successor. U.S. Department of Homeland Security, Memorandum for the Secretary, Designation of an Order of Succession for the Secretary (April 9, 2019) ("Nielsen Memorandum"), available at https://www.theusconstitution.org/wp-content/uploads/2021/01/Nielsen-April-9-2019-Order.pdf (last accessed April 26, 2021). The Nielsen Memorandum overrode all previous designations, including former Secretary Jeh C. Johnson's 2016 order of succession, which had been issued under the Federal Vacancy Reform Act and prior to the enactment of Sections 113(g)(1) and (2). Subsequently, then-Acting Secretary McAleenan later amended the order of succession, resulting in Acting Secretary Wolf taking office. Acting Secretary Wolf subsequently amended the order of succession for Deputy Secretary, enabling Ken Cuccinelli to assume the role of the SOPDDS.

Upon his resignation, Acting Secretary Wolf designated the Deputy Secretary—Mr. Cuccinelli—as his successor. Order Designating the Order of Succession for the Secretary of Homeland Security (Jan. 11, 2021), https://www.dhs.gov/sites/default/files/publications/20_0111_order-of-succession-secretary-of-homeland-security.pdf.

agency to educate itself on the full range of interests the rule affects"); *see also California v. United States DOI*, 381 F. Supp. 3d 1153, 1172 (N.D. Cal. 2019) (one purpose of notice and comment is "'to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.'") (quoting *Prometheus Radio Project v. F.C.C.*, 652 F.3d 431, 449 (3d Cir. 2011)).

The Record, however, is devoid of any evidence of consultation with the States or consideration of the impacts to them.  The MOUs recognized that Plaintiffs are directly and concretely affected by changes in immigration enforcement.  AR_AZ_00004660-4661.  Plaintiffs even wrote to Acting Secretary Pekoske on January 26, 2021 regarding the MOUs and impact of a pause on removals.  AR_AZ_00004657; Dkt. 12-1, Ex. I (not included in the Record). After receiving no response, Arizona again wrote to DHS on February 1 regarding the release of 27 aliens with final removal orders in the Phoenix area.  Dkt. 12-1, Ex. E.  The February 1 Letter from Arizona is not included in the Administrative Record (incidentally demonstrating the record's incomplete nature). DHS's only communications were cursory letters terminating the MOUs, which are also not included.   Dkt. 12-1, Exs. F, J.  DHS's decision to terminate the MOUs is a tacit recognition that the agreements are valid.  It also underscores that DHS was aware of its commitments, forthcoming change in position, and the potential consequences.

### D.    The Interim Guidance Violates 8 U.S.C. § 1231(a)(1)

The Interim Guidance is contrary to law under 8 U.S.C. § 1231(a)(1) because on its face it creates a presumption against certain types of removals despite the law's imposition on a 90-day deadline on all removals.[9]   The word "shall" as used in § 1231(a)(1)'s 90-day removal directive is mandatory language.  *See Lema v. I.N.S.*, 341 F.3d 853, 855 (9th Cir. 2003) ("Ordinarily, the INS *must* remove an alien in its custody

---

[9]  Certain exceptions to the removal requirement are prescribed by law within § 1231(a)(1), but Congress's express inclusion of these exceptions do not grant DHS any additional ability or discretion to write its own exceptions into the law's mandate.  *See* Dkt. 38 at 12.

within ninety days from the issuance of a final removal order. *See* 8 U.S.C. § 1231(a)(1)(A)-(B).") (emphasis added).  DHS's authority is bound by the language of the U.S. Constitution and of relevant statutes enacted by Congress, and "does not include the authority to 'suspend' or 'dispense with' *Congress's* exercise of legislative Powers in enacting immigration laws." *Texas*, 2021 WL 723856, at *37 (S.D. Tex. Feb 23, 2021).

As discussed above in Section I.B, the Interim Guidance encodes a value judgment against certain congressionally mandated removals by distinguishing some categories of aliens as presumptively un-removable, despite final orders of removal, unless special permission is obtained.  The Interim Guidance therefore does not have the effect of merely diverting resources to ensure that the highest priority removals are completed first but rather dramatically reducing the overall number of removals conducted by DHS.

This effect is not compatible with § 1231(a)(1)'s instructions to the agency to complete removals within 90 days.  DHS has not argued—nor does the evidence support—that the reduction in removals is due to outside factors stymieing its best efforts at complying with the law.  Rather, it has issued a policy in the Interim Guidance that instructs its personnel to generally disregard certain types of removals, putting in place hurdles to enforcement of those removal orders.  And statistics from the months following its issuance have shown that the policy has cut in half DHS's compliance with Congress's directive to complete removals within 90 days. Therefore, the Interim Guidance is invalid because it violates and is incompatible with §1231(a)(1)'s mandate.

### E.   Defendants' Threshold APA Defenses Fail

As set out in Plaintiff's Reply, DHS's threshold defenses fail, and Plaintiffs incorporate those same arguments here as applied to the Interim Guidance.  Dkt. 38 at 4-10.  In short, and for additional reasons such as presented in Plaintiffs' prior briefing: The Interim Guidance is a final agency action that marks the consummation of DHS's decision-making process, has already gone into effect, and impacts rights and obligations with legal consequences directly flowing therefrom, including for those removable aliens depending on their priority categories. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*,

16

136 S.Ct. 1807, 1813 (2016).  The statutory language of § 1231(a)(1) contains an express command that divests DHS of the very discretion upon which the Interim Guidance necessarily depends.  *See Heckler v. Chaney*, 470 U.S. 821, 832-33 (1985).  Judicial review is available for Plaintiffs' APA claims, and the statutory text Defendants have previously cited only precludes individuals' challenges to removal proceedings, not state governments' challenges to inappropriate agency action that happens to have substantive effect on the subject of removals.  *See Reno v. Am.-Arab Anti- Discrimination Comm.*, 525 U.S. 471, 499 (1999) (Stevens, J., concurring).  And Plaintiffs fall within the zone of interests protected by the INA.  *See Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015) (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012)**.**

## II.   Plaintiffs Will Suffer Irreparable Harm Under The Interim Guidance

The Interim Guidance directly and irreparably harms Plaintiffs by increasing the unreimbursed costs they must bear due to the decrease in removals, including law enforcement and incarceration—on top of the monetary cost of crime itself given the statistical certainty of recidivism—as well as healthcare and education costs.  These costs also impose a sovereign injury upon Plaintiffs by interfering with their legislative budget processes.  *See* Dkt. 17 at 17 n.9.  Further, the Plaintiffs suffer procedural harms under the Interim Guidance because it was issued in violation of the APA's notice-and-comment requirements and the MOUs, which required consultation prior to such a change in policy.  *See* Sections I.B and I.C, *supra*.

It is well established that irrecoverable economic harms constitute irreparable injury.[10] And there is no dispute here that Plaintiffs have no avenue of recovering damages from the federal government for the injuries at issue here. Moreover, the Ninth Circuit has specifically recognized that a state suffers irreparable harms where it is likely to bear the "heavy financial costs" of supporting an increased number of immigrants "on state and local programs" as a consequence of a federal agency rulemaking.  *City &*

---

[10]   *See, e.g., E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); Dkt. 17 at 17-18.

*County of San Francisco v. United States Citizenship & Immigration Services*, 981 F.3d 742, 762 (9th Cir. 2020).  And the U.S. Supreme Court recognizes that a state may assert injuries based on "the predictable effect of Government action on the decisions of third parties."  *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2565-66 (2019).  Just so here.

### A.   Law Enforcement, Incarceration and Increased Crime Costs

Plaintiffs have suffered, and will suffer, increased costs of incarceration and other law enforcement services due to the challenged actions.   Significantly, the Interim Guidance has directly resulted in ICE lifting detainers on criminals who have completed their sentences.  Instead of being removed, these individuals instead being released on the street and into communities.

Defendants' actions have directly led to Arizona incurring supervised-release costs that they otherwise would not occur.  In particular, Arizona has identified at least four convicted criminal aliens whose ICE detainers were lifted prior to their release from state prisons due to the new removal priorities throughout February, both pre- and post-Interim Guidance issuance.  *See* Decl. of Jennifer Abbotts, Ex. W, AZMT007439-7441.  The reasons their detainers were lifted are documented in Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") business records and in emails received from ICE itself.  *See, e.g.*, *id.* at internal Ex. E, AZMT007455-AZMT007458.[11]   These individuals were placed on community supervision (similar to federal supervised release), which costs the State $4,163.60 annually per individual.  *See id.* AZMT007439; Decl. of Shaka Okougbo, Ex. X, AZMT008128.  These increased costs are irrecoverable, and hence irreparable, injury.

Defendants' actions also impose direct law enforcement costs and crime-based injuries.  *See, e.g.*, Ex. M, Decl. of Brian Lockerby, AZMT007419-AZMT007422; Ex. P, AZMT0074320-AZMT007433. Unsurprisingly, just as everywhere else in the U.S., the

---

[11] For example, an April 14, 2021, email titled "316717 Detainer lift" from ICE employee Christopher Murphy informs ADCRR that the detainer for inmate 316717 has been lifted, explaining "Subject does not meet the current enforcement priorities."  Decl. of Jennifer Abbotts Ex. C, AZMT007450.

statistical rate of recidivism of convicted criminals is non-zero in the Plaintiff States. Defendants' failure to remove aliens with criminal convictions and final orders of removal thus causes the Plaintiff States irreparable injury.

Generally, among released prisoners, 68% are re-arrested within 3 years, 79% within 6 years, and 83% within 9 years.  *See* National Institute of Justice, Measuring Recidivism (Feb. 20, 2008), https://nij.ojp.gov/topics/articles/measuring-recidivism#statistics.  Given those recidivism rates, the release of convicts into the community pursuant to the Interim Guidance makes it virtually certain that Plaintiffs will incur additional law enforcement and incarceration costs and direct crime-based losses. In 2019 alone, Arizona reported costs of $19,019,255.68 related to the incarceration of certain alien criminals under the federal SCAAP program. Ex. Y.  Of this, less than 10% was reimbursed. Ex. Y.

The Interim Guidance emboldens illegal entry by allows for alien criminals who would otherwise be removed to remain.  ICE ERO statistics report that the percentage of aliens that ICE removed from the interior in 2020 who have prior criminal convictions is 92%.  U.S. Immigration and Customs Enforcement, *ERO FY 2020 Achievements*, available at https://ice.gov/features/ERO-2020.   In 2019, ICE removed 13,436 with criminal convictions from the Phoenix Area of Responsibility alone.  *See* ERO FY2020 Local Statistics at p.7, https://www.ice.gov/doclib/news/library/reports/annual-report/ero-fy20-localstatistics.pdf.   State and local law enforcement must spend resources combatting this crime, both as criminals and traffickers comes across the border and as those who make it into the communities continue their criminal activity.[12]

---

[12] These irreparable harms are not confined to states on the southwestern border, but affect states like Montana as well.  Decreasing the number of removals increases the infusion of drugs into Montana, increases drug-related violent and property crimes, and harms the State's efforts to promote public safety and health.  *See* Ex. M, Decl. of Brian Lockerby, AZMT007422.  Illicit drugs, as well as the gangs and cartels that traffic them across the southern border and into Montana lead to increased drug use and drug-related crime.  *See id.*, AZMT007419-22.  This forces law enforcement to expend greater resources on drug crime and its associated problems.  *See* Ex. P, AZMT0074320-33.

**B.     Healthcare Costs**

Additionally, Plaintiffs are required by federal law to include unauthorized aliens in their Emergency Medicaid Programs.  *See* 42 C.F.R. § 440.255(c).  The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants.  As an example, one Arizona hospital, Yuma Regional Medical Center ("YRMC"), has provided care to at least 111 patients in ICE custody, alone, in February, March, and April 2021.  *See* Trenschel Decl., Ex. Z, at internal Ex. A, AZMT008126.  This does not include care provided to unlawful aliens who are not in ICE custody, and YRMC has not completely tabulated its full April numbers, so these statistics are likely under-inclusive.  *Id.* at ¶4.  In February and March 2021—*i.e.*, immediately following the challenged actions—Arizona incurred the first and fourth-highest amount of relevant charges of the past twelve months: $591,610 for February alone—$152,014 higher than the next-highest month and dramatically exceeding the $231,602 average for May 2020-January 2021.  *Id.* at internal Ex. A.

On average over the past twelve months, YRMC experiences $861 in unreimbursed costs of care for each patient it sees in this population.  *Id.* at ¶ 3. Plaintiffs' investigation regarding the full amount of applicable expenditures in its Emergency Medicaid Program is ongoing.

**C.     Education Costs**

The Supreme Court in *Plyler v. Doe* mandated that States provide public education to school-age unauthorized aliens. 457 U.S. 202, 230 (1982).  In FY 2019, Arizona spent an average of $10,928 per pupil, $8,905 of which went to instruction and other operational costs.  Arizona Auditor General, *Arizona School District Spending: Fiscal Year 2019* at 8 (March 2020), available at https://bit.ly/3h4xaO9.  Similarly, Montana spent $11,666 per student in the 2019-2020 school year.  Montana Office of Public Instruction, *2019-20 State Report Card*, available at https://bit.ly/3h1lkV3.  These represent the direct costs to Plaintiff States, which are and will continue to be realized, of

continuing to provide educational services to removable individuals who are not removed due to the priorities set out in the Interim Guidance.

### D.    Procedural Harms

Plaintiffs have also suffered procedural harm that is tied to monetary damages that cannot be recovered from their APA claims against Defendants.  The MOUs signed between DHS and Plaintiffs include DHS's agreement to consult with Plaintiffs before taking action "reducing, redirecting, reprioritizing, relaxing, lessening, eliminating, or in any way modifying immigration enforcement" or "decreasing the number of returns or removals" and acknowledge that Plaintiffs will suffer "concrete injuries" should DHS undertake any of a number of actions related to the Interim Guidance.  Dkt. 12-1, Ex. C, at 21-22; Dkt. 12-1 Ex. H at 49-50; *accord East Bay*, 993 F.3d at 677 (9th Cir. 2021) ("Intangible injuries may also qualify as irreparable harm.").

Similarly, Plaintiffs have been deprived on the opportunity to provide input through notice-and-comment rulemaking for the substantive change in Defendants policy. And they have also been deprived of the protections enacted by Congress in 8 U.S.C. § 1231 to remove aliens with final orders of removal within 90 days.

### III.    The Balance Of Equities And Public Interest Favor An Injunction

The Interim Guidance has directly led—and continues to lead on an ongoing basis—to the release of criminals who previously had ICE detainers in order to be removed, and the increasing harms from this result of the policy alone is sufficient to shift the balance of equities and public interest in Plaintiffs' favor.  These two *Winter* factors are properly considered together here to establish that a preliminary injunction will serve its proper purpose in "preserv[ing] the relative positions of the parties" prior to the Interim Guidance's issuance.  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Doe #1 v. Trump*, 984 F.3d 848, 861-62 (9th Cir. 2020); Dkt. 17 at 25-26.

As set out in Section II., *supra*, the Interim Guidance is causing ongoing injuries to Plaintiffs, including the direct, unreimbursed cost of community supervision of criminal aliens whose detainers ICE lifted because the "subject does not meet the new

priorities" under the Interim Guidance.  Ex. W.  The number of actual removals has been cut nearly in half since the Interim Guidance was issued, leading to further costs of criminal recidivism—incarceration, law enforcement costs, and the sometimes less tangible costs to communities of criminal activity—as well as unreimbursed, mandatory costs to Plaintiff States' healthcare and education systems.  The Interim Guidance is depressing the number of removals, so every day it remains in place leads to additional direct harms to the Plaintiffs which bear the medical, education, and law enforcement/incarceration costs associated with individuals who would have otherwise been removed.  Conversely, Defendants will not be harmed by an injunction maintaining the prior status quo.  *See, e.g.*, *Doe #1*, 957 F.3d at 1068-69 ("lack of irreparable harm to the United States" due to delay in immigration policy implementation by "a preliminary injunction").  Further, DHS has no legitimate interest in the implementation of an unlawful memorandum.  *See N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

DHS has already acknowledged that any costs from delaying new policies is outweighed by the benefits of consultation and reasoned decision making.  *See* Ex. C § II; Ex. H § II.  Where Plaintiffs face irreparable harm without an injunction while DHS faces none if the status quo is maintained, the public interest and balance of equities favor granting the preliminary injunction.  *E.g.*, *Doe #1*, 957 F.3d at 1069.

## CONCLUSION

Plaintiffs respectfully request that the Court issue a preliminary injunction preventing Defendants from implementing the Interim Guidance as it relates to removals.

//

//

//

//

//

RESPECTFULLY SUBMITTED this 6th day of May, 2021.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By /s/ *Anthony R. Napolitano* _____
  Joseph A. Kanefield (No. 15838)
  Brunn W. Roysden III (No. 28698)
  Drew C. Ensign (No. 25463)
  Anthony R. Napolitano (No. 34586)
  Robert J. Makar (No. 33579)
    *Assistant Attorneys General*

*Attorneys for Plaintiffs Arizona and Arizona Attorney General Mark Brnovich*

**AUSTIN KNUDSEN**
**ATTORNEY GENERAL OF MONTANA**

*/s/ David M.S. Dewhirst (with permission)*
David M.S. Dewhirst*
  *Solicitor General*
*Pro hac vice granted*

*Attorneys for Plaintiff State of Montana*

CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2021, I electronically transmitted the attached document to the Clerk's office using CM/ECF System for filing.  Notice of this filing is sent by email to all parties by operation of the Court's electronic filing system.

  */s/ Anthony R. Napolitano*