BRIAN M. BOYNTON
ACTING ASSISTANT ATTORNEY GENERAL

BRIGHAM J. BOWEN
ASSISTANT BRANCH DIRECTOR

Michael F. Knapp (CA Bar No. 314104)
Adam Kirschner (IL Bar No. 6286601)
Brian C. Rosen-Shaud (ME Bar No. 006018)
Kuntal Cholera (DC Bar No. 1031523)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW Room 12008
Washington, D.C. 20530
(202) 514-2071 (telephone)
(202) 616-8470 (facsimile)
Email: Michael.F.Knapp@usdoj.gov
       Adam.Kirschner@usdoj.gov
       Brian.C.Rosen-Shaud@usdoj.gov
       Kuntal.Cholera@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br><br>United States Department of Homeland Security, et al.,<br><br>       Defendants. | No. 2:21-cv-00186-SRB<br><br>**DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 1

ARGUMENT ................................................................................................................... 3

I.    The States Still Have Not Established Standing, Much Less Irreparable Harm.............3

II.    Four APA Thresholds Preclude the States' Claims. ..........................................................7

      *A.*    *ICE's enforcement priorities are "committed to agency discretion by law."* ...........7

      *B.*    *The challenged action is not "final agency action.".* ...........................................9

      *C.*    *Congress has precluded judicial review of these types of decisions.* ..................... 10

      *D.*    *The States fall outside the zone of interests of the relevant statute.* ................... 11

III.    The States' APA Claims Fail on the Merits. .................................................................. 12

      *A.*    *The Memorandum is a reasonable effort to set enforcement priorities.* ............... 12

      *B.*    *The agency complied with the procedures required by law.* ................................. 18

      *C.*    *The purported agreements are void and unenforceable.* ....................................... 20

      *D.*    *The ICE Memo is consistent with § 1231.* ........................................................ 20

IV.    An Injunction Restraining Core Article II Authority Outweighs Any Harm to the States and Undermines the Public Interest. .......................................................... 21

CONCLUSION ............................................................................................................. 22

i

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Vance,*
   570 F.2d 950 (D.C. Cir. 1978) ................................................................ 21

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
   458 U.S. 592 (1982) .................................................................................. 7

*Arizona v. United States,*
   567 U.S. 387 (2012) ................................................................................ 16

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) ................................................................... 5

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta,*
   785 F.3d 710 (D.C. Cir. 2015) ............................................................... 18

*Bennett v. Spear,*
   520 U.S. 154 (1997) ...................................................................... 9, 10, 12

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
   419 U.S. 281 (1974) ................................................................................ 13

*Brock v. Cathedral Bluffs Shale Oil Co.,*
   796 F.2d 533 (D.C. Cir. 1986) ............................................................... 20

*CACI, Inc. v. Stone,*
   990 F.2d 1233 (Fed. Cir. 1993) ............................................................. 20

*Cal-Almond, Inc. v. U.S. Dep't of Agric.,*
   14 F.3d 429 (9th Cir. 1993) ................................................................... 20

*California by & through Becerra v. U.S. Dep't of the Interior,*
   381 F. Supp. 3d 1153 (N.D. Cal. 2019) ................................................ 18

*Campos v. INS,*
   62 F.3d 311 (9th Cir. 1995) ................................................................... 12

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ................................................................................ 15

*City & Cnty. of S.F. v USCIS,*
   981 F.3d 742 (9th Cir. 2020) ................................................................. 11

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) .................................................................. 5, 15, 16

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020) ........................................................................... 17

*DHS v. New York*,
    140 S. Ct. 599 (2020) ............................................................................. 22

*East Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ................................................................ 11

*East Bay Sanctuary Covenant v. Garland*,
    No. 19-16487, 2020 WL 9156716 (9th Cir. July 6, 2020) ...................... 16

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................... 17

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*,
    887 F.3d 906 (9th Cir. 2018) ................................................................ 13

*FTC v. Standard Oil Co. of California*,
    449 U.S. 232 (1980) ............................................................................... 10

*Hall v. USDA*,
    984 F.3d 825 (9th Cir. 2020) .................................................................. 3

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ...................................................................... 8, 13, 14

*Hernandez-Avalos v. INS*,
    50 F.3d 842 (10th Cir. 1995) ................................................................ 12

*Inst. for Fisheries Res. v. Hahn*,
    424 F. Supp. 3d 740 (N.D. Cal. 2019) ................................................... 9

*J.E.F.M. v. Lynch*,
    837 F.3d 1026 (9th Cir. 2016) .............................................................. 11

*Levine v. Vilsack*,
    587 F.3d 986 (9th Cir. 2009) .................................................................. 5

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ............................................................................... 11

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ............................................................................... 18

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ................................................................ 3

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................ 5

*Mada-Luna v. Fitzpatrick,*
    813 F.2d 1006 (9th Cir. 1987) ................................................... 18, 19

*Mendoza v. Perez,*
    754 F.3d 1002 (D.C. Cir. 2014) ..................................................... 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ........................................................................ 17

*N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.,*
    878 F.3d 271 (D.C. Cir. 2017) ..................................................... 18

*Nat'l Mining Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014) ..................................................... 19

*Nat'l Shooting Sports Found., Inc. v. Jones,*
    716 F.3d 200 (D.C. Cir. 2013) ..................................................... 17

*Quantum Entm't Ltd. v. U.S. Dep't of the Interior, Bureau of Indian Affairs,*
    597 F. Supp. 2d 146 (D.D.C. 2009) ............................................. 14

*Regents of the Univ. of California v. DHS,*
    908 F.3d 476 (9th Cir. 2018) ........................................................ 19

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n,*
    324 F.3d 726 (D.C. Cir. 2003) ..................................................... 10

*Reno v. American-Arab Anti-Discrimination Comm. ("AADC"),*
    525 U.S. 471 (1995) ................................................................. 11, 21

*S.F. Herring Ass'n v. Dep't of Interior,*
    683 F. App'x 579 (9th Cir. 2017) ................................................. 9, 10

*Sierra Forest Legacy v. Sherman,*
    646 F.3d 1161 (9th Cir. 2011) ........................................................ 7

*Summers v. Earth Island Inst.,*
    555 U.S. 488 ................................................................................. 7

*The Floyd Acceptances,*
    74 U.S. (7 Wall.) 666 (1868) ......................................................... 20

*Thompson v. U.S. Dep't of Lab.,*
    885 F.2d 551 (9th Cir. 1989) ......................................................... 16

*Town of Castle Rock v. Gonzales,*
  545 U.S. 748 (2005) ............................................................................8, 21

*Trump v. Hawaii,*
  138 S. Ct. 2393 (2018) .......................................................................13, 22

*Tucson Airport Auth. v. Gen. Dynamics Corp.,*
  136 F.3d 641 (9th Cir. 1998) ....................................................................20

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
  136 S. Ct. 1807 (2016) ..........................................................................9, 10

*United States v. Arizona,*
  No. CV 10-1413-PHX-SRB, 2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ...........7, 12

*United States v. Fausto,*
  484 U.S. 439 (1988) ..................................................................................10

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................3, 21

*Wyoming ex rel. Crank v. United States,*
  539 F.3d 1236 (10th Cir. 2008) ..................................................................7

*Zadvydas v. Davis,*
  533 U.S. 678 (2001) ..................................................................................11

**Statutes**

5 U.S.C. § 553(b)(A) ......................................................................................18

5 U.S.C. § 701(a)(2) ........................................................................................8

5 U.S.C. § 702 ............................................................................................8, 11

5 U.S.C. § 704 ............................................................................................9, 10

6 U.S.C. § 202(5) ........................................................................................1, 9

8 U.S.C. § 1103(a)(3) ......................................................................................9

8 U.S.C. § 1231 ..............................................................................................11

8 U.S.C. § 1231(h) ..........................................................................................11

8 U.S.C. § 1252(b)(9) ...................................................................................7, 10

28 U.S.C. § 547 ..............................................................................................20

## Regulations

E.O. 13993, Revision of Civil Immigration Enforcement Policies and Priorities,
86 Fed. Reg. 7051 (Jan. 25, 2021) ................................................................................. 15

# INTRODUCTION

In arguing for a preliminary injunction, the States still refuse to acknowledge that the February 18, 2021 Interim Guidance (ICE Memo) does not institute a pause on removals. *Compare* Apr. 8, 2021 Hr'g Tr. at 27:21-28:2 (statement by the Court). The ICE Memo establishes that the removal of noncitizens in three broad categories are presumed priorities, while expressly authorizing the removal of noncitizens outside those categories on a case-by-case basis subject to supervisor approval. As the States acknowledge, the documents produced in this litigation confirm that the policy has been implemented in just this way, including in Arizona and Montana. Supp. Brief in Supp. of Mot. for Prelim. Inj. 12-13, ECF No. 64 ("Pls.' Supp.").

The States' claims related to the ICE Memo fail at the threshold for the same reasons Defendants have already explained: (1) the States have not presented evidence that shows they have spent or will spend any more than they otherwise would, and therefore have not established standing; (2) the establishment of enforcement priorities is committed to agency discretion by law; (3) the ICE Memo is not final agency action; (4) Congress has precluded review of the States' claims; and (5) the States are outside the zone of interests of the statute they invoke.

Regardless, the States cannot show a likelihood of success on the merits. In developing the ICE Memo, ICE considered the relevant factors, including reasonable alternatives. And because the ICE Memo simply structures the internal operations of the agency, it was not required to go through the APA's notice-and-comment procedures. Nor does the ICE Memo violate § 1231. That statute does not impose any enforceable mandate and, even if it did, the ICE Memo does not prohibit removals and so would not violate it. The States still fail to identify any statutory authority for DHS to enter into an agreement in the nature of the MOUs; those MOUs are therefore void and unenforceable. Finally, the equities and public interest favor denying any injunction.

# BACKGROUND

Congress has tasked the Secretary of Homeland Security with "[e]stablishing national

immigration enforcement policies and priorities." 6 U.S.C. § 202(5). Over the years, DHS Secretaries (and before them, other officials charged with immigration enforcement) have often revised existing immigration enforcement priorities. *See* Decl. of Peter B. Berg (Ex. 2) ¶ 12. On January 20, 2021, the then–Acting Secretary of Homeland Security issued a Memorandum that ordered a review of enforcement policies and redirected resources to new priorities in the interim. *See* Am. Compl. (FAC) Ex. A, ECF. No. 12-1 (DHS Memo). The DHS Memo has three substantive parts. In Section A, the Acting Secretary instructed DHS components to develop recommendations concerning, among other things, "policies for prioritizing the use of enforcement personnel, detention space, and removal assets" and "policies governing the exercise of prosecutorial discretion." *Id.* at 2. Section A is not at issue in this litigation. And the Court has already denied the States' motion for a preliminary injunction with regard to Section C, which set out a 100-day pause on most removals and which has now expired. *See* Dep't of Homeland Sec., DHS Statement on the Expiration of 100-day Removal Pause, May 6, 2021, *available at* https://go.usa.gov/xHwkr (last visited May 13, 2021).

In Section B, the DHS Memo recognizes that, because DHS has "limited resources" and "cannot respond to all immigration violations," DHS must prioritize which violations it pursues. Section B sets out three broad "priority" groups of noncitizens—those who are threats to national security, border security, or public safety—that DHS components should focus on when rendering "a broad range" of "discretionary enforcement decisions." DHS Memo at 2. It also calls on the Acting Director of U.S. Immigration and Customs Enforcement (ICE) to "issue operational guidance on the implementation" of this priority framework. *Id.* at 3.

On February 18, 2021, the Acting Director of ICE issued the guidance contemplated by the DHS Memo, noting that the Secretary had approved the incorporated revisions to the interim priorities. *See* FAC Ex. G, ECF No. 12-1 at 40 (ICE Memo). The ICE Memo confirms that "ICE operates in an environment of limited resources," and "necessarily must prioritize" certain "enforcement and removal actions over others" in order to "most effectively achieve

[its] mission" of "national security, border security, and public safety." *Id.* at 2-3. The Acting Director noted additional constraints that guided ICE's policies, including the ongoing COVID-19 pandemic, the importance of ensuring noncitizens' access to procedural safeguards provided by law, and the United States' relationship with foreign countries. *Id.* at 3. The ICE Memo catalogues the three presumed priority groups identified in the DHS Memo, and clarifies and expands on those categories. *Id.* at 1, 4-5.

The ICE Memo reiterates that the policies do not "prohibit the arrest, detention, or removal of any noncitizen," and that enforcement actions against non-presumed priority persons may still be permissible and justified based on "all relevant facts and circumstances," including the nature of any prior criminal convictions. *Id.* at 3. To ensure that resources are spent pursuing priority cases, though, the ICE Memo puts in place certain internal approval procedures ICE officials must follow when taking enforcement action in non-presumed priority cases. *See id.* at 6. The ICE Memo also includes a general catch-all provision allowing agents to submit "requests to exercise . . . individualized discretion" in certain cases, if it is "in the interest[] of law and justice." *Id.*

The States seek a preliminary injunction enjoining ICE from adhering to the priorities set out in the ICE Memo, as it relates to removals, or from following the internal approval and data collection procedures it describes. *See* Pls.' Proposed Order ¶ 1, ECF No. 13-2. The States contend that the ICE Memo is arbitrary and capricious, procedurally defective, and contrary to law.

## ARGUMENT

To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see Hall v. USDA*, 984 F.3d 825, 835 (9th Cir. 2020). "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

3

**I.    The States Still Have Not Established Standing, Much Less Irreparable Harm.**

The States contend that they are injured by the ICE Memo because it "increas[es] the unreimbursed costs they must bear due to the decrease in removals." Pls.' Supp. at 17. They allege monetary harms in several categories, but the States have failed to meet their burden of proof as to any. Indeed, in response to Defendants' Interrogatories the States advised that their current budgets were "set well in advance" and have not yet been "adjust[ed] . . . to account for the impact." Pls.' Disc. Resp. (Ex. 1) at 12, ECF No. 59-1. As to future spending, the States can only speculate what effect the challenged policies may have, because the budget process "requires a budget bill to be passed by the legislature and signed by the governor." *Id.* at 13. Put otherwise, the States have not provided any evidence that they have spent, or will spend, even a single penny more than they otherwise would have.

Start, as the States do in their briefing, with supervised release costs. The States contend that, because of the ICE Memo, ICE has declined to remove four specific noncitizens upon their release from Arizona state custody, and that Arizona therefore incurs the costs of supervising these noncitizens during the remainder of their sentence. Pls.' Supp. at 18. First, it would be *Arizona's* choice to commit resources to supervising these individuals; nothing in the ICE Memo compels them to do so, and so any injury on that front is not fairly traceable to the ICE Memo. But, regardless, the States do not actually contend that Arizona has to spend more money on supervised release than it otherwise would. Rather, the evidence they have provided establishes both the total costs of community supervision in 2019, and, evidently, the average cost per person in community supervision in 2019.[1] But the average cost per person is irrelevant; rather, the States must demonstrate that there is a *marginal* cost—an additional cost—attributable to some increase in supervision, and that the States in fact incur such costs (as opposed to simply assigning additional cases to existing case workers). The

---

[1] The 2019 cost-per-person of $4,163.60 equates to 5516 persons in community supervision for the 2019 total cost of $22,966,393. *See* Decl. of Shaka Okougbo, Ex. X, ECF No. 64-5. According to ADCRR's public website, there are currently "216 community corrections staff supervising approximately 5500 active offenders in the community." *See* "Community Supervision," Arizona Department of Corrections Rehabilitation & Reentry, Community Corrections, *available at* https://go.usa.gov/xHAdw (last visited May 13, 2021).

States have not alleged, argued, or proffered evidence that, for example, Arizona has had to hire additional staff to perform supervised release for the four noncitizens they identify. Because the States have not shown any additional costs they incur, they have not established a monetary injury.

The States next assert general law enforcement costs together with an assertion that, because of historical rates of recidivism, the failure to remove noncitizens will increase those costs. This argument fails not only on proof—again, the States' own interrogatory answers indicate there has been no effect on the States' budget—but also as a matter of law. As Defendants set out in their earlier opposition, any costs the States incur as a result of the criminal acts of third parties is not fairly traceable to the challenged conduct, but rather would be the consequence of the "unfettered choices made by independent actors," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Although standing may sometimes be found where the challenged conduct directly influences those choices, nothing in the ICE Memo encourages or causes any noncitizen to perform an illegal act. *Compare Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (finding standing based on "the predictable effect of Government action *on the decisions* of third parties" (emphasis added)); *Levine v. Vilsack*, 587 F.3d 986, 992 (9th Cir. 2009) (when injury turns on third parties' actions, a plaintiff must show that the challenged conduct has a "*determinative or coercive effect* upon the action of someone else" (emphasis added)). Because any subsequent increase in criminal activity is not fairly traceable to the challenged conduct, the States cannot establish standing on this basis. *See Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015).

The States next contend that they will incur additional costs from providing healthcare services to noncitizens. As Defendants previously explained, the challenged conduct does not cause noncitizens to require or seek medical care from the States. This injury is therefore inadequate to establish standing for the same reasons just set out above. But the specific evidence the States submit shows a further flaw in their theory. Arizona evidently tracks the specific expenses for one specific hospital from providing healthcare services to noncitizens in ICE custody, and that hospital has evidently spent more money providing care to

noncitizens in ICE custody in the past three months than it has historically. *See* Pls.' Supp. at 20 (citing Decl. of Robert Trenschel, ECF No. 64-5). But this evidence simply confirms that whatever healthcare costs the States incur are disconnected from the challenged policies. Plaintiffs argue that the ICE Memo means that ICE is taking *fewer* noncitizens into custody (and they seek an injunction that, in their telling, would *increase* the number in custody). *See, e.g.*, Pls.' Supp. at 1, 15, 18; Pls.' Mot. for Prelim. Inj. 17-18, ECF No. 17 (Pls.' Mot.). But the States' evidence suggests that the States have nonetheless incurred greater expenses since, in Plaintiffs' own telling, the number of detainees in ICE custody has declined as a result of the policy. Thus, rather than establishing that the ICE Memo causes the States to incur additional medical costs, this evidence shows that the medical costs the State incurs rise or fall without regard to the number of noncitizens in ICE custody.

The States also contend, briefly, that they incur costs in providing education services to noncitizens. Pls.' Supp. at 20-21. But beyond providing the general costs of these services and, again, the average costs per student, the States have not shown that they will have *increased* costs from additional noncitizen students. Indeed, they make no attempt even to show that the ICE Memo has or will increase the student-age noncitizen population in Arizona or Montana. And the States continue to insist that the ICE Memo encourages new migration, and thus the general costs associated with an increased population. But the ICE Memo expressly prioritizes enforcement actions against those arriving after November 1, 2020—such a policy does not encourage new migration.

At bottom, the States have not shown that they have had to spend any additional money beyond what they previously budgeted because of the ICE Memo, and in fact have admitted that they have not adjusted their budgets since the ICE Memo was implemented. Because the States bear the burden to adduce evidence of their injury to establish standing and have failed to do so, the Court lacks jurisdiction.

The States' remaining claims of injury are substantively undeveloped, factually unproven, and legally inadequate. First, the States fleetingly reference a "sovereign injury" from interference with their "legislative budget processes." Pls.' Supp. at 17; *see* Pls.' Mot. at

15 n.9. But nothing about the ICE Memo prevents or interferes with the States developing or enacting a budget. Thus, while a state may have standing to challenge federal action that, for example, *preempts* state law, the ICE Memo does no such thing. *See, e.g.*, *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241-42 (10th Cir. 2008). Second, the States contend that they have suffered a "procedural harm" from violation of the APA's notice-and-comment requirements and the MOUs' consultation provisions. Pls.' Supp. at 21; Reply in Supp. of Mot. for Prelim. Inj. 15, ECF No. 38. But a "procedural harm *in vacuo*" is not a cognizable harm for standing purposes; it is relevant only to the extent that it is tied to some concrete harm. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). Third, the States attempt to base standing on injuries to their citizenry. *E.g.*, Pls.' Supp. at 19 n. 12; Pls.' Mot. at 19-20. But a state "does not have standing as *parens patriae* to bring an action against the Federal Government." *Sierra Forest Legacy*, 646 F.3d at 1178 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 610 n.16 (1982)).

## II. Four APA Thresholds Preclude the States' Claims.

The ICE Memo is not subject to APA review. First, the setting of enforcement priorities is committed to agency discretion, 5 U.S.C. § 701(a)(2). Second, the ICE Memo does not constitute "final agency action," *id.* § 704. Third, Congress has precluded review of removal decisions outside the statutory procedures available to the subject of removal, *id.* § 701(a)(1); *see, e.g.*, 8 U.S.C. § 1252(b)(9). Fourth, the States are not "aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702—they are outside the zone of interests—because Congress provided expressly that § 1231 does not create judicially enforceable rights.

### A. ICE's enforcement priorities are "committed to agency discretion by law."

The ICE Memo establishes internal priorities for ICE enforcement actions—it tells agency officers and agents which cases deserve the most attention and should be pursued first, while expressly authorizing them to pursue removal in other cases. The establishment of enforcement priorities is committed to agency discretion and not subject to APA review. *United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *9 n.6 (D. Ariz.

Oct. 21, 2011). Such a policy "involves a complicated balancing of a number of factors which are peculiarly within [the Executive's] expertise," including "whether agency resources are best spent on this violation or another" and "whether the particular enforcement action requested best fits the agency's overall policies." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

The States contend that § 1231(a)(1) denies this discretion. As previously explained, that statutory provision does not create an enforceable mandate. *See* Defs.' Mem. in Opp'n to Pls.' Mot. for a Prelim. Inj. 9-10, 15-16, ECF No. 26 ("Defs.' Opp'n"). A statute providing for executive enforcement, even one using the word "shall," does not displace the inherent executive discretion in selecting which cases to pursue. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005). But, regardless, the ICE Memo would not violate such a requirement even if it existed. Congress instructed the Secretary to establish national immigration enforcement priorities. 6 U.S.C. § 202(5). The Secretary has done so, and nothing in § 1231 precludes the Secretary from prioritizing the most serious offenders for removal. Consistent with this prioritization scheme, the ICE Memo does "not require or prohibit the arrest, detention, or removal of any noncitizen," but instead directs "officers and agents . . . to exercise their discretion thoughtfully" after consideration of "all relevant facts and circumstances." ICE Memo at 3.

To the extent that the States contend that ICE has erred in its prosecutorial judgment with respect to specific noncitizens, such a challenge is not to ICE Memo itself at all; Plaintiffs would need to amend their complaint to challenge specific nonenforcement decisions made on a case-by-case basis with regard to specific noncitizens. Such an amendment would be futile, of course, because a nonenforcement decision of that type is plainly not subject to judicial review. The Executive's "[r]efusals to take enforcement steps" are presumptively not subject to judicial review. *Chaney*, 470 U.S. at 831. These exercises of prosecutorial discretion are inherent to the Executive power that the Constitution confers on the President. It therefore would it be an improper exercise of the judicial function to displace the Executive's prosecutorial judgment and superintend the day-to-day operations of DHS.

Congress vested DHS with broad discretion to set immigration enforcement priorities.

6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3). The agency has exercised that discretion here to focus agency attention first on what it determined to be the most important cases, while permitting other enforcement actions when justified by the specific facts. Review of these priorities is not available under the APA.

### B. The challenged action is not "final agency action."

Only "final agency action" is subject to judicial review under the APA. 5 U.S.C. § 704. Agency action is "final" under the APA only if it both is "the consummation of the agency's decisionmaking process" and also determines "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016). The ICE Memo does not determine or alter any individual's rights or obligations, nor is it one "from which legal consequences will flow," *Hawkes*, 136 S. Ct. at 1813. It is therefore not subject to judicial review under the APA.

The ICE Memo sets out procedures for and the manner in which ICE will take enforcement actions—some of which may result in later "final agency action" subject to judicial review through the statutory review scheme Congress has established. But a "forward-looking statement of enforcement priorities is not final agency action." *Inst. for Fisheries Res. v. Hahn*, 424 F. Supp. 3d 740, 750 n.6 (N.D. Cal. 2019). It is only those later, final agency actions—such as the issuance of a final order of removal—that "alter" a noncitizen's "legal rights or obligations" or create "legal consequences." *See S.F. Herring Ass'n v. Dep't of Interior*, 683 F. App'x 579, 580 (9th Cir. 2017) (challenge to increased enforcement patrols failed for lack of final agency action, as the patrols were "at best only the first step in the enforcement process"). Thus, the priority framework does not itself change any person's legal status, confer any legal benefits, or have any "legal consequences." Indeed, both the DHS Memo and the ICE Memo expressly advise that they do not "create any right or benefit, substantive or procedural, enforceable at law." DHS Memo at 4; ICE Memo at 7.

The ICE Memo is thus entirely different from the agency action at issue in *Hawkes*. There, the agency's "jurisdiction determination" had true "legal" consequences: the grant or denial of "a five-year safe harbor from [civil enforcement] proceedings" and a "limit[] on

potential liability." 136 S. Ct. at 1814. Not so here, where no noncitizen can invoke either memorandum to evade or lessen an enforcement action. Indeed, the Secretary retains the discretion to change or abandon these policies at any time—underscoring that the Memos establish no rights or obligations. Moreover, the Memos are explicit that they do not exempt any noncitizen from enforcement action.

To be sure, the ICE Memo is not an abstract document without any effect. *Cf. S.F. Herring Ass'n*, 683 F. App'x at 580 ("The Service's patrols of the [park] do not constitute final agency action, whatever practical effects those patrols may have on [the plaintiff's] members' activities."). Perhaps ICE will take enforcement action against one noncitizen it otherwise would not have, and perhaps ICE will defer enforcement action against a different noncitizen it otherwise might not have. But any such consequences are secondary, as opposed to "direct and appreciable legal" ones. *Bennett*, 520 U.S. at 178; *see also Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003). And it is only *legal* consequences that establish finality for purposes of the APA. Thus, for example, the decision to initiate an enforcement action is the quintessential example of non-final agency action, notwithstanding that it will have the immediate practical effect of requiring the target to participate in related proceedings. *See, e.g.*, *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 241 (1980). The ICE Memo here is one step further removed even from that: it does not itself initiate (or terminate) any proceeding but instead merely sets internal procedures for doing so in discrete cases. Because the ICE Memo does not constitute final agency action, the States cannot challenge it under the APA. *See* 5 U.S.C. § 704.

*C. Congress has precluded judicial review of these types of decisions.*

The States challenge ICE's decisionmaking process antecedent to a removal of a noncitizen. But Congress has provided a specific and detailed statutory scheme for challenging removal decisions. A detailed mechanism for review of some claims by some plaintiffs is "strong evidence that Congress intended to preclude [other plaintiffs] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

Under the review scheme Congress has erected, only noncitizens can obtain judicial

review of decisions related to removal. Section 1252(a)(5) provides that "[*n*]*otwithstanding any other provision of law*," "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal." And § 1252(b)(9) states that "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." Thus, district courts lack jurisdiction over "*any* issue—whether legal or factual—arising from *any* removal-related activity." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029-31 (9th Cir. 2016). This includes "policies-and-practices challenges," *Id.* at 1035, arising from any "action taken or proceeding brought to remove an alien," 8 U.S.C. § 1252(b)(9), whether or not the challenge is to an actual final order of removal or whether there even is a final order at all. *J.E.F.M.*, 837 F.3d at 1032. Instead, such challenges "can be reviewed *only* through the [statutorily defined] process." *Id.* at 1035; *see also Reno v. American-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 483, 485 (1995). Because only § 1252 provides judicial review, and because the States cannot invoke that provision, their claims necessarily fail. And underscoring that the statute precludes review of the sort the States seek—whether ICE is complying with § 1231—Congress expressly barred review of any claim, by *any* party, invoking § 1231 against the government. 8 U.S.C. § 1231(h). That provision "limit[s] the circumstances in which judicial review . . . is available," *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001).

    *D.  The States fall outside the zone of interests of the relevant statute.*

Whether a particular plaintiff is "aggrieved . . . within the meaning of a relevant statute," 5 U.S.C. § 702, and therefore "whether [the plaintiff] falls within the class of plaintiffs whom Congress has authorized to sue," is a question of statutory interpretation, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). Contrary to the States' suggestion, Pls.' Supp. at 17, the relevant statute here is 8 U.S.C. § 1231, not "the INA" as a whole. *See, e.g., City & Cnty. of S.F. v USCIS*, 981 F.3d 742, 755 (9th Cir. 2020) (considering, in an APA case, the specific immigration provision at issue); *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 667-68 (9th Cir. 2021) ("[T]he relevant purpose is not that of the entire INA; it is 'by

reference to the particular provision of law upon which the plaintiff relies.'" (quoting *Bennett*, 520 U.S. at 175-76)).

And Congress was explicit in § 1231 that *no* party—not a state, not a non-profit, not a noncitizen—was within the zone of interests of § 1231 such that that party could enforce it, whether through the APA or otherwise. In § 1231(h) Congress provided that "[n]othing in [§ 1231] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by *any party* against the United States or its agencies or officers or any other person," 8 U.S.C. § 1231(h) (emphasis added). Congress was unmistakable that it wanted no party to judicially enforce § 1231. *See Arizona*, 2011 WL 13137062, at *11 n.8 ("[I]t is not clear that Arizona has any rights under 8 U.S.C. § 1231 that it can seek to vindicate."); *see also Hernandez-Avalos v. INS*, 50 F.3d 842, 844 (10th Cir. 1995) (interpreting identically worded statute to mean "that no one can satisfy the zone of interests test"); *Campos v. INS*, 62 F.3d 311, 314 (9th Cir. 1995) (favorably citing legislative history stating that the same statutory language "clarifies that . . . the requirement in current law of speedy deportation for criminal aliens do[es] not create enforcement rights against the United States"). The States' APA claims therefore fail.

### III.    The States' APA claims fail on the merits.

Defendants maintain that, for the reasons set out above, the ICE Memo is not subject to review under the APA. The States' supplemental briefing does not engage in any of these threshold requirements, save conclusory assertions that they are met and incorporation of their arguments with regard to Section C "as applied to the Interim Guidance." *See* Pls.' Supp. at 16-17. But the ICE Memo is distinct from Section C—it operates differently and has different effects—and, especially with regard to "agency discretion" and "final agency action," it requires a distinct, if familiar, analysis. The States' failure to address these threshold barriers to APA review with respect to the distinct policy set out in the ICE Memo is fatal.

But even if the States could pursue their APA claims, they would fail on the merits.

*A.  The Memorandum is a reasonable effort to set enforcement priorities.*

The States cannot establish that the ICE Memo is arbitrary and capricious. "Review

under the arbitrary and capricious standard is deferential." *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 920 (9th Cir. 2018). The judiciary's "role is simply to ensure that the [agency] made no clear error of judgment that would render its action arbitrary and capricious, and [courts] require only a rational connection between facts found and conclusions made." *Id.*; *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"). *Cf. Trump v. Hawaii*, 138 S. Ct. 2393, 2418 (2018) ("For more than a century, this [Supreme] Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'"). Here, Defendants considered the relevant factors and reached a reasonable decision.

The ICE Memo calls on immigration officials to focus their limited resources on noncitizens who pose the greatest risk to national and border security and to public safety, while still providing flexibility for those officials to take enforcement actions against other noncitizens based on individual circumstances. ICE Memo at 2-6; *see* DHS Memo at 2. That is what law enforcement officers do day-to-day anyhow—prioritize the most serious offenses. The States fail to acknowledge a fundamental premise of these memoranda: not all enforcement actions and removals are equal. *See* DHS Memo at 2 (prioritizing enforcement actions that "protect[] national security, border security, and public safety"); ICE Memo at 3-5 (prioritizing removals that serve "[ICE's] critical national security, border security, and public safety mission"). *Cf. Chaney*, 470 U.S. at 831 (Executive is responsible for determining "whether agency resources are best spent on this violation or another" and "whether the particular enforcement action requested best fits the agency's overall policies."). Additionally, the memoranda also seek to institute temporary practices that limit close contact among those involved in the immigration enforcement process in light of the COVID-19 pandemic. DHS Memo at 1, 3. And the ICE Memo explains that, in addition to resource constraints and health concerns, ICE's enforcement actions are guided by "the responsibility to ensure that eligible noncitizens are able to pursue relief from removal under immigration laws," and the United

States' "relationship with[] sovereign nations." ICE Memo at 2. These justifications are sufficient to survive arbitrary and capricious review. *See, e.g.*, *Chaney*, 470 U.S. at 842 (Marshall, J. concurring) ("a decision not to enforce that is based on valid resource-allocation decisions will generally not be arbitrary, [and] capricious"); *Quantum Entm't Ltd. v. U.S. Dep't of the Interior, Bureau of Indian Affairs*, 597 F. Supp. 2d 146, 152 (D.D.C. 2009) ("Nothing more than a 'brief statement' is necessary [under the APA], as long as the agency explains 'why it chose to do what it did.'").

None of the States' contrary arguments are availing.[2] First, the States are wrong to imply that the Acting ICE Director changed removal priorities without considering the agency's resource limitations. Pls.' Supp. at 7. The DHS Memo explains that DHS must prioritize certain enforcement actions over others due to "limited resources." DHS Memo at 2-3. Likewise, Acting Director Johnson's February 4th email directed ICE to focus removal operations in accordance with the Section B priorities from the DHS Memo to "ensure they align with focusing our finite resources on the most significant national security, border security, and public safety threats." *See* AZ_AR_00004699.[3] The ICE Memo also explains that ICE "has always prioritized, and necessarily must prioritize, certain enforcement and removal actions over others," because the agency "operates in an environment of limited resources." ICE Memo at 2.

Second, the States' focus on the purported political influence on the ICE Memo betrays

---

[2] Despite their repeated references to it, the States do not explain why the time of day that a policy was issued would render it arbitrary or capricious or have any relevant bearing on the analysis.

[3] The States challenge the February 4, 2021 email as a "substantive command" that shows the guidance binding. Pls.' Supp. at 7. This is a complete red herring, of course, because the policy in that email was superseded by the February 18 ICE Memo, which is the subject of this litigation. Regardless, the States' selective quotation from that letter is misleading: although Mr. Johnson wrote that "removal flights" "[o]ver the next few days" "should be prioritized so that only those who meet the above priorities will be removed," the very next line of the email states that "while removal resources should be focused on the priorities described above, ICE is not foreclosed from taking appropriate enforcement action, including removal, against other removable noncitizens" when those individuals pose a threat to public safety. AZ_AR_00004699.

a fundamental misunderstanding of the nature of agency decisionmaking. Pls.' Supp. at 6-7, 10-11. An "agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984). Certainly, the ICE Memo reflects the Administration's policy preferences and values, but such influence is permissible. *Id.*; *see* DHS Memo at 2; ICE Memo at 2-6; E.O. 13993, Revision of Civil Immigration Enforcement Policies and Priorities, 86 Fed. Reg. 7051 (Jan. 25, 2021) (beginning a "reset [of] policies and practices for enforcing civil immigration laws" to align with the Administration's priorities, which include "protect[ing] national and border security, address[ing] the humanitarian challenges at the southern border, and ensur[ing] public health and safety."). Policy considerations, such as the need to ensure noncitizens' access to legal avenues for relief, were just one factor, along with resource limitations and COVID-19 precautions, that the Defendants considered. *See* ICE Memo at 2.

Similarly, the States are wrong to claim that Defendants' resource limitations are pretext. To establish a "pretext" claim, the States must show that the stated justifications played *no* role in motivating the agency action at issue; not just that other factors (including policy preferences) played a role as well. *See Dep't of Commerce*, 139 S. Ct. at 2575 (finding a pretext claim viable when "the sole stated reason" for an agency action "seems to have been contrived"). The Supreme Court made clear that "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons," such as "an Administration's priorities," "considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns." *Id.* at 2573; *see also id.* ("policymaking is not a rarified technocratic process"). Here, the Administrative Record includes letters from immigrant rights organizations as well as a February 7th Washington Post article about leaked ICE memos, the agency's limited resources, and how outside groups and ICE line agents felt about ICE's interim priorities. *See, e.g.*, AZ_AR_00004679; AZ_AR_00004689; AZ_AR_00004693; AZ_AR_00004701. Including these materials is consistent with the agency's obligation to include all materials considered

directly or indirectly by the Acting ICE Director. *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989). The record, as explained above, also documents how resources limitations, COVID-related concerns, and humanitarian concerns were significant factors in the ICE Memo's design. Thus, it is immaterial whether other considerations—including policy preferences and external advocacy—may have played a role as well. *See Dep't of Commerce*, 139 S. Ct. at 2575.

Third, the States are wrong to argue that ICE was required to evaluate the costs to the States from the ICE Memo. Federal immigration policy implicates "trade, investment, tourism, [] diplomatic relations for the entire Nation," and "human concerns." *Arizona v. United States*, 567 U.S. 387, 395-96 (2012). The cost to individual states is not a relevant concern that the Acting Director was required to consider, notwithstanding the fact that immigration policy is "importa[nt]" to the States. *See id.* at 397. *East Bay Sanctuary Covenant v. Garland* is not to the contrary. No. 19-16487, 2020 WL 9156716, at *17 (9th Cir. July 6, 2020). There, the Ninth Circuit held that an asylum rule was arbitrary and capricious because Congress had amended the asylum statute specifically to provide special procedural and substantive protections to minors, but the agency had failed to consider that aspect of the problem. In adopting this policy, ICE considered how the ICE Memo would impact public safety for the nation as a whole, with the goal of bringing enforcement actions against the most serious threats to the public. In setting *national* policy, ICE was not required to consider the effect in each individual state. Regardless, ICE *did* consider Arizona's specific concern that a policy that "discontinue[d] processing the removal of persons who have been convicted of or charged with crimes" would "seriously harm law enforcement efforts and public safety in Arizona."[4] AR_AZ_00004658. Indeed, the ICE Memo is responsive to that concern: unlike the Section C pause on removals that is the subject of that letter, the ICE Memo prioritizes removals for those convicted of an "aggravated felony." *Compare* DHS Memo at 2, *with* ICE Memo at 4.

---

[4] The States are thus mistaken to complain that DHS would not "receive input from [the] States." Pls. Supp. at 10. And considering the context of Arizona's and other states' letters— letters that threatened litigation, *see, e.g.*, Ex. E, ECF No. 12-1 at 35; Ex. I, ECF No. 12-1 at 60—a referral to DOJ was eminently reasonable.

Fourth, the States argue that ICE did not consider more limited alternatives in enacting the ICE Memo. Pls.' Mot. at 9. An agency need not "consider all policy alternatives in reaching decision." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983). "[W]hen an agency" changes its policy, it need only "consider the alternative[s] that are within the ambit of the existing [policy]." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) ("an agency must consider . . . reasonably obvious alternative[s]" that are "significant and viable"). The States initially suggest that Defendants failed to consider expanding the presumed priorities to cover more criminal convictions and charges, but ICE *did* consider what categories of noncitizens to include as presumed priorities, as evidenced by its expansion of the public safety category from the initial priorities set in the DHS Memo. *Compare* ICE Memo at 1-2 (adding noncitizens convicted of certain gang convictions to presumed priorities, among other revisions), *with* DHS Memo at 2. Immigration officers also have the discretion to take enforcement actions against other priority criminal offenders under the ICE Memo, which is further evidence that ICE considered how to treat various categories of criminal noncitizens. ICE Memo at 4-6; *see* Frequently Asked Questions re: Interim Civil Immigration Enforcement and Removal Policies and Priorities, AZ_AR_00004758.

The States next maintain that ICE failed to consider continuing removals at the pre-January 20th rate. Pls.' Mot. at 9. But DHS "display[ed] awareness that it is changing position," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and provided the reasons for the change to the removal priorities. *See supra* at 12-14.[5] The States' final point is that ICE failed to consider increasing removals "as COVID subsides." Pls.' Mot. at 9. But COVID-19 had not "subsided" by February 18th,[6] and ICE's responsibility was to act on the present data

---

[5] The States give undue weight to a single projection about the possible impact of the Section B priorities—not the ICE Memo priorities. Pls.' Mot. at 9. Regardless, that projection shows that ICE *did* consider the previous policy, and how one possible policy would differ from it.

[6] *See* COVID Data Tracker Weekly Review, last updated February 12, 2021, *available at* https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/past-

before the agency rather than speculate on an improvement in the COVID-19 pandemic. *Cf. California by & through Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1171 (N.D. Cal. 2019) (predicating agency action on future contingent events is arbitrary and capricious because an agency must consider the relevant data). The States' arguments are especially unavailing when considered alongside the fact that these are *interim* enforcement priorities. One purpose of the ICE Memo is to collect data to inform DHS's final immigration enforcement priorities. ICE Memo at 5. Given these circumstances, the States have failed to meet their burden to show what more limited circumstances ICE failed to consider. *Cf. N. Am.'s Bldg. Trades Unions v. Occupational Safety & Health Admin.*, 878 F.3d 271, 305–06 (D.C. Cir. 2017) ("[T]he force of the evidence and argument that [the agency] must offer to defend its choice will vary with the force of the proponent's evidence and argument." (citation omitted)).

An agency enjoys great deference when, as here, a decision "requires a complicated balancing of a number of factors which are peculiarly within its expertise." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). The States may wish that ICE's policy were to detain and remove a different class or greater number of noncitizens than the ICE Memo prioritizes. But these are not arguments that the ICE Memo is arbitrary and capricious. ICE met its burden to consider the relevant factors and adequately explain the basis for the challenged priorities.

> *B. The agency complied with the procedures required by law.*

The ICE Memo is exempt from the APA's notice and comment requirements; it is a "general statement of policy" or a "procedural rule" under the APA. 5 U.S.C. § 553(b)(A). General statements of policy are those that "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Vigil*, 508 U.S. at 197; *see also Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012-13 (9th Cir. 1987). Or, as the D.C. Circuit has put it, "[a] policy statement 'explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule.'" *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785

---

reports/02122021.html (last visited May 13, 2021) (reporting seven-day average of 104,217 cases, which "remains higher than what was seen during either of the first two peaks in the pandemic").

F.3d 710, 716 (D.C. Cir. 2015) (quoting *Nat'l Mining Ass'n v. McCarthy,* 758 F.3d 243, 252 (D.C. Cir. 2014)). That is precisely what the ICE Memo does: it advises how ICE will exercise its statutory discretion to prioritize which among millions of cases it will pursue for enforcement.

Thus, the Ninth Circuit concluded that a policy that "[o]n its face" allowed DHS officials "to exercise discretion . . . as to individual cases" did not require notice-and-comment. *Regents of the Univ. of California v. DHS*, 908 F.3d 476, 507 (9th Cir. 2018), *rev'd in part on other grounds*, 140 S. Ct. 1891 (2020). The States contend that the ICE Memo is substantive because it has resulted in a change in ICE enforcement actions. Pls.' Supp. at 12-13. But a resulting change to discretionary enforcement does not transform a general policy statement into a substantive rule requiring notice and comment. Rather, the "critical factor" is the extent to which the policy "leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Regents*, 908 F.3d at 507 (quoting *Mada-Luna*, 813 F.2d at 1013). The ICE Memo expressly directs ICE officials to "exercise their discretion thoughtfully" and to consider "all relevant facts and circumstances" when deciding whether to pursue enforcement outside the presumed priorities. *See Mada-Luna*, 813 F.2d at 1016 (enforcement guidance was exempt from notice and comment when it preserved agency's decisionmaking discretion).[7] What the ICE Memo does not do is change any law or regulation or alter any noncitizen's legal rights or obligations. All noncitizens subject to a final order of removal remain legitimate subjects for ICE enforcement actions, subject to case-by-case analysis. The ICE Memo therefore is not a substantive rule and did not require notice-and-comment.

The States' principal counterargument is that the ICE Memo operates as a *de facto* pause on removals, or at least does so with respect to those outside the three presumed priority categories. *See* Pls.' Supp. at 15-17 (asserting that the ICE Memo makes some noncitizens

---

[7] The Court's review is limited to the administrative record and so it need not and should not consider the subsequent implementation of the ICE Memo to determine its nature. But even Plaintiffs concede that the evidence shows that ICE officials *are* seeking, and receiving, approval to pursue non-presumptive priority cases. *See* Pls.' Supp. at 12-13; *see also* Berg Decl. (Ex. 2) ¶ 9.

"presumptively un-removable"). But that contention is belied by the text of the ICE Memo itself, which expressly authorizes, and provides procedures for, enforcement actions against noncitizens outside the presumed priority categories. And, as the States concede, the ICE Memo has been implemented in just that way. *See* Pls.' Supp. at 12-13 (citing ICE enforcement reports produced in discovery); *see also* Berg Decl. (Ex. 2) ¶ 9.

The ICE Memo does require ICE officers and agents to comply with new procedures, but if this takes it outside the realm of general policy statement then it is only to make it a procedural rule. *See, e.g., Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986) (holding that enforcement guidelines were internal procedural rule exempt from notice and comment). Procedural rules, too, are exempt from notice-and-comment—to "ensure that agencies retain latitude in organizing their internal operations." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014). "'[P]rocedural' rules, those that are legitimate means of structuring [the agency's] enforcement authority, are exempt from the APA notice and comment requirement." *Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 447 (9th Cir. 1993). This is so even if the enforcement policy "may have a substantial impact." *Id.* at 447 n.18.

C. *The purported agreements are void and unenforceable.*

Defendants have already explained why the MOUs on which the States rely are void and unenforceable. *See* Defs.' Opp'n at 20-22. The States have not addressed any of those arguments. Instead, in a lengthy footnote, they address an argument that Defendants did not make: that Kenneth Cuccinelli was not lawfully appointed. *See* Pls.' Supp. at 14 n.8. But the States still have not identified any statutory authority that would authorize *any* DHS official to bind the agency in the manner of the MOUs. *See The Floyd Acceptances*, 74 U.S. (7 Wall.) 666, 679-80 (1868); *CACI, Inc. v. Stone*, 990 F.2d 1233, 1237 (Fed. Cir. 1993). And the States' contention that they do not seek to enforce the MOUs is hard to square with their assertion of a consultation right *derived from* the MOUs, a right on which they rely to justify injunctive relief. *See* Pls.' Supp. at 21. The sole remedy, if any, that is available for a violation of a contract with the United States is monetary damages. *See Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 646 (9th Cir. 1998).

*D. The ICE Memo is consistent with § 1231.*

As Defendants have previously explained, § 1231(a)(1) does not require the Secretary to remove every noncitizen subject to a final order of removal within 90 days. *See* Defs.' Opp'n at 9-10, 15-16. Rather, as with any statute providing for enforcement, even one using the word "shall," the Executive retains the inherent discretion to choose which cases to pursue. *See Castle Rock*, 545 U.S. at 761. Thus, the statute providing that the U.S. Attorney "shall [] prosecute for all offenses against the United States," 28 U.S.C. § 547, does not strip him of all prosecutorial discretion.

But even if § 1231 did impose an enforceable mandate, the ICE Memo would not violate it. The ICE Memo does not prohibit any removal action, it simply directs ICE officials to prioritize removals (and other enforcement actions) for the presumed priority cases, and to pursue other removals when justified by the circumstances and with additional approval. That the raw number of removals fluctuates from month to month, including in response to changing enforcement priorities, does not mean that the new enforcement priorities—which expressly authorize removal in every case where it is justified—violate any statutory duty. Nothing in § 1231 even arguably precludes ICE from prioritizing removals to focus on the most important cases.

## IV. An Injunction Restraining Core Article II Authority Outweighs Any Harm to the States and Undermines the Public Interest.

The States have not established any injury caused by the ICE Memo, much less an injury that outweighs the harm to the Defendants and the public interest that would result from enjoining it. *See Winter*, 555 U.S. at 24-26. And even assuming that, as the States maintain, the ICE Memo did cause some injury, that injury would be limited to the States' *marginal* increase in costs from four additional noncitizens now in community supervision—an injury that borders on the negligible.

On the other side of the equation, an injunction cabining ICE's immigration enforcement discretion would "invade a special province of the Executive." *AADC*, 525 U.S. at 489; *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978). An order enjoining the ICE Memo

would have serious practical consequences for ICE operations, as well. *See* Berg Decl. (Ex. 2) ¶¶ 11-23. Given the limited resources, an injunction would frustrate the Secretary's and Acting ICE Director's policy of focusing on removing threats to national and border security and to public safety. *Id.* ¶ 11, 14. An injunction would thereby displace the Executive's judgment on how best to prioritize limited resources. An injunction would also interfere with DHS's ongoing efforts to collect information to inform future policies. *Id.* ¶ 23.

Finally, if the Court issues any relief, it should be limited to Arizona and Montana. Nationwide relief that would affect those who are not parties to this case would exceed this Court's authority under Article III and violate longstanding equitable doctrines. *See DHS v. New York*, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring); *Trump*, 138 S. Ct. at 2429 (Thomas, J., concurring). Further, nationwide relief is unnecessary to address the States' alleged harms, all of which are limited to their jurisdictions.

## CONCLUSION

The States' motion should be denied and judgment entered for Defendants.

RESPECTFULLY SUBMITTED this 13th day of May, 2021.

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director
Federal Programs Branch

_/s/ Michael F. Knapp_
MICHAEL F. KNAPP
CA Bar No. 314104
Trial Attorney
ADAM KIRSCHNER
IL Bar No. 6286601
Senior Trial Counsel
BRIAN C. ROSEN-SHAUD
ME Bar No. 006018
KUNTAL CHOLERA
DC Bar No. 1031523
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW Room 12008
Washington, D.C. 20530
(202) 514-2071 (telephone)
(202) 616-8470 (facsimile)
Email: Michael.F.Knapp@usdoj.gov
        Adam.Kirschner@usdoj.gov
        Brian.C.Rosen-Shaud@usdoj.gov
        Kuntal.Cholera@usdoj.gov

EREZ REUVENI
CA Bar No. 264124
Assistant Director
U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
202-307-4293 (telephone)
Email: Erez.R.Reuveni@usdoj.gov

_Counsel for Defendants_