**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joseph A. Kanefield (No. 15838)
Brunn (Beau) W. Roysden III (No. 28698)
Drew C. Ensign (No. 25463)
Anthony R. Napolitano (No. 34586)
Robert Makar (No. 33579)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Joe.Kanefield@azag.gov
Beau.Roysden@azag.gov
Drew.Ensign@azag.gov
Anthony.Napolitano@azag.gov
Robert.Makar@azag.gov
*Attorneys for Plaintiffs State of Arizona*
*and Mark Brnovich in his official capacity*

**AUSTIN KNUDSEN**
**MONTANA ATTORNEY GENERAL**

David M. Dewhirst*
  *Solicitor General*
215 N Sanders St.
Helena, MT 59601
Phone: (406) 444-4145
David.Dewhirst@mt.gov

*pro hac vice granted*

*Attorneys for Plaintiff State of Montana*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

State of Arizona; State of Montana; and
Mark Brnovich, in his official capacity as
Attorney General of Arizona,

      Plaintiffs,

      v.

United States Department of Homeland
Security; United States of America;
Alejandro Mayorkas, in his official
capacity as Secretary of Homeland
Security; Troy Miller, in his official
capacity as Acting Commissioner of
United States Customs and Border
Protection; Tae Johnson, in his official
capacity as Acting Director of United
States Immigration and Customs
Enforcement; and Tracy Renaud, in her
official capacity as Acting Director of U.S.
Citizenship and Immigration Services,

      Defendants.

No. 2:21-cv-00186-SRB

**RESPONSE TO DEFENDANTS'
MOTION TO DISMISS**

**(Hearing Set for May 27, 2021, at
10:00 a.m.)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………….…...1

ARGUMENT…………………………………………………………………….……..2

I.     Plaintiffs Have Established Standing ........................................................ 2

II.    Defendants' Threshold Defenses Do Not Apply Here............................................ 8

   A.  The Interim Guidance's Establishment of Disfavored Removal Categories Is Not Committed to Agency Discretion By Law ............................................... 8

   B.  Congress Has Not Precluded Judicial Review Of DHS's Illegal Policy Issued In Violation Of The APA ................................................. 11

   C.  The States Are Within The Relevant Zone Of Interests ....................................... 14

   D.  The Interim Guidance Is A Final Agency Action ................................................. 15

III.   The Court Has Jurisdiction to Consider the APA Claims, And Consider Defendants' Admissions in the MOUs As Part of Adjudicating those APA Claims 16

IV.    The Court Should Not Dismiss Any Part of This Case As Moot........................... 17

V.     Plaintiffs Should Be Granted Leave to Amend If The Court Grants Dismissal .... 17

CONCLUSION………………………………………………………………..………17

1

**INTRODUCTION**

2        Most of Defendants' arguments are based on mistaken premises: *i.e.*, that this case

3    involves highly individualized, discretionary determinations about deportation for which

4    the Interim Guidance offers only helpful guidance.   Not so.   The Interim Guidance

5    imposes new *substantive* criteria to govern virtually all cases.   It does not merely guide

6    exercise of discretion, it effectively supplants it.   That alone would require (1) notice and

7    opportunity to comment and (2) a reasoned explanation, neither of which were provided.

8        But there is more to the Interim Guidance that what appears on its face.   Lurking

9    beneath the surface is Defendants' actual implementation of it its innocuously presented

10   "priority categories."   In a midnight directive to subordinates, Acting ICE Director Tae

11   Johnson made clear that the purported "prioritization" that was being imposed, and

12   subsequently carried forward to the Interim Guidance is intended to be near-absolute:

13   "only those who meet the [Section B] priorities will be removed." AR_AZ_00004699.

14   And that has borne out by the facts—a reduction in removals to only 55% of the already

15   reduced COVID-19 levels and similar reductions in book-ins and immigration detainers.

16       The Interim Guidance—as actually implemented—is thus not merely guiding

17   discretion in individualized cases.   It effectively obliterates that discretion.   In doing so, it

18   becomes plain that the Interim Guidance is *de facto* the sort of administrative rule that

19   courts review every day under the APA.   Having created new substantive criteria that

20   confers new rights, the APA permits aggrieved parties to challenge both the procedures

21   used to promulgate the rule and its ultimate substance, including compliance with the

22   underlying statutes such as 8 U.S.C. § 1231.   Moreover, the reviewability of Defendants'

23   actions is further confirmed by the *Texas v. United States* decisions, which correctly

24   rejected virtually identical arguments.   Despite Defendants' bravado in this Court, if they

25   truly believed that their reviewability arguments are as strong as they now contend, they

26   would have appealed the *Texas* preliminary injunction.   They tellingly declined to.

27       The record further makes plain that Plaintiffs are indeed aggrieved and have amply

28   satisfied their burden of establishing their standing, both as a matter of Article III and

1

under the prudential zone-of-interest test.   In particular, Defendants' actions directly cause Plaintiff States to incur costs in imposing community-supervision sentences that would not occur but for Defendants' challenged actions (*i.e.*, declining to remove aliens with criminal convictions they previously would have removed).   And Plaintiffs are plainly within the relevant zone of interests here—as the Ninth Circuit has squarely held, Congress eliminated discretion not to remove aliens with final orders of removal specifically to alleviate burdens on the States. *See e.g., Campos v. I.N.S.*, 62 F.3d 311, 314 (9th Cir. 1995). Thus, this Court should deny the Motion to Dismiss.[1]

## ARGUMENT

### I.   Plaintiffs Have Established Standing

To establish Article III standing, the State must demonstrate (1) "an injury in fact," that is (2) "fairly traceable" to the defendant's conduct and (3) "likely to be redressed by a favorable" ruling. *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016).   These requirements are satisfied here.

#### A.   Plaintiffs have shown an injury-in-fact

While Defendants contend (Dkt. 59 at 8) that Plaintiffs' injuries are "wholly speculative," those injuries are both concrete and amply supported by record evidence. And because at least one plaintiff (Arizona) has standing, this Court's inquiry ends there. *See, e.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012).

As Defendants admit, this Court has previously assumed that States have standing to challenge federal immigration policy that they contend is unlawful.  *See United States v. Arizona*, 2011 WL 13137062, at *2 (D. Ariz. Oct. 21, 2011).  This is in accord with the Supreme Court's recognition that "Arizona bears many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012).  In *Arizona* there were 387,000 removals per year, *see id.*; now there will be fewer than 100,000 for the first time in recent history.  Dkt. 61 at 3.  State "consequences" from illegal immigration are thus

---

[1] Plaintiffs incorporate their factual and procedural background from their Motion for PI. Dkt. 17 at 3-8; Dkt. 61 at 3-7.

even clearer today under the Interim Guidance.

Defendants' dramatic decreases in removals inflict injury directly upon Plaintiffs. In particular, Arizona Department of Corrections, Rehabilitation, and Reentry ("ADCRR") has incurred direct injury as a result of Defendants' actions: specifically, ADCRR has been forced to place aliens with criminal convictions on community supervision (akin to federal supervised release) who, but for the Interim Guidance, would have been deported (obviating any need for community supervision).  Dkt. 61 at 20-21. Unsurprisingly, such community supervision is not free, and Plaintiffs supplied direct evidence of the resulting costs.  Dkt. 61-5 at 3.  And the State will continue to have more prisoners whose sentences are completed and should be picked up by ICE pursuant to immigration detainers—over 6% of the AZ prison population has ICE detainers.[2]  If just a small fraction of this 6% of inmates continues to be released on community supervision rather than removed due to the ongoing effects of the Interim Guidance, Plaintiffs will incur an increasing marginal cost in their community supervision operations.[3]

Defendants' own admissions in the administrative record makes clear that without a "significant likelihood of [an alien's] removal in the reasonably foreseeable future," release from ICE detention is required, *see* Dkt. 64 at 2 (citing *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001); AR_AZ_00000018).  Therefore, if ICE will not remove aliens who have been released from ADCRR custody, they will necessarily have to be let into the community, requiring ADCRR to place them on supervised release and monitor them,

---

[2] ADCRR records indicate Arizona had 2434 inmates with ICE detainers at the end of April 2021 and a total population in March 2021 of 36704.  Dkt. 61-4 at AZMT007464-7535; Arizona Department of Corrections, *Two-Year Prison Population Trend Report* available at https://bit.ly/2QeLKaM.

[3] There are currently 216 corrections staff members working Arizona's community supervision program with 5516 persons being supervised (roughly 25 individuals per staff member).  Dkt. 69 at 11 n. 1.  Increasing the 216 staff members by 6%, representing the percentage of current inmates with ICE detainers, would correspond to the need to hire another 13 officers.  In other words, Arizona would experience an increased marginal cost corresponding to the need to hire one more community supervision staff member if just 1% of the 2434 inmates currently on ICE detainers are instead released into community supervision because ICE refuses to remove them under the Interim Guidance.  This 1% increase is a likely and real, expected marginal cost to the state under the Interim Guidance.

which requires expending $4,000/yr.  Dkt. 61-5 at 3.

That Arizona budgets for such expenses does not prevent the resulting costs from being cognizable injuries.  The relevant question for standing purposes is only whether the Defendants' actions have imposed costs upon the States, not whether the States have budgeted for such costs.  Nor are budgeted amounts set in stone: For instance, the governor's budget master list for FY 2020 set a total funding estimate of $30.7 million for community corrections, but the actual funding required for the program was $26.6 million, which allowed the government to decrease estimates for following years.  Ex. AA, AZMT 003662; AZMT006452.  Thus, the fact that the costs of the Interim Guidance are too recent for them to have impacted a state budget *yet* does not mean that budgetary numbers are so inflexible as to not be affected by the additional costs it imposes.

Lifted detainers are not the only source of Plaintiffs' injuries; the Interim Guidance has caused a significant drop the in the number of detainers placed on inmates in the first place: Under the Interim Guidance, the number of ICE immigration detainers being issued nationally fell from ~10,000 per month through 2020 to 5,000 in February 2021 and less than 2,500 in March and April.  Defs.' Resp. and Obj. to Pls.' Third Disc. Req., Ex. BB at 5.  For Arizona specifically, it fell from ~300 per month to under 100 per month in February, March, and April 2021.  *Id.*  This means that in the wake of the Interim Guidance, ICE has seriously decreased the number of detainers issued as to people being taken into custody.  With that number falling by about two-thirds, the majority of previously removable aliens taken into custody may be incarcerated and released without ever having had a detainer placed on them, making the future injury harder to document on an individual basis, but no less real.  And beyond this, Plaintiffs experience costs of further incarceration of criminal aliens who are not removed and subsequently commit additional crimes.  *See*, Dkt. 38 at 18-19; Dkt. 61 at 20-21.

These costs are a much more direct injury than what was at issue in United *States v. Arizona*, 2011 WL 13137062, where some of the claims were just a general increase in immigration.  In sum, what is alleged here is far more than enough to establish standing.

4

*See Texas v. United* States, 787 F.3d 733, 744-45, 751 (5th Cir. 2015).

Additionally, Plaintiffs are required by federal law to include unauthorized aliens in their Emergency Medicaid Programs, such that decreased removals leads inexorably to increased costs on the Plaintiff States.  *See* 42 C.F.R. § 440.255(c).  The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants.  As an example, one Arizona hospital, Yuma Regional Medical Center ("YRMC"), has provided care to at least 111 patients in ICE custody, alone, in February, March, and April 2021.  *See* Trenschel Decl., Ex. Z, at internal Ex. A, AZMT008126.  This does not include care provided to unlawful aliens who are not in ICE custody, and YRMC has not completely tabulated its full April numbers, so these statistics are likely under-inclusive.  *Id.* at ¶4.  In February and March 2021—*i.e.*, immediately following the challenged actions—Arizona incurred the first and fourth-highest amount of relevant charges of the past twelve months: $591,610 for February alone—$152,014 higher than the next-highest month and dramatically exceeding the $231,602 average for May 2020-January 2021.  *Id.* at internal Ex. A.

On average over the past twelve months, YRMC experiences $861 in unreimbursed costs of care for each patient it sees in this population.  *Id.* at ¶ 3.  Plaintiffs' investigation regarding the full amount of applicable expenditures in its Emergency Medicaid Program is ongoing.

The States are also injured through increased education costs.  The Supreme Court in *Plyler v. Doe* mandated that States provide public education to school-age unauthorized aliens. 457 U.S. 202, 230 (1982).  In FY 2019, Arizona spent an average of $10,928 per pupil, $8,905 of which went to instruction and other operational costs.  Arizona Auditor General, *Arizona School District Spending: Fiscal Year 2019* at 8 (March 2020), available at https://bit.ly/3h4xaO9.  Similarly, Montana spent $11,666 per student in the 2019-2020 school year.  Montana Office of Public Instruction, *2019-20 State Report Card*, available at https://bit.ly/3h1lkV3.  These represent the direct costs to Plaintiff States, which are and will continue to be realized, of continuing to provide

educational services to removable individuals who are not removed due to the priorities set out in the Interim Guidance.

## B.   Traceability and Redressability

Defendants' traceability and redressability arguments also fail.   As an initial matter, those requirements are relaxed in cases asserting procedural rights such as this case, where Plaintiffs are arguing Defendants' actions were arbitrary and capricious and failed to follow notice and comment under the APA.  *California v. Azar*, 911 F.3d 558, 571 (9th Cir. 2018).  Plaintiffs' injury-in-fact is thus sufficient here.

Defendant's contention that any injuries suffered by Plaintiffs are caused by the "independent acts of third parties" (Dkt. 59 at 8) fails.  *See also*, Dkt. 59 at 15, citing *Levine v. Vilsack*, 587 F.3d 986, 992 (9th Cir. 2009).  The Ninth Circuit has rejected this argument in similar circumstances, holding that "an increased demand for aid supplied by the state and local entities" sufficed.  *City and County of San Francisco v. USCIS,* 981 F.3d 742, 754 (9th Cir. 2020).  Similarly, the Ninth Circuit found plaintiffs had standing where "the defendant's behavior has frustrated its mission and caused it to divert resources in response." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020).   And here, the record satisfies *Town of Chester, N.Y. v. Laroe Ests., Inc.*, demonstrating causation where the Interim Guidance has a coercive effect on Plaintiffs because DHS is lifting ICE detainers for prisoners bring released who do not meet the new priorities.  137 S. Ct. 1645, 1650 (2017).  These criminal aliens, who were slated to enter ICE custody and be removed, must instead be released on community supervision at the State's expense.  This is also shown through the impact on mandatory spending on education, incarceration, and medical care due to the dramatic decrease in removals, leaving individuals to remain in and consume the aid and services of Plaintiff States. [4]

---

[4] Further, the contention that by expressly prioritizing non-citizens after November 1, 2020, the Interim Guidance does not incentivize new illegal immigration (Dkt. 59 at 14) is an unsupported factual content that is inappropriate to resolve at the Rule 12 stage. And, as Plaintiffs are not alleging a mere increase in population, the portion of *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015), on which Defendants base their contentions is inapplicable here.

These are all predictable results supported by the statistics cited above.[5]

Defendants argue that the "increase in number of crimes committed by noncitizens" are merely "independent decision[s]" not sufficiently traceable to the Interim Guidance, but Plaintiffs are not referencing the general alien population as was at issue in DACA and DAPA (indeed those populations by their own terms excluded aliens who had committed certain crimes). Plaintiffs briefing details anticipated and highly predictable injury from recidivism of aliens who have already been charged or convicted of crimes, and the recidivism rate for that population is extremely high.  Dkt. 61 at 20-21.  Ninety-two percent of interior arrests and by ICE are criminal aliens.  Dkt. 61 at 21.

These injuries are ongoing and will increase the longer the Interim Guidance is in effect, making them redressable by an order invalidating the Interim Guidance, allowing ICE employees to return to normal operations.  This "return to normal removal operations as prior to the issuance of the January 20, 2021 memorandum" is stated twice in the administrative record.  AR_AZ_00004631; AR_AZ_00004711.  The first is a message to all ICE employees instructing them to "return to normal removal operations" following the temporary restraining order issued by the Southern District of Texas.  AR_AZ_00004631.   The second is a February 10, 2021, message concerning the extension of the Texas court's TRO.  AR_AZ_00004711.  This provides strong factual evidence of redressability because it establishes that DHS's response to the *Texas* court's injunction was a "return to normal," and with the 100-day pause memorandum both

---

[5] Even if, as Defendants argue, Montana cannot assert *parens patriae* interests against the federal government, only one Plaintiff needs to demonstrate standing for all Plaintiffs to continue in the case.  *See Melendres*, 695 F.3d at 999.  Further, Montana and Arizona may both still assert special solicitude injury to their sovereign and quasi-sovereign interests, including "'the power to create and enforce a legal code.'" *Texas v. U.S.*, 809 F.3d 134, 153 (5th Cir. 2015) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601 (1982)); *See also*, *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1241-42 (10th Cir. 2008) (acknowledging "the 'special solicitude' the *Massachusetts* Court afforded to states" in determining "Wyoming has Article III standing" where the federal government's actions "interfere[] with Wyoming's ability to enforce its legal code.") (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)).

enjoined and expired, the Interim Guidance is what is preventing DHS from its "return to normal removal operations."   This return to the previous level of removal operations obtained via this Court declaring the Interim Guidance illegal and invalid is precisely the relief Plaintiffs request.

### C.   The MOU's Separately Support Standing

DHS's failure to follow the MOUs supports these claims. Plaintiffs are not seeking specific performance of the MOUs, and so the authority of the MOUs is not necessary to Plaintiffs' claims.  Rather, Plaintiffs seek a declaration that the Interim Guidance is void, and the MOUs serve as evidence establishing that DHS changed its removal policy, did not follow proper procedure in doing so—including a failure to comply with either the APA or the MOUs' requirements to provide notice and an explanation of that change— and recognized that such a change would cause Defendants irreparable harm. Dkt. 12 at 15. DHS's non-compliance with the MOUs exposes its non-compliance with APA requirements.  Even if DHS could not bind itself to later specific performance claims via the MOUs, these documents support Plaintiffs' APA claims, highlighting policy change and DHS's failure to follow statutory procedures in adopting it.

## II.   Defendants' Threshold Defenses Do Not Apply Here

### A.   The Interim Guidance's Establishment of Disfavored Removal Categories Is Not Committed to Agency Discretion By Law

The Interim Guidance is reviewable.  The APA establishes a "basic presumption of judicial review," *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019), and only "a very narrow exception" to that presumption when an action is "committed to agency discretion by law." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 410 (1971); 5 U.S.C. § 701(a)(2).  And while an agency decision not to take enforcement action is presumptively not subject to judicial review, *Heckler v. Chaney*, 470 U.S. 821, 824 (1985), that presumption is rebutted here both because "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers," and "the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 832-33 & n.4.

8

Most directly, 8 U.S.C. § 1231(a)(1)(A) provides guidelines sufficient to rebut the presumption. *See* Dkt. 35 at 5 (discussing statutory history). The *Texas* Court found this after extensive analysis when granting the preliminary injunction of Section C of the Memorandum, which Defendants did not appeal. *See* Dkt. 12-1 at 96 (reproducing *Texas*, 2021 WL 723856, at *38, which concluded "shall remove" in §1231 "means *must* remove").[6] And Ninth Circuit case law is in accord with this, holding that § 1231 means what it says: there is no discretion not to remove aliens with final orders of removal. *See Lema v. I.N.S.*, 341 F.3d 853, 855 (9th Cir. 2003) ("Ordinarily, the INS *must* remove an alien in its custody within ninety days from the issuance of a final removal order. *See* 8 U.S.C. § 1231(a)(1)(A)-(B)." (emphasis added)).[7] Given this case law, the Court can easily dispose of Defendants' unreviewable-discretion argument.

The second method for rebutting the presumption is also present here because the Interim Guidance in the context of final orders of removal is "a general policy that is so extreme as to amount to an abdication of [Defendants'] statutory responsibilities." *Heckler*, 470 U.S. at 833 n.4. The Ninth Circuit has recognized in the specific context of the predecessor to § 1231 that if "the allegations asserted in the instant Complaint … rise to a level that would indicate such an abdication," the action is reviewable. *See California v. United States*, 104 F.3d 1086, 1094 (9th Cir. 1997). While that was not the case in *California*, multiple courts have found such circumstances in other contexts resulting in judicial reviewability. In *WildEarth Guardians v. DOJ.*, this Court denied

---

[6] Section 1231 is much more specific, particularly given the legislative history, than what was at issue in *Castle Rock v. Gonzales*, 545 U.S. 748 (2005). The statute in that case was talking about using every reasonable means to enforce a restraining order. *Id.* at 761. That is a general command. Here, § 1231 uses "shall remove" to apply to a specific class of aliens (those with final orders of removal) within a specific time period, 90 days. It is one thing were the States arguing DHS should conduct removals beyond its actual resources, but that is not the allegation here. Instead, the agency is adopting a policy that will categorically exclude certain subgroups from the statute when it has excess resources that it could be employing. *Castle Rock* is thus distinguishable.

[7] Although the Ninth Circuit in the earlier case of *California v. United States*, 104 F.3d 1086, 1094 (9th Cir. 1997), found *Heckler* did bar California's claim, it was addressing a prior version of the statute and made no mention of the specific 90-day timeframe, which *Lema* focused on when interpreting the statute to mean "must."

the Government's motion to dismiss a complaint seeking review of the "McKittrick policy," which stated DOJ would "request a specific intent instruction requiring the Government to prove beyond a reasonable doubt that the alleged shooter knew the biological identity of the animal at the time of the shooing."  181 F. Supp. 3d 651, 657 (D. Ariz. 2015), *later judgment vacated on other grounds*, 752 Fed. Appx 421 (9th Cir. 2018).  The Court found that judicial review was applicable because this was "*arguably* an abdication of DOJ's duty under the ESA to ensure that it uses its authority in furtherance of the purposes of ESA." *Id.* at 667-68.  Similarly, in *American Academy of Pediatrics v. FDA*, the court found reviewable a challenge to the FDA's express policy that it would not enforce the Family Smoking Prevention and Tobacco Control Act's premarket review provisions—a non-enforcement decision akin to the Interim Guidance here.  379 F. Supp. 3d 461, 493 (D. Md. 2019).  Finally, in *Whitaker v. Clementon Housing Authority*, the court found reviewable a challenge to HUD's decision not to initiate an enforcement action as stated in letters that HUD had sent to the plaintiff.  788 F. Supp. 226, 231 (D.N.J. 1992).

Here, Plaintiffs allege that the Interim Guidance, particularly when considered in light of the February 4 email from the Acting ICE Director that preceded it, is *not* mere prioritization/allocation of scarce resources, but rather a substantive rule that imposes *substantive* criteria: effectively creating only three categories of aliens for whom DHS will even attempt to carry out removal under § 1231(a)(1), and that for all other aliens with final orders of removal, removal is presumptively (and overwhelmingly) disfavored notwithstanding § 1231's unequivocal command.  Amended Complaint, Dkt. 12 at ¶ 73. This characterization is manifestly borne out by statistics, removals have plummeted under the Interim Guidance. Ex. BB at 5.

Defendants' main counter-argument on this point (Dkt. 59 at 17-18) is circular: they ask the Court to assume—contrary to the allegations and evidence provided by Plaintiffs —that the Interim Guidance merely sets enforcement priorities (and does not otherwise affect overall removal operations), and then contend that if the Court agrees

with them on the merits of this factual issue, the policy is not an abdication.   But Defendants' cannot defeat jurisdiction by having the Court assume their interpretation of the policy is correct on the merits.   *E.g.*, *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007).

Neither *California* nor *United States v. Arizona*, 2011 WL 13137062, at *9 (D. Ariz. Oct. 21, 2011), precludes a challenge such as this one to an official policy creating disfavored categories of removal contrary to an express statutory command.   *California* did not involve any specific policy, as the Ninth Circuit noted.   104 F.3d at 1094. Similarly, in dismissing Count 3 of Arizona's counterclaims in *United States v. Arizona*, this Court was not confronted by an official policy.   2011 WL 13137062, at *9 (D. Ariz. Oct. 21, 2011).[8]

## B.   Congress Has Not Precluded Judicial Review Of DHS's Illegal Policy Issued In Violation Of The APA

Defendants fail to cite any statute that "preclude[s] judicial review" of Plaintiffs' claims as States challenging the illegality and lack of procedure involved in Defendants' issuance of the Interim Guidance.   5 U.S.C. § 701(a)(1).   To the contrary, Defendants attempt to stretch the language of INA provisions that pertain only to *individuals'* claims that are actually part of specific removal proceedings and subject to, for instance, requirements of administrative exhaustion.   Dkt. 59 at 20-22.   Neither Congress nor any court has granted DHS *carte blanch* immunity from judicial review.   Instead, the INA is properly read with the presumption "that Congress legislates with knowledge of our basic rules of statutory construction, and given our well-settled presumption favoring

---

[8] The other cases cited by defendants are clearly inapposite.   *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 967 (9th Cir. 2017), does not actually address un-reviewability under the APA or even mention § 1231, but rather contains a background reference to *Heckler* and *Reno* as part of its "3,000-word Equal Protection detour," *id.* at 958 (Koznski, J, dissenting from denial of reh'g en banc).   And *Morales de Soto v. Lynch*, 824 F.3d 822, 827 (9th Cir. 2016), similarly does not address the situation when a party is challenging an official, concrete policy that the Plaintiff contends is an abdication of the agency's statutory enforcement policies, or even mention § 1231.   Instead, it involved the court declining to remand to an agency when the agency did not seek such remand notwithstanding a change in its own policies.   *Id.* at 826-27.

interpretations of statutes that allow judicial review of administrative action." *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 496 (1991).  Here, the Ninth Circuit has adopted a narrow interpretation of the jurisdiction-limiting portions of the statutes on which Defendants rely, for instance holding that "§ 1252(b)(9) has built-in limits …. claims that are independent of or collateral to the removal process do not fall within the scope of § 1252(b)(9)." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032 (9th Cir. 2016).

      *J.E.F.M.* explains that § 1252(b)(9) is more appropriately considered a "zipper clause," intended to "consolidate judicial review of immigration proceedings into one action in the court of appeals" through a mandatory petition for review process.  *Id.* at 1031, citing *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AAADC*"), 525 U.S. 471, 483 (1999) and *INS v. St. Cyr*, 533 U.S. 289, 313 & n. 37 (2001) (internal quotation marks omitted).  The statute thus excludes from the petition for review requirement "any claim that does not arise from removal proceedings," and the Ninth Circuit catalogues some of its cases that demonstrate the narrow reading of "arising from" in this context:

> For example, in *Nadarajah v. Gonzales*, we held that an immigrant could challenge his five-year administrative detention by filing a petition for a writ of habeas corpus in district court, notwithstanding § 1252(b)(9). 443 F.3d at 1075-76….
> Similarly, … in *Signh v. Gonzales*, we recognized that the district court had jurisdiction over the petitioner's ineffective-assistance-of-counsel claim that arose after his attorney failed to file a timely [petition for review].  499 F.3d at 980.

*J.E.F.M.*, 837 F.3d at 1032.  But that jurisdiction-channeling provision is irrelevant here.  If these claims fall outside the ambit of § 1252(b)(9)'s jurisdiction limiting function, as Plaintiffs' claims  do, then the provision does not bar review.

      The Ninth Circuit similarly shows that § 1252(a)(5) has a limited scope, even in the APA context, prohibiting claims "by an *alien*" that are "'inextricably linked' to *the* order of removal" ("*the*" indicating *that alien's* removal order).  *Id.*, quoting *Martinez v. Napolitano*, 704 F.3d 620, 623 (9th Cir. 2012) (emphasis added).[9]  Plaintiffs are not

---

[9] Defendants cite two cases, *AAADC* and *E. Bay Sanctuary Covenant v. Trump*, out of

12

aliens. They are not seeking review of any part of the removal proceeding process, nor are their claims "inextricably linked" to any particular order of removal.  Defendant's tortured reading of § 1252 is incorrect.  Plaintiff's claims are not an "action taken or proceeding brought to remove an alien."  § 1252(b)(9).  Rather, they are legal action taken to require Defendants to follow the law when it issues new policy.  That the particular policy involved here happens to do with what DHS does *after* removal proceedings are complete and final orders are ripe to be acted upon is irrelevant to its reviewability and far removed from § 1252's jurisdictional rules.  Section 1252, therefore, cannot bar the Court from exercising jurisdiction over Plaintiffs' claims for the generally-favored "judicial review of administrative actions." *McNary*, 498 U.S. at 496.

Section 1231(h), which on its face cannot apply to Plaintiffs' arbitrary-and-capricious or notice-and-comment claims, also does not bar review of their claim of statutory violation.  As with § 1252, Defendants cite no precedent showing the application of § 1231(h)'s language against states or any party other than aliens subject to removal.  *See* Dkt. 59 at 21, citing *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (discussing § 1231(h) in a challenge by removable aliens to the length of their pre-removal detention).  The term "any party," as used in § 1231(h), unambiguously refers to aliens involved in removal proceedings.  As a result, "[s]ection 1231(h)'s bar is irrelevant" because the States do "not bring any claims under that section." *See Chhoeun v. Marin*, No. SACV 17-01898-CJC, 2018 U.S. Dist. LEXIS 132363, at *17 n.3 (C.D. Cal. Mar. 26, 2018).  This conclusion that § 1231(h) applies only to aliens involved in removal proceedings is confirmed by the statutory and legislative history of § 1231.  *See* Dkt. 38 at 7-8.

---

context for their language describing the relationship an action must have to a removal proceeding in order to fall under the relevant § 1252 language.  Dkt. 59 at 21.  *AAADC* applies § 1252 to bar a challenge to deportation brought by a group of individual aliens. 525 U.S. at 472-73.  *E. Bay Sanctuary Covenant* allows an APA challenge to asylum rules, which the court held are "collateral to the process of removal."  950 F.3d at 1269. Both thus comport with the distinctions described by the Ninth Circuit in *J.E.F.M.*

C.      **The States Are Within The Relevant Zone Of Interests**

The States are in the zone of interests "within the meaning of a relevant statute."  5 U.S.C. § 702.  Congress has provided a cause of action in the APA for persons seeking redress against the federal government for violating other federal laws. *See* 5 U.S.C. §§ 702, 706.  The zone of interest test is not especially demanding, requiring only that the States be "arguably" within what is protected or regulated by the statute.  *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). The States easily satisfy this "lenient" standard for an APA claim. *Sierra Club v. Trump*, 929 F.3d 670, 703 n.26 (9th Cir. 2019).

For Plaintiffs' contrary-to-law claim, Defendants misinterpret the phrase "any party" in § 1231(h) as applying to *all* challenges by states to DHS policy.  Not so.  The context of the statute makes clear that the term "party" refers only to a "party" to a removal proceeding under § 1231.  *See Lexmark*, 572 U.S. at 128 (courts must "determine the meaning of the congressional provision" in question when making a zone of interest determination).  As recognized by several circuits, § 1231(a)(1)(A) and its prior corollary statutes, 8 U.S.C. § 1252(i) and 8 U.S.C. § 1252(c), were intended to *remove* burdens on the State and local governments.  *See, e.g., Campos v. I.N.S.*, 62 F.3d 311, 314 (9th Cir. 1995); *Prieto v. Gluch*, 913 F.2d 1159, 1165 (6th Cir. 1990); *Giddings v. Chandler*, 979 F.2d 1104, 1109 (5th Cir. 1992).  This "[r]eflect[s] a concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates[.]'" *Id.* (quoting 8 U.S.C. § 1601).  Thus, because Congress requires DHS to remove an individual alien for economic reasons related to detainment, *see Campos*, 62 F.3d at 314, it intended to preclude aliens from filing a freestanding lawsuits asserting a right to be removed and further burdening state resources during the delay necessitated by such additional lawsuit.

Defendants mistakenly rely on dicta from the Tenth Circuit's decision in *Hernandez-Avalos v. I.N.S.*, 50 F.3d 842 (10th Cir. 1995), which did not involve an APA claim, *id. at* 845 n.8, and was decided prior to the Supreme Court's decision in *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002), which relaxed the zone-of-interest test.  *See id.* at 283.

14

Also, *Arizona* noted but did not decide the issue.  *See* 2011 WL 13137062 at 11 n.8. *Campos* is the more applicable case, and supports Plaintiffs' position because it concerned incarcerated aliens challenging deportation under § 1231's predecessors.  62 F.3d at 314 ("Congress … clarif[ied] … that section 1252(i) does not create an obligation on the part of the government toward individual incarcerated aliens and that such aliens lack standing to sue for any relief under section 1252 because they are outside the 'zone of interests' of the statute.").  As such, § 1231(h) only precludes claims by *aliens*.

Plaintiffs' arbitrary-and-capricious and notice-and-comment claims do not arise from § 1231 so Plaintiffs need not be within the zone of interests for that statute.  These claims are independently based upon the APA's procedural protections.  DHS's policy changed the existing removal process without consulting Plaintiffs, providing a reasoned explanation for the change, considering lesser alternatives, considering important aspects of the problem, or engaging in formal rulemaking.  *See* Dkt. 64 at 5-13.  The interests Plaintiffs seek to protect are within the zone of interests of § 1231, *see Campos*, 62 F.3d at 314, but also the INA generally.  *See Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015) (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012) ("The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[] many of the consequences of unlawful immigration.").  Plaintiffs are well within the zone of interest for all claims.

### D.   The Interim Guidance Is A Final Agency Action

The interim guidance is "final agency action."  5 U.S.C. § 704.  The interim guidance is final because it is in effect.  Defendants cannot evade APA review by attaching misnomers such as "structure" to their new policy.  *See* Dkt. 59 at 16.  As discussed previously, the interim guidance was a significant change in policy that has plummeted removals to historic lows since February.  *See* Dkt. 64 at 2-3 (citing AR_AZ_004670, AR_AZ_00004673 (chart)).  The possibility that DHS may supersede it with another final agency action down the line does not insulate it from review.  *See Sackett v. EPA*, 566 U.S. 120, 127 (2012).

Defendants incorrectly claim that the interim guidance merely "shift[s] agency priorities," Dkt. 59 at 16, and therefore does not affect any legal rights or benefits. Even if the interim guidance confers some discretion on its face, the record show that it effectively abdicates DHS's statutory obligation to remove aliens within 90 days. *See Lema v. INS*, 341 F.3d 853, 855 (9th Cir. 2003); AR_AZ_00004673. It also reverses the statutory presumption in favor of removal and forces ICE to seek approval from high-level officials to carry out its most routine statutory functions. *See Lema,* 341 F.3d at 855. DHS's abdication of its statutory duty also has significant legal consequences for those with final orders of removal who are detained. *See Zadvydas*, 533 U.S. at 683-84; *id.* at 701 (discussing 8 U.S.C. § 1231(a)(6)). Additionally, as discussed in section II(c), *supra*, the interim guidance also affects the obligations of the States. *See, e.g.*, *Campos*, 62 F.3d at 314; *Prieto*, 913 F.2d at 1165; 8 U.S.C. § 1231(i).

## III.   The Court Has Jurisdiction to Consider the APA Claims, And Consider Defendants' Admissions in the MOUs As Part of Adjudicating those APA Claims

Plaintiffs' MOU claims do not implicate sovereign immunity because Plaintiffs do not seek specific performance of the MOUs and are not alleging a breach of contract triggering the Tucker Act or Little Tucker Act. *See* Dkt. 64 at 13-14. Plaintiffs merely seek a negative injunction in line with the normal remedies for unlawful agency action under the APA. *See* 5 U.S.C. § 706. The MOUs establish that DHS changed its removal policy and did not follow proper procedure in doing so. The consultation provisions are analogous to the APA's notice-and-comment and reasoned-decisionmaking requirements. They also served as notice to and recognition by the agency that any change in immigration policy would cause irreparable harm to Plaintiffs. The MOUs do not bind the agency to any particular policy options, but rather to engaging in consultation prior to a change in policy. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (requiring an agency "to follow [its] own procedures . . . . even where the internal procedures are possibly more rigorous than otherwise would be required"); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 717 (8th Cir. 1979) ("Failure of the [agency] to make any real

attempt to comply with its own policy of consultation ... violates those general principles which govern administrative decisionmaking.").

**IV.    The Court Should Not Dismiss Any Part of This Case As Moot.**

Plaintiffs are no longer challenging the January 20 Memorandum itself but rather the Interim Guidance that was issued pursuant to that Memorandum and improperly expanded to cover Removals.  To the extent that the Interim Guidance, which is still in effect, relies in any way on the January 20 Memorandum, which it expressly does, then it is still part of a live case or controversy—as illustrated by today's filings.  *See* Dkt. 69 at 3 (acknowledging "[t]he ICE Memo Catalogs the three presumed priority groups identified in the DHS Memo, and clarifies and expands on those categories."); *id.* at 14 (relying on the DHS Memo as the basis why the Interim Guidance is not arbitrary and capricious).  Each of the Amended Complaint's counts challenge the January 20 Memorandum and Interim Guidance as a pair, which is factually accurate if the allegations in the complaint are taken as true, because the application of the Interim Guidance to removals carried forward "priorities" stemming from the Memorandum.

Indeed, Section B of the January 20 Memorandum says that the "interim enforcement priorities shall go into effect on February 1, 2021 and remain in effect until superseded by revised priorities developed in connection with the review directed in section A."  That review has not yet completed.  It would therefore be premature and contrary to common sense to declare the Memorandum moot when the Interim guidance is still in effect and being litigated, partially on the basis that it stems from the Memorandum.

**V.    Plaintiffs Should Be Granted Leave to Amend If The Court Grants Dismissal**

Finally, if the Court does grant any part of Defendants' motion to dismiss, such dismissal should be with leave to amend.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.  If it is granted, Plaintiffs should be given leave to amend.

RESPECTFULLY SUBMITTED this 13th day of May, 2021.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By /s/ *Anthony R. Napolitano* _____
   Joseph A. Kanefield (No. 15838)
   Brunn W. Roysden III (No. 28698)
   Drew C. Ensign (No. 25463)
   Anthony R. Napolitano (No. 34586)
   Robert J. Makar (No. 33579)
      *Assistant Attorneys General*

*Attorneys for Plaintiffs Arizona and Arizona Attorney General Mark Brnovich*

**AUSTIN KNUDSEN**
**ATTORNEY GENERAL OF MONTANA**

/s/ *David M.S. Dewhirst (with permission)*
David M.S. Dewhirst*
   *Solicitor General*
*Pro hac vice granted*

*Attorneys for Plaintiff State of Montana*

CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2021, I electronically transmitted the attached document to the Clerk's office using CM/ECF System for filing. Notice of this filing is sent by email to all parties by operation of the Court's electronic filing system.

 /s/ *Anthony R. Napolitano*