Victoria Lopez (Bar No. 330042)
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
vlopez@acluaz.org
Telephone: (602) 650-1854
*Counsel for Amici Curiae ACLU, ACLU of Arizona, ACLU of Montana*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| State of Arizona, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>United States Department of Homeland Security, *et al.*,<br><br>    *Defendants*. | Case No. 2:21-cv-00186-SRB |

**SUPPLEMENTAL BRIEF OF AMICI CURIAE
AMERICAN CIVIL LIBERTIES UNION, ACLU OF ARIZONA, AND
ACLU OF MONTANA IN SUPPORT OF DEFENDANTS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

    I. The Guidance Is a Routine Exercise of ICE's Enforcement Discretion. ............. 2

    II. There Is Nothing Arbitrary About the Guidance. ................................................ 5

    III. Even If the Court Concludes that More Explanation Was Warranted, the Proper Remedy Would Be to Remand Without an Injunction ......................... 8

    IV. The Guidance Did Not Require Notice and Comment. ....................................... 9

    V. The Guidance Cannot Be Enjoined Based on the SAFE Agreements. .............. 11

CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) .................................................................................. 8, 9

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................................................ 3, 4

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ................................................................................................ 6

*Chief Probation Officers of Cal. v. Shalala*,
  118 F.3d 1327 (9th Cir. 1997) .............................................................................. 10, 11

*Ctr. for Auto Safety, Inc. v. NHTSA*,
  342 F. Supp. 2d 1 (D.D.C. 2004) .............................................................................. 10

*Gill v. DOJ*,
  913 F.3d 1179 (9th Cir. 2019) ................................................................................... 10

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
  920 F.2d 960 (D.C. Cir. 1990) .................................................................................... 9

*Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*,
  729 F.3d 1025 (9th Cir. 2013) ................................................................................... 10

*Mada-Luna v. Fitzpatrick*,
  813 F.2d 1006 (9th Cir. 1987) .............................................................................. 10, 11

*North Side Lumber Co. v. Block*,
  753 F.2d 1482 (9th Cir. 1985) ................................................................................... 12

*Pollinator Stewardship Council v. EPA*,
  806 F.3d 520 (9th Cir. 2015) ....................................................................................... 8

*Reno v. Am.-Arab Anti-Discr. Comm.*,
  525 U.S. 471 (1999) .................................................................................................... 5

*Russell v. United States*,
  2009 WL 4050938 (N.D. Cal. Nov. 20, 2009) .......................................................... 12

*Ryder Truck Lines, Inc. v. United States*,
  716 F.2d 1369 (11th Cir. 1983) .................................................................................. 10

*Sacora v. Thomas*,
  628 F.3d 1059 (9th Cir. 2010) .................................................................................... 10

*Texas v. United States*,
  2021 WL 723856 (S.D. Tex. Feb. 23, 2021) ............................................................ 5, 9

*Tucson Airport Auth. v. Gen. Dyn. Corp.*,
  136 F.3d 641 (9th Cir. 1998) ................................................................................ 11, 12

*United States v. Park Place Assoc., Ltd.*,
  563 F.3d 907 (9th Cir. 2009) ................................................................................ 11, 12

**Statutes**

5 U.S.C. § 553(b)(A) ....................................................................................................... 10

6 U.S.C. § 202(5) .............................................................................................................. 3

**Other Authorities**

DHS Office of Imm. Stats., *Estimates of the Unauthorized Immigrant Population*
  (Jan. 2021) ..................................................................................................................... 6

Forman Memo., Issuances of Notices to Appear (June 21, 2004) .................................... 4

ICE Directive No. 11072.1 (Jan. 10, 2018) ...................................................................... 4

Johnson Memo., Interim Guidance: Civil Immigration Enforcement
  and Removal Priorities (Feb. 18, 2021) ............................................................. passim

Kelly Memo., Enforcement of the Immigration Laws to Serve the National Interest
  (Feb. 20, 2017) ............................................................................................................. 3

Meissner Memo., Exercising Prosecutorial Discretion (Nov. 17, 2000) ................. 3, 4, 6

Morton Memo., Civil Immigration Enforcement Priorities (Mar. 2, 2011) ............. 3, 4, 6

Myers Memo., Prosecutorial and Custody Discretion (Nov. 7, 2007) ......................... 3, 4

Paul J. Ray, OIRA,
    Memo. to the Deputy Secretaries of Exec. Depts. (Aug. 31, 2020) .................................. 4

Pekoske Memo, Review of and Interim Revision to Civil Immigration Enforcement
    and Removal Policies and Priorities ............................................................... 4, 7, 9

TRAC, Latest Data: ICE Removals ................................................................................ 6

Sec. & Exch. Comm'n, Enforcement Manual 14 (Nov. 28 2017) ................................... 4

U.S. Dep't of Justice, The Attorney General's Guidelines
    for Domestic FBI Operations (2008) .............................................................................. 4

# INTRODUCTION

In their supplemental brief, Arizona and Montana ("Plaintiffs") challenge the interim enforcement priorities established by ICE's February 18, 2021 Interim Guidance ("Guidance"), Dkt. 64-1 at 2-8. *See* Supp. Br., Dkt. 61. Plaintiffs challenge the Guidance only "as applied to removals," *id.* at 5, not as applied to all other enforcement actions, *see* Guidance 3 (explaining that the Guidance applies to *all* enforcement decisions, such as whether to arrest, initiate removal proceedings, release, or grant deferred action). Amici previously filed a brief regarding the 100-day removal pause, Dkt. 27-2, and Defendants have argued that the entire case is unreviewable for various reasons, Dkt. 26 at 8-14. Amici respectfully submit this supplemental brief to address several additional reasons why Plaintiffs' new challenge to the Guidance, even assuming it is reviewable in the first place, must fail.

Plaintiffs' central claim is that ICE's enforcement priorities are arbitrary and capricious. To the contrary, the Guidance is a routine exercise of ICE's enforcement discretion. For decades, in every administration, ICE and its predecessors have used similar policies to establish enforcement priorities. And all administrations have declined to execute certain removal orders, with the Supreme Court's explicit approval.

Plaintiffs present no basis to upset these established practices. Plaintiffs complain that removal numbers have changed, but nothing obligates ICE to remove any set number of people each month. Plaintiffs also suggest that the Guidance's invocation of resource limitations is pretextual, but it is obvious that ICE can only pursue a tiny percentage of the millions of people who are potentially removable. Meanwhile Plaintiffs ignore the many

other rationales stated in the Guidance. And they misread both the Guidance and the record when they claim that the Guidance bars large categories of enforcement.

In any event, even if the Court determines that ICE should have offered more explanation for its interim priorities, the proper remedy would be to remand to ICE for further explanation without enjoining the policy. Remand without vacatur is clearly appropriate here because the agency could fill out its explanation on remand, and an injunction would seriously disrupt the agency's operations.

Plaintiffs' notice-and-comment claim must also fail. ICE's priority policies *never* go through notice and comment, nor do those of other agencies. Courts have uniformly concluded that these policies are not subject to notice and comment where they leave the agency free to exercise discretion in individual cases.

Finally, as explained in earlier briefing, Plaintiffs' contract claim fails for a host of reasons, most of which Plaintiffs do not address. They respond to one defect, suggesting that Congress has waived sovereign immunity for claims seeking to enjoin agency action that violates a contract. But the Ninth Circuit has held squarely to the contrary.

## ARGUMENT

Even if the Court concludes that the Guidance is reviewable in the first place, Plaintiffs' claims fail on the merits.

### I. The Guidance Is a Routine Exercise of ICE's Enforcement Discretion.

Plaintiffs are challenging basic components of the immigration system—priority policies and stays of removal—that have been used for decades, across every administration.

ICE and its predecessors have consistently used policies like the Guidance to establish enforcement priorities. Every administration for decades has issued an equivalent policy identifying its priorities. *See, e.g.*, Kelly Memo., Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017), https://bit.ly/3tNxBzk; Morton Memo., Civil Immigration Enforcement Priorities (Mar. 2, 2011), https://bit.ly/31hkwC9; Myers Memo., Prosecutorial and Custody Discretion (Nov. 7, 2007), https://bit.ly/3rfw8jZ; Meissner Memo., Exercising Prosecutorial Discretion, (Nov. 17, 2000), https://bit.ly/3bp1nUC. Just like the Guidance, these typically identify priority categories, but leave field offices free to make specific enforcement decisions on a case-by-case basis. *See, e.g.*, Guidance 3, 6; Kelly Memo 4; Morton Memo 2. They never go through notice and comment.

Congress has expressly instructed ICE to issue these policies. *See* 6 U.S.C. § 202(5) (directing DHS to establish "enforcement policies and priorities"). And the Supreme Court has understood them as fundamental parts of the immigration system, which implement "the broad discretion exercised by immigration officials," who "must decide whether . . . to pursue removal at all." *Arizona v. United States*, 567 U.S. 387, 407-08, 396, 412 (2012).

These policies are generally issued for the same kinds of reasons as the Guidance. First, ICE does not have the resources to arrest, detain, and remove the millions of people who are technically removable, so it *has* to decide what subset to focus on. *See, e.g.*, Guidance 2; Morton Memo 1; Meissner Memo 4. Second, ICE often faces specific operational challenges; currently, those challenges include the COVID-19 pandemic. *See* Pekoske Memo 1, Dkt. 64-1 at 11; Meissner Memo 8 (noting fluctuations in "detention

3

space"). Third, ICE must balance enforcement with "human concerns," *Arizona*, 567 U.S. at 396, which play an important role in ICE's choice of enforcement priorities. *See* Guidance 2; Morton Memo., Exercising Prosecutorial Discretion, 4-5 (June 17, 2011), https://bit.ly/3cfLhgK; Myers Memo 1; Meissner Memo 7-8, 11. Plaintiffs have no valid claim to dictate how ICE balances these often competing considerations.

The Guidance's requirement of supervisor approval for certain actions is also standard practice. ICE frequently requires supervisors to sign off on a variety of enforcement activities. *See, e.g.*, Forman Memo., Issuances of Notices to Appear (June 21, 2004), http://bit.ly/3f6hQQb (requiring approval from Special Agent in Charge for specific enforcement actions); ICE Directive No. 11072.1 (Jan. 10, 2018), https://bit.ly/399Ixzt (approval from Special Agent in Charge or Field Office Director); Morton Memo, Mar. 2, 2011, at 3 (same); Morton Memo., Enforcement at Sensitive Locations (Oct. 24, 2011), https://bit.ly/319y3f0 (similar). Other agencies regularly do the same. *See, e.g.*, U.S. Dep't of Justice, The Attorney General's Guidelines for Domestic FBI Operations, 14-15 (2008), https://bit.ly/3vWDvQ0; Sec. & Exch. Comm'n, Enforcement Manual 14 (Nov. 28 2017), https://bit.ly/3becdfO; Paul J. Ray, OIRA, Memo. to the Deputy Secretaries of Exec. Depts., 5 (Aug. 31, 2020) (recommending that agencies require senior officials to sign off on "the initiation of investigations and enforcement actions"). The Guidance thus requires supervisors to review whether lower-priority enforcement actions "constitute[] a justified allocation" of agency resources. Guidance at 6. And the outcome of that case-by-case review is anything but foreordained: In Arizona and Montana, supervisors have approved "the majority" of requests so far. Supp. Br. 13; *see* Dkt. 64-3 at 17-18 (listing eight people

who can approve requests in Arizona and Montana); Dkt. 64-2 at 86 (describing "a streamlined, IT-based approval platform").

The Guidance is likewise a routine exercise of ICE's longstanding discretion over executing removal orders. As explained in amici's prior brief, ICE has exercised this discretion continuously for a century, during every administration. *See* Dkt. 27-2 at 6-8 (documenting extensive practice of deferring removal on humanitarian and other grounds). The Supreme Court has been clear that this is a valid exercise of ICE's deeply-rooted prosecutorial discretion. *See Reno v. Am.-Arab Anti-Discr. Comm.*, 525 U.S. 471, 483-84 (1999). And even the district court that enjoined the 100-day removal pause acknowledged that ICE has discretion to stay removals on an "individual case by case basis," *Texas v. United States*, 2021 WL 723856, *19 (S.D. Tex. Feb. 23, 2021) (italics omitted)—exactly as the Guidance provides, *see* Guidance 3, 6 (requiring all enforcement decisions to be made on an individualized basis). The Guidance, as applied to removals, fits squarely within decades of uninterrupted administrative practice.

II.     **There Is Nothing Arbitrary About the Guidance.**

Plaintiffs offer a list of complaints about the Guidance, but all of them are either irrelevant or contradicted by the record.

First, Plaintiffs criticize ICE for not "[s]ustaining th[e] level of removals" that occurred in previous months. Supp. Br. 7. But Plaintiffs do not seriously claim that ICE is required to effectuate any set number of removals per month, or that ICE must choose priorities that maximize removal numbers. Nor do Plaintiffs even attempt to show that the Guidance is solely responsible for the change in aggregate removal numbers. Removal

numbers are always changing, whether in response to the pandemic, or the situation at the border, or humanitarian needs, or any number of other factors. *See, e.g.*, Dkt. 64-3 at 19 (73% drop from January to May 2020, 44% drop from October to November 2020); TRAC, *Latest Data: ICE Removals*, https://bit.ly/2SCPl3e (multiple large fluctuations over the last decade). Plaintiffs cannot use the judiciary to dictate how many people ICE must remove.

Second, Plaintiffs remarkably claim that ICE's invocation of resource limitations as a reason for the Guidance is pretextual. Supp. Br. 1, 7-8. But they offer no real evidence of pretext. *Cf. Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575-76 (2019) (discussing "rare" and "unusual" evidence of pretext). Nor can there be any doubt that the agency must make choices regarding how to deploy its limited resources. There are *millions* of potentially removable people in the United States, and ICE can only take enforcement action against a tiny percentage each year. *See* DHS Office of Imm. Stats., *Estimates of the Unauthorized Immigrant Population* (Jan. 2021), https://bit.ly/3tGLJdA. ICE therefore *must* set priorities, as the agency has made clear for decades. *See* Morton Memo 1; Meissner Memo 4; Guidance at 2 ("ICE has always prioritized, and necessarily must prioritize, certain enforcement and removal actions over others.").

Plaintiffs argue that decreases in removal numbers undermine ICE's resource concerns. Supp. Br. 1. But some enforcement actions take more resources than others, so changes in overall removal numbers do not alter the reality that ICE faces resource constraints. And more importantly, Plaintiffs ignore the Guidance's many *other* rationales, which also impact removal numbers. Supp. Br. 1 (calling resource limitations the "sole" justification). ICE has explained that in addition to resource limitations, its priorities are

informed by health and safety concerns "during the current COVID-19 pandemic," the need to ensure that people can pursue available "relief from removal under the immigration laws," "litigation in various fora," and constraints placed by other countries' "laws and expectations." Guidance 2; *see also* Pekoske Memo 1 (explaining need to "surge resources to the border"). Plaintiffs do not deny that these are valid bases to exercise prosecutorial discretion or divert resources to other tasks. They simply ignore these other reasons.

Third, Plaintiffs assert that the Guidance "preclud[es]" enforcement actions that fall outside of its main priorities. Supp. Br. 1. The record forecloses this argument. The Guidance makes crystal clear that it does not "prohibit the arrest, detention, or removal of *any* noncitizen," and it provides a process to approve enforcement "that falls outside" the priorities. Guidance 3, 6 (emphasis added); *see* Dkt. 64-2 at 83-84 (ICE FAQs stating the same). And Plaintiffs admit that ICE is actively approving requests for enforcement outside the priorities. Supp. Br. 12-13. Even if ICE did require officers to stick to set priorities, there would be nothing improper about that. But here it could not be clearer that ICE has not imposed any categorical bars.

Plaintiffs cite isolated cases in which supervisors did not approve particular removals that fell outside the priorities. Supp. Br. 7, 10. But individual decisions hardly demonstrate a categorical bar. Plaintiffs do not suggest that ICE lacked valid reasons for deferring these particular removals—for instance, the individuals may have still been pursuing relief from removal. Dkt. 64-2 at 6-7, 30. And, critically, the cases Plaintiffs cite came *before* February 18 when ICE issued the current Guidance, which established a new process for approving enforcement outside the priorities. So even the few cases Plaintiffs

cherry-pick are not traceable to the February 18 Guidance they now challenge.

Finally, Plaintiffs repeatedly complain that ICE has received letters from lawyers and advocates. Supp. Br. 1, 6, 7, 10 (ICE received "no fewer than four different letters from advocacy groups"). Agencies receive such letters all the time, and there is nothing improper about that fact. Plaintiffs try to portray ICE's internal guidance regarding the priorities as a "politicized process," Supp. Br. 2-3, 6, but their complaints are remarkably thin. Four times, they criticize an ICE official for sending an email at "midnight." *Id.* at 1, 3, 6, 7. They suggest that ICE clarified the priorities' application to removals hours after receiving a letter from advocates. *Id.* This appears to misstate the facts, because the letter was received on February 1, but the clarification came on February 4. *Id.* at 3. At any rate, there would be nothing strange about an agency receiving information from the public and acting accordingly. Nor is there anything remarkable about an agency refining its guidance over the course of several days, particularly in the first days of a new administration and in connection with related litigation.

### III. Even If the Court Concludes that More Explanation Was Warranted, the Proper Remedy Would Be to Remand Without an Injunction.

No injunction is appropriate here even if the Court concludes that ICE failed to sufficiently explain the Guidance's stated rationales. Rather, when there is "at least a serious possibility that the agency would be able to substantiate its decision on remand," and when an injunction would impose "disruptive consequences," remand without vacatur is the proper remedy. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51

(D.C. Cir. 1993)). Courts "commonly remand[] without vacating an agency's rule or order where the failure lay in lack of reasoned decision making" that could be fixed on remand. *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966–67 (D.C. Cir. 1990). Even the district court that enjoined the 100-day pause acknowledged that such a failure to explain would not itself be sufficient to justify an injunction, because "the proper remedy" in that instance "is to remand the matter back to the agency." *Texas*, 2021 WL 723856, at *42 n.47.

Both factors are clearly present here. There is at the very least "a serious possibility" that ICE could offer further explanation on remand. *Allied-Signal*, 988 F.2d at 150-51. The Guidance rests on a number of rationales, including limited resources, the pandemic, the border situation, humanitarian concerns, and foreign policy constraints. *See* Guidance 2; Pekoske Memo at 1. If the Court thought more explanation was necessary, it is very likely the agency could provide it. And an injunction would be highly "disruptive," as it would leave ICE officers without *any* priorities to guide their enforcement, *see* Pekoske Memo 5 (rescinding previous priority policy), and would hamper ICE's efforts to channel resources to the areas of highest need. Thus, even if the Court remands for further explanation, it should leave the Guidance in place.

**IV.    The Guidance Did Not Require Notice and Comment.**

As mentioned, ICE and other agencies consistently use policies like the Guidance to set enforcement priorities. These policies *never* go through notice and comment. None of ICE's policies ever have, nor do similar policies at other agencies. Plaintiffs' notice-and-comment claim would cause a sea change in administrative practice.

It is well established that these policies do not require notice and comment. Under the APA, legislative rules require notice and comment, but "general statements of policy" do not. 5 U.S.C. § 553(b)(A). And "courts have uniformly construed enforcement guidelines as policy statements." *Ctr. for Auto Safety, Inc. v. NHTSA*, 342 F. Supp. 2d 1, 20 (D.D.C. 2004), *aff'd*, 452 F.3d 798 (D.C. Cir. 2006) (collecting cases upholding policies that established priorities but allowed officials to deviate in individual cases).

The Ninth Circuit is no exception. In *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006 (9th Cir. 1987), the Court rejected a notice-and-comment challenge to the INS's "enforcement priority" policy, *id.* at 1009 n.2, because the policy left immigration officials "'free to consider the individual facts' in each case," *id.* at 1014, 1017 (quoting *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1377 (11th Cir. 1983)). The Ninth Circuit has upheld numerous guidance policies for the same reason. *See, e.g., Gill v. DOJ*, 913 F.3d 1179, 1186 (9th Cir. 2019) (policy "allows analysts to exercise discretion"); *Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025, 1039 (9th Cir. 2013) (same); *Sacora v. Thomas*, 628 F.3d 1059, 1070 (9th Cir. 2010) (same). The exact same is true of the Guidance, which leaves officials free to make individualized decisions based on "all relevant facts and circumstances" of each case. Guidance at 3, 6.

Plaintiffs maintain that notice and comment was required because of the Guidance's "impact" on aggregate removal numbers. Supp. Br. 12, 13. But the Ninth Circuit has "expressly rejected the argument that, for purposes of imposing notice-and-comment requirements[,] . . . courts should look to the 'substantial impact' of the rule." *Mada-Luna*, 813 F.3d at 1016 & n.11 (cleaned up); *see Chief Probation Officers of Cal. v. Shalala*, 118

F.3d 1327, 1335 (9th Cir. 1997). Nor does it matter whether a policy changes "the likelihood" of particular enforcement actions, as long as it preserves individual-case discretion. *Mada Luna*, 813 F.3d at 1016.

### V. The Guidance Cannot Be Enjoined Based on the SAFE Agreements.

Plaintiffs renew their effort to enforce their so-called "SAFE Agreements," in which an outgoing DHS official purported to promise that the recently elected incoming administration would be unable to change any immigration policies for six months without Plaintiffs' consent. As amici have explained, this contract is unenforceable, invalid, and unconstitutional. Dkt. 27-2 at 9-13. And as other amici have explained, the outgoing official lacked authority to sign the Agreements for DHS. Dkt. 63 (explaining that his appointment was invalid).

Plaintiffs do not dispute that sovereign immunity bars claims for specific performance of a contract. *Tucson Airport Auth. v. Gen. Dyn. Corp.*, 136 F.3d 641, 646 (9th Cir. 1998). Instead, they claim that they can seek "a negative injunction" under the APA to enforce their contract. Supp. Br. 14. The Ninth Circuit has foreclosed such attempts to repackage contract claims as APA claims. There is no waiver of sovereign immunity for claims seeking *any* "declaratory and injunctive relief"—specific performance or otherwise—to enforce "contractually-based" rights. *Tucson Airport*, 136 F.3d at 646. In other words, there is no waiver where a contract provides "the source of the rights upon which the plaintiff bases its claim." *United States v. Park Place Assoc., Ltd.*, 563 F.3d 907, 931 (9th Cir. 2009) (quotation marks omitted). And there is no question that the Agreement is "the source" of Plaintiffs' claimed right to "consult" for six months "prior to any change

in policy." Supp. Br. 14. The Ninth Circuit has repeatedly rejected claims on exactly this basis, even where plaintiffs claimed that they were only seeking relief under the APA. *See, e.g., North Side Lumber Co. v. Block*, 753 F.2d 1482, 1486 (9th Cir. 1985) (rejecting supposed APA claim because it sought to enforce "rights created within the contractual relationship"); *Tucson Airport*, 136 F.3d at 647 (no APA waiver of immunity because the asserted "duty, if it exists, derives from the contract"); *Park Place*, 563 F.3d at 931 (same because claim "does not exist independent of the contract") (cleaned up); *Russell v. United States*, 2009 WL 4050938, *9 (N.D. Cal. Nov. 20, 2009) (same).

In any event, Plaintiffs have never responded to amici's arguments that the Agreements are invalid under the reserved powers doctrine, Dkt. 27-2 at 10-11, or that they are unconstitutional, *id.* at 12-13. See PI Reply, Dkt. 38 at 14 (no defense of agreement's substantive legality); Supp. Br. 13-15 (same). Plaintiffs' inability to defend them is telling. The Agreements, a transparent attempt to hobble an incoming administration days before the transition, are incompatible with democracy and should be forcefully rejected.

## CONCLUSION

The motion for preliminary injunction should be denied.

Dated: May 13, 2021

Cody Wofsy*
Spencer E. Amdur*
AMERICAN CIVIL LIBERTIES UNION
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-1198
cwofsy@aclu.org
samdur@aclu.org

Alex Rate*
ACLU OF MONTANA
FOUNDATION, INC.
P.O. Box 1968
Missoula, MT 59806
Telephone: (406) 224-1447
ratea@aclumontana.org

Respectfully submitted,

/s/ *Victoria Lopez*
Victoria Lopez** (AZ 330042)
ACLU FOUNDATION OF ARIZONA
P.O. Box 17148
Phoenix, AZ 85011
Telephone: (602) 650-1854
vlopez@acluaz.org

Noor Zafar*
Omar C. Jadwat
Michael K.T. Tan
Anand Balakrishnan
David Chen
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, IMMIGRANTS' RIGHTS
PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600
nzafar@aclu.org
ojadwat@aclu.org
mtan@aclu.org
abalakrishnan@aclu.org
dchen@aclu.org

*admitted pro hac vice
**admitted pursuant to Ariz. Sup. Ct. R. 38(f)

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2021, I electronically filed the foregoing with the Clerk of the Court by using the District Court CM/ECF system. A true and correct copy of this brief has been served via the Court's CM/ECF system on all counsel of record.

/s/ *Victoria Lopez*
Victoria Lopez