MICHAEL RYAN WILLIAMS, ESQ.
3636 North Central Avenue, Suite 560
Phoenix, Arizona 85012
State Bar No. 029703
m.ryan.williams@gmail.com
(602) 740-0321

*Lead Counsel for Amicus IRLI*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| State of Arizona, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> United States Department of Homeland Security, *et al.*, <br><br> Defendants | Case No.: 2:21-cv-00186-SRB |

**MEMORANDUM OF LAW OF IMMIGRATION REFORM LAW INSTITUTE AS *AMICUS CURIAE* IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

CHRISTOPHER J. HAJEC
MATT A. CRAPO
Immigration Law Reform Institute
25 Massachusetts Ave., NW, Ste. 335
Washington, DC  20001
Tel: 202-232-5590
Fax: 202-464-3590
Email: chajec@irli.org
Email: matt.crapo@pm.me

*On the Brief*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 2

I.     Plaintiffs Have Standing .......................................................................................... 2

II.    The Interim Guidance is Reviewable ...................................................................... 7

CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. Richardson*,
  480 F.2d 1159 (D.C. Cir. 1973) .................................................................................. 5, 11

*Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*,
  458 U.S. 592 (1982) ............................................................................................................ 3

*Arizona v. United States*,
  567 U.S. 387 (2012) ......................................................................................................... 4, 5

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ............................................................................................................ 9

*Campos v. INS*,
  62 F.3d 311 (9th Cir. 1995) ........................................................................................ 10, 11

*City & Cty. of San Francisco v. USCIS.*,
  981 F.3d 742 (9th Cir. 2020) ............................................................................................ 11

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) .......................................................................................................... 11

*Corley v. United States*,
  556 U.S. 303 (2009) ............................................................................................................ 7

*Demore v. Kim*,
  538 U.S. 510 (2003) ......................................................................................................... 3, 4

*Galvan v. Press*,
  347 U.S. 522 (1954) ............................................................................................................ 4

*Garcia v. Taylor*,
  40 F.3d 299 (9th Cir. 1994) ................................................................................................ 9

*Heckler v. Chaney*,
  470 U.S. 821 (1985) .................................................................................................. 5, 7, 11

*In re Aiken Cty.*,
  725 F.3d 255 (D.C. Cir. 2013) ........................................................................................... 7

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
   523 U.S. 26 (1998) .................................................................................................. 8

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................ 3, 7

*Maine Cmty. Health Options v. United States*,
   140 S. Ct. 1308 (2020) ........................................................................................... 8

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ............................................................................................... 4

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ............................................................................................. 11

*Mont. Shooting Sports Ass'n v. Holder*,
   727 F.3d 975 (9th Cir. 2013) .................................................................................. 3

*Sierra Forest Legacy v. Sherman*,
   646 F.3d 1161 (9th Cir. 2011) ................................................................................ 2

*Silveyra v. Moschorak*,
   989 F.2d 1012 (9th Cir. 1993) .............................................................................. 11

*Soler v. Scott*,
   942 F.2d 597 (9th Cir. 1991) .................................................................................. 9

*Texas v. United States*,
   2021 U.S. Dist. LEXIS 33890, 2021 WL 723856 (S.D. Tex. 2021) .............. 8, 9, 10

*Texas v. United States*,
   86 F. Supp. 3d 591 (S.D. Tex. 2015) .............................................................. 2, 4, 5

*Washington Utilities & Transp. Comm'n v. FCC*,
   513 F.2d 1142 (9th Cir. 1975) ................................................................................ 2

*WildEarth Guardians v. United States DOJ*,
   181 F. Supp. 3d 651 (D. Ariz. 2015) ...................................................................... 7

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ............................................................................................... 3

## CONSTITUTION AND STATUTES

5 U.S.C. § 701(a)(2) .................................................................................................................. 8

6 U.S.C. § 251 ........................................................................................................................... 8

6 U.S.C. § 557 ........................................................................................................................... 8

8 U.S.C. § 1182(a)(2) ................................................................................................................ 8

8 U.S.C. § 1182(a)(3)(B) ........................................................................................................... 8

8 U.S.C. § 1227(a)(2) ................................................................................................................ 8

8 U.S.C. § 1227(a)(4)(B) ........................................................................................................... 8

8 U.S.C. § 1231 .................................................................................................................... 7, 11

8 U.S.C. § 1231(a)(1)(A) .................................................................................................. 7, 8, 9

8 U.S.C. § 1231(a)(2) ................................................................................................................ 8

8 U.S.C. § 1231(h) ......................................................................................................... 9, 10, 11

8 U.S.C. § 1252(a)(5) ................................................................................................................ 9

8 U.S.C. § 1252(b)(9) ................................................................................................................ 9

8 U.S.C. § 1252(i) (repealed 1996) ..................................................................................... 9, 10

Immigration and Nationality Technical Corrections Act of 1994,
  § 225, Pub. L. No. 103-416, 108 Stat. 4305 ("INTCA") ......................................... 9, 10

Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"),
  § 305, Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996) ........................................ 9

IIRIRA,
  § 306 ................................................................................................................................ 9

U.S. CONST. art. II, §3 ............................................................................................................... 5

**MISCELLANEOUS**

104 Cong. Rec. 28441 (1994) .......................................................................................... 10

Executive Order 13993, *Revision of Civil Immigration Enforcement Policies and Priorities*, 86 Fed. Reg. 7051 (Jan. 25, 2021) ...................................................................... 1

H.R. REP. NO. 104-828 (Conf. Rep.) (1996) ........................................................................ 1

Proclamation 10142, *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7225 (Jan. 27, 2021) ....................................................... 1

## **INTRODUCTION**

On his first day in office, President Biden immediately began dismantling programs and policies designed to secure the nation's borders and enforce the Immigration and Nationality Act ("INA"). For example, President Biden issued Executive Order 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021), revising immigration enforcement priorities, and Proclamation 10142, 86 Fed. Reg. 7225 (Jan. 27, 2021), terminating border wall construction. In addition, the Department of Homeland Security ("DHS") announced the termination of the Migrant Protection Protocols ("MPP") program, otherwise known as the "Remain in Mexico" policy. *See* DHS Press Release: DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program, available at: https://www.dhs.gov/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program (last visited May 17, 2021). DHS also issued a memorandum entitled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities," dated January 20, 2021 (the "January Memo"), in which it announced an immediate 100-day pause of all removals and extremely narrow immigration enforcement priorities. *See* Exhibit ("Ex.") A attached to the Amended Complaint, Dkt. No. 12-1.

On February 18, 2021, the Acting Director of Immigration and Customs Enforcement ("ICE") issued an interim guidance memorandum in support of the January Memo. ("February Memo"). Ex. G, Dkt. No. 12-1. This memorandum largely reiterated the enforcement priorities set forth in the January 20 Memo. Ex. G at 4-5. Although the February 18 Memo stressed that "the interim priorities do not require or prohibit the arrest, detention, or removal of any noncitizen," *id.* at 3, it requires an immigration officer to make a written justification for a proposed enforcement action and to receive preapproval from a Field Office Director or Special Agent in Charge before the officer may take an enforcement action against a non-priority alien. *See id.* at 6. Thus, prior to the issuance of the February Memo, an immigration officer had the authority conferred by the INA and the implementing regulations to take enforcement actions against any

individual who is present in the United States in violation of the immigration laws. After the issuance of the February Memo, however, an immigration officer must seek permission from a supervisor in writing before enforcing the law. These actions signaled to potential border crossers that the government was no longer acting to secure our border and resulted in the ongoing surge of migrants at the southern border.

Collectively, these government actions since January 20, 2021, reflect a conscious decision to cease effective immigration enforcement policies and pursue a policy of non-enforcement going forward. This case arises in the context of the executive branch's ongoing abdication of its duty to enforce the nation's immigration laws.

## ARGUMENT

**I.   Plaintiffs Have Standing**

*Amicus* Immigration Reform Law Institute ("IRLI") addressed the Plaintiffs' standing in its memorandum of law filed in support of Plaintiffs' motion for a preliminary injunction. *See* Dkt. No. 23. Those arguments will not be repeated here; instead, IRLI will address only issues raised by Defendants' motion to dismiss.

Defendants assert that Plaintiffs' alleged injuries that are borne by its respective citizens are "legally insufficient" to confer standing because a State cannot invoke *parens patriae* standing in a suit against the federal government. Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Defendants' MTD") at 7 (citing *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011)). Defendants' argument is misplaced.

Although States are generally precluded from advancing a *parens patriae* claim against the federal government, such claims may be raised in federal court where, as here, Plaintiff States "rel[y] upon [a] federal statute, and seek[] to vindicate the congressional will by preventing what [they] assert[] to be a violation of that statute by the administrative agency charged with its enforcement." *Washington Utilities & Transp. Comm'n v. FCC*, 513 F.2d 1142, 1153 (9th Cir. 1975).  Plaintiffs are not "bringing suit to protect their citizens from the operation of a federal statute," but rather "are bringing suit to enforce the rights guaranteed by a federal statute." *Texas v. United States*, 86 F. Supp.

3d 591, 626 (S.D. Tex. 2015). That is, Plaintiffs are suing to compel the government to enforce the federal immigration statutes passed by Congress and to prevent the implementation of a policy that undermines those laws. In these circumstances, a claim based on a *parens patriae* theory is legally sufficient to establish standing.[1]

In any event, Plaintiffs have established sufficient direct injuries to establish standing. *See* Plaintiffs' Response to Defendants' Motion to Dismiss ("Plaintiffs' Response") at 2-6.  Under Circuit precedent, the economic injuries incurred directly by the State of Arizona suffice for an Article III case or controversy. *Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 979 (9th Cir. 2013) ("Economic injury caused by a proscriptive statute is sufficient for standing to challenge that statute.") (citation omitted).

Defendants also argue that any injuries sustained by Plaintiffs are not traceable to the interim enforcement guidelines because the injuries are the result of independent third-party actions. Defendants' MTD at 8-9. As Plaintiffs point out, however, the interim enforcement guidelines determine whether criminal aliens remain in custody pending removal and whether they are removed. Plaintiffs' Response at 6-7. Therefore, Plaintiffs' alleged injuries are not the result of "unfettered choices made by independent actors" as Defendants contend. Defendants' MTD at 9 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)).

Even if Plaintiffs' injuries were deemed to be the result of third-party actions, the increase in criminal activity attributable to Defendants' failure to detain criminal aliens is sufficient to establish standing. The Supreme Court has recognized that "deportable criminal aliens who remained in the United States often committed more crimes before being removed." *Demore v. Kim*, 538 U.S. 510, 518 (2003); *see also Zadvydas v. Davis*, 533 U.S. 678, 713 (2001) (Kennedy, J., dissenting) (discussing "statistical studies showing high recidivism rates for released aliens"). Indeed, the high rate of recidivism

---

[1] There is little question that Plaintiff States have a requisite quasi-sovereign interest "in the health and well-being—both physical and economic—of its residents" necessary for *parens patriae* standing. *Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez*, 458 U.S. 592, 601 (1982).

3

among criminal aliens is why Congress mandated their detention. *See Demore*, 538 U.S. at 525 n.9 (noting that Congress considered previous criminal convictions "relevant to future dangerousness"). Congress mandated detention of criminal aliens "against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens." *Id.* at 518. Before mandating detention of criminal aliens, Congress considered evidence "that, after criminal aliens were identified as deportable, 77% were arrested at least once more and 45%—nearly half—were arrested multiple times before their deportation proceedings even began." *Id.*

In addition, the Court should evaluate standing in the context of Defendants' abdication of its duty to enforce the immigration laws. *See* Plaintiffs' Response at 8-11, 16 (noting that the interim guidance "effectively abdicates DHS's statutory obligation to remove aliens within 90 days"). As the Supreme Court has explained, the "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). While the average citizen cannot establish standing to compel the federal government to enforce the law, courts have recognized that there are certain situations in which the States may challenge government inaction. Abdication standing exists

> when the federal government asserts sole authority over a certain area of American life and excludes any authority or regulation by a [S]tate; yet subsequently refuses to act in that area. Due to this refusal to act in a realm where other governmental entities are barred from interfering, a [S]tate has standing to bring suit to protect itself and the interests of its citizens.

*Texas v. United States*, 86 F. Supp. 3d 591, 636 (S.D. Tex. 2015).

The first element—total control to the exclusion of others—is well established. Although States and localities bear many of the consequences of illegal immigration, federal law regulating immigration largely preempts any State or local laws aimed at addressing those consequences. *See Arizona v. United States*, 567 U.S. 387, 397 (2012) (acknowledging that States bear consequences of unlawful immigration); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right

to remain here are . . . entrusted exclusively to Congress . . . ."). Not only are States and localities prevented from legislating with respect to immigration, State officials are largely prevented from enforcing federal immigration laws. *See Arizona*, 567 U.S. at 407-10 (describing the limited circumstances in which State officers may perform the functions of an immigration officer). Thus, States are powerless to address the consequences of illegal immigration if the federal government refuses to enforce the immigration laws.

The second element—the federal government's refusal to act—is established by showing the executive branch has intentionally abandoned its constitutional duty to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, §3; *see also Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (explaining that a State has standing where a federal agency "has consciously and expressly adopted a general policy which is in effect an abdication of its statutory duty"); *Heckler v. Chaney*, 470 U.S. 821, 833 (1985) (explaining that "Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers."); *Texas v. United States*, 86 F. Supp. 3d 591, 639 (S.D. Tex. 2015) ("[S]tanding under a theory of abdication requires only that the Government declines to enforce the law.").

Here, the interim guidance is remarkable in how narrowly it defines enforcement priorities, and reflects the government's conscious decision not to enforce the law against the vast majority of aliens. The only aliens identified as enforcement priorities under the interim guidance consist of:  1) terrorists, spies, or other national security risks; 2) recent arrivals (defined as those aliens who enter or attempt to enter the United States on or after November, 1, 2020); and 3) aggravated felons or criminal gang members who pose a risk to public safety. Ex. G at 4-5, Dkt. No. 12-1. The February Memo permits immigration officers to exercise their discretion in taking enforcement actions against aliens who fall within one of the three priority categories, but requires preapproval by a Field Office Director or Special Agent in Charge before any enforcement action may be taken against an alien who falls outside those priority categories. *Id.* at 5-6. By limiting enforcement

priorities to terrorists, spies, aggravated felons, and gang members, the government is consciously refusing to enforce the law against the vast majority of aliens unlawfully present in the United States.

According to the government's own data, criminal aliens constituted approximately 90 percent of all interior removals initiated by ICE before the adoption of the interim guidance.[2] According to one study, only 15 percent of the interior removals in fiscal year 2018 were classified as aggravated felons. *See* Center for Immigration Studies, Biden Freezes ICE; Suspends 85% of Criminal Alien Deportations, available at: https://cis.org/Vaughan/Biden-Freezes-ICE-Suspends-85-Criminal-Alien-Deportations (last visited May 17, 2021). Terrorists and gang-related aliens comprise even a smaller fraction of those ordered removed. Aliens who are known or suspected gang members make up approximately two percent of total removals. *See* 2020 ICE Report at 19, 21 (compare Figures 19 and 21, depicting total ICE removals and ICE removals of gang members, respectively). The number of terrorist removals is relatively small. *See id.* at 23 (Figure 22, showing that between 31 and 58 terrorists were removed during the past three years). Thus, following the adoption of the interim guidance, about 85 percent of the criminal aliens who normally would be removed will no longer be subject to enforcement action by ICE. This dramatic reduction in removals is reflected in the evidence cited by Plaintiffs. *See* Plaintiffs' Response at 2, 10, 15 (citing Dkt. 61 at 3, Ex. BB at 5, Dkt. 64 at 2-3).

The government traditionally defends such claims by asserting the agency's authority to exercise prosecutorial discretion. The refusal to pursue criminal charges on a case-by-case basis, however, is not the same as the refusal to follow legitimate statutory

---

[2] In fiscal year 2020, "90 percent of ICE ERO's administrative arrests were for aliens with criminal convictions or pending criminal charges while the remaining 10 percent were other immigration violators." U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, Fiscal Year 2020 Enforcement and Removal Operations Report ("2020 ICE Report") at 13, available at: https://www.ice.gov/doclib/news/library/reports/annual-report/eroReportFY2020.pdf, (last visited May 17, 2021). In fiscal year 2018, criminal aliens constituted 87 percent of all ICE interior removals. *See id.* at 14 (Figure 9).

commands and final orders of removal. *See Heckler v. Chaney*, 470 U.S. 821, 847 (1985) ("[A]rguments about prosecutorial discretion do not necessarily translate into the context of agency refusals to act."); *In re Aiken Cty.*, 725 F.3d 255, 266 (D.C. Cir. 2013) ("Prosecutorial discretion encompasses the discretion not to enforce a law against private parties; it does not encompass the discretion not to *follow* a law imposing a mandate or prohibition on the Executive Branch.") (emphasis in original); *WildEarth Guardians v. United States DOJ*, 181 F. Supp. 3d 651, 665 (D. Ariz. 2015) (stating that prosecutorial discretion "does not encompass discretion to not follow a law imposing a mandate or prohibition on the Executive Branch").

Finally, insofar as Plaintiffs allege procedural violations, the bar for Article III standing is lowered. "The history of liberty has largely been the history of observance of procedural safeguards," *Corley v. United States*, 556 U.S. 303, 321 (2009) (internal quotation marks omitted), and "procedural rights are special," *Lujan*, 504 U.S. at 572 n.7 (internal quotation marks omitted). For procedural injuries, Article III's redressability and immediacy requirements apply to the present procedural violation (which may someday injure a concrete interest) rather than to a concrete future injury. *Lujan*, 504 U.S. at 571-72 & n.7. Plaintiffs' allegations of procedural-rights violations thus undercut the potential claim that they lack a sufficiently immediate injury.

## II.     The Interim Guidance is Reviewable

Defendants argue that the Court lacks jurisdiction to review Plaintiffs' challenges to the interim guidance because the enforcement priorities established by the interim guidance are committed to agency discretion by law. Defendants' MTD at 10-12. As Plaintiffs argue in response, 8 U.S.C. § 1231(a)(1)(A) provides sufficient guidelines to constrain the agency's discretion not to take enforcement action. Plaintiffs' Response at 8-9.

As Plaintiffs observe, *see* Plaintiffs' Response at 9, 8 U.S.C. § 1231 mandates the removal of all aliens with a final removal order within 90 days of when that order becomes final. 8 U.S.C. § 1231(a)(1)(A) ("Except as otherwise provided in this section,

when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period').").[3] By its terms, the statute applies to every alien who is issued a removal order, and 8 U.S.C. § 1231(a)(1)(A) commands the removal of every such alien. Courts routinely interpret "shall" as creating a mandatory duty. *See*, *e.g.*, *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."); *see also Texas v. United States*, 2021 U.S. Dist. LEXIS 33890 at *92-106 (S.D. Tex. 2021) (determining that "shall" in section 1231(a)(1)(A) means "must").

Congress not only mandates the removal of every alien with a final removal order, but further constrains the government's discretion by requiring the detention of every alien during the 90-day removal period. 8 U.S.C. § 1231(a)(2) ("During the removal period, the Attorney General shall detain the alien."). Congress even further limits the government's discretion with respect to criminal and terrorist aliens. "*Under no circumstance* during the removal period shall the Attorney General release an alien who has been found inadmissible under section 1182(a)(2) or 1182(a)(3)(B) of this title or deportable under section 1227(a)(2) or 1227(a)(4)(B) of this title." 8 U.S.C. § 1231(a)(2) (emphasis added).[4]

Thus, Congress uses mandatory language to compel the removal and detention of every alien who is issued a final removal order. Whether to enforce this statute can hardly be said to be a choice committed to the agency's discretion by law. 5 U.S.C. § 701(a)(2). Because the statute constrains the agency's discretion and provides ample guidance to

---

[3] Although section 1231 refers to the Attorney General, the detention and removal authority has been transferred to the Secretary of Homeland Security. *See* 6 U.S.C. §§ 251, 557.

[4] Sections 1182(a)(2) and 1227(a)(2) define aliens who are removable due on criminal grounds. Sections 1182(a)(3)(B) and 1227(a)(4)(B) define aliens who are removable on terrorism grounds.

8

govern judicial review, the Court should reject Defendants' argument that the interim guidance is committed to agency discretion by law.

Defendants also argue that judicial review is precluded by statute. Defendants' MTD at 13-14 (citing 8 U.S.C. §§ 1231(h), 1252(a)(5), (b)(9)). As Plaintiffs show, however, neither 8 U.S.C. § 1252(a)(5) nor (b)(9) precludes review here because Plaintiffs do not seek review of any removal order. Plaintiffs' Response at 11-13.

At first blush, 8 U.S.C. § 1231(h), might appear to preclude review of Plaintiffs' challenge insofar as they assert that the interim guidance runs afoul of 8 U.S.C. § 1231(a)(1)(A). Whether a particular statute precludes review, however, "is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). Here, the legislative history unmistakably shows that Congress enacted the language found in section 1231(h) to preclude *aliens* from compelling government action through mandamus.

The substance of section 1231(h) was originally enacted as section 225 of the Immigration and Nationality Technical Corrections Act of 1994, Pub. L. No. 103-416, 108 Stat. 4305 ("INTCA"),[5] and referred to the removal mandate at former 8 U.S.C. § 1252(i).[6] *See Texas*, 2021 U.S. Dist. LEXIS 33890 at *71-74. Prior to the enactment of § 225 of INTCA, a line of Ninth Circuit cases had held that aliens had standing under § 1252(i) to compel the INS to provide an expeditious deportation hearing by a writ of mandamus. See, *e.g.*, *Garcia v. Taylor*, 40 F.3d 299 (9th Cir. 1994); *Soler v. Scott*, 942

---

[5] Section 225 provided:

> No amendment made by this Act and nothing in § 242(i) of the Immigration and Nationality Act (8 U.S.C. § 1252(i)) shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.

INTCA § 225, 108 Stat. 4305 at 4324 (1994).

[6] Former section 1252(i) was amended and redesignated as 8 U.S.C. § 1231 by sections 305 and 306 of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (Sept. 30, 1996).

F.2d 597 (9th Cir. 1991). In the legislative history, Congress made clear that § 225 of the INTCA was designed to prohibit individual aliens from attempting to compel the government to deport them by relying on former § 1252(i)'s mandate to remove the alien "as expeditiously as possible." For instance, the Congressional Record for section 225 provides:

> Sec. 352. Construction of Expedited Deportation Requirements.
> *In response to another recent ruling by the Court of Appeals for the Ninth Circuit*, this section makes clear that the provision in the INA that requires the Attorney General to begin deportation proceedings as expeditiously as possible cannot be construed to create a legally enforceable right or benefit.

104 Cong. Rec. 28441 (1994) (emphasis added); *See also Texas*, 2021 U.S. Dist. LEXIS 33890 at *72-73 (discussing historical statutory framework and legislative history). The Ninth Circuit quickly recognized that the language now codified at 8 U.S.C. § 1231(h) was intended to preclude aliens from seeking mandamus relief in district court to effect their deportation or initiation of proceedings. *See Campos v. INS*, 62 F.3d 311, 314 (9th Cir. 1995).

Similarly, the legislative history for IIRIRA (which moved the substance of INTCA § 225 into the new section 1231(h)) expressly states that section 1231(h) is intended to prohibit litigation by aliens. The 1996 Conference Report for section 1231(h) specifically provides:

> Section 241(h) [section 1231(h)] provides that nothing in section 241 [section 1231] shall be construed to create any substantive or procedural right or benefit that is legally enforceable against the United States, its agencies or officers, or any other person. *This provision is intended, among other things, to prohibit the litigation of claims by aliens who have been ordered removed from the U.S. that they be removed at a particular time or to a particular place.*

H.R. REP. NO. 104-828 at 219 (Conf. Rep.) (1996) (emphasis added); *see also Texas*, 2021 U.S. Dist. LEXIS 33890 at *75 & n.41 (quoting the 1996 Conference Report and describing legislative history for IIRIRA).

Defendants also suggest that no one can satisfy the zone of interests test in light of 8 U.S.C. § 1231(h). Defendants' MTD at 15-16. But if no entity could fall within the

10

zone of interests regulated by the statute, "the scope of permissible immigration litigation against the government would be so narrow as to practically insulate it from many challenges to immigration policy and procedures, even those violating the Constitution or federal laws." *City & Cty. of San Francisco v. USCIS.*, 981 F.3d 742, 755 (9th Cir. 2020).

In any event, the Ninth Circuit has long recognized that the removal mandate at former 1252(i) (now at section 1231) was "enacted to avoid the high costs of extended incarceration." *Campos*, 62 F.3d at 314 (citing *Silveyra v. Moschorak*, 989 F.2d 1012, 1014 n.1 (9th Cir. 1993)). As Plaintiffs demonstrate, States who seek to avoid the costs of detaining or supervising criminal aliens fall within the zone of interests of 8 U.S.C. § 1231. *See* Plaintiffs' Response at 14-15. Indeed, under the APA, the interest asserted need only be "arguably within the zone of interests to be protected or regulated by the statute" in question. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (internal quotation marks omitted). The Supreme Court has described the test as "not meant to be especially demanding" and as "not requir[ing] any 'indication of congressional purpose to benefit the would-be plaintiff.'" *Id.* at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987)). "A plaintiff's interest need only be sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further the statutory objectives." *City & Cty. of San Francisco*, 981 F.3d at 755 (internal quotations omitted). Plaintiffs claims fall well within the zone of interests protected by the removal mandate of 8 U.S.C. § 1231.

Finally, Defendants argue that the interim guidance is not final agency action subject to review. Defendants' MTD at 16-17. Defendants suggest that only "when the agency completes a removal action" may that action be challenged. *Id.* at 17. But such a reading of the final agency action requirement under the APA would insulate Defendants' non-enforcement of the law from review, a result directly contrary to the abdication doctrine of *Heckler*, 470 U.S. at 833, and *Adams*, 480 F.2d at 1162. Under the appropriate

test, as Plaintiffs demonstrate, *see* Plaintiffs' Response at 15-16, the interim guidance constitutes final agency action for purposes of review under the APA.

## **CONCLUSION**

This Court should deny Defendants' motion to dismiss.

Respectfully submitted, this 18th day of May, 2021.

|  |  |
|---|---|
| CHRISTOPHER J. HAJEC<br>MATT A. CRAPO<br>Immigration Law Reform Institute<br>25 Massachusetts Ave., NW, Ste. 335<br>Washington, DC  20001<br>Tel: 202-232-5590<br>Fax: 202-464-3590<br>Email: chajec@irli.org<br>Email: matt.crapo@pm.me | /s/ Michael Ryan Williams<br>MICHAEL RYAN WILLIAMS, ESQ.<br>3636 North Central Avenue, Suite 560<br>Phoenix, Arizona 85012<br>State Bar No. 029703<br>m.ryan.williams@gmail.com<br>(602) 740-0321<br><br>*Lead Counsel for Amicus Curiae* IRLI |