BRIAN M. BOYNTON
ACTING ASSISTANT ATTORNEY GENERAL

BRIGHAM J. BOWEN
ASSISTANT BRANCH DIRECTOR

Michael F. Knapp (CA Bar No. 314104)
Adam Kirschner (IL Bar No. 6286601)
Brian C. Rosen-Shaud (ME Bar No. 006018)
Kuntal Cholera (DC Bar No. 1031523)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW Room 12008
Washington, D.C. 20530
(202) 514-2071 (telephone)
(202) 616-8470 (facsimile)
Email: Michael.F.Knapp@usdoj.gov
       Adam.Kirschner@usdoj.gov
       Brian.C.Rosen-Shaud@usdoj.gov
       Kuntal.Cholera@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, et al.,<br>    Plaintiffs,<br><br>v.<br><br>United States Department of Homeland Security, et al.,<br>    Defendants. | No. 2:21-cv-00186-SRB<br><br>**DEFENDANTS' 3-PAGE RESPONSE TO PLAINTIFFS' SUPPLEMENT**<br><br>**(Hearing Set for May 27, 2021 at 10:00 a.m.)** |

*1.* In their supplement, the States make three arguments. The first merely repeats some of their merits arguments. But the Court's merits review is limited to the administrative record and so the discovery taken in this case is not relevant. In any event, their arguments are wrong for the reasons Defendants have already given. *See* Defs.' Supp. Br. 12-18, ECF No. 69.

The States continue to erroneously suggest that the February 18, 2021 Interim Guidance (ICE Memo) is "hardly distinguishable from Section C of the January 20 Memorandum." Pls.' 3-Page Supp. 1, ECF No. 79. But Section C set out a general prohibition on removals outside narrowly defined exceptions. *See* DHS Memo 3-4, Ex. A, ECF No. 12-1. By contrast, the ICE Memo, both by its terms and as implemented, does not prohibit *any* removals—it expressly authorizes removals, including outside the presumed priority categories when appropriately justified on a case-by-case basis. ICE Memo 3, Ex. G, ECF No. 12-1. To the extent that the Court is inclined to consider the discovery taken in this matter for issues beyond the question of standing or irreparable harm, it confirms that the ICE Memo has been implemented according to its terms. *See infra* at 3. The discovery has thus confirmed what is apparent from the face of the document: the ICE Memo sets out a *prioritization* scheme that retains case-by-case discretion. The ICE Memo is therefore not subject to review under the APA. It does not constitute final agency action because only the later enforcement actions—made after case-by-case analysis—actually affect noncitizens' rights and obligations. Moreover, the ICE Memo reflects the Executive's authority to exercise prosecutorial discretion—a judgment committed to agency discretion by law. And the discovery also confirms that the ICE Memo is either a policy statement or else a procedural rule, because it preserves the decisionmakers' discretion to evaluate proposed enforcement actions on a case-by-case basis. *See, e.g.*, *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012-13 (9th Cir. 1987).

*2.* The States correctly identify that there has been a reduction in certain enforcement actions since the ICE Memo. Pls.' 3-Page Supp. 2-3. But the States elide three important points. First, Mr. Carter was explicit that enforcement numbers "fluctuate drastically" due to many factors *other than* the ICE Memo. *E.g.*, Carter Depo. (Ex. 4) at 63:13-64:2.

Second, the narrow focus on the *quantity* of enforcement actions misses the point of

1 the ICE Memo: to focus resources on those who present the most serious threats to national
2 and border security and to public safety. As Mr. Carter testified, the number of enforcement
3 actions a single line officer can take in a given time period varies significantly depending on
4 numerous factors, including "the number of leads coming in." Carter Depo. at 70:18-:19; *see*
5 *id.* at 68:16-72:18. As ICE shifts to focus on enumerated public safety threats, it stands to
6 reason that line officers will take some time to develop appropriate leads targeted to those
7 cases. *Cf. id.* at 152:7-:11 ("[W]e are just operating under different guidance at this point. You
8 know, the guidance has been refined, but all programmatic areas are still being worked. We
9 are just working on it in different ways.").

10       Third, Mr. Carter testified that the pace of enforcement actions for other-priority cases
11 has increased over time as the office became more familiar with the new procedures and
12 guidance. *See id.* at 100:17-:24 ("ERO Phoenix did start a little slow"); *id.* at 101:11-:14 ("I
13 would say the bare minimum probably towards the end of my acting time, it would have been
14 probably an average, give or take, three [other-priority enforcement actions] a day."); *id.* at
15 105:22-24 ("There was confusion. . . . [W]e had to work through that."). And Mr. Carter has
16 specifically instructed the line officers within the Phoenix Field Office to "aggressively pursue
17 cases that they feel were other priority cases." *Id.* at 105:10-:14.

18       The States emphasize that, even before the ICE Memo, ICE prioritized threats to
19 national security, recent entrants, and noncitizens with significant criminal records. *See* Pls.' 3-
20 Page Supp. 3. But the previous ICE priorities included not just those three categories but also
21 (among others) noncitizens who "have been convicted of any criminal offense," "charged with
22 any criminal offense," and "subject to a final order of removal but [who] have not complied
23 with their legal obligation to depart the United States." Feb. 21, 2017 Memo at 2 (Ex. 5).
24 Unlike the previous policy, which "prioritized" nearly every category of noncitizen, the ICE
25 Memo makes three narrower categories the focus of ICE enforcement efforts, while expressly
26 authorizing enforcement for other categories, subject to supervisory approval.

27       Regardless, a reduction in enforcement actions does nothing to establish that the States
28 have additional "unreimbursed costs" because of that reduction. Pls.' Supp. 17, ECF No. 64.

2

*3.* Last, the States contend that ICE operations are important to public safety. Defendants agree. That is why the ICE Memo focuses resources on those cases that present the most serious threats to public safety (and to national and border security) while still authorizing enforcement against other cases that also present such a threat. ICE Memo at 3.

As Mr. Carter testified, the ICE Memo created a two-track system for enforcement actions: First, for noncitizens in one of the three "presumed priorities" categories, enforcement is presumptively justified and a line officer can proceed with enforcement without further approval; second, for noncitizens in the "other priorities" category, enforcement can proceed if the FOD determines the action is adequately justified. *See* Carter Depo. at 50:3-50:19; *see also id.* at 117:3-:13; ICE Memo at 3-7. And as both Mr. Carter's testimony and the States' own summary exhibit confirm, the ICE Memo has been implemented in just that way: ICE has taken enforcement actions, including removals, against noncitizens in the "other priorities" category consistent with the ICE Memo's instructions. *See* Carter Depo. at 101:11-:14 (estimating an average of three other-priority preapproval requests per day); Pls.' Summ. Ex., Ex. FF, ECF No. 79-1 (identifying 17 requests for preapproval of removal action from February 22 to April 15, 2021); *see also* Carter Depo. at 146:24-147:18 (explaining that the documents summarized in Ex. FF may not have encompassed all other-priority removals).

Mr. Carter also explained that whether to approve an enforcement action for an other-priority case was based on "the totality of the circumstances of the case." Carter Depo. at 112:21-:22; *see also id.* at 116:24-:25 ("So it is not one size fits all. It is a case by case."); *id.* at 118:3-:6 ("So, again, no two cases are alike. It is based on the totality of the information that I am provided . . . ."); *id.* at 133:20-:24 ("So, again, keep in mind that each case is different, each case is based on the totality of the circumstances."); *id.* at 159:23-:25 ("Each case is reviewed on a case-by-case basis on the totality of the facts.").

And to the extent the States claim a net negative effect on "public safety," they have neither established such a change nor can they assert standing as *parens patriae* to sue the federal government. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011).

RESPECTFULLY SUBMITTED this 21st day of May, 2021.

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director
Federal Programs Branch

*/s/ Michael F. Knapp*
MICHAEL F. KNAPP
CA Bar No. 314104
Trial Attorney
ADAM KIRSCHNER
IL Bar No. 6286601
Senior Trial Counsel
BRIAN C. ROSEN-SHAUD
ME Bar No. 006018
KUNTAL CHOLERA
DC Bar No. 1031523
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW Room 12008
Washington, D.C. 20530
(202) 514-2071 (telephone)
(202) 616-8470 (facsimile)
Email: Michael.F.Knapp@usdoj.gov
         Adam.Kirschner@usdoj.gov
         Brian.C.Rosen-Shaud@usdoj.gov
         Kuntal.Cholera@usdoj.gov

EREZ REUVENI
CA Bar No. 264124
Assistant Director
U.S. Department of Justice
Civil Division, Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
202-307-4293 (telephone)
Email: Erez.R.Reuveni@usdoj.gov

*Counsel for Defendants*

4