# Exhibit 4

*Excerpts from Deposition of Albert Carter*

*Phoenix, AZ*

*May 14, 2021*

Albert Edward Carter - May 14, 2021

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

State of Arizona; State of   )
Montana; and Mark Brnovich,  )
in his official capacity as  )
Attorney General of          )
Arizona,                     )
                             )
              Plaintiffs,    )
                             )
      vs.                    ) No. 2:21-cv-00186-SRB
                             )
United States Department of  )
Homeland Security, et al.,   )
                             )
              Defendants.    )
_____)

DEPOSITION OF ALBERT EDWARD CARTER

Phoenix, Arizona

May 14, 2021

AMENDED                      Prepared By:
                             Colette E. Ross, CR
                             Certified Reporter #50658

**Coash & Coash, Inc.**
602-258-1440        www.coashandcoash.com

```
 1   fiscal year 2021 for any of the centers described in that
 2   paragraph?
 3           MR. GARDNER:  Objection, lack of foundation.
 4   BY MR. NAPOLITANO:
 5       Q.   You may answer.
 6       A.   I am unaware of their funding status.
 7       Q.   Okay.  As the field operations field office
 8   director, were you aware of the targeting operations
 9   division funding status?
10       A.   I was not, no, sir.
11       Q.   Okay.  Were you aware of the funding status for
12   any of the divisions listed on this page, of these pages 4
13   and 5 of this exhibit?
14       A.   No, sir.
15       Q.   Are you, were you at that time as -- were you,
16   as acting field office director, aware of any resource
17   issues for these centers?
18           MR. GARDNER:  Objection, vague.
19           THE WITNESS:  I am unaware of any resource
20   issues for any of the components of this time.
21   BY MR. NAPOLITANO:
22       Q.   Okay.  Under the interim guidance did you, as
23   the acting field office director, have to approve requests
24   for enforcement of a nonpriority case in Arizona?
25       A.   I did.
```

Timestamps:
- 11:11:36 (line 5)
- 11:11:54 (line 10)
- 11:12:12 (line 15)
- 11:12:47 (line 20)
- 11:13:03 (line 25)

1      Q.      Okay.

2      A.      But, I am sorry, repeat your question, please.

3      Q.      Under the interim guidance did you as acting

4   field office director, Phoenix field office director, have

11:13:18  5   to approve requests for enforcement of nonpriority cases

6   in Arizona?

7      A.      For other priority cases, yes, I did.

8      Q.      Now, would you define the term you used, other

9   priority cases.

11:13:34  10      A.      Yeah.  Other priority cases imply that they are

11   still priorities, the priority of the field office

12   director.  Nonpriority cases I don't think are applicable.

13      Q.      How do you define nonpriority cases?

14      A.      A nonpriority instead of an other priority.  You

11:13:56  15   know, the three priorities are articulated in the interim

16   guidance.  But you will notice in the verbiage, it talks

17   about other priorities, basically, you know, an individual

18   case that the field office director deems a priority in my

19   interpretation.

11:14:17  20      Q.      Okay.  Now, can you go to the bottom of page 7

21   of Exhibit 7.  There is a header titled Removal.  Is

22   removal distinct from enforcement?

23      A.      I would say no.  I would say that a removal is

24   an enforcement action.

11:14:42  25      Q.      Okay.  And what does a removal encompass?

Albert Edward Carter - May 14, 2021          51

1       A.     A removal would encompass someone being removed

2   to a country other than the United States.

3       Q.     Removed from where, sir?

4       A.     From the United States.

11:15:03   5       Q.     Okay.  And what does enforcement encompass?

6       A.     Enforcement, in my opinion, would encompass the

7   entire enforcement cycle, to include the identification,

8   arrest, due process, and ultimately removal in an

9   immigration perspective.

11:15:30  10       Q.     Is there anything else that enforcement

11   encompasses?

12       A.     Like what?  I mean, specifically what are you

13   looking for?

14       Q.     Are there other major steps in the enforcement

11:15:53  15   process that you have not already listed?

16       A.     Well, I listed the overarching cycles throughout

17   the, you know, the cycle for enforcement.  I mean there

18   are, you know, a lot of steps that go into that.  It is,

19   you know, how the enforcement is carried out and things

11:16:13  20   like that.

21              So, and that's, that's an over -- very, very

22   long topic.  But basically you identify someone, you

23   determine whether or not they are amenable to arrest to

24   make, you know, to ensure that it is a lawful arrest.  If

11:16:27  25   they are amenable to arrest, you effect the arrest, you

          1    deportation officers that have regular contact, as well as

          2    enforcement removal systems.

          3           So it is, you know, not to, not to be overly

          4    complex, but there are a lot of hands in the pot so to

11:34:55  5    speak.  There is a lot of coordination that goes into

          6    having a successful flight and ensuring that the mission

          7    goals are met.  So it is a big system, sir.

          8       Q.    Okay.  And would the Phoenix field office keep

          9    records of which individuals are placed on removal flights

11:35:16 10    from its area of operations?

         11       A.    I believe we do.  But, again, you know, any

         12    records such as that I would refer to the removal division

         13    in headquarters.

         14       Q.    You previously stated that the Phoenix field

11:35:43 15    office manages busing to the US-Mexico border, is that

         16    correct?

         17       A.    That is correct, yes, sir.

         18       Q.    Okay.  Are you aware of any new resource

         19    constraints since February 2021 compared to immediately

11:35:59 20    before February 2021 that require reducing the number of

         21    bus trips?

         22       A.    I am not, no, sir.

         23       Q.    Okay.  And has the number of bus trips since

         24    February 2021 compared to immediately before February 2021

11:36:19 25    been reduced?

```
 1              MR. GARDNER:  Objection, lack of foundation.
 2              THE WITNESS:  And I would say not that I am
 3     aware of, sir.  You know, our operations are moving, you
 4     know, at a constant, steady state.  So there are no
11:36:37  5   resource restrictions, you know, that we have at this time
 6     to carry out our mission.
 7     BY MR. NAPOLITANO:
 8         Q.    Okay.  And in that same time period,
 9     February 2021 and after, compared to immediately before
11:36:53 10   February 2021, have the buses been less full on those
11     removal bus trips?
12              MR. GARDNER:  Objection, lack of foundation.
13              THE WITNESS:  And I would add to that that not
14     that I am aware of, you know, again, understanding we are
11:37:14 15   in a dynamic situation where, you know, we COVID test
16     everyone that's being released or removed from ICE
17     custody.  So those things can have an impact.
18              As far as the removals, generally if they are
19     subject to an order of removal, they should still go, even
11:37:39 20   with the positive test, as long as we coordinate with the
21     government of Mexico.
22              So I couldn't tell you for sure, sir.  But
23     numbers do fluctuate drastically based on, you know, the
24     pace of due process, you know, depending on how many
11:37:59 25   individuals are ordered removed, that are ordered removed
```

1    to Mexico and what have you.  So it is a, it is a

2    difficult question to actually quantify, in my opinion.

3    BY MR. NAPOLITANO:

4        Q.    Order removed by who?

11:38:20 5        A.    A variety of sources.  You know, an individual

6    can be ordered removed by an immigration officer.  An

7    individual could be ordered removed by an immigration

8    judge or a district court judge, or whatever, primarily

9    those three areas, so any of those means.

11:38:40 10        Q.    Okay.  And would you acknowledge that the

11   restraints of COVID have been around, have been affecting

12   busing operations since the spring of 2020?

13        A.    I would say to a degree, yes, sir.

14        Q.    And has there been a change in how those COVID

11:39:11 15   concerns have affected these busing operations in terms of

16   the resource constraints during that time?

17        A.    I would say whether -- would say no for the most

18   part.  You know, there are a lot of -- you know, COVID

19   causes a lot of resources to be expensed, you know,

11:39:40 20   mitigating an exposure and things like that to COVID.  So,

21   you know, it has been pretty consistent.

22             You know, again, as I stated earlier, from a

23   resource standpoint, the Phoenix field office is situated

24   in an appropriate way from a resource standpoint.

11:39:59 25        Q.    Under the interim guidance, was it your role as

1    so you may pull a calculator out or anything like that if

2    it would help with the discussion.

3         A.    Okay.

4         Q.    What divisions of ERO are involved in arresting

11:45:32 5    aliens?

6         A.    Again, I mean it is kind of a vague question.  I

7    would say any division that has a sworn law enforcement

8    officer assigned to the division would technically be able

9    to carry out those duties.  So to clarify it to which

11:45:58 10   division I think is, with all due respect, I think it is a

11   rather vague question.  And beyond that, I wouldn't be

12   able to really quantify it.

13        Q.    So would it be correct that multiple divisions

14   of ERO are involved in arresting aliens?

11:46:22 15   A.    Yes, sir, absolutely.

16        Q.    Okay.  What is considered a full caseload in

17   terms of the number of arrests per month for an ICE law

18   enforcement officer in this area?

19        A.    Sir, I mean that varies.  You know, the officers

11:46:42 20   that are assigned to those enforcement functions develop

21   leads through a variety of means.  So, you know, there is

22   really no set number that they are required to encounter

23   or anything like that.  It is, you know, they are assigned

24   to identify arrests and, you know, place individuals in

11:47:07 25   the immigration cycle.  So, you know, as far as

```
 1   quantifying it, there really is no quantifying.  They are

 2   to do their job and do their job to the best of their

 3   ability.

 4        Q.    Would it be more than one arrest per month?

 5             MR. GARDNER:  Objection --

 6             THE WITNESS:  Again --

 7             MR. GARDNER:  Sorry.  Objection, misstates the

 8   witness's testimony.

 9             THE WITNESS:  Again, you know, again, it varies.

10   And, you know, there is really, you know, based on my

11   experience, no quantifiable requirement to do.  They are

12   to do their job.  And, you know, productivity is always --

13   is an issue.  But it is, it is dependent on so many

14   factors.

15   BY MR. NAPOLITANO:

16        Q.    As the acting field office director, did you

17   oversee ICE law enforcement officers who conducted

18   arrests?

19        A.    Yes, sir.

20        Q.    And in prior years, would an ICE law enforcement

21   officer typically, the typical officer, have a caseload

22   that involved more than one arrest per month?

23        A.    I would say yes, absolutely.

24        Q.    And would the typical law, ICE law enforcement

25   officer be able to maintain a caseload of more than one
```

1    arrest per month, other than during the, during 2020 after

2    the spring when COVID restrictions were in place?

3         A.    Yes, sir.

4         Q.    Okay.  I would like to turn back to Exhibit 5.

11:49:13  5  That was that spreadsheet.  So can you please open that

6    up.  It was AZMT007826.

7         A.    Are we going to refer back to the one or do I

8    need to leave it open?

9         Q.    To this exhibit?  We may come back to

11:49:32 10  Exhibit 10.

11        A.    Okay.

12        Q.    Okay.  Do you have that?

13        A.    I have that.

14        Q.    Okay.  Before we move on, would the average ICE

11:49:57 15  officer, ICE law enforcement officer, conducting arrests

16   conduct more than five arrests per month?

17        A.    Sir, again, it varies.  There are a lot of

18   factors going into it, you know, the number of leads

19   coming in, you know, whether the officer is on leave for

11:50:21 20  part of the month, or whatever the case may be.  So there

21   is really no set, set goal or average that I am aware of.

22            You know, again, as a field office director, I

23   evaluate my programs.  But whether, whether one officer is

24   conducting one arrest or whether one officer is, you know,

11:50:45 25  effecting five, you know, as long as the units are

 1  producing, they are producing.

 2          You know, again, if an officer conducts

 3  20 arrests in a month, then I am going to recognize that

 4  individual for exceptional service or whatever.  But, you

11:51:02  5  know, it varies.  It truly does.

 6      Q.    Okay.  You said that, you know, 20 arrests might

 7  be exceptional service.  Is there a number that would be,

 8  that would be unacceptable service?

 9      A.    Yes, you know, there would, you know, if there

11:51:20 10  are times to where, you know, the numbers aren't

11  necessarily meeting, you know, a reasonable expectation.

12  But, you know, in that event you are going to look and see

13  what the circumstances were.  And that's why I said there

14  is no quantifiable way.

11:51:41 15          There are always extenuating, there is always

16  circumstances that lead to various things.  If an officer

17  is working, you know, the entire time and they are just

18  not producing, we are going to look at that.  We are going

19  to evaluate that.  But, you know, at the end of the day,

11:51:59 20  it is a process and it is a team effort.  So, again,

21  quantifying it to that degree I think is not indicative

22  of, you know, what, as the acting field office director,

23  what my expectation was for the units.

24      Q.    For a normal -- an officer who is normally

11:52:25 25  operationally active for a month, is there a number that

           1    would cause you to want to look into why they were

           2    underperforming?  It might be less than ten, less than

           3    five, less than two?

           4        A.    I would, I mean I would probably ask the

11:52:44   5    question if it was, you know, just a couple.  But, you

           6    know, really, before I even get that far in, you know, is

           7    it a pattern, is it, you know, are there factors outside

           8    the norm, again, keeping in mind that, you know, even as

           9    the acting field office director, if there was a question

11:53:07  10    of any of the programmatic areas that I had questions

          11    about, I am talking to the, you know, the managers that

          12    oversee those programs, potentially the first line

          13    supervisors who are overseeing those officers and what

          14    have you.  But, you know, as far as drilling down on

11:53:27  15    specific criteria that I would look at, it is not

          16    necessarily an accurate representation of how I managed

          17    the field office when I was the acting field office

          18    director.

          19        Q.    Okay.  So let's go back -- thank you for that

11:53:43  20    answer -- back to Exhibit 5.  And if you click on the

          21    third tab, titled Detention FY21, YTD...

          22        A.    Yes, sir.

          23        Q.    If you look at the table at I18, titled ICE

          24    initial book-ins by arresting agency and month, FY2021,

11:54:08  25    YTD --

1    A.    I have it open.  I can't see the screen.  The
2  exhibit is covering my Zoom.  But I have it open.
3    Q.    Okay.  So this Exhibit 14 is a document summary
4  that the Arizona Attorney General's Office created after
12:53:26 5  reviewing every document produced to us from AART.  It
6  shows that during the total time period we have documents
7  for, which is February 22, 2021 to April 15th, 2021, there
8  were only 17 aliens for whom requests for preapproval for
9  removals were made in the Phoenix field office.
12:53:53 10    Does 17 aliens, or does 17 aliens for whom
11  requests in that time period were made sound accurate to
12  you?
13    A.    It does not.  The, and early on after the
14  priorities were implemented, the AART tool was, it was
12:54:30 15  developed after the fact.  So my understanding was that
16  those cases were, you know, put in at some point.  But the
17  17 does not sound right to me.
18    Q.    Okay.  Why does it not sound right to you?
19    A.    Over -- I believe I recall, I believe, it was a
12:54:53 20  53-day span.  And it just seems like it is awfully low.
21  Over 50 some on odd days, it took up a fair amount of time
22  working on those.
23    Now, I will say this.  The tool has evolved.
24  You know, early on all the cases were input that had to
12:55:14 25  have the approval.  That was changed at a later time to

```
          1   where those cases that were priority were not routed to
          2   the field office director for review.  They were approved
          3   through the February interim guidance.  So there could be
          4   a variety of reasons for that.  That could be part of it.
12:55:36  5           But, you know, there, it seems low.
          6       Q.    Okay.  Were -- as the acting field office
          7   director, did all requests for preapproval come to you?
          8       A.    I would say 99 percent of them.  There was a
          9   span at, I don't know the dates at this time, that
12:56:05 10   Alejandro Almeida was the acting FOD when I was on leave.
         11   But I believe you are only talking probably one to three
         12   submissions at most.  I covered many, probably
         13   99.5 percent of them.
         14       Q.    Okay.  And I want to clarify.  What this, this
12:56:23 15   spreadsheet or this table shows is just other priority,
         16   not priority removal, but other priority removals.
         17           So given that clarification, does it sound right
         18   to you that there were only 17 other priority removals
         19   requested?
12:56:44 20       A.    It would still seem somewhat low, understanding
         21   early on, you know, there was uncertainty over the
         22   interpretation of the priorities.  So ERO Phoenix did
         23   start a little slow, but, you know, again, given what I
         24   feel the average was, it still seems a little low.
12:57:18 25       Q.    Okay.  What number would seem right?  More than
```

 1   50?  More than 100?

 2        A.    I would be afraid to say, sir.  You know, again,

 3   just like some of the other things that I mentioned

 4   earlier, it is cyclical.  You know, it, you know, it goes

12:57:35  5   up, goes down.  But I would be afraid to say.  17 over a

 6   50 some odd day span just seems low to me.  I mean that's

 7   an average of, what, one every three days, one every four

 8   days.  That seems odd.

 9        Q.    Would you say you probably received one a day,

12:58:01  10   two a day?

11        A.    I would say the bare minimum probably towards

12   the end of my acting time, it would have been probably an

13   average, give or take, three a day.  But, you know,

14   probably it is certainly single digits per day.

12:58:26  15        Q.    Okay.  And that's just for preapproval of other

16   priority removals, isn't that correct?

17        A.    That's correct, sir.

18        Q.    Is there a better data source than AART?

19        A.    No, sir, in my opinion.  I mean, you know,

12:58:48  20   that's where, that's where we are documenting the cases.

21        Q.    And going back to our earlier calculation, so

22   the Phoenix field office is removing potentially about 330

23   fewer people per month.  There are only 17 requests here.

24   If we took the high end of your number over 50 days, you

12:59:40  25   said at the end the high was three a day requests for

 1   preapproval, that would amount to 150 over those 50 days.

 2   Why so few given the drop in removals?

 3              MR. GARDNER:  Objection, calls for speculation.

 4              THE WITNESS:  To answer I would go back to your

01:00:05  5   earlier point.  You know, if these are other priority

 6   cases, you are only talking a small, a small portion of

 7   it.  You know, you still have the other priority cases

 8   that would fall into, potentially into those removals and

 9   arrests and other statistics.  So it is kind of an apples

01:00:26 10   to oranges comparison.

11   BY MR. NAPOLITANO:

12        Q.    Why would we only, why -- who initiated the

13   requests for preapproval, generally, not individual names,

14   but what types of individuals would bring these requests

01:00:51 15   to you?

16        A.    It would be the, for Arizona, it would be the

17   ERO deportation officers assigned to the Phoenix field

18   offices.

19        Q.    Is it true that they would initiate them and

01:01:05 20   bring them to you; you would not initiate them yourself?

21        A.    That's correct.

22        Q.    Okay.  And, yet, with the reduced activity that

23   we talked about, we are still seeing only a percentage, be

24   it 17 or maybe more, a small percentage of the overall

01:01:30 25   number of dropoff being made up for with requests for

 1    requests being made for preapproval -- and, you know,

 2    perhaps there were more, but certainly by your numbers it

 3    doesn't sound like that would add up to more than 150 in

 4    50 days -- why were those removal numbers so low without

01:03:33  5    other priority removals being used to make up for the gap?

 6            MR. GARDNER:  Objection, vague.

 7            THE WITNESS:  I think that's somewhat

 8    contradictory, sir.  I think the numbers would be, you

 9    know, accounted for in the submissions.  And those

01:03:58 10    submissions aren't just those 17 cases that you have in

11    the exhibit.  It is other, it is the -- it would seem that

12    the priority cases would account for the rest of them.

13            Those other, or those priority cases at this

14    time do not come to the field office director for

01:04:19 15    approval.  They are, you know, they are preapproved since

16    they are priority cases to where they can go through the

17    cycle once the submission is entered into the AART.  So,

18    you know, those statistics that you have for the removals,

19    they should be, they should be, you know, included in the

01:04:45 20    database.

21    BY MR. NAPOLITANO:

22        Q.    Why would the number of priority cases, sorry,

23    other priority cases being submitted for preapproval be

24    this low during this time period?

01:05:04 25            MR. GARDNER:  Objection, calls for speculation.

1          THE WITNESS:  There are a variety of factors.

2   As I mentioned early on, there was, there was, I guess,

3   hesitancy from the officers and some of the supervisors as

4   to, you know, what the priorities tactically include.

01:05:36  5          You know, after the priorities came out, we as a

6   field office, me as a field office director, had numerous

7   conversations with staff outlining what, what my

8   expectation was, what my interpretation of the priorities

9   were, and, you know, going through, you know, meetings and

01:05:59  10  stuff, empowering all levels of those law enforcement

11  officers to look and, you know, aggressively pursue cases

12  that they feel were other priority cases.  So it has been

13  an education.  It has been, you know, a learning moment

14  for them.  This is a change.  But, you know, there are a

01:06:25  15  lot of reasons.

16  BY MR. NAPOLITANO:

17       Q.   In those conversations did your officers express

18  to you hesitancy to request removal for cases that were

19  not part of the three priorities listed in the interim

01:06:38  20  guidance?

21       A.   Yes.  You know, there was, there was hesitancy.

22  There was confusion.  You know, the priorities are worded

23  in a way that there are different interpretations.  You

24  know, we had to work through that.  I had to work through

01:06:59  25  that as the acting field office director to instruct

1    individuals as to what my interpretation was so that they

2    could, you know, enforce the mission per my direction.

3            So, you know, it is -- you know, there were some

4    instances to where the individuals didn't want to bring

01:07:25  5    any undue attention upon the field office for, you know,

6    going outside the priorities.  There was confusion as to

7    what the priorities were.  There are a variety of reasons.

8    And, you know, with change, any change, it is my job to

9    make sure that this field office is on comfortable ground

01:07:51  10    and to ensure that we work consistent with how we enforce

11    the law and the priorities as written.

12    Q.    Did you ever instruct the officers to not submit

13    priority cases to you?

14    A.    Absolutely not.

01:08:17  15    Q.    And did officers feel that they needed to submit

16    for approval priority cases to you before removal?

17    A.    I would say that the officers were very careful

18    as to what they submitted.  You know, again, the men and

19    women of the Phoenix field office want to do the best job

01:08:49  20    possible and within, you know, the guidance that's out

21    there.

22            You know, did they submit priority cases as

23    other priority cases?  Absolutely, due to, you know, lack

24    of, of not necessarily knowledge, but lack of

01:09:07  25    understanding what the interpretations were, you know, of

Albert Edward Carter - May 14, 2021                 111

1   what it appears to me is a case that was rejected.  The

2   reason it is rejected is there is a significant amount of

3   information that's missing from the narrative.

4           So when you go down to the bottom of the page,

01:17:12  5   or the bottom of the exhibit, you will see it requires

6   more supporting information as to the reason why it was

7   rejected, and that, you know, based off the limited

8   information that's contained within, it appears that the

9   individual would have been a Priority 3, and that the

01:17:34 10   officer was asked to review the case against the

11   priorities.

12       Q.   Okay.  And so if we look at the narrative, it

13   says he has an aggravated felony conviction that falls

14   within the INA.  The fact that he committed this crime

01:17:53 15   while in possession of a firearm indicates he is a danger

16   to the public.  He also has two DUI convictions, which

17   indicate he is a danger, and, under additional details,

18   aggravated felony with a firearm.  Is that correct?

19       A.   That's correct, yes, sir.

01:18:05 20       Q.   All right.  Did you credit or discredit your

21   officer's statement in the narrative?

22       A.   I did not, not at all.  The -- you know, I take

23   into account all the information in the narrative.  And if

24   you use the word discredit, I would never, to my

01:18:28 25   knowledge, discredit one of my officers anyway.

1    Q.    Okay.  So you credited, you believed this

2    narrative, is that correct?

3    A.    Oh, absolutely, yes, sir.  I have full faith in

4    the men and women that serve in the Phoenix field office.

01:18:42  5    Q.    Okay.  And would you just repeat again why you

6    denied this.

7    A.    The narrative is lacking.

8         When I review a case for approval for an other

9    priority, you know, not only do you have to take into

01:19:04 10    account the aggravating circumstances, but you also have

11    to take into account the mitigating circumstances.  You

12    know, there may be a health issue.  There may be, you

13    know, some other inequities or something to that effect.

14    Generally, as far as I am concerned, you know, any

01:19:25 15    mitigating factors for a case like this would have to be

16    pretty significant.

17         But, you know, a case like this, after the

18    submission was corrected, you know, others that may review

19    this after me, you know, would have an accurate

01:19:44 20    understanding as to what all the case entailed as well and

21    understanding the totality of the circumstances of the

22    case, the reasons that the approval was made.

23    Q.    Okay.  So you believe that this would have been

24    a priority case, is that correct?

01:20:05 25    A.    I do.  You know, you are looking for certain

```
 1   keywords.  And when you see, you know, aggravated felony,
 2   he has an aggravated felony conviction, that falls within
 3   the INA, you know, that's your first clue.  And then the
 4   next thing is that the officer deems him to be a danger to
 5   the public, in which I would speculate that I agreed with
 6   that decision.  But, again, wanting to classify the case
 7   probably for data-keeping purposes, I had to reject it and
 8   ask them to review it against the priorities and provide
 9   additional information, as I spoke of earlier.
10        Q.    Okay.  Were resource constraints a consideration
11   in your rejection of this?
12        A.    No, sir.
13        Q.    Based on the information that we received from
14   your attorneys, this individual's case was never
15   resubmitted.  To your knowledge, was their case
16   resubmitted as a priority case?
17        A.    Again, if I was to speculate, sir, I would say
18   that it wasn't resubmitted for other priority.  I would
19   say that that case was submitted as a priority case,
20   which, again, if I was to assume or speculate, I would say
21   that the ask for that particular exhibit included other
22   priority cases, not priority cases.
23        Q.    Okay.  So, to your knowledge, what would have
24   likely happened with this individual?
25        A.    Based on my experience, I would say that the
```

01:20:23 (line 5)
01:20:43 (line 10)
01:21:05 (line 15)
01:21:24 (line 20)
01:21:42 (line 25)

         1  officer resubmitted it as a priority case and I never saw

         2  it again.

         3       Q.    Okay, thank you.

         4             Let's turn to Exhibit 18.

01:22:02 5       A.    Okay.

         6       Q.    All right.  So this is a similar AART printout

         7  for ███████████?

         8       A.    Yes, sir.

         9       Q.    Please scroll to page 3.  And looking at the

01:22:22 10 narrative, we see basis for enforcement action, no

        11  convictions but charged with disorderly conduct, slash,

        12  crime against minor, multiple aggravated assault charges,

        13  is that correct?

        14       A.    That's correct, yes, sir.

01:22:39 15      Q.    And did you believe the narrative presented

        16  here?

        17       A.    Do I believe what?

        18       Q.    That the narrative presented here was correct?

        19       A.    I have no reason to doubt it, sir.  Looking at

01:22:58 20 the entire exhibit, I would say that there wasn't enough

        21  information to base a decision off of.

        22             Looking at this now, just so you know the train

        23  of thought, you see a lengthy criminal history like

        24  this -- you know, criminal histories can be incomplete, to

01:23:28 25 say the least, and require additional research, either be

```
 1    it a call to the individual courts or, you know, further

 2    digging in the file, or whatever the case may be.

 3            But, you know, in a case like this, with a

 4    criminal history that long, my first inclination would be

 5    to send it back to confirm, you know, that there aren't

 6    any convictions.  As mentioned in the previous example,

 7    the narrative is lacking as opposed to what I expect for a

 8    narrative, because the narrative should include, you know,

 9    all the aggravating factors, all the mitigating factors,

10    the immigration history, you know, brief summary of his

11    immigration history, rather.  Because the immigration

12    history does play into it, you know, are they a repeat

13    immigration violator, or whatever the case may be.

14            But this record is incomplete.  So it would be,

15    it would be rejected on those grounds alone.  But looking

16    at the last page, you will see that there is comments in

17    there that, I don't know what the comments are, but, you

18    know, it would imply to me that I asked the officer to

19    take additional steps.

20    Q.    And so you rejected it wanting additional steps.

21    What, in your mind, would you have -- what, in your mind,

22    were you asking the officer to bring back to you?

23    A.    I, well, one, I would ask him to correct the

24    narrative to begin with and include all the information

25    that's expected.
```

           1            Secondly, I would ask him to research the case
           2    further to see, or to confirm that there are no
           3    convictions.  Again, NCIC criminal histories can be
           4    incomplete.  You know, it is incumbent upon the law
01:25:26   5    enforcement agency to nail it on the disposition.  So
           6    understanding that, and over the years understanding that
           7    that that happens, you know, I would ask him to research
           8    those cases further.
           9       Q.    So if there was -- so you were expecting that
01:25:44  10    you would find convictions that would convert this to a
          11    priority case, is that correct?
          12       A.    No, sir.  I was just expecting to have
          13    confirmation that the information is accurate, you know --
          14    complete rather, not accurate, but complete.  But, you
01:26:00  15    know, if there were other aggravating factors -- and,
          16    again, aggravating factors can come from criminal history.
          17    It can come from immigration history.  It can come from
          18    institutional history, whether they were in jail, were
          19    there, were there disciplinary infractions and things like
01:26:19  20    that.  When making the decision, I am looking at the
          21    totality of the case, is the individual a danger or is it
          22    an individual that has inequities that outweigh any minor
          23    criminal history.
          24            So it is not a one size fits all.  It is a case
01:26:38  25    by case.  But, you know, the expectation is that I have a

         1   full and complete picture as much as possible to make the
         2   best decision in my interpretation of the priority.
         3          The other thing I will back up and say as well,
         4   just so you know the process, that, in just rough terms,
01:27:02 5   in a very brief summary, you know, the officers, when they
         6   encounter someone, the first step is for them to determine
         7   whether or not it is a lawful stop or arrest, or what have
         8   you.  They determine alien removability.  And then, once
         9   they get to that point, then they look at, you know, do
01:27:20 10  they meet the priorities or whatever.  If it falls outside
        11   the priorities and requires other priority approval, then
        12   they, you know, then a request comes through, or what have
        13   you.  So, you know, it is a multi-pronged test.  But once
        14   it gets to those AART submissions, it should be a complete
01:27:38 15  case that gives me everything that I need to make an
        16   informed decision.
        17      Q.    If this was of the complete record, would this
        18   be enough for you to make a decision to reject or approve
        19   the removal of this individual?
01:27:50 20     A.    It is not enough, sir.  You know, this only has
        21   the criminal history.  It doesn't have any of the
        22   mitigating factors.
        23          As you know, the priorities rely on convictions.
        24   This individual doesn't have convictions.  So, you know,
01:28:08 25  first glance you would kind of say no.  I can say that on

1    at least one or two occasions I have approved other

2    priority cases that did not have convictions.

3              So, again, no two cases are alike.  It is based

4    on the totality of the information that I am provided, and

01:28:29   5    if I am not comfortable with the amount of detail, I will

6    reject it.

7         Q.    Okay.  Was your denial due to resource

8    constraints?

9         A.    No, sir.  And let me clarify.  It is not a

01:28:43  10    denial.  It is a rejection of that particular submission.

11    And I know it is semantics, but, you know, that case was

12    rejected.  Most likely it was, you know, seeking

13    clarification.  So I don't know that I would classify it

14    as a denial either way.

01:29:01  15         Q.    What would have likely happened to this case

16    after the rejection?

17         A.    After the rejection it would go back to the

18    officer to do as instructed, whatever those instructions

19    were.  I can't see it because of the --

01:29:13  20         Q.    The privilege?

21         A.    But, but, you know, I feel quite certain because

22    it was an incomplete record that I asked them to conduct

23    follow-up steps to see if, if it met the other priority,

24    or even a priority designation.

01:29:35  25         Q.    Okay.  Thank you.  Let's move to Exhibit 19.

1    does not mean it is a denial.  And you will see here it

2    requires more supporting information.

3             And then, you know, you can briefly see my

4    initial comment is please provide.  I don't know what that

01:54:10  5    is per this particular record, but the fact that the

6    individual was convicted of assault with a deadly weapon

7    other than a firearm and sentenced to 180 days and has

8    passport fraud, then, you know, you know, it is a case

9    that that is going to, well, that at first glance, you

01:54:50 10    know, it looks like it is going to be, you know, it looks

11    like the individual is going to be amenable to enforcement

12    action.

13             On this particular case, again, I have no way of

14    knowing what my comment was at that time.  This individual

01:55:04 15    does not look like an aggravated felon.  So, you know, it

16    is somewhat, seems like it would be an other priority

17    case.  But, you know, this could very well have been one

18    of those cases to where my assumption was wrong.  In

19    looking at it, it may have been, because the aggravated

01:55:32 20    assault with a deadly weapon would not be to the

21    definition of an aggravated felony because it lacks the

22    one-year sentence, so, you know, that could have been a

23    very well, very good example rather, of, you know, a case

24    that wasn't necessarily -- that I didn't speculate

01:55:52 25    accurately on.  So that is a case that we will look at.

1          As you see at the very bottom, under the
2     mitigating circumstances, if I can find it, I do not
3     believe that there were other mitigating -- yeah, there is
4     no other mitigating circumstances.  So this would be a
01:56:14  5     case that I would normally approve for another enforcement
6     action.
7          So I don't know, I don't recall what I was
8     seeking other than, you know, more supporting information.
9     So that is wholeheartedly one of the cases that I would
01:56:35 10    look at for an enforcement action.
11         One of the things that you will note is the
12    conviction for the aggravated deadly assault -- aggravated
13    assault with a deadly weapon other than a firearm occurred
14    in 2008.  So one of the factors that you look at is the
01:56:59 15    recency of the conviction.  So then you look at the rest
16    of the case, you know, does there appear to be a
17    propensity to reoffend, you know, are there other
18    infractions or encounters with law enforcement or, you
19    know, additional immigration history, or whatever.
01:57:27 20         So, again, keep in mind that each case is
21    different, each case is based on the totality of the
22    circumstances.  An individual like that that has multiple
23    convictions is a case that we are going to look at very
24    close.
01:57:43 25    Q.    Okay.  And we see that he just reentered the

Albert Edward Carter - May 14, 2021                    134

```
          1   United States on  ██████████  2020, is that correct?
          2        A.    Let me look.
          3        Q.    In the middle of page 4.
          4        A.    Sorry.  I am having computer problems.  Just one
01:58:03  5   second.
          6              Middle of page of -- let's see the encounter.
          7   He entered  ██████████  2020, which falls outside of the
          8   border security priority date.
          9        Q.    Okay.  And so you said that this was a more
01:58:23 10   complete record, that you may have had suspicion of it
         11   being a priority case, is that correct?
         12        A.    Well, initially, you know, at first glance when
         13   I reviewed it with you here today, you know, I saw the
         14   aggravated assault with a deadly weapon.  You know, the
01:58:47 15   sentence becomes important on that particular conviction.
         16   So --
         17        Q.    Why?
         18        A.    -- you know, because it is the aggravated
         19   assault, and, you know, that immediately leads you to, you
01:58:59 20   know, a multi-pronged approached after that of, you know,
         21   did they, did they get sentenced to the year that they
         22   would make them more amenable to, you know, as an
         23   aggravated felon.  But, you know, he fell short because it
         24   was only a 180-day sentence.
01:59:17 25              The other thing that I look at to --
```

1   his removal was approved, is that correct?

2        A.    That's correct.

3        Q.    Okay.  So what we have shown you were a sampling

4   of the preapproval or other priority cases that we saw

02:19:14  5   from the AART database that was given to us.  We only have

6   134 unique removals from the database that was produced.

7   The time period for that is from February 22, 2021 to

8   April 15, 2021.

9             To your knowledge, while you were the acting

02:19:40 10   field office director at that time, were there more than

11   134 removals during that period in the Phoenix FOD?

12        A.    I don't have the statistics in front of me.  I

13   think they may have been included in the -- in one of the

14   previous charts.  But can you clarify the question?

02:20:07 15        Q.    Sure.  From the information that we have been

16   provided through our discovery requests, we see that from

17   February 22nd, 2021 to April 15th, 2021, we are only given

18   134, records of 134 unique removals, which includes

19   priority removals, from the AART.  My question --

02:20:36 20        A.    So --

21        Q.    -- would there, to your knowledge, have been

22   more than 134 removals?

23        A.    So what, what -- you are asking about the

24   removals.  To explain a little bit about the AART, the

02:20:59 25   AART only requires one submission for the entire

1    enforcement lifecycle.  If there is a submission for an

2    arrest or a detainer or a removal, that's the only one

3    that's required.  So if someone submits one for a

4    detainer, there will not be follow-up AART submissions for

02:21:20  5    the removals.  Does that make sense?  That approval

6    follows them all the way through the process.

7         Q.    Would every individual removed be in the AART?

8         A.    In some form or fashion, they should be.

9         Q.    Okay.

02:21:40  10        A.    To my understanding they should be.  Any

11    enforcement action after the interim priorities should be

12    in there.  And, you know, those individuals, there should

13    be a record.

14        Q.    Okay.  And if someone from the -- is put into

02:22:00  15    the AART as a detainer and is ultimately removed, you are

16    telling me that the detainer would appear in the AART but

17    not a separate record for the removal, is that correct?

18        A.    That is correct, yes, sir.

19        Q.    Okay.  And let's turn back now to Exhibit 14.

02:22:31  20    That was that summary that we put together.

21        A.    Okay.

22        Q.    And so, you know -- actually, we have gone on

23    for a quite a stretch.  Why don't we take a short five or

24    10-minute break.  We don't have that much after this, but

02:23:11  25    let's stop and refresh.

1       Q.    Okay.  And just to confirm, you have never seen

2   any report along these lines, is that correct?

3       A.    Not that I recall, sir.

4       Q.    Okay.  Have you heard anyone request these

02:37:45  5   reports before?

6       A.    We have been requested to provide data.  You

7   know, like I said, early on before the AART was created,

8   there was manual reporting.  That manual reporting was

9   needed to compile the report.  But, you know, what portion

02:38:14 10   of that manual reporting went into the report, what it

11   looked like, I have no personal knowledge.

12       Q.    Okay.  Do you know what was submitted based on

13   those requests for data?

14       A.    I do not, no, sir.

02:38:30 15       Q.    All right.  As the Phoenix field office

16   director, what does normal removal operations mean to you

17   with respect to the Phoenix field office prior to

18   February 2021?

19       A.    That's a broad question, sir.  You know, I would

02:38:53 20   say that, you know, the ERO Phoenix field office was

21   working to identify arrests and review individuals

22   amenable to removal.  We were identifying arresting

23   individuals that were amenable to criminal arrest and

24   submitting those to the courts.  And we were removing

02:39:16 25   people.  We were monitoring the nondetained docket.  We

```
 1   were managing alternatives to detention as well as all the
 2   other programmatic areas.  So that's a very broad
 3   question.  But we were doing those mission sets that we
 4   were asked to do.
 5   Q.   Okay.  How does that differ from what the
 6   operations were like after February of 2021?
 7   A.   The -- yeah, we are just operating under
 8   different guidance at this point.  You know, the guidance
 9   has been refined, but all programmatic areas are still
10   being worked.  We are just working on it in different
11   ways.
12   Q.   Okay.  Does a different level of enforcement
13   activity come into play in that definition?
14   A.   Can you clarify that, please.
15   Q.   Does new removal operations reflect a different
16   level of enforcement activity prior to February 2021 as
17   opposed to the current field, the current removal
18   operations?
19          MR. GARDNER:  Objection, vague.
20          THE WITNESS:  The -- if you are asking have
21   things changed, yes, things have changed.
22   BY MR. NAPOLITANO:
23   Q.   So if your superior instructed you effective
24   immediately to resume normal removal operations and you
25   were the field -- say you were still acting field office
```

02:39:37 (line 5)
02:39:58 (line 10)
02:40:16 (line 15)
02:40:39 (line 20)
02:41:02 (line 25)

    1    director, or your superior, while you were the acting

    2    field office director, instructed you to resume normal

    3    field, normal removal operations, would that change the

    4    level of enforcement activity?

02:41:24  5            MR. GARDNER:  Objection, calls for speculation.

    6            THE WITNESS:  You know, I think, in response, I

    7    think there is a qualifier that needs to be, you know,

    8    identified.  You know, as the acting field office director

    9    and as a career law enforcement officer, I am going to

02:41:50 10   perform my duties as assigned.  You know, would it be

   11    different, you know, if we were required to operate in a

   12    different manner?  Yeah, I mean it is going to be

   13    different.

   14            You know, please understand that the men and

02:42:09 15   women of the Phoenix field office and ERO as a whole are

   16    going to exercise and perform our duties as required.  I

   17    hope that helps.  I mean it is a general response, but we

   18    are going to conduct ourselves and perform our duties as

   19    required by the executive branch.

   20    BY MR. NAPOLITANO:

   21        Q.    Okay.  Please open Exhibit 29.  When you have it

   22    open, please let me know if you can identify this exhibit.

   23        A.    Okay.  It is in two separate emails, so it takes

   24    a little time to get back and forth.  Okay.

02:43:14 25       Q.    All right.  And we see that on the bottom,

1  in which those aliens are located?

2        A.    Absolutely.

3        Q.    So if 92 percent of interior removals have

4  criminal convictions or pending criminal charges, and

02:51:02 5  those removals are going to drop, then does that mean

6  people with criminal convictions or charges aren't being

7  removed?

8              MR. GARDNER:  Objection, calls for speculation.

9              THE WITNESS:  I would say that's an accurate

02:51:20 10  statement.

11  BY MR. NAPOLITANO:

12        Q.    Okay.  In total, these are numbers from that

13  same page, it says ICE ERO conducted 185,884 removals,

14  well, from fiscal year 2020, is that correct?

02:51:53 15        A.    ICE conducted 185,884 -- where are you at, sir?

16        Q.    That first paragraph of the third page.

17        A.    Third page, 103,300 -- 103,603 administrative

18  arrests in 2020?

19        Q.    Correct.

02:52:16 20        A.    Yes, sir.

21        Q.    Then it goes on to say that in total ICE ERO

22  conducted 185,884 removals in that year, is that correct?

23        A.    Yes, sir.

24        Q.    Okay.  And if you look at the second page of

02:52:33 25  this, you will notice that the individual discussed was

1     arrested for possession of dangerous drugs and drug
2     paraphernalia?
3          A.    Yes, sir.
4          Q.    And listed at the top, it says he was also
02:53:05 5  wanted by Mexican authorities for possession of military
6     firearms, is that correct?
7          A.    That's correct.
8          Q.    Okay.
9          A.    But he was wanted in his country for carrying
02:53:27 10  firearms and being in possession of firearm cartridges
11    that were exclusive for use of the Mexican military, yes,
12    sir.
13         Q.    Reading from that quote from you, it says:
14    Criminals who attempt to evade their home country's law
02:53:47 15  enforcement reached out -- law enforcement reach will not
16    find refuge in Arizona.  Is that correct?
17         A.    That's correct.
18         Q.    Okay.  Would this individual, based on
19    information presented here, qualify for priority removal?
02:54:01 20         MR. GARDNER:  Objection, calls for speculation.
21         THE WITNESS:  I think at face value the
22    individual would.  But, again, not having all the facts
23    from the case, you know, it is hard to judge.  Each case
24    is reviewed on a case-by-case basis on the totality of the
02:54:24 25  facts.

Albert Edward Carter - May 14, 2021                    160

```
        1   BY MR. NAPOLITANO:

        2       Q.    What, in your opinion, if this was presented to

        3   you as, you know, when you were the acting field office

        4   director, would make this a priority?

02:54:39  5             MR. GARDNER:  Object, calls for speculation,

        6   hypothetical.

        7             THE WITNESS:  As far as reviewing it as an other

        8   priority, you know, just the level of his criminal

        9   activity.  You know, there is a lot of unknowns as -- you

02:55:02 10   know, this is speculative.  If -- you know, it would

       11   depend, you know, with the current case they were arrested

       12   for, would it result in a conviction, or whatever the case

       13   may be.

       14             So, again, I mean there is a lot of missing

02:55:18 15   information that, you know, makes it inconclusive at this

       16   point.  At face value we are going to review the case and

       17   see if it does rise to the level.  But, you know, an

       18   individual like that would cause for a good level of

       19   review.

       20   BY MR. NAPOLITANO:

       21       Q.    This individual was arrested in America for

       22   possession of dangerous drugs and drug paraphernalia.

       23   Would that criminal activity be the only basis for his

       24   priority categorization or would interim guides allow for

02:55:59 25   his warrant for military firearms in Mexico to be
```

1  considered for priority as well?

2      A.   At face value, it would look like an other

3  priority consideration.  And, again, you know, the

4  totality of the facts of the entire case go into that

02:56:25  5  consideration.  You know, the warrant in their home

6  country, the arrest, and the subsequent conviction would

7  be taken into account, as well as those mitigating

8  circumstances as well.

9          So, you know, again, a case, when it comes to

02:56:43  10  the field office director, should be complete and paint,

11  you know, an accurate representation of all the facts in

12  the case.

13      Q.   So is it correct that he would be an other

14  priority and not Priorities 1, 2, or 3?

02:57:06  15          MR. GARDNER:  Objection, calls for speculation,

16  hypothetical.

17          THE WITNESS:  And, again, it would be just for

18  the fact that, you know, we don't have all the facts.  You

19  know, if it looks like this individual was removed in

02:57:23  20  December, if he came back, now he would be a priority

21  under border security.  So, you know, again, I mean it is

22  the totality of all the facts.

23  BY MR. NAPOLITANO:

24      Q.   So discounting border security and the date that

02:57:39  25  this individual might have come in, you said it would be,

 1  it would be other priority or it would be priority?

 2          MR. GARDNER:  Same objection, calls for

 3  speculation, hypothetical.

 4          THE WITNESS:  Based on the facts in the, in the

 5  exhibit, it does not appear to be one of the three

 6  priorities.  So, yes, it would have to be considered as an

 7  other priority based on the information in the exhibit.

 8          MR. NAPOLITANO:  Okay.  Thank you.

 9          All right.  I think that's all we have.

10          MR. GARDNER:  Yeah, no, I have no questions.

11  Just the witness will read and sign the deposition

12  transcript.

13          (The deposition adjourned at 2:58 p.m.)

14

15

16          _____

17                  ALBERT EDWARD CARTER

18

19

20

21

22

23

24

25

1   STATE OF ARIZONA   )
                       )  ss.
2   COUNTY OF MARICOPA )

3

4        BE IT KNOWN that the foregoing deposition was

5   taken before me, COLETTE E. ROSS, CR, Certified Reporter

6   No. 50658 for the State of Arizona, and by virtue thereof

7   authorized to administer an oath; that the witness before

8   testifying was duly sworn by me to testify to the whole

9   truth; pursuant to request, notification was provided that

10  the deposition is available for review and signature; that

11  the questions propounded by counsel and the answers of the

12  witness thereto were taken down by me in shorthand and

13  thereafter transcribed into typewriting under my

14  direction; that the foregoing pages contain a full, true,

15  and accurate transcript of all proceedings and testimony

16  had, all to the best of my skill and ability.

17        I FURTHER CERTIFY that I am not related to nor

18  employed by any of the parties hereto and have no interest

19  in the outcome thereof.

20        DATED at Phoenix, Arizona, this 16th of May,

21  2021.

22

23  _____
         COLETTE E. ROSS, CR
         Certified Reporter No. 50658

24

25