IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, et al., | No. CV-21-00186-PHX-SRB |
| Plaintiff, | **ORDER** |
| v. | |
| United States Department of Homeland Security, et al., | |
| Defendants. | |

The Court now considers Plaintiffs State of Arizona ("Arizona"), State of Montana ("Montana"), and Arizona Attorney General Mark Brnovich ("Attorney General Brnovich," collectively "Plaintiffs")' Motion for Preliminary Injunction ("PI Motion"). (Doc. 17, ("PI Mot.").) Also before the Court is the Government's[1] Motion to Dismiss Plaintiff's Amended Complaint ("Motion to Dismiss"). (Doc. 59, ("MTD").) For the following reasons, the Court grants the Motion to Dismiss without prejudice and denies the PI Motion as moot.

## I.   BACKGROUND

On January 20, 2021, the same day he assumed the office of the Presidency, President Joe Biden signed Executive Order 13,993, entitled "Revision of Civil Immigration Enforcement Policies and Priorities." Exec. Order No. 13,993, 86 Fed. Reg.

---

[1] "Government" is used throughout this Order to refer to all Defendants in this case: United States of America, United States Department of Homeland Security ("DHS"), DHS Secretary Alejandro Mayorkas ("Secretary Mayorkas"), Acting Commissioner of United States Customs and Border Protection ("CBP") Troy Miller ("Acting Commissioner Miller"), Acting Director of United States Immigration and Customs Enforcement ("ICE") Tae Johnson ("Acting Director Johnson"), and Acting Director of United States Citizenship and Immigration Services ("USCIS") Tracy Renaud ("Acting Director Renaud").

7051 (Jan. 20, 2021). The order had two primary components: (1) it revoked former President Donald Trump's Executive Order 13,768, which set forth the previous Administration's enforcement priorities;[2] and (2) it set forth the current Administration's priorities, including "to protect national and border security, address the humanitarian challenges at the southern border, and ensure public health and safety." *Id.* at 7051. President Biden directed the Secretary of State, Attorney General, Secretary of DHS, Director of the Office of Management and Budget, Director of the Office of Personnel Management, and all other heads of relevant executive departments and agencies to issue revised guidance to advance the current Administration's priorities. *Id.*

### A.   The January 20 Memorandum

That same day, DHS Acting Secretary David Pekoske ("Acting Secretary Pekoske") issued "Department-wide guidance" in the form of a four-page Memorandum entitled "Review of and Interim Revision to Civil Immigration Enforcement and Removal Policies and Priorities" (the "January 20 Memo"). (Doc. 12-1, Ex. A, Mem. from Acting Secretary Pekoske to Acting Commissioner Miller, Acting Director Johnson, Acting Director Renaud

---

[2] Those priorities were:

> [DHS] shall prioritize for removal those aliens described by the Congress in sections 212(a)(2), (a)(3), and (a)(6)(C), 235, and 237(a)(2) and (4) of the INA (8 U.S.C. 1182(a)(2), (a)(3), and (a)(6)(C), 1225, and 1227(a)(2) and (4)), as well as removable aliens who:
>
> (a) Have been convicted of any criminal offense;
>
> (b) Have been charged with any criminal offense, where such charge has not been resolved;
>
> (c) Have committed acts that constitute a chargeable criminal offense;
>
> (d) Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;
>
> (e) Have abused any program related to receipt of public benefits;
>
> (f) Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or
>
> (g) In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

Exec. Order No. 13,768, 82 Fed. Reg. 8799, 8800 (Jan. 25, 2017).

(Jan. 20, 2021) ("Jan. 20 Mem.").) In the January 20 Memo, Acting Secretary Pekoske provided three directives. In Section A, he directed the DHS Chief of Staff to "coordinate a Department-wide review of policies and practices concerning immigration enforcement" and develop "recommendations for the issuance of revised policies" within 100 days. (*Id.* at 2.) In Section B, he set forth interim immigration enforcement priorities for DHS while the review prescribed in Section A took place. (*Id.*) Those priorities, which were required to apply "to a broad range of . . . discretionary enforcement decisions," were:

> 1. **National security.** Individuals who have engaged in or are suspected of terrorism or espionage, or whose apprehension, arrest and/or custody is otherwise necessary to protect the national security of the Unites States[;]
>
> 2. **Border security.** Individuals apprehended at the border or ports of entry while attempting to unlawfully enter the United States on or after November 1, 2020, or who were not physically present in the United States before November 1, 2020[; and]
>
> 3. **Public safety.** Individuals incarcerated within federal, state, and local prisons and jails released on or after the issuance of this memorandum who have been convicted of an "aggravated felony," as that term is defined in section 101(a)(43) of the Immigration and Nationality Act at the time of conviction, and are determined to pose a threat to public safety.

(*Id.*) However, Acting Secretary Pekoske also noted in the January 20 Memo that while Section B set out priorities for immigration enforcement, "nothing in this memorandum prohibits the apprehension or detention of individuals unlawfully in the United States who are not identified as priorities." (*Id.* at 3.) He further directed Acting Director Johnson to issue "operational guidance on the implementation of these priorities." (*Id.* at 3.) Finally, in Section C, Acting Secretary Pekoske ordered an "Immediate 100-Day Pause on Removals," subject to certain exceptions,[3] to go into effect no later than January 22, 2021. (*Id.* at 3–4.) Section C's 100-day removal pause was enjoined by the United States District

---

[3] Those exceptions included noncitizens who: (1) engaged in or were suspected of terrorism or espionage or otherwise pose a danger to national security; (2) were not present in the United States before November 1, 2020; (3) voluntarily agreed to waive any rights to remain in the United States; or (4) the Acting Director of ICE determined that removal was required by law. (*Id.* at 4.)

1    Court for the Southern District of Texas by a temporary restraining order on January 26,
2    2021. *See Texas v. United States*, No. 6:21-cv-00003, 2021 WL 247877 (S.D. Tex. Jan. 26,
3    2021).

4        **B.    The February 18, 2021 Interim Guidance**

5        On February 18, 2021, Acting Director Johnson issued "Interim Guidance" to all
6    ICE employees revising and expanding upon the interim civil immigration enforcement
7    priorities laid out in Section B of the January 20 Memo.[4] (Doc. 12-1, Ex. G, Mem. from
8    Acting Director Johnson to All ICE Employees (Feb. 18, 2021) ("IG").) Among other
9    directives, the Interim Guidance: (1) expanded the public safety priority to include
10   noncitizens who were qualifying members of criminal gangs and transnational criminal
11   organizations; (2) established that noncitizens who fit the priority descriptions were to be
12   presumed priorities for civil immigration enforcement and removal; (3) provided guidance
13   for determining whether a noncitizen qualifies as a presumed public safety priority; (4) set
14   forth that no prior approval was necessary for enforcement or removal of a presumed
15   priority; and (5) required written pre-approval from a Field Office Director or Special
16   Agent in Charge for any civil immigration enforcement or removal action against a
17   noncitizen that was not a presumed priority. (*Id.* at 4–6.) Additionally, the Interim
18   Guidance clarified that although it distinguished between presumed priority versus "other
19   priority" noncitizens, "the interim priorities [did] not require or prohibit the arrest,
20   detention, or removal of any noncitizen." (*Id.* at 3.)

21       The Interim Guidance stated it would "remain in effect until Secretary Mayorkas
22   issue[d] new enforcement guidelines" which he anticipated issuing within "90 days" from
23   the date of the Interim Guidance.[5] (*Id.* at 1.) The directives applied to "all civil immigration
24   enforcement and removal decisions" including:

---

25   [4] Acting Director Johnson sought and received approval from Secretary Mayorkas to revise
26   certain provisions of the January 20 Memo. (*Id.* at 1.) Therefore, to the extent the Interim
     Guidance conflicted with the January 20 Memo, the Interim Guidance controlled. (*See id.*)
27   However, given the TRO out of Texas, the Interim Guidance explicitly purported to *not*
     implement Section C. (*Id.* at 2.)
28   [5] Now well past the 90-day period, the Government anticipates the new guidelines to issue
     sometime in late August or early September. (Doc. 89, Sec. Not. Re: Timeline for
     Super'ing Imm. Enforcem't Priorities.)

- Deciding whether to issue a detainer, or whether to assume custody of a noncitizen subject to a previously issued detainer;
- Deciding whether to issue, reissue, serve file, or cancel a Notice to Appear;
- Deciding whether to focus resources only on administrative violations or conduct;
- Deciding whether to stop, question, or arrest a noncitizen for an administrative violation of the civil immigration laws;
- Deciding whether to detain or release from custody subject to conditions;
- Deciding whether to grant deferred action or parole; and
- Deciding when and under what circumstances to execute final orders of removal.

(IG at 3.)

### C.    Procedural Background

Arizona and Attorney General Brnovich filed suit on February 3, 2021, challenging Section C of the January 20 Memo under the Administrative Procedure Act ("APA"). (Doc. 1, Compl.) However, on February 23, 2021, the Southern District of Texas entered a nationwide preliminary injunction enjoining implementation of Section C's 100-day pause on removals. *See Texas v. United States*, No. 6:21-cv-00003, 2021 WL 2096669 (S.D. Tex. Feb. 23, 2021). The Government did not appeal that decision and the 100 days expired on April 30, 2021.

On March 8, 2021, Arizona and Attorney General Brnovich, joined as Plaintiffs by Montana, filed their Amended Complaint. (Doc. 12, Am. Compl.)  Plaintiffs now challenge both the January 20 Memo and the Interim Guidance under the APA, alleging that they constitute agency action that is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law because: (1) they violate Memorandums of Understanding[6] ("MOUs") signed by Plaintiffs and DHS in the waning days of the Trump Administration; (2) they violate 8 U.S.C. § 1231(a)(1)(A)'s requirement to remove noncitizens with final

---

[6] These MOUs were purported agreements between Montana and DHS and Arizona and DHS whereby DHS agreed to "consult" with the States before enacting basically any changes to immigration enforcement, provide the States with "180 days' written notice" of any proposed action, and "provide a detailed written explanation of the reasoning behind any decision to reject" the States' input. (*See* Doc. 12-1, Ex. C, Agreement between DHS, Ariz. Att'y Gen.'s Office, and Ariz. Dep't of Law, at 3–4; Doc. 12-1, Ex. H, Agreement between DHS and Montana, at 2–4.)

orders of removal within 90 days; and (3) the Government failed to provide a reasoned justification for its change in policy, including considering the costs of adopting these policies and any possible alternatives. (*Id.* ¶¶ 76–87, 92–96.) Plaintiffs further challenge both policies as failing to adhere to the APA's notice-and-comment requirements for agency rules. (*Id.* ¶¶ 88–91.) Plaintiffs additionally challenge the Interim Guidance alone as pre-textual agency action, alleging it was "an attempt to quickly paper over the sparse administrative record without changing" the substance of the January 20 Memo's 100-day pause on removals. (*Id.* ¶ 98.)

Plaintiffs also filed their PI Motion on March 8, 2021. (*See* PI Mot.) Referring to both Section C of the January 20 Memo and the Interim Guidance collectively as "the Removal Moratorium," Plaintiffs sought to preliminarily enjoin the Government from enforcing either policy. (*See id.*) The Government filed its Memorandum in Opposition to the PI Motion ("Opposition") on March 26, 2021, to which Plaintiffs filed a Reply on April 5, 2021.  (Doc. 26, Defs.' Mem. in Opp'n to Pls.' PI Mot. ("Opp'n"); Doc. 38, Reply in Supp't of PI Mot. ("Reply").) The Court also received amicus briefs on the PI Motion from the American Civil Liberties Union ("ACLU") and the Immigration Reform Law Institute ("IRLI"). (Doc. 23, Mem. of Law of IRLI; Doc. 30, Br. of Amici Curiae ACLU, ACLU of Ariz., and ACLU of Mont.)

After considering the PI Motion, the Response, the Reply, and both amicus briefs, the Court heard argument on April 8, 2021 and denied the PI Motion as moot as it pertained to Section C of the January 20 Memo because that policy was already under a nationwide injunction—a decision the Government did not appeal. (*See* Doc. 42, Min. Entry.) However, the Court also determined that neither side directly addressed whether the Interim Guidance should be preliminarily enjoined and ordered supplemental briefing on the separate issue.[7] (*See id.*; Doc. 46, 04/13/21 Order.) The Government was also permitted to file its Motion to Dismiss on the same briefing schedule as the supplemental briefing on the PI Motion. (*See* 04/13/21 Order.)

---

[7] The parties were also permitted to conduct limited discovery pertaining to standing and irreparable harm. (*See id.*)

1   Plaintiffs filed their Supplemental Brief in Support of the PI Motion ("Plaintiffs'
2   Supplemental Brief") and the Government filed its Motion to Dismiss on May 6, 2021.
3   (Doc. 64, Supp'l Br. in Supp't of PI Mot. ("Supp'l Brief"); MTD.) The Government filed
4   its Supplemental Brief in Opposition to Plaintiffs' PI Motion ("Supplemental Opposition")
5   and the Plaintiffs filed their Response to the Government's Motion to Dismiss on May 13,
6   2021.[8] (Doc. 69, Defs.' Supp'l Br. in Opp'n to PI Mot. ("Supp'l Opp'n"); Doc. 70, Resp.
7   to MTD.) Additional amicus briefs were also accepted by the Court. (*See* Docs. 63, 73, 77.)
8   After the parties completed the additional briefing on both motions, the Court once again
9   heard oral argument on May 27, 2021. (*See* Doc. 81, Min. Entry.)

10  ## II.   LEGAL STANDARDS

11  ### A.   Motion to Dismiss

12  The Government seeks to dismiss Plaintiffs' Amended Complaint in its entirety
13  pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (*See* MTD at 1.) Rule
14  12(b)(1) allows parties to move to dismiss for lack of subject matter jurisdiction. As courts
15  of limited jurisdiction, federal courts may only hear cases as permitted by Congress and
16  the U.S. Constitution. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).
17  Subject matter jurisdiction "can never be forfeited or waived." *United States v. Cotton*, 535
18  U.S. 625, 630 (2002). Federal jurisdiction is thus presumed lacking until the claimant
19  demonstrates otherwise. *Kokkonen*, 511 U.S. at 377.

20  A Rule 12(b)(6) dismissal for failure to state a claim can be based on either (1) the
21  lack of a cognizable legal theory or (2) insufficient facts to support a cognizable legal
22  theory. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011). In determining
23  whether an asserted claim can be sustained, "[a]ll of the facts alleged in the complaint are
24  presumed true, and the pleadings are construed in the light most favorable to the
25  nonmoving party." *Bates v. Mortg. Elec. Registration Sys., Inc.*, 694 F.3d 1076, 1080 (9th
26  Cir. 2012). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that

27

28  ---
[8] The parties filed additional 3-page supplements to their supplemental briefs on May 19, 2021 and May 21, 2021, respectively. (*See* Doc. 79, Pls.' 3-Page Suppl. to Supp'l Br.; Doc. 80, Defs.' 3-Page Resp. to Pls.' Suppl. ("3-Page Supp'l Opp'n").)

actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). However, "for a complaint to survive a motion to dismiss, the nonconclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### B.    Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up). To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). Employing a sliding-scale analysis, the Ninth Circuit has also stated that if a plaintiff can only show that there are "serious questions going to the merits," an injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the plaintiff satisfies the two remaining *Winter* factors. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quotation and citation omitted); *see Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013). When the government is a party, the last two factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

### C.    ANALYSIS

Both the PI Motion and the Motion to Dismiss are before the Court. The Court first addresses the Government's arguments in favor of dismissal.

### A.    Motion to Dismiss

The Government presents several arguments for dismissal of Plaintiffs' Amended Complaint. First, it argues that Plaintiffs' challenge to Section C of the January 20 Memo is now moot because Section C, by its terms, expired on April 30, 2021. (MTD at 5–7.)

Second, the Government argues that the States lack standing. (*Id.* at 7–9.) Third, the Government contends that Plaintiffs cannot state claims under the APA because they cannot overcome four threshold requirements to judicial review of agency action. (*Id.* at 10–17.) The Court addresses each argument in turn.

### i.        Section C of the January 20 Memo

The Government first argues that "the challenge to the Section C pause is plainly moot" because Section C expired by its own terms on April 30, 2021 and no exception applies. (*Id.* at 5–7.) In response, Plaintiffs acknowledge that they "are no longer challenging the January 20 Memorandum itself but rather the Interim Guidance." (Resp. to MTD at 17.)

Federal courts are granted authority to adjudicate only genuine "Cases" and "Controversies" under Article III of the United States Constitution. U.S. Const. art. III, § 2. To satisfy Article III, an actual case or controversy must exist throughout all stages of litigation. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013). "A case becomes moot— and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer live or the parties lack a cognizable interest in the outcome.'" *Id.* (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (some internal quotation marks omitted)).

The Court concludes that Plaintiffs' challenge to the January 20 Memo in their Amended Complaint is now moot. The 100-day pause—the only section of the January 20 Memo directly challenged in the Amended Complaint—expired on April 30, 2021 and Plaintiffs readily admit that they are no longer challenging the January 20 Memo. (Am. Compl. ¶¶ 2, 8, 29, 35, 43, 45–46, 50, 66–67, 68, 71; Resp. to MTD at 17.) Although Plaintiffs maintain that no part of this case should be dismissed for mootness because the Interim Guidance relies upon the January 20 Memo, they cite no law for this assertion. (*Id.*) Therefore, to the extent that the Amended Complaint presents claims based on the January 20 Memo's 100-day pause on removals, those claims are dismissed.[9]

---

[9] Plaintiffs assert that it would be "premature and contrary to common sense to declare the [January 20 Memo] moot when the Interim [G]uidance is still in effect and being litigated."

1

ii.      **Standing**

2    The Government argues that the Plaintiffs cannot establish standing "because they

3 cannot demonstrate any actual or imminent injury caused by the challenged policies," and

4 alternatively that any claimed injuries are not "fairly traceable to [the] challenged policies

5 or redressable by an order of the Court." (MTD at 7.)

6    In addition to requiring a "live" case or controversy, Article III requires litigants to

7 have standing to bring their claims. *See California v. Texas*, 593 U.S. ___, slip op. at 4

8 (June 17, 2021). It is the burden of the party invoking federal jurisdiction to establish

9 standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "A plaintiff has

10 standing only if he can 'allege personal injury fairly traceable to the defendant's allegedly

11 unlawful conduct and likely to be redressed by the requested relief.'" *California*, 593 U.S.

12 ___, slip op. at 4 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)); *see

13 also Lujan*, 504 U.S. at 560–61 (1992). "Absent such a showing, exercise of its power by

14 a federal court would be gratuitous and thus inconsistent with the Art[icle] III limitation."

15 *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S.Ct. 1645, 1650 (2017) (internal

16 quotation marks and citation omitted). While "States are not normal litigants for the

17 purposes of invoking federal jurisdiction," nothing prevents them from satisfying the

18 "regular inquiry." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *see Texas*, 2021 WL

19 2096669, at *10.

20    "The general rule applicable to federal court suits with multiple plaintiffs is that

21 once the court determines that one of the plaintiffs has standing, it need not decide the

22 standing of the others." *Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012) (quoting

23 *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993)); *see also Dep't of Commerce v. New

24
25
26
27
28

(*Id.*) Plaintiffs misconstrue the Government's argument. Plaintiffs sought declaratory and injunctive relief in their Amended Complaint on the basis that the January 20 Memo, through its 100-day pause on removals, was arbitrary and capricious, issued without observance of procedure required by law, violated 8 U.S.C. § 1231, and issued without notice and comment. (Am. Compl. ¶¶ 76–91.) It is not that the January 20 Memo ceases to be relevant in evaluating the Interim Guidance. It is that, by their own admission, Plaintiffs no longer challenge the January 20 Memo itself, and, in any event, the 100-day pause expired on April 30, 2021. There is no live controversy over the January 20 Memo's 100-day pause when Plaintiffs are no longer challenging it. *See Already, LLC*, 568 U.S. at 90–91.

*York*, 139 S.Ct. 2551, 2565 (2019) ("[T]o qualify as a genuine case or controversy, at least one plaintiff must have standing to sue."). The parties focus almost exclusively on whether Arizona can establish standing to bring the APA claims, and the Court likewise focuses its analysis.

Plaintiffs contend that the Government's "dramatic decreases in removals [under the Interim Guidance] inflict injury directly upon" Arizona in the form of increased costs: (1) in community supervision of noncitizens with criminal convictions who must be released from state prison into the community instead of being removed; (2) from having to provide emergency medical care to noncitizens that otherwise would have been removed; and (3) from having to provide education to unremoved noncitizens. (Resp. to MTD at 3–6.) Each of these injuries, Plaintiffs allege, are directly linked to the Government's issuance of the Interim Guidance and are redressable by an order of this Court. (*Id.*) The Court analyzes Plaintiffs' standing under the first alleged injury.

Article III standing requires plaintiffs to allege that they have suffered an injury in fact. *Lujan*, 504 U.S. at 560. "An injury in fact is 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Nw. Requirements Utils. v. F.E.R.C.*, 798 F.3d 796, 805 (9th Cir. 2015) (quoting *Lujan*, 504 U.S. at 560); *see also City and Cnty. of San Francisco v. United States Citizenship and Immigr. Servs.*, 981 F.3d 742, 754 (9th Cir. 2020). An injury is "concrete" if it "actually exists" and is not merely "abstract." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016). An injury is "particularized" if it affects the plaintiff in a personal and individual way. *Id.* Even future injuries "may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Commerce*, 139 S.Ct. at 2565; *Nw. Requirements Utils.*, 798 F.3d at 805.

Plaintiffs present evidence that Arizona annually spends $4,163.60 per individual placed on community supervision after they are released from state prison. (Doc. 61-5, Ex. X, Decl. of Shaka Okougbo ¶ 4.) Plaintiffs further present evidence that the Arizona Department of Corrections, Rehabilitation, and Reentry ("ADCRR") has already been

forced to place at least four noncitizens "with criminal convictions on community supervision . . . who, but for the Interim Guidance, would have been [removed]." (Resp. to MTD at 3; Supp'l Br. at 18; Doc. 61-4, Ex. W, Decl. of Jennifer Abbotts ("Abbotts Decl.") ¶¶ 2–8; Doc. 61-4, Exs. A, C, E, to Abbotts Decl.) ADCRR put these individuals on community supervision because ICE lifted detainers against them as a result of their failure to meet ICE's removal priorities under the Interim Guidance. (*See* Exs. A, C, E to Abbotts Decl.) Plaintiffs allege that ICE will continue to lift detainers under the Interim Guidance, not remove the incarcerated noncitizens upon their release, and that Arizona will therefore continue to accrue additional community supervision costs over unremoved criminal noncitizens. (Resp. to MTD at 3.) This is because over 6% of Arizona's prison population—2,434 noncitizen inmates—currently have ICE detainers lodged against them. (Resp. to MTD at 3; *see* Doc. 61-4, Ex. H to Abbotts Decl., ADCRR Report on Arizona Inmates with ICE Detainers as of April 29, 2021.) If even just 1% of these individuals have their detainers lifted, Plaintiffs contend, Arizona will be forced to hire additional community supervision staff to deal with the increase. (Resp. to MTD at 3 n.3.)

In addition to cost resulting from the lifted detainers, Plaintiffs contend that Arizona will incur increased costs in community supervision because ICE has drastically reduced the number of detainers it is issuing in the first place: from approximately 300 per month throughout 2020 to less than 100 per month under the Interim Guidance, February through April 2021. (Resp to MTD at 4; Doc. 70-1, Ex. BB, Defs.' Resp. and Obj. to Pls.' Third Disc. Req. at 5.) Plaintiffs contend that this means that "the majority of previously removable [noncitizens] taken into custody may be incarcerated and released without ever having had a detainer placed on them, making the future injury harder to document on an individual basis, but no less real." (Resp. to MTD at 4.)

The Court finds that the increase in community supervision costs, both already suffered and likely to arise in the near future, constitutes a concrete and particularized injury under Article III. *See Lujan*, 504 U.S. at 560. Arizona spends a significant amount of money on conducting community supervision of individuals released from state

prison—almost $23,000,000 in 2019—and unremoved noncitizens are being added to the ranks of those under community supervision, which almost certainly increases the overall cost to Arizona. (*See* Decl. of Shaka Okougbo ¶ 3; Exs. A, C, E to Abbotts Decl.) Even if the Court agreed with the Government that Arizona has yet to incur any additional costs from community supervision,[10] there is a substantial risk that those costs will occur in the near future given the sheer volume of noncitizens in Arizona state prisons subject to ICE detainers and the Government's clear willingness to lift detainers against criminal noncitizen's in Arizona's custody. *See Dep't of Commerce*, 139 S.Ct. at 2565. It is without question that Arizona, as a border state, "bears many of the consequences of unlawful immigration" as "[h]undreds of thousands of [removable noncitizens] are apprehended in Arizona each year." *Arizona v. United States*, 567 U.S. 387, 397 (2012). One such consequence is that for those noncitizens who commit state crimes, are then incarcerated, and subsequently released but not removed by ICE, Arizona has to spend money to supervise their release into the community. Plaintiffs have met their burden to show they have suffered or will imminently suffer an injury in fact.

Turning to the second and third requirements for standing—traceability and redressability—the Court finds that the rise in supervision costs are traceable to the Interim Guidance and redressable by the Court's entry of an injunction prohibiting implementation of the Interim Guidance.

As to traceability, it is quite clear to the Court that the increase in community supervision costs is "fairly traceable" or "causally linked" to the Interim Guidance and not "the result of independent choices of third parties." *See Nw. Requirements Utils.*, 798 F.3d at 806. As noted above, for all four of the lifted detainers that resulted in noncitizens being placed on community supervision, ICE specifically relayed that it lifted the detainers because of the new enforcement priorities, which are embodied in the Interim Guidance.

---

[10] The Government argues that Plaintiffs have failed to carry their burden because they did not show that Arizona has actually had to spend any additional money on community supervision, but rather merely notified the Court of what it currently spends on supervision per individual. (Supp'l Opp'n at 4.) Arizona, the Government continues, cannot establish a monetary injury unless it can show that it is suffering some additional cost in community supervision, not just that additional cases would be assigned to existing case workers. (*Id.*)

(*See* Exs. A, C, E to Abbotts Decl.) Although the Government halfheartedly suggests that the supervision costs are not traceable to the Interim Guidance because "it would be *Arizona's* choice to commit resources to supervising these individuals; nothing in the [Interim Guidance] compels them to do so," that argument is misplaced. (Supp'l Opp'n at 4.) The Interim Guidance "need not be the sole source of injury, and a causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible." *Nw. Requirements Utils.*, 798 F.3d at 806 (internal quotation marks and citation omitted). Nothing about Plaintiffs' argument of causation is "hypothetical or tenuous": because of the Interim Guidance, ICE is lifting detainers against criminal noncitizens, which then forces Arizona to place these individuals on community supervision when they are released at the end of their state prison sentences. The fact that the Interim Guidance does not compel Arizona to supervise the released criminal noncitizens is not dispositive as to whether the Interim Guidance is "causally linked" to the rising costs of doing so.

As to redressability,[11] "plaintiffs must show that that the relief they seek is both (1) substantially likely to redress their injuries; and (2) within the district court's power to award." *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020) (citation omitted). "Redress need not be guaranteed, but it must be more than merely speculative." *Id.* (cleaned up). In their Amended Complaint, Plaintiffs seek to have the Court enjoin the Government from applying the Interim Guidance. (Am. Compl. at 18.) Were the Court to oblige, the Government would be forced to return to "normal removal operations," and remove the criminal noncitizens that would otherwise be placed on community supervision. (Resp. to MTD at 7–8.) The Court finds that Arizona's alleged injury can be redressed because "an order against the named defendants would offer some relief to Arizona." *United States v. Arizona*, No. CV-10-1413-PHX-SRB, 2011 WL 13137062, at *2 (D. Ariz. Oct. 21, 2011) (quoting *Chiles v. United States*, 69 F.3d 1094, 1096 (11th Cir. 1995)).

---

[11] The Government never substantively contended, in any briefing, that a favorable decision from this Court would not redress Plaintiffs' alleged injuries. (*See* Opp'n; MTD; Supp'l Opp'n; 3-Page Supp'l Opp'n.)

1    The Court concludes that Arizona has established standing to sue under Article III

2    due to its increased costs in community supervision of unremoved criminal noncitizens and

3    therefore declines to address Arizona's other alleged injuries or the standing of Montana

4    or Attorney General Brnovich. *See Melendres*, 695 F.3d at 999.

5                        **iii.     Judicial Review Under the APA**

6    As an alternative ground for dismissal, the Government argues the Interim Guidance

7    is not subject to judicial review under the APA because it fails to meet four "threshold"

8    requirements to review: (1) the Interim Guidance's prioritization scheme is agency action

9    committed to agency discretion by law; (2) Congress has precluded judicial review of these

10   decisions under 8 U.S.C. § 1252(a)(5) and 1252(b)(9);  (3) Plaintiffs fall outside the "zone

11   of interests" protected by 8 U.S.C. § 1231; and (4) the Interim Guidance is not final agency

12   action. (MTD at 10–17.)

13   The APA establishes a general presumption of judicial review of agency action.

14   *Dep't of Commerce*, 139 S.Ct. at 2567. However, "before any review at all may be had, a

15   party must first clear the hurdle of [5 U.S.C.] § 701(a)." *Heckler v. Chaney*, 470 U.S. 821,

16   828 (1985). Section 701(a)(2) provides that no review may occur if the "agency action is

17   committed to agency discretion by law." The general presumption of judicial review of

18   agency action does not apply when the challenged agency action is a decision *not* to take

19   an enforcement action. *Chaney*, 470 U.S. at 831. In these instances, a presumption exists

20   that judicial review is not available. *Id.* This presumption recognizes that "an agency's

21   decision not to prosecute or enforce, whether through civil or criminal process, is a decision

22   generally committed to an agency's absolute discretion" and that these decisions are

23   generally unsuitable for judicial review.[12] *Id.* This presumption may be rebutted if

24   Congress "has provided guidelines for the agency to follow in exercising its enforcement

25   powers" or where "the agency has consciously and expressly adopted a general policy that

26   _____

[12] The Supreme Court in *Chaney* stated that these decisions were unsuitable for judicial
27   review because they involve "a complicated balancing of a number of factors which are
     peculiarly in [the agency's] expertise," including whether: (1) "agency resources are best
28   spent on this violation or another"; (2) "the agency is likely to succeed if it acts"; (3) "the
     particular enforcement action requested best fits the agency's overall policies"; and (4) "the
     agency has enough resources to undertake the action at all." *Id.*

1    is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 832–33;
2    *id.* at 833 n.4.

3          Both Plaintiffs and the Government acknowledge that the Interim Guidance is
4    presumptively unreviewable under *Chaney*. (*See* MTD at 10; Resp. to MTD at 8.) Plaintiffs
5    contend, however, that the presumption is rebutted here because 8 U.S.C. § 1231(a)(1)(A)
6    provides sufficient guidelines for DHS to follow and because the Interim Guidance, insofar
7    as it addresses execution of final orders of removal, reflects an abdication of the
8    Government's statutory responsibilities. (Resp. to MTD at 9–11.) The Court disagrees and
9    concludes that it cannot properly review Plaintiffs' claims.

10         Under 8 U.S.C. § 1231(a)(1)(A), "[e]xcept as otherwise provided in this section,
11   when an alien is ordered removed, the Attorney General shall remove the alien from the
12   United States within a period of 90 days." Plaintiffs argue that in this context "shall" means
13   "must." (Resp. to MTD at 9.) Under that reading, Plaintiffs' continue, there is no discretion
14   for the Government to apply, meaning Congress has provided the guidelines needed to
15   rebut the presumption of non-reviewability. (*See id.*) At first glance, it appears that
16   Plaintiffs may have a point based on the plain language used in the statute. The statute uses
17   unequivocal language seeming to mandate removal within 90 days, thereby limiting the
18   "broad discretion exercised by immigration officials." *See Arizona v. United States*, 567
19   U.S. 387, 396 (2012). However, a blanket "shall" does not automatically constitute a
20   statutory mandate, especially when it concerns the enforcement of laws. *See Town of Castle*
21   *Rock v. Gonzales*, 545 U.S. 748, 761 (2005); *Sierra Club v. Whitman*, 268 F.3d 898, 904
22   (9th Cir. 2001) ("[T]he use of 'shall' is not conclusive.'").  Instead, "a true mandate of
23   police action would require some stronger indication" from Congress than simply placing
24   the word "shall" in the legislative command. *Gonzales*, 545 U.S. at 761.

25         Here, no such stronger indication is present. First, interpreting 8 U.S.C. §
26   1231(a)(1)(A)'s language as a mandate is not supported by the additional language in 8
27   U.S.C. § 1231(a)(3), which contains provisions for when a noncitizen is *not* removed
28   within the 90-day statutory period. 8 U.S.C. § 1231(a)(3) ("If the alien does not leave *or is*

*not removed* within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." (emphasis added)). Indeed, federal regulations explicitly allow noncitizens that are subject to final orders of removal to request stays of removal, which may be granted in ICE's discretion "for such time and under such conditions" as ICE deems appropriate. 8 C.F.R. § 241(a). Interpreting § 1231(a)(1)(A) to mandate the removal of a noncitizen within 90 days is irreconcilable with § 1231(a)(3)'s provisions for supervision of noncitizens not removed within 90 days.

Second, the Supreme Court itself has on multiple occasions recognized the Government's discretion not to remove a noncitizen within the 90-day period. For example, in *Reno v. American-Arab Anti-Discrimination Committee*, the Court stated that the Government has discretion to "abandon the endeavor" to remove noncitizens at any stage of the removal process, including when "executing removal orders." 525 U.S. 471, 483 (1999) (cleaned up). And in *Zadvydas v. Davis*, the Court noted that it is doubtful "that when Congress shortened the removal period to 90 days in 1996 it believed that all reasonably foreseeable removals could be accomplished in that time." 533 U.S. 678, 701 (2001).

Finally, the legislative history of 8 U.S.C. § 1231 further bolsters the reading of § 1231(a)(1)(A)'s 90-day period as merely a "target" date for removal rather than a statutory mandate. *See* H.R. Rep. 104-469, pt. 1, at 160 (1996) (referring to the 90 days as a "target period").

Contrary to Plaintiffs' assertions, there is no "stronger indication" here that Congress meant the 90-day period to be mandatory.[13] *See Gonzales*, 545 U.S. at 761; *contra Texas v. United States*, 2021 WL 2096669, at *33–*38, (S.D. Tex. Feb. 23, 2021) (finding "shall" means "must" in 8 U.S.C. § 1231(a)(1)(A)). The Court does not read the use of a naked "shall" in § 1231(a)(1)(A) as stripping the Government of its discretion to prioritize the removal of certain noncitizens over others and as mandating the removal of all

---

[13] The Court finds the lack of a stronger indication even more important in the context of immigration enforcement, given that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

noncitizens with final orders of removal within 90 days. Section 1231(a)(1)(A) therefore does not suffice to rebut the presumption of non-reviewability.

In order to avoid this conclusion, Plaintiffs cite to one sentence used by the Ninth Circuit in *Lema v. I.N.S.*, 341 F.3d 853, 855 (9th Cir. 2003). (MTD Resp. at 9.) In *Lema*, the Ninth Circuit stated that "[o]rdinarily, [DHS] must remove an alien *in its custody* within ninety days from the issuance of a final removal order." *Id.* (citing 8 U.S.C. § 1231(a)(1)(A)–(B)) (emphasis added). However, *Lema* does not address whether all noncitizens with final orders of removal must be removed within the 90-day removal period. *See id.* Furthermore, *Lema* did not concern judicial review under the APA nor present the opportunity for the Ninth Circuit to address whether "shall" means "must" in this statute. *See id.* Instead, the court in *Lema* addressed whether a removable noncitizen, who was in custody and refused to cooperate with government officials to obtain travel documents from a foreign government could be detained indefinitely. *Id.* at 854. *Lema* is therefore distinguishable from the instant case and the Court does not read the single cited sentence, which predates *Gonzales*, as presenting binding precedent requiring a contrary conclusion to that reached above.

Plaintiffs next seek to rebut the presumption of non-reviewability by claiming that the Interim Guidance reflects an abdication of the Government's statutory responsibility to remove noncitizens that have final orders of removal. (Resp. to MTD at 9–11.) Plaintiffs argue that the Interim Guidance "is not mere prioritization/allocation of scarce resources, but rather a substantive rule that imposes substantive criteria: effectively creating only three categories of aliens for whom DHS will even attempt to carry out removal under § 1231(a)(1)[.]" (*Id.* at 10.; *see also* Am. Compl. ¶ 73.) The Court does not agree.

By its very terms, the Interim Guidance does not "prohibit the arrest, detention, or removal of any noncitizen," but merely sets up procedural steps for "other priority" cases to be pursued in light of ICE's "limited resources" and other various factors. (*See* IG at 2–3, 6.) This distinguishes the Interim Guidance from the enjoined 100-day pause on removals in Section C of the January 20 Memo, which arguably did present a scenario

1    where the Government abdicated its responsibility to remove noncitizens with final orders

2    of removal. The Government is not refusing to remove "other priority" noncitizens; it is

3    prioritizing the removal of some noncitizens over others. While Plaintiffs may not agree

4    with this prioritization scheme, Plaintiffs' allegations in their Amended Complaint do not

5    "rise to a level that would indicate" that the Government is *abdicating* its responsibility to

6    remove noncitizens with final orders of removal from the United States.[14] *California v.*

7    *United States*, 104 F.3d 1086, 1094 (9th Cir. 1997); *see Arizona*, 2011 WL 13137062, at

8    \*9 ("While Arizona may disagree with the established enforcement priorities, Arizona's

9    allegations do not give rise to a claim that the Counterdefendants have abdicated their

10   statutory responsibilities.").

11      Having found that the Interim Guidance is not subject to judicial review, the Court

12   finds that Plaintiffs have failed to state a claim under the APA and dismisses Plaintiffs'

13   Amended Complaint.[15]

14           **iv.    Leave to Amend**

15      Plaintiffs request that "if the Court does grant any part of [the Motion to Dismiss],

16   such dismissal should be with leave to amend." (*See* Resp. to MTD at 18.) Leave to amend

17   should be "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). This policy is

18   to be applied with "extreme liberality" and leave should be granted unless there is an

19   apparent reason for denying this opportunity, such as "bad faith, undue delay, prejudice to

20   the opposing party, and/or futility." *See Eminence Cap., LLC v. Aspeson, Inc.*, 316 F.3d

---

22 [14] To be sure, the low number of preapproval requests for removal of "other priority"
noncitizens in ICE's Phoenix Field Office is concerning: only 17 such requests came in
23 over the first 53 days the Interim Guidance was in effect. (*See* Doc. 79-1, Ex. FF, Requests
for Preapproval for Removal in PHX Field Office from 2/22/21 to 4/15/21.) However, the
24 former ICE Acting Phoenix Field Office Director, Albert Carter, testified that the low
initial numbers were due to initial difficulty in understanding how to apply the new
25 prioritization scheme, and that by the end of his time in that position, in early May, he was
receiving "at bare minimum . . . on average, give or take, three [preapproval requests] a
26 day." (Doc. 80-1, Ex. 4, Excerpts from Albert Carter Dep. at 101:11–13, 105:2–4.) The
Government's slow start at implementing its new prioritization scheme, especially in light
27 of the drastic nature of the change in priorities between the two administrations, does not
suggest it was abdicating its responsibilities.
[15] Because the Court finds that it is barred from conducting judicial review of the Interim
28 Guidance as agency action committed to agency discretion by law, it does not reach the
Government's alternative arguments for non-reviewability.

1048, 1051 (9th Cir. 2003); *Serra v. Lappin*, 600 F.3d 1191, 1200 (9th Cir. 2010). Since no "apparent reason" has been offered by the Government why Plaintiffs should not be allowed leave to amend and the "extreme liberality" with which leave to amend should be granted, the Court will allow Plaintiffs to file a Second Amended Complaint. *See Eminence Cap., LLC*, 316 F.3d at 1051.

**B.  Preliminary Injunction**

Because the Court determines that Plaintiffs have failed to state claims under the APA, and dismisses the Amended Complaint on that basis, Plaintiffs' PI Motion is denied as moot.

**D.  CONCLUSION**

The Court concludes that Plaintiffs' challenges to Section C of the January 20 Memo are moot and dismisses their claims to the extent they challenge Section C. Further, although Plaintiffs have standing to bring their suit, the Court concludes they have failed to state a claim under the APA regarding the Interim Guidance because the Interim Guidance is unreviewable as agency action committed to agency discretion by law. The Government's Motion to Dismiss is therefore granted and the Amended Complaint is dismissed. However, the Court will grant Plaintiffs leave to file a Second Amended Complaint related to the Interim Guidance. Plaintiffs' PI Motion is denied as moot.

**IT IS ORDERED** granting the Government's Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 59).

**IT IS FURTHER ORDERED** denying Plaintiffs' Motion for Preliminary Injunction as it pertains to the Interim Guidance as moot (Doc. 17).

. . .

. . .

. . .

. . .

. . .

. . .

**IT IS FURTHER ORDERED** permitting Plaintiffs to file a Second Amended Complaint related to the Interim Guidance not later than 30 days from the date of this Order. If no Second Amended Complaint is filed within 30 days, final Judgment will be entered without further notice.

Dated this 30th day of June, 2021.

_____
Susan R. Bolton
United States District Judge