# Exhibit A

Case 2:21-cv-00186-SRB   Document 101-1   Filed 07/12/21   Page 2 of 5
State of Arizona vs. United States Department of
Homeland Security // 2:21-cv-00186-SRB
Albert Edward Carter
May 14, 2021

10:32:53-10:34:30                                      Page 34

1  Q.  Okay.  Do some of the individuals who are
2  released as you describe have criminal convictions or
3  criminal charges that do not meet the priority guidance?
4       MR. GARDNER: Objection, lack of foundation.
5       THE WITNESS: So to answer your question, sir,
6  there are individuals that, with varying backgrounds, be
7  it criminal histories or whatever the case may be, that
8  are released on a regular basis depending on, you know,
9  what, what process of the immigration process they are in.
10 Individuals can bond out.  Individuals can be granted
11 relief whether they have a criminal history or not.
12      BY MR. NAPOLITANO:
13 Q.  Okay.  And once people are released from these
14 facilities, where do those people go once they are
15 released?
16 A.  It varies, sir.
17 Q.  When they are released, are they released into
18 the State of Arizona?
19 A.  Yes, sir, they sure are.
20 Q.  And does the Phoenix field office still attempt
21 to identify the location of these individuals after they
22 are released?
23 A.  It is a broad question, sir.  The -- there is a
24 variety of things that go on after.  If the individual is
25 staying in the State of Arizona, depending on where they

10:34:54-10:35:55                                      Page 35

1  are in their court case would determine, you know, what
2  level monitoring that we provide.  And if they were
3  granted relief and they are legally entitled to stay in
4  the United States, you know, we don't necessarily try to
5  track that close.  If they are still going through
6  proceedings and they are required to report into the ERO
7  field office, then, you know, we, we have them come in on
8  a regular basis.
9       What you will find is that, you know, a lot of
10 individuals that are released from the Phoenix field
11 office detention system, is that they travel outward.
12 And, again, it would be the same situation there.  If they
13 are traveling out of state and they are still going
14 through proceedings, then they would most likely be
15 required to report to the local ERO office at their final
16 destination.  If they are granted relief, then not so
17 much, if that makes sense.
18 Q.  Okay.  Thank you.
19      So to clarify, the, at least some of these
20 individuals stay in the State of Arizona, these
21 individuals who have been released from detention
22 facilities?
23 A.  Some do, yes.
24      MR. NAPOLITANO: Okay.  Mr. Gardner, in Arizona
25 you only specify form and foundation in your objection to

10:36:16-10:37:34                                      Page 36

1  preserve your objection, if you would.
2       BY MR. NAPOLITANO:
3  Q.  Are there other types of facilities in Arizona
4  where ICE houses people besides detention facilities?
5  A.  Houses, no.  There are ICE processing stations
6  like the office here in Phoenix.  There is a processing
7  area where they are processed administratively, the case
8  is reviewed and determined whether or not detention is
9  suitable or not.  And there are, there are about four
10 other locations in the State of Arizona that would make up
11 that 12-hour processing location.
12 Q.  And who is in charge of those processing
13 locations?
14 A.  The field office director is ultimately in
15 charge.  But, you know, going down the table of
16 organization then is, it would be deputy field office
17 directors and, you know, down to various supervisors.
18 Q.  Who would be the person directly in charge of
19 those, of those processing facilities?
20 A.  Again, directly, I mean it would be the field
21 office director, but, you know, there are multiple,
22 multiple layers in the chain of command.  But for, you
23 know, individual locations, we have either an officer in
24 charge or an assistant field office director that provides
25 the day-to-day.

10:38:02-10:39:20                                      Page 37

1  Q.  And is there a third type of facility that is
2  through Health and Human Services, not DHS, where some of
3  these immigrants go?
4  A.  That are operated by DHS, no.  HAHS, you know,
5  another department, they do have shelters throughout the
6  State of Arizona.
7  Q.  So HAHS has shelters throughout the State of
8  Arizona where some aliens are housed, is that correct?
9  A.  That is correct, yes, sir.
10 Q.  And is the Phoenix field office director or
11 acting field office director directly in charge of those
12 facilities?
13 A.  No, sir.
14 Q.  To whom do they report?
15 A.  Health and Human Services.
16 Q.  Thank you.
17      I want to ask about the number of employees and
18 contractors in the field office.  I am going to ask you
19 about private contractors next, but I don't want you to
20 include that in your answer.
21      Mr. Carter, I wanted to ask you about the number
22 of employees and contractors assigned to the Phoenix field
23 office.  I am going to ask you about private contractors
24 next.  So in my first question, I do want you to include
25 that number.  Approximately how many ICE employees are

Case 2:21-cv-00186-SRB   Document 101-1   Filed 07/12/21   Page 3 of 5
State of Arizona vs. United States Department of
Homeland Security // 2:21-cv-00186-SRB
Albert Edward Carter
May 14, 2021

**12:50:58-12:53:08**   Page 98

1  removal tool database?
2  A.  I am, yes, sir.
3  Q.  Okay.  If I refer to that as the AART, is that
4  okay for you to recognize what I am speaking about?
5  A.  Absolutely, yes, sir.
6  Q.  Okay.  What is the AART?
7  A.  It is the database in which all the cases for an
8  enforcement action are entered into requesting -- not
9  necessarily requesting, but it records all the arrests or
10 pending arrests.
11 Q.  Anything else in that database, I mean probably
12 in terms of broad strokes?
13 A.  Broad strokes, I mean it is the database that
14 all the cases are entered into, one, to document, you
15 know, enforcement actions that are included in the
16 priorities, as well as those requests or other priority
17 cases.
18 Q.  Okay.  All right.  So I would like to open
19 Exhibit 14.
20 A.  Okay.  14 is in a different email.  Are we done
21 with 1 through 13?
22 Q.  I think we are for now, yes.
23 A.  All right.
24 Q.  Just let me know when you have it.  Take your
25 time, sir.

**12:53:26-12:55:14**   Page 99

1  A.  I have it open.  I can't see the screen.  The
2  exhibit is covering my Zoom.  But I have it open.
3  Q.  Okay.  So this Exhibit 14 is a document summary
4  that the Arizona Attorney General's Office created after
5  reviewing every document produced to us from AART.  It
6  shows that during the total time period we have documents
7  for, which is February 22, 2021 to April 15th, 2021, there
8  were only 17 aliens for whom requests for preapproval for
9  removals were made in the Phoenix field office.
10      Does 17 aliens, or does 17 aliens for whom
11 requests in that time period were made sound accurate to
12 you?
13 A.  It does not.  The, and early on after the
14 priorities were implemented, the AART tool was, it was
15 developed after the fact.  So my understanding was that
16 those cases were, you know, put in at some point.  But the
17 17 does not sound right to me.
18 Q.  Okay.  Why does it not sound right to you?
19 A.  Over -- I believe I recall, I believe, it was a
20 53-day span.  And it just seems like it is awfully low.
21 Over 50 some on odd days, it took up a fair amount of time
22 working on those.
23      Now, I will say this.  The tool has evolved.
24 You know, early on all the cases were input that had to
25 have the approval.  That was changed at a later time to

**12:55:36-12:57:18**   Page 100

1  where those cases that were priority were not routed to
2  the field office director for review.  They were approved
3  through the February interim guidance.  So there could be
4  a variety of reasons for that.  That could be part of it.
5      But, you know, there, it seems low.
6  Q.  Okay.  Were -- as the acting field office
7  director, did all requests for preapproval come to you?
8  A.  I would say 99 percent of them.  There was a
9  span at, I don't know the dates at this time, that
10 Alejandro Almeida was the acting FOD when I was on leave.
11 But I believe you are only talking probably one to three
12 submissions at most.  I covered many, probably
13 99.5 percent of them.
14 Q.  Okay.  And I want to clarify.  What this, this
15 spreadsheet or this table shows is just other priority,
16 not priority removal, but other priority removals.
17      So given that clarification, does it sound right
18 to you that there were only 17 other priority removals
19 requested?
20 A.  It would still seem somewhat low, understanding
21 early on, you know, there was uncertainty over the
22 interpretation of the priorities.  So ERO Phoenix did
23 start a little slow, but, you know, again, given what I
24 feel the average was, it still seems a little low.
25 Q.  Okay.  What number would seem right?  More than

**12:57:35-12:59:40**   Page 101

1  50?  More than 100?
2  A.  I would be afraid to say, sir.  You know, again,
3  just like some of the other things that I mentioned
4  earlier, it is cyclical.  You know, it, you know, it goes
5  up, goes down.  But I would be afraid to say.  17 over a
6  50 some odd day span just seems low to me.  I mean that's
7  an average of, what, one every three days, one every four
8  days.  That seems odd.
9  Q.  Would you say you probably received one a day,
10 two a day?
11 A.  I would say the bare minimum probably towards
12 the end of my acting time, it would have been probably an
13 average, give or take, three a day.  But, you know,
14 probably it is certainly single digits per day.
15 Q.  Okay.  And that's just for preapproval of other
16 priority removals, isn't that correct?
17 A.  That's correct, sir.
18 Q.  Is there a better data source than AART?
19 A.  No, sir, in my opinion.  I mean, you know,
20 that's where, that's where we are documenting the cases.
21 Q.  And going back to our earlier calculation, so
22 the Phoenix field office is removing potentially about 330
23 fewer people per month.  There are only 17 requests here.
24 If we took the high end of your number over 50 days, you
25 said at the end the high was three a day requests for

Case 2:21-cv-00186-SRB   Document 101-1   Filed 07/12/21   Page 4 of 5
State of Arizona vs. United States Department of Homeland Security // 2:21-cv-00186-SRB
Albert Edward Carter
May 14, 2021

**01:00:05-01:01:30** — Page 102

1 preapproval, that would amount to 150 over those 50 days.
2 Why so few given the drop in removals?
3     MR. GARDNER: Objection, calls for speculation.
4     THE WITNESS: To answer I would go back to your
5 earlier point.  You know, if these are other priority
6 cases, you are only talking a small, a small portion of
7 it.  You know, you still have the other priority cases
8 that would fall into, potentially into those removals and
9 arrests and other statistics.  So it is kind of an apples
10 to oranges comparison.
11     BY MR. NAPOLITANO:
12 Q.  Why would we only, why -- who initiated the
13 requests for preapproval, generally, not individual names,
14 but what types of individuals would bring these requests
15 to you?
16 A.  It would be the, for Arizona, it would be the
17 ERO deportation officers assigned to the Phoenix field
18 offices.
19 Q.  Is it true that they would initiate them and
20 bring them to you; you would not initiate them yourself?
21 A.  That's correct.
22 Q.  Okay.  And, yet, with the reduced activity that
23 we talked about, we are still seeing only a percentage, be
24 it 17 or maybe more, a small percentage of the overall
25 number of dropoff being made up for with requests for

**01:01:48-01:03:04** — Page 103

1 preapproval.  Do you know why that would be?
2     MR. GARDNER: Objection, lack of foundation,
3 calls for speculation.
4     THE WITNESS: I apologize, sir.  I am not sure I
5 understand your question to begin with.
6     BY MR. NAPOLITANO:
7 Q.  Was there anything that, was there anything
8 that --
9     Could the court reporter read my question back,
10 please.
11     (The record was read by the reporter as
12 requested as follows:
13     Question: And, yet, with the reduced
14 activity that we talked about, we are still seeing
15 only a percentage, be it 17 or maybe more, a small
16 percentage of the overall number of dropoff being
17 made up for with requests for preapproval.  Do you
18 know why that would be?)
19     MR. GARDNER: Same objections.
20     THE WITNESS: Unfortunately I am still not clear
21 as to what the question is.
22     BY MR. NAPOLITANO:
23 Q.  If in February, March, and April of 2021 the
24 Phoenix field office was removing a large number of fewer
25 individuals during that time, but we only see here 17

**01:03:33-01:05:04** — Page 104

1 requests being made for preapproval -- and, you know,
2 perhaps there were more, but certainly by your numbers it
3 doesn't sound like that would add up to more than 150 in
4 50 days -- why were those removal numbers so low without
5 other priority removals being used to make up for the gap?
6     MR. GARDNER: Objection, vague.
7     THE WITNESS: I think that's somewhat
8 contradictory, sir.  I think the numbers would be, you
9 know, accounted for in the submissions.  And those
10 submissions aren't just those 17 cases that you have in
11 the exhibit.  It is other, it is the -- it would seem that
12 the priority cases would account for the rest of them.
13     Those other, or those priority cases at this
14 time do not come to the field office director for
15 approval.  They are, you know, they are preapproved since
16 they are priority cases to where they can go through the
17 cycle once the submission is entered into the AART.  So,
18 you know, those statistics that you have for the removals,
19 they should be, they should be, you know, included in the
20 database.
21     BY MR. NAPOLITANO:
22 Q.  Why would the number of priority cases, sorry,
23 other priority cases being submitted for preapproval be
24 this low during this time period?
25     MR. GARDNER: Objection, calls for speculation.

**01:05:36-01:06:59** — Page 105

1     THE WITNESS: There are a variety of factors.
2 As I mentioned early on, there was, there was, I guess,
3 hesitancy from the officers and some of the supervisors as
4 to, you know, what the priorities tactically include.
5     You know, after the priorities came out, we as a
6 field office, me as a field office director, had numerous
7 conversations with staff outlining what, what my
8 expectation was, what my interpretation of the priorities
9 were, and, you know, going through, you know, meetings and
10 stuff, empowering all levels of those law enforcement
11 officers to look and, you know, aggressively pursue cases
12 that they feel were other priority cases.  So it has been
13 an education.  It has been, you know, a learning moment
14 for them.  This is a change.  But, you know, there are a
15 lot of reasons.
16     BY MR. NAPOLITANO:
17 Q.  In those conversations did your officers express
18 to you hesitancy to request removal for cases that were
19 not part of the three priorities listed in the interim
20 guidance?
21 A.  Yes.  You know, there was, there was hesitancy.
22 There was confusion.  You know, the priorities are worded
23 in a way that there are different interpretations.  You
24 know, we had to work through that.  I had to work through
25 that as the acting field office director to instruct

Case 2:21-cv-00186-SRB   Document 101-1   Filed 07/12/21   Page 5 of 5
State of Arizona vs. United States Department of
Homeland Security // 2:21-cv-00186-SRB
Albert Edward Carter
May 14, 2021

**01:07:25-01:09:07** — Page 106

1  individuals as to what my interpretation was so that they
2  could, you know, enforce the mission per my direction.
3     So, you know, it is -- you know, there were some
4  instances to where the individuals didn't want to bring
5  any undue attention upon the field office for, you know,
6  going outside the priorities.  There was confusion as to
7  what the priorities were.  There are a variety of reasons.
8  And, you know, with change, any change, it is my job to
9  make sure that this field office is on comfortable ground
10 and to ensure that we work consistent with how we enforce
11 the law and the priorities as written.
12 Q. Did you ever instruct the officers to not submit
13 priority cases to you?
14 A. Absolutely not.
15 Q. And did officers feel that they needed to submit
16 for approval priority cases to you before removal?
17 A. I would say that the officers were very careful
18 as to what they submitted.  You know, again, the men and
19 women of the Phoenix field office want to do the best job
20 possible and within, you know, the guidance that's out
21 there.
22    You know, did they submit priority cases as
23 other priority cases?  Absolutely, due to, you know, lack
24 of, of not necessarily knowledge, but lack of
25 understanding what the interpretations were, you know, of

**01:09:27-01:11:25** — Page 107

1  the priorities.  So, you know, what you saw in that
2  exhibit, if I recall correctly, was that, you know, some
3  of them were rejected and asked to resubmit with, you
4  know, with a, more of an eye to the priorities.
5     So, you know, those were rejected because, from
6  a data-keeping standpoint, you know, I wanted to make sure
7  that each case was categorized under the appropriate
8  priority, understanding that there is a lot of attention
9  on the priorities and, you know, what that means.
10 Q. Okay.  Let's turn to some of the specific
11 requests.  Let's look at Exhibit 15.
12    Now, this is a table.  And the first individual
13 on that table is Iram Morales -- Enrique Morales-Parra.
14 A. Okay.
15 Q. Can you confirm that this table represents data
16 that was, was before the AART was implemented?
17 A. I can't confirm that, sir.  I don't know that I
18 have ever seen this specifically.
19    I can say that before the AART we, you know, we
20 did our best to keep track of the cases via a spreadsheet.
21 But I don't recall specifically seeing this particular
22 snapshot.
23 Q. Okay.  If you will look at column H, it says
24 date and time of action, February 22, 2021.  Would that be
25 dated before the AART?

**01:11:47-01:13:19** — Page 108

1  A. I believe so, but I don't recall the exact date
2  the AART rolled out.  There was a time after the AART
3  rolled out that there were system issues to where we were
4  still tracking those particular cases manually.
5  Q. Okay.
6  A. And unfortunately I can't tell you if it is
7  pre-2/22 or post.
8  Q. And you will see that this first individual on
9  the first row is listed as an other priority case, is that
10 correct?
11 A. Yes, sir.
12 Q. And that that approval was given, is that
13 correct?
14 A. Yes, sir, it was.
15 Q. Okay.  And can we confirm that the other
16 individuals listed on this sheet were listed as one of the
17 priority categories under the interim guidance so it did
18 not need preapproval?  Is that correct?
19 A. Again, sir, I don't know when, at what point
20 each iteration of the updates of the AART were submitted.
21 The spreadsheet itself, under column M, would imply that
22 the dates at which these were entered, the priority cases
23 were still required to be approved.  But, you know, these
24 reflect that FOD approval was needed and that FOD approval
25 was granted one way or another.

**01:13:40-01:14:57** — Page 109

1  Q. Okay.  But the only other priority on this sheet
2  is for Morales-Parra, is that correct?
3  A. I would say that's an accurate representation,
4  yes, sir.
5  Q. All right, thank you.
6     All right.  Let's turn to Exhibit 16.
7  A. Just so you guys know, I am having some
8  technical problems.  I can't move from screen to screen.
9  So just be aware.
10 Q. Okay.  If you need extra time or anything, just
11 let me know.
12 A. Okay.  I have got it pulled up, though.
13 Q. Okay.  So this is another tracking spreadsheet.
14 And there are two individuals here.  And they are
15 Gutierrez-Yepiz, Adrian, and Cruz Reyes-Aristides.  So we
16 are looking at those two individuals' records.
17 A. Okay.  Which one was the first one?
18 Q. Gutierrez is the first one.
19 A. Yep.
20 Q. And --
21 A. Okay.
22 Q. And the second was Reyes.
23 A. Okay.
24 Q. And so if you scroll across, these are the only
25 individuals on this sheet who are listed as other